# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PFLAG, INC.,
1625 K St. NW, Suite 700,
Washington, DC 20006;

AMERICAN ASSOCIATION OF PHYSICIANS
FOR HUMAN RIGHTS, INC. d/b/a
GLMA: HEALTH PROFESSIONALS
ADVANCING LGBTQ+ EQUALITY,
1629 K St. NW, Suite 300,
Washington, DC 20006;

GABE GOE, by and through his parent and next
friend George Goe (Montgomery County);

GEORGE GOE (Montgomery County);

BELLA BOE, by and through her parent and next
friend Bruce Boe;

BRUCE BOE;

CAMERON COE, by and through their parent and
next friend CLAIRE COE;

CLAIRE COE;

ROBERT ROE, by and through his parent and next
friend Rachel Roe;

RACHEL ROE;

LAWRENCE LOE; and

DYLAN DOE,

   *Plaintiffs*,

     v.

DONALD J. TRUMP, in his official capacity as
President of the United States,
1600 Pennsylvania Ave. NW
Washington, DC 20220;

Civil Action No.  BAH-25-337

**AMENDED COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

\* Plaintiffs have filed a motion to waive the requirement under Local Rule 102.2(a) to provide their addresses and to permit Plaintiffs Gabe Goe, George Goe, Bella Boe, Bruce Boe, Cameron Coe, Claire Coe, Robert Roe, Rachel Roe, Lawrence Loe, and Dylan Doe to proceed under pseudonyms.

U.S. DEPARTMENT OF HEALTH AND HUMAN
SERVICES,
200 Independence Ave. SW
Washington, DC 20201;

DOROTHY A. FINK, in her official capacity as
Acting Secretary of the U.S. Department of Health
and Human Services,
200 Independence Ave. SW
Washington, DC 20201;

HEALTH RESOURCES AND SERVICES
ADMINISTRATION,
5600 Fishers Lane
Rockville, MD 20857 (Montgomery County);

DIANA ESPINOSA, in her official capacity as
Principal Deputy Administrator of the Health
Resources and Services Administration,
5600 Fishers Lane
Rockville, MD 20857 (Montgomery County);

NATIONAL INSTITUTES OF HEALTH,
9000 Rockville Pike
Bethesda, MD 20892 (Montgomery County);

MATTHEW J. MEMOLI, in his official capacity as
Acting NIH Director,
9000 Rockville Pike
Bethesda, MD 20892 (Montgomery County);

NATIONAL SCIENCE FOUNDATION,
2415 Eisenhower Avenue
Alexandria, VA 22314; and

SETHURAMAN PANCHANATHAN, in his official
capacity as Director of the National Science
Foundation,
2415 Eisenhower Avenue
Alexandria, VA 22314;

   *Defendants*.

Plaintiffs, by and through their attorneys, bring this Complaint against Defendants and in support state the following:

## INTRODUCTION

1.      Over the past week, hospitals across the country have abruptly halted medical care for transgender people under nineteen, cancelling appointments and turning away some patients who have waited years to receive medically necessary care for gender dysphoria.  This sudden shut-down in care was the direct and immediate result of an Executive Order that President Trump issued on January 28, 2025—*Protecting Children from Chemical and Surgical Mutilation*—directing all federal agencies to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end" gender affirming medical care for people under nineteen (the "Denial of Care Order").[1]

2.      The Denial of Care Order, directing that federal funding be immediately revoked from entities that provide gender affirming medical care for patients under nineteen years old, follows on the heels of an earlier Executive Order that President Trump issued on January 20, 2025—*Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (the "Gender Identity Order").[2] The Gender Identity Order declares that gender identity is a "false" idea and commands that federal funds "shall not be used to promote gender ideology."

3.      The Executive Orders were issued for the openly discriminatory purpose of preventing transgender people from expressing a gender identity different from their sex

---

[1] Exec. Order No. 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8,771 (Jan. 28, 2025).

[2] Exec. Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615 (Jan. 20, 2025).

designated at birth—and expressing governmental disapproval of transgender people who, by definition, have a gender identity that does not align with their sex designated at birth. These Orders are part of a government-wide effort by the Trump Administration to restrict legal protections and essential services for the transgender community.

4.      Plaintiffs Gabe Goe, Bella Boe, Cameron Coe, and Robert Roe (the "Minor Plaintiffs"), Plaintiffs Lawrence Loe and Dylan Doe (the "Adult Plaintiffs"), and certain PFLAG members are transgender people under the age of nineteen who have been thriving because they have had access to medically necessary treatment for their gender dysphoria (collectively, the "Transgender Plaintiffs"). President Donald Trump, through the Denial of Care and Gender Identity Orders, unilaterally seeks to terminate access to this health care immediately by directing agencies to withhold funding from entities that "promote gender ideology" or provide medical care to transgender people under nineteen for the purpose of gender transition.

5.      These Executive Orders are unlawful and unconstitutional. Under our Constitution, it is Congress, not the President, who is vested with the power of the purse. The President does not have unilateral power to withhold federal funds that have been previously authorized by Congress and signed into law, and the President does not have the power to impose his own conditions on the use of funds when Congress has not delegated to him the power to do so.

6.      The Executive Orders unconstitutionally usurp congressional authority by withholding lawfully appropriated federal funds from medical institutions, providers, and researchers, such as GLMA's health professional members. They violate the rights of thousands of transgender people under nineteen, including the Transgender Plaintiffs, by depriving them of necessary medical care solely on the basis of their sex and transgender status. They also infringe upon parents' fundamental rights, including the rights of Plaintiffs George Goe, Bruce Boe, Claire

Coe, and Rachel Roe (the "Parent Plaintiffs") and parent members of PFLAG, by overriding the aligned judgment of parents, adolescents, and their doctors regarding necessary medical care.

7.    President Trump's directives to cut off funding have had concrete and immediate effects.  Hospitals across the country, including those that have provided medical care to the Transgender Plaintiffs, have ended the provision of ongoing and essential gender affirming medical care to transgender patients under nineteen because of the Executive Orders.[3]

8.    A few days after the Executive Orders were issued, Defendant Health Resources and Services Administration ("HRSA") sent notices to grant recipients that HRSA grant funds may not be used for activities that "do not align with" the Executive Orders and any "vestige, remnant, or re-named piece of any programs in conflict with these E.O.s are terminated in whole or in part." So did   the Centers for Disease Control and Prevention ("CDC"), one of the subagencies of Defendant U.S. Department of Health and Human Services ("HHS").

9.    When the President usurps congressional authority and infringes on the constitutional rights of individuals, the essential role of the courts is to "say what the law is."  The Executive Orders should be declared unlawful, and the agency defendants should be enjoined from enforcing or implementing them.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as this action arises under the laws of the United States and the United States Constitution; 28 U.S.C. § 1346, as a civil action against the United States founded upon the Constitution, an Act of Congress, or an executive

---

[3] News Release, *President Trump is Delivering on His Commitment to Protect Our Kids*, THE WHITE HOUSE (Feb. 3, 2025),    https://www.whitehouse.gov/uncategorized/2025/02/president-trump-is-delivering-on-his-commitment-to-protect-our-kids/.

regulation; and 28 U.S.C. § 1361, as an action to compel an officer or employee of the United States or an agency to perform a duty owed to the plaintiff.

11.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

12.     Venue is proper under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1) because each defendant is an agency of the United States or an officer of the United States sued in their official capacity; Defendant HRSA and Defendant National Institutes of Health ("NIH") reside in Montgomery County, Maryland; Plaintiffs Gabe and George Goe reside in Montgomery County, Maryland; and a substantial part of the events or omissions giving rise to this action occurred and continue to occur in this district because Gabe and George Goe reside in this district and Defendants HRSA and NIH are among the federal agencies that have been instructed to withhold grants and because Defendant HRSA has already taken action to do so.

