**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

_____

|                                                    |   |                              |
|----------------------------------------------------|---|------------------------------|
| PFLAG, INC., *et al.*,                             | ) |                              |
|                                                    | ) |                              |
|                          Plaintiffs,               | ) |                              |
|                                                    | ) |                              |
|                     v.                             | ) | Civil Action No. 8:25-cv-337 |
|                                                    | ) |                              |
| DONALD J. TRUMP, in his official capacity as       | ) |                              |
| President of the United States, *et al.*,          | ) |                              |
|                                                    | ) |                              |
|                          Defendants.               | ) |                              |

_____


**<u>DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**

**Table of Contents**

INTRODUCTION ..................................................................................................................1

BACKGROUND .................................................................................................................3

I.   The Executive Orders .....................................................................................................3

II.  This Lawsuit....................................................................................................................5

STANDARD OF REVIEW ...................................................................................................5

ARGUMENT .........................................................................................................................6

I.   Plaintiffs' claims fail at the threshold. ...........................................................................6

    A.  Any claims against the agency defendants are premature because they have not
       revoked any relevant funding.........................................................................................6

    B.  Article II undermines Plaintiffs' claims. .....................................................................8

    C.  Plaintiffs lack an equitable cause of action..................................................................9

II.  Plaintiffs have not established a likelihood of success on the merits. ...........................10

    A.  The EOs cannot be ultra vires when they merely direct agencies to act in accordance
       with applicable law. .....................................................................................................11

    B.  Plaintiffs are unlikely to succeed on the merits of their Equal Protection claim...............15

    C.  Plaintiffs are unlikely to succeed on the merits of their statutory sex discrimination
       claim..............................................................................................................................25

III. The remaining factors counsel against granting the requested relief......................................26

    A.  Plaintiffs have not shown irreparable injury attributable to the EOs................................26

    B.  The public interest weighs against relief. ........................................................................27

IV.  Any TRO should be limited to Plaintiffs. .............................................................................28

V.   Any injunctive relief should be stayed..................................................................................30

CONCLUSION..............................................................................................................................30

## INTRODUCTION

President Trump issued two Executive Orders (EOs) directing agencies to take steps, as permitted by law, to condition certain federal grant funding on his policy preferences. Executive Order 14,168, 90 FR 8615 (Jan. 20, 2025), entitled *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Defending Women EO), sets forth a policy "to recognize two sexes, male and female." *Id.* § 2. It states in relevant part that "each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* § 3(g). Meanwhile, Executive Order 14,187, 90 FR 8771, *Protecting Children from Chemical and Surgical Mutilation* (Protecting Children EO), sets forth a policy that the federal government will not "fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another." *Id.* § 1. It directs the heads of agencies that provide research or educational grants to medical institutions to, "consistent with applicable law and in coordination with the Director of the Office of Management and Budget, immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children." *Id.* § 4. Both orders make clear that they "shall be implemented consistent with applicable law," EO 14,168 § 8(b); EO 14,187 § 11(b), and "shall not be construed to . . . affect . . . the authority granted by law to an executive department or agency, or the head thereof," EO 14,168 § 8(a)(i); EO 14,187 § 11(a)(1).

Plaintiffs, two membership organizations and individual plaintiffs, claim the EOs were issued without authority, conflict with two laws prohibiting sex discrimination, and violate the Fifth Amendment's equal protection guarantee. Plaintiffs seek the extraordinary relief of a temporary restraining order (TRO) enjoining the agency defendants from implementing the challenged portion of each EO nationwide or "otherwise conditioning or withholding federal funding based on" the provision of "gender affirming medical care." Proposed Order on Pls.' Mot.

for TRO at 2, ECF No. 35-2 (Pls.' Proposed Order). But Plaintiffs fail to satisfy any of the requirements for the broad relief they seek.

To begin, Plaintiffs' claims fail at the threshold for multiple reasons. They identify no cause of action against the agencies and cannot challenge the President's authority under Article II. Further, their claims are unripe. The defendant agencies have not finally implemented the EOs' directives, let alone revoked any particular grants relied upon by the individual Plaintiffs' providers or association GLMA's members as a result of the EOs. Which grants the agency can condition consistent with applicable law as directed by the EOs is currently uncertain, and there is no final agency action for the Court to evaluate.

On the merits, Plaintiffs are unlikely to succeed on any of their claims. First, the EOs are not *ultra vires.* The President's authority to direct subordinate agencies to implement his agenda, subject to those agencies' own statutory authorities, is well-established. *See Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[T]he President's power necessarily encompasses 'general administrative control of those executing the laws.'" (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926))). By their terms, the EOs require any funding conditions to be implemented consistent with applicable law, a requirement that encompasses the robust and comprehensive body of federal grants and contracts law as well as antidiscrimination statutes like Section 1557 of the Affordable Care Act (ACA), and Section 1908 of the Public Health Services Act (PHSA), and the Constitution, which Plaintiffs paradoxically claim *conflict* with the EOs instead of cabining their scope.

Second, the EOs do not violate the Fifth Amendment's guarantee of equal protection. The framework for scrutinizing governmental action under equal protection doctrine has little application here, where there is no agency action to scrutinize. The government recognizes that

the Fourth Circuit in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024), held that certain funding restrictions on the provision of similar kinds of treatments implicated suspect classifications, although the government's position is that *Kadel* was wrongly decided and should be overruled. But Plaintiffs' equal protection claim nevertheless fails because the EOs substantially relate to the important governmental interest of safeguarding children from potentially dangerous, ineffective, and unproven treatments. As a result, the EOs satisfy any heightened scrutiny applicable under *Kadel*, in addition to the lower rational-basis scrutiny that would otherwise apply.

As to Plaintiffs' statutory sex discrimination claims under Section 1557 of the ACA, 42 U.S.C. § 18116, and Section 1908 of the PHSA, 42 U.S.C. § 300w-7, the EOs expressly require any implementing agency action to be consistent with applicable law, including those statutes, and plaintiffs have identified no action violating them. Plaintiffs' contention that grantees would be required to provide a given treatment to cisgender patients but not transgender patients is not supported in any event, because grantees would be free not to provide the specified treatment to anyone.

Plaintiffs also fail to satisfy the remaining elements for a temporary restraining order. For these reasons, as explained more fully below, Plaintiffs' motion for a TRO should be denied.

