IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PFLAG, INC., et al.,<br>　*Plaintiffs*,<br><br>　　　　　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br>　*Defendants*. | Civil Action No. BAH-25-337 |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR A TEMPORARY RESTRAINING ORDER**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

ARGUMENT ................................................................................................................................... 1

I.     PLAINTIFFS' CLAIMS ARE JUSTICIABLE. ................................................................. 1

     A.     Plaintiffs' Claims Are Ripe............................................................................................. 1

     B.     Plaintiffs Have Asserted Valid Claims for Equitable Relief. ................................ 4

II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS. ................................ 5

     A.     The Gender Identity and Denial of Care Orders Violate Separation of Powers. ..... 5

     B.     The Gender Identity and Denial of Care Orders Conflict with Statutory Nondiscrimination Requirements. ....................................................................... 7

     C.     The Gender Identity and Denial of Care Orders Violate Equal Protection. ........... 9

          1.     The Orders Trigger Heightened Equal Protection Scrutiny......................... 9

          2.     The Orders Fail Heightened Scrutiny. ...................................................... 10

III.     THE OTHER FACTORS FAVOR A TEMPORARY RESTRAINING ORDER. .......... 14

CONCLUSION ................................................................................................................................ 15

**INTRODUCTION**

Defendants' attempt to withhold federal funding from institutions that provide gender affirming medical care violates bedrock constitutional principles, including the separation of powers and the equal protection of the laws, and conflicts with duly enacted acts of Congress. As more hospitals continue to shut down necessary care for transgender patients under age nineteen in response to the Gender Identity and Denial of Care Orders ("the Orders"),[1] a nationwide temporary restraining order against the Orders' challenged provisions is necessary and fully within this Court's power to issue.

**ARGUMENT**

**I.    PLAINTIFFS' CLAIMS ARE JUSTICIABLE.**

**A.    Plaintiffs' Claims Are Ripe.**

Defendants do not dispute that Plaintiffs have Article III standing to bring this suit. *See* Dkt. 35-1 ("Pls.' Mem.") at 14-15. Rather, they assert the litigation is premature because the Agency Defendants have not (according to Defendants) taken action to implement the illegal Executive Orders. Defendants' assertions misstate the relevant facts and the applicable law.

Plaintiffs' challenge to the facially unconstitutional Executive Orders is ripe for review. "When evaluating ripeness, [courts] consider (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Int'l Refugee Assistance*

---

[1] Since Plaintiffs filed their complaint and motion for a temporary restraining order last week, additional hospitals have cut off necessary care for transgender patients under age nineteen. Children's Hospital of Colorado released a statement on February 5 that it must "transition its model of gender affirming care" and "end hormone-based" gender affirming medical care for any patient under 19. The hospital noted that the Denial of Care Order threatens its ability to receive federal health care funds that support thousands of patients. O. Gonzalez-Pagan Supp. Decl. Ex. R-4. Multiple providers in Arizona have followed suit, confirming they would cease providing gender-affirming hormone therapy to patients under 19. *Id.*, Exs. R-7 and R-8. Additionally, several other hospitals, including Children's Hospital Los Angeles and Corewell Heath in Michigan, have stopped initiating care for new patients. *Id.*, Exs. R-5 and R-6.

*Project v. Trump ("IRAP")*, 857 F.3d 554, 587 (4th Cir. 2017) (*en banc*), *vacated and remanded on other grounds*, 583 U.S. 912 (2017) (cleaned up).  The issues in this case are fit for judicial decision because Plaintiffs have brought a facial challenge that the President lacks authority to direct agencies to withhold federal grants from an institution because it provides gender affirming medical care.  *See City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1235-37 (9th Cir. 2018) (finding pre-enforcement standing where policies of grant recipients were in conflict with executive order).

Moreover, as Plaintiffs' declarations demonstrate, Plaintiffs and members of PFLAG across the country face immense hardship every day President Trump's unlawful Orders remain unreviewed by the courts.  *See Edgar v. Haines*, 2 F.4th 298, 311 (4th Cir. 2021) (explaining that ripeness requires only that "[t]he plaintiffs have challenged practices and procedures to which they are currently subject" and often hinges on "the hardship to the parties of withholding court consideration") (citations omitted).  In light of the Executive Orders' immediate and devastating consequences, Plaintiffs need not await future enforcement to seek judicial relief.

