**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| PFLAG, INC., ET AL., | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil No. 25-337-BAH |
| DONALD J. TRUMP ET AL., | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

This matter is before the Court on Plaintiffs' Motion for a Temporary Restraining Order ("TRO"), ECF 35. Yesterday, February 13, 2025, and upon consideration of the parties' filings and after a robust oral argument on the motion, the Court **GRANTED** Plaintiffs' motion and, for the reasons stated on the record, entered a TRO against agency Defendants enjoining the enforcement of particular sections of two Executive Orders as they relate to a prohibition on federal funding for institutions that provide gender affirming medical care for transgender patients under the age of nineteen. In addition to that oral ruling, this memorandum opinion is offered to further explain the Court's reasoning.

In sum, the Court finds that this case presents a straightforward question regarding the separation of powers. The Court also finds that clearly established precedent of the United States Supreme Court and the United States Court of Appeals for the Fourth Circuit compels findings on Plaintiffs' discrimination-related claims. Moreover, the Court finds that Plaintiffs have met the standard for a TRO.

First, there is a very strong likelihood that Plaintiffs will succeed on the merits of all three claims that are the subject of their motion for a TRO. The challenged provisions of the Executive Orders place conditions on federal funding that Congress did not prescribe. This, the Constitution simply does not allow as "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Further, given that the Court is bound by the holdings in *Bostock v. Clayton County*, 590 U.S. 644, 662 (2020), *Grimm v. Gloucester County School Board*, 972 F.3d 586, 611 (4th Cir. 2020), *as amended* (Aug. 28, 2020), and *Kadel v. Folwell*, 100 F.4th 122, 163–64 (4th Cir. 2024), Plaintiffs are likely to succeed on their claims related to discrimination.

Second, Plaintiffs have shown they will face irreparable harm if the challenged portions of the Executive Orders are not enjoined both because they have shown a strong likelihood of success on their constitutional claims, *see Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009), but also because they have provided unassailable documentation that they are suffering from "diminished access to high-quality health care suited to [their] needs." *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019).

Finally, the balance of equities and the public interest weigh in favor of a preliminary injunction as Defendants are not harmed by a prohibition that maintains the status quo and enjoins the enforcement of restrictions likely to be found unconstitutional. *See Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). Moreover, it is "well-established that the public interest favors protecting constitutional rights." *Id.* (citations omitted).

For these reasons, expanded on below, the Court entered the TRO.

2

## I.   BACKGROUND

### A.   Executive Orders

#### 1.   Executive Order 14168

On January 20, 2025, President Trump issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Gender Identity Order"[1]). *See* 90 Fed. Reg. 8615 (Jan. 20, 2025). To achieve the stated objective of eradicating gender ideology[2], Section 3(g) of the Gender Identity Order declares: "[f]ederal funds shall not be used to promote gender ideology." *Id.* The Gender Identity Order directs that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* The Gender Identity Order cites "the Constitution and the laws of the United States of America, including section 7301 of title 5, United States Code," as the authority by which the President promulgated the executive order. *Id.* at Preamble. 5 U.S.C. § 7301 permits the President to "prescribe regulations for the conduct of employees in the executive branch."

#### 2.   Executive Order 14187

On January 28, 2025, President Trump issued Executive Order 14187, titled "Protecting Children from Chemical and Surgical Mutilation" (the "Healthcare Order"[3]). *See* 90 Fed. Reg.

---

[1] Defendants refer to Executive Order 14168 as the "Defending Women EO." ECF 55, at 3.

[2] Section 2(f) of the Gender Identity Order claims that "'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *See* Gender Identity Order § 3(g). It further asserts that "[g]ender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id.* § 2(f).

[3] Defendants refer to Executive Order 14187 as the "Protecting Children EO." ECF 55, at 3.

8771 (Jan. 28, 2025). The Healthcare Order[4] directs all federal agencies[5] to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children."[6] *Id.* § 4. The Healthcare Order cites "the authority vested in [the] President by the Constitution and the laws of the United States of America," as the authority by which the President promulgated the executive order. *Id.* at Preamble.

According to Plaintiffs, "President Trump unilaterally directs that <u>all</u> federal medical and research grants be stripped from medical institutions, medical schools and hospitals, that provide medically necessary gender affirming medical care to patients under nineteen[7] for the purpose of gender transition, regardless of whether the funds are used for or related to such care." ECF 1, at 16–17 ¶ 69 (emphasis in original).[8] Defendants contend that "[t]he EOs do not purport to withhold all federal funding if an institution promotes gender ideology or provides the [referenced]

---

[4] The Court will collectively refer to the Gender Identity Order and Healthcare Order as the "Executive Orders" or "EOs." To be clear, when the Court refers to the Executive Orders, the Court is referring only to the challenged portions (Section 3g of the Gender Identity Order and Section 4 of the Healthcare Order).

[5] The Healthcare Order is specifically directed to "[t]he head of each executive department or agency [] that provides research or education grants to medical institutions." *See* Healthcare Order § 4.

[6] In Section 2(c) of the Healthcare Order, the President acknowledges that "th[e] phrase [chemical and surgical mutilation] sometimes is referred to as 'gender affirming care.'" The Court will refer to the treatment at issue as "gender affirming medical care."

[7] Section 2(a) of the Healthcare Order defines "child" or "children" to mean "an individual or individuals under [nineteen] years of age."

[8] The Court notes that Plaintiffs filed an amended complaint, ECF 53, on February 11, 2025. However, Plaintiffs did not amend the TRO, *see* ECF 35, which cites to the initial complaint, ECF 1. Thus, the Court will cite to the initial complaint in this memorandum opinion.

4

treatments," but instead, "instruct agencies to implement the President's policy preference to the extent permitted by applicable law." ECF 55, at 13.[9]

### 3.    Impact of the Executive Orders

On January 31, 2025, Defendant Health Resources and Services Administration ("HRSA") issued a notice to HRSA grant recipients indicating that "HRSA grant funds may not be used for activities that do not align with" the Executive Orders and any "vestige, remnant, or re-named piece of any programs in conflict with these E.O.s are terminated in whole or in part." ECF 35-5, at 2.  The Center for Disease Control and Prevention ("CDC") also issued a notice to grant recipients stating: "[t]o implement the [Gender Identity Order] and in accordance with Office of Personnel Management's Initial Guidance [], you must immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity . . . that are supported with funds from this award." ECF 57-11, at 2. Like the HRSA notice, the CDC notice indicated that "[a]ny vestige, remnant, or re-named piece of any gender ideology programs funded by the U.S. government under this award are immediately, completely, and permanently terminated." *Id.*  Additionally, medical institutions across the United States that receive federal funding have stopped providing gender affirming medical care for patients younger than nineteen as a result of the Executive Orders. *See* ECF 35-6, at 2; ECF 35-7, at 2; ECF 35-8, at 2; ECF 35-9, at 2.

Plaintiffs allege that federal funding makes up a significant portion of certain medical institutions' budgets where the patient Plaintiffs receive care. *See* ECF 1, at 20 ¶ 82 (explaining that Children's National in Washington, D.C. receives 70% of its research funding from federal

---

[9] All citations to page numbers herein refer to the ECF-generated page numbers at the top of the page.

agencies, including 60% from Defendant National Institute of Health[10] ("NIH")); *id.* ¶ 84 (explaining that Virginia Commonwealth University ("VCU") Health and Children's Hospital of Richmond receives nearly $7.3 million in grants from Defendant HRSA and nearly $107 million in grants from Defendant NIH in fiscal year 2023); *id.* ¶ 85 (explaining that UVA Health in Charlottesville, Virginia received more than $200 million in grants from Defendant NIH in fiscal year 2023); *id.* at 21 ¶ 89 (explaining that NYU Langone Health in New York City receives federal funding, including $5.6 million in grants from Defendants HRSA and NIH in the last twelve months); *id.* at 22 ¶ 92 (explaining that Boston Children's Hospital received more than $27.5 million in grants from Defendant HRSA and more than $245 million in grants from Defendant NIH in fiscal year 2023); *id.* ¶ 94 (explaining that Denver Health in Denver, Colorado received more than $25 million in grants from Defendant HRSA and more than $700,000 in grants from Defendant NIH in fiscal year 2023).

After the issuance of the Healthcare Order, each of the aforementioned medical institutions announced that they were either pausing or cancelling gender affirming medical care for transgender youth. *See* ECF 35-6, at 2 (pausing provision of puberty blockers and hormone therapy prescriptions for transgender youth at Children's National); ECF 35-7, at 2 (suspending gender affirming medical care for patients under nineteen at VCU Health and Children's Hospital of Richmond[11]); ECF 35-8, at 2 (suspending all gender affirming medical care for patients under

---

[10] In fiscal year 2023, Children's National received $69.6 million in funding from Defendant NIH and $8.7 million from Defendant HRSA. ECF 1, at 20 ¶ 82.

[11] On January 30, 2025, the Attorney General of Virginia, Jason Miyares, sent a letter to the University of Virginia and VCU advising that the Healthcare Order "directs federal agencies to immediately ensure that medical institutions that receive federal research or education grants end chemical and surgical mutilation of children." ECF 35-10, at 3. He warned that "[a]ny hospital or other institution, including agencies of the Commonwealth, that continues to perform chemical and surgical mutilation of children is at risk of losing such grants," *id.*, and noted that "the grants

nineteen at UVA Health); ECF 35-15, at 4–5 ¶¶ 15, 16 (cancelling appointments for medical care for transgender patients under nineteen at NYU Langone); ECF 35-19, at 4 ¶ 12 (cancelling immediate appointments with transgender patients under nineteen at Boston Children's Hospital); ECF 35-9, at 2 (ceasing gender affirming medical care to patients under nineteen at Denver Health[12]).

On February 3, 2025, the White House issued a press release about the Healthcare Order, stating: "[i]t's already having its intended effect–preventing children from being maimed and sterilized by adults perpetuating a radical, false claim that they can somehow change a child's sex. Hospitals around the country are taking action to downsize or eliminate their so-called 'gender-affirming care' programs." ECF 35-11, at 2–3.

### B.    The Individual Plaintiffs

There are six individually named transgender Plaintiffs in the instant suit.[13]  The six Plaintiffs are all under nineteen years old.[14]  ECF 1, at 24 ¶ 99; *id.* at 25 ¶ 105; *id.* at 26 ¶ 113; *id.*

---

are not just limited to those related to this subject matter, but could apply to <u>all</u> medical and research grants from federal agencies." *Id.* (emphasis in original).

[12] In a statement, Denver Health acknowledged that the Healthcare Order would lead to "increased risk of depression, anxiety, and suicidality" among transgender adolescents.  ECF 35-9, at 2.  However, Denver Health indicated that it is concerned about the "criminal and financial consequences for those who do not comply [with the Healthcare Order]," including the loss of participation in federal programs administered by HHS that "represent a significant portion of Denver Health's funding." *Id.*

[13] There are also four parents named as Plaintiffs.  ECF 1, at 7 ¶ 15; *id.* at 8 ¶ 17; *id.* ¶ 19; *id.* ¶ 21.

