**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| PFLAG, INC., *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. BAH-25-337 |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Defendants*. | |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 3

    A.    Medical Guidelines for Treating Gender Dysphoria ..................................... 3

    B.    The Executive Orders .................................................................................. 5

    C.    The Impact of the Executive Orders on the Provision of Medical
          Care and Harm to Public Health. ................................................................ 7

    D.    The Harm of the Executive Orders to the Individual Plaintiffs .................... 7

    E.    The Harm of the Executive Orders to the Members of PFLAG
          and GLMA ................................................................................................ 12

LEGAL STANDARD ...................................................................................... 15

ARGUMENT .................................................................................................... 16

I.       PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS. .................... 16

    A.    Plaintiffs Have Standing and Their Claims Are Justiciable ........................ 16

    B.    The Executive Orders Are *Ultra Vires* Because They Exceed the
          President's Authority, Infringe Upon Congress's Powers, and
          Violate Article I's Framework for Federal Legislation. .............................. 18

    C.    The Executive Orders Are *Ultra Vires* Because They Conflict
          with Laws that Prohibit Discrimination on the Basis of Sex. ..................... 21

    D.    Plaintiffs Are Likely to Succeed on Their Equal Protection Claim. ............ 22

          1.    The Executive Orders Trigger Heightened Scrutiny. ...................... 22

          2.    The Executive Orders Cannot Survive Heightened
                Scrutiny. ..................................................................................... 26

          3.    The Executive Orders Fail Rational Basis Review. ......................... 28

II.      THE OTHER FACTORS FAVOR A NATIONWIDE PRELIMINARY
       INJUNCTION. ............................................................................................. 29

CONCLUSION ................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aiken Cnty.*,
   725 F.3d 255 (D.C. Cir. 2013).........................................................................19

*Air Evac EMS, Inc. v. McVey*,
   37 F.4th 89 (4th Cir. 2022)............................................................................29

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015).......................................................................................17

*Ass'n of Cmty. Cancer Ctrs. v. Azar*,
   509 F. Supp. 3d 482 (D. Md. 2020) ..........................................................29, 30

*Bostock v. Clayton County*,
   590 U.S. 644 (2020).......................................................................................21

*Brandt v. Rutledge*,
   677 F. Supp. 3d 877 (E.D. Ark. 2023).......................................................26, 27

*Chamber of Com. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996)...................................................................17, 22

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985).......................................................................................28

*Clinton v. City of New York*,
   524 U.S. 417 (1998)..............................................................................18, 19, 21

*Dekker v. Weida*,
   679 F. Supp. 3d 1271 (N.D. Fla. 2023) .....................................................26, 28

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019).......................................................................................16

*Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*,
   438 U.S. 59 (1978).........................................................................................17

*Gardner v. Toilet Goods Ass'n*,
   387 U.S. 167 (1967).......................................................................................17

*HIAS, Inc. v. Trump*,
   985 F.3d 309 (4th Cir. 2021)............................................................16, 18, 22, 30

*INS v. Chadha*,
    462 U.S. 919 (1983)...................................................................... 20

*Kadel v. Folwell*,
    100 F.4th 122 (4th Cir. 2024) (en banc) ...................................................*passim*

*Koe v. Noggle*,
    688 F. Supp. 3d 1321 (N.D. Ga. 2023)........................................................ 27

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013)...................................................................... 19

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
    2 F.4th 330 (4th Cir. 2021) (en banc) ......................................................... 29

*Legend Night Club v. Miller*,
    637 F.3d 291 (4th Cir. 2011) ................................................................ 30

*Mayor of Balt. v. Azar*,
    973 F.3d 258 (4th Cir. 2020) ................................................................ 19

*Miller v. Brown*,
    462 F.3d 312 (4th Cir. 2006) ........................................................... 16, 17

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)...................................................................... 29

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003)...................................................................... 16

*Nken v. Holder*,
    556 U.S. 418 (2009)...................................................................... 16

*Ostergren v. Cuccinelli*,
    615 F.3d 263 (4th Cir. 2010) ................................................................ 30

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ........................................................................ 19

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979)................................................................... 24, 25

*Planned Parenthood S. Atl. v. Baker*,
    941 F.3d 687 (4th Cir. 2019) ................................................................ 29

*Poe v. Labrador*,
    709 F. Supp. 3d 1169 (D. Idaho 2023) ........................................................ 26

*Romer v. Evans,*
    517 U.S. 620 (1996)...................................................................... 29

*South Dakota v. Dole,*
    483 U.S. 203 (1987)...................................................................... 19

*St. Michael's Media v. Mayor & City Council of Balt.*, 566 F. Supp. 3d 327, 351
    (D. Md. 2021).............................................................................. 30

*Train v. City of N.Y.,*
    420 U.S. 35 (1975)................................................................. 19, 21

*Trump v. United States,*
    603 U.S. 593 (2024)...................................................................... 18

*Washington v. Trump,*
    2025 WL 509617 (W.D. Wash. Feb. 16, 2025) ....................... 17, 18

*Williams v. Kincaid,*
    45 F.4th 759 (4th Cir. 2022).......................................................... 24

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952)................................................................. 18, 20

*Zivotofsky v. Kerry,*
    576 U.S. 1 (2015).......................................................................... 20

**Statutes**

5 U.S.C. § 7301 ................................................................................. 19

42 U.S.C. § 300ff .............................................................................. 20

42 U.S.C. § 300ff-1 ........................................................................... 20

42 U.S.C. § 300ff-71 ......................................................................... 20

42 U.S.C. § 300w-7 ........................................................................... 21

42 U.S.C. § 300w-7(a)(2)..................................................................... 2

42 U.S.C. § 18114(1)-(5)................................................................... 19

42 U.S.C. § 18116 ............................................................................. 21

42 U.S.C. § 18116(a)........................................................................... 2

Further Consolidated Appropriations Act, Pub. L. No. 118-47, § 202, 526 (2024).................... 19

## Executive Orders

Exec. Order No. 14,148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025) .......................................................... 25

Exec. Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) .................................................................................................... 1

Exec. Order No. 14,170, *Reforming the Federal Hiring Process and Restoring Merit to Government Service*, 90 Fed. Reg. 8621 (Jan. 20, 2025) ........................ 25

Exec. Order No. 14,183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025) .................................................................................... 25

Exec. Order No. 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025) ....................................................... 1

Exec. Order No. 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025) .............................................................................. 25

Exec. Order No. 14,201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025) .......................................................................................... 25

## Other Authorities

*Transgender*, MERRIAM WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/transgender.......................................................................... 24

U.S. CONST. Amendments V, XIV.......................................................................... 22

## Constitutional Provisions

U.S. CONST. art. I § 7 .......................................................................... 16, 17, 18, 19

U.S. CONST. art. I § 8 .......................................................................................... 16

U.S. CONST. Article I, § 7, cl. 2, 3 ........................................................................ 19

U.S. CONST. Article I, § 7, cl. 2 ............................................................................ 20

## INTRODUCTION

Between January 29, 2025, and February 13, 2025, hospitals across the country abruptly halted medical care for transgender people under the age of nineteen, cancelling appointments and turning away some patients who have waited years to receive medically necessary care for gender dysphoria. This sudden shutdown in care was the direct and immediate result of Executive Order 14,187, issued by President Trump on January 28, 2025, directing all federal agencies to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end" gender affirming medical care for people under nineteen (the "Denial of Care Order").[1] The Denial of Care Order followed on the heels of and built upon Executive Order 14,168, issued on January 20, 2025, which commanded that "[f]ederal funds shall not be used to promote gender ideology," and directed all federal agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology" (the "Gender Identity Order").[2] The President has celebrated the shutdown in care as proof that the Orders are "already having [their] intended effect." Gonzalez-Pagan Decl. Ex. A-16.

On February 13, 2025, this Court issued a temporary restraining order ("TRO") prohibiting Defendants from "conditioning or withholding federal funding based on the fact that a healthcare entity or health professional provides gender affirming medical care to a patient under the age of nineteen under section 3(g) of [the Gender Identity Order] and Section 4 of [the Denial of Care Order]." Dkt. 61. This Court issued its accompanying memorandum opinion on February 14. Dkt. 62 ("TRO Op."). Plaintiffs respectfully request that the Court adopt its analysis from the TRO

---

[1] Exec. Order No. 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025).

