# **Exhibit T**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PFLAG, INC.; *et al.*,<br><br>            *Plaintiffs*,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*,<br><br>            *Defendants*. | Civil Action No. No. BAH-25-337 |

**DECLARATION OF JANE DOE 6**

I, Jane Doe 6, hereby declare and state and follows:

1. I am over 18 years of age, of sound mind, and in all respects competent to testify.

2. I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3. I live in the State of Oklahoma with my children and my spouse.

4. My family is a member of PFLAG.

5. One of my children, my daughter Jenna Doe, is 17 years old.

6. Jenna is a creative, smart, and hardworking young woman. She is taking dual enrollment classes at a local college, and she works part-time at a restaurant. Like any 17-year-old, she loves spending time with her friends.

7. She is also transgender. My daughter was assigned male at birth, but she is a girl. From a very young age, we knew that Jenna was different, but we did not understand fully until we had the language for it. She made it clear she was not a boy early in her childhood. Jenna gravitated towards dolls and other traditionally feminine toys, and because of the way that she dressed and presented, she would often be identified as a girl by people that we encountered in our

daily life. Around the age of ten, she asked me not to correct people in public who did so. She even sewed herself a dress out of an old curtain and insisted on wearing it to the grocery store. From then on, she only wanted to wear clothing from the girls' section.

8. At first, when Jenna was younger, I was not sure how best to proceed, so I took her to see a pediatric endocrinologist, purely to learn more about Jenna's experience and what options might be available to us in the future. We had regular visits with that doctor, and eventually, Jenna began to see a therapist who has experience with gender-diverse children. Jenna has received a formal diagnosis of gender dysphoria.

9. As Jenna grew older, she continued to consistently assert her identity as a girl. She started to go by a different name, and continued to use female pronouns. Eventually, around when Jenna was eleven and was entering puberty, we made the decision in consultation with Jenna's medical providers and therapist to initiate a puberty-blocking medication so that Jenna would not have to undergo her endogenous puberty and we would have time to explore whether a medical transition with hormone therapy was the right decision for Jenna. She received a letter of support from her therapist, and we fully discussed all of the available options with her medical provider before ultimately initiating that medication.

10. Things were not always great. Living in Oklahoma, Jenna's environment was sometimes challenging, and as she came to understand herself as transgender and started to come out to the people in her life, we lost friends along the way who cut contact with us because they did not understand.

11. As Jenna's peers began to visibly enter puberty, she experienced worsening gender dysphoria, and her mental health suffered as a result. As Jenna grew further into adolescence, her distress over not experiencing a typically female puberty only deepened, and she began to experience episodes of depression and even suicidality. I was afraid for her safety and well-being.

12. As Jenna approached the age when she would be eligible to initiate gender-affirming hormone therapy, we continued to see her pediatric endocrinologist and discussed medical options for Jenna. Eventually, after much conversation and consultation as a family with Jenna's doctor, and with an additional letter of support from Jenna's therapist, we made the decision to initiate estrogen around when Jenna was about to turn 14.

13. Jenna's endocrinologist wanted to take a cautious approach and started Jenna on a very low dose of estrogen. With this low dose, we saw a slight improvement in Jenna's mental health, but it was not until her dose was later adjusted to a more typical level for a transgender girl of her age that I noticed a vast improvement in Jenna's mental health and well-being. Where before she struggled deeply, now she is joyful again, has friends, and loves life. She is truly thriving.

14. But in 2023, an Oklahoma state law went into effect which banned gender-affirming medical care for minors. This law prevented my daughter from receiving further care in Oklahoma.

15. In order to ensure that Jenna could continue to receive the medical care that she needs, we established care at the Children's Hospital of Colorado. Since then, we have travelled from our home in Oklahoma to Denver every six months for follow up appointments. When she needs refills of medication, my daughter and I drive what is almost nine hours each way to pick them up. This was disruptive to our lives, but I knew this care was absolutely vital to my daughter's continued well-being.

16. Our last appointment at Children's Colorado was in December of 2024, though we did not know it at the time.

17. On Tuesday, January 28, 2025, the White House issued an Executive Order entitled "Protecting Children from Chemical and Surgical Mutilation" (the "Executive Order").

18. On February 5, 2025, I received a letter from Children's Colorado indicating that the hospital would no longer provide gender-affirming medical care due to the executive order, fearing the loss of federal funds. Jenna's six-month follow-up at Children's Colorado had not yet been scheduled.

19. This was a difficult day for my family. I felt deep panic and devastation when I received this news. When my daughter heard that she would no longer be able to get care through Children's Colorado, she was also upset, and she told me that she was not sure she could survive losing her healthcare. She does not want to leave Oklahoma—she has a life, a job, and friends here—but when she heard this news, she asked me to promise that if it was the only way for her to continue to receive the care she needs, that we would leave.

20. Even Jenna's existing prescriptions seem uncertain, as the specialty pharmacy that fills her prescriptions for puberty-blocking medications and estrogen have not contacted us about upcoming refills, which they would normally have done.

21. Jenna has taught me so much about authenticity and joy. She has made me brave in her own way. She is both a remarkable person and a normal girl. Her medical care has allowed her to enjoy her adolescence and get ready for the adult life she hopes to build. I would do anything to keep my daughter safe and healthy, and I know that this care is what allows her to thrive. No one who has met Jenna would have any doubts about whether this care is right for her.

22. Jenna turns 18 later this year, and I thought that would protect her from the fear of restrictions placed on the very care that allows her to live the way that she wants to and on her ability to make medical decisions. As she prepares to go off to college, I thought that turning 18 would protect her ability to ensure that her physical characteristics align with her gender identity. But this Executive Order threatens her ability to receive this care even after she turns 18. It is

terrifying to imagine how her mental health might regress if she lost access to gender-affirming medical care.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 14th day of February 2025.

*Jane Doe 6*
Jane Doe 6