# Exhibit Z

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PFLAG, INC.; *et al.*,

        *Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*,

        *Defendants*.

Civil Action No. BAH-25-337

## DECLARATION OF DR. NATALIE NOE, MD

I, Natalie Noe,[1] MD, MPH, hereby declare and state and follows:

1. I am over 18 years of age, of sound mind, and in all respects competent to testify.

2. I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3. I am a physician, licensed in Colorado, and practicing at a major healthcare system in Colorado. I am board certified in a primary care specialty. I am a clinician and also teach medical students and residents.

4. I am a member of GLMA: Health Professionals Advancing LGBTQ+ Equality.

5. My practice includes providing medical care to patients with gender dysphoria under the age of 19, including the prescription of puberty blockers and hormones and the referral of 18-year-old adults for gender affirming surgeries. I provide these treatments in the context of

---

[1] Natalie Noe is a pseudonym. I am aware of numerous instances in which providers of gender-affirming medical care like me have been doxxed—a form of relentless online harassment from having their private contact information shared publicly—and have had their lives threatened. Accordingly, I am submitting this declaration under a pseudonym to protect my privacy and protect my family and me from harassment and violence.

an interdisciplinary model of care that involves behavioral health providers, physicians, nurses, and health educators, as well as collaboration with surgical providers and teams.

6. In the wake of President Trump's Executive Order on January 28, 2025, my healthcare system stopped providing the standard-of-care treatments for these youth and young adults, including stopping providing new prescriptions for puberty blockers or hormones or performing surgeries.

7. Since then, I have had dozens of heartbreaking conversations with patients and parents about not being able to provide this necessary medical care as I always have. Most of them are scared about what losing access to medical care will mean for them and about safety in a society in which the President of the United States has targeted transgender people. Parents have expressed a sense of overwhelm and distress, trying to create feelings of safety and stability for their children while panicking behind closed doors. More than one family has mentioned looking into leaving the country for their child's safety and access to care. Some of my patients' families relocated to Colorado from Texas so that their children could access needed medical care, and this is the second round of feeling the world close in around them despite having already gone to heroic lengths to protect their children. Other patients simply have no other means of accessing this care for their children as a financial matter. For families on Medicaid, the cost of trying to pay out of pocket to providers that receive no federal funding would mean having to choose between the medications their child needs and food or bills or housing. Patients have expressed worry about whether turning 19 is really a safe light at the end of the tunnel and what further restrictions are coming. Most critically, parents are worried about the forced cessation of care and what that means for their child's mental health, including their child's ability to survive that loss of care.

8. I have been evaluating every patient to assess the mental health implications of this to determine whether they are in crisis or present a risk of self-harm, referring to behavioral health colleagues as appropriate. My team instituted a new structure to deal with these crisis referrals because of the termination of care. I have also been offering harm reduction counseling in anticipation that some patients will continue using their existing medicine without supervision because of their access to supervised care being cut off.

9. As a doctor, not being able to provide this medically necessary care is demoralizing and infuriating. I think of other equally essential forms of suffering-reducing or lifesaving treatments I provide in the course of my regular practice and can only imagine the national horror at the government getting in the way of my ability to do so in other contexts and for other populations. We would never accept it. Being forced to deny gender affirming medical care conflicts with my oath to care for my patients and provide them the best possible care I can and to not hurt them. To tell them that I am not able to provide this care is hurting them and I have no way to ameliorate that harm inside or outside of my institution. The Executive Order makes me feel like I must choose between my duty to these patients and to all the other patients in my healthcare system whose care is potentially in jeopardy from the loss of federal funding. It is rage inducing.

10. My colleagues feel similarly. I am not unusual in my response of grief, tears, anger, and indignation. We have all talked about it, which is helpful so as not to feel alone in it. I have enormous empathy for the decisions my institution's leadership has had to face around protecting our entire mission from the massive threat to our funding as a result of our providing gender affirming medical care. My institution receives a tremendous amount of its funding from federal sources, including from the Department of Health and Human Services, the Health Resources and

Services Administration, the Centers for Disease Control and Prevention, and the National Institutes of Health. We conduct research, teach medical students, residents, and fellows, and are committed to meeting the health care needs of patients in our community. We cannot fulfill our mission without those federal dollars. But we also have an obligation to our transgender patients who need this medical care.

11. After the Temporary Restraining Order was issued by Judge Hurson on February 13, 2025, my institution did not resume providing this care. I had hoped that we would have a structure in place to reschedule care immediately once a court had issued an order against the Executive Orders. Unfortunately, I was advised by leaders in my health system that the short time limit of the TRO did not offer enough predictability on which to change practice, given the possibility of needing to stop providing this care again in very short order if the TRO expires without a preliminary injunction in place.

12. The Executive Orders continue to interfere with my ability to provide my transgender patients with the medical treatments they need.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated this 17th day of February, 2025.

*Natalie Noe M.D.*

Natalie Noe, M.D.