**PARTIES**

A.     **Plaintiffs**

    1.     **The Member Organization Plaintiffs**

13.     Plaintiff PFLAG, Inc. ("PFLAG") is a 501(c)(3) national membership nonprofit organization based in Washington, D.C. and incorporated in California. PFLAG is the first and largest organization dedicated to supporting, educating, and advocating for lesbian, gay, bisexual, transgender, and queer ("LGBTQ+") people, their parents and families, and allies. People become PFLAG members by joining the national organization directly or through one of its nearly 350 local chapters throughout the United States. PFLAG has more than 550,000 members and supporters nationwide, including many families of transgender youth who currently receive or will soon need to access the medical treatment for gender dysphoria that the Executive Orders seek to

4

prohibit. PFLAG's mission is to create a caring, just, and affirming world for LGBTQ+ people and those who love them. Encouraging and supporting parents and families of transgender and gender non-conforming people in affirming and loving their children and helping them access the supports and care they need is central to PFLAG's mission. PFLAG brings its claims on behalf of its members. The Transgender Plaintiffs and Parent Plaintiffs are members of PFLAG.

14.     Plaintiff American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ+ Equality ("GLMA") is a 501(c)(3) national nonprofit membership organization based in Washington, D.C. and incorporated in California. GLMA's mission is to ensure health equity for LGBTQ+ people and equality for LGBTQ+ health professionals in their work and learning environments. GLMA's membership includes approximately 1,000 member physicians, nurses, advanced practice nurses, physician assistants, researchers and academics, behavioral health specialists, health-profession students, and other health professionals throughout the country. Their practices represent the major healthcare disciplines and a wide range of health specialties, including primary care, internal medicine, family practice, psychiatry, pediatrics, obstetrics/gynecology, emergency medicine, neurology, and infectious diseases. GLMA asserts its claims in this lawsuit on behalf of its members, including health professional members who work at medical institutions receiving grant funding from Defendants HRSA and NIH, as well as other subagencies of Defendant HHS.

**2.     The Individual Plaintiffs and Their Families**

**a.     The Goe Family**

15.     Plaintiffs Gabe and George Goe live in Bethesda, Maryland. George is the father of Gabe, his fourteen-year-old son. The Goe family are members of PFLAG.

16.     Gabe is transgender and was scheduled to receive medically necessary care that the Executive Orders prohibit.

### b.    The Boe Family

17.    Plaintiffs Bruce Boe and Bella Boe live in New York.  Bruce is the father of Bella, his twelve-year-old daughter.  The Boe family are members of PFLAG.

18.    Bella is transgender and was scheduled to receive medically necessary care that the Executive Orders prohibit.

### c.    The Coe Family

19.    Plaintiffs Cameron and Claire Coe live in New York.  Claire is the mother of Cameron, who is twelve years old.  The Coe family are members of PFLAG.

20.    Cameron is non-binary, is receiving, and was scheduled to receive medically necessary care that the Executive Orders prohibit.

### d.    The Roe Family

21.    Plaintiffs Rachel and Robert Roe live in Massachusetts.  Rachel is the mother of Robert, her sixteen-year-old son.  The Roe family are members of PFLAG.

22.    Robert is transgender and is receiving medically necessary care that the Executive Orders prohibit.

### e.    Lawrence Loe

23.    Plaintiff Lawrence Loe is eighteen years old and lives in New York.  He is a member of PFLAG.

24.    Lawrence is transgender, is receiving, and was scheduled to receive medically necessary care that the Executive Orders prohibit.

### f.    Dylan Doe

25.    Plaintiff Dylan Doe lives in Massachusetts.  He is eighteen years old.  He is a member of PFLAG.

26.    Dylan is transgender, is receiving, and was scheduled to receive medically necessary care that the Executive Orders prohibit.

**B.    Defendants**

27.    Defendant Donald J. Trump is the President of the United States. He is responsible for the actions and decisions that Plaintiffs challenge in this action. He is sued in his official capacity.

28.    Defendant U.S. Department of Health and Human Services ("HHS") is a cabinet department of the federal government. HHS is an "agency" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1). Multiple subagencies, offices, and entities of HHS provide grants and funding to healthcare providers and medical institutions. In addition to Defendant HRSA and Defendant NIH, these HHS components include, but are not limited to the CDC, the Agency for Healthcare Research and Quality ("AHRQ"), the Substance Abuse and Mental Health Services Administration ("SAMHSA"), and the Administration for Children and Families ("ACF"). HHS also allots Preventive Health and Health Services Block Grants under the Public Health Service Act ("PHSA").

29.    Defendant Dorothy A. Fink is the Acting Secretary of HHS. She is sued in her official capacity. Acting Secretary Fink is responsible for all aspects of the operation and management of HHS, implementing and fulfilling HHS's duties under the United States Constitution and statutory law.

30.    Defendant Health Resources and Services Administration ("HRSA") is an agency of HHS located in Rockville, Maryland. It provides financial support to healthcare providers in the United States through grants to those providers.

31.      Defendant Diana Espinosa is the Principal Deputy Administrator of HRSA.  She is sued in her official capacity.  As Principal Deputy, Defendant Espinosa oversees the design and implementation of HRSA's programs and grants.

32.      Defendant National Institutes of Health ("NIH") is a part of HHS and is the nation's medical research agency and the largest public funder of biomedical research in the world. It is located in Bethesda, Maryland.  NIH offers funding for many types of grants, contracts, and even programs that help repay loans for researchers.

33.      Defendant Matthew J. Memoli is the Acting NIH Director.  He is sued in his official capacity.  He is responsible for setting policy for NIH and for planning, managing, and coordinating the programs and activities of all NIH components, as well as overseeing the overall direction of the agency's activities, and identifying needs and opportunities for NIH.

34.      Defendant National Science Foundation ("NSF") is an independent federal agency that supports research and education in fields of science and engineering through research and education grants, including to medical institutions in which Transgender Plaintiffs receive gender affirming medical care.

35.      Defendant Sethuraman Panchanathan is the Director of the NSF.  He is sued in his official capacity.

36.      Defendants HHS, Acting HHS Secretary Fink, HRSA, HRSA Principal Deputy Espinosa, NIH, Acting NIH Director Memoli, NSF, and NSF Director Panchanathan are referred to collectively as the "Agency Defendants."

**FACTUAL ALLEGATIONS**

A.    **Medical Guidelines for Treating Gender Dysphoria**

37.      Doctors in hospitals and other medical facilities that receive federal funding have long followed and continue to use evidence-based, well-researched, and widely accepted clinical

practice and medical guidelines to assess, diagnose, and treat adolescents and adults with gender dysphoria, which is a medical condition characterized by the clinically significant distress caused by the incongruence between a person's gender identity and the sex they were assigned at birth.

38.    Decades of clinical experience and a large body of scientific and medical literature support these medical guidelines, which are recognized as authoritative by the major medical associations in the United States.  These guidelines provide a framework for the safe and effective treatment of gender dysphoria, which, if left untreated, can have serious consequences for the health and wellbeing of transgender people, including adolescents.  For some adolescent patients with gender dysphoria, puberty-delaying treatment and hormone therapy are medically indicated.

39.    Gender identity refers to a person's internal sense of belonging to a particular gender.  Everyone has a gender identity, and a person's gender identity is durable and cannot be altered voluntarily or changed through medical intervention.

40.    A person's gender identity usually matches the sex they were designated at birth based on their external genitalia.[4]

41.    Most boys are designated male at birth based on their external genital anatomy, and most girls are designated female at birth based on their external genital anatomy.

42.    But transgender people have a gender identity that differs from their sex designated at birth.  A transgender boy is someone who was designated a female sex at birth but has a male gender identity.  A transgender girl is someone who was designated a male sex at birth but has a female gender identity.  A transgender boy cannot simply turn off his gender identity like a switch, just as a non-transgender (also known as "cisgender") boy cannot turn off his gender identity.

---

[4] The terms "sex designated at birth" or "sex assigned at birth" are more precise than the term "biological sex" because there are many biological sex characteristics, and they do not always align with each other.

9

43.     The health and wellbeing of all people, including those who are transgender, depends on their ability to live in a manner consistent with their gender identity.   The process by which transgender or nonbinary people begin to live in a manner consistent with their gender identity is known as "social transition."   This can include using a new name, pronouns that correspond to a person's gender identity, and adopting dress or grooming styles that more authentically reflect a person's gender.   For transgender people, the incongruence between their gender identity and sex assigned at birth can cause clinically significant distress.