## BACKGROUND

## I.    The Executive Orders

On January 20, 2025, President Trump signed the Defending Women EO. It states that "the Executive Branch will enforce all sex-protective laws to promote" the policy "to recognize two sexes, male and female," which "are not changeable." EO 14,168 § 2. In relevant part, the EO directs agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology," *id.* § 3(e), including by "assess[ing] grant conditions and grantee preferences and ensur[ing] grant funds do not promote gender ideology," *id.* § 3(g). The EO makes clear that

"[n]othing in this order shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency," *id.* § 8(a), and that the "order shall be implemented consistent with applicable law," *id.* § 8(b).

On January 28, 2025, President Trump signed the Protecting Children EO. In relevant part, it directs the heads of departments and agencies "that provide[] research or educational grants to medical institutions" to, "consistent with applicable law and in coordination with the Director of the Office of Management and Budget, immediately take appropriate steps to ensure that institutions receiving Federal research or educations grants end the chemical and surgical mutilation of children."[1] EO 14,187 § 4. The EO does not address medical institutions or practices that do not receive federal research or educational grants, like many private, physician-owned practices, even if they receive other federal funding. Like the Defending Women EO, the Protecting Children EO makes clear that "[n]othing in this order shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency," *id.* § 11(a)(i), and that the "order shall be implemented consistent with applicable law," *id.* § 11(b). Indeed, the EO does not restrict care but rather announces a policy on what sorts of grants the Executive Branch has chosen to subsidize.

---

[1] The EO defines "chemical and surgical mutilation" to mean

the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions.

EO 14,187 § 2(c).

Many states and other countries have gone further and enacted laws and policies to restrict gender-affirming care for minors. *See* KFF, *Policy Tracker: Youth Access to Gender Affirming Care and State Policy Restrictions*, https://perma.cc/M9Y3-D4M2; Joshua P. Cohen, *Increasing Number Of European Nations Adopt A More Cautious Approach To Gender-Affirming Care Among Minors*, FORBES, June 14, 2023, https://perma.cc/9VM9-W4S4.

## II.    This Lawsuit

On February 4, 2025, Plaintiffs filed the instant lawsuit. Compl., ECF No. 1. Plaintiffs consist of two membership organizations and individual plaintiffs. Compl. ¶¶ 13–28. They sued President Trump; the U.S. Department of Health and Human Services (HHS); two HHS components, the National Institutes of Health (NIH) and the Health Resources and Services Administration (HRSA); and the heads of HHS, NIH, and HRSA. Compl. ¶¶ 29–35.

On February 5, 2025, Plaintiffs filed a motion for a TRO. Pls.' Emergency Mot. TRO, ECF No. 35 (Pls.' Mem.). Plaintiffs seek to temporarily restrain the agency defendants from "enforcing, implementing, or applying" Section 3(g) of the Defending Women EO and Section 4 of the Protecting EO or "otherwise conditioning or withholding federal funding based on" the provision of "gender affirming medical care." Pls.' Proposed Order at 2; *see also id.* at 1–2. Plaintiffs raise three claims in their motion: (1) the EOs are *ultra vires* because they purportedly attempt to amend, repeal, rescind, or circumvent duly enacted federal statutes or appropriations; (2) the EOs are *ultra vires* because they allegedly conflict with Section 1557 of the ACA, 42 U.S.C. § 18116, and Section 1908 of the PHSA, 42 U.S.C. § 300w-7; and (3) the EOs violate the equal protection component of the Fifth Amendment. *See* Pls.' Mem. 15–28.

## STANDARD OF REVIEW

A temporary restraining order "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Mazurek v.*

*Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *see also MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power" and is "to be granted only sparingly and in limited circumstances") (citation omitted). A plaintiff seeking a TRO "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I.    Plaintiffs' claims fail at the threshold.

Multiple threshold defects plague Plaintiffs' claims. They identify no cause of action or final agency action that allows them to proceed against the agency defendants. Their claims are unripe because the agency defendants have not implemented the challenged portions of EOs, leaving material questions unanswered about the statutory and regulatory requirements for any grant funding at issue and the scope of funding potentially at stake. Their claims also run headlong into Article II's authority for the President to direct his subordinates to take appropriate steps to further policy preferences. Finally, they lack a cause of action to challenge the EOs as *ultra vires*.

#### A.  *Any claims against the agency defendants are premature because they have not revoked any relevant funding.*

Plaintiffs cannot bring claims against the agency defendants.[2] As an initial matter, Plaintiffs

---

[2] Plaintiffs also cannot obtain relief against the President for issuing the EOs. Courts have no authority to second-guess "discretion[ary]" acts taken by the President "in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. 475, 499, 501 (1866); *see also Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part). The courts' refusal to police the President's discretionary acts is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief." (citation omitted)).

do not invoke the Administrative Procedure Act (APA) or any other statute providing for a cause of action against an agency. *See, e.g.*, 5 U.S.C. § 706(2)(A)–(C) (permitting courts to "set aside agency action . . . otherwise not in accordance with law; contrary to constitutional right. . . [or] in excess of statutory jurisdiction"). In any event, invoking the APA would be futile. The APA authorizes challenges to only final agency action. *Id.* § 704. A final agency action is one that "marks the consummation of the agency's decisionmaking process" and from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 156 (1997); *Genesis Healthcare, Inc. v. Becerra*, 39 F.4th 253, 262 (4th Cir. 2022). Plaintiffs have not pointed to any agency action that determined any rights or obligations or otherwise caused legal consequences. Indeed, Plaintiffs' claimed harm is not based on any action taken by the agency defendants, but on the decisions of medical institutions to stop providing certain treatments based on their prediction that the agency defendants might take some action in the future to revoke their funding. *See* Pls.' Mem. at 11–13.

For similar reasons, any claims against the agency defendants are not ripe. The ripeness doctrine "require[s] courts to avoid taking premature judicial action, thereby preventing them from becoming entangled in 'abstract disagreements.'" *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967). "A case is fit for adjudication when the action in controversy is final and not dependent on future uncertainties." *Id.* (quotation omitted). In other words, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).

Here, no agency defendant has revoked, or initiated proceedings to revoke, any particular grants as a result of the EOs. Plaintiffs note that HRSA issued an email to grant recipients on January 31, 2025, stating that "HRSA grant funds may not be used for activities that do not align

with" various EOs including the two at issue in this case, Pls.' Mot. Ex. A-1, ECF No. 35-5, but HRSA has since rescinded that email. Moreover, when an agency takes steps to implement the EOs' contemplated grant conditions, it must only take appropriate actions "as permitted by law." EO 14,168 § 3(e); *see also* EO 14,187 § 4 (requiring the heads of departments and agencies to act "consistent with applicable law and in coordination with the Director of the Office of Management and Budget" and "take appropriate steps" to ensure that medical institutions receiving federal research or education grants refrain providing the treatment defined in Section 2(c)).