Defendants' assertion that "no agency defendant has revoked . . . any particular grant as a result of the EO" is also untrue.  Dkt. 55 ("Opp.") at 7.  The Denial of Care Order instructed agencies to "*immediately* take appropriate steps to ensure that institutions receiving Federal research or education grants end" the provision of gender affirming medical care.  Denial of Care Order § 4 (emphasis added).  That is precisely what Defendant Health Resources and Services Administration ("HRSA") did.  On January 31, 2025, HRSA issued notices to grant recipients informing them that HRSA grant funds may not be used for activities that "do not align with" the Gender Identity and Denial of Care Orders and that any "vestige, remnant, or re-named piece of any programs in conflict with these E.O.s *are terminated* in whole or in part."  Am. Compl. ¶ 81 (emphasis added); *see* Dkt. 35-5.  Thus, the Order is "already in effect as to certain individuals and

2

is being enforced by federal agencies." *Int'l Refugee Assistance Project v. Trump*, 265 F. Supp. 3d 570, 604 (D. Md. 2017), *judgment vacated on other grounds*, 585 U.S. 1028 (2018).

Nor does it matter that HRSA subsequently "rescinded" that notice on February 5, 2025. HRSA likely issued the retraction to comply with the TRO issued by the district court in *New York v. Trump*, No. 25 Civ. 39, 2025 WL 357368 (D.R.I. Jan. 31, 2025), which Defendants are seeking to stay pending appeal. It is "well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks and citation omitted). For instance, as Judge Bates explained earlier this week in a challenge to the removal of agency websites, "that an agency may restore the removed webpages in the future does not mean that the agency's prior removal decision was not the consummation of an agency's decisionmaking process." *Drs. for Am. v. Off. of Pers. Mgmt.*, No. 25 Civ. 322, 2025 WL 452707, at *6 (D.D.C. Feb. 11, 2025).

The HRSA recission notice also does not apply to termination notices that the CDC and other components of HHS have issued, which remain in place. The CDC, for example, has issued notices to grant recipients ordering them to "*immediately* terminate, to the maximum extent, all programs, personnel, activities, or contracts *promoting or inculcating gender ideology at every level and activity*." Gonzalez-Pagan Supp. Decl. Ex. R-9 (emphasis added). Additionally, NIH appears to have issued "specific orders defunding" or suspending multiple research studies and health services for transgender people. *Id.*, Ex. R-3. Plaintiffs' claims are ripe for review.[2]

---

[2] Defendants conflate the requirements of "ripeness" with the requirements of "final agency action" under the APA. As Defendants acknowledge (Opp. 6-7), Plaintiffs do not seek a TRO pursuant to the APA, and the requirement of "final agency action" applies only to APA claims. *See Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006) (explaining the APA waives sovereign immunity even for non-APA claims where no final agency action has occurred); *Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 672 (6th Cir. 2013)

3

## B. Plaintiffs' Claims for Equitable Relief are Valid.

Plaintiffs have asserted valid claims for equitable relief. *See CASA, Inc. v. Trump*, No. 25 Civ. 201, 2025 WL 408636, at *4 (D. Md. Feb. 2, 2025). "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). And it is "well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring)). Thus, even when agency officials are "acting at the behest of the President . . . courts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Id.* (cleaned up).

Defendants admit that courts have equitable power to enjoin *ultra vires* agency actions. Defendants nevertheless assert Plaintiffs may not seek relief based on injuries caused by the coercive effect of *ultra vires* actions on third-party hospitals. But Defendants provide no support for that argument. It is well settled that for purposes of Article III standing, a party may assert claims based on injuries that flow from the "predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 767-68 (2019). And as President Trump's press release celebrating the hospital closures reflects, "[t]his expected behavior" was "the desired result." *Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 489 (D. Md. 2019); *see* Dkt. 35-11.