[14] The individual plaintiffs have asserted that "[p]roceeding under pseudonyms [] is necessary to protect the Adult Plaintiffs and the Minor Plaintiffs (and by extension, the Parent Plaintiffs) from undue harassment, discrimination, and violence because of the Minor and Adult Plaintiffs' transgender status." ECF 2-1, at 2.  The government does not oppose the motion," but wishes to "reserve[] the right to request that the Court modify any resulting protective order for good cause." ECF 55, at 32 n.11.  The motion to proceed under pseudonyms, ECF 2, is granted.  If the

at 27 ¶ 122; *id.* at 30 ¶ 145; *id.* at 9 ¶ 27. All six Plaintiffs have received gender dysphoria

diagnoses. ECF 35-18, at 3 ¶ 9 (Gabe Goe); ECF 35-15, at 4 ¶ 11 (Bella Boe) ECF 35-16, at 4 ¶

12 (Cameron Coe); ECF 35-19, at 3 ¶ 7 (Robert Roe); ECF 35-20, at 3 ¶ 5 (Lawrence Loe); ECF

35-21, at 2 ¶ 6 (Dylan Doe). All of the Plaintiffs are members of PFLAG. ECF 1, at 6–7 ¶ 13.

Plaintiffs were at various stages of obtaining care for gender dysphoria at the time the

Executive Orders were issued. Each Plaintiff reported the discontinuation of gender affirming

medical care after the Healthcare Order was issued. *See* ECF 35-18, at 4 ¶ 14 (Gabe Goe); ECF

35-15, at 4 ¶¶ 14–16 (Bella Boe); ECF 35-16, at 5 ¶¶ 15–17 (Cameron Coe); ECF 35-19, at 4 ¶¶

11–12 (Robert Roe); ECF 35-20, at 4 ¶ 12 (Lawrence Loe); ECF 35-21, at 3 ¶¶ 12–13 (Dylan

Doe).

### The Associational Plaintiffs

Plaintiff PFLAG, Inc. ("PFLAG") is a 501(c)(3) national membership nonprofit

organization. ECF 1, at 6 ¶ 13. PFLAG is an organization dedicated to supporting, educating, and

advocating for lesbian, gay, bisexual, transgender, and queer ("LGBTQ+") people, their parents

and families, and allies. *Id.* PFLAG has "more than 550,000 members[15] and supporters

nationwide, including many families of transgender youth who currently receive or will soon need

to access the medical treatment for gender dysphoria that the Executive Orders seek to prohibit."

*Id.*

Plaintiff American Association of Physicians for Human Rights, Inc. d/b/a GLMA Health

Professionals Advancing LGBTQ+ Equality ("GLMA") is a 501(c)(3) national nonprofit

---

government needs to know the identities of the individual plaintiffs to defend this case, it may file
a request for relief from the Court.

[15] People become PFLAG members by joining the national organization directly or through one
of its nearly 350 local chapters throughout the United States. *Id.*

membership organization. ECF 1, at 7 ¶ 14. GLMA's mission is to ensure health equity for LGBTQ+ people and equality for LGBTQ+ health professionals in their work and learning environments. *Id.* GLMA's membership includes approximately 1,000 member physicians, nurses, advanced practice nurses, physician assistants, researchers and academics, behavioral health specialists, health-profession students, and other health professionals throughout the country.[16] *Id.*

### C.   Temporary Restraining Order Hearing

On February 13, 2025, the Court held a hearing on Plaintiffs' motion for a TRO. *See* ECF 60. At the conclusion of the hearing, the Court granted the TRO and notified the parties that a written memorandum opinion would follow.

## II.   LEGAL STANDARD

"Temporary restraining orders [] . . . are 'extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances.'" *Franklin v. BMW Law Group LLC*, Civ. No. DKC-16-455, 2016 WL 9724972, at *1 (D. Md. Apr. 4, 2016) (quoting *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001)); *see also Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). To obtain a temporary restraining order, the Plaintiffs must establish four factors: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm if preliminary relief is not granted; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest.[17] *See Frazier v. Prince*

---

[16] Their practices represent the major healthcare disciplines and a wide range of health specialties, including primary care, internal medicine, family practice, psychiatry, pediatrics, obstetrics/gynecology, emergency medicine, neurology, and infectious diseases. *Id.*

[17] "The substantive requirements for a TRO and a preliminary injunction are identical." *J.O.P. v. U.S. Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 376 (D. Md. 2019) (citing *U.S. Dep't of Labor v. Wolf Run Mining Co., Inc.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006)).

*George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). When a government entity is a party to the case, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Pursuing Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). The movant "must establish all four elements in order to prevail." *Profiles, Inc. v. Bank of America Corp.*, 453 F. Supp. 3d 742, 746 (D. Md. 2020) (citing *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013)).

## III.   ANALYSIS

### A.   Ripeness

Defendants assert that the Court is being asked to prematurely judge the constitutionality of a future government policy. ECF 55, at 8. According to Defendants, the case is not ripe for review because "the agency defendants have not yet taken the steps necessary to revoke funding, for example, by identifying specific education or research grants that the agency believes may . . . be conditioned on ending the treatment," and thus, "it is not clear what law the Court would need to apply or what funding would be at stake." ECF 55, at 10. Plaintiffs contend that the issues are fit for judicial review "because Plaintiffs have brought a facial challenge that the President lacks authority to direct agencies to withhold federal grants from an institution because it provides gender affirming medical care." ECF 57, at 4. Plaintiffs further argue that "[i]n light of the Executive Orders' immediate and devastating consequences, Plaintiffs need not await future enforcement to seek judicial relief." *Id.*

When evaluating whether a claim is ripe for review, the Court considers: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 587 (4th Cir. 2017) (citations omitted), *vacated and remanded on other grounds sub nom. Trump v. Int'l Refugee Assistance*, 583 U.S. 912 (2017). "An action is fit for resolution 'when the issues are purely legal

10

and when the action in controversy is final and not dependent on future uncertainties.'" *Id.* (citing *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006)). "The hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiff]." *Id.* (quotation marks and citations omitted).

Plaintiffs have brought a facial challenge, alleging that the Executive Orders violate separation of powers, directly conflict with existing statutes, and violate the Equal Protection Clause of the Fifth Amendment. This legal question is squarely presented for the Court's review and does not depend on future uncertainties. The plain text of the Executive Orders conditions federally funded hospital grants on the denial of gender affirming medical care to transgender youth. *See* Gender Identity Order § 3(g) ("[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology."); Healthcare Order § 4 (directing all federal agencies to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children"). Where the "only uncertainties are how, not if, the policies will be implemented," the validity of the President's directive is fit for review. *Stone v. Trump*, 280 F. Supp. 3d 747, 767 (D. Md. 2017).

Further, Defendants' contention that "no agency defendant has revoked, or initiated proceedings to revoke, any particular grants as a result of the EOs," ECF 55, at 10, is contradicted by the emails sent by the HRSA and CDC. The HRSA issued a notice to all grant recipients stating that: "grant funds may not be used for activities that do not align with" the Executive Orders. ECF 35-5, at 2. The CDC issued a similar notice to grant recipients requiring that all grant recipients: "must immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity . . . that are

11

supported with funds from this award." ECF 57-11, at 2. Both notices indicated that "[a]ny vestige, remnant, or re-named piece of any gender ideology programs funded by the U.S. government under this award are immediately, completely, and permanently terminated." *Id.;* ECF 35-5, at 2. Further, the White House press release describes the denial of care at several hospitals around the country as the "intended effect" of the Executive Orders. ECF 35-11, at 2. Considering these documents, the Court finds Defendants' argument that the "agency defendants have not yet taken the steps necessary to revoke funding," ECF 55, at 10, to be "little more than a formalistic contrivance." *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Landsowne, LLC*, 713 F.3d 187, 198–199 (4th Cir. 2013) (finding that where defendants' position is unsupported by the record and the plaintiffs have produced evidence that defendants have no intention of abandoning the matter at issue, defendants' "claim of factual uncertainty" does not defeat ripeness). Considering the tangible steps taken by at least two agencies to comply with the Executive Orders, along with the Administration's unequivocal statements outside of the context of this litigation, the legal claims are sufficiently viable and do not depend on future uncertainties.

Additionally, withholding review would certainly impose hardship on Plaintiffs. As noted, Plaintiffs provide ample evidence of disrupted or delayed treatment and its effect. *See* ECF 35-18, at 4 ¶ 14 (Gabe Goe); ECF 35-15, at 4 ¶¶ 14–16 (Bella Boe); ECF 35-16, at 5 ¶¶ 15–17 (Cameron Coe); ECF 35-19, at 4 ¶¶ 11–12 (Robert Roe); ECF 35-20, at 4 ¶ 12 (Lawrence Loe); ECF 35-21, at 3 ¶¶ 12–13 (Dylan Doe).

Plaintiffs have established that the hardships they are suffering, as well as the hardships to PFLAG's members, are caused by the discontinuation of what has been deemed by medical professionals to be essential care. This hardship comes as a result of the conditioning on federal funding outlined in the Executive Orders and is non-speculative, concrete, and potentially

catastrophic. Specifically, the sudden denial or interruption of Plaintiffs' medical care has caused or is expected to soon cause unwanted physical changes, depression, increased anxiety, heightened gender dysphoria, severe distress, risk of suicide, uncertainty about how to obtain medical care, impediments to maintaining a social life, and fear of discrimination, including hate crimes. *See* ECF 35-18, at 4–5 ¶¶ 15, 17; ECF 35-15, at 5 ¶ 20; ECF 35-16, at 5 ¶ 18; ECF 35-19, at 4 ¶ 13; ECF 35-20, at 4 ¶¶ 10, 13; ECF 35-21, at 3–4 ¶ 15. Defendants' assertion that these injuries are nothing more than "hypothetical" and "incidental" is blatantly contradicted by the record. ECF 55, at 12. Plaintiffs have demonstrated that hardship would result in the absence of judicial review. *See Stone*, 280 F. Supp. 3d at 767 (finding that plaintiffs had already suffered harmful consequences, including the cancellation and postponement of surgeries, and thus "[w]aiting until after the Directives have been implemented to challenge the alleged violation of constitutional rights only subjects [plaintiffs] to substantial risk of even greater harms").

In light of the above, the Court finds that the legal questions are not dependent on future uncertainties, and withholding review would cause even more hardship to Plaintiffs, thus the claim is ripe for adjudication.

### B.    Mootness

Additionally, Defendants' assertion that the HRSA notice has been "rescinded" does not deprive the federal court of jurisdiction to determine the legality of the Executive Orders. ECF 55, at 10. While not labeled as such, Defendants' assertion functionally invokes the mootness doctrine.

The Court notes at the outset that Defendants appear to argue that the Government has not yet taken any action, while also acknowledging that the HRSA issued a notice to all grant recipients indicating that funds may not be used for activities that do not align with the Executive Orders.