[2] Exec. Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

Opinion, particularly as to the justiciability of Plaintiffs' claims (TRO Op. 10-25); the likelihood of success on Plaintiffs' two *ultra vires* claims, which the Court termed the "Separation of Powers Claim" (*id.* at 26-37), and the "Contrary to Existing Statutes" claim (*id.* at 37-42); and its analysis of the remaining factors required to issue preliminary injunctive relief—namely, irreparable harm, balance of the equities, and the public interest. *Id.* at 45-52. Plaintiffs submit this memorandum of law primarily to discuss additional record evidence, including new Plaintiff declarations and new expert declarations, that further supports their claims and, more specifically, supports a finding that Plaintiffs are likely to succeed on their equal protection claim.

As the Court explained in its TRO Opinion, Plaintiffs are likely to succeed on the merits of their claims that these Orders are unlawful and unconstitutional. *Id.* at 26-45. President Trump does not have unilateral power to withhold federal funds Congress has authorized and signed into law, and he cannot impose conditions on the use of funds when Congress has not delegated that authority to him. Under the Constitution, Congress holds the power of the purse and the power to enact legislation. Simply put, "the Administration may not usurp Congress's power just because the administration of healthcare at issue is antithetical to the Administration's policies." *Id.* at 36.

President Trump also does not have the unilateral authority to direct agencies to take actions contrary to constitutional and statutory rights. Section 1557 of the Affordable Care Act ("ACA") and Section 1908 of the Public Health Service Act ("PHSA") prohibit healthcare entities from discriminating based on sex as a condition of receiving federal funding. *See* 42 U.S.C. § 18116(a); 42 U.S.C. § 300w-7(a)(2). President Trump cannot override these statutes and require federal grantees to engage in the same discrimination Congress prohibited. TRO Op. 37-42. Nor does he have the authority to violate the equal protection rights of thousands of transgender people

under nineteen, including the Transgender Plaintiffs,[3] by depriving them of necessary medical care solely on the basis of their sex and transgender status. *Id.* at 42-45.

To prevent these unconstitutional Executive Orders from continuing to inflict irreparable harm, the Court should convert the TRO into a preliminary injunction.

## STATEMENT OF FACTS

### A.    Medical Guidelines for Treating Gender Dysphoria

Gender dysphoria is a medical condition characterized by clinically significant distress caused by the incongruence between a person's gender identity and the sex they were assigned at birth. Shumer Decl. ¶¶ 45-58, 77; Antommaria Decl. ¶¶ 21-33; Karasic Decl. ¶ 54-63. If left untreated, gender dysphoria can have serious consequences for the health and wellbeing of transgender people, including depression, anxiety, and suicidality. Karasic Decl. ¶¶ 29, 52, 65, 105; Shumer Decl. ¶¶ 46, 129; Turban Decl. ¶ 12. The treatment for gender dysphoria is broadly referred to as gender affirming medical care. Shumer Decl. ¶¶ 45, 77; Karasic Decl. ¶ 87; Turban Decl. ¶ 16.

Doctors in hospitals and other medical facilities receiving federal funding follow evidence-based and widely accepted clinical practice guidelines to assess, diagnose, and treat adolescents and adults with gender dysphoria. Shumer Decl. ¶¶ 45-58, 77; Antommaria Decl. ¶¶ 34-47; Karasic Decl. ¶¶ 54-63. Decades of clinical experience and a large body of scientific and medical literature support these guidelines, which the major medical associations in the United States recognize as authoritative. Antommaria Decl. ¶¶ 34-47; Shumer Decl. ¶¶ 51, 84-101; Karasic Decl. ¶¶ 63, 84-89; Turban Decl. ¶¶ 14-18. These guidelines are evidence-based, and the evidence supporting

---

[3]   The Transgender Plaintiffs are Plaintiffs Gabe Goe, Bella Boe, Cameron Coe, and Robert Roe (the "Minor Plaintiffs"), Plaintiffs Lawrence Loe and Dylan Doe (the "Adult Plaintiffs"), and certain PFLAG members under age nineteen who also are transgender.

gender affirming medical care is of comparable quality to the evidence supporting other treatments in pediatrics. Antommaria Decl. ¶¶ 6, 29, 32, 39; Karasic Decl. ¶¶ 60, 62; Shumer Decl. ¶¶ 54, 56. Gender affirming medical care is not experimental, and contrary to the Denial of Care Order's assertions, it is not based on "junk" science. Antommaria Decl. ¶¶ 21, 27, 38; Shumer Decl. ¶ 101.

Medically indicated treatments for some adolescents may include puberty-delaying treatment and hormone therapy. Shumer Decl. ¶¶ 59-60, 62. For many transgender adolescents, the onset of puberty, which leads to physical changes in their bodies that are incongruent with their gender identity, can cause extreme distress. Shumer Decl. ¶ 39; Karasic Decl. ¶ 70; Bond Decl. ¶¶ 15, 18; Bruce Boe Decl. ¶ 26; Claire Coe Decl. ¶ 30; Chapman Decl. ¶¶ 10, 36. Puberty-delaying medication allows transgender adolescents to delay these changes, minimizing and potentially preventing the heightened gender dysphoria caused by the development of secondary sex characteristics incongruent with their gender identity. Shumer Decl. ¶¶ 39, 49, 62, 64-72; Karasic Decl. ¶ 70. Without this treatment, an adolescent's body will undergo changes that can cause extreme distress and may be difficult or impossible to later reverse. Shumer Decl. ¶ 68. For some older adolescents and adults, treatment with gender affirming hormone therapy (e.g., testosterone for transgender boys, and estrogen and testosterone suppression for transgender girls) may be medically necessary. Karasic Decl. ¶ 73. Hormone therapy allows patients to develop physical characteristics that align with their gender identity instead of their sex assigned at birth. Shumer Decl. ¶¶ 62, 72-77; Karasic Decl. ¶ 71. Some transgender male older adolescents and adults may need masculinizing chest surgery to help bring their bodies into alignment with their gender identity. Karasic Decl. ¶ 72, 96. This surgery is much more commonly performed on cisgender boys (as treatment for gynecomastia) than on transgender males. *Id.* ¶ 96. Minors may receive gender affirming medical care only with parental consent. Antommaria Decl. ¶¶ 48, 49; Karasic

4

Decl. ¶ 68; Shumer Decl. ¶ 44. Once a transgender adolescent begins puberty, it is rare for them to later re-identify with their birth-assigned sex. Karasic Decl. ¶ 95, 97; Turban Decl. ¶ 25.

These same treatments used to treat gender dysphoria are also used for other conditions in adolescents and adults. Shumer Decl. ¶¶ 70, 71, 86. Puberty-delaying medication is used to treat children with central precocious puberty and to treat adolescents and adults with hormone-sensitive cancers and endometriosis. Shumer Decl. ¶ 71. For cisgender adolescents experiencing delayed puberty, boys are prescribed testosterone and girls are prescribed estrogen. Shumer Decl. ¶ 86. In general, puberty-delaying medication and hormone therapy are prescribed to cisgender boys and girls to allow them to undergo a typical puberty for boys and girls, respectively. *Id.* Medication to suppress testosterone is also provided to cisgender girls with Polycystic Ovarian Syndrome to reduce some symptoms of the condition, including excess facial hair. *Id.* ¶ 71, n.1.

The potential risks associated with these interventions when used to treat gender dysphoria are comparable to the risks associated with many other medical treatments to which parents routinely consent on behalf of their children, and for which otherwise competent adults can consent on their own. Shumer Decl. ¶ 70; Antommaria Decl. ¶ 57.

B.    **The Executive Orders**

President Trump issued the Gender Identity Order on January 20, 2025. Section 3(g) of the Order declares: "Federal funds shall not be used to promote gender ideology." President Trump further directs that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds to do not promote gender ideology." *Id.* The Order claims that "'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id.* § 2(f). It further asserts that "[g]ender ideology is internally inconsistent, in that it diminishes sex as an identifiable

5

or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id.*

On January 28, 2025, President Trump issued the Denial of Care Order, which builds on the Gender Identity Order. Section 4 of the Denial of Care Order directs the immediate defunding of medical institutions that provide gender affirming medical care to patients under age nineteen for the purpose of gender transition. Denial of Care Order § 4. The Orders do not seek to prohibit federal funding to entities that provide these same treatments for other medical conditions; rather, they prohibit federal funding to entities only when the medical care is for the purpose of gender transition—that is, to align a patient's body with a gender identity different from their sex assigned at birth. *Id.* §§ 2(c), 4. Importantly, the Orders are not limited to grants used for or related to gender affirming medical care. Rather, President Trump has unilaterally directed that *all* federal medical and research grants be stopped, regardless of whether the funds are used for or related to gender affirming medical care in any way. *Id.*

The Orders are part of a systematic effort by the Trump Administration to target what it terms "gender ideology" and transgender people. In his first nine full days in office, President Trump signed nine Executive Orders targeting transgender people. Am. Compl. ¶¶ 72-76.