44.     According to the American Psychiatric Association's *Diagnostic & Statistical Manual of Mental Disorders, Fifth Edition, Text Revision* ("DSM-5-TR"), "gender dysphoria" is the diagnostic term for the condition experienced by some transgender people of clinically significant distress resulting from the lack of congruence between their gender identity and the sex assigned to them at birth.   To be diagnosed with gender dysphoria, the incongruence must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.[5]

45.     Gender dysphoria is a serious medical condition.[6] Treatment for gender dysphoria aims to resolve the distress associated with the incongruence between a transgender person's assigned sex at birth and their gender identity.

46.     If left untreated, gender dysphoria can result in negative mental health outcomes, including severe anxiety and depression, post-traumatic stress disorder, eating disorders, substance abuse, self-harm, and suicidality.

---

[5] Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, Text Revision F64.0 (5th ed. 2022).

[6] *See* Eric Yarbrough et al., Am. Psych. Ass'n, *Gender Dysphoria Diagnosis*, *in* A GUIDE FOR WORKING WITH TRANSGENDER AND GENDER NONCONFORMING PATIENTS (2017).

47.     For many transgender adolescents, the onset of puberty leading to physical changes in their bodies that are incongruent with their gender identities can cause extreme distress. Puberty-delaying medication allows transgender adolescents to pause these changes, thereby minimizing and potentially preventing the heightened gender dysphoria caused by the development of secondary sex characteristics incongruent with their gender identity. Without puberty-delaying medication, an adolescent will undergo changes to their body that may be difficult or impossible to later reverse.

48.     Puberty-delaying treatment is temporary. If an adolescent discontinues the medication, endogenous puberty resumes. Puberty-delaying treatment does not cause infertility.

49.     For some older adolescents and young adults, it may be medically necessary and appropriate to treat them with gender affirming hormone therapy (e.g., testosterone for transgender boys and estrogen and testosterone suppression for transgender girls).

50.     Gender affirming hormone therapy does not necessarily result in a loss of fertility, and many individuals treated with hormone therapy can still biologically conceive children.

51.     As with all medications that could affect fertility, transgender patients—and their parents, in the case of adolescent patients—are counseled on the potential risks of the medical intervention, and treatment is only initiated where patients are properly informed and consent/assent to the care.

52.     Adolescents and young adults who first receive treatment later in puberty and are treated only with gender affirming hormone therapy (and not puberty-delaying treatment) also go through a hormonal puberty consistent with their gender identity. However, they will have undergone physical changes associated with their endogenous puberty that may not be wholly reversed by hormone therapy or even surgery later in life.

53.    Some older adolescents and young adults also may receive chest surgeries, provided they are medically indicated in accordance with established clinical practice guidelines.

54.    Medical treatment recommended for and provided to transgender young people with gender dysphoria can substantially reduce lifelong gender dysphoria and eliminate the medical need for some surgeries or other medical interventions later in life.

55.    Providing gender affirming medical care can be lifesaving treatment and positively change the short- and long-term health outcomes for transgender adolescents.

56.    The treatments used to treat gender dysphoria are also used to treat other conditions. in both adolescents and adults.  For example, puberty-delaying medication is used to treat children with central precocious puberty and is used to treat adolescents and adults with hormone-sensitive cancers and endometriosis.  For delayed puberty, non-transgender boys are prescribed testosterone and non-transgender girls are prescribed estrogen.  Testosterone suppression is also used in non-transgender girls with Polycystic Ovarian Syndrome to reduce some symptoms of the condition, including excess facial hair.   And chest surgery is often used to treat gynecomastia in non-transgender adolescents and young adults.

57.    The potential risks associated with these medical interventions when used to treat gender dysphoria are comparable to the risks associated with many other medical treatments to which parents routinely consent on behalf of their children—and that the Executive Orders permit.

58.    The Executive Orders do not prohibit these treatments when used to treat any condition other than gender dysphoria, even though the treatments have comparable risks and side effects to those that can be present when treating gender dysphoria.  The use of these treatments for gender dysphoria is not any riskier than for other conditions and diagnoses for which the same treatments are regularly used.

**B.      The Executive Orders**

**1.      The Gender Identity Order**

59.      On January 20, 2025, President Trump issued the Gender Identity Order.

60.      Section 2 of the Gender Identity Order declares: "It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality."

61.      Section 2(a) defines "sex" to mean "an individual's immutable biological classification as either male or female," which is "not a synonym for and does not include the concept of 'gender identity.'" Section 2(d) defines "female" as "a person belonging, at conception, to the sex that produces the large reproductive cell," and Section 2(e) defines "male" as "a person belonging, at conception, to the sex that produces the small reproductive cell."

62.      Section 2(f) claims that "'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." It further asserts that "[g]ender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body."

63.      Section 2(g) states that "'[g]ender identity' reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex."

64.      To achieve the objective of eradicating "gender ideology," Section 3(g) of the Executive Order declares: "Federal funds shall not be used to promote gender ideology." President

Trump directs that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology."

### 2.    The Denial of Care Order

65.    On January 28, 2025, President Trump issued the Denial of Care Order, which builds on the Gender Identity Order.

66.    Section 1 declares that "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures."

67.    Section 2 defines "'child' or 'children'" to mean "an individual or individuals under 19 years of age," and it defines "pediatric" as "relating to the medical care of a child."

68.    Section 2 defines the phrase "chemical and surgical mutilation" to mean "the use of puberty blockers . . . to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones . . . to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions."

69.    To eradicate access to health care provided for the purpose of gender transition, Section 4 of the Denial of Care Order directs the immediate defunding of medical institutions that provide such treatments. Importantly, the funding instructed to be stripped is not limited to grants used for or related to gender affirming medical care for the purpose of gender transition. President Trump unilaterally directs that <u>all</u> federal medical and research grants be stripped from medical

institutions, medical schools and hospitals, that provide medically necessary gender affirming medical care to patients under nineteen for the purpose of gender transition, regardless of whether the funds are used for or related to such care.

70.    In Section 4 of the Denial of Care Order, President Trump commands: "The head of each executive department or agency (agency) that provides research or education grants to medical institutions, including medical schools and hospitals, shall, consistent with applicable law and in coordination with the Director of the Office of Management and Budget, immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children."

71.    Critically, the Gender Identity and Denial of Care Orders do not seek to prohibit federal funding to entities that provide these treatments for all medical conditions; rather, they prohibit federal funding to entities only when the gender affirming medical care is for the purpose of gender transition—that is, to align a patient's gender presentation with an identity different from their sex assigned at birth.

## C.    The Executive Orders Are Part of a Systematic Effort Targeting Transgender People

72.    The Gender Identity and Denial of Care Orders are part of a broad and sweeping attack President Trump has launched against "gender ideology" and transgender people through a series of discriminatory Executive Orders.  In his first nine full days in office, President Trump signed nine Executive Orders targeting gender identity and transgender people—a rate of approximately one per day.  These orders span military service, health care, education, and employment, part of a systematic and expressly discriminatory attack on gender identity and transgender people.

73.     On his first day in office, President Trump issued Executive Order 14,148, rescinding several Biden Administration Executive Orders that provided protections for transgender people (the "Rescission Order").[7]

74.     President Trump then issued Executive Order 14,183, banning transgender people from serving in the military, and revoked Executive Order 14,004, which had allowed all qualified persons to serve in the military.[8]  As justification, President Trump declared that "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service" and "is not consistent with the humility and selflessness required of a service member."  The language in Executive Order 14,183, on its face, expressly and unequivocally evidences President Trump's discriminatory animus toward transgender people.

75.     President Trump has acted to discriminate against transgender people in other contexts as well.  For example, Executive Order 14,170 forbids government employers from considering gender identity in the hiring process,[9] and Executive Order 14,190 eliminates federal funding for K-12 schools that "directly or indirectly support" the "instruction, advancement, or promotion" of "gender ideology" in their curricula for students or in training materials for instructors.[10]  It also goes beyond the Denial of Care and Gender Identity Orders to prohibit the use of federal funds "to directly or indirectly support or subsidize the social transition of a minor student."  "Social transition" is defined as "the process of adopting a 'gender identity' or 'gender marker' that differs from a person's sex."

---

[7] Exec. Order No. 14,148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025).