Because the agency defendants have not yet taken the steps necessary to revoke funding, for example, by identifying specific education or research grants that the agency believes may, consistent with applicable law, be conditioned on ending the treatment described in Section 2(c) of the Protecting Children EO, it is not clear what law the Court would need to apply or what funding would be at stake. The Court cannot determine in the abstract whether the statutory and regulatory requirements for any particular grant program provide the agency with discretion to condition funding on these terms. Absent this essential context, it would be premature to decide the issues now. *See Scoggins*, 718 F.3d at 271 (homeowners' claim based on request for HOA's permission to engage in construction not ripe for review because "final action on the request is still forthcoming and is dependent on future uncertainties"); *Donovan v. Vance*, 576 F. Supp. 3d 816, 824 (E.D. Wash. 2021), *aff'd in part, appeal dismissed in part and remanded,* 70 F.4th 1167 (9th Cir. 2023) ("It is simply too early to know with any degree of certainty whether Plaintiffs' fears of termination will come into fruition."). If and when an agency takes final agency action against a medical institution under the EO, an injured party may bring suit then, and the court can decide the matter on the facts presented.

### B.  Article II undermines Plaintiffs' claims.

As explained, the EO charges certain components of the Executive Branch with taking

appropriate steps to implement a policy directive by the President, in a manner consistent with all applicable law. Plaintiffs' TRO seeks to pretermit that process entirely, barring any defendant from "implementing and enforcing" the directive in any manner. Pls.' Proposed Order at 4. That sort of order—cutting off the ability of the Executive Branch to even pursue a general course of action— would be a remarkable intrusion on a separate branch of government, in conflict with Article II.

The President has the constitutional authority to direct his subordinates to pursue a general policy goal, consistent with all applicable law. *See* Art. II § 1 ("The executive Power shall be vested in a President of the United States of America."); *id.* § 2 ("[h]e may require the Opinion . . . of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices."). Of course, if an agency decides to act in a specific manner contrary to law, the federal courts may review (and prevent) that action; but federal courts cannot superintend—let alone proscribe—that policymaking from even taking place. *See Trump v. United States*, 603 U.S. 593, 608–09 (2024).

### C. Plaintiffs lack an equitable cause of action.

All of Plaintiffs' claims—statutory and constitutional—depend on this Court's inherent equitable powers to provide a cause of action, remedying what they see as *ultra vires* executive conduct in violation of some binding source of law. But that narrow form of relief, whatever its precise bounds, is not available to the Plaintiffs here.

The *ultra vires* doctrine is "extremely limited" in "scope." *Griffith v. Fed. Labor Rel. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988). Of these limits, one is that it is only available to parties who are the *direct objects* of the allegedly unlawful governmental action. *See Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 153–54 (1951) (Frankfurter, J., concurring) ("[T]he injury must be 'a wrong which directly results in the violation of a legal right.'"). *Ultra vires* relief developed as an equitable remedy to prevent the government from unlawfully acting upon a

person—*i.e.*, to prevent a certain restriction or enforcement action from taking place. *See, e.g.*, *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110–11 (1902). It is not a tool for those incidentally affected later, empowering them to reach upstream and proactively combat an alleged wrong happening to another. *See Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 902–04 (10th Cir. 2017). And that is this case. All of the hypothetical future actions that Plaintiffs complain about are funding decisions affecting separate medical institutions. But *those* institutions would be the direct objects of any unlawful action. Plaintiffs here may be incidentally harmed depending on how those institutions react (*i.e.*, whether they choose to forgo federal funding or continue certain treatments). But this Court's inherent equitable powers do not provide a cause of action to redress that sort of removed harm.

Another limit is that *ultra vires* relief must run against a particular governmental action that "violates some specific command of a statute" or other binding law. *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 764 (D.C. Cir. 2022). But again, Plaintiffs do not identify any specific source of authority that prevents a presidential order directing subordinates to consider and pursue as appropriate (and as consistent with law) a given policy. Plaintiffs' arguments concern hypothetical downstream actions that may or may not result from the EOs; but *ultra vires* relief is about stopping actual concrete action, not pretermitting hypothetical future harm.

## II.    Plaintiffs have not established a likelihood of success on the merits.

The President of the United States plainly has authority to direct agencies to fully implement the President's agenda, consistent with each individual agency's underlying statutory authorities. This well-established authority dooms Plaintiffs' likelihood of succeeding on their claim that the President exceeded his presidential authority in issuing the EOs. Plaintiffs also are unlikely to succeed on their constitutional and statutory discrimination claims: the EOs do not discriminate based on sex or any other protected class, and they bear a substantial relationship to

important governmental objectives regarding the protection of children and adolescents from potentially dangerous and ineffective treatments such that they satisfy any possible standard of constitutional scrutiny anyway.

### A. The EOs cannot be ultra vires when they merely direct agencies to act in accordance with applicable law.

Plaintiffs' *ultra vires* claims fail because they rely on characterizations of the EOs that are simply inconsistent with their terms. The EOs do not purport to withhold all federal funding if an institution promotes gender ideology or provides the treatments referenced in the Protecting Children EO. Instead, the EOs instruct agencies to implement the President's policy preference to the extent permitted by applicable law. The Executive often has discretion to impose other conditions or allocate fixed grants based on priorities.  As discussed above, courts have long upheld these types of Presidential directives to agencies.

The Defending Women EO explicitly states that any withholding of federal funds must only be implemented "as permitted by law." EO 14168 § 3(e). The Protecting Children EO likewise requires agencies to act "consistent with applicable law and in coordination with the Director of the Office of Management and Budget" in ending federal research and educational grants to institutions providing the treatments referenced in the EO. EO 14,187 § 4. Further, both EOs include a "General Provision[]," stating that "[n]othing in this order shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency" and that "[t]his order shall be implemented consistent with applicable law." EO 14,168 § 8(a), (b); EO 14,187 § 11(a), (b).