---

(explaining the APA's "waiver of sovereign immunity extends to all non-monetary claims against federal agencies and their officers sued in their official capacity, regardless of whether plaintiff seeks review of 'agency action' or 'final agency action'").

4

Defendants do not explain why the same principles do not apply for *ultra vires* actions. They cite a Tenth Circuit decision holding that a plaintiff cannot assert claims in equity against a state for statutory violations unless the plaintiff has a substantive right under the statute that has been violated. Opp. 10 (citing *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 902 (10th Cir. 2017)). But as the Tenth Circuit noted, "[t]he question of who may enforce a statutory right is fundamentally different from the question of who may enforce a right that is protected by the Constitution." 859 F.3d at 902 n.14 (cleaned up). And the Supreme Court has already recognized a right to equitable relief "under the Constitution to challenge governmental action under . . . separation-of-powers principles." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). Moreover, through their claim that the Executive Orders conflict with Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116, and Section 1908 of the Public Health Service Act ("PHSA"), 42 U.S.C. § 300w-7, Plaintiffs are asserting their own substantive rights to be free from sex discrimination by health care entities receiving federal funding. Plaintiffs may seek equitable relief to vindicate those rights.

## II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS.

### A.     The Gender Identity and Denial of Care Orders Violate Separation of Powers.

The Executive Orders are *ultra vires* and violate the separation of powers because they attempt to impose additional conditions on funds already appropriated by Congress. Defendants admit that "[b]y their own terms, the EOs challenged here direct agencies to impose a new *condition* on grant funding." Opp. 14. But as Plaintiffs explained in their opening brief, the Constitution vests Congress—not the President—with the power of the purse. When Congress has appropriated federal funds by statute for a particular purpose, the President does not have the authority to effectively amend or repeal the appropriation statutes by unilaterally adding his own conditions to the funding. "The Executive Branch has a duty to align federal spending and action

5

with the will of the people as expressed through congressional appropriations, not through 'Presidential priorities.'" *New York*, 2025 WL 357368, at *2 (cleaned up).

Defendants dispute none of this. Defendants concede that agencies may pursue "the President's policy preference [only] to the extent permitted by applicable law." Opp. 11. And Defendants do not argue that federal law actually authorizes agencies to withhold federal grants from entities providing gender affirming medical care to people under nineteen. Instead, Defendants assert that the President's unlawful Executive Orders merely ask agencies to "act within their own statutory authorities" and impose additional conditions on federal grants only to the extent that doing so would be in accordance with the ordinary procedural requirements for agency action. Opp. 11-12.

Nonsense. Although *other* provisions of the Executive Orders may have directed agencies to take future administrative actions, the provisions regarding federal funding are mandatory and direct agencies to act "immediately." *Cf. Stone v. Trump*, 280 F. Supp. 3d 747, 771 (D. Md. 2017) ("[T]he President's Memorandum [banning transgender service members] is not a request for a study but an order to implement the Directives contained therein"). Everyone—from the agency appointees at HRSA who issued immediate termination notices, to the Attorney General of Virginia who ordered hospitals to stop providing gender affirming medical care based on the Orders, to the hospital executives across the country who suddenly halted medical care leaving transgender patients and their families stranded and scared—understood that the Executive Orders had immediate and severe consequences. If there were any doubt, the President's own words confirm that these immediate shutdowns were the Orders' "intended effect." Dkt. 35-11.

Defendants' suggestion that Plaintiffs could have waited to "seek redress through any of the procedures ordinarily available" under the Administrative Procedure Act is not only

6

misguided; it is perverse. Opp. 13. The "intended effect" of the Executive Orders' "immediate" command was to terrorize hospitals with threats that the government would instantly and unlawfully terminate federal funding outside the ordinary administrative process. HRSA did precisely that by immediately informing grant recipients that their grants "are terminated" and that recipients "may not incur any additional costs that support any programs, personnel, or activities in conflict with these E.O.s." Dkt. 35-5. The CDC has done the same. Gonzalez-Pagan Supp. Decl., Exs. R-1, R-2, R-9.