ECF 55, at 10. According to Defendants, that email "has since [been] rescinded." *Id.* Defendants do not raise a formal mootness challenge, but seemingly rely on the HRSA's email recission to bolster their argument that judicial review is "premature," and the case is not yet ripe for adjudication. *Id.* at 8. Having already previously found the case is ripe for adjudication, the Court addresses Defendants' implicit mootness argument out of an abundance of caution.

"Mootness concerns whether there is still a live controversy for the court to adjudicate." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239 (LLA), --- F. Supp. 3d ---, 2025 WL 368852, at *6 (D.D.C. Feb. 3, 2025). It is well-established that "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine [its] legality." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). If voluntary cessation automatically mooted every case, a defendant would be "free to return to [its] old ways" as soon as the case was dismissed. *Id.* (quoting *City of Mesquite*, 455 U.S. at 289).

To the extent Defendants claim that they have ended (or reversed) any alleged unlawful activity by rescinding the HRSA email, the Court is not persuaded that the Government will refrain from "resum[ing] the challenged activity" in the future. *Pub. Citizen, Inc. v. Fed. Energy Reg. Comm'n*, 92 F.4th 1124, 1128 (D.C. Cir. 2024). As evidenced by the White House press release noting the intended effects of the executive action at issue, the executive is committed to restricting federal funding based on the denial of gender affirming care. ECF 35-11, at 2–3. Importantly, there is "nothing stopping [the agency] from rewording, repackaging, or reissuing the substance of [the HRSA email] if the court were to dismiss this lawsuit." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *7 (finding that "[i]f [d]efendants retracted the memorandum in name only while

continuing to execute its directives, it is far from 'absolutely clear' that the conduct is gone for good").

Moreover, there is ample evidence demonstrating that the funding restrictions remain in full effect, despite the HRSA recission.[18]  Indeed, in reply, Plaintiffs attached a separate notice from the CDC requiring all grant recipients to "immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity . . . that are supported with funds from this award."  ECF 57-11, at 2.  Like the prior HRSA notice, the CDC notice indicated that "[a]ny vestige, remnant, or re-named piece of any gender ideology programs funded by the U.S. government under this award are immediately, completely, and permanently terminated."  *Id.*; ECF 35-5, at 2.  Even beyond the explicit notices from agencies, Plaintiffs have presented ample evidence that they continue to be deprived of medical care.  Additionally, the coercive effect on the medical institutions comes from more than just the Administration or the agencies.  For example, a letter from the Attorney General of Virginia interpreted the Executive Orders and warned UVA and VCU that "any hospital or other institution [] that continues to perform [gender affirming care] is at risk of losing such grants," and importantly, "[t]he grants are not just limited to those related to this subject matter, but could apply to <u>all</u> medical and research grants from federal agencies."  ECF 35-10, at 3 (emphasis in original).  Thus, it is clear that the recission of the HRSA notice does not render the issue moot.

### C.    Agency Action

---

[18] Plaintiffs argued at the hearing that the recission of the email was likely to ensure compliance with a temporary restraining order in an unrelated case challenging a blanket freeze in federal funding, *see Nat'l Council of Nonprofits*, 2025 WL 368852 (D.D.C. Feb. 3, 2025), and thus not indicative of an effort to repeal the funding contingencies in the Executive Orders.

Defendants assert that Plaintiffs "do not invoke the Administrative Procedure Act (APA) or any other statute providing for a cause of action against an agency." ECF 55, at 9. Defendants further argue that "invoking the APA would be futile" because there is no final agency action "that determined any rights or obligations or otherwise caused legal consequences." *Id.* Plaintiffs acknowledge that they do not seek a TRO pursuant to the APA and point the Court to two cases explaining that the APA waives sovereign immunity for non-APA claims where no final agency action has occurred if the plaintiff seeks equitable relief against an agency. ECF 57, at 5 (citing *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 187 (D.C. Cir. 2006) and *Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 672 (6th Cir. 2013)).

To the extent Defendants argue that the claims are only justiciable under the APA, that claim fails. "The APA generally waives the Federal Government's immunity from a suit 'seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702); *see also Amador v. Mnuchin*, 476 F. Supp. 3d 125, 142 (D. Md. 2020) ("This waiver of sovereign immunity [under 5 U.S.C. § 702] encompasses claims asserted under the APA as well claims arising under non-APA authority that seek equitable relief from agency action.") (citation omitted). The waiver applies regardless of whether a final agency action has occurred. *Trudeau*, 456 F.3d at 187. Plaintiffs seek only declaratory and injunctive relief against federal agencies and officers; thus, the APA unquestionably waives sovereign immunity. This Court has subject matter jurisdiction over Plaintiffs' claims.[19]

---

[19] Defendants also argue that "[i]f and when an agency takes final agency action against a medical institution under the [Executive Order], an injured party may bring suit then." ECF 55, at 10. As established above, Plaintiffs are not required to wait for a final agency action before bringing a

### D.    Reviewability

The Supreme Court has consistently "sustain[ed] the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution." *See Bell v. Hood*, 327 U.S. 678, 684 (1946); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."). The Supreme Court has affirmed that "the President's actions may . . . be reviewed for constitutionality." *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *see also Dalton v. Specter*, 511 U.S. 462, 473–74 (1994). And it is "well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Franklin*, 505 U.S. at 815 (Scalia, J., concurring)). Because the Plaintiffs seek injunctive relief restraining federal agencies from enforcing, implementing, or applying Section 3(g) of the Gender Identity Order and Section 4 of the Healthcare Order on the basis that the Executive Orders are unconstitutional, this Court can review Plaintiffs' claims.

As a threshold matter, the Court addresses Defendants' argument that the Executive Orders "do not themselves impose any conditions on funding, and only direct agencies to take actions consistent with applicable law, including [the antidiscrimination statutes at issue here]." ECF 55, at 28. The fact that the Executive Orders merely direct subordinate agency heads to act does not insulate the Executive Orders from judicial review.

"[W]hen 'the President takes measures incompatible with the expressed or implied will of Congress . . . he can rely only upon his own constitutional powers minus any constitutional powers

---

suit for equitable relief. In addition, the Court agrees with Plaintiffs' contention that waiting to seek redress through any of the procedures ordinarily available through the APA is incompatible with the circumstances established here.

of Congress over the matter.'" *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635–638 (1952) (Jackson, J., concurring)). Here, the President has not purported to implement these Executive Orders under a delegation of authority from Congress beyond citing his workplace authority over the Executive Branch under 5 U.S.C. § 7301. In opposition to the TRO, Defendants have pointed to the Executive's "Article II[] authority . . . to direct his subordinates to take appropriate steps to further policy preferences." ECF 55, at 8. They also assert that Plaintiffs do not have a cause of action. ECF 55, at 11. In doing so, they point to the "extremely limited" scope of the *ultra vires* doctrine. *Id.* (quoting *Griffith v. Fed. Labor Rel. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)). Because the medical institutions are the direct objects of any funding decisions, Defendants argue that Plaintiffs are only "incidentally harmed depending on how those institutions react." *Id.* at 12.

Defendants cite to *Griffith* for the proposition that "[t]he *ultra vires* doctrine is 'extremely limited' in 'scope.'" *See* ECF 55, at 11 (citing *Griffith*, 842 F.2d at 493). However, the language from *Griffith* that Defendants cite appears to apply only to a subset of *ultra vires* claims alleging that an agency acted beyond its delegated authority. What *Griffith* actually said was that the "*Leedom v. Kyne* exception," a narrow avenue for "judicial review for claims that an agency exceeded the scope of its authority or violated a clear statutory mandate," *Paladin Cmty. Mental Health Ctr. v. Sebelius*, 684 F.3d 527, 532 (5th Cir. 2012) (citing *Leedom v. Kyne,* 358 U.S. 184, 188 (1958)), "is intended to be of extremely limited scope," *Griffith*, 842 F.2d at 493 (citing *Kyne*, 358 U.S. 188–89). The Fourth Circuit has explicitly recognized that "a plaintiff [may] file[] suit seeking equitable relief against federal officials in their official capacities and alleging that those officials exceeded the scope of their authority *and/or acted unconstitutionally*." *Strickland v.*

*United States*, 32 F.4th 311, 363 (4th Cir. 2022) (emphasis added) (first citing *Kyne*, 358 U.S. at

188–89, then citing *Noble v. Union River Logging R.R. Co.*, 147 U.S. 165, 171–72 (1893)).

In *American School of Magnetic Healing v. McAnnulty*, private plaintiffs brought suit to

enjoin a subordinate "postmaster from carrying out the order of the Postmaster General." 187 U.S.

94, 101 (1902). The Supreme Court rejected the idea that it could not review the legality of the

order:

> That the conduct of the postoffice is a part of the administrative department of the
> government is entirely true, but that does not necessarily and always oust the courts
> of jurisdiction to grant relief to a party aggrieved by any action by the head, or one
> of the subordinate officials, of that Department, which is unauthorized by the statute
> under which he assumes to act. The acts of all its officers must be justified by some
> law, and in case an official violates the law to the injury of an individual the courts
> generally have jurisdiction to grant relief.

*Id.* at 108. "The reasoning of *McAnnulty* has been employed repeatedly." *Reich*, 74 F.3d at 1327–

28 (collecting cases). In *Reich*, the D.C. Circuit considered whether an executive order issued by

President Clinton, purportedly issued under the Procurement Act and which forbid agencies from

contracting "with employers that permanently replace[d] lawfully striking employees," violated

the National Labor Relations Act ("NLRA"). *Id.* at 1324. The D.C. Circuit explained that if the

executive order was indeed in conflict with the NLRA, "it is unnecessary to decide whether, in the

absence of the NLRA, the President would be authorized (with or without appropriate findings)

under the Procurement Act [under which the President had purported to issue the executive order

at issue] and the Constitution to issue the Executive Order." *Id.* at 1332. The D.C. Circuit

ultimately "conclude[d] that the Executive Order [was] regulatory in nature and [was] pre-empted

by the NLRA which guarantees the right to hire permanent replacements." *Id.* at 1339.