Defendant Health Resources and Services Administration ("HRSA") has issued notices to grant recipients that HRSA grant funds may not be used for activities that "do not align with" the Orders and any "vestige, remnant, or re-named piece of any programs in conflict with these E.O.s are terminated in whole or in part." Gonzalez-Pagan Decl. Ex. A-1.[4]  The Centers for Disease

---

[4] Although the HRSA notice appears to have been temporarily rescinded, "there is ample evidence demonstrating that the funding restrictions remain in full effect, despite the HRSA recission." TRO Op. 15. Indeed, after HHS was ordered to restore webpages it had taken down pursuant to the Gender Identity Order, Defendant HHS's subagencies have appended notices to these webpages that the "Administration rejects gender ideology and condemns the harms it causes to children, by promoting their chemical and surgical mutilation . . . This page does not reflect biological reality and therefore the Administration and this Department reject[] it." Gonzalez-Pagan Decl. Exs. A-17–A-18.

Control and Prevention ("CDC") has done the same, ordering grant recipients to "immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity." Gonzalez-Pagan Decl. Ex. A-2.

### C.    The Impact of the Executive Orders on the Provision of Medical Care and Harm to Public Health.

The Orders had direct and immediate effects on the provision of medical care to transgender people under nineteen.[5] As the Court already has found, "medical institutions [across the United States] immediately halted all gender affirming medical care for those under the age of nineteen soon after the issuance of the Executive Orders." TRO Op. 24; *see also* Poe Decl. ¶ 10; Noe Decl. ¶ 6; Gonzalez-Pagan Decl. Exs. A-3–A-15. Hospitals and other healthcare institutions fear that if they do not stop providing gender affirming medical care to transgender patients under nineteen, they will immediately lose significant and essential federal funding, including funds unrelated to the provision of treatment of gender dysphoria. Indeed, the hospitals "unambiguously cite the Executive Orders as the reason for ceasing care." TRO Op. 25 n.21. President Trump has touted these shutdowns as proof that the Orders are "already having [their] intended effect." *See* Gonzalez-Pagan Decl. Ex. A-16.

### D.    The Harm of the Executive Orders to the Individual Plaintiffs

**Boe Family:** Bruce Boe and his 12-year-old daughter Bella live in New York City. Bruce Decl. ¶¶ 2-3, 6. Bella is transgender. Bruce Decl. ¶ 6; Bella Decl. ¶ 4. From a young age, Bella strongly identified with typical feminine expression and interests and feared the idea of growing into a man. Bruce Decl. ¶ 6; Bella Decl. ¶ 5. Male puberty feels distressing for Bella because she

---

[5] *See* Am. Compl. ¶¶ 77-99; George Goe Decl. ¶¶ 21-27; Bruce Boe Decl. ¶¶ 23-28; Claire Coe Decl. ¶¶ 28-34; Rachel Roe Decl. ¶¶ 20-28; Chapman Decl. ¶¶ 31-34, 36; Lawrence Loe Decl. ¶¶ 25-28; Dylan Doe Decl. ¶¶ 28-35; Bond Decl. ¶ 14; Jane Doe 1 Decl. ¶ 17; Jane Doe 2 Decl. ¶ 22; Jane Doe 3 Decl. ¶ 14; Jane Doe 4. Decl. ¶ 13; Jane Doe 5 Decl. ¶ 28; Jane Doe 6 Decl. ¶18; Sheldon Decl. ¶ 29; Birnbaum Decl. ¶¶ 13-15; Poe Decl. ¶¶ 9-11; Noe Decl. ¶ 6.

worries about developing masculine features that may be permanent and are the opposite of who she is as a girl. Bella Decl. ¶ 13. After Bella was diagnosed with gender dysphoria, Bella, her parents, and her doctors at NYU Langone decided to begin puberty delaying medication for Bella. They initiated this treatment only after reviewing the risks, benefits, and alternatives. Bruce Decl. ¶¶ 17, 19; Bella Decl. ¶ 14. But on January 29, 2025, NYU Langone shut down all new procedures and prescriptions related to gender affirming medical care for patients under nineteen because of the Orders. Bruce Decl. ¶ 25. When Bella heard the news, she was distraught. Bruce Decl. ¶ 27. Bella wants to be like the other women in her life when she is older, and needs medical treatment to get there. Bella Decl. ¶¶ 17-18. The Orders prevent Bruce from doing his job as a parent to protect Bella and get her the medical care she needs. Bruce Decl. ¶ 29.

**Coe Family:** Claire Coe lives in New York City with her 12-year-old child Cameron Coe. Claire Decl. ¶¶ 3-4; Cameron Decl. ¶ 2. Cameron is nonbinary. Claire Decl. ¶ 4; Cameron Decl. ¶ 4.[6] Cameron was designated male at birth, but they have consistently expressed a nonbinary identity. Claire Decl. ¶¶ 4-6; Cameron Decl. ¶¶ 4-5, 7. As Cameron started puberty, Claire realized they were increasingly uncomfortable with their body, which manifested in refusing to go swimming or be shirtless and being anxious in public. Claire Decl. ¶ 15; Cameron Decl. ¶ 10. Cameron has since been diagnosed with gender dysphoria and is starting male puberty, which will cause permanent changes to their body. Claire Decl. ¶¶ 21-22, 24; Cameron Decl. ¶ 13. To allow Cameron time to decide which puberty is right for them, Cameron received a three-month puberty blocking injection. Claire Decl. ¶¶ 22-23, 25; Cameron Decl. ¶¶ 13-14. With puberty blockers, Cameron is less anxious, stressed, and vigilant about their body, can focus on school, and has hope

---

[6] A nonbinary person is a person whose gender identity is neither exclusively male nor exclusively female even though they were designated the sex of male or female at birth. *Cf.* Karasic Decl. ¶ 35. Thus, like other transgender people, their gender identity differs from their birth-designated sex. *See infra* note 9; Karasic Decl. ¶ 41.

about how they look now and will look in the future. Claire Decl. ¶ 26; Cameron Decl. ¶ 14. Cameron had an appointment scheduled at NYU Langone to receive a longer-acting puberty blocker, but NYU Langone cancelled it because of the Orders. Claire Decl. ¶ 29. After two weeks of uncertainty and following the filing of this suit, Cameron was able to get their implant. Claire Decl. ¶ 33; Cameron Decl. ¶ 16. But the Coes are terrified about how Cameron will continue to get care going forward. Claire Decl. ¶¶ 33-34; Cameron Decl. ¶ 16.

**Goe Family:**  George Goe and his 14-year-old son Gabe live in Maryland. George Decl. ¶ 2. Gabe came out as transgender at age 12. George Decl. ¶¶ 2, 7; Gabe Decl. ¶ 4. After socially transitioning with a boys' name, he/him pronouns, a boys' haircut, and more masculine clothes, Gabe has become more confident, cracking jokes and taking better care of himself. George Decl. ¶¶ 8-10; Gabe Decl. ¶¶ 13-14. But Gabe's physical body is holding him back, making it hard to keep up his confidence. George Decl. ¶ 11. Puberty caused Gabe to feel at war with his increasingly feminine body, and he experienced severe anxiety and distress. Gabe Decl. ¶ 9. Gabe has been diagnosed with gender dysphoria. George Decl. ¶¶ 12-15; Gabe Decl. ¶ 15. After taking initial steps to control his periods and reviewing the risks, benefits, and alternatives, Gabe's parents, Gabe, and Gabe's doctors at Children's National all decided that testosterone was the appropriate treatment. George Decl. ¶¶ 16-19. Gabe's appointment to start testosterone was scheduled for March 2025. George Decl. ¶ 19. But on January 30, 2025, Children's National told George that because of the Orders, the hospital would not be issuing new prescriptions or processing refills on existing prescriptions for gender affirming medical care for people under nineteen. George Decl. ¶ 22. Now Gabe will suffer because he cannot receive medication for his gender dysphoria. George Decl. ¶ 25.