[8] Exec. Order No. 14,183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025).

[9] Exec. Order No. 14,170, Reforming the Federal Hiring Process and Restoring Merit to Government Service, Fed. Reg. 8621 (Jan. 20, 2025).

[10] Exec. Order No. 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025).

76.     In addition, federal agencies like the CDC, a subagency of Defendant HHS, have been instructed to remove references to or mentions of terms such as "gender," "transgender," "LGBT," "transsexual," and "non-binary," among others.[11]

**D.    The Impact of the Executive Orders on Medical Care and Harm to Public Health**

77.     The Denial of Care and Gender Identity Orders have had direct and immediate effects on the provision of medical care to transgender people under nineteen.

78.     Medical institutions across the United States that receive federal funding have stopped providing gender affirming medical care for patients younger than nineteen because of the Executive Orders.[12]

79.     Hospitals and other healthcare institutions fear that if they do not stop providing gender affirming medical care to their transgender patients, they will immediately lose significant federal funding for research, medical education, and health care, including research and care unrelated to the provision of treatment of gender dysphoria, and also face lawsuits from the Justice Department.

80.     These fears are exacerbated by the fact that immediately after taking office, the Trump Administration, through the Office of Management and Budget, cut off all federal funds without warning or further administrative process. Two federal lawsuits, two temporary restraining orders, and now an order granting a motion to enforce one of the TROs have been required to stop this unilateral executive action.

---

[11] Jeremy Faust, *CDC Orders Mass Retraction and Revision of Submitted Research Across All Science and Medicine Journals. Banned Terms Must Be Scrubbed*, INSIDE MED. (Feb. 1, 2025), https://insidemedicine.substack.com/p/breaking-news-cdc-orders-mass-retraction.

[12] Carla K. Johnson, et al., *Denver Health is Pausing Gender-Affirming Care to Comply with Trump Executive Order*, CPR NEWS (Jan. 31, 2025), https://www.cpr.org/2025/01/31/denver-health-pauses-gender-affirming-care/; Jenna Portnoy, *After Trump Order, Hospitals Suspend Some Health Care for Trans Youths*, WASH. POST (Jan. 31, 2025), https://www.washingtonpost.com/dc-md-va/2025/01/31/trans-children-trump-hormones-healthcare/.

81.     Agency Defendants have already taken action to enforce the Gender Identity and Denial of Care Orders. Defendant HRSA issued notices to grant recipients that HRSA grant funds may not be used for activities that "do not align with" the Executive Orders and any "vestige, remnant, or re-named piece of any programs in conflict with these E.O.s are terminated in whole or in part."

82.     CDC similarly issued notices to grant recipients ordering them to "immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity." (Emphasis added.)

83.     Children's National in Washington, D.C., which provides care to Minor Plaintiff Gabe Goe, receives 70% of its research funding from federal agencies, including 60% from Defendant NIH.  In fiscal year 2023, Children's National received $69.6 million in funding from Defendant NIH and $8.7 million from Defendant HRSA.

84.     On January 30, 2025, two days after the issuance of the Denial of Care Order, Children's National announced that it is pausing its provision of puberty blockers and hormone therapy prescriptions for transgender youth, citing "the guidelines in the Executive Order."[13] That same day, Minor Plaintiff Gabe Goe was informed that Children's National was no longer issuing new prescriptions or processing refills on existing prescriptions for gender affirming medical care for people under nineteen.  Gabe thus would not be able to start hormone therapy as planned.

85.     Virginia Commonwealth University ("VCU") Health and Children's Hospital of Richmond in Richmond, Virginia receives federal funding, including nearly $7.3 million in grants from Defendant HRSA and nearly $107 million in grants from Defendant NIH in fiscal year 2023.

---

[13] *Children's National Hospital Statement on Executive Order* (Jan. 30, 2025), https://www.childrensnational.org/about-us/newsroom/2025/statement-on-executive-order.

86.    UVA Health in Charlottesville, Virginia receives federal funding, including more than $200 million in grants from Defendant NIH in fiscal year 2023.

87.    On January 28, 2025, the Attorney General of Virginia Jason Miyares sent a letter to the University of Virginia and Virginia Commonwealth University advising that the Denial of Care Order "directs federal agencies to immediately ensure that medical institutions that receive federal research or education grants end chemical and surgical mutilation of children." He warned that "any hospital or other institution, including agencies of the Commonwealth, that continues to perform chemical and surgical mutilation of children is at risk of losing such grants," and noted that "the grants are not just limited to those related to this subject matter, but could apply to all medical and research grants from federal agencies."[14]

88.    In "response to" the Denial of Care Order and the Attorney General's letter, VCU Health and Children's Hospital of Richmond announced they were suspending gender affirming medical care for patients under nineteen.[15] As a result, on January 29, 2025, hours before a PFLAG transgender adolescent member's scheduled appointment to meet with a doctor at the clinic to continue her hormone treatment for gender dysphoria, VCU Health informed her that her appointment was cancelled.

89.    UVA Health also immediately suspended all gender affirming medical care for patients under nineteen in "response to" the Denial of Care Order and the Attorney General's letter.[16]

---

[14] Letter from Jason Miyares, Attorney General of Virginia, to the University of Virginia and Virginia Commonwealth University (Jan. 28, 2025).

[15] *Transgender*, CHILDREN'S HOSP. OF RICHMOND AT VCU (Feb. 1, 2025), https://www.chrichmond.org/services/transgender/.

[16] *Gender Health Services Impacted by Executive Order*, UVA HEALTH, https://childrens.uvahealth.com/services/transgender-youth-health (last visited Feb. 1, 2025).

90.     NYU Langone Health in New York City, New York, which provides care to Minor Plaintiff Cameron Coe, Minor Plaintiff Bella Boe, and Adult Plaintiff Lawrence Loe, receives federal funding, including $5.6 million in grants from Defendants HRSA and NIH in the last twelve months.

91.     Following the issuance of the Denial of Care Order, NYU Langone Health began cancelling appointments for medical care for transgender patients under nineteen.  The day after the Denial of Care Order was issued, NYU Langone informed Minor Plaintiff Cameron Coe that their appointment to receive a puberty blocking implant was cancelled, told Minor Plaintiff Bella Boe that NYU would not be able to schedule Bella's appointment to receive a puberty blocking implant, and informed Adult Plaintiff Lawrence Loe that his gender affirming surgery scheduled for the next week was cancelled.

92.     An NYU doctor said that this denial of care was due to "the new administration." Another employee said the medical team was "awaiting more guidance" before providing care. [17]

93.     Boston Children's Hospital in Boston, Massachusetts, which provides care to Minor Plaintiff Robert Roe, receives federal funding, including more than $27.5 million in grants from Defendant HRSA  and more than $245 million in grants from Defendant NIH in fiscal year 2023, and nearly $1.2 million from NSF.

94.     Following the issuance of the Denial of Care Order, Boston Children's Hospital cancelled its immediate appointments with transgender patients under nineteen.  Minor Plaintiff Robert Roe's routine hormone therapy checkup set for January 29, 2025 was cancelled.

---

[17] Joseph Goldstein, *N.Y. Hospital Stops Treating 2 Children After Trump's Trans Care Order*, N.Y. TIMES (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/nyregion/nyu-langone-hospital-trans-care-youth.html.

95.     Denver Health in Denver, Colorado received more than $25 million in grants from Defendant HRSA and more than $700,000 in grants from Defendant NIH in fiscal year 2023.

96.     Denver Health has stopped providing gender affirming medical care to patients under nineteen in response to the Denial of Care Order.  In a statement, Denver Health acknowledged that the Order would lead to "increased risk of depression, anxiety, and suicidality" among transgender adolescents.  However, it is concerned about the "criminal and financial consequences for those who do not comply [with the Denial of Care Order]," including the loss of participation in federal programs administered by HHS that "represent a significant portion of Denver Health's funding."  The statement asserted: "The loss of this funding would critically impair [Denver Health's] ability to provide care for the Denver community."[18]

97.     Children's Hospital Colorado receives federal funding, including $9.75 million from Defendant HRSA and $50,000 from Defendant NIH during fiscal year 2023.