Definitionally, directing executive agencies to take action *to the extent consistent with applicable law* cannot be interpreted as an order to violate the law. It is plainly lawful for the President to instruct agencies to act within their own statutory authorities to implement the

President's priorities consistent with applicable law. *See, e.g.*, *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."); *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981). Indeed, on his first day in office, President Biden issued an analogous executive order, requiring agencies to take action, consistent with applicable law, "to fully enforce . . . laws that prohibit discrimination on the basis of gender identity or sexual orientation. Exec. Order No. 13,988, §§ 1–2, 86 Fed. Reg. 7023, 7023 (Jan. 20, 2021).[3]

The D.C. Circuit's decision in *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002) is instructive. There, Plaintiffs challenged an executive order that provided that "to the extent permitted by law," no federal agency and no entity that receives federal assistance for a construction product could require or prohibit bidders or contractors from entering into a project labor agreement. *Id.* at 29. Plaintiffs sued, claiming that the executive order exceeded the President's constitutional authority. *See id.* at 31–32. The D.C. Circuit rejected this argument, pointing out that the executive order "directs [agencies] how to proceed in administering federally funded projects, but only '[t]o the extent permitted by law.'" *Id.* at 33. "Thus, if an executive agency, such as the FEMA, may lawfully implement the Executive

---

[3] Presidents regularly exercise their supervisory authority over how executive officers carry out their statutory responsibilities. *See, e.g.*, Exec. Order No. 12,866, 58 Fed. Reg. 51,735, § 1(b), (Sept. 30, 1993) (directing agencies on how to exercise regulatory authority, "to the extent permitted by law and where applicable"); Exec. Order No. 13,563, 76 Fed. Reg. 3821, § 1(b) (Jan. 18, 2011) (similar); Exec. Order No. 13,279, 67 Fed. Reg. 77,141, § 2 (Dec. 12, 2002) (directing agencies, "to the extent permitted by law," to be guided by certain principles when "formulating and implementing policies that have implications for faith-based and community organizations"); Exec. Order No. 13,765, 82 Fed. Reg. 8351, § 2 (Jan. 20, 2017) (directing agencies to "exercise all authority and discretion available to them" to waive certain requirements "[t]o the maximum extent permitted by law"); Exec. Order. No. 14,004, 86 FR 7475 § 1 (Jan. 25, 2021) (directing the Executive Branch to "consistent with applicable law, use terms and conditions of Federal financial assistance awards and Federal procurements to maximize the use of goods, products, and materials produced in, and services offered in, the United States").

Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Id.* The court concluded that "[t]he mere possibility that some agency might make a legally suspect decision" in the future is not a ground for an injunction. *Id.* (citing *Reno v. Flores*, 507 U.S. 292, 301 (1993)); *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) (Katsas, J.) ("We cannot ignore these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing the memorandum.").

The Fourth Circuit's decision in *HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021), is not to the contrary. There, the court held that an EO and an implementing agency notice imposed a requirement that was contrary to statute, even though they allowed a "theoretical opportunity for the Secretary to *override*" the unlawful requirement. *Id.* at 325. Imposing a requirement that is contrary to law, but allowing agencies the "discretion" to override it in "limited circumstances," *id.* at 319, is not the same as directing agencies to take actions only to the extent they are consistent with applicable law. The former may be contrary to law, but the latter cannot.[4]

Nor do the EOs challenged here "preclude[] a court from examining whether [they are] consistent with law," rendering "judicial review . . . a meaningless exercise." *HIAS*, 985 F.3d at 325 (quoting *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018)). As the D.C. Circuit noted, "[i]n the event that an agency does contravene the law in a particular instance, an aggrieved party may seek redress through any of the procedures ordinarily available to it: a bid protest, a motion for administrative reconsideration, or an action in the district court challenging that specific decision." *Allbaugh*, 295 F.3d at 33; *see also* 5 U.S.C § 702 (providing a right to

---

[4] The EOs' applicability only to the extent consistent with existing law also forecloses Plaintiffs' argument that they conflict with Section 1557 of the ACA, 42 U.S.C. § 18,116, Section 1908 of the PHSA, 42 U.S.C. § 300w-7, or the Fifth Amendment. *See* Pls.' Mem. at 19–27.

review for "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute").

Recent TROs against a separate EO placing a broad and immediate pause on federal funding, meanwhile, do not counsel in favor of a TRO here. *See* TRO, *New York v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I. Jan. 31, 2025), ECF No. 50; *see also* TRO, *Nat'l Council of Nonprofits v. OMB*, 25-cv-239-LLA (D.D.C. Feb. 3, 2025), ECF No. 30. In those cases, plaintiffs challenged a now-rescinded OMB memorandum "requir[ing] Federal agencies to identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements." OMB Mem. at 1, M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025). The OMB Memo also directed that "[i]n the interim, to the extent permissible under applicable law, Federal agencies must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders[.]" *Id.* at 2.

The EOs at issue here are fundamentally different from the funding pause at issue in those cases. By their own terms, the EOs challenged here direct agencies to impose a new *condition* on grant funding—not immediately pause existing grant funding. Thus, the two actions implicate different agency statutory authorities and aspects of the underlying grant agreements. Moreover, no agency defendant has amended the conditions of any grant or revoked any grant. Finally, the EOs challenged here are undisputedly narrow, in that they apply only to "[f]ederal research or education grants," EO 14,187 § 4, or federal funding "used to promote gender ideology," EO 14,168 § 3(g). The court in Rhode Island, in contrast, construed the OMB Memo as a "wide-ranging, all-encompassing, and ambiguous 'pause' of critical funding." TRO at 4, *New York*, No. 25-cv-39-JJM-PAS. The EOs challenged here, which do not pause any funding, only concern a

limited subset of federal grants, and can only be implemented consistent with applicable law, are entirely legal and appropriate.

### B. Plaintiffs are unlikely to succeed on the merits of their Equal Protection claim.[5]

"[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976).[6] This guarantee "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). To analyze governmental action under the equal protection guarantee, courts "apply different levels of scrutiny to different types of classifications." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Typically, governmental classifications must be merely "rationally related to a legitimate governmental purpose." *Id.* "Classifications based on race or national origin," on the other hand, are suspect and receive "the most exacting scrutiny." *Id.* "Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy." *Id.*; *see also Farm Lab. Org. Comm. v. Stein*, 56 F.4th 339, 351 (4th Cir. 2022) (describing sex as a "quasi-suspect factor").

As an initial matter, application of any of these tiers of scrutiny is inappropriate here, where there is no agency action to scrutinize. And although the Fourth Circuit in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) held that certain funding restrictions on the provision of similar kinds of treatments implicated suspect classifications, the government's position is that *Kadel* was wrongly

---

[5] Plaintiffs do not move on the basis of their substantive due process or First Amendment claims.

[6] The Supreme Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).

decided and should be overruled.[7] In any event, the EOs satisfy the intermediate scrutiny that *Kadel* applied, and Plaintiffs' motion should therefore be denied.