Defendants cannot ignore the reality of what actually happened by hiding behind a boilerplate statement that the Orders must be implemented consistent with applicable law. As explained herein, there is simply no lawful implementation of these Orders. In similar circumstances, the Fourth Circuit already has held in *HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021), that plainly unlawful executive orders cannot evade judicial review by including a similar boilerplate statement. *HIAS* explained that government cannot "immunize [an Executive] Order from review through a savings clause" that conflicts with the Order's plainly unlawful "substantive provisions." *Id*. at 325. If a boilerplate savings clause "precludes a court from examining whether [an] Executive Order [actually] is consistent with law, judicial review is a meaningless exercise." *Id.* (quoting *City & Cnty. of S.F.*, 897 F.3d at 1240).

**B.     The Gender Identity and Denial of Care Orders Conflict with Statutory Nondiscrimination Requirements.**

The Executive Orders are also *ultra vires* because they conflict with statutes prohibiting healthcare entities receiving federal grants from discriminating based on sex. Defendants acknowledge the Executive Orders would be unlawful if they directed grantees to engage in conduct that violated Section 1557 of the ACA or Section 1908 of the PHSA. Opp. 13 n.4. And Defendants concede that under *Kadel v. Folwell*, 100 F.4th 122, 153 (4th Cir. 2024) (*en banc*)

7

("*Kadel II*"), denying gender affirming medical care to people under nineteen is sex discrimination under those statutes. Defendants' only argument in defense of the Orders is that a hospital could theoretically comply with *both* the President's grant conditions *and* the antidiscrimination statutes by declining to provide any hormone medications to anyone. Opp. 3.

Defendants do not explain how placing the nation's hospitals in that untenable position—making it effectively impossible for any entity receiving federal funding to provide any treatment for endocrine conditions—is consistent with "the expressed or implied will of Congress" when it appropriated funds for grants to hospitals or passed the ACA. *Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015). In interpreting federal statutes, a "fair reading of legislation demands a fair understanding of the legislative plan." *King v. Burwell*, 576 U.S. 473, 498 (2015). Congress passed the ACA and PHSA "to improve" access to healthcare, "not to destroy" it. *Id.*[3]

Indeed, far from delegating open-ended authority to the Executive Branch to impose its own grant conditions to "end" particular medical practices—much less all endocrine treatments—in Section 1554 of the ACA, Congress has prohibited HHS from taking action that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care"; "impedes timely access to health care services"; "interferes with communications regarding a full range of treatment options between the patient and the provider"; "restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions"; or "violates the principles of informed consent and ethical standards of health care professionals." 42 U.S.C. § 18114(1)-(5); *see Mayor of Balt. v. Azar*, 973 F.3d 258, 288 (4th Cir. 2020) (affirming preliminary injunction against enforcement of regulation that conflicted with

---

[3] Because Medicaid is also subject to Section 1557, Defendants' argument would also leave millions of Medicaid beneficiaries, cisgender or transgender, without access to these treatments. *See Kadel II*, 100 F.4th at 164.

8

these prohibitions). Defendants cannot save the Executive Orders from conflicting with Section 1557 of the ACA by interpreting them in a manner that conflicts with Section 1554 instead.

### C. The Gender Identity and Denial of Care Orders Violate Equal Protection.

#### 1. The Orders Trigger Heightened Equal Protection Scrutiny.

Defendants concede, as they must, that *Kadel II* controls. Nonetheless, they attempt to relitigate that controlling precedent. In *Kadel II*, the Fourth Circuit held that governmental policies categorically excluding or prohibiting gender affirming medical care for transgender people are subject to heightened scrutiny because they classify based on sex and transgender status. Despite Defendants' protestations, the same is true here.