Also instructive is *HIAS, Inc. v. Trump*, where the Fourth Circuit considered whether an

executive order issued by President Trump during his prior term in office, which "create[d] an

'opt-in' system requiring that both a state and a locality provide their affirmative consent before refugees will be resettled there" violated the Refugee Act. 985 F.3d 309, 315 (4th Cir. 2021). The Fourth Circuit first reviewed the text of the Refugee Act and then determined that the executive order's "license to ignore the statutory criteria plainly is at odds with the careful sequencing process established by Congress," *id.* at 322, and that the order also impermissibly shifted decision-making authority to local governments in conflict with the procedures set up by Congress through the Refugee Act, *id.* at 323–24. Finding that the order was "'incompatible with the overall statutory scheme governing' the refugee resettlement program," *id.* at 325 (citing *Kouambo v. Barr*, 943 F.3d 205, 213 (4th Cir. 2019)), the Fourth Circuit "conclude[d] that the plaintiffs [were] likely to succeed on the merits of their" claim that the executive order violated the Refugee Act, *id.*

Despite generally (and perhaps correctly) pointing out that the *ultra vires* doctrine is narrow, Defendants have not demonstrated that this case falls outside of its admittedly constrained bounds. Moreover, this is not a case where the Court is tasked with determining whether the Executive has acted in excess of a specifically delegated *statutory* authority as the Executive Orders, at least as they pertain to the freeze in federal funding for institutions that provide gender affirming medical care for minors, are not issued pursuant to any relevant statutory delegation.[20]

---

[20] The Gender Identity Order does claim to derive authority from "section 7301 of title 5." Gender Identity Order, Preamble. However, this statute simply provides that "[t]he President may prescribe regulations for the conduct of employees in the executive branch," 5 U.S.C. § 7301, and generally bestows on the President the "discretion-laden power" to regulate the federal workplace, *see Crandon v. United States*, 494 U.S. 152, 180 (1990) (Scalia, J., concurring). This statute essentially codifies "the President's responsibility for the efficient operation of the Executive Branch." *Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 273 n.5 (1974). While other sections of the Gender Identity Order, which are not at issue in this case, may be aimed at regulating the federal workforce, 5 U.S.C. § 7301 cannot provide the basis for the sweeping directive to withhold Congressionally allocated funds. Defendants do not

20

Based on the reasoning in *McAnnulty* and its progeny, the Court determines that the Executive Orders are judicially reviewable to determine whether they were issued within the President's constitutional powers or any powers delegated to him by Congress. *See Zivotofsky*, 576 U.S. at 10; *Youngstown,* 343 U.S. at 635–638 (Jackson, J., concurring).

Additionally, Defendants argue that the harm alleged here is the result of decisions by independent third parties not before this Court because it is the grantee medical institutions, as private actors, that are making the decisions to terminate gender affirming care for those under the age of nineteen. *See* ECF 55, at 9 ("Plaintiffs' claimed harm is not based on any action taken by the agency defendants, but on the decisions of medical institutions to stop providing certain treatments based on their prediction that the agency defendants might take some action in the future to revoke their funding."). Plaintiffs counter that "the Transgender Plaintiffs who have been denied gender affirming medical care have suffered an injury in fact and their injuries flow from 'the predictable effect of [the Orders] on the decisions of third parties.'" ECF 35-1, at 21 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)).

For the purposes of Article III standing, "[w]hen the plaintiff is an unregulated party, causation 'ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). "The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *Id.* (citing *Allen v. Wright*, 468 U.S. 737, 757–59 (1984)). In

---

appear to argue otherwise. *See* ECF 55, at 11 (citing to Article II as the source of the authority to implement the challenged portions of the Executive Orders).

short, to establish causation, a plaintiff must show "a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff." *Id.* at 385. Here, Plaintiffs have clearly articulated this "predictable chain of events," *id.*, as the issuance of the Executive Orders led almost immediately to government agencies directing medical institutions to cease providing gender affirming care or risk the loss of all federal funds. Indeed, this case is not one where the Court must speculate on how third parties will respond to the Executive Orders as several medical institutions have already ceased gender affirming care explicitly because of the Executive Orders. *See* ECF 35-6, at 2; ECF 35-7, at 2; ECF 35-8, at 2; ECF 35-9, at 2; *see also* ECF 35-11, at 2–3.

Further, a plaintiff seeking to hold government officials liable for a decision made by a private actor may succeed "only when [the government] has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government]." *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *see also Robinson v. State of Fla.*, 378 U.S. 153, 156–57 (1964) (finding state action within the purview of the Fourteenth Amendment where Florida regulations "[did] not directly and expressly forbid restaurants" from serving all races but "certainly embod[ied] a state policy putting burdens upon any restaurant that did and therefore "involv[ing the state] to such a significant extent in bringing about restaurant segregation"); *Peterson v. City of Greenville, S.C.*, 373 U.S. 244, 248 (1963) (finding ordinance requiring restaurant owners to seat customers of different races separately "compell[ed] persons to discriminate against other persons because of race").

The Ninth Circuit's recent decision in *United States v. King County*, 122 F.4th 740 (9th Cir. 2024) is instructive on this point. There, King County, Washington, "promulgated [an] Executive Order . . . direct[ing] county officials to ensure that future leases" at Boeing Field, a

local airport, prohibited airport lessees "from servicing ICE [Immigration and Customs Enforcement] charter flights." *Id.* at 747. "The record demonstrate[d] that the Executive Order had its intended effect almost immediately" as lessees quickly stopped providing services to ICE soon after it was issued. *Id.* at 749. The United States sued the county, alleging that the order violated the Supremacy Clause. *Id.* King County argued that the United States lacked standing and that suit was not yet ripe because the order was "a general policy statement with no real legal force or effect." *Id.* at 750. Calling King County's "apparent theory that the Executive Order does nothing and means nothing" a "mischaracterization of the Executive Order and the plain impact it [] had on ICE's operations at Boeing Field," the Ninth Circuit found that the United States had "Article III standing and that its claims are ripe for resolution." *Id.* Relevant to the instant matter, the court rejected the claim that the matter was not justiciable because the decision to stop providing services to ICE "resulted not from the Executive Order but from the [lessees] own 'business' concerns." *Id.* at 751. "[T]hese business concerns," the court observed, "arise most readily from [lessees'] fears that County officials would put [them] out of business at Boeing Field if [they] continued servicing ICE." *Id.* "An asserted business concern that is itself rooted in the Executive Order does not demonstrate a lack of traceability between the Order and the injuries at hand" because the "Executive Order was still—at minimum—a substantial factor motivating the [lessees] to stop servicing ICE," in fact, the court observed, "it was the overriding factor." *Id.* The same logic applies here.

Though it was no doubt true that the lessees in *King County*—much like the gender affirming care providers here—made the decision to stop providing the forbidden services, it was only because they saw "the writing on the wall," felt the government's "pressure," and "immediately fell in line." *Id.* at 752. This is enough to establish causation. *Id.* To find otherwise

would be to deny reality as Plaintiffs have amply supported their claim that medical institutions immediately halted all gender affirming medical care for those under the age of nineteen soon after the issuance of the Executive Orders. *See* ECF 35-15, at 4–6 ¶¶ 14–16; ECF 35-16, at 5 ¶¶ 15–17; ECF 35-4 ¶ 14; ECF 35-19, at 4 ¶¶ 11–12; ECF 35-20, at 4 ¶¶ 11–12; ECF 35-21 ¶¶ 11–12. More importantly, these decisions to halt care and cancel appointments came as "a clear (and fairly predictable) response to" the Executive Orders. *King County*, 122 F.4th at 752. And this was exactly the intended effect of the Executive Orders. *See* Healthcare Order § 1 (explaining that the purpose of the EO is to "prohibit or limit these destructive and life-altering procedures"); ECF 35-11, at 2–3 (February 3, 2025 White House press release noting the Healthcare Order "[is] already having its intended effect . . . [h]ospitals around the country are taking action to downsize or eliminate their so-called 'gender-affirming care' programs"). This is enough to show that the medical institutions' purported choice to cease providing the challenged care can be imputed to the government. *See Blum*, 457 U.S. at 1004. It is difficult to imagine how this Court could hold that the Executive Orders did not cause the denial of gender affirming medical care, given that the Executive Orders, along with the subsequent correspondence from the White House and HRSA, describe the denial of gender affirming medical care as the intended purpose of the Executive Orders.

Having established that the hospitals' recission of medical care was directly caused by the Executive Orders, this Court is satisfied that the causal connection is imputed to the individually named Plaintiffs as well. In other words, if the hospitals' decision to withhold gender affirming medical care was caused by the Executive Orders, then it follows that the denial of care experienced by the named Plaintiffs was also causally related to the Executive Orders. ECF 35-1, at 14–18. Defendants' statement that the claims "concern hypothetical downstream actions that

may or may not result from the EOs" is unpersuasive. ECF 55, at 12. The denial of Plaintiffs'
medical care is causally connected to the Executive Orders, regardless of the fact that the medical
institutions are the regulated party, because the medical institutions, as established above, acted in
direct response to the Executive Orders.[21]

### E.    Temporary Restraining Order

Plaintiffs claim that the Executive Orders violate the separation of powers, conflict with
statutory law, and violate the Equal Protection component of the Fifth Amendment. ECF 35.
While the parties discuss all three claims in their briefs, it bears noting that the Court "only needs
to find that Plaintiffs are likely to succeed on one in order for this factor to weigh in favor of a
TRO." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *9 (citation omitted); *see also Profiles,
Inc.*, 453 F. Supp. 3d at 747 ("Plaintiffs bear the burden to show that they are likely to succeed on
one of their claims." (citation omitted)). Despite this, the Court will analyze all three claims. The

---

[21] Plaintiffs attach numerous exhibits to the TRO motion that articulate the hospitals' official
statements on gender affirming medical care, which unambiguously cite the Executive Orders as
the reason for ceasing care. *See* ECF 35-6, at 2 ("[Children's National is] currently pausing all
puberty blockers and hormone therapy prescriptions for transgender youth patients, *per the
guidelines in the Executive Order* issued by the White House this week."); ECF 35-7, at 2 ("VCU
Health and Children's Hospital of Richmond at VCU have suspended gender-affirming
medications and gender-affirming surgical procedures for patients under 19 years old *in response
to an Executive Order* issued by the White House [] on January 28, 2025, and related state guidance
received by VCU on January 30, 2025."); ECF 35-8, at 2 ("*In response to the recent federal
executive order* and related Commonwealth of Virginia, Office of Attorney General guidance,
UVA Health has suspended all gender-affirming care for patients under 19 years of age."); ECF
35-9, at 2 ("The executive order . . . includes criminal and financial consequences for those who
do not comply, including placing participation in federal programs including Medicare, Medicaid
and other programs administered by HHS at risk. These programs represent a significant portion
of Denver Health's funding, and *the executive order explicitly states that should we not comply,
our participation in these programs is at risk.*") (emphasis added to all). It is difficult to conceive
of clearer causal language than that used by the hospitals here. Thus, the Court is satisfied that the
hospitals acted "in response to" the Executive Orders, which, in turn, led to the denial of medical
care at issue in this case. The injury, that is, the consequences of being denied gender affirming
medical care, is therefore clearly traceable to the challenged conduct: conditioning funding on
refusing to provide such care.

Court will first take up Plaintiffs' Separation of Powers argument and focus on whether the Executive Orders exceed the President's Article II powers and unconstitutionally infringe upon the power of Congress by attempting to amend federal legislation while bypassing Article I's Bicameralism and Presentment Clauses. ECF 35-1, at 22.

1.  Likelihood of Success on the Merits

    i.  *Separation of Powers Claim*

        (1)  Article II does not authorize the President to terminate federal grants authorized by Congress.

The President's authority to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. Neither the Healthcare Order nor the Gender Identity Order identifies a statute authorizing the Executive Branch to amend or terminate federal grants; therefore, in order for the action to be lawful, Article II must provide this authority.[22] Against this backdrop, Plaintiffs first argue that "[f]ederal grants are part of federal law," and "[m]odifying or terminating those grants amounts to modifying or repealing the statutes authorizing them." ECF 35-1, at 23. According to Plaintiffs, "[n]othing in Article II 'authorizes the President to enact, to amend, or to repeal statutes.'" *Id.* (citing *City of New York*, 524 U.S. at 438).