**Roe Family:**  Rachel Roe lives in Massachusetts with her 16-year-old son Robert. Rachel Decl. ¶ 3; Robert Decl. ¶¶ 2-3. Robert is transgender. Rachel Decl. ¶ 6; Robert Decl. ¶ 5. Robert has identified as a boy for as long as he can remember. Rachel Decl. ¶ 6; Robert Decl. ¶ 6. When Robert was eight, he began socially transitioning by using a boy's name, he/him pronouns, and presenting himself as a boy. Rachel Decl. ¶ 8; Robert Decl. ¶ 8. At nine, Robert's pediatrician diagnosed him with gender dysphoria. Robert's doctors at Boston Children's Hospital later confirmed the diagnosis. Rachel Decl. ¶¶ 9-10; Robert Decl. ¶ 9. Until Robert started puberty, feeling supported in living as a boy was all he needed to thrive. Rachel Decl. ¶ 10; Robert Decl. ¶ 9. But when Robert's doctors saw he was starting puberty at eleven, they reviewed potential options with Rachel and Robert. Robert started on puberty blockers. Rachel Decl. ¶¶ 11-12; Robert Decl. ¶ 10. Robert thrived while on blockers because he did not have the anxiety of worrying about physical changes that did not match his male identity. Rachel Decl. ¶ 15; Robert Decl. ¶ 10. But Robert could not stay on blockers indefinitely; after reviewing the risks, benefits, and alternatives, Robert started on testosterone, which he has now been on for two years. Rachel Decl. ¶¶ 16-18; Robert Decl. ¶¶ 11, 14. Robert had a routine check-up appointment scheduled on January 29, 2025, but that morning, the hospital informed Rachel that all appointments for patients under nineteen were cancelled due to the Orders. Rachel Decl. ¶¶ 21-22; Robert Decl. ¶¶ 17-18. When he heard, Robert felt numb. Robert Decl. ¶ 19. If he has to stop hormone therapy, he will start female puberty. *Id*. Robert has been clear he is a boy since he was two years old and has been living as a boy since he was eight; it would be alarming and terrifying for him to suddenly develop at sixteen feminine features completely inconsistent with his male identity. Rachel Decl. ¶ 23.

**Lawrence Loe:**  Plaintiff Lawrence Loe is an 18-year-old transgender man living in New York City. Loe Decl. ¶ 2. When Lawrence started puberty, he was depressed and unable to

function. *Id.* ¶ 5. After two years, he realized female puberty felt so wrong because he is not a girl; he is a transgender boy. *Id.* ¶¶ 5, 7. Lawrence wanted to take puberty blockers, but his parents could not agree, so he did not receive them. *Id.* ¶ 9. Instead, Lawrence saw a therapist. But his mental health continued to deteriorate. *Id.* ¶ 9. When Lawrence was sixteen, and after receiving a gender dysphoria diagnosis, his parents consented to him starting testosterone—bringing his years of misery to an end. *Id.* ¶¶ 15-16. As his voice deepened and body changed, Lawrence was able to talk in class and to start singing again. *Id.* ¶ 19. Now eighteen, Lawrence still experiences significant dysphoria because he developed breasts during puberty; he cannot leave his room without binding his chest, which is painful. *Id.* ¶ 21. After years of suffering, Lawrence was scheduled for chest masculinization surgery for February 2025 at NYU Langone, after he turned eighteen. *Id.* ¶¶ 22-23. But on January 29, 2025, NYU called Lawrence to cancel his surgery because of the Orders. *Id.* ¶ 25. Lawrence's life is on hold while he waits to get surgery. *Id.* ¶ 28.

**Dylan Doe:** Dylan Doe is an eighteen-year-old transgender man living in Massachusetts. Doe Decl. ¶¶ 3, 25. As a young child, Dylan would wish on dandelions that he would wake up as a boy. *Id.* ¶ 4. When he was 12, Dylan realized he was a transgender boy. *Id.* ¶ 6. He told his parents and started to socially transition with a new haircut, clothes, he/him pronouns, and a boys' name. *Id.* ¶¶ 7-8. Dylan's therapist diagnosed him with gender dysphoria, and after reviewing the risks, benefits, and alternatives, Dylan's parents, doctors, and Dylan decided that Dylan would start puberty blocking medication to give him more time to explore his identity. *Id.* ¶¶ 13-15. The blockers changed Dylan's life—he felt less panicked, and stopped getting his period, which was a huge source of dysphoria. *Id.* ¶ 16. At fourteen years old, Dylan's parents, his doctors, and Dylan all decided he would start testosterone to continue to live consistent with his identity and expression as a boy. *Id.* ¶¶ 17-18. After a series of anti-transgender bills passed in Tennessee,

Dylan's family moved to Massachusetts, where Dylan found a new doctor. *Id.* ¶¶ 21-22, 26. Dylan sees his doctor every four months for a long-acting form of testosterone and injections to stop his period. *Id.* ¶¶ 26-27. Dylan was supposed to have an appointment for testosterone on January 31, 2025, but the doctor cancelled it because of the Orders. *Id.* ¶¶ 28-31. Dylan is worried and anxious about his continued ability to look like and live as the man he knows himself to be. *Id.* ¶¶ 32-33.

### E.    The Harm of the Executive Orders to the Members of PFLAG and GLMA

In addition to the individual plaintiffs in this case, who are all PFLAG members, many other PFLAG members' children are being monitored for the appropriate time to begin puberty blockers and/or hormone therapy as part of a medically prescribed course of care for gender dysphoria. Bond Decl. ¶ 14. Since the Orders, PFLAG has heard from members across the country that their or their children's appointments for gender affirming medical care were cancelled, putting those adolescents and young adults at risk of serious mental and physical harm—the very reasons families seek this medical care in the first place. *Id.*

For example, PFLAG member Kristen Chapman and her 17-year-old daughter, W.G., live in Virginia. Chapman Decl. ¶ 4. W.G. is transgender and has been diagnosed with gender dysphoria. *Id.* ¶ 17. The Chapmans fled Tennessee after it passed a statewide ban on gender affirming medical care for transgender minors, then struggled to find a doctor in Virginia who could continue W.G.'s hormone treatment. *Id.* ¶¶ 19, 21-22, 27-30. Hours before their long-awaited appointment at Children's Hospital of Richmond on January 29, 2025, a member of the VCU staff told the Chapmans that, due to the Orders, VCU would no longer be able to provide W.G. necessary medical treatment. *Id.* ¶¶ 30, 32.

Similar stories from other PFLAG members abound. In response to the Orders, Denver Health cancelled gender affirming medical care appointments, *see* Jane Doe 1 Decl. ¶¶ 16, 17, 19; as did NYU Langone, *see* Jane Doe 3 Decl. ¶¶ 7, 12, 14; Children's Wisconsin, *see* Jane Doe 4

Decl. ¶¶ 7, 11, 13-14; and University of Illinois Health, *see* Jane Doe 2 Decl. ¶¶ 15, 18, 22. Some families are on their second or third state seeking care. Jane Doe 6's daughter lost care at Children's Colorado. They had been traveling to Colorado after Oklahoma banned care. Jane Doe 6 Decl. ¶¶ 15, 16. Jane Doe 5 is moving her family from Florida to Maryland so her daughter can receive care at Children's National. But after Children's National cancelled due to the Orders, she pivoted to Children's Hospital Los Angeles, only to face another potential appointment cancellation for the same reason. Jane Doe 5 Decl. ¶¶ 3, 25, 27-30. Each of these families, who initiated this medically necessary care only after a careful and deliberative process with healthcare providers, is terrified about whether they will be able to find providers to resume this care in time to prevent significant and potentially permanent harm to their adolescent children from untreated gender dysphoria.

Since the Denial of Care Order was issued, GLMA's members and their patients have been immediately negatively affected. Sheldon Decl. ¶ 22. Many GLMA members are employed by medical institutions that receive federal grants, including some medical provider members that provide gender affirming medical care to patients under nineteen. *Id.* ¶ 24.

One of GLMA's members is Kyle Koe, a clinician-researcher at Boston Medical Center ("BMC") specializing in sexual and gender minority health who depends on grant funding, including NIH funding. Koe Decl. ¶¶ 3-5. BMC also receives millions of dollars in federal grants, including from Defendants NIH and HRSA, the CDC, and Agency for Healthcare Research and Quality ("AHRQ"), among others. *Id.* ¶ 6. Most of these grants do not relate to medical interventions to treat gender dysphoria. *Id.* As a provider, Kyle treats both cisgender and transgender patients, including for gender dysphoria. *Id.* ¶ 8. Like other healthcare providers, when treating gender dysphoria, he uses the same medications to treat transgender people as he uses to treat cisgender people with hormone deficiencies. *Id.* ¶ 9.