98.     Children's Hospital Colorado has stopped providing gender affirming medical care to patients under nineteen in response to the Denial of Care Order.[19]  Children's Hospital Colorado issued a statement on February 5, 2025 that "[t]he executive order threatens Children's Hospital Colorado's ability to provide care for the many children who rely on [them]" and "Children's Colorado will transition its model of gender affirming care" to no longer provide medical treatments for gender dysphoria to patients under 19.  The statement acknowledged "the grief and anxiety that these changes will bring for the patients and families who have shown unwavering dedication and commitment to supporting children in embracing their true selves."

---

[18] Melissa Reeves & Jaleesa Irizarry, *UCHealth and Denver Health Pause Gender-Affirming Care for Trans Youth*, 9NEWS (Jan. 31, 2025), https://www.9news.com/article/news/local/local-politics/denver-health-pauses-gender-affirming-surgeries-minors-federal-funding/73-e61f598b-e32d-474e-94b4-4b11d4c5c8af.

[19] John Daley, *Children's Hospital Colorado suspends gender affirming treatment, following White House executive order*, CPR News (Fe. 5, 2025), https://www.cpr.org/2025/02/05/childrens-hospital-colorado-suspends-gender-affirming-treatment-following-white-house-executive-order/.

99.     Other hospitals have responded to the Orders by continuing to provide medical care to existing patients but refusing to provide gender affirming medical care to new ones.  Children's Hospital Los Angeles ("CHLA") has paused the initiation of hormone therapy for transgender patients under 19 but is allowing existing patients receiving hormone therapy to continue their course of care.[20] CHLA receives federal funding, including $33.5 million from Defendant NIH, $21 million from Defendant HRSA in fiscal year 2023. Corewell Health in Michigan is not beginning any new hormone therapy.[21] Corewell Health receives federal funding, including $2.1 million from Defendant NIH and $1.2 million from Defendant HRSA in fiscal year 2023.

100.    As demonstrated, the Denial of Care and Gender Identity Executive Orders have directly forced medical institutions across the United States to suspend providing critical medical care to their transgender patients under nineteen out of fear that they will lose all federal funding upon which they rely to provide care to their surrounding communities.

101.    On February 3, 2025, the White House issued a press release touting the broad and immediate effects of the Denial of Care Order, stating:  "It's already having its intended effect – preventing children from being maimed and sterilized by adults perpetuating a radical, false claim that they can somehow change a child's sex.  Hospitals around the country are taking action to downsize or eliminate their so-called 'gender-affirming care' programs."[22]

102.    By directing agencies to withhold <u>all</u> federal funding from entities that "promote gender ideology" and provide gender affirming medical care to patients under nineteen, the Gender

---

[20] Emily Alpert Reyes, *Children's Hospital LA Stops Initiating Hormonal Therapy for Transgender Patients Under 19*, L.A. Times (Feb. 4, 2025), https://www.latimes.com/california/story/2025-02-04/childrens-hospital-to-stop-initiating-hormonal-therapy-for-trans-patients-under-19

[21] Georgea Kovanis, *Corwell Becomes First Michiagan Health System to Limit Gender-Affirming Care for Minors*, Detroit Free Press (Feb. 7, 2025), https://www.freep.com/story/news/health/2025/02/07/transgender-minors-michigan-corewell-beaumont-trump/78307419007/

[22] News Release, *supra* note 3.

Identity and Denial of Care Orders threaten the ability of medical institutions and healthcare providers throughout the U.S. to provide essential health care to their communities, train the next generation of physicians, and support research to address this country's greatest health challenges.

**E.    The Harm of the Executive Orders to the Individual Plaintiffs**

**1.    The Goe Family**

103.    Gabe Goe is fourteen years old and lives in Maryland with his family. He is creative and kind.

104.    Gabe is transgender. He is a boy with a male gender identity, but when he was born, he was designated as female. Gabe has been loved and supported by his family, school, and community since he socially transitioned when he was twelve.

105.    Gabe has been diagnosed with gender dysphoria. Gabe and his family have worked with a multi-disciplinary team at Children's National Hospital in Washington, D.C., including an endocrinologist and a psychologist, to identify appropriate medical treatment for his gender dysphoria, including starting testosterone.

106.    In November 2024, after extensively discussing the risks and benefits with the endocrinologist, along with the requirement for blood testing and psychologist's letter of support, Gabe's family scheduled an appointment for March 2025 to start testosterone.

107.    On January 30, 2025, after the President signed the Denial of Care Order, the psychologist at Children's National told George that because of the Denial of Care Order, she could finish Gabe's evaluation after another appointment, but Children's National was no longer issuing new prescriptions or processing refills on existing prescriptions for gender affirming medical care for people under nineteen. Gabe would not be able to start testosterone as planned.

108.    Gabe has been looking forward to this part of his transition. Treating his gender dysphoria by starting testosterone will allow him to physically develop as a young man, which is how he sees himself and how he presents himself to the world. George is heartbroken for his son, and the rest of Gabe's family is devastated. They are worried that the Denial of Care Order is the first step in enabling other people to discriminate against their son or that the government will look the other way if hate crimes are committed against transgender people like Gabe.

**2.    The Boe Family**

109.    Bella Boe is twelve years old and lives in New York with her family.

110.    Bella is transgender. She is a girl with a female gender identity, but when she was born, she was designated as male.

111.    From the time Bella was a toddler, she would tell her parents she wanted to have long hair and she did not want to have a beard when she grew up. Closer to puberty, Bella told her parents that she identifies as a girl. She has also been diagnosed with gender dysphoria.

112.    Bella's family did not impose gendered expectations on her. Based on her gender expression, she has experienced bullying. Her classmates called her slurs, and they targeted her both in and out of school. One student grabbed Bella, called her trans, and told her to kill herself. She began to miss school and developed depression. Once she moved to a new school, where she can live fully as herself, her wellbeing improved dramatically.

113.    Bella's parents sought medical care for her at NYU Langone Health's Transgender Youth Health Program. After extensive conversations about risks and benefits, Bruce decided in consultation with Bella and her doctors that a puberty blocking implant was the right decision to treat her gender dysphoria by halting the changes of endogenous male puberty before they could cause her further distress.

114.    On January 28, 2025, after President Trump signed the Denial of Care Order, NYU refused to schedule Bella's implant appointment.  NYU told Bella's parents NYU was likely changing its policies on gender affirming medical care in response to the Denial of Care Order. After rescheduling and cancelling again, NYU told Bruce it had shut down all appointments for gender affirming medical care.

115.    Bruce is afraid of the impact that the Executive Orders will have on Bella.  Bella has already started puberty.  She is already fearful, worried, and scared about what she might look like in the future if she does not get the care that she needs.

116.    Because of the Executive Orders, Bella's family is scared that they have no way of getting Bella the care she requires.  Bruce is worried that she will regress and become depressed again without this care.

**3.    The Coe Family**

117.    Cameron Coe is twelve years old and lives in New York with their family.

118.    Cameron is transgender.  They are non-binary, but when they were born, they were designated as male.

119.    From the age of four, Cameron communicated to their parents that they were neither a boy nor a girl.  They began to express their non-binary identity in the fourth grade.

120.    Cameron began seeing a therapist who diagnosed them with gender dysphoria. They also met with doctors at NYU Langone Health to learn about options for medical care.

121.    Once Cameron began to enter puberty, Cameron grew more uncomfortable in their changing body, and they expressed anxiety about going through a masculine puberty.  As puberty continued, they experienced escalating stress, anxiety, and discomfort in their body.

122.    The Coe family first went to NYU Langone purely to learn more about potential medical and non-medical options. The doctor they met with counseled them on the available options, including the potential for pubertal suppression. Based on Cameron's escalating distress, blood testing showed high levels of endogenous testosterone, the imminence of permanent physical changes, consultation with doctors, and the need for more time to consider whether to pursue further medical treatment without worrying about Cameron's body changing right now, the Coe family decided to pursue puberty-suppressing medications, with a letter of support from Cameron's therapist. Cameron received an injection of puberty-suppressing medication in fall 2024, with a plan to eventually receive an implant that would last longer.

123.    Beginning puberty-suppressing medication had a positive effect on Cameron. They experienced enormous relief after their first injection and started doing better socially.