> i.    *EOs directing agencies to explore future options are not amenable to constitutional scrutiny.*

At the threshold, there is a doctrinal mismatch between the EOs—which direct agencies to explore a policy option—and any form of heightened scrutiny. As discussed in Parts I.A. and II.A., *supra*, the EOs only direct agencies to go forth, gather information, and take "appropriate" steps, based on what the facts and law allow. Plaintiffs seek to pretermit that process, forcing the government to justify policies that it has not even adopted. But there is no evidentiary hurdle for the contemplation of future action.  And Plaintiffs do not cite authority subjecting EOs like these to the sort of searching review they propose.  They therefore have not met their heavy burden to show entitlement to the extraordinary relief of a TRO.

> ii.    *The EOs do not warrant intermediate scrutiny based on sex classification.*

In *Kadel*, the closely-split *en banc* Fourth Circuit held that restrictions on coverage for treatments whose purpose was "to align a patient's gender presentation with a gender identity that does not match their sex assigned at birth" amounted to a sex classification and sex stereotyping, where coverage was not restricted "when the purpose of the surgery is to align a patient's gender presentation with their sex assigned at birth." *Id.* at 153. While the government recognizes that this Court is bound by the Fourth Circuit's precedential decisions, *Kadel* was wrongly decided.

The EOs do not treat anyone differently on the basis of sex. In addressing treatments that seek to delay "puberty in an individual who does not identify as his or her sex," or "to align an

---

[7] Petitions for certiorari in *Kadel* are currently pending before the Supreme Court.  The Supreme Court's disposition of those petitions may be affected by its forthcoming decision in *United States v. Skrmetti*, No. 23-477 (U.S.), concerning whether other state laws regarding similar treatments violate the Equal Protection Clause.

individual's physical appearance with an identity that differs from his or her sex," the Protecting

Children EO applies evenhandedly to males and females. EO 14,187 § 2(c). It directs agencies to

take appropriate steps, consistent with applicable law, to ensure that grant recipients do not provide

the referenced treatments to members of either sex who are less than 19 years of age. *Id.* §§ 2, 4.

*See L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 480 (6th Cir. 2023), *cert. granted*, 144 S. Ct.

2679 (U.S.) (that a "key distinction in the laws turns on age" is "eminently reasonable and does

not trigger heightened review.").  The Defending Women EO similarly rejects the proposition that

"there is a vast spectrum of genders that are disconnected from one's sex," EO 14,168 § 2(f)—a

position that again applies equally to both sexes.

Such policies do not privilege or burden one sex over the other, nor apply one regime to

men and another to women, making it wholly unlike the classifications the Supreme Court has

found to be sex-based. *See Craig v. Boren*, 429 U.S. 190 (1976) (prohibition on beer sales to males

under 21 while permitting sales to females over 18 was sex classification); *Miss. Univ. for Women*

*v. Hogan*, 458 U.S. 718 (1982) (university's policy of admitting women, but not men, was sex

classification). It is no surprise, then, that several circuits have concluded that state restrictions on

similar treatments did not establish a sex classification. *See Eknes-Tucker v. Governor of Ala.*

("*Eknes-Tucker I*"), 80 F.4th 1205, 1228 (11th Cir. 2023), *petitions for cert. filed*, Nos. 24-582,

24-612 (U.S.) (state statute did not "establish an unequal regime for males and females" or

otherwise classify based on sex where it restricted services "treating discordance between

biological sex and sense of gender identity for *all* minors"); *Skrmetti*, 83 F.4th at 480 (concluding

that laws that "regulate sex-transition treatments for all minors, regardless of sex" do not constitute

sex classifications).

Plaintiffs wrongly contend that the Protecting Children EO classifies based on sex because

it does not implicate "a given type of care" (e.g., "testosterone") to a boy who seeks to align his appearance with a male identity, but does implicate that type of care for a girl who seeks to align her appearance with a male identity. This reasoning is flawed because it "assumes that any administration of these hormones is one treatment," whereas in fact "[u]sing testosterone or estrogen to treat gender dysphoria (to transition from one sex to another) is a different procedure from using testosterone or estrogen to treat, say, Kleinfelter Syndrome or Turner Syndrome (to address a genetic or congenital condition that occurs exclusively in one sex)." *Skrmetti*, 83 F.4th at 481; *see also Eknes-Tucker v. Governor of Ala.* ("*Eknes-Tucker II*"), 114 F.4th 1241, 1262 (11th Cir. 2024) (Lagoa, J., concurring in denial of reh'g en banc) (state restriction on similar treatments "discriminates based on purpose, not sex"). That the Protecting Children EO treats different treatments, with different purposes, differently does not implicate the Fifth Amendment's requirement that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

Plaintiffs also argue the EOs classify based on sex because they "enforc[e] sex stereotypes and gender conformity." Pls.' Mem. at 22. This too is incorrect: the Orders do not prescribe how men and women should behave, dress, or present themselves, nor do they rely on any generalizations or social constructs relating to "the proper roles of men and women," *Hogan*, 458 U.S. at 726. Moreover, the EOs recognize inherent *physical* and *biological* differences between men and women—differences that the Supreme Court and others have long recognized. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533 (1996) (stating that "[p]hysical differences between men and women . . . are enduring"). Governmental recognition of the "biological" and "undeniable difference[s]" between the sexes "is not a stereotype." *Nguyen v. INS*, 533 U.S. 53, 68, 73 (2001); *see also Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974) (stating that "[w]hile it is true that only

women can become pregnant it does not follow that every legislative classification concerning pregnancy is a sex-based classification").

> iii.   *The EOs do not warrant intermediate scrutiny based on transgender classification.*

Plaintiffs next argue that the EOs trigger intermediate scrutiny because they "classify based on transgender status." Pls.' Mem. at 23. The Protecting Children EO targets only specified treatments for minors, and evinces a policy decision about the medical uses of certain treatments, not classification based on transgender status.  In any event, Plaintiffs' contention fails because, even if the Orders classify based on transgender status, transgender status is not a quasi-suspect classification and thus does not warrant intermediate scrutiny. The government recognizes that the Fourth Circuit has held that "transgender people constitute at least a quasi-suspect class," *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020), and that this Court is bound by the Fourth Circuit's precedential rulings. The government's position is that the Fourth Circuit's conclusion is incorrect and should be overruled.

As the Sixth Circuit explained a decade ago,

> The Supreme Court has not recognized any new constitutionally protected classes in over four decades, and instead has repeatedly declined to do so. Moreover, the Court has never defined a suspect or quasi-suspect class on anything other than a trait that is definitively ascertainable at the moment of birth, such as race or biological gender.

*Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015). In the face of the Supreme Court's reluctance to expand protected classifications beyond the limited classes already recognized, lower courts should not look to create new ones.