Defendants' argument that the Orders "do not treat anyone differently on the basis of sex" because they purportedly apply "evenhandedly to males and females" does not change that the Orders classify individuals based on sex and trigger heightened equal protection scrutiny under controlling precedent. Opp. 16-17. As *Kadel II* already explained, Defendants' "argument elides common sense and is inconsistent with Supreme Court precedent about how to approach equal-protection analyses." 100 F.4th at 147. Explicit facial classifications do not become neutral "on the assumption that all persons suffer them in equal degree." *Powers v. Ohio*, 499 U.S. 400, 410 (1991); *see J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 142 n.13 (1994) (rejecting "equal application" argument in the context of sex classifications).[4]

Defendants also argue the Orders do not enforce sex stereotypes because they merely "recognize inherent physical and biological differences." Opp. 18. But the Fourth Circuit already rejected the argument that stereotypes connected to biological differences are somehow immune

---

[4] Defendants intimate that the Denial of Care Order merely discriminates based on age. Opp. 21. But including an age classification alongside a sex classification does not insulate the Denial of Care Order from heightened scrutiny. *See Craig v. Boren*, 429 U.S. 190, 197 (1976) (applying heightened scrutiny to sex classification even though it affected only men between the ages of 18 and 20).

9

from heightened scrutiny. *Kadel II*, 100 F.4th at 154. "No doubt, the majority of those assigned female at birth have breasts, and the majority of those assigned male at birth do not. But we cannot mistake what is for what must be. And because gender stereotypes can be so ingrained, we must be particularly careful in order to keep them out of our Equal Protection jurisprudence." *Id.*[5]

Finally, Defendants' argument that classifications based on transgender status do not warrant heightened scrutiny (Opp. 19-20) likewise is foreclosed. *See Kadel II*, 100 F.4th at 143; *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611-13 (4th Cir. 2020).[6]

### 2. The Orders Fail Heightened Scrutiny.

Under heightened scrutiny, Defendants bear the burden of "provid[ing] an exceedingly persuasive justification for the classification" and "show[ing] that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Kadel II*, 100 F.4th at 156 (cleaned up). They have not done so. Though no one disputes that protecting children is an important governmental interest, the Orders do not substantially advance, or even rationally relate to, that interest.

Defendants argue that gender affirming medical care is ineffective, that it carries risks, and that adolescents are unable to consent to this care because they may later regret it. Opp. 22-24. None of these arguments, which simply repeat the text of the Order without presenting evidence, passes muster. "Without evidence that the treatments are ineffective to treat gender dysphoria, Defendants cannot meet their burden to show that the risks substantially outweigh the benefits so

---

[5] Defendants' suggestion that people assigned male and female at birth are not similarly situated with respect to the prohibited medication (Opp. 17-18) misconstrues controlling law. *See Kadel II*, 100 F.4th at 155 ("The similarly situated inquiry does not just ask whether two groups are similarly situated; it asks whether they are similarly situated with respect to the statute's objective.").

[6] The idea that transgender people are not politically powerless currently (Opp. 20) is as untenable as it is fanciful. *See* Pls.' Mem., at 24-25. "[T]ransgender people are unarguably a politically vulnerable minority." *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018).

as to justify their sex- and transgender-based policy." *Kadel v. Folwell*, 620 F. Supp. 3d 339, 380 (M.D.N.C. 2022), *aff'd*, 100 F.4th 122.

In *Kadel II*, the Fourth Circuit rejected the argument that singling out gender affirming medical care for disparate treatment was justified on the ground that the treatment was ineffective. 100 F.4th at 156. Defendants wrongly argue this holding from *Kadel II* is not controlling because that case purportedly "did not address restrictions on these treatments for persons under 19 years of age." Opp. 22. But Defendants are mistaken. Two of the plaintiffs in *Kadel* were suing over gender affirming medical care denied to them *as minors*. *See Kadel*, 620 F. Supp. 3d at 355; Am. Compl. ¶¶ 76-89, 99-118, *Kadel*, No. 1:19-cv-00272 (M.D.N.C. Mar. 9, 2021), ECF No. 75.

None of Defendants' other arguments justify the Orders. Defendants' unsupported criticisms of gender-affirming medical care are overstated or simply untrue, and are also applicable to many other forms of medical treatment. "There is nothing unique about the risks of gender-affirming medical care for adolescents that warrants taking this medical decision out of the hands of adolescent patients, their parents, and their doctors." *Brandt v. Rutledge*, 677 F. Supp. 3d 877, 902 (E.D. Ark. 2023).