Under Article II, Section 3, the President has an obligation to "take Care that the Laws be faithfully executed." U.S. Const. art. II § 3. "Where Congress has failed to give the President discretion in allocating funds, the President has no constitutional authority to withhold such funds and violates his obligation to faithfully execute the laws duly enacted by Congress if he does so."

---

[22] As noted, the only statutory authority the Gender Identity Order identifies pertains to "regulations for the conduct of employees in the executive branch." Gender Identity Order, Preamble (citing 5 U.S.C. § 7301).

*Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 531 (N.D. Cal. 2017) (citing *City of New York*, 524 U.S. at 439); *see also City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018) ("Because Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations."). Moreover, the President's obligation to execute the laws is "an affirmative one, meaning that failure to act may be an abdication of the President's constitutional role." *Id.* As then-Judge Kavanaugh explained, "a President sometimes has policy reasons (as distinct from constitutional reasons []) for wanting to spend less than the full amount appropriated by Congress for a particular project or program . . . [b]ut in those circumstances, even the President does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

Defendants admit in the very first line of their response in opposition to the motion for a TRO that the President "issued two Executive Orders directing agencies to take steps, as permitted by law, to condition certain federal grant funding on his policy preferences."[23] ECF 55, at 3. This is a clear violation of the Constitution as "attempt[s] [by the Executive Branch] to place new conditions on federal funds [are] an improper attempt to wield Congress's exclusive spending power and is a violation of the Constitution's separation of powers principles." *Cnty. of Santa Clara*, 250 F. Supp. 3d at 531.

---

[23] The Court notes that Defendants cite Article II and *Trump v. United States*, 603 U.S. 593, 608–09 (2024), for the proposition that "if an agency decides to act in a specific manner contrary to law, the federal courts may review (and prevent) that action; but federal courts cannot superintend—let alone proscribe—that policymaking from even taking place." ECF 55, at 11. HRSA and CDC likely acted contrary to law in sending notices to grant recipients requiring compliance with the Executive Orders. Thus, even assuming arguendo that Article II allows for general policymaking, the action at issue goes well beyond the President's "constitutional authority to direct his subordinates to pursue a general policy goal, consistent with all applicable law." ECF 55, at 11 (citing U.S. Const. art. II, §§ 1, 2).

*County of Santa Clara* is instructive on how to interpret a challenge to this delicate balance

of power between the President and Congress. There, the court analyzed an executive order that

directed relevant officials to ensure that jurisdictions that willfully refused to comply with a statute

were not eligible to receive federal grants, with limited exceptions for law enforcement purposes.

*Id.* The court explained that the executive order "purports to give the Attorney General and the

Secretary [of Homeland Security] the power to place a new condition on federal funds (compliance

with [a statute]) not provided for by Congress." *Id.* In issuing injunctive relief, the court reasoned

that "the President does not have the power to place conditions on federal funds and so cannot

delegate this power." *Id.*; *see also New York v. Trump,* No. 25-cv-39, 2025 WL 357368, at *2

(D.R.I. Jan. 31, 2025) ("It is no exaggeration to say that 'an agency literally has no power to

act . . . unless and until Congress confers power upon it.'") (citing *La. Pub. Serv. Comm'n v. FCC,*

476 U.S. 355, 374 (1986)).

These fundamental principles compel the same result here. Section 4 of the Healthcare

Order directs "[t]he head of each executive department or agency [] that provides research or

education grants to medical institutions . . . [t]o immediately take appropriate steps to ensure that

institutions receiving Federal research or education grants end the chemical and surgical mutilation

of children." Similarly, Section 3(g) of the Gender Identity Order instructs that "[f]ederal funds

shall not be used to promote gender ideology," and "[e]ach agency shall assess grant conditions

and grantee preferences and ensure grant funds do not promote gender ideology."[24] As in *County*

*of Santa Clara,* Sections 4 and 3(g) of the respective Executive Orders purport to give executive

agencies the power to place a new condition on federal funds not provided for by Congress. In

---

[24] Gender ideology is defined in Section 2(f) of the Gender Identity Order as "permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true."

fact, Defendants have not even attempted to show that Congress authorized, explicitly or implicitly, the withholding of federal funds from medical institutions that do not comply with the Administration's policies on healthcare for transgender youth.[25]  And it is clear that "when it comes to spending, the President has none of 'his own constitutional power' to 'rely' upon." *City & Cnty. of San Francisco*, 897 F.3d at 1233–34 (citing *Youngstown*, 343 U.S. at 637).  Simply put, the President does not have "unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d at 261 n.1.  Congress has not authorized the Administration to withhold federal grant monies from medical institutions that provide gender affirming care for transgender youth, thus the Administration exceeded its power under Article II by refusing to spend the funds. *See* U.S. Const. art. I, § 8, cl. 1.

Defendants argue that the Executive Orders "instruct agencies to implement the President's policy preference to the extent permitted by applicable law," and therefore "[d]efinitionally, directing executive agencies to take action *to the extent consistent with applicable law* cannot be interpreted as an order to violate the law." ECF 55, at 13 (emphasis in original).  While this admonition to be lawful is unquestionably present in the Executive Orders, courts have repeatedly rejected the argument that simply including "consistent with applicable law" or a similar

---

[25] In fact, a brief review of recent legislative history reflects that while bills banning federal funding for this type of care have been proposed at the federal level, none have passed.  The Court takes judicial notice of H.R. 10075, a bill introduced in the House in the 2023-2024 Legislative Session, which attempted the same action that the Executive Orders direct here.  *See* H.R. 10075 (prohibiting an entity from receiving Federal funds if such entity provides to any person any medical or surgical intervention for the purpose of assisting an individual's disassociation from his or her sex).  This bill failed in Congress.  The Court is of course mindful of the fact that "speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt." *Bostock*, 590 U.S. at 670.  However, that the challenged portions of the Executive Orders bear strong resemblance to failed legislation supports Plaintiffs' overarching premise that the Executive Orders sought to do what Congress expressly had not—namely, banned funding for institutions that provide gender affirming care for minors and youthful adults.

boilerplate phrase inoculates an otherwise unconstitutional Executive Order from judicial review. *See, e.g., HIAS, Inc.*, 985 F.3d at 325 (rejecting government's attempt to "immunize the Order from review through a savings clause which, if operational, would nullify the 'clear and specific' substantive provisions of the Order" (citation omitted)).  There are no magic words that can override an executive order's plain meaning.  Rather, any savings clause (or similar directive to follow the law), if it is to be afforded weight, must not be "purely theoretical," and cannot "override the Order's meaning" as derived from the Order's "stated goal." *Id.*  Where, as here, the plain text and stated purpose of the Executive Orders evince a clear intent to unlawfully restrict federal funding without Congressional authorization, the mere inclusion of the phrase "consistent with applicable law" cannot insulate these Executive Orders from review.  As the Ninth Circuit has pointed out, "[i]f 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues." *City & Cnty. of San Francisco*, 897 F.3d at 1240.

Contrary to Defendants' argument, *see* ECF 55, at 14–15, *Building & Construction Trades Dep't v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002) does not counsel a different result.  In *Allbaugh*, the D.C. Circuit considered an executive order with a savings clause, ultimately holding that "[t]he mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that, so far, as the present record reveals, is above suspicion in the ordinary course of administration." *Id.* at 33.  Unlike *Allbaugh*, and more like the executive order in *City and County of San Francisco*, the Executive Orders here "unambiguously command[] action" such that there is much "more than a 'mere possibility that some agency might make a legally suspect decision.'"  897 F.3d at 1240 (citing *Allbaugh*, 295 F. 3d at 33).  In fact, as established above, a legally suspect decision has

already been made by the CDC and HRSA by virtue of the agencies sending out grant termination and compliance notices. Given that the Executive Orders explicitly instruct the executive to develop policies that run afoul of the separation of powers, the apparent simultaneous command to "follow the law" bears a striking resemblance to the "purely theoretical savings clause," in *HIAS*, which the Fourth Circuit held "cannot immunize [the] Order from scrutiny." *HIAS, Inc.*, 985 F.3d at 325.

> (2)    The Executive Orders run afoul of Article I's grant of spending powers to Congress.

Plaintiffs further argue that "[t]he Executive's unilateral attempt to terminate federal grants also infringes on Congress's authority to promulgate law and control public monies." ECF 35-1, at 24. The Court agrees. Article I of the United States Constitution specifically grants the Spending Powers to Congress. "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. The Constitution's allocation of authority with respect to appropriations could not be clearer: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . ." U.S. Const. art. I, § 9, cl. 7. "Incident to [the spending] power, Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal [monies] upon compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)). "Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress." *City & Cnty. of San Francisco*, 897 F.3d at 1232.

"The Appropriations Clause of the Constitution gives Congress exclusive power over federal spending." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *12 (citation omitted). Without it, "the executive would possess an unbounded power over the public purse of the nation[] and might apply all its monied resources at his pleasure." *U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (quoting 3 Joseph Story, Commentaries on the Constitution of the United States § 1342, at 213–14 (1833)). Indeed, the Clause "was intended as a restriction upon the disbursing authority of the Executive [Branch]." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937); *see also U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 76 (D.D.C. 2015) ("Congress's power of the purse is the ultimate check on the otherwise unbounded power of the Executive.").

In keeping with this fundamental principle of our constitutional order, the District Court of the District of Columbia recently enjoined federal agencies from pausing agency grant, loan, and other assistance programs on the basis of other executive actions. *Nat'l Council of Nonprofits*, 2025 WL 368852, at *1. In *National Council of Nonprofits*, a memorandum issued by the Office of Management and Budget ("OMB") directed federal agencies to temporarily pause "all activities related to [the] obligation or disbursement of all Federal financial assistance, and other relevant agency acti[vities] that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." *Id.* In finding that plaintiffs there had demonstrated a likelihood of success on the merits, the court held that "Defendants' actions appear to suffer from infirmities of a constitutional magnitude." *Id.* at 12. In reaching this holding, the court explained the following:

> In 1982, Congress enacted the "Purpose Statute," which requires the appropriation of federal funds in accordance with "the objects for which . . . [they] were made." Any "reappropriation and diversion of the unexpended balance of an appropriation for a purpose other than that for which [it] originally was made" is treated "as a

new appropriation." Related laws expressly prohibit the Executive Branch from encroaching on Congress's appropriations power. Most notably, the Impoundment Act of 1974, 2 U.S.C. § 681 *et seq.*, lays out specific procedures whenever the President wishes to suspend appropriations that have already been enacted.