13

Another of GLMA's members is Dr. Jeffrey Birnbaum, an adolescent medicine specialist and board-certified pediatrician at SUNY Downstate Health Sciences University. Birnbaum Decl. ¶¶ 3, 5. He is a clinician and researcher focusing on caring for teens and young adults living with HIV and providing gender affirming medical care, including pubertal suppression and hormone therapy. *Id.* ¶¶ 3, 10. Dr. Birnbaum's research and clinical work, including the primary medical care he provides to HIV+ youth, depend on federal grants, including from Defendants NIH and HRSA, and his institutions do as well, receiving millions of dollars for purposes that have no bearing on treating gender dysphoria. *Id.* ¶¶ 6-8.

Another GLMA member, Dr. Peyton Poe, is a board-certified pediatrician at Children's National in D.C. Their practice includes providing gender-affirming medical care. Poe Decl. ¶¶ 3, 6. Within hours of the Denial of Care Order being signed, Children's National informed providers that "effective immediately, no prescriptions should be written or refilled for gender-affirming medications for patients under 18 years old." *Id.* ¶ 10. The hospital later clarified this applied to patients nineteen and under. *Id.* ¶ 11. Dr. Poe had to contact patients with imminent appointments and inform them they were no longer able to prescribe their medications; they received a flood of messages from patients and families expressing distress, anxiety, and fear in response. *Id.* ¶ 13. Dr. Poe is deeply concerned that disruptions to care may cause transgender adolescents to experience mental health crises, including possible self-harm. *Id.* ¶ 16. Children's National receives extensive federal funding, including from Defendant NIH. *Id.* ¶ 7.

Dr. Natalie Noe, a board-certified physician practicing at a major healthcare system in Colorado, is another GLMA member. Dr. Noe provides gender-affirming medical care to patients under nineteen. Noe Decl. ¶¶ 3-5. Her healthcare institution, which receives substantial federal funding including from Defendants HHS, HRSA, CDC, and NIH, stopped providing new

prescriptions for puberty blockers or hormones and performing surgeries as a direct result of the Orders. *Id.* ¶¶ 6, 10. Dr. Noe has had heartbreaking conversations with patients and parents about not being able to provide this care as she always has, and she worries for their mental health; her institution developed a new crisis referral protocol because of the termination of care. *Id.* ¶¶ 7-8.

Because the Orders mandate that all federal funding be stripped from a medical institution if it continues to provide gender affirming medical care—even when the funding is not related to that care—the Orders have placed Drs. Koe, Birnbaum, Poe, and Noe and other clinicians, researchers, and medical institutions in an untenable position. They force physicians, including these GLMA members, to make an impossible choice between denying care to a vulnerable minority community or not being to provide care to anyone at all. Koe Decl. ¶¶ 11-13; Birnbaum Decl. ¶¶ 13-14; Noe Decl. ¶ 10.

One of the guiding ethics of medicine is to treat all patients equally. Sheldon Decl. ¶ 27. To not permit—indeed, to actively forbid—a provider from making individualized assessments of the medical needs of all patients harms patients by preventing them from accessing needed care even at trusted facilities and practices. *Id.* The Orders are causing precisely this harm. *Id.* ¶ 29. Patients and parents have called GLMA members in tears expressing extreme distress. *Id.* GLMA members at institutions that have suspended care have received calls from their patients who are experiencing significant distress and even suicidality. *Id.* And even at institutions that are providing care, the widespread fear has led many patients to express feelings of extreme distress and even suicidality because they fear losing care. *Id.*

## LEGAL STANDARD

To obtain a preliminary injunction, the moving party must show: "(1) the party is likely to succeed on the merits of the claim; (2) the party is likely to suffer irreparable harm in the absence of an injunction; (3) the balance of hardships weighs in the party's favor; and (4) the injunction

serves the public interest." *HIAS, Inc. v. Trump*, 985 F.3d 309, 318 (4th Cir. 2021). The balance

of equities and public interest factors "merge when the Government is the opposing party." *Nken*

*v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS.

### A.    Plaintiffs Have Standing and Their Claims Are Justiciable.

**Standing.** To have standing, "a plaintiff must present an injury that is concrete,

particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and

likely to be redressed by a favorable ruling." *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019)

(cleaned up). The Court already has found that "Plaintiffs have established that the hardships they

are suffering, as well as the hardships to PFLAG's members, are caused by the discontinuation of

what has been deemed by medical professionals to be essential care. This hardship comes as a

result of the conditioning on federal funding outlined in the Executive Orders and is non-

speculative, concrete, and potentially catastrophic." TRO Op. 12-13. Moreover, PFLAG and

GLMA have associational standing to assert claims on behalf of their members, including those

members who have submitted declarations establishing "concrete, particularized, and actual or

imminent" injuries emanating from the Orders. *Dep't of Com.*, 588 U.S. at 766.

**Ripeness.** Determining whether an action is ripe requires courts to evaluate "the fitness of

the issues for judicial decision" and "the hardship to the parties of withholding court

consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). "A case is

fit for judicial decision when the issues are purely legal" and not "dependent on future

uncertainties." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006). Plaintiffs' claims are ripe. *See*

TRO Op. 10-13.

Here, Plaintiffs bring a "facial challenge" to the Orders' constitutionality, and this issue

"does not depend on future uncertainties." TRO Op. 11. The Gender Identity Order declares: "[f]ederal funds shall not be used to promote gender ideology." Gender Identity Order § 3(g). The Denial of Care Order instructed agencies to "immediately" "ensure that institutions receiving Federal research or education grants end" the provision of gender affirming medical care. Denial of Care Order § 4. Agencies, including Defendants HRSA and the CDC, have already acted on these orders and limited how grant recipients may use federal funding. *See* Am. Compl. ¶ 81; Dkt. 35-5; TRO Op. 11-12; Gonzalez-Pagan Decl. ¶ 5. Based on the "tangible steps taken by at least two agencies to comply with the Executive Orders, along with the Administration's unequivocal statements outside of the context of this litigation, the legal claims are sufficiently viable and do not depend on future uncertainties." TRO Op. 12.

The Orders have also had an "immediate and substantial impact upon" Plaintiffs, many of whom have suffered substantial disruptions and delays in their treatment. *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 171 (1967). "[D]elayed resolution of these issues would foreclose any relief from the present injury," particularly to the loss of treatment which may cause lasting, permanent effects. *Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*, 438 U.S. 59, 82 (1978); Shumer Decl. ¶¶ 64, 121. And all Plaintiffs have suffered "immediate harm to their constitutionally protected rights." *Miller*, 462 F.3d at 321.

**<u>Justiciability</u>**. The Executive Orders are also reviewable. *See* TRO Op. 17-25. Private parties may "sue to enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *see also Washington v. Trump*, 2025 WL 509617, at *7 (W.D. Wash. Feb. 16, 2025). Thus, even when agency officials are "acting at the behest of the President . . . courts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996)

(cleaned up).

Finally, the Orders' boilerplate savings clauses do not "immunize" the Orders from judicial review. *HIAS*, 985 F.3d at 325; *see also Washington v. Trump*, 2025 WL 509617, at *13. The Fourth Circuit has already held that "purely theoretical savings clause[s]," *i.e.*, clauses "with no method or standard for invoking [them], the application of which would undermine the" Orders' substantive requirements, would render judicial review a "meaningless exercise." *HIAS*, 985 F.3d at 325.

> **B.    The Executive Orders Are *Ultra Vires* Because They Exceed the President's Authority, Infringe Upon Congress's Powers, and Violate Article I's Framework for Federal Legislation.**

The Executive Orders are *ultra vires* actions that exceed the bounds of Article II, infringe upon Congress's authority under Article I to control the public fisc, and violate Article I's Bicameralism and Presentment Clauses. *See* TRO Op. 26-37.

Federal grants are federal law enacted by Congress, and conditioning or cancelling federal grants amounts to amending or repealing federal law. *Clinton v. City of New York*, 524 U.S. 417, 444 (1998) (cancellations "are the functional equivalent of partial repeals of Acts of Congress"). Defendants admit the Orders "direct agencies to impose a new *condition* on grant funding" to delineate "what sorts of grants the Executive Branch has chosen to subsidize." Dkt. 55 at 4, 14 (emphasis in original); TRO Op. 28. The Orders thus attempt to unilaterally amend federal law.