124.    The earliest that Cameron was able to schedule an appointment for a puberty-blocking implant at NYU Langone was January 31, 2025. On January 29, 2025, Cameron's family received a call from NYU Langone informing them that the appointment was cancelled.

125.    Cameron's anxiety has increased greatly because of the fear of not being able to continue puberty-blocking medication. This has had negative physical consequences, including stomach pains and insomnia. Cameron's parents are worried about immediate severe distress and suicidality if Cameron remains unable to receive necessary gender affirming medical care.

**4.    The Roe Family**

126.    Robert Roe is sixteen years old and lives in Massachusetts with his family. Robert is a smart, active, and involved teenager. He is an honors student and talented at sports.

127.    Robert is transgender.  He is a boy with a male gender identity, but when he was born, he was designated as female.  Because Robert is adopted, he is eligible for health insurance through MassHealth until he turns 26.

128.    Robert started to express his gender identity at two years old.  He began his social transition at eight years old and received a gender dysphoria diagnosis at nine.

129.    Robert has been receiving medical care from GeMS at Boston Children's Hospital for several years.  A team of doctors there thoroughly explained how puberty-delaying medications and hormone replacement therapy work, as well as the benefits and risks of both.

130.    Robert received a puberty-blocking implant at age 12 at GeMS.  He started receiving hormone therapy at age fourteen at GeMS.

131.    Robert had an appointment scheduled at GeMS on January 29, 2025.  It was supposed to be a regular check-up for his hormone therapy, where his providers would do his bloodwork and confirm that his dosage was correct.

132.    But the morning of January 29, a nurse practitioner at GeMS called Robert's mother Rachel to tell her that because of the Denial of Care Order and out of an abundance of caution, GeMS was cancelling all of its appointments for people under the age of 19.

133.    Without access to necessary medical care, Rachel is fearful that Robert will experience significant distress and anxiety.  He never experienced endogenous female puberty because of the blockers; he has only ever lived life as a boy.  He needs testosterone to continue to live his life.  Because of the Executive Orders, Robert's family does not know how else to get him access to the care he needs.

134.    Rachel has seen Robert become a successful, involved, and happy young man.  She is scared of what will happen to his confidence and happiness if he cannot access the care he needs.

27

**5.    Lawrence Loe**

135.    Lawrence Loe is eighteen years old and lives in New York with his father.

136.    Lawrence is transgender.  He is a man with a male gender identity, but when he was born, he was designated as female.

137.    After starting puberty, Lawrence sought support from a therapist for navigating his strong feelings that something was wrong with his changing body, and he eventually received a formal diagnosis of gender dysphoria.

138.    At thirteen years old, he started a medication to suppress menstruation and manage his distress.  In consultation with his doctors and parents, he began testosterone when he was 16.

139.    Testosterone has had a dramatic positive effect on Lawrence's mental health and wellbeing.  Prior to starting testosterone, he had experienced significant mental health issues due to gender dysphoria.

140.    Lawrence has been looking forward to receiving chest masculinization surgery for six years.  To get an appointment for surgery, he obtained a letter of support signed by his longtime therapist and another mental health professional, and another one signed by his doctor.  His surgery was planned for the first week of February at NYU Langone.  He has been preparing for his surgery by making appropriate arrangements, undergoing blood testing, and attending a pre-operative appointment.  He has been counting down to the day he is able to obtain surgery.  Trying to flatten his chest is physically painful and hard on his skin.

141.    On January 29, 2025, Lawrence received a call from a nurse practitioner at NYU Langone who told him that because of the Denial of Care Order, NYU was cancelling his surgery appointment, and would not reschedule him until after he turned nineteen.

142.    Lawrence is devastated, angry, and saddened to think the necessary medical care he has been working toward for so long could be pulled away from him, even though he is an adult.

**6.    Dylan Doe**

143.    Dylan Doe is eighteen years old and lives in Massachusetts.

144.    Next year, Dylan plans to go to college to study linguistics. He already speaks three languages and is learning two more. He wants to help preserve endangered languages.

145.    Dylan is transgender. He is a man with a male gender identity, but when he was born, he was designated as female.

146.    Dylan came out as transgender when he was twelve years old. He was formally diagnosed with gender dysphoria. The year after he came out, he began puberty blockers. When he was fourteen, he began to take testosterone, which he has continued to take since.

147.    Dylan's family decided to move from Tennessee to Massachusetts in 2021 because the anti-transgender laws in Tennessee created a hostile environment.

148.    Dylan lives a full life in Massachusetts. He goes to school, has friends, volunteers in his community, and has a job.

149.    Dylan has gone to a doctor's appointment every four months to receive testosterone.

150.    Dylan had an appointment scheduled for January 31, 2025, where he was supposed to receive testosterone as he normally does.

151.    On January 30, 2025, a provider from the clinic called to tell Dylan that his appointment was cancelled and would need to be postponed because of the Denial of Care Order.

152.    Access to health care makes Dylan's life livable. When he thinks about losing it, he becomes too depressed to function. Before he had access to that care, he was so anxious about not passing as male that it inhibited his social life. Healthcare is an essential part of his life.

153.    If the Denial of Care Order is not enjoined, and Dylan cannot access health care for another year, he will be devastated. He may have to travel abroad to seek care. He does not think he should have to leave his doctor or his country to live his life, especially as an adult.

**F.    The Harm of the Executive Orders to Members of PFLAG and GLMA**

     **1.    PFLAG**

154.    Since the issuance of the Denial of Care Order, PFLAG has heard from members across the U.S. about their adolescents' appointments for gender affirming medical care being cancelled.

155.    From Massachusetts to Washington to Colorado to New York to Illinois to Maryland and beyond, hospitals and healthcare systems have shut down appointments and cancelled procedures that PFLAG families and their transgender and nonbinary children had scheduled to treat their gender dysphoria as a direct result of the Denial of Care Order. The cancellations include appointments for young people whose providers had already deemed puberty blockers or hormone therapy to be medically necessary for them. Eighteen-year-olds—legal adults—also had scheduled surgical procedures cancelled.

156.    The Denial of Care Order has stripped PFLAG families of their ability to obtain medically necessary care to treat their children's gender dysphoria, putting those children at risk of serious mental and physical harm—the very reasons families seek this medical care in the first place. And it denies them the ability to make the decisions that they, their children, and their children's medical providers know are in their best interests.

157.    The Denial of Care Order has directly harmed and puts at risk the lives of young transgender and non-binary PFLAG members.

## 2.    GLMA

158.    Since President Trump issued the Denial of Care Order, GLMA's members and their patients have been and will continue to be immediately negatively affected.

159.    Many GLMA members are employed by medical institutions that receive federal grants, including some medical provider members that provide medically necessary gender affirming medical care to patients under nineteen.

160.    Many of the medical institutions that employ GLMA's members rely on federal grants and financial assistance from the NIH, HRSA, CDC, and AHRQ, among others, to provide healthcare to their communities, train the next generation of physicians, and support research aimed at addressing this nation's greatest health challenges.  The vast majority of these grants do not relate to the provision of medical interventions for the treatment of gender dysphoria.

161.    Because of the Executive Orders' mandate to strip all federal funding if medical institutions continue to provide gender affirming medical care—even when the funding is not related to gender affirming medical care—some medical institutions that employ GLMA medical provider members already have prohibited GLMA members from providing medically necessary gender affirming medical care to patients under the age of nineteen pursuant to well-established clinical guidelines.

162.    The Executive Orders have created grave uncertainty and distress for GLMA's medical provider members and their patients.  They also are in direct conflict with the Hippocratic oath members swore as doctors and with statutes that GLMA members are required to follow, which prohibit discrimination on the basis of sex and transgender status.

163.    GLMA's members also include individuals who are directors, investigators, or otherwise employed on projects and programs funded by federal grants, including grants from the

NIH, among other federal agencies and entities. Such federal funding is the lifeblood of scientific advancement in medicine.

164. GLMA members who are directors, investigators, or otherwise employed on projects and programs funded by federal grants fear they will immediately lose all federal research grant funding under the funding mandate of the Executive Orders if their medical institution continues to provide gender affirming medical care to patients under the age of nineteen.