Applying the factors the Supreme Court has looked to in determining whether a quasi-suspect class exists results in the same conclusion. Transgender persons do not "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group." *Bowen v.*

*Gilliard*, 483 U.S. 587, 602 (1987). Transgender status is not obvious and "ascertainable at the moment of birth" like other protected classes, *Ondo*, 795 F.3d at 609, nor is it "necessarily immutable, as the stories of 'detransitioners' indicate." *Skrmetti*, 83 F.4th at 487; *see also Eknes-Tucker II*, 114 F.4th at 1271–72. Transgender status further is not characterized by a specific defining feature, but instead may be said to include "a huge variety of gender identities and expressions." *Skrmetti*, 83 F.4th at 487; *see also* Br. of American Psychological Association as *Amicus Curiae*, Dkt. 50, at 6 n.7, *United States v. Skrmetti*, No. 23-477 (U.S. Sept. 3, 2024) (stating that "transgender" is an "umbrella term" that covers "many diverse gender experiences").

It cannot be said that transgender persons are a "political[ly] powerless[]" group either. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973). "A national anti-discrimination law, Title VII, protects transgender individuals in the employment setting," and many "States have passed laws specifically allowing some of the treatments sought here." *Skrmetti*, 83 F.4th at 487. The mere fact that transgender persons may not be able to "themselves mandate the desired legislative responses," and that they may "claim some degree of prejudice from at least part of the public at large," is insufficient. *Cleburne*, 473 U.S. at 445. Similarly, claims of historical injustice are not sufficient: the Supreme Court in *Cleburne* "rejected the argument that mental disability is a suspect classification, despite a history of compulsory sterilization, exclusion from public schools, and a system of 'state-mandated segregation and degradation' 'that in its virulence and bigotry rivaled, and indeed paralleled, the worst excesses of Jim Crow.'" *Eknes-Tucker II*, 114 F.4th at 1266 (Lagoa, J., concurring) (quoting *Cleburne*, 473 U.S. at 462–63 (Marshall, J., concurring in the judgment and dissenting in part)).

    iv. *The EOs do not warrant intermediate scrutiny based on discriminatory intent.*

Plaintiffs argue that even if the EOs do not facially classify based on sex, they still warrant

intermediate scrutiny because they are animated by "prejudice" against transgender persons. Pls.' Mem. at 25; *see Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 276 (1979) (stating that the "dispositive question" in an equal protection analysis of a facially neutral statute was whether "a gender-based discriminatory purpose" motivated the legislation). But Plaintiffs do not come close to the required showing that the Orders are "inexplicable by anything but animus." *Trump v. Hawaii*, 585 U.S. 667, 706 (2018); *see also Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253 (2022) ("This Court has long disfavored arguments based on alleged legislative motives.").

As set out in the Order's text and further discussed at Part II.B.v., *infra*, the purpose of the Protecting Children EO is to combat "irreversible medical interventions" that some "children soon regret," leaving them with rising "medical bills," "lifelong medical complications," and other issues. EO 14,187 § 1; *see also* EO 14,168 § 1 (discussing purpose of preventing the deprivation of women's "dignity, safety, and well-being"); *Eknes-Tucker II*, 114 F.4th at 1271–75 (declarations discussing physical and mental health issues stemming from similar medical interventions). As the Sixth Circuit explained in *Skrmetti*, "a law premised only on animus toward the transgender community would not be limited" by age, and age limits on serious medical interventions in fact show that the government "plainly had other legitimate concerns in mind." 83 F.4th at 487; *see also id.* at 488 (noting that the "novelty" of similar treatments "also undercuts any claim of animus," given "limited data" evaluating those treatments and the considered positions of other nations that have "limited these medical interventions for minors").

Plaintiffs' contention that the "context surrounding" the EOs shows animus should not be credited. Plaintiffs cite no authority for the proposition that other orders issued by the President— not before the Court in this case—can or should shed meaningful light on the purposes of the EOs

challenged here, and such speculative theories of cross-order animus conflict with the Supreme

Court's reluctance to engage in wide-ranging motive-based inquiries. *See Dobbs*, 597 U.S. at 253.

> v.    *Important governmental interests animate the President's order that agencies explore policy options.*

Rational basis review requires only that "there is any reasonably conceivable state of facts

that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S.

307, 313 (1993). "[T]hose attacking the rationality of the . . . classification have the burden to

negative every conceivable basis which might support it." *Id.* at 315 (quotations omitted). Under

intermediate scrutiny, the government must show that the classification "serves important

governmental objectives and that the discriminatory means employed are substantially related to

the achievement of those objectives." *Virginia*, 518 U.S. at 533 (quotations omitted). Because the

EOs do not classify based on any protected characteristic, rational basis review should apply.  But

the EOs also satisfy intermediate scrutiny, and should therefore be upheld notwithstanding *Kadel*,

which did not address restrictions on these treatments for persons under 19 years of age.

The EOs serve important (indeed compelling) governmental interests. "A democratic

society rests, for its continuance, upon the healthy, well-rounded growth of young people into full

maturity as citizens," and the Supreme Court has accordingly "sustained legislation aimed at

protecting the physical and emotional well-being of youth even when the laws have operated in

the sensitive area of constitutionally protected rights." *New York v. Ferber*, 458 U.S. 747, 757

(1982) (quotation omitted). The EOs are based on this governmental interest: as the Protecting

Children EO explains,

> Countless children soon regret that they have been mutilated [through the covered treatments] and begin to grasp the horrifying tragedy that they will never be able to conceive children of their own or nurture their children through breastfeeding. Moreover, these vulnerable youths' medical bills may rise throughout their lifetimes, as they are often trapped with lifelong medical complications, a losing war with their own bodies, and, tragically, sterilization.

EO 14,187 § 1.[8] Far from evincing a "bare desire to harm" transgender people, Pls.' Mem. at 27, the Protecting Children EO evinces a presidential directive that agencies consider appropriate ways to prevent serious harms to young people under applicable law.

Evidence abounds that treatments covered by the Protecting Children EO "are dangerous and ineffective." *Eknes-Tucker II*, 114 F.4th at 1266 (Lagoa, J., concurring); *see also id.* (discussing "declarations from six medical experts—three endocrinologists (including two pediatric endocrinologists), a clinical psychologist, a psychotherapist, and a pediatrician—who testified to the acute dangers posed to children" by "cross-sex hormones and puberty blockers"); *Skrmetti*, 83 F.4th at 489 (discussing similar evidence); Tenn. Code Ann. § 68-33-101 (legislative findings that similar treatments "can lead to the minor becoming irreversibly sterile, having increased risk of disease and illness, or suffering from adverse and sometimes fatal psychological consequences"). Moreover, as the Protecting Children EO references, adolescents cannot necessarily "appreciate the life-altering nature of the[se] medical treatments" such that they are "incapable of knowingly consenting" to their use. *Eknes-Tucker II*, 114 F.4th at 1267 (Lagoa, J., concurring). Combined with the fact that "studies show that most children with gender dysphoria grow out of it," *id.*, this results in adolescents later experiencing "regret" about the irreversible treatments they were subjected to, EO 14,187 § 1.