*First*, "gender-affirming medical care delivered in accordance with WPATH and Endocrine Society guidelines is helpful and necessary for some adolescents, . . . [while] withholding such care is harmful." *Poe ex. rel. Poe v. Labrador*, 709 F. Supp. 3d 1169, 1193 (D. Idaho 2023). For patients who need it, "denial of [gender affirming medical] treatment will cause needless suffering for a substantial number of patients and will increase anxiety, depression, and the risk of suicide." *Dekker v. Weida*, 679 F. Supp. 3d 1271, 1286 (N.D. Fla. 2023); *see also Brandt*, 677 F. Supp. 3d at 888 ("Gender dysphoria is a serious condition that, if left untreated, can

11

result in other psychological conditions including depression, anxiety, self-harm, suicidality, and impairment in functioning."); *Kadel II*, 100 F.4th at 136.

The Orders and Defendants' defense of them "ignore the benefits that many patients realize from these treatments and the substantial risk posed by foregoing the treatments." *Dekker*, 679 F. Supp. 3d at 1294. Indeed, "based on the decades of clinical experience and scientific research, it is widely recognized in both the medical and mental health fields—including by major medical and mental health professional associations—that gender-affirming medical care can relieve the clinically significant distress associated with gender dysphoria in adolescents." *Brandt*, 677 F. Supp. 3d at 919–20; *see also Poe*, 709 F. Supp. 3d at 1182 (finding that "the treatment for gender dysphoria—when provided in accordance with the guidelines published by WPATH and the Endocrine Society, and which may include medical interventions such as puberty blockers, hormone therapy, and surgeries—is safe, effective, and medically necessary for some adolescents"); *Dekker*, 679 F. Supp. 3d at 1286. Plaintiffs' experiences confirm the benefits of gender affirming medical care to treat gender dysphoria in adolescents and young adults. *See* Dkts. 35-16 (¶¶ 12-13); 35-21 (¶¶ 6, 15); 35-18 (¶ 10); 35-20 (¶ 7); 35-19 (¶¶ 8-9). They also show the harm of delaying or denying this care when medically indicated. *See* Dkts. 35-15 (¶¶ 18-20); 35-16 (¶¶ 11, 18); 35-21 (¶¶ 15-17); 35-18 (¶¶ 8, 16-17); 35-20 (¶¶ 8, 10, 13); 35-19 (¶ 13).

*Second*, that gender affirming medical care carries risks does not justify the Orders. "That there are risks does not end the inquiry." *Dekker*, 679 F. Supp. 3d at 1294. "Risks attend many kinds of medical treatment, perhaps most," and "[o]rdinarily[,] it is the patient, in consultation with the doctor, who weighs the risks and benefits and chooses a course of treatment." *Id.* at 1295. And "[t]he risks of gender-affirming medical care are not categorically different than the types of

12

risks that other types of pediatric healthcare pose." *Brandt*, 677 F. Supp. 3d at 902; *see also Poe*, 709 F. Supp. 3d at 1194.

*Third*, with all medical care involving minors—including gender affirming medical care-- it is the parents or guardians who provide consent, while the adolescent minor provides assent. And courts have found that "[t]he informed consent process is adequate to enable minor patients and their parents to make decisions about gender-affirming medical care for adolescents." *Brandt*, 677 F. Supp. 3d at 891. Defendants do not provide evidence for why this informed consent process is insufficient for minors—much less evidence for why the eighteen-year-old Adult Plaintiffs, who can vote or enlist to serve our country, cannot provide consent for this care.

*Fourth*, although Defendants and the Denial of Care Order allude to the possibility that some patients may regret their care, such possibility does not justify the Orders. Put simply, "[r]egret is rare." *Dekker*, 679 F. Supp. 3d at 1297. And "[r]egret over a medical procedure is not unique to gender-affirming medical care and is common in medicine." *Brandt*, 677 F. Supp. 3d at 905.