*Id.* (citing 31 U.S.C. § 1301(a), (b), 31 U.S.C. §§ 1341, 1350). Ultimately, the Court held that "a wealth of legal authority supports this fundamental separation of powers," and thus "[t]he appropriations of the government's resources is reserved for Congress, not the Executive Branch."[26] *Id.*

The same logic applies here, where Defendants have likewise "attempted to wrest the power of the purse away from the only branch of government entitled to wield it." *Nat'l Council of Nonprofits*, 2025 WL 368852, at \*12. The challenged portions of the Executive Orders direct the agencies of the Executive Branch to withhold funds appropriated by Congress in order to further an administrative policy on gender ideology. *See* Healthcare Order § 4; Gender Identity Order § 3(g). Regardless of the validity of this policy, it is a plain and simple fact that Congress has not imposed conditions on federal grants regarding gender affirming care. "[I]n those instances where Congress has intended the States to fund certain entitlements as a condition of receiving federal funds, it has proved capable of saying so explicitly."[27] *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–18 (1981) (citing *King v. Smith*, 392 U.S. 309, 333 (1968)).

---

[26] Judge AliKhan analyzed the separation of powers issue to determine whether the plaintiffs were likely to succeed on the merits of their claim that the agency action was arbitrary and capricious under the APA. The Court concluded that "[i]f Defendants' actions violated the separation of powers, that would certainly be arbitrary and capricious under the APA." *Nat'l Council of Nonprofits*, 2025 WL 368852, at \*12. While Plaintiffs do not raise an APA claim here, the separation of powers analysis nevertheless applies.

[27] Defendants attempt to distinguish *National Council of Nonprofits v. Office of Management and Budget* and *New York v. Trump* by claiming that "[b]y their own terms, the [Executive Orders] challenged here direct agencies to impose a new condition on grant funding—not immediately pause existing grant funding." ECF 55, at 16. This argument fails to remedy the inherent separation of powers issue that prohibits the President from "possess[ing] an unbounded power

33

Plaintiffs also point out that the Executive Orders "appl[y] even to grantees who comply with the [legitimate] conditions attached to their funding [by Congress] and utilize their funds to effectuate the program's purposes." ECF 35-1, at 25. Thus, the Executive Orders are "incompatible with the expressed or implied will of Congress." *Zivotofsky*, 576 U.S. at 10. "The Executive Branch has a duty to align federal spending and action with the will of the people as expressed through congressional appropriations, not through 'Presidential priorities.'" *New York*, 2025 WL 357368, at *2 (emphasis omitted). As Chief Judge McConnell of the District of Rhode Island recently reiterated, "[f]ederal law specifies how the Executive should act if it believes that appropriations are inconsistent with the President's priorities—it must ask Congress, not act unilaterally." *Id.* Because there is no evidence that the Administration asked Congress to rescind appropriated funds, the Court finds that the Executive Orders unconstitutionally intrude upon the Congressional prerogative to control the public fisc. *See City & Cnty. of San Francisco*, 897 F.3d at 1235 ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").

> (3)    The Executive Orders impermissibly infringe on Article I's framework for passing legislation.

Lastly, Plaintiffs argue that "the Orders not only usurp Congressional powers, but bypass the Legislative branch altogether to sidestep Article I's framework for passing laws." ECF 35-1, at 25. Defendants argue the Executive Orders "instruct agencies to implement the President's

---

over the public purse of the nation." *U.S. Dep't of the Navy*, 665 F.3d at 1347. Regardless of whether the executive action is characterized as a "new condition" on grant funding or a "pause" on grant funding, the case law is clear: if Congress wishes to condition federal research and education grants on the denial of gender affirming care, it has "proved capable of saying so explicitly." *Pennhurst State Sch. & Hosp.*, 451 U.S. at 17–18. In the absence of Congressional action, no amount of re-packaging and re-naming the executive action will cure the unconstitutionality.

policy preference to the extent permitted by applicable law." ECF 55, at 13. Again, the Court finds that Plaintiffs have the stronger argument.

The Constitution and its history evidence the "unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process." *INS v. Chadha*, 462 U.S. 919, 959 (1983). "The power to enact statutes may only 'be exercised in accord with a single, finely wrought and exhaustively considered, procedure.'" *Clinton*, 524 U.S. at 439–40 (quoting *Chadha*, 462 U.S. at 951). As Justice Kennedy observed, if "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened." *Id.* at 451 (Kennedy, J., concurring). "The bicameral requirement, the Presentment Clauses, the President's veto, and Congress's power to override a veto were intended to erect enduring checks on each Branch and to protect the people from the improvident exercise of power by mandating certain prescribed steps." *Chadha*, 462 U.S. at 957–58. "To preserve those checks, and maintain the separation of powers, the carefully defined limits on the power of each Branch must not be eroded." *Id.*

"In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343 U.S. at 587. Rather, as the Supreme Court has unequivocally stated: "[t]he Constitution limits [the President's] functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Id.* The Executive Orders cannot, therefore, be properly sustained as an exercise of the President's power. The Constitution is "neither silent nor equivocal about who shall make laws which the President is to execute." *Id.* To accomplish what has been attempted by the Executive Orders in this case requires "action in conformity with the express procedures of

the Constitution's prescription for legislative action," not unilateral action on the part of the President. *Chadha*, 462 U.S. at 958.

The Court is unpersuaded by Defendants' argument that the challenged portions of the Executive Orders are merely a reflection of the President's "plain[] authority to direct agencies to fully implement the President's agenda, consistent with each individual agency's underlying statutory authorities." ECF 55, at 12. In essence, "the Administration argues that the Executive Order is all bluster and no bite, representing a perfectly legitimate use of the presidential 'bully pulpit,' without any real meaning—'gesture without motion,' as T.S. Eliot put it." *City & Cnty. of San Francisco*, 897 F.3d at 1238. However, the Executive Orders do far more than simply effectuate the President's unquestionably lawful authority to amplify his position on an issue of national importance. Much like the pronouncements at issue in *City and County of San Francisco v. Trump*, the plain language of the Executive Orders here reflects that "the Administration's current litigation position is grounded not in the text of the Executive Order[s] but in a desire to avoid legal consequences." *Id.* As discussed above, the Executive Orders directed agencies to act "immediately" and the funding restrictions were mandatory, thus demonstrating that Defendants' current position that the directives were mere toothless advisements to explore possible routes to effectuating policy appears to be a direct response to litigation, rather than a reasonable interpretation of the plain text of the challenged portions of the Executive Orders. *See HIAS, Inc.*, 985 F.3d at 325 (interpreting an executive order by analyzing its "stated goal," and the "clear and specific substantive provisions").

It is, moreover, well-established that the Administration may not usurp Congress's power just because the administration of healthcare at issue is antithetical to the Administration's policies. Here, the Administration has "[n]ot only . . . claimed for itself Congress's exclusive spending

power, [but] also attempted to coopt Congress's power to legislate." *City & Cnty. of San Francisco*, 897 F.3d at 1234. However, "[t]he Constitution [does] not subject this law-making power of Congress to presidential [] control." *Youngstown*, 343 U.S. at 588 (finding a separation of powers violation where "[t]he President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President"). If the President does not wish to disburse funds in the manner appropriated by Congress, "the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *In re Aiken Cnty.*, 725 F.3d at 261 n.1; *see also* U.S. Const. art. I, § 7, cl. 2. Article I does not allow the President to circumvent Bicameralism and Presentment by unilaterally amending or cancelling federal appropriations through an executive order. *See Clinton*, 524 U.S. at 448. This is especially true where, as here, Congress has "considered and thus far rejected legislation accomplishing the goals of the Executive Order." *City & Cnty. of San Francisco*, 897 F.3d at 1234; *see supra* note 25 (noting failed Congressional efforts to ban funding for gender affirming care for minors).

Because the Executive Orders direct agencies to withhold funding on a condition that Congress has not authorized, the President has exceeded his authority. The Plaintiffs have thus sufficiently shown likelihood of success on the merits of their claim that the Executive Orders violate the separation of powers.

### ii.    *Contrary to Existing Statutes*

Plaintiffs argue that they are likely to succeed on the merits of their second claim for relief—that the Executive Orders are *ultra vires* in that they conflict with statutory law (namely, Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C § 18116, and Section 1908 of the Public Health Service Act ("PHSA"), 42 U.S.C. § 300w-7), both of which prohibit discrimination

on the basis of sex. *See* ECF 35-1, at 26–28. As noted, "when 'the President takes measures incompatible with the expressed or implied will of Congress . . . he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.'" *Zivotofsky*, 576 U.S. at 10 (quoting *Youngstown*, 343 U.S. at 635–638 (Jackson, J., concurring)). The Court has the authority to determine whether the Executive Orders are incompatible with the will of Congress. *See, e.g.*, *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 385 (2024) (summarizing the function of the Judiciary to interpret statutes dating back to the earliest decisions of the Supreme Court and citing *Marbury v. Madison*, 1 Cranch 137, 177 (1803); *United States v. Dickson*, 15 Pet. 141, 162 (1841); *Decatur v. Paulding*, 14 Pet. 497, 515 (1840)). Bound by precedent from both the Supreme Court and the United States Court of Appeals for the Fourth Circuit, the Court is constrained to conclude that Executive Orders are indeed incompatible with the will of Congress.

Section 1557 of the ACA "provides that, '[e]xcept as otherwise provided . . . an individual shall not, on the ground prohibited under Title VI of the Civil Rights Act . . . [and] Title IX . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance.'" *Kadel*, 100 F.4th at 163–64 (alteration in original) (quoting 42 U.S.C. § 18116(a)). Section 1908 of the PHSA mandates that "[n]o person shall on the ground of sex or religion be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity funded in whole or in part with funds made available under this part." 42 U.S.C. § 300w-7(a)(2).

In *Bostock*, the Supreme Court held that Title VII's prohibition on discrimination on the basis of sex in employment, 42 U.S.C. § 2000e–2(a)(1), encompassed discrimination on the basis

of transgender status. 590 U.S. at 662. Justice Gorsuch, writing for the Court, explained: "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* at 660. "The plain language of Title VII, the Court observed [in *Bostock*], establishes a but-for causation standard." *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 590 (D. Md. 2021). In *Kadel*,[28] an en banc Fourth Circuit affirmed a district court's application of *Bostock* to Section 1557 of the ACA, explicitly rejecting the idea that *Bostock*'s analysis applied only to Title VII claims. 100 F.4th at 164 (citing *Bostock*, 590 U.S. at 658). Defendants have not presented any argument that the *Kadel* Court's application of *Bostock*'s reasoning should not also extend to Section 1908 of the PHSA, which is nearly identical in wording to Section 1557 of the ACA. Indeed, Defendants appear to concede that *Kadel* compels the outcome the Court reaches here. *See* ECF 55, at 28 n.9 ("The government acknowledges that the Fourth Circuit in *Kadel* held that Section 1557 prohibits discrimination based on transgender status.").[29]

The sections challenged here facially differentiate on the basis of transgender identity. Section 4 of the Healthcare Order directs agency heads to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children." "Chemical and surgical mutilation of children" is defined as

---

[28] Plaintiffs refer to this case as *Kadel II*. Because the Court refers to only one decision this case, it will refer to *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) only as *Kadel*.