But the President lacks the power to condition federal funds. "The President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). Neither federal statute nor Article II authorize the President to amend or repeal federal statutes. The Denial of Care Order identifies no statutory authority to "immediately" terminate grants, nor do the HRSA and CDC terminations. The Gender Identity Order cites only a

federal law inapplicable to either federal grants or gender affirming medical care. *See* 5 U.S.C. § 7301. This is plainly insufficient. As this Court has already found, "Congress has not authorized the Administration to withhold federal grant monies from medical institutions that provide gender affirming care for transgender youth." TRO Op. 29.

Article II also does not, and cannot, justify the Orders. Nothing in Article II "authorizes the President to enact, to amend, or to repeal statutes," in whole or in part. *Clinton*, 524 U.S. at 438. Nor does the Constitution or any statute vest the President with a general impoundment power. Quite the opposite. The Impoundment Control Act, 2 U.S.C. §§ 683, 684, prohibits the President or federal agencies from impounding lawfully appropriated funds. Courts thus have regularly rejected arguments that the President may refuse to disperse federal funds on a whim, notwithstanding any "policy reasons" for wanting to do so. *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); *Clinton*, 524 U.S. at 442; *cf. Train v. City of N.Y.*, 420 U.S. 35, 38 (1975).

The Executive's unilateral attempt to terminate federal grants also infringes on Congress's power of the purse. *See* U.S. CONST. art. I, § 7, cl. 2, 3. Only Congress may condition how public funds are spent. *See generally South Dakota v. Dole*, 483 U.S. 203 (1987); *Koontz v. St. Johns River Water Mgmt. Dist.,* 570 U.S. 595 (2013). When Congress intends to place conditions on federal funds, "it has proved capable of saying so explicitly." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17-18 (1981); *see, e.g.*, Further Consolidated Appropriations Act, Pub. L. No. 118-47, § 202, 526 (2024). Critically, Congress has imposed *no* conditions on federal grants regarding gender affirming medical care.[7]

The Orders run roughshod over Congress's authority by conditioning federal grants on

---

[7] Far from delegating open-ended authority to the Executive Branch to "end" particular medical practices, Congress through Section 1554 of the ACA has *prohibited* the Executive Branch from taking action that burdens access to and communications regarding appropriate health care. 42 U.S.C. § 18114(1)-(5); *see also Mayor of Balt. v. Azar*, 973 F.3d 258, 288 (4th Cir. 2020).

grantees' immediate agreement to "end" gender affirming medical care and not to promote "gender ideology." Denial of Care Order § 4; Gender Identity Order § 3(g). The Orders thus unconstitutionally subordinate Congress's purpose to the President's preferences. They do "not direct that a congressional policy be executed in a manner prescribed by Congress" but instead direct "that a presidential policy be executed in a manner prescribed by the President." *Youngstown*, 343 U.S. at 588.

The Ryan White HIV/AIDS Program, dispensed by HRSA, exemplifies this incongruity. The Ryan White Program provides grants to provide family-centered care for youth in communities disproportionately affected by the Human Immunodeficiency Virus (HIV). *See* 42 U.S.C. § 300ff; 42 U.S.C. § 300ff-71. Congress placed one condition on these grants: The funds may not be used to provide "individuals with hypodermic needles or syringes so that such individuals may use illegal drugs." 42 U.S.C. § 300ff-1. The Denial of Care Order strips grantees, including Dr. Birnbaum, of their Ryan White Program funding if they also provide evidence-based gender affirming medical care. *See* Birnbaum Decl. ¶¶ 7, 10, 14. Because the Order applies even to grantees who comply with the conditions attached to their funding and utilize their funds to effectuate the program's purposes, the Order forces a Presidential policy that is "incompatible with the expressed or implied will of Congress," *Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015), and unconstitutionally intrudes upon the Congressional prerogative to control the public fisc.

Finally, the Orders not only usurp congressional powers, but unconstitutionally bypass the legislative process altogether. Article I requires that every bill pass in both the House of Representatives and the Senate before it is presented to the President. U.S. CONST. art. I, § 7, cl. 2. "Amendment and repeal of statutes, no less than enactment, must conform with Art. I." *INS v. Chadha*, 462 U.S. 919, 954 (1983). "Article I does not allow the President to circumvent

20

Bicameralism and Presentment by unilaterally amending or canceling federal appropriations via executive order." TRO Op. 37 (citing *Clinton*, 524 U.S. at 448); *see also Train*, 420 U.S. at 38.

The Orders disregard this fundamental process. Defendants admit that the Orders "impose a new *condition* on grant funding." Dkt. 55 at 14. But imposing additional terms on, or terminating, a grant is equivalent to amending or repealing a federal statute and must abide by Article I's Bicameralism and Presentment requirements. The Orders are a unilateral attempt to modify federal legislation and are not the "product of the 'finely wrought' procedure that the Framers designed." *Clinton*, 524 U.S. at 440.

### C.    The Executive Orders Are *Ultra Vires* Because They Conflict with Laws that Prohibit Discrimination on the Basis of Sex.

The Executive Orders are also *ultra vires* because they impermissibly direct agencies to act in contravention of Section 1557 of the ACA, 42 U.S.C. § 18116, and Section 1908 of the PHSA, 42 U.S.C. § 300w-7, which prohibit health care entities receiving federal financial assistance from discriminating against individuals on the basis of sex. *See* TRO Op. 37-42.

In *Bostock v. Clayton County*, 590 U.S. 644, 660 (2020), the Supreme Court held that discrimination "because of . . . sex" under Title VII includes discrimination based on transgender status. And in *Kadel v. Folwell*, 100 F.4th 122, 164 (4th Cir. 2024) (en banc), the Fourth Circuit held *Bostock*'s reasoning applies to "discrimination on the basis of sex" under Section 1557. There is no reason *Kadel*'s "application of *Bostock*'s reasoning should not also extend to Section 1908 of the PHSA, which is nearly identical in wording to Section 1557 of the ACA." TRO Op. 39.

Here, the Orders "facially differentiate on the basis of transgender identity." *Id.* Allowing or disallowing treatment based on whether the treatment aligns with a person's sex assigned at birth "is textbook sex discrimination" under *Bostock*, and under Section 1557 of the ACA and Section 1908 of the PHSA. *Kadel*, 100 F.4th at 153, 164.

As the Court already concluded, "Because the challenged portions of the Executive Orders are facially discriminatory on the basis of transgender identity, and therefore sex under *Kadel* and *Bostock*, in violation of Section 1557 of the ACA and Section 1908 of the PHSA, . . . Plaintiffs are likely to succeed on the merits of their *ultra vires* statutory claim." TRO Op. 42. President Trump does not have the power to "override[]" Section 1557 of the ACA and Section 1908 of the PHSA by requiring federal grantees to engage in precisely the discrimination these statutes prohibit. *See HIAS*, 985 F.3d at 322; *Chamber of Com.*, 74 F.3d at 1330-31.

> **D.    Plaintiffs Are Likely to Succeed on Their Equal Protection Claim.**

The Orders also violate the Transgender Plaintiffs' right to equal protection. *See* U.S. CONST. amends. V, XIV. *Kadel* establishes that laws or policies prohibiting gender affirming medical care classify based on sex and transgender status, and thus trigger heightened scrutiny. *See* 100 F.4th at 143, 148-49. Because the Orders cannot survive any level of scrutiny—much less heightened scrutiny—Plaintiffs are likely to succeed on their equal protection claim.

> **1.    The Executive Orders Trigger Heightened Scrutiny.**

The Orders trigger heightened scrutiny three times over: They (1) classify based on sex, (2) classify based on transgender status, and (3) were issued at least in part because of—not simply in spite of—their adverse effects on transgender people.

*First*, the Orders prohibit recipients of federal funds from providing necessary medical care to adolescent patients only if the purpose of the care is "to align [their] physical appearance with an identity that differs from his or her sex." Denial of Care Order § 2(c). But the Orders permit the exact same care if it is provided in manner that aligns with a person's sex. This distinction "is textbook sex discrimination." *Kadel*, 100 F.4th at 153.