165. GLMA's members also include health profession students.

166. Student members will lose their federal tuition assistance under the financial mandate of the Executive Orders if their medical institution continues to provide medically necessary gender affirming medical care to patients under the age of nineteen.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Ultra Vires – Presidential Action in Excess of Authority; Usurping the Legislative Function; Violation of the Bicameralism and Presentment Clauses**
(All Plaintiffs Against All Defendants)

167. Plaintiffs restate and reallege paragraphs 1 to 166 set forth above.

168. The President's authority stems from either an act of Congress or the Constitution.

169. Article II of the Constitution tasks the President to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3.

170. Article I of the Constitution vests Congress with the powers to make laws and control the public fisc. The Presentment Clause provides that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States." U.S. CONST. art. I, § 7, cl. 2. The Appropriations Clause provides that no "[m]oney shall be drawn from the Treasury, but in Consequence of Appropriations made

32

by Law," U.S. Const. art. I, § 7, and the Spending Clause vests Congress with the power to expend Treasury funds for the "general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

171.    As part of its power over the public fisc, Congress distributes millions of dollars every year in healthcare, research, and educational grants. Congress may specify how its grants are used in its annual appropriations bill or by passing federal statutes. None of the Congressional conditions placed on the grants administered or disbursed by the Agency Defendants, or any other of HHS's subagencies condition federal funds on the terminating gender affirming medical care.

172.    No provision of the Constitution authorizes the Executive Branch to enact, amend, or repeal statutes, including appropriations approved and signed into law.

173.    The Executive cannot directly and unilaterally amend or cancel appropriations Congress has duly enacted, nor can he order federal agencies to do so.

174.    Section 4 of the Denial of Care Order directs agencies to terminate all federal grants—without regard to the statute authorizing those grants, any applicable regulations, or the terms governing each grant. Section 3(g) of the Gender Identity Order similarly directs agencies to terminate grants that the Executive considers to "promote gender ideology," again, without regard to the authorizing statute, any applicable regulations, or the terms governing each grant.

175.    By directing agencies to terminate or withhold congressionally appropriated grants based on the President's own policy preferences, the Denial of Care and Gender Identity Orders attempt to amend, repeal, rescind, or circumvent duly enacted federal statutes or appropriations.

176.    By directing agencies to terminate or withhold congressionally appropriated grants, the Denial of Care and Gender Identity Orders attempt to expend public funds to advance the President's policy preferences, rather than those of Congress. These actions exceed the

33

President's Article II powers, unconstitutionally infringe upon Congress's powers, and attempt to amend federal legislation while bypassing Article I's Bicameralism and Presentment Clauses.

177.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Denial of Care and Gender Identity Orders violate the separation of powers and impermissibly arrogate to the executive power that is reserved to Congress.

178.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing the Agency Defendants, including any subagencies of Defendant HHS, from enforcing or implementing the Denial of Care and the Gender Identity Orders.

### SECOND CLAIM FOR RELIEF
### Ultra Vires – Conflicts with Statutory Law – Discrimination on the Basis of Sex
(All Plaintiffs Against All Defendants)

179.    Plaintiffs restate and reallege paragraphs 1 to 166 set forth above.

180.    Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116, provides that an individual shall not on the basis of sex "be subjected to discrimination under[ ] any health program or activity, any part of which is receiving Federal financial assistance."

181.    Section 1908 of the Public Health Service Act ("PHSA"), 42 U.S.C. § 300w-7, similarly prohibits discrimination on the basis of sex in programs, services, and activities "receiving Federal financial assistance" through Preventive Health and Health Services Block Grants, which Defendant Fink allots as the Acting Secretary of Defendant HHS. *See* 42 U.S.C. § 300w-1.

182.    Discrimination based on transgender status, including discrimination based on the fact that medical treatment is provided for purpose of gender transition by aligning a patient's gender presentation with an identity different from their sex assigned at birth, constitutes discrimination on the basis of sex under Section 1557 of the ACA and Section 1908 of the PHSA.

183.    Federal law—passed by both houses of Congress and signed by the President—prohibits medical institutions and healthcare entities receiving federal grants from discriminating based on sex as a condition of receiving federal financial assistance. The Executive Orders attempt to override that statutory scheme with President Trump's unilateral declaration that medical institutions and healthcare entities must do the opposite and deny gender affirming medical care to people under nineteen based solely on the fact that health care is for the purpose of gender transition.

184.    The Gender Identity and Denial of Care Orders facially discriminate based on sex. For example, they direct agencies to withhold grants from entities that "promote gender ideology" or that provide "gender affirming care," *i.e.*, medical care "to align an individual's physical appearance with an identity that differs from his or her sex."

185.    The Executive Orders were issued for the openly discriminatory purpose of preventing transgender people from expressing a gender identity different from their sex designated at birth—and to express governmental disapproval of people who do so.

186.    President Trump does not have the power to override Section 1557 of the ACA or Section 1908 of the PHSA and require federal grantees to engage in precisely the discrimination that those laws prohibit.

187.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Gender Identity and Denial of Care Orders are *ultra vires* as they impermissibly direct agencies to take actions in violation of statutory laws that prohibit discrimination on the basis of sex.

188.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing the Agency Defendants, including any subagencies of Defendant HHS, from enforcing or implementing the Denial of Care and the Gender Identity Orders.

**THIRD CLAIM FOR RELIEF**
**Ultra Vires – Conflicts with Statutory Law – Discrimination on the Basis of Disability**
(All Plaintiffs Against All Defendants)

189.    Plaintiffs restate and reallege paragraphs 1 to 166 set forth above.

190.    Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794.

191.    Section 1557 of the ACA similarly prohibits discrimination on the basis of disability by "any health program or activity, any part of which is receiving Federal financial assistance."  42 U.S.C. § 18116.

192.    Gender dysphoria qualifies for protection as a "disability" under the Rehabilitation Act and consequently under Section 1557 of the ACA.

193.    Withholding health care based solely on the fact that the health care is intended to treat gender dysphoria is discrimination based on disability under the Rehabilitation Act and Section 1557 of the ACA.

194.    President Trump does not have the power to override the Rehabilitation Act or Section 1557 of the ACA and require federal grantees to engage in precisely the discrimination that the Rehabilitation Act and Section 1557 prohibit.

195.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Gender Identity and Denial of Care Orders are *ultra vires* and impermissibly direct agencies to take actions that violate statutory law that prohibit discrimination on the basis of disability.

196.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing the Agency Defendants, including any subagencies of Defendant HHS, from enforcing or implementing the Denial of Care and the Gender Identity Orders.

36

## FOURTH CLAIM FOR RELIEF
### Violation of Equal Protection Component of the Fifth Amendment
(Transgender Plaintiffs and PFLAG Against All Defendants)

197.    Plaintiffs restate and reallege paragraphs 1 to 166 set forth above.

198.    The Equal Protection Clause of the Fourteenth Amendment, which is incorporated into the Fifth Amendment, protects individuals from discrimination on the basis of sex.

199.    By directing agencies to withhold grants from entities that "promote gender ideology" or provide gender affirming medical care to transgender people under nineteen, the Gender Identity and Denial of Care Orders discriminate based on sex and transgender status.

200.    The Executive Orders facially discriminate based on sex because they direct agencies to withhold grants from entities that "promote gender ideology" by providing medical care "to align an individual's physical appearance with an identity that differs from his or her sex."

201.    The Executive Orders also facially discriminate based on transgender status because they direct agencies to withhold grants from entities based solely on the fact that those entities provide healthcare for the purpose of gender transition, that is, helping a patient's gender presentation to align with an identity different from their sex assigned at birth.

202.    Agencies are not required to withhold grants from entities that provide the same healthcare for the purpose of helping a patient's gender presentation to align with an identity that corresponds with their sex assigned at birth.

203.    Under any standard of scrutiny, the Executive Orders' deprivation of the right to equal protection of the laws cannot be justified as sufficiently related to an interest in protecting the health and safety of transgender people under nineteen.  Instead of protecting health and safety, the Gender Identity and Denial of Care Orders harm transgender people under nineteen, including the Minor Plaintiffs and Adult Plaintiffs, by denying them medically necessary care.