Plaintiffs argue that these treatments are "medically necessary." Pls.' Mem. at 26. But while plaintiffs may disagree, there is ample evidence for the EOs' concern about a lack of sufficient medical or scientific evidence of the efficacy of such treatments for gender dysphoria in minors

---

[8] Plaintiffs do not separately address the interests served by the Defending Women EO, which include "defend[ing] women's rights and protect[ing] freedom of conscience" by addressing attempts to deprive women "of their dignity, safety, and well-being." EO 14,168 § 1. Plaintiffs therefore have failed to meet their burden of showing entitlement to the extraordinary relief of a TRO as against that Order.

and the high risks of adverse effects. *See, e.g.*, *Skrmetti*, 83 F.4th at 488–89 (stating that "the evidence supporting [similar treatments'] use is far from conclusive," and discussing the "unsettled, developing, in truth still experimental[] nature of treatments in this area"); Tenn. Code Ann. § 68-33-101 (similar treatments "are experimental in nature and not supported by high-quality, long-term medical studies"); *Treatment: Gender Dysphoria*, National Health Service (May 28, 2023), https://www.nhs.uk/conditions/gender-dysphoria/treatment/ (explaining that "[p]uberty suppressing hormones are not available to children and young people" for treating gender dysphoria in England "because there is not enough evidence on their clinical safety and effectiveness," and that there is "uncertainty about the risks of long-term gender-affirming hormone treatment").

Plaintiffs further argue that the Protecting Children EO does not protect children because it targets treatments provided to those "under 19 years of age," EO 14,187 § 2, whereas Plaintiffs contend that "18-year-olds are legal adults," Pls.' Mem. at 26. As an initial matter, the age of majority differs across the United States, and may exceed eighteen years. *E.g.*, Ala. Code § 26-1-1 ("Any person in this state, at the arrival at the age of 19 years, shall be relieved of his or her disabilities of minority."). More importantly, the Protecting Children EO seeks to address real-world harms applicable to adolescents, whose bodies and minds are still developing, and who therefore may be understood to have not fully reached adulthood in relevant respects. Medical organizations have stated that adolescence may continue at least to a person's nineteenth year. *See, e.g.*, *Age Limits and Adolescents*, Canadian Paediatric Society (Nov. 2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC2794325/ ("Adolescence . . . corresponds roughly to the period between the ages of 10 and 19 years.").

Plaintiffs finally argue, without citing authority, that the Protecting Children EO is not

sufficiently related to any important governmental interest because it is both "over- and under-inclusive." Pls.' Mem. at 26. Not so. That the Protecting Children EO does not address treatments to "conform a person's gender presentation . . . to their assigned sex," *id.* at 27, does not make it underinclusive: the government did not identify, nor do Plaintiffs cite, evidence that use of these treatments create the same harms as the uses addressed in the Order. Nor does the Order's purported nationwide reach make it overinclusive; as discussed, the covered treatments raise risks applicable to all adolescents. Moreover, it only represents the President's request that agencies consider implementation of a condition as permitted under law, and therefore does not effect a nationwide change in any relevant respect.  Plaintiffs have therefore not shown that the EOs are over- or under-inclusive at all, much less that they are "*grossly* over [or] under-inclusive," *Harrison v. Kernan*, 971 F.3d 1069, 1075 (9th Cir. 2020) (emphasis added), such that there can be no substantial relationship between the government's means and its ends.

In sum, the EOs satisfy intermediate scrutiny (as well as rational basis review), and should not be enjoined.

### C. Plaintiffs are unlikely to succeed on the merits of their statutory sex discrimination claim.

Title IX of the Education Amendments of 1972 prohibits certain education entities from subjecting individuals to discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Section 1557 of the ACA, 42 U.S.C. § 18116, and Section 1908 of the PHSA, 42 U.S.C. § 300w-7, in turn, incorporate Title IX's prohibition against health care entities receiving certain federal funding. Plaintiffs argue that the Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644, 658, 660 (2020), which held that discrimination "because of [an] individual's . . . sex" under Title VII of the Civil Rights Act of 1964 includes discrimination based on "transgender status," applies

equally to Title IX and thus Sections 1557 and 1908.[9]

The EOs, however, do not themselves impose any conditions on funding, and only direct agencies to take actions consistent with applicable law, including these statutes. Plaintiffs thus have not identified any violation of those statutes. Moreover, Plaintiffs are incorrect that the EOs "require federal grantees to engage in precisely the discrimination that those laws prohibit," Compl. ¶ 196. If grantees believe that providing, for example, a given hormone to a cisgender patient for one purpose but not to a transgender patient for a different purpose is discrimination under Sections 1557 or 1908, the grantees may choose not to provide that hormone to anyone. Nothing in the EOs compel grantees to discriminate, even under Plaintiffs' own reasoning.

## III. The remaining factors counsel against granting the requested relief.

### A. Plaintiffs have not shown irreparable injury attributable to the EOs.

Plaintiffs wrongly contend that they have shown irreparable injury because of the "prospect of an unconstitutional enforcement" against them. Pls.' Mem. at 28 (quoting *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022)). But that prospect is speculative at this point given that the EOs have not been applied to any specific funding or grants. Moreover, "merely asserting a constitutional claim is insufficient to trigger a finding of irreparable harm." *Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 542 (E.D.N.C. 2020). As set out herein, Plaintiffs "are unlikely to succeed on the merits of their constitutional claims; therefore, their alleged constitutional injuries do not constitute irreparable harm." *Id.*; *see also, e.g.*, *Maryland Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567, 593 (D. Md. 2023) (similar).