For all these reasons, the Orders cannot satisfy heightened scrutiny—or any standard of review. *See Dekker*, 679 F. Supp. 3d at 1286.

At their core, the Orders are a bald attempt to render transgender people invisible in the eyes of the government and deprive them of access to medically necessary health care. In just mere days, President Trump has issued multiple executive orders targeting transgender people for discrimination. Pls.' Mem. at 25. The very text of these Orders—along with the multiple other executive actions targeting transgender people for discrimination that have accompanied them—demonstrate that they are "dripping" with animus toward transgender people. *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 572 (4th Cir. 2017), *vacated and remanded sub nom*.

13

*Trump v. Int'l Refugee Assistance*, 583 U.S. 912 (2017). And the President's "bare … desire to harm" transgender people "cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *see also* Pls.' Mem. at 27.[7]

## III. THE OTHER FACTORS FAVOR A TEMPORARY RESTRAINING ORDER.

Nothing in Defendants' Opposition changes the fact that the other factors also weigh in favor of a temporary restraining order. Medical institutions have cancelled appointments, refused to fill prescriptions, and shut down gender affirming medical care programs and services for adolescents and adults under nineteen. Those shutdowns were caused by the President's unlawful directive to "immediately" withhold grants, and—despite Defendants' assertions to the contrary (Opp. 26)—a TRO would redress Plaintiffs' injuries by removing the unlawful and coercive threat that prompted hospitals to stop providing this evidence-based and often critical care.

Against these severe, irreparable harms, the government has identified no counteracting interest that would justify immediate enforcement. This is particularly true in light of the fact that "the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). And as established *supra*, the constitutional violations in this case are glaring and severe. Any interest in valid exercises of executive authority does not extend to *ultra vires* executive actions or to unconstitutional actions targeting vulnerable communities, as here. *See Legend Night Club v. Miller*, 637 F.3d 291, 302-03 (4th Cir. 2011) (the

---

[7] Defendants' suggestion that Plaintiffs failed to address the alleged purposes of the Gender Identity Order is wrong. Plaintiffs asserted in their opening brief that the Gender Identity Order deliberately targets transgender people for disfavored treatment, effectively seeking to invalidate their identities, Pls.' Mem. at 24, and is motivated by invidious animus. *Id*. at 27. In the face of such blatant, purposeful discrimination, the asserted justifications are nothing more than pretext. Defendants claim the purpose of the Gender Identity Order is to "defend women's rights" and their "dignity, safety, and wellbeing," but fail to explain how those interests are rationally related to requiring grantees to effectively deny the existence of transgender people or depriving transgender youth and young adults of medically necessary care. Denying medical care to transgender youth and young adults is "so far removed from these particular justifications that [it is]impossible to credit them." *Romer v. Evans*, 517 U.S. 620, 635 (1996).

14

government "is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions").

Finally, "[o]nly a nationwide injunction will provide complete relief to the plaintiffs" because PFLAG and GLMA have members throughout the country who have been harmed by the Executive Orders. *CASA, Inc.*, 2025 WL 408636, at *17. *See, e.g.*, Dkts. 35-17 (Virginia); 35-23 (Washington); 35-25 (Colorado); 35-26 (Illinois); 35-27 (New York); Jane Doe 4 Decl. (Wisconsin); Jane Doe 5 Decl. (Florida, Maryland, and California); *see also* Dkts. 35-13; 35-22; Dr. Poe Decl. (members of GLMA in New York, Massachusetts, and Maryland). The Fourth Circuit specifically authorizes nationwide relief from harmful executive orders where exigencies meet the circumstances. *See HIAS*, 985 F.3d at 326.[8]

## CONCLUSION

For the foregoing reasons, the Court should enter an order temporarily restraining the Agency Defendants from implementing or enforcing Section 3(g) of the Gender Identity Order and Section 4 of the Denial of Care Order and from otherwise withholding federal funding based on the fact that a healthcare entity provides gender affirming medical care, including any healthcare institution from which the Transgender Plaintiffs and patients of health professional members of GLMA receive gender affirming medical care.