[29] To be clear, Defendants take the position that "*Kadel* was wrongly decided and should be overruled." ECF 55, at 5. Given *Kadel*'s binding holding that compels this Court to find that discrimination on the basis of transgender status violates Section 1557 of the ACA, Defendants are constrained to argue that because the Executive Orders are to be carried out "consistent with applicable law, including [the anti-discrimination] statutes," they do not compel discrimination that would violate [the ACA or PHSA]." *See* ECF 55, at 28. However, the Court has already addressed why the phrase "consistent with applicable law" does not make an executive order inherently lawful. *See supra* Section III.E.1.i.(1).

the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty *in an individual who does not identify as his or her sex*; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, *to align an individual's physical appearance with an identity that differs from his or her sex*; and surgical procedures that attempt to transform an individual's physical appearance *to align with an identity that differs from his or her sex* or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions. This phrase sometimes is referred to as "gender affirming care."

Healthcare Order § 2(c) (emphasis added). The same course of treatment, such as prescribing puberty blockers or hormones, therefore, is available to a patient who is not "an individual who does not identify as his or her sex" and not undergoing the course of treatment "to align an individual's physical appearance with an identity that differs from his or her sex." *Id.* "This is textbook sex discrimination" under *Kadel* because

> [f]or one, [the Court] can determine whether some patients will be eliminated from candidacy for these surgeries [or other courses of treatment] solely from knowing their sex assigned at birth. And two, conditioning access to these surgeries based on a patient's sex assigned at birth stems from gender stereotypes about how men or women should present.

100 F.4th at 153 (citing *Bostock*, 590 U.S. at 660–74). Indeed, the effect of the Healthcare Order—the cessation of all gender affirming medical care for those under the age of nineteen—tracks precisely with the Executive Order's stated purpose—to "prohibit or limit these destructive and life-altering procedures." Healthcare Order § 1.

Section 3(g) of the Gender Identity Order is admittedly slightly vaguer than Section 4 of the Healthcare Order in that it only proscribes the use of "[f]ederal [grant] funds [to] promote gender ideology." The Gender Identity Order, appears, however, to deny the existence of transgender persons altogether. *See* Gender Identity Order § 1 (describing the purpose of the order as "defend[ing] women's rights and protect[ing] freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically

male"); *id.* § 2 ("It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality."). The Court cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist. Thus, Section 3(g) of the Gender Identity Order can only be read as doing exactly what Section 4 of the Healthcare Order does—cease funding institutions, including medical institutions, that provide gender affirming medical care to patients under the age of nineteen. Thus, as with Section 4 of Healthcare Order, *Kadel* mandates a similar finding of discrimination as to Section 3(g) of the Gender Identity Order.

Plaintiffs accurately note that the Executive Orders foist upon hospitals receiving federal funds an impossible choice: (1) keep providing medical care to transgender patients under the age of nineteen in compliance with the antidiscrimination statutes and risk losing federal funding under the Executive Orders, or (2) stop providing care on the basis of transgender identity in violation of the statutes, but in compliance with the EOs. Defendants counter that there may be a third option: refusing to provide certain types of care to any patient at all. ECF 55, at 28 ("If grantees believe that providing, for example, a given hormone to a cisgender patient for one purpose but not to a transgender patient for a different purpose is discrimination under Sections 1557 or 1908, the grantees may choose not to provide that hormone to anyone."). First, this argument appears to be a tacit admission that compliance with both the Executive Orders and the antidiscrimination statutes is not possible. Second, to say that an entity can evade liability for violations of an antidiscrimination statute by ceasing operations defies credulity and misses the point, especially

given *Bostock*'s but-for causation standard.[30] One "who takes adverse action against someone for

being transgender 'inescapably *intends* to rely on sex in' his decisionmaking." *Hammons*, 551 F.

Supp. 3d at 591 (quoting *Bostock*, 590 U.S. at 661) (emphasis in *Bostock*). Because the challenged

portions of the Executive Orders are facially discriminatory on the basis of transgender identity,

and therefore sex under *Kadel* and *Bostock*, in violation of Section 1557 of the ACA and Section

1908 of the PHSA, the Court finds that Plaintiffs are likely to succeed on the merits of their *ultra*

*vires* statutory claim.

### iii.    *Equal Protection*

"The Fifth Amendment to the United States Constitution provides, in pertinent part, that

'[n]o person shall . . . be deprived of life, liberty, or property, without due process of law.'"

*Strickland v. United States*, 32 F.4th at 356 (alterations in original) (quoting U.S. Const. amend.

V). While the Equal Protection Clause of the Fourteenth Amendment applies only to the states,

"'[i]n numerous decisions,' the Supreme 'Court has held that the Due Process Clause of the Fifth

Amendment forbids the Federal Government to deny equal protection of the laws.'" *Id.* (quoting

*Davis v. Passman*, 442 U.S. 228, 234 (1979)). Equal protection analysis and the "obligations

imposed by the Fifth and the Fourteenth Amendments" are "indistinguishable." *Adarand*

*Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995). "To succeed on an equal protection claim,

a plaintiff must first demonstrate that he has been treated differently from others with whom he is

similarly situated and that the unequal treatment was the result of intentional or purposeful

discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). "Once this showing

---

[30] As Plaintiffs point out in reply, forcing medical institutions receiving federal funds to cease performing certain procedures would likely violate Section 1554 of the ACA. *See* ECF 57, at 10–11. The Court need not reach this issue as the challenged portions of the Executive Orders are facially discriminatory on the basis of transgender identity in violation of Section 1557 of the ACA, Section 1908 of the PHSA, and *Kadel*.

is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.* For the challenged government action to withstand judicial review under intermediate scrutiny, "the government bears the burden of establishing a reasonable fit between the challenged statute and a substantial governmental objective." *Kadel*, 100 F.4th at 156 (quoting *United States v. Chapman*, 666 F.3d 220, 226 (4th Cir. 2012)). "The classification must be based on 'reasoned analysis rather than [on] the mechanical application of traditional, often inaccurate, assumptions.'" *Id.* (alteration in *Kadel*) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 726 (1982)). "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

In *Kadel*, the Fourth Circuit confronted equal protection challenges to North Carolina's and West Virginia's state-funded health plans and their coverage of gender affirming care. 100 F.4th at 133. North Carolina's plan "exclu[ded] . . . '[t]reatment or studies leading to or in connection with sex changes or modifications and related care," and West Virginia's "cover[ed] some gender-affirming care, but not gender-affirming surgery," and did "cover the same surgical procedures when conducted to treat non-gender dysphoria diagnoses. *Id.* at 133–34. Preliminarily, the en banc Fourth Circuit reiterated its holding in *Grimm*, 972 F.3d at 611, that "transgender persons constitute a quasi-suspect class." *Kadel*, 100 F.4th at 143. The Court then held that "gender dysphoria [is] a proxy for transgender identity," that "proxy discrimination [can be] facial discrimination," and that, in that case, "discrimination on the basis of gender dysphoria [was] discrimination on the basis of gender identity." *Id.* Thus, "[b]ecause the [health plan] exclusions discriminate[d] on the basis of transgender identity and sex, they [were] subject to intermediate [or heightened] scrutiny." *Id.* at 155–56.

The Court then found that the healthcare insurance exclusions did not satisfy intermediate scrutiny. *Id.* at 156 ("[T]he district court properly rejected the contention that the coverage exclusion is substantially related to [protecting public health from ineffective medicine]."); *id.* at 156–57 ("Without evidence to show that gender-dysphoria treatments are ineffective, the North Carolina Appellants cannot show that the coverage exclusion is narrowly tailored to serve the state's substantial interest in not covering medically ineffective treatment."); *id.* at 157 ("What's more, West Virginia Department of Health and Human Resources Secretary Bill Crouch said he did not know if Medicaid had conducted any research or analysis about the cost of providing access to gender-affirming care[, so] Appellants' proffered rationales were created for the purposes of litigation" and "therefore cannot justify the policy under a heightened-scrutiny analysis." (citing *Virginia*, 518 U.S. at 533)).

Here, as explained above, the Executive Orders discriminate on the basis of transgender identity, and therefore on the basis of sex, so the Court need not conduct the proxy analysis that the Fourth Circuit did in the first instance in *Kadel*. *See supra* Section III.E.1.ii; *Kadel*, 100 F.4th at 143–52. Thus, the government bears the burden of establishing that the orders are substantially related to an important government interest.[31] *Kadel*, 100 F.4th at 156.

In seeking to meet their burden, Defendants assert that the challenged portions of the Executive Orders are based on the important government interest of "protecting the physical and emotional well-being of youth." *See* ECF 55, at 24–25 (quoting *New York v. Ferber*, 458 U.S. 747, 757 (1982) and citing Healthcare Order § 1). Defendants assert that the Orders are

---

[31] Defendants spend the bulk of its opposition on the equal protection claim arguing that rational basis review, not heightened scrutiny, applies and that *Kadel* was wrongly decided. *See* ECF 55, at 18–24. The Court need not entertain this argument because, as Defendants acknowledge, this Court is bound to follow the Fourth Circuit's decision in *Kadel*, which held that transgender identity is a quasi-suspect class triggering heightened scrutiny. *See* ECF 55, at 18.

substantially related to this important government interest because "[e]vidence abounds that treatments covered by the Protecting Children EO 'are dangerous and ineffective.'" *Id.* at 25 (quoting *Eknes-Tucker v. Governor of Ala.*, 114 F.4th 1241, 1266 (11th Cir. 2024) (Lagoa, J., concurring)). Though Defendants might well have support for this argument, the en banc Fourth Circuit in *Kadel* rejected a similar claim by noting that "those criticisms do not support the notion that gender-dysphoria treatments are ineffective so much as still developing." 100 F.4th at 156; *id.* at 156–57 ("Without evidence to show that gender-dysphoria treatments are ineffective, the North Carolina Appellants cannot show that the coverage exclusion is narrowly tailored to serve the state's substantial interest in not covering medically ineffective treatment."). With this binding precedent in mind, and with a barer record than the one before the Fourth Circuit in *Kadel*, the Court is again constrained to find that Defendants are not likely to meet their burden of showing that the Executive Orders are substantially related to an important government interest.[32] As such, Plaintiffs are likely to succeed on the merits of their Equal Protection claim.

### 2.   Irreparable Harm

To establish irreparable harm, the plaintiff "must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (2019) (citation omitted). Additionally, the harm "must be irreparable, meaning that it cannot be fully rectified by the final judgment after trial." *Id.* (quotations and citations omitted).

---

[32] Further, Section 4 of the Healthcare Order directs "immediate[]" action. In doing so, it makes no effort to ensure that a patient is weaned off any medical care they are currently undergoing in conjunction with their medical provider. Such an abrupt halt in medical care, even if, as Defendants contend, that care is dangerous or ineffective, cuts against Defendants' argument that the policy is substantially related to protecting children.