The Orders draw even more explicitly sex-based lines than those at issue in *Kadel*, as they hinge the operative prohibitions on even more explicitly sex-based terms: Recipients of federal

funds may not provide care that "align[s] [a patient's] physical appearance with an identity that differs from his or her sex." Denial of Care Order § 2(c). To know whether a federal fund recipient may continue to provide a given type of care—say, testosterone—to a patient, one must know "his or her sex." The Orders do not prohibit federal fund recipients from providing testosterone to an adolescent who identifies as a boy to align his physical appearance with his male identity if the adolescent was assigned male at birth. But the Orders prohibit that same recipient from providing that treatment if the adolescent's sex assigned at birth was female, because it seeks to "align [his] physical appearance with an identity that differs from his or her sex." *Id.*

The Orders also classify based on sex by explicitly enforcing sex stereotypes and gender conformity. They prohibit medical care intended to "to align an individual's physical appearance with an identity that *differs from his or her sex*." *Id.* (emphasis added); *see also* Gender Identity Order § 2(f) (defining "gender ideology" as having a gender identity "disconnected from one's sex."). But as *Kadel* explained, "a policy that conditions access to gender-affirming [medical care] on whether [it] will better align the patient's gender presentation with their sex assigned at birth is a policy based on gender stereotypes." 100 F.4th at 154.[8] That, too, is a facial sex-based classification—triggering heightened scrutiny.

*Second*, the Orders classify based on transgender status, which is a quasi-suspect classification triggering heightened scrutiny. TRO Op. 44 n.31. The Denial of Care Order explicitly refers to transgender people in describing the prohibited medical care. *See*, *e.g.*, Denial of Care Order § 7(a). And the Order restricts federal funding only if the care is provided to a patient

---

[8] The same is true for puberty-delaying medication. Birth-assigned males can receive puberty-delaying medication to bring their bodies into alignment with a typical male puberty, but birth-assigned females cannot. Birth-assigned females can receive puberty-delaying medication to bring their bodies into alignment with a typical female puberty, but birth-assigned males cannot. The bans operate when (and only when) a medication is being used "to align an individual's physical appearance with an identity that *differs from his or her sex*." Denial of Care Order § 2(c) (emphasis added).

who possesses "an identity that differs from his or her sex." *Id.* § 2(c).[9] The Orders thus go to "the very heart of transgender status" by excluding "treatments aim[ed] at addressing incongruity between sex assigned at birth and gender identity." *Kadel*, 100 F.4th at 146; *see also Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022). As *Kadel* instructs, prohibiting treatments based on whether they are provided for purposes of "gender transition" expressly targets transgender people and, thus, triggers heightened scrutiny. *See* 100 F.4th at 143-49.

*Third*, even if the Executive Orders were facially neutral, they would still trigger heightened scrutiny because they were passed at least in part because of, not simply in spite of, their adverse effects on transgender people and the Trump administration's ideological opposition to gender transition. *See id.* at 168 (Richardson, J., dissenting); *see also*, *e.g.*, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). The Orders' text makes clear that the Trump Administration intends to restrict transgender people's rights. The Gender Identity Order contrasts so-called "gender ideology" or the "false claim that males can identify as and thus become women and vice versa" with the "biological reality" of assigned sex at birth. Gender Identity Order § 1. It defines sex as an "immutable biological classification" that "does not include the concept of gender identity." *Id.* § 2(a). And the Gender Identity Order asserts that transgender identities are invalid and "false" identities that "[do] not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." *Id.* § 2(f)-(g). It is difficult to "fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." TRO Op. 41.

For its part, the Denial of Care Order reflects and implements the Gender Identity Order's

---

[9] To possess an identity that differs from one's sex assigned at birth is the definition of being transgender. *See Transgender*, MERRIAM WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/transgender.

ideological opposition to transgender people by seeking to end access to medically necessary care for transgender adolescents and young adults. This objective is evident from the effect and admitted purposes of the restrictions, *see* Gender Identity Order §§ 1, 2(a), (f); Denial of Care Order § 2(c), as well as their tone. Gender affirming medical care is pejoratively called "chemical and surgical mutilation," and described as "maiming and sterilizing" them and "damaging" their "healthy body parts." Denial of Care Order §§ 1, 2(c), 8(d). The Order also draws insulting comparisons between gender affirming medical care and female genital mutilation and suggests that medical care to treat gender dysphoria is "child abuse." *Id.* §§ 8(a)-(b), (e).

The context surrounding these Orders further demonstrates their intent, at least in part, to impose adverse effects on transgender people. *See Feeney*, 442 U.S. at 279. The challenged Orders are just two among a litany of others that expressly target transgender people,[10] including by disparaging the "adoption of a gender identity inconsistent with an individual's sex" as conflicting with a "commitment to an honorable, truthful, and disciplined lifestyle."[11] These Executive Orders are a systematic attack on transgender people's ability to participate in civic life, whether in schools, the workplace, or while traveling; that broader context reinforces that the challenged Orders intend to adversely impact transgender people and that such adverse effects are not merely an incidental byproduct of the Orders targeting gender affirming medical care.

For any and all of these reasons, heightened scrutiny applies.

---

[10] See Am. Compl. ¶¶ 72-76; see, e.g., Exec. Order No. 14,148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025); Exec. Order No. 14,170, *Reforming the Federal Hiring Process and Restoring Merit to Government Service*, 90 Fed. Reg. 8621 (Jan. 20, 2025); Exec. Order No. 14,190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025); Exec. Order No. 14,201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025).

[11] Exec. Order No. 14,183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025).

### 2.    The Executive Orders Cannot Survive Heightened Scrutiny.

To survive heightened scrutiny, "the government must show that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Kadel*, 100 F.4th at 156 (cleaned up). The Executive Orders assert an interest in "protecting" children but do not substantially advance or even rationally relate to that interest. None of the Order's claims about the banned medical care comport with science or explain why this care alone was singled out for prohibition.

**Effectiveness.** Gender affirming medical care as treatment for an adolescent's or young adult's gender dysphoria is safe and effective. *See Poe v. Labrador*, 709 F. Supp. 3d 1169, 1193 (D. Idaho 2023). This medical treatment "promotes wellness and helps to prevent negative mental health outcomes, including suicidality." Shumer Decl. ¶ 101; Karasic Decl. ¶ 86; *see also Kadel*, 100 F.4th at 136; *Dekker v. Weida*, 679 F. Supp. 3d 1271, 1286 (N.D. Fla. 2023); *Brandt v. Rutledge*, 677 F. Supp. 3d 877, 888 (E.D. Ark. 2023).

The Orders "ignore the benefits that many patients realize from these treatments and the substantial risk posed by for[]going the treatments." *Dekker*, 679 F. Supp. 3d at 1294; *see also* Turban Decl. ¶ 14. "The denial of medically indicated care to transgender people with gender dysphoria not only results in the prolonging of their gender dysphoria, but causes additional distress and poses other health risks, such as depression, posttraumatic stress disorder, and suicidality." Karasic Decl. ¶ 105; *see also* Shumer Decl. ¶¶ 129, 131. Plaintiffs' experiences confirm the benefits of gender affirming medical care to treat gender dysphoria in adolescents and

young adults[12]—and the harm of delaying or denying this care when medically indicated.[13]

**Regret.** The Denial of Care Order asserts, without evidence, that "[c]ountless children soon regret" receiving gender affirming medical care. Denial of Care Order § 1. But the risk of regret is not unique to the treatment of gender dysphoria and cannot justify a sweeping ban that prohibits treatment for all transgender patients under nineteen. *See Brandt*, 677 F. Supp. 3d at 905; Karasic Decl. ¶ 97, 101; Shumer Decl. ¶¶ 77, 100, 120. Scientific studies also indicate that the rates of regret among people receiving gender affirming medical care are exceedingly low, and the vast majority who rely on such treatments to live happy and fulfilling lives never regret receiving it. Karasic Decl. ¶¶ 96-101; Shumer Decl. ¶¶ 77, 120; Turban Decl. ¶¶ 30-33; *see Koe v. Noggle*, 688 F. Supp. 3d 1321, 1350-51 (N.D. Ga. 2023).

**Infertility.** The Denial of Care Order states (again, citing nothing) that people receiving gender affirming medical care "will never be able to conceive children." Denial of Care Order § 1. But puberty-delaying medication and gender-affirming chest surgery have no impact on fertility, and the evidence shows that many adolescents and young adults who receive gender-affirming hormones will remain able to conceive and procreate. Shumer Decl. ¶¶ 67, 81, 82. Moreover, the clinical guidelines recommend that impacts of care on fertility and fertility preservation options be discussed thoroughly with the patient, and in the case of a minor, with parents or guardians. Karasic Decl. ¶ 83. Many other types of pediatric medicine can also impact fertility, but the Orders do not prohibit recipients of federal funding from providing those other forms of medical care. Shumer Decl. ¶ 83.