37

204.    The Gender Identity and Denial of Care Orders were issued for the openly discriminatory purpose of preventing transgender people from expressing a gender identity different from their sex designated at birth—and expressing governmental disapproval of people who do so—which are not legitimate governmental interests under any standard of review.

205.    The Gender Identity and Denial of Care Orders violate the equal protection rights of transgender people under nineteen under the Fifth Amendment.

**FIFTH CLAIM FOR RELIEF**
**Violation of Substantive Due Process Under the Fifth Amendment**
(Parent Plaintiffs and PFLAG Against All Defendants)

206.    Plaintiffs restate and reallege paragraphs 1 to 166 set forth above.

207.    The Due Process Clause of the Fifth Amendment protects the fundamental rights of parents to decide on medical care for their children—an interest that is especially strong when it aligns with the judgment of medical providers and their adolescent children.

208.    By directing agencies to withhold grants from entities that provide gender affirming medical care to minors, the Gender Identity and Denial of Care Orders infringe upon parents' fundamental rights by overriding the aligned judgment of parents, adolescents, and their doctors regarding medically necessary care.

209.    Under any standard of scrutiny, the Executive Orders' infringement on parental rights cannot be justified as sufficiently related to an interest in protecting the health and safety of children. Instead of protecting health and safety, the Gender Identity and Denial of Care Orders harm children by denying them medically necessary care.

210.    The Gender Identity and Denial of Care Orders were issued for the openly discriminatory purpose of preventing transgender people from expressing a gender identity different from their sex designated at birth—and expressing governmental disapproval of people who do so—which are not legitimate governmental interests under any standard of review.

211.    The Gender Identity and Denial of Care Orders unconstitutionally infringe the fundamental rights of parents under the Fifth Amendment.

### SIXTH CLAIM FOR RELIEF
### Violation of First Amendment of the United States Constitution
(Transgender Plaintiffs and Organizational Plaintiffs Against All Defendants)

212.    Plaintiffs restate and reallege paragraphs 1 to 166 set forth above.

213.    The First Amendment prohibits the government from "abridging the freedom of speech." U.S. CONST. amend. 1.

214.    Section 3(g) of the Gender Identity Order directs "[e]ach agency" to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." Section 4 of the Denial of Care Order implements that directive, ordering agencies to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end" gender affirming medical care.

215.    By withholding federal grants, the Orders engage in unconstitutional viewpoint discrimination in violation of the First Amendment and violate the rights of grant recipients and transgender patients.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

A.    Declare that Section 3(g) of the Gender Identity Order and the Denial of Care Order are unconstitutional and unlawful;

B.    Issue temporary, preliminary, and permanent injunctive relief enjoining Agency Defendants, including any subagencies of Defendant HHS, their employees, agents, and successors in office and those in active concert or participation with them, from implementing or enforcing Section 3(g) of the Gender Identity Order and the Denial of

Care Order or otherwise withholding federal funding based on the fact that a healthcare entity provides gender affirming medical care;

C.      Waive the requirement for the posting of a bond of security for the entry of temporary and preliminary relief;

D.      Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees; and

E.      Grant any other and further relief that this Court may deem just and proper.

Date:  February 11, 2025

Respectfully submitted

Joshua Block*
Harper Seldin*
Chase Strangio*
Alexandra R. Johnson*
**American Civil Liberties Union**
  **Foundation**
125 Broad Street, Floor 18
New York, NY 10004
Telephone: (212) 549-2500
Facsimile:  (212) 549-2650
jblock@aclu.org
hseldin@aclu.org
cstrangio@aclu.org
a.johnson@aclu.org

Deborah A. Jeon (Fed. Bar No. 06905)
Zoe M. Ginsberg (Fed. Bar No. 30727)
**American Civil Liberties Union**
  **Foundation of Maryland**
3600 Clipper Mill Road, Suite 200
Baltimore, MD 21211
Telephone: (410) 889-8555
Facsimile:  (410) 366-7838
jeon@aclu-md.org
zginsberg@aclu-md.org

Laura J. Edelstein*
Kai N. Galindo*
**Jenner & Block LLP**
525 Market Street, 29th Floor

*/s/ Zachary B. Cohen*

Omar Gonzalez-Pagan*
Jennifer C. Pizer*
**Lambda Legal Defense**
  **and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
Facsimile:  (855) 535-2236
ogonzalez-pagan@lambdalegal.org
jpizer@lambdalegal.org

Karen L. Loewy*
**Lambda Legal Defense**
  **and Education Fund, Inc.**
815 16th Street NW, Suite 4140
Washington, DC 20006
Telephone: (202) 804-6245
Facsimile:  (855) 535-2236
kloewy@lambdalegal.org

Nora Huppert*
**Lambda Legal Defense**
  **and Education Fund, Inc.**
3656 N. Halsted Street
Chicago, IL 60613
Telephone: (312) 605-3233
Facsimile:  (855) 535-2236
nhuppert@lambdalegal.org

San Francisco, CA 94105
Telephone: (628) 267-6800
Facsimile:  (628) 267-6859
LEdelstein@jenner.com
KGalindo@jenner.com

Madeleine V. Findley*
Zachary B. Cohen (Fed. Bar No. 20159)
Mary-Claire Spurgin*
**Jenner & Block LLP**
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Facsimile:  (202) 639-6066
MFindley@jenner.com
MSpurgin@jenner.com

Jocelyn A. Sitton*
Lillian M. McGuire*
Rebecca M. Diamond*
**Jenner & Block LLP**
353 N. Clark Street
Chicago, IL 60654
Telephone: (312) 222-9350
Facsimile:  (312) 527-0484
JSitton@jenner.com
LMcGuire@jenner.com
RDiamond@jenner.com

Catherine E. Stetson**
Danielle Desaulniers Stempel (Fed. Bar No. 20501)
Kristina Alekseyeva*
Sam H. Zwingli*
**Hogan Lovells US LLP**
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
Facsimile:  (202) 637-5910
cate.stetson@hoganlovells.com
danielle.stempel@hoganlovells.com
kristina.alekseyeva@hoganlovells.com
sam.zwingli@hoganlovells.com

Jackson Skeen***
**Hogan Lovells US LLP**
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 702-7747
Facsimile:  (617) 371-1037
jackson.skeen@hoganlovells.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice.*

*\*\*Application for admission forthcoming.*

*\*\*\* Admitted pro hac vice.  Admitted only in D.C.  Supervised by principals of the firm admitted in Massachusetts.*

41

## CERTIFICATE OF SERVICE

I hereby certify that this Amended Complaint has been served electronically on the

following parties:

> DONALD J. TRUMP, in his official capacity as President of the United States
> 1600 Pennsylvania Ave. NW
> Washington, DC 20220
>
> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
> 200 Independence Ave. SW
> Washington, DC 20201
>
> DOROTHY A. FINK, in her official capacity as Acting Secretary of the U.S.
> Department of Health and Human Services
> 200 Independence Ave. SW
> Washington, DC 20201
>
> HEALTH RESOURCES AND SERVICES ADMINISTRATION
> 5600 Fishers Lane
> Rockville, MD 20857 (Montgomery County)
>
> DIANA ESPINOSA, in her official capacity as Principal Deputy Administrator of
> the Health Resources and Services Administration
> 5600 Fishers Lane
> Rockville, MD 20857 (Montgomery County)
>
> NATIONAL INSTITUTES OF HEALTH
> 9000 Rockville Pike
> Bethesda, MD 20892 (Montgomery County)
>
> MATTHEW J. MEMOLI, in his official capacity as Acting NIH Director
> 9000 Rockville Pike
> Bethesda, MD 20892 (Montgomery County)

I hereby certify that the Amended Complaint will be served concurrently with the

Summonses in this matter upon the following defendants by certified mail, return receipt

requested:

> NATIONAL SCIENCE FOUNDATION
> 2415 Eisenhower Avenue
> Alexandria, VA 22314
>
> SETHURAMAN PANCHANATHAN,
> in his official capacity as Director of the National Science Foundation
> 2415 Eisenhower Avenue
> Alexandria, VA 22314

Dated: February 11, 2025                    */s/ Zachary B. Cohen*
                                            Zachary B. Cohen