Plaintiffs also contend that the EOs harm them because medical institutions have refused to provide Plaintiffs with certain treatments purportedly in response to the EOs. This contention

---

[9] The government acknowledges that the Fourth Circuit in *Kadel* held that Section 1557 prohibits discrimination based on transgender status. *See* 100 F.4th at 163–64.

fails to support their request for a TRO as well: The EOs do not revoke federal funding provided to the relevant medical institutions or prohibit those institutions from undertaking any particular treatments. The harm plaintiffs allege is thus based on the medical institutions' speculation regarding actions that funding agencies might take in the future. There is no reason to think the medical institutions' views on the relevant agencies' likely future behavior would change if the EO were enjoined. Thus, plaintiffs cannot demonstrate that the TRO they seek would remedy this alleged harm. *See Raia v. Pompeo*, 455 F. Supp. 3d 7, 15 (E.D.N.Y. 2020) (denying motion for preliminary injunction where, "while the harm Plaintiff alleges . . . is irreparable, the record does not demonstrate that this harm would likely be remedied by the relief requested").

### B. The public interest weighs against relief.

Plaintiffs cannot establish that the balance of equities and the public interest favor granting the extraordinary remedy of a TRO. These final two factors merge in cases where relief is sought from the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214 (D. Md. 2020).

In arguing that the public interest weighs in their favor, Plaintiffs primarily rely on the notion that there is no public interest in unconstitutional actions. *See* Pls.' Mem. at 29. But that is just a repackaged version of their merits arguments, and as previously discussed, Plaintiffs have failed to establish a likelihood of success on the merits of their claims. Furthermore, the relief Plaintiffs request would effectively disable the President and federal agencies from effectuating the President's agenda consistent with their statutory authorities and constitutional duties. The public interest is not advanced when the Executive is disabled from even *considering* a policy, especially one that has been the subject of legislation across the country. *See* KFF, *Policy Tracker: Youth Access to Gender Affirming Care and State Policy Restrictions*. Thus, the balance of the equities weighs in favor of the Government and relief should be denied.

## IV.    Any TRO should be limited to Plaintiffs.

For the reasons explained above, the Court should deny Plaintiffs' motion in its entirety. But even if the Court determines that a TRO is appropriate, it should be limited to the Plaintiffs before this Court. Nationwide injunctions are extraordinary remedies, and the burden is on the plaintiff to prove why one is necessary. Plaintiffs have not done so here because they have not demonstrated why an injunction limited to themselves would not suffice. Rather, they relegate this heavy burden to a cursory paragraph at the end of their brief. *See* Pls.' Mem. at 28–29.

"Article III of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.'" *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 438 (2017) (citation omitted). A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Gill v. Whitford*, 585 U.S. 48, 50 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)); *see also Doe 2 v. Shanahan*, 917 F.3d 694, 739–40 (D.C. Cir. 2019) (Williams, J., concurring) ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it.' Nothing more." (quoting *Gill*, 585 U.S. at 72)). Thus, "a plaintiff's judicial 'remedy must be tailored to redress *the plaintiff's* particular injury.'" *Id.* at 740 (quoting *Gill*, 585 U.S. at 73).

Principles of equity reinforce those limitations. A court's equitable authority to award relief is generally confined to relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318, 319 (1999). And "[u]niversal injunctions have little basis in traditional equitable practice." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring); *see also Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021) (noting that the "appropriate circumstances" for issuing a nationwide injunction "are rare").

Nationwide injunctions also "take a toll on the federal court system." *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring). "The traditional system of lower courts issuing interlocutory relief limited to the parties at hand . . . . encourages multiple judges and multiple circuits to weigh in." *New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring). In contrast, nationwide injunctions "prevent[] legal questions from percolating through the federal courts." *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring). Moreover, "[i]f a single successful challenge is enough to stay the challenged rule across the country, the government's hope of implementing any new policy could face the long odds of a straight sweep, parlaying a 94-to-0 win in the district courts into a 12-to-0 victory in the courts of appeal." *New York*, 140 S. Ct. at 601 (Gorsuch, J., concurring). "A single loss and the policy goes on ice—possibly for good, or just as possibly for some indeterminate period of time until another court jumps in to grant a stay." *Id.* These concerns are apt here. A group of plaintiffs have challenged the Protecting Children EO on similar grounds in the Western District of Washington, and have also moved for a TRO. *See* Pls.' Mot. for a Temporary Restraining Order, ECF No. 11, *Washington*, 2:25-cv-244 (W.D. Wa. Feb. 7, 2025). Here, Plaintiffs' statutory and Equal Protection arguments hinge on Fourth Circuit precedent that diverges from authority in other circuits, and Ninth Circuit law and the reviewing court's analysis may diverge in other relevant respects as well. As a result, this Court should allow "multiple circuits to weigh in," *New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring), and not block the administration's policies beyond what is necessary to provide relief to Plaintiffs.

Permitting nationwide injunctions also undercuts the primary mechanism Congress has authorized to permit broader relief: class actions. It enables all potential claimants to benefit from nationwide injunctive relief by prevailing in a single district court, without satisfying the prerequisites of Federal Rule of Civil Procedure 23, while failing to afford the Government the

corresponding benefit of a definitive resolution of the underlying legal issues to all potential claimants if it prevails instead.

Plaintiffs nonetheless contend that a nationwide TRO is necessary because the plaintiff associations have "members throughout the country."[10] Pls.' Mem. at 29. But "injunctive relief operates on specific parties, not geographic territories, and identifying the . . . association members is possible." *Georgia v. President of the United States*, 46 F.4th 1283, 1307 (11th Cir. 2022). Nor is nationwide relief appropriate to remedy harms to "third parties," Pls.' Mem. at 30; Article III limits the judicial power to redressing injuries to Plaintiffs in this suit. Any TRO should thus be limited to the named Plaintiffs only.  And as to the membership organizations, any relief should be granted only to the members identified in the complaint, and plaintiffs have identified none. *See FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring).

## V.    Any injunctive relief should be stayed.

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

## CONCLUSION

Plaintiffs' motion for a temporary restraining order should be denied.[11]

---

[10] Plaintiffs do not state that the associations have members in fifty states, let alone have members at every hospital that receives federal grant funding. *See* Pls.' Mem. at 29–30.

[11] Certain Plaintiffs have also moved for leave to proceed under pseudonyms, and for related relief. *See* ECF No. 2. Without taking a position on the factual and/or legal assertions in the motion, the government does not oppose the motion. The government reserves the right to request that the Court modify any resulting protective order for good cause.

Dated: February 11, 2025

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

MICHELLE BENNETT
Assistant Director
Federal Programs Branch

*/s/  Vinita B. Andrapalliyal*
VINITA B. ANDRAPALLIYAL
Senior Counsel
CHRISTIAN S. DANIEL*
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel.:    (202) 514-0265
vinita.b.andrapalliyal@usdoj.gov
christian.s.daniel@usdoj.gov
*Counsel for Defendants*

*\*Application for admission pro hac vice pending*