---

[8] The only support for Defendants' suggestion that an injunction be limited to the specific members of PFLAG and GLMA identified in the Complaint is a solo concurrence by Justice Thomas in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring). But as the concurrence acknowledged, binding Supreme Court precedent holds that associations are entitled to seek relief on behalf of all their members. *See id.* at 404-05 (citing *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986); *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 199-201 (2023)). Only a majority of the Court can overturn those precedents, not a solo concurrence.

Dated: February 12, 2025

Joshua Block*
Harper Seldin*
Chase Strangio*
Alexandra R. Johnson*
American Civil Liberties Union
   Foundation
125 Broad Street, Floor 18
New York, NY 10004
Telephone: (212) 549-2500
Facsimile: (212) 549-2650
jblock@aclu.org
hseldin@aclu.org
cstrangio@aclu.org
a.johnson@aclu.org

Deborah A. Jeon (Fed. Bar No. 06905)
Zoe M. Ginsberg (Fed. Bar No. 30727)
American Civil Liberties Union
   Foundation of Maryland
3600 Clipper Mill Road, Suite 200
Baltimore, MD 21211
Telephone: (410) 889-8555
Facsimile: (410) 366-7838
jeon@aclu-md.org
zginsberg@aclu-md.org

Laura J. Edelstein*
Kai N. Galindo*
Jenner & Block LLP
525 Market Street, 29th Floor
San Francisco, CA 94105
Telephone: (628) 267-6800
Facsimile: (628) 267-6859
LEdelstein@jenner.com
KGalindo@jenner.com

Madeleine V. Findley*
Zachary B. Cohen (Fed. Bar No. 20159)
Mary-Claire Spurgin*
Jenner & Block LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

Respectfully submitted,

*/s/ Zachary B. Cohen*

Omar Gonzalez-Pagan*
Jennifer C. Pizer*
Lambda Legal Defense
   and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
Facsimile: (855) 535-2236
ogonzalez-pagan@lambdalegal.org
jpizer@lambdalegal.org

Karen L. Loewy*
Lambda Legal Defense
   and Education Fund, Inc.
815 16th Street NW, Suite 4140
Washington, DC 20006
Telephone: (202) 804-6245
Facsimile: (855) 535-2236
kloewy@lambdalegal.org

Nora Huppert*
Lambda Legal Defense
   and Education Fund, Inc.
3656 N. Halsted Street
Chicago, IL 60613
Telephone: (312) 605-3233
Facsimile: (855) 535-2236
nhuppert@lambdalegal.org

Catherine E. Stetson**
Danielle Desaulniers Stempel (Fed. Bar No. 20501, Renewed 1/31/25)
Kristina Alekseyeva*
Sam H. Zwingli*
Hogan Lovells US LLP
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
Facsimile: (202) 637-5910
cate.stetson@hoganlovells.com
danielle.stempel@hoganlovells.com
kristina.alekseyeva@hoganlovells.com

16

MFindley@jenner.com
MSpurgin@jenner.com

Jocelyn A. Sitton*
Lillian M. McGuire*
Rebecca M. Diamond*
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
Telephone: (312) 222-9350
Facsimile:  (312) 527-0484
JSitton@jenner.com
LMcGuire@jenner.com
RDiamond@jenner.com

sam.zwingli@hoganlovells.com

Jackson Skeen***
Hogan Lovells US LLP
125 High Street
Suite 2010
Boston, MA 02110
Telephone: (617) 702-7747
Facsimile:  (617) 371-1037
jackson.skeen@hoganlovells.com

*Attorneys for Plaintiffs*

*\*Application for admission pro hac vice granted.*

*\*\*Application for admission forthcoming.*

*\*\*\*Application for admission pro hac vice granted and admitted only in D.C. Supervised by principals of the firm admitted in Massachusetts.*

17

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically filed using the Court's CM/ECF system.  Service will be effected by and through the Court's CM/ECF system.


Dated: February 12, 2025                                         */s/ Zachary B. Cohen*
                                                                 Zachary B. Cohen