The Court notes at the outset that "the prospect of an unconstitutional enforcement 'supplies the necessary irreparable injury.'" *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381-82 (1992)). Additionally, because Plaintiffs have shown a strong likelihood of success on their constitutional claims, the irreparable harm factor is satisfied. *See Mills*, 571 F.3d at 1312 ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The Fourth Circuit has also previously held that the irreparable harm prong is satisfied where the plaintiff suffers from "diminished access to high-quality health care suited to the individual plaintiff's needs." *Baker*, 941 F.3d at 707. As Plaintiffs point out, "[t]ransgender adolescents and young adults across the country already have lost care because their providers have cancelled appointments, refused to fill prescriptions, or even shut down their gender affirming medical care programs altogether." ECF 35-1, at 35. Further, "[f]amilies have been forced to watch their children suffer, and medical providers have been compelled to abandon their patients." *Id.* The circumstances in this case yield no justification to depart from the Fourth Circuit's reasoning in *Baker*, as the sudden denial of medical care "visits a tangible harm" on the health and well-being of Plaintiffs. *Baker*, 941 F.3d at 707.

Defendants argue that "[t]here is no reason to think the medical institutions' views on the relevant agencies' likely future behavior would change if the EO were enjoined." ECF 55, at 29. However, as described above, the medical institutions have made clear that the decision to pause or cancel gender affirming care was undertaken as a direct response to the Executive Orders and the threat to withhold federal funding. Thus, enjoining Defendants from withholding funding for

institutions that provide prohibited gender affirming medical care would remedy Plaintiffs' harms. Based on the record evidence at this early stage of litigation, the Court has no reason to conclude that the sudden and complete cancelation of gender affirming care at the medical institutions was related to anything other than the fear of losing federal funding pursuant to the challenged portions of the Executive Orders. *See e.g.,* ECF 35-9, at 2 (explaining that "[t]he loss of this funding would critically impair [Denver Health's] ability to provide care for the Denver Community"). As such, enjoining agencies from attaching specific conditions to the hospitals' federal grants would, as far as this Court can tell at this stage, remedy the harm suffered by Plaintiffs.

Lastly, a final judgment after trial cannot rectify the harm caused by Section 4 of the Healthcare Order and Section 3(g) of the Gender Identity Order given that Plaintiffs have shown that the care has already ceased and that each day that passes exacerbates Plaintiffs' injuries, which, as described above, include depression, increased anxiety, heightened gender dysphoria, severe distress, risk of suicide, uncertainty about how to obtain medical care, impediments to maintaining a social life, and fear of discrimination, including hate crimes. *See Koe v. Noggle*, 688 F. Supp. 3d 1321, 1357 (N.D. Ga. 2023) (finding irreparable harm in the absence of a preliminary injunction where "middle-school-age plaintiffs will be unable to obtain [] a course of treatment that has been recommended by their health care providers in light of their individual diagnoses and mental health needs"). The Court concludes that the Plaintiffs have demonstrated they are likely to suffer irreparable harm absent injunctive relief.

### 3.    Prejudice and Public Interest

The Court must balance the significant irreparable harms identified above against the harms that the Government asserts will arise from temporarily enjoining enforcement of the challenged provisions of the Executive Orders. Here, the balance of equities and the public interest

weigh in favor of issuing a TRO. *See Ass'n of Cmty Cancer Centers v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020).

As an initial matter, the Court finds that the Government is in no way harmed by the issuance of a TRO which prevents it from enforcing restrictions likely to be found unconstitutional. *See Leaders of a Beautiful Struggle*, 2 F.4th at 346. And it is "well-established that the public interest favors protecting constitutional rights." *Id.* (citations omitted). Further, the Executive Orders threaten to harm the livelihoods of transgender youth, as well as access to medical care for entire communities if hospitals decide to continue to provide gender affirming medical care and then lose significant federal funding.

Plaintiffs point to affidavits by doctors and researchers that detail the far-reaching effects of these Executive Orders. And importantly, the Executive Orders have been interpreted to mean that *all* of medical institutions' federal funding is in jeopardy if they do not comply, regardless of whether the funding is tied to gender affirming care. *See* ECF 35-9, at 2; ECF 35-10, at 3. As Denver Health acknowledged in their statement regarding the Healthcare Order, federally funded programs represent "a significant portion of Denver Health's funding," and the "loss of this funding would critically impair our ability to provide care for the Denver community." ECF 35-9, at 2. The Government, on the other hand, has adduced no evidence that any harm will result if the grant funding is restored to the status quo. Instead, Defendants simply argue that the "public interest is not advanced when the Executive is disabled from even *considering* a policy, especially one that has been the subject of legislation across the country." ECF 55, at 29 (emphasis in original). As described above, the Executive Orders went well-beyond general policymaking; the Executive Orders condition funding in a manner not prescribed by Congress. Though the Executive is no doubt free to pursue at the federal level the very type of legislation that Defendants

note has been enacted in many states, this process must proceed within the boundaries set by the Constitution. Seeking to effectively enact legislation by executive order clearly exceeds the bounds of Article II and thus does not serve the public interest.

In sum, the Executive Orders threaten to disrupt treatment of patients, stall critical research, and gut numerous programs in medical institutions that rely on federal funding. Accordingly, the Plaintiffs have shown that they are likely to succeed on the merits, that they would suffer irreparable harms absent an injunction, and that the balance of equities and the public interest tip in their favor. The Court will therefore grant a temporary restraining order.

### F.    Scope of Injunction

Having determined that Plaintiffs are entitled to a temporary restraining order, the Court must determine its proper scope. Plaintiffs contend that "PFLAG and GLMA have members 'throughout the country' who have been harmed by the Executive Orders." *See* ECF 35-1, at 36 (citing declarations). Additionally, Plaintiffs maintain that because "the Orders harm the Transgender Plaintiffs through their coercive impact on third parties, an injunction must necessarily extend to those third parties to provide the necessary relief to all of PFLAG and GLMA's members." *Id.*

"Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Hills v. Gautreaux*, 425 U.S. 284, 293–94 (1976) (citations and internal quotation marks omitted). It is well-established that "district courts have broad discretion when fashioning injunctive relief." *Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010). Nevertheless, the "power[] [is] not boundless." *Id.* "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)

49

(citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).  Consistent with these principles, courts may issue nationwide injunctions.  *See Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308–09 (4th Cir. 1992); *see also Azar*, 509 F. Supp. 3d at 503 ("[F]ederal courts over the years have issued 'hundreds' of nationwide injunctions 'reaching beyond the parties in the lawsuit[,]' especially when such a scope is considered 'necessary to afford complete relief.'" (citing *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 46 (D.D.C. 2020))).  "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance and legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 583 (2017) (per curiam) (denying in part a request to stay a nationwide injunction in a challenge to an executive order suspending entry of foreign nationals from seven countries). Here, Plaintiffs have demonstrated that they are likely to succeed on their claims that the Executive Orders purport to wield powers exclusive to Congress, directly conflict with existing statutes, and, pursuant to *Kadel*, violate the Equal Protection component of the Fifth Amendment, which supports nationwide relief.

As an initial matter, "where a law is unconstitutional on its face, and not simply in its application to certain plaintiffs, a nationwide injunction is appropriate." *Cnty. of Santa Clara*, 250 F. Supp. 3d at 539 (citing *Califano*, 442 U.S. at 702).  Additionally, this Court has reasonably cautioned that "a court order should not cause confusion about which companies or providers are subject to a rule and which are not; instead, a court order must be clear and definite." *Azar*, 509 F. Supp. 3d at 504.  With this principle in mind, the Court finds that a piecemeal approach is not appropriate in this case.  Significant confusion would result from preventing agencies from conditioning funding on certain medical institutions, while allowing conditional funding to persist

as to other medical institutions. And while the TRO is nationwide in scope, it is "limited in that it simply preserves the status quo without requiring the agency to take any affirmative action." *Id.*

Additionally, PFLAG and GLMA are organizational plaintiffs suing on behalf of their members. When associations prevail in obtaining injunctive relief, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). Here, PFLAG has members who "currently receive or will soon need to access the medical treatment for gender dysphoria that the Executive Orders seek to prohibit." ECF 1, at 6 ¶ 13. Additionally, GLMA includes many "health professional members who work at medical institutions receiving grant funding from Defendants HRSA and NIH as well as other subagencies of Defendant [HHS]." *Id.* at 7 ¶ 14. The members of PFLAG and GLMA are located throughout the country. *See id.* at 6–7 ¶¶ 13, 14. Thus, it follows that an injunction of nationwide scope is necessary to provide complete relief.

Further, the reason the Executive Orders are unconstitutional—namely that, at minimum, they violate the separation of powers—are applicable to jurisdictions throughout the country.[33] The necessity of a nationwide injunction is underscored by the fact that hospitals all over the county could lose access to all federal funding if they continue to provide gender affirming medical care.[34] And if medical institutions stop providing gender affirming medical care, as many have

---

[33] *Kadel* is obviously not binding beyond this Circuit, thus the Court's holding with respect to Equal Protection may clash with the findings of other courts. If this were Plaintiffs' lone claim, the Court might be persuaded that a more limited TRO is appropriate. However, even Defendants appear to concede that the separation of powers issue, if decided in Plaintiffs' favor, would apply equally in all jurisdictions. *See* ECF 55, at 31 (arguing that the statutory and equal protection arguments diverge from authority in other circuits).

[34] The harm of losing this funding extends well beyond the named Plaintiffs or even the transgender community writ large. Some hospitals, like Denver Health have already stated that losing this funding would "critically impair" hospital functioning and deprive all persons in the Denver area

already done, the irreparable harm to Plaintiffs, who live in many different states, has been well-established. *See Richmond Tenants Org.*, 956 F.2d at 1308–09 (upholding nationwide injunction where challenged conduct caused irreparable harm in myriad jurisdictions across the country). The constitutional and statutory violations apply equally to all medical institutions that receive federal grants. Accordingly, the "equities of the case" call for, and the Court will issue, an order temporarily restraining the government from enforcing the contested rule. Given the circumstances, a narrower injunction cannot provide complete relief.

### G.    Security

Plaintiffs ask the Court to waive Rule 65(c)'s bond requirement. Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The district court "has discretion to set the bond amount," but it is "not free to disregard the bond requirement altogether." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999). Security can be waived when complying with the preliminary injunction raises no risk of monetary loss to the defendant. *See Md. Dep't of Human Res. v. U.S. Dept. of Agric.*, 976 F.2d 1462, 1483 n.23 (4th Cir. 1992) (stating that district court has "discretion to set a bond amount of zero where the enjoined or restrained party faces no likelihood of material harm"); 11A Wright, Miller & Kane, Federal Practice & Procedure § 2954, at 293 (2d ed. 1995, April 2011 Supp.) (stating that a "court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant"). As explained above, Defendants have shown no evidence of a likelihood of

---

of critical access to healthcare. ECF 35-9, at 2. The Government has not presented factual differences that would compel a different conclusion in any other jurisdictions.

harm, monetary or otherwise. Thus, the Court will not require the posting of security. Defendants may request a bond if they so choose.

## IV.    **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for a Temporary Restraining Order, ECF 35, is **GRANTED**.

Dated: <u>February 14, 2025</u>

<u>                    /s/                    </u>
Brendan A. Hurson
United States District Judge