---

[12] Claire Coe Decl. ¶¶ 21-26; Dylan Doe Decl. ¶¶ 18, 32; George Goe Decl. ¶¶ 23-24; Lawrence Loe Decl. ¶ 18; Rachel Roe Decl. ¶¶ 14, 19.

[13] Bruce Boe Decl. ¶¶ 27-28; Claire Coe Decl. ¶¶ 30-31; Dylan Doe Decl. ¶¶ 32-35; George Goe Decl. ¶¶ 24-27; Lawrence Loe Decl. ¶¶ 24-28; Rachel Roe Decl. ¶ 23.

**Quality of evidence.** The Denial of Care Order refers to the evidence supporting the safety and efficacy of gender affirming medical care as "junk science." Denial of Care Order § 3. To the contrary, clinical guidelines for gender affirming medical care are based on decades of clinical experience and a substantial body of evidence showing the safety and efficacy of medical interventions to treat gender dysphoria. Antommaria Decl. ¶¶ 35-47; Karasic Decl. ¶ 103; Shumer Decl. ¶ 56. The level of evidence supporting medical treatment for gender dysphoria in adolescents is comparable to the evidence of safety and efficacy for many other forms of pediatric medicine. Antommaria Decl. ¶¶ 6, 29, 32, 39; Karasic Decl. ¶ 60. The Orders do not impose a general requirement that grant recipients stop providing all forms of pediatric medicine that are not supported by a particular level of evidence. They prohibit grant recipients from providing those treatments *only* when done for the purpose of providing gender affirming medical care for transgender people. Additionally, there is no scientific evidence of *any* quality that supports withholding gender affirming medical care from patients for whom it is medically indicated. Antommaria Decl. ¶ 37; Karasic Decl. ¶¶ 106-07; Turban Decl. ¶ 39.

### 3. The Executive Orders Fail Rational Basis Review.

Ultimately, the Orders are substantially related to only one purpose, which they openly declare: mandating gender conformity and preventing transgender people from expressing a gender identity different from their sex designated at birth. The Orders result from "negative attitudes," "fear," and "irrational prejudice," rather than legitimate governmental interests. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985). But "disapproving [of] transgender status," "discouraging individuals from pursuing their honest gender identities," and "[d]issuading a person from conforming to the person's gender identity rather than to the person's natal sex," are "plainly illegitimate purposes." *Dekker*, 679 F. Supp. 3d at 1292-93. A "bare desire

to harm" transgender people is not a valid governmental interest under any standard of scrutiny. *Romer v. Evans*, 517 U.S. 620, 635 (1996) (citation omitted).

## II.    THE OTHER FACTORS FAVOR A NATIONWIDE PRELIMINARY INJUNCTION.

The other preliminary injunction factors strongly favor Plaintiffs, and only a nationwide injunction can provide complete relief. TRO Op. 49-52.

Plaintiffs have shown a strong likelihood of success on at least three constitutional claims, and the "prospect of an unconstitutional enforcement" alone "supplies the necessary irreparable injury" for emergency relief. *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381-82 (1992)). In addition, acts that "diminish[] access to high-quality health care" cause irreparable harm. *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019). The Orders have done that and more: Transgender adolescents and young adults across the country already have lost care because their providers have cancelled appointments, refused to fill prescriptions, or even shut down their gender affirming medical care programs altogether. Families have been forced to watch their children suffer, and medical providers have been compelled to abandon their patients—directly in response to the Orders. TRO Op. 46-47. While the TRO itself prompted a few institutions to resume care, others await further action by the Court to ensure that treating their patients does not jeopardize their funding in the interim. *See, e.g.*, Noe Decl. ¶¶ 11-12; Gonzalez-Pagan Decl. Exs. A-6, A-15.

The balance of equities and the public interest, which merge when the defendant is the government, also clearly favor relief. *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020) ("*ACCC*"). "It is well-established that the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc). "[T]he government is in no way harmed by issuance of an injunction that

prevents the state from enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3d 291, 302-03 (4th Cir. 2011). The threat of a deprivation of constitutional rights "will easily outweigh whatever burden the injunction may impose." *St. Michael's Media v. Mayor & City Council of Balt.*, 566 F. Supp. 3d 327, 351 (D. Md. 2021). Indeed, the Orders will have "far-reaching effects": They "threaten to disrupt treatment of patients, stall critical research, and gut numerous programs in medical institutions that rely on federal funding," including programs whose funding is not "tied to gender affirming care." TRO Op. 48-49.

Finally, as the Court recognized, nationwide relief is appropriate. TRO Op. 49-52. "[D]istrict courts have broad discretion when fashioning injunctive relief," *Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010), including to issue nationwide injunctions against executive orders with a nationwide scope. *See HIAS*, 985 F.3d at 326; *ACCC*, 509 F. Supp. 3d at 503 (collecting cases). Here, "an injunction of nationwide scope is necessary to provide complete relief" because PFLAG and GLMA have members throughout the country who have been harmed by the Executive Orders. TRO Op. 51. *See, e.g.*, Bond Decl. ¶¶ 4, 8; Sheldon Decl. ¶¶ 9, 29; *HIAS*, 985 F.3d at 326-27. Moreover, as the Court recognized, a narrower injunction limited to members of PFLAG and GLMA would "cause confusion about which companies or providers are subject to a rule and which are not; instead, a court order must be clear and definite." TRO Op. 50 (quoting *ACCC*, 509 F. Supp. 3d at 504). "Given the circumstances, a narrower injunction cannot provide complete relief." *Id*. at 52.

## CONCLUSION

The Court should convert the TRO into a preliminary injunction, enjoining the Agency Defendants from conditioning or withholding federal funding based on the fact that a healthcare entity or health professional provides gender affirming medical care to a patient under the age of nineteen under section 3(g) of the Gender Identity Order and Section 4 of the Denial of Care Order.

Date:  February 18, 2025

Respectfully submitted,

/s/ Omar Gonzalez-Pagan
Omar Gonzalez-Pagan*
Jennifer C. Pizer*
**Lambda Legal Defense
   and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
Facsimile:  (855) 535-2236
ogonzalez-pagan@lambdalegal.org
jpizer@lambdalegal.org

Joshua Block*
Harper Seldin*
Chase Strangio*
Alexandra R. Johnson*
**American Civil Liberties Union
   Foundation**
125 Broad Street, Floor 18
New York, NY 10004
Telephone: (212) 549-2500
Facsimile:  (212) 549-2650
jblock@aclu.org
hseldin@aclu.org
cstrangio@aclu.org
a.johnson@aclu.org

Karen L. Loewy*
**Lambda Legal Defense
   and Education Fund, Inc.**
815 16th Street NW, Suite 4140
Washington, DC 20006
Telephone: (202) 804-6245
Facsimile:  (855) 535-2236
kloewy@lambdalegal.org

Deborah A. Jeon (Fed. Bar No. 06905)
Zoe M. Ginsberg (Fed. Bar No. 30727)
**American Civil Liberties Union
   Foundation of Maryland**
3600 Clipper Mill Road, Suite 200
Baltimore, MD 21211
Telephone: (410) 889-8555
Facsimile:  (410) 366-7838
jeon@aclu-md.org
zginsberg@aclu-md.org

Nora Huppert*
**Lambda Legal Defense
   and Education Fund, Inc.**
3656 N. Halsted Street
Chicago, IL 60613
Telephone: (312) 605-3233
Facsimile:  (855) 535-2236
nhuppert@lambdalegal.org

Catherine E. Stetson**
Danielle Desaulniers Stempel (Fed. Bar No. 20501)
Kristina Alekseyeva*
Sam H. Zwingli*
**Hogan Lovells US LLP**
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
Facsimile:  (202) 637-5910
cate.stetson@hoganlovells.com
danielle.stempel@hoganlovells.com
kristina.alekseyeva@hoganlovells.com

Jackson Skeen***
**Hogan Lovells US LLP**
125 High Street
Suite 2010
Boston, MA 02110
Telephone: (617) 702-7747
Facsimile:  (617) 371-1037
jackson.skeen@hoganlovells.com

*Attorneys for Plaintiffs*

*Application for admission pro hac vice
granted.*

** *Application for admission pending.*

31

*\*\*\*Application for admission pro hac vice granted and admitted only in D.C. Supervised by principals of the firm admitted in Massachusetts.*