# **Exhibit AA**

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

|  |  |
|---|---|
| PFLAG, INC.; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. BAH-25-337 |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| *Defendants*. | |

## EXPERT DECLARATION OF
## ARMAND H. MATHENY ANTOMMARIA, MD, PhD, FAAP, HEC-C

### INTRODUCTION

I, Armand H. Matheny Antommaria MD, PhD, hereby declare and state as follows:

1.     I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation. I am over 18 years old, of sound mind, and in all respects competent to testify.

2.     I have actual knowledge of the matters stated herein.

3.     In preparing this declaration, I reviewed Executive Order 14168 of January 20, 2025 "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" and Executive Order 14187 of January 28, 2025 "Protecting Children From Chemical and Surgical Mutilation." In addition to these Executive Orders and the materials cited herein, I have also relied on my years of research and other experience, as set out in my curriculum vitae (CV), attached as **Exhibit A**, in forming my opinions. The materials I have relied upon in preparing this declaration are the same types of materials that experts in my fields of study regularly rely upon when forming opinions on subjects. I may wish to supplement these

opinions or the bases for them as a result of new scientific research or publications or in response to statements and issues that may arise in my areas of expertise.

## OVERVIEW

4.    I am a pediatrician and bioethicist with extensive clinical and research experience. I am the author of 44 peer-reviewed articles, which have been published in high-impact journals including the *Journal of the American Medical Association* and *Annals of Internal Medicine,* and I direct the Ethics Center at Cincinnati Children's Hospital Medical Center. I have reviewed Executive Orders 14168 and 14187 and submit this declaration to explain my disagreement with and concerns about their conclusions.

5.    Executive Order 14168 seeks to end "gender ideology extremism" by recognizing two distinct sexes and excluding references to gender and gender identity. It directs that the definitions of terms like "sex," "male," and "female" given in the Order "govern all Executive interpretation of and application of Federal law and administration policy." Executive Order 14187 seeks to end the "chemical and surgical mutilation of children" including the use of "puberty blockers." I will refer to puberty blockers as gonadotropin releasing hormone (GnRH) agonists or analogs; the use of GnRH analogs, sex hormones, and surgery to treat gender dysphoria collectively as gender-affirming medical care; and the individuals to whom they are prescribed as minors or adolescents although the Orders affect people who are 18 years old too. These Orders seek to achieve their goals, in part, by withholding or withdrawing funding from healthcare entities who provide gender affirming medical care to people under 19 years of age.

6.    There is no sound medical or ethical basis for such actions. Gender-affirming medical care is evidence-based and the evidence for it is comparable to the evidence for many other treatments in pediatrics. The potential benefits and risks of gender-affirming medical care are comparable to those of other forms of medical treatment, treatment for which parents or legal

guardians are capable of providing informed consent and minor adolescents are capable of providing assent.

7.      As a result, the Orders put clinicians and healthcare entities in the untenable position of either violating their ethical duties to promote their patients' well-being and protect them from harm, or losing all federal funding, potentially preventing them from providing any care at all. Either outcome harms patients.

## BACKGROUND AND QUALIFICATIONS

8.      I am the Director of the Ethics Center, the Lee Ault Carter Chair of Pediatric Ethics, and an Attending Physician in the Division of Hospital Medicine at Cincinnati Children's Hospital Medical Center ("Cincinnati Children's"). I am also a Professor in the Departments of Pediatrics and Surgery at the University of Cincinnati College of Medicine.

9.      I received my medical degree from Washington University School of Medicine in St. Louis, Missouri in 2000. I received my PhD in Religious Ethics from The University of Chicago Divinity School in 2000. I completed my pediatrics residency at the University of Utah in 2003.

10.      I have been licensed to practice medicine since 2001 and am currently licensed to practice medicine in Ohio. I have been Board Certified in General Pediatrics since 2004 and in Pediatric Hospital Medicine since the inception of this certification in 2019. I have been certified as a Healthcare Ethics Consultant since the inception of this certification in 2019.

11.      I have extensive experience as a pediatrician and as a bioethicist. I have been in clinical practice since 2003 and 30% of my current effort is dedicated to caring for hospitalized patients. I was Chair of the Ethics Committee at Primary Children's Medical Center in Salt Lake City, Utah from 2005 to 2012 and have been Director of the Ethics Center at Cincinnati Children's since 2012. I regularly consult on the care of patients in the Transgender Health Clinic at Cincinnati Children's and participate in the Clinic's monthly multidisciplinary team meetings. I remain

current with the medical and bioethics literature regarding the treatment of individuals with gender dysphoria, particularly minors. I am also part of Cincinnati Children's team that cares for patients born with differences or disorders of sex development (DSD), also known as intersex traits. I chair Cincinnati Children's Fetal Care Center's Oversight Committee, which provides the Center recommendations on the use of innovative treatments and experimental interventions.

12.     As an academic pediatric hospitalist, I practice and teach evidence-based medicine, including the development and use of clinical practice guidelines. As a bioethicist, I help patients, parents, and healthcare providers address ethical dilemmas and resolve ethical conflicts. This involves analyzing the evidence and reasons supporting different treatment options. I also assist my institution to develop ethically sound policies and procedures.

13.     I am a member of the American Academy of Pediatrics (AAP), the American Society for Bioethics and Humanities (ASBH), the Association of Bioethics Program Directors, and the Society for Pediatric Research. I was a member of the AAP Committee on Bioethics from 2005 to 2011. I have also served as a member of ASBH's Clinical Ethics Consultation Affairs Committee from 2009 to 2014 and recently completed my service on its Healthcare Ethics Consultant Certification Commission.

14.     I am the author of 44 peer-reviewed journal articles, 11 non-peer-reviewed journal articles, 6 book chapters, and 29 commentaries. My peer-reviewed journal articles have been published in high-impact journals, including the *Journal of the American Medical Association* and *Annals of Internal Medicine*. I am also an author of 17 policy statements and technical reports, including 4 as lead author, by the AAP.

15.     I am a member of *Pediatrics'* Executive Editorial Board and its Associate Editor for Ethics Rounds. I am an active peer reviewer for many medical journals, including the *American*

*Journal of Bioethics* and the *Journal of Pediatrics*. I am a member of the Program Committee for ASBH's annual meeting and review abstracts for meetings of other professional organizations, including the Pediatric Academic Societies. I was previously a member of the editorial boards of the *Journal of Clinical Ethics* and the *Journal of Medical Humanities.*

16.    I have previously testified at deposition and/or in court in *Boe v. Marshall*, United States District Court, Middle District of Alabama, No. 2:22-cv-00184-LCB; *Brandt v. Rutledge*, United States District Court, Eastern District of Arkansas, No. 4:21-cv-00450-JM; *Dekker v. Weida*, United States District Court, Northern District of Florida, No. 4:22-cv-00325-RH-MAF; *Doe v. Abbott*, District Court of Travis County, Texas, No. D-1-GN-22-000977; *Misanin v. Wilson,* United    States    District    Court,    Middle    District    of    South    Carolina, No. 2:24-cv-4734-RMG; *Moe v. Yost*, Franklin County Court of Common Pleas, Ohio, Case No. 24-cv-H03-2481; *Noe v. Parson,* Circuit Court of Cole County, Missouri, No. 23AC-CC04530; *Van Garderen v. Montana,* Montana Fourth Judicial District Court, Missoula County, No. DV 2023-541; *Voe v. Mansfiled,* United States District Court, Middle District of North Carolina, Case No. 1:19-cv-864-LCB-LPA; and *Zayre-Brown v. North Carolina Department of Public Safety*, United States District Court, Western District of North Carolina, No. 3:22-cv-191-MOC-DCK. The cases in which I have authored reports but have not testified are listed in my CV (**Exhibit A**).

17.    I am being compensated at a rate of $400 per hour for preparation of expert declarations and reports, and for deposition or trial testimony. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

## TERMINOLOGY

18.    Executive Order 14187 refers to the use of GnRH agonists, sex hormones, and surgery for the treatment of gender dysphoria as "maiming," "sterilizing," and "mutilation." This

characterization inappropriately conflates potential side-effects of gender-affirming medical care with its intention and overstates the risks of gender-affirming medical care. The purpose of gender-affirming medical care is generally to make an individual's body and appearance more consistent with the individual's gender identity and therefore reduce an individual's dysphoria and increase an individual's well-being. While gender affirming-medical care can have side effects, they are generally proportionate to the benefits as described below. Performing a mastectomy to treat breast cancer or hysterectomy to treat endometrial cancer would similarly be mischaracterized if described as maiming or surgical mutilation.

19.    Executive Order 14187 uses the terms "child and children" in a potentially misleading manner. It defines these terms as "an individual or individuals under 19 years of age." Childhood is commonly understood to be a shorter stage in human development which includes infancy (up to 1 year of age), toddlerhood (1 to 5 years of age), childhood (3 to 11 years of age), and adolescence (12 to 18 years of age). With respect to the use of GnRH agonists and sex hormones for the treatment of gender dysphoria, neither of these interventions are indicated for individuals until they have begun puberty.[1] They, therefore, are generally used during adolescence rather than childhood. Furthermore, the Order defines children as including individuals who are 18 years of age. In contrast, most states consider 18-year-olds to be adults.[2] This Order prevents

---

[1] Hembree WC, Cohen-Kettenis P, Delemarre-van de Waal HA, et al. Endocrine treatment of transsexual persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2009;94(9):3132-3154.

[2] National Center for Youth Law. Minor consent and confidentiality: A compendium of state and federal laws. August 2024. Accessed February 3, 2025.

them from receiving medical care despite being adults who are of legal age to consent to their own medical treatment.

20.    Executive Order 14187 also refers to "rapid-onset gender dysphoria" and "other identity-based confusion." Neither of these terms is a validated medical diagnosis. For example, neither is contained in the *Diagnostic and Statistical Manual of Mental Disorders*.[3] "Identity-based confusion" is also demeaning to individuals with gender dysphoria suggesting that they are confused, rather than that they are experiencing a medical condition. I, therefore, will not use these terms.

## THE TREATMENT OF GENDER DYSPHORIA IS SUPPORTED BY EVIDENCE COMPARABLE TO THE EVIDENCE FOR MANY OTHER MEDICAL TREATMENTS

### Clinical Practice Guidelines

21.    Executive Order 14187 erroneously refers to the evidence for gender-affirming medical care as "junk science" when in fact this evidence is comparable to the evidence for many other types of medical treatments.

22.    Medical professional organizations develop clinical practice guidelines to provide clinicians with helpful, evidence-based recommendations and improve patient care and outcomes. Clinical practice guidelines are developed using systematic processes to select and review scientific evidence. Guidelines typically rate the quality of the evidence and grade the strength of recommendations.[4] One widely used method of grading the quality of the evidence and the strength

---

[3] American Psychiatric Association. Gender Dysphoria. In: *Diagnostic and Statistical Manual of Mental Disorders*. 5th ed., text rev. American Psychiatric Publishing; 2022.

[4] American Academy of Pediatrics Steering Committee on Quality Improvement and Management. Classifying recommendations for clinical practice guidelines. *Pediatrics*. 2004;114(3):874-877.

of recommendations is the Grading of Recommendations Assessment, Development, and Evaluation (GRADE) system.[5]

23.     GRADE states, "In the context of making recommendations, the quality ratings reflect the extent of our confidence that the estimates of an effect are adequate to support a particular decision or recommendation."[6] The GRADE system is more nuanced than the Levels of Evidence Pyramid. In addition to study design, GRADE characterizes the quality of evidence based on risk of bias, consistency, and directness. GRADE distinguishes four levels of evidence: "high," "moderate," "low," and "very-low." These levels are relative to one another and "low" does not necessarily mean poor or inadequate. As discussed below, a recommendation in a clinical practice guideline may be based on "low" or "very low" quality evidence, not just "high" or "moderate" quality evidence.[7]

24.     With respect to study design, randomized controlled trials generally provide "high" quality evidence.[8] In a randomized controlled trial, participants are randomly assigned to a treatment or a comparison group. The major benefit of a randomized trial is that it decreases the likelihood that any differences in the outcomes between the groups is the result of baseline differences between the groups rather than the result of the intervention.[9]

25.     By comparison, observational studies generally constitute "low" quality evidence.[10]

---

[5] Atkins D, Best D, Briss PA, et al. Grading quality of evidence and strength of recommendations. *BMJ*. 2004;328(7454):1490.

[6] Balshem H, Helfand M, Schünemann HJ, et al. GRADE guidelines: 3. Rating the quality of evidence. *J Clin Epidemiol*. 2011;64(4):403.

[7] Balshem H, Helfand M, Schünemann HJ, et al. GRADE guidelines: 3. Rating the quality of evidence. *J Clin Epidemiol*. 2011;64(4):401-406.

[8] Balshem H, Helfand M, Schünemann HJ, et al. GRADE guidelines: 3. Rating the quality of evidence. *J Clin Epidemiol*. 2011;64(4):401-406.

[9] Browner WS, Newman TB, Cummings SR, et al. *Designing Clinical Research*. 5th ed. Wolters Kluwer; 2022.

[10] Balshem H, Helfand M, Schünemann HJ, et al. GRADE guidelines: 3. Rating the quality of evidence. *J Clin Epidemiol*. 2011;64(4):401-406.

Observational studies include cross-sectional and longitudinal studies. In cross-sectional studies, investigators collect data at a single point in time. A cross-sectional design permits investigators to examine potential associations between factors, but it cannot prove one factor caused the other. An example of a cross-sectional study related to gender-affirming medical care is Jack L. Turban and colleagues' study that analyzed data from the 2015 United States (US) Transgender Survey. The survey asked transgender adults, who were recruited through community outreach, about their demographics, past gender-affirming medical care, family support, and mental health outcomes. The investigators found that those who received pubertal suppression had lower odds of lifetime suicidal ideation compared to those who wanted treatment with pubertal suppression but did not receive it.[11] In longitudinal studies, researchers follow individuals over time, making continuous or repeated measures.[12] Examples of longitudinal studies include the studies of the associations between gender-affirming medical care and psychological outcomes discussed below.[13]

26.    While randomized trials generally provide "high" quality evidence and observational studies "low," the quality of a study or group of studies may be moved up or down based on other considerations such as the risk of bias.[14]

27.    The labels "high" and "low" quality evidence can be misleading if the latter is used in the colloquial sense of poor, inadequate, or "junk". While randomized controlled trials are described in the medical literature as "high" quality evidence and observational studies as "low" quality evidence, randomized controlled trials may not be feasible or ethical, may have intrinsic

---

[11] Turban JL, King D, Carswell JM, Keuroghlian AS. Pubertal suppression for transgender youth and risk of suicidal ideation. *Pediatrics*. 2020;145(2):e20191725.

[12] Browner WS, Newman TB, Cummings SR, et al. *Designing Clinical Research*. 5th ed. Wolters Kluwer; 2022.

[13] See, for example, de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *J Sex Med*. 2011;8(8):2276-2283.

[14] Balshem H, Helfand M, Schünemann HJ, et al. GRADE guidelines: 3. Rating the quality of evidence. *J Clin Epidemiol*. 2011;64(4):401-406.

methodological limitations, or may be unavailable in some contexts. "High" quality evidence is not required for a treatment to no longer be considered experimental. A particular quality of evidence as specified by the GRADE system does not necessarily entail a particular strength of recommendation; as described below, "low" quality evidence can be sufficient to justify "strong" recommendations.[15]

28.     At times, it may be unethical to conduct randomized trials. For randomized trials to be ethical, clinical equipoise must exist; there must be uncertainty about whether the efficacy of the intervention or the control is greater. Otherwise, it would be unethical to knowingly expose trial participants to an inferior intervention or control. Trials must also be feasible; it would also be unethical to expose individuals to the risks of trial participation without the benefit of the trial generating generalizable knowledge. A randomized trial that is unlikely to find enough people to participate because they believe they might be randomized to an inferior intervention would be unethical because it could not produce generalizable knowledge due to an inadequate sample size.[16]

29.     Pediatric clinical research is less likely to use randomized trials than is clinical research with adults. Potential reasons for this disparity include the low prevalence of pediatric diseases, small market share for therapeutic agents in this population, low level of National Institutes of Health funding, and difficulty enrolling minors in research.[17]

---

[15] Balshem H, Helfand M, Schünemann HJ, et al. GRADE guidelines: 3. Rating the quality of evidence. *J Clin Epidemiol.* 2011;64(4):401-406; Swiglo BA, Murad MH, Schünemann HJ, et al. A case for clarity, consistency, and helpfulness: State-of-the-art clinical practice guidelines in endocrinology using the Grading of Recommendations Assessment, Development, and Evaluation system. *J Clin Endocrinol Metab.* 2008;93(3):666-673.

[16] Emanuel EJ, Wendler D, Grady C. What makes clinical research ethical? *JAMA.* 2000;283(20):2701-2711.

[17] Martinez-Castaldi C, Silverstein M, Baucher H. Child versus adult research: The gap in high quality study design. *Pediatrics.* 2008;122(1):52-57.

30.     The process for assessing the quality of the evidence is separate and distinct from the process for grading the strength of recommendations based on this evidence.[18] When making recommendations, the authors of guidelines consider a variety of factors; the quality of the evidence is only one factor considered in making recommendations. Other considerations include the balance between desirable and undesirable outcomes, confidence and variability in patients' values and preferences, and resource use.[19] The GRADE system distinguishes "strong" and "weak" recommendations; if the authors are highly confident in the balance between desirable and undesirable consequences, they make a "strong" recommendation and, if they are less confident, a "weak" recommendation.[20] The larger the differences between the desirable and undesirable consequences and the smaller the variability in patient values and preferences, the more likely a "strong" recommendation is warranted. "Low" quality evidence may be sufficient to make a "strong" recommendation.[21]

31.     Recommendations for pediatric care made by professional associations in clinical practice guidelines are seldom based on well-designed and conducted randomized controlled trials due to their rarity. Instead, recommendations are frequently based on observational studies or, if such studies are unavailable, expert opinion. The medical use of the term "expert opinion" in this context refers to the consensus of experts when studies are not available.

---

[18] Balshem H, Helfand M, Schünemann HJ, et al. GRADE guidelines: 3. Rating the quality of evidence. *J Clin Epidemiol*. 2011;64(4):401-406.

[19] Andrews JC, Schünemann HJ, Oxman AD, et al. GRADE guidelines: 15. Going from evidence to recommendation-determinants of a recommendation's direction and strength. *J Clin Epidemiol*. 2013;66(7):726-735.

[20] Andrews J, Guyatt G, Oxman AD, et al. GRADE guidelines: 14. Going from evidence to recommendations: The significance and presentation of recommendations. *J Clin Epidemiol*. 2013;66(7):719-725.

[21] Andrews JC, Schünemann HJ, Oxman AD, et al. GRADE guidelines: 15. Going from evidence to recommendation-determinants of a recommendation's direction and strength. *J Clin Epidemiol*. 2013;66(7):726-735.

32.    For example, of the 236 recommendations in the current clinical practice guidelines by the AAP, only 25 (10.6%) are based on Level A evidence (well-designed and conducted randomized controlled trials). Among its 80 "strong" recommendations, 10 (13%) are based on Level X evidence (exceptional situations in which validating studies cannot be performed and there is a clear preponderance of benefit or harm) and among its 117 "moderate" recommendations, 50 (42.7%) are based on Level C evidence (multiple observational studies with inconsistent findings, single or few observational studies, or observational studies with major limitations).[22]

33.    Clinicians cannot tell their patients to come back later after randomized controlled trials have been conducted. Clinicians must make decisions based on the best, currently available evidence, which may be observational studies or expert opinion. The lack of randomized controlled trials and reliance on "low" quality evidence does not mean that there is not reasonable support for a clinical practice guideline recommendation or that a treatment is not medically necessary.

### Clinical Practice Guidelines for the Treatment of Gender Dysphoria

34.    Gender dysphoria is a medical diagnosis contained in the American Psychiatric Association's (APA's) *Diagnostic and Statistical Manual of Mental Disorders*. This diagnosis is defined by "a marked incongruence between one's experienced/expressed gender and their assigned gender, lasting at least 6 months" which is "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."[23]

35.    Gender-affirming medical care, whether for minors or adults, is not experimental in the sense of new or novel. Hormone treatment for gender dysphoria began after estrogen and

---

[22] Antommaria AHM, Kelleher M, Peterson RJ. Quality of evidence and strength of recommendations in American Academy of Pediatrics' guidelines." *Pediatrics.* In press. The AAP's clinical practice guidelines use different terminology than the GRADE approach for describing the quality of the evidence and the strength of recommendations.

[23] American Psychiatric Association. Gender Dysphoria. In: *Diagnostic and Statistical Manual of Mental Disorders.* 5th ed., text rev. American Psychiatric Publishing; 2022.

testosterone became commercially available in the 1930s. The first documented male to female gender-affirming genital surgery was performed in 1931, and Christine Jorgensen famously underwent gender-affirming surgery in 1952.[24] WPATH developed in original SOC in 1979.[25] The first reference to the use of GnRH analogs for the treatment of gender dysphoria in adolescents in the medical literature was in 1998, over 25 years ago.[26] In the same year, the World Professional Association for Transgender Health (WPATH), then called the Harry Benjamin International Gender Dysphoria Association, included recommendations regarding gender-affirming hormones for adolescents in its Standards of Care (SOC).[27] Providers at Children's Hospital Boston began treating minors with gender-affirming hormones at this time.[28] Prospective observational trials of GnRH analogs began recruiting participants in 2000.[29] In 2007, Boston Children's Hospital established its Gender Management Service which provided treatment with GnRH analogs, in addition to gender-affirming hormones.[30] The Endocrine Society published its first clinical practice guideline for gender-affirming medical care, which recommended treatment with GnRH

[24] Stryker S. Transgender History. 2nd ed. Seal Press; 2017.

[25] Coleman E, Radix AE, Bouman WP, et al. Standards of care for the health of transgender and gender diverse people, version 8. *Int J Transgend Health*. 2022;23(Suppl 1):S1-S259.

[26] Cohen-Kettenis PT, van Goozen SH. Pubertal delay as an aid in diagnosis and treatment of a transsexual adolescent. *Eur Child Adolesc Psychiatry*. 1998;7(4):246-248. See also Gooren L, Delemarre-van de Waal H. The feasibility of endocrine interventions in juvenile transsexuals. *J Psychol Human Sex*. 1996;8(4):69-74.

[27] Levine SB, Brown G, Coleman E, et al. The standards of care for gender identity disorders. *Int J Transgend*. 1998;2(2). Gender identity disorders is the prior terminology for gender dysphoria. This is the 5th edition of the Standards of Care.

[28] Spack NP, Edwards-Leeper L, Feldman HA, et al. Children and adolescents with gender identity disorder referred to a pediatric medical center. *Pediatrics*. 2012;129(3):418-425.

[29] de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *J Sex Med*. 2011;8(8):2276-2283.

[30] Spack NP, Edwards-Leeper L, Feldman HA, et al. Children and adolescents with gender identity disorder referred to a pediatric medical center. *Pediatrics*. 2012;129(3):418-425.

analogs, in 2009[31] and WPATH added recommendations about GnRH analogs in the 7th edition of

its Standards of Care in 2012.[32]

36.     The Endocrine Society published its updated clinical practice guideline for the

treatment of gender-dysphoric/gender-incongruent persons, including pubertal suppression, sex

hormone treatment, and surgery for gender confirmation, in 2017.[33] WPATH's Standards of Care

is currently in its 8th version.[34] The treatments outlined in these guidelines are also endorsed by

other medical professional associations including the American Academy of Family Physicians,[35]

the AAP,[36] the American College of Obstetricians and Gynecologists,[37] the American Medical

---

[31] Hembree WC, Cohen-Kettenis P, Delemarre-van de Waal HA, et al. Endocrine treatment of transsexual persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2009;94(9):3132-3154.

[32] Coleman E, Bockting W, Botzer M, et al. Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *Int J Transgend,* 2012;13(4):165-232.

[33] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3869-3903.

[34] Coleman E, Radix AE, Bouman WP, et al. Standards of care for the health of transgender and gender diverse people, version 8. *Int J Transgend Health*. 2022;23(Suppl 1):S1-S259.

[35] American Academy of Family Physicians. Care for the transgender and gender nonbinary patient. December 2023. Accessed February 3, 2025. Available at https://www.aafp.org/about/policies/all/transgender-nonbinary.html#:~:text=The%20American%20Academy%20of%20Family,patients%2C%20including%20children%20and%20adolescents.

[36] Rafferty J, Committee on Psychosocial Aspects of Child and Family Health, Committee on Adolescence, Section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness. Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. *Pediatrics*. 2018;142(4):e20182162.

[37] American College of Obstetricians and Gynecologists. ACOG Committee Opinion Number 823: Health care for transgender and gender diverse individuals. March 2021. Accessed February 3, 2025. Available at https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2021/03/health-care-for-transgender-and-gender-diverse-individuals/; American College of Obstetricians and Gynecologists' Committee on Gynecologic Practice and Committee on Health Care for Underserved Women. Health care for transgender and gender diverse individuals: ACOG Committee Opinion, Number 823. *Obstet Gynecol*. 2021;137(3):e75-e88.

Association,[38] the APA,[39] the American Psychological Association,[40] and the Pediatric Endocrine Society.[41]

37.　　Executive Order 14187 asserts without evidence that WPATH lacks scientific integrity and instructs agencies to rescind or amend all policies that rely on WPATH's guidance. But the WPATH and Endocrine Society guidelines are evidence-based and were developed using methods comparable to other clinical practice guidelines across different areas of medicine. To my knowledge, there are *no* clinical practice guidelines that recommend withholding gender-affirming medical care from all adolescents. Additionally, policies that rely on WPATH's guidance may also rely on other sources for their recommendations. Therefore, even if WPATH's guidance were unreliable, and I am not conceding that it is, policies may nonetheless have a sound basis and rescinding them would not be justified.

38.　　Gender-affirming medical care is also not experimental in the sense of unproven. The Endocrine Society clinical practice guideline includes 28 recommendations: 3 (11%) are based on "moderate" and 19 (68%) are based on "low" or "very low" quality evidence. The remaining 6 (21%) recommendations are Ungraded Good Practice Statements.[42] Table 1 (**Exhibit B**).

---

[38] American Medical Association. Removing financial barriers to care for transgender patients H-185.950. 2022. Accessed February 3, 2025. Available at https://policysearch.ama-assn.org/policyfinder/detail/H-185.950?uri=%2FAMADoc%2FHOD.xml-0-1128.xml; Madara JL. Letter to Mr. Bill McBride. April 26, 2021. Accessed February 3, 2025. Available at https://searchlf.ama-assn.org/letter/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTERS%2F2021-4-26-Bill-McBride-opposing-anti-trans-bills-Final.pdf.

[39] American Psychiatric Association. Position statement on treatment of transgender (trans) and gender diverse youth. July 2020. Accessed February 3, 2025. Available at https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-Transgender-Gender-Diverse-Youth.pdf.

[40] American Psychological Association. Transgender, gender identity, and gender expression non-discrimination. August 2008. Accessed February 3, 2025, Available at https://www.apa.org/about/policy/transgender.pdf.

[41] Endocrine Society and Pediatric Endocrine Society. Transgender health: Position statement. December 2020. Accessed February 3, 2025. Available at https://www.endocrine.org/-/media/endocrine/files/advocacy/position-statement/position_statement_transgender_health_pes.pdf.

[42] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3869-3903.

Ungraded Good Practice Statements draw attention to general principles, like shared decision-making, for which direct evidence is unavailable or not systematically apprised.

39.    The quality of the evidence supporting these recommendations is similar to the quality of the evidence supporting the recommendations in the AAP's clinical practice guidelines described above and in other Endocrine Society guidelines for the pediatric population. For example, none of the Endocrine Society's 84 recommendations in its two other guidelines that focus on the pediatric population—guidelines on pediatric obesity and congenital adrenal hyperplasia—is based on "high" quality evidence. Twenty-four (29%) of the recommendations are based on "moderate," and 49 (58%) on "low" or "very low" quality evidence. The remaining recommendations (11, 13%) are Ungraded Good Practice Statements.[43] Table 1 (**Exhibit B**).

40.    With respect to GnRH analogs, the Endocrine Society specifically "suggest[s] that adolescents who meet diagnostic criteria for [gender dysphoria]/gender incongruence, fulfill criteria for treatment, . . . and are requesting treatment should initially undergo treatment to suppress pubertal development."[44] The evidence for this recommendation includes a longitudinal study of a group of 70 transgender adolescents who were evaluated using objective measures prior to both pubertal suppression and sex hormone treatment. The mean length of time between the start of pubertal suppression and sex hormone treatment was 1.88 years and ranged from 0.42 to 5.06 years. The study showed statistically significant decreases in behavioral and emotional

---

[43] Speiser PW, Arlt W, Auchus RJ, et al. Congenital adrenal hyperplasia due to steroid 21-hydroxylase deficiency: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2018;103(11):4043-4088; Styne DM, Arslanian SA, Connor EL, et al. Pediatric obesity-assessment, treatment, and prevention: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(3):709-757.

[44] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3880.

problems and depressive symptoms, and increases in general functioning.[45]

41.     This is the same level of evidence as supports the use of GnRH analogs for the treatment of central precocious puberty. Central precocious puberty is the premature initiation of puberty, before 8 years of age in people assigned female at birth and before 9 in people assigned male, by the central nervous system. The potential negative effects of precocious puberty include impairment of final adult height as well as antisocial behavior and lower academic achievement. There are no randomized trials evaluating the adult height of treated and untreated individuals. Most studies are observational and compare pretreatment predicted final height with actual final height. These studies have additional limitations including small sample sizes. This "low" quality evidence nonetheless is sufficient to support the use of GnRH analogs as treatment for central precocious puberty.[46] Executive Order 14187 therefore subjects the use of GnRH analogs to a double standard. There are no randomized clinical trials for the use of GnRH analogs to treat precocious puberty or gender dysphoria, but the evidence is deemed sufficient for the former but not the latter.

42.     The evidence supporting the guideline's recommendations regarding gender-affirming hormone treatment in adolescents include Annelou L. C. de Vries and colleagues' longer-term follow-up of individuals after pubertal suppression through sex hormone and gender-affirming surgical treatment. Participants' mean age at their initial assessment was 13.6 years and

---

[45] de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *J Sex Med*. 2011;8(8):2276-2283.

[46] Mul D, Hughes IA. The use of GnRH agonists in precocious puberty. *Eur J Endocrinol*. 2008;159(Suppl 1):S3-S8.

their mean age at their final assessment was 20.7 years. The researchers report the resolution of gender dysphoria and improvement in psychological functioning.[47]

43.    The evidence base for gender-affirming medical care in adults does include randomized, double-blind, placebo-controlled trials. One trial compared the effect of testosterone combined with a 5alpha-reductase inhibitor or placebo on muscle strength.[48] It is important to note that this trial compared one form of gender-affirming hormone treatment to another, rather than comparing gender-affirming hormone treatment to no treatment at all.

44.    The evidence base for gender-affirming surgical care generally consists of observational studies. WPATH SOC-8, for example, cites 5 prospective observational studies of gender-affirming chest surgery in individuals assigned female at birth and 8 prospective observational studies of gender-affirming vaginoplasty in individuals assigned male at birth.[49]

45.    As a result of these studies and healthcare providers' subsequent experience, randomized, placebo-controlled trials (trials that compare pharmacological treatment to no pharmacological treatment) of gender-affirming medical care are currently unethical because potential investigators do not have equipoise (as explained above) between pharmacological treatment and no pharmacological treatment; they believe that pharmacological treatment is superior. It is also highly unlikely that a sufficient number of participants would enroll in

---

[47] See de Vries AL, McGuire JK, Steensma TD, Wagenaar EC, Doreleijers TA, Cohen-Kettenis PT. Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics*. 2014;134(4):696-704. Additional longitudinal studies of the psychosocial effects of pubertal suppression to treat gender dysphoria include Costa R, Dunsford M, Skagerberg E, Holt V, Carmichael P, Colizzi M. Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria. *J Sex Med*. 2015;12(11):2206-2214 and Carmichael P, Butler G, Masic U, et al. Short-term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK. *PLoS One*. 2021;16(2):e0243894.

[48] Gava G, Armillotta F, Pillastrini P, et al. A randomized double-blind placebo-controlled pilot trial on the effects of testosterone undecanoate plus dutasteride or placebo on muscle strength, body composition, and metabolic profile in transmen. *J Sex Med*. 2021;18(3):646-655.

[49] Coleman E, Radix AE, Bouman WP, et al. Standards of care for the health of transgender and gender diverse people, version 8. *Int J Transgend Health*. 2022;23(Suppl 1):S1-S259.

randomized, placebo-controlled trials for them to be informative.[50]

46.    Even if such studies could be conducted ethically, they would provide a lower quality of evidence because of intrinsic limitations in their design. For example, it would be impossible to blind/mask the investigators or the participants to whether the participants were receiving the active treatment or a placebo. They would know if participants were in the intervention or the control arm of the study due to the physical changes in their bodies, or the lack thereof, over time. This might bias their perception of the outcomes and lower the rating of the study's quality.[51]

47.    While Executive Order 14187 directs the Secretary of Health and Human Services to "use all available methods to increase the quality of data to guide practices for improving the health of minors with gender dysphoria," it appears to punish investigators and healthcare entities who would conduct such research on gender-affirming medical care (or force them to stop doing so) by threatening to withhold or retract their federal funding. Even if one were to believe that such care was not currently evidence based, which I do not, there is no evidence that it is impossible to be effective and therefore nothing to justify prohibiting any and all research on its use.

## GENERALLY APPLICABLE PRINCIPLES OF INFORMED CONSENT APPLY TO GENDER-AFFIRMING MEDICAL CARE

48.    Before performing any medical intervention, a healthcare provider must generally obtain an adult patient's informed consent. Informed consent is a process in which the provider discloses information, elicits the patient's preferences, offers medical advice, and seeks explicit

---

[50] Chew D, Anderson J, Williams K, May T, Pang K. Hormonal treatment in young people with gender dysphoria: A systematic review. *Pediatrics*. 2018;141(4):e20173742; Reisner SL, Deutsch MB, Bhasin S, et al. Advancing methods for US transgender health research. *Curr Opin Endocrinol Diabetes Obes*. 2016;23(2):198-207.

[51] Browner WS, Newman TB, Cummings SR, et al. *Designing Clinical Research*. 5th ed. Wolters Kluwer; 2022; Atkins D, Best D, Briss PA, et al. Grading quality of evidence and strength of recommendations. *BMJ*. 2004;328(7454):1490.

authorization. In order to participate in the informed consent process, a patient must have medical decision-making capacity. If an adult patient lacks capacity, a proxy decision-maker is generally appointed. The healthcare provider's disclosure should include the nature of the intervention and the reasons for it, as well as its potential benefits, risks, and alternatives, including the alternative of not undergoing the intervention. The patient or the patient's proxy must understand and appreciate this information and express a decision. For the informed consent to be valid, the authorization must be voluntary. Exceptions to the requirement to obtain informed consent exist, such as in the case of an emergency.[52]

49.    Medical decision-making and informed consent in pediatrics is more complex than in adult medicine because it involves both minor patients and their parents or legal guardians. Parents and guardians are afforded substantial, but not unlimited, discretion in making medical decisions for their minor children based on their assessment of the individual child's best interest. They generally care about their children and best understand their children's unique needs.[53]

50.    Healthcare providers also have an ethical obligation to include children and adolescents in medical decision-making to the extent that it is developmentally appropriate. For example, a provider examining a toddler for a possible ear infection should not ask them for permission to look in their ear because the provider intends to look even if they say no. The provider could, however, ask the toddler which ear they would like to have looked in first. As a minor becomes older, the minor should participate more actively in medical decision-making and the minor's assent should be sought. Younger adolescents typically have developed a sense of identity, individual values and preferences, and are developing medical decision-making capacity.

---

[52] Beauchamp TL, Childress JF. *Principles of Biomedical Ethics*. 6th ed. Oxford University Press; 2009.

[53] Diekema DS. Parental refusals of medical treatment: The harm principle as threshold for state intervention. *Theor Med Bioeth.* 2004;25(4):243-264.

Capacity entails the ability to (i) understand the indications and the potential benefits, risks, and alternatives to a treatment, including declining treatment; (ii) appreciate the implications of a treatment decision for their own lives; (iii) evaluate the potential benefits and risks; and (iv) express a preference.[54] Adolescents generally possess comparable medical decision-making capacity to adults. Louis A. Weithorn and Susan B. Campbell, for example, found that 14-year-olds performed similarly to adults with respect to their ability to understand and reason about treatment information.[55]

51.     Executive Order 14187 falsely suggests that adults are trying to change a child's sex though gender-affirming medical care. This is not something that adults are doing to children. The diagnosis of gender-dysphoria is based on the child or adolescent's own gender identity, not a gender identity imposed by the adolescent's parent(s). The adolescent patient's assent is also required for these medical interventions.

52.     The current treatment paradigm for treating gender dysphoria in minors is consistent with general ethical principles instantiated in the practices of informed consent and assent. The Endocrine Society clinical practice guideline extensively discusses the potential benefits, risks, and alternatives to treatment, and its recommendations regarding the timing of interventions are based in part on the treatment's potential risks and the adolescent's decision-making capacity. The guideline recommends that the informed consent process for GnRH analogs and sex hormones include a discussion of the implications for fertility and options for fertility preservation. The Endocrine Society clinical practice guideline also advises delaying gender-

---

[54] Katz AL, Webb SA, Committee on Bioethics. Informed consent in decision-making in pediatric practice. *Pediatrics*. 2016;138(2):e20161485; Kon AA, Morrison W. Shared decision-making in pediatric practice: A broad view. *Pediatrics*. 2018;142(Suppl 3):S129-S132.

[55] Weithorn LA, Campbell SB. The competency of children and adolescents to make informed treatment decisions. *Child Dev*. 1982;53(6):1589-1598.

affirming hormone treatment, which results in partly irreversible physical changes, until an adolescent is developmentally capable of providing informed consent.[56] Lieke J. J. J. Vrouenraets and colleagues found most adolescents with gender dysphoria have sufficient medical decision-making capacity to make decisions regarding GnRH analogs.[57]

### Gender-Affirming Medical Care's Benefits, Risks, and Alternatives

53.    The potential benefits of gender-affirming medical care in minors include improved physical and psychological outcomes. Starting pubertal suppression in early puberty prevents adolescents with gender dysphoria from developing secondary sex characteristics inconsistent with their gender identity, which can be extremely distressing for them, and that may be difficult, if not impossible, to eliminate once the characteristics have fully developed. Sex hormone therapy results in the development of secondary sex characteristics consistent with an individual's gender identity. Potential psychological benefits include increased quality of life and decreased depression, suicidal ideation and suicide attempts, and anxiety.[58]

54.    As with all medical treatments, gender-affirming medical care entails risks. One of the potential risks is negative effects on fertility, but this risk should not be overstated as it is in Executive Order 14187. GnRH analogs do not, by themselves, permanently impair fertility. Children with central precocious puberty are routinely treated with GnRH analogs and have typical

---

[56] See Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab.* 2017;102(11):3869-3903.

[57] Vrouenraets LJJJ, de Vries ALC, de Vries MC, van der Miesen AIR, Hein IM. Assessing medical decision-making competence in transgender youth. *Pediatrics.* 2021;148(6):e2020049643.

[58] See, for example, Baker KE, Wilson LM, Sharma R, Dukhanin V, McArthur K, Robinson KA. Hormone therapy, mental health, and quality of life among transgender people: A systematic review. *J Endocr Soc.* 2021;5(4):1-16.

fertility in adulthood.[59] GnRH analogs are also used for fertility preservation in individuals being treated for cancer.[60]

55.　　While treatment for gender dysphoria with gender-affirming hormones may impair fertility, this is not universal and may also be reversible. There are transgender men who became pregnant while on or after discontinuing testosterone therapy.[61] Transgender men and women are also capable of producing eggs and sperm respectively both during and after the discontinuation of gender-affirming hormone treatment.[62]

56.　　Additionally, the clinical practice guidelines discussed above recommend that healthcare providers offer individuals considering gender-affirming medical care methods to potentially preserve their fertility.[63]

57.　　The risk of infertility is also not unique to treatment for gender dysphoria. For example, parents and legal guardians consent to the treatment of medical conditions for their minor children, including some nonmalignant rheumatologic disorders and hematologic conditions, which may impair fertility.[64]

---

[59] Lazar L, Meyerovitch J, de Vries L, Phillip M, Lebenthal Y. Treated and untreated women with idiopathic precocious puberty: Long-term follow-up and reproductive outcome between the third and fifth decades. *Clin Endocrinol* (Oxf). 2014;80(4):570-576.

[60] Valsamakis G, Valtetsiotis K, Charmandari E, Lambrinoudaki I, Vlahos NF. GnRH analogues as a co-treatment to therapy in women of reproductive age with cancer and fertility preservation. *Int J Mol Sci*. 2022;23(4):2287.

[61] Light AD, Obedin-Maliver J, Sevelius JM, Kerns JL. Transgender men who experienced pregnancy after female-to-male gender transitioning. *Obstet Gynecol*. 2014;124(6):1120-1127.

[62] Leung A, Sakkas D, Pang S, Thornton K, Resetkova N. Assisted reproductive technology outcomes in female-to-male transgender patients compared with cisgender patients: A new frontier in reproductive medicine. *Fertil Steril*. 2019;112(5):858-865; de Nie I, van Mello NM, Vlahakis E, et al. Successful restoration of spermatogenesis following gender-affirming hormone therapy in transgender women. *Cell Rep Med*. 2023;4(1):100858.

[63] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3869-3903.

[64] Delessard M, Saulnier J, Rives A, Dumont L, Rondanino C, Rives N. Exposure to chemotherapy during childhood or adulthood and consequences on spermatogenesis and male fertility. *Int J Mol Sci*. 2020;21(4):1454; Blumenfeld Z. Chemotherapy and fertility. *Best Pract Res Clin Obstet Gynaecol*. 2012;26(3):379-390; Hirshfeld-Cytron J, Gracia C, Woodruff TK. Nonmalignant diseases and treatments associated with primary ovarian failure: An expanded role for fertility preservation. *J Womens Health (Larchmt)*. 2011;20(10):1467-1477.

58.     While transgender adolescents have higher rates of depression, anxiety, suicidal ideation, and suicide attempts, there are no studies indicating that those higher rates are caused or exacerbated by gender-affirming medical care.[65] Rather, contributing factors include conflict between one's appearance and identity, stigma, and rejection.[66] As discussed above, the available evidence indicates that gender-affirming care improves, rather than worsens, psychological outcomes.

59.     Finally, not knowing all potential harmful effects associated with a medication is not a sufficient reason for the FDA to not approve a medication, let alone for the President to defund and seek to ends its use. The FDA requires post-marketing surveillance of medications' adverse effects because the clinical trials on which the approvals are based cannot identity all possible side effects.[67]

60.     In determining whether the benefits of treatment outweigh the risks, medical providers and patients must also consider the potential alternatives including not providing or receiving the treatment. As stated above, prior to the initiation of gender-affirming medical care, many minors with gender dysphoria have significant, unresolved symptoms that treatment improves. Without medical treatment, these symptoms would persist. The assertion that psychotherapy alone is sufficient to treat gender dysphoria in adolescents is only supported by anecdotal evidence.[68]

---

[65] Haas AP, Eliason M, Mays VM, et al. Suicide and suicide risk in lesbian, gay, bisexual, and transgender populations: Review and recommendations. *J Homosex*. 2011;58(1):10-51.

[66] Bauer GR, Scheim AI, Pyne J, Travers R, Hammond R. Intervenable factors associated with suicide risk in transgender persons: A respondent driven sampling study in Ontario, Canada. *BMC Public Health*. 2015;15:525.

[67] U.S. Food & Drug Administration. Postmarketing Surveillance Programs. April 2, 2020. Accessed February 3, 2025. Available at https://www.fda.gov/drugs/surveillance/postmarketing-surveillance-programs.

[68] See, for example, Levine SB. Transitioning back to maleness. *Arch Sex Behav*. 2018;47(4):1295-1300.

**The Risks and Benefits of Gender-Affirming Medical Care Are Comparable to Those of Other Medical Care to which Individuals (Including Parents and Guardians) May Consent**

61.     Medical care for minors can require weighing potential benefits and risks in the face of uncertainty. There is nothing unique about gender-affirming medical care that justifies singling out this medical care for prohibition based on concern for adolescents' inability to assent or parents or guardians' inability to consent. Medical decisions regarding treatment for gender dysphoria should continue to be left to the discretion of adolescents, their parents or guardians, and their healthcare providers.

62.     The potential risks of gender affirming medical care are comparable to the risks parents and adolescents are permitted to assume in numerous other treatment decisions. As described above, parents can choose treatments that have some chance of damaging their children's gonads and impairing their fertility. Individuals with some types of DSDs, such as complete androgen insensitivity syndrome, are treated with sex hormones, which have comparable risks to the use of these treatments in persons with gender dysphoria.[69] Parents of children with some types of DSDs may even choose to have their children's gonads removed due to the possible elevated risk of malignancy, which causes infertility.[70]

63.     Additionally, while Executive Order 14187 would end the provision of chest surgery for the treatment of gender dysphoria among older adolescents and 18-year-olds, provision of comparable surgeries, such as those for gynecomastia, is unaffected. Gynecomastia in the proliferation of ductal or glandular breast tissue, as opposed to adipose tissue or fat, in individuals who sex assigned at birth is male. While surgeries to treat gynecomastia may at times be performed

---

[69] Lanciotti L, Cofini M, Leonardi A, Bertozzi M, Penta L, Esposito S. Different clinical presentations and management in complete androgen insensitivity syndrome (CAIS). *Int J Environ Res Public Health*. 2019;16(7):1268.

[70] Abacı A, Çatlı G, Berberoğlu M. Gonadal malignancy risk and prophylactic gonadectomy in disorders of sexual development. *J Pediatr Endocrinol Metab*. 2015;28(9-10):1019-1027.

to lessen pain, they are commonly performed to reduce psychosocial distress. Surgery affirms patients' gender identity, that is, to help someone assigned male at birth feel more typically masculine. Risks associated with the procedure include bruising, bleeding, infection, scarring, poor cosmetic outcome, and loss of sensation.[71] There is nothing unique about chest surgery for gender dysphoria that justifies singling this treatment out.

64.    As discussed above, the potential benefits of gender-affirming medical care, including improved psychological outcomes, frequently outweigh the potential risks.

**Potential Regret Does Not Support the Executive Orders**

65.    Patients experiencing regret as a result of any medical treatment is profoundly unfortunate and such individuals should be provided support and additional treatment as needed. Patients expressing regret over having received a certain kind of medical care however, does not justify ending the provision of that medical care.

66.    Executive Order 14187 states that "[c]ountless children soon regret" receiving gender affirming medical care. While there are individuals who received gender-affirming medical care as minors who express regret, the available studies report that rates of regret regarding gender-affirming medical care are very low. For example, Chantal M. Wiepjes and colleagues report that 0.6% of transgender women and 0.3% of transgender men experienced regret.[72] Similarly, R. Hall and colleagues report regret was specifically documented in 1.1% of adult gender-diverse patients.[73] Defunding and ending gender-affirming medical care to prevent regret in a small

---

[71] Nordt CA, DiBVasta AD. Gynecomastia in adolescents. *Curr Opin Pediatr*. 2008;20(4):375-382.

[72] Wiepjes CM, Nota NM, de Blok CJ, et al. The Amsterdam Cohort of Gender Dysphoria Study (1972-2015): Trends in prevalence, treatment, and regrets. *J Sex Med*. 2018;15(4):582-590. This study analyzes all individuals who presented to the clinic, whether they presented as minors or adults. Regret was assessed in individuals who had undergone gender-affirming surgery that included removal of the gonads. This surgery was only performed on adults.

[73] Hall R, Mitchell L, Sachdeva J. Access to care and frequency of detransition among a cohort discharged by a UK national adult gender identity clinic: Retrospective case-note review. *BJPsych Open*. 2021;7(6):e184.

minority of patients would result in harm to the majority of patients who benefit. The potential for regret should nonetheless be disclosed in the informed consent process, and support and services should be provided to individuals who experience regret.

67.    The potential for regret is also not unique to gender-affirming medical care. Parents of children who have undergone feminizing genitoplasty and hypospadias repair (treatments having nothing to do with gender dysphoria) have experienced regret over their decisions.[74] For example, Rachel S. Fisher and colleagues found that 38% of caregivers of infants with congenital adrenal hyperplasia reported some level of regret about their child's surgical care.[75] Executive Order 14187 does not, however, seek to end the provision of these procedures.

**EXECUTIVE ORDER 14187 UNDERMINES THE INTEGRITY OF THE MEDICAL PROFESSION AND LACKS MEDICAL OR ETHICAL JUSTIFICATION**

68.    Executive Order 14187 violates the integrity of the medical profession and coerces medical professionals to violate their integrity and ethical duties. The medical profession has processes by which it evaluates treatments and determines whether they are safe and effective. This Executive Order intervenes in these processes replacing medical professionals' judgement with the judgment of the President.

69.    Healthcare providers have an ethical obligation to promote their patients' well-being and to protect them from harm. When providers believe that the potential benefits of gender-affirming medical care outweigh the potential risks for a particular patient, preventing them from

---

[74] Fisher RS, Espeleta HC, Baskin LS, et al. Decisional regret about surgical and non-surgical issues after genitoplasty among caregivers of female infants with CAH. *J Pediatr Urol.* 2022;18(1):27-33; Vavilov S, Smith G, Starkey M, Pockney P, Deshpande AV. Parental decision regret in childhood hypospadias surgery: A systematic review. *J Paediatr Child Health.* 2020;56(10):1514-1520.

[75] Fisher RS, Espeleta HC, Baskin LS, et al. Decisional regret about surgical and non-surgical issues after genitoplasty among caregivers of female infants with CAH. *J Pediatr Urol.* 2022;18(1):27-33.

providing this treatment forces them to violate their ethical obligations to their patients or risk losing federal funding.

70.    There is no medical or ethical basis for treating gender-affirming medical care differently from other care covered by federal funds. Gender-affirming medical care is consistent with generally accepted professional medical standards and is not experimental or investigational. It is endorsed by evidence-based clinical practice guidelines that are themselves based on studies published in the peer-reviewed literature demonstrating that it improves individuals' health outcomes.

71.    Executive Order 14187 not only seeks to withhold or withdraw federal funding for gender-affirming medical care but also perniciously pits one group of patients against one another. It threatens to withhold not only funding for gender-affirming medical care but all research and education grants and Medicare and Medicaid funding from organizations that provide gender-affirming medical care.

## CONCLUSIONS

72.    Treating adolescents with gender dysphoria with gender-affirming medical care under clinical practice guidelines, like the Endocrine Society's, is evidence-based; its potential benefits outweigh its potential risks for many patients; and these risks are well within the range of other medical decisions that adolescents and their parents or guardians have the discretion to make in consultation with their healthcare professionals.

73.    Based on my research and experience as a pediatrician and bioethicist, there is no sound medical or ethical basis to prohibit healthcare professionals and entities from providing gender-affirming medical care to individuals with gender dysphoria under 19 years of age. Doing so puts clinicians and healthcare entities in the untenable position of having to harm their patients and violate their integrity and ethical obligations due to the threat of loss of federal funding.

74.    There is not a sound medical or ethical basis for seeking to end the provision of gender-affirming medical care to patients under 19. Such care is evidence-based and is not experimental. Ending the provision of gender-affirming medical and surgical care is also inconsistent with the Order's silence as to other comparable medical interventions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this ı2 th day of February 2025

_Armand H. Matheny Antommaria_
ARMAND H. MATHENY ANTOMMARIA, MD, PhD

29

# Exhibit A

**EXHIBIT A**

## Curriculum Vitae

Last Updated: February 3, 2025

## PERSONAL DATA
Armand H. Matheny Antommaria, MD, PhD, FAAP, HEC-C
Birth Place: Pittsburgh, Pennsylvania
Citizenship: United States of America

## CONTACT INFORMATION
Address: 3333 Burnet Ave, ML 15006, Cincinnati, OH 45229
Telephone Number: (513) 636-4939
Electronic Mail Address: armand.antommaria@cchmc.org

## EDUCATION
1983-1987 BSEE       Valparaiso University, with High Distinction
Valparaiso, IN
1983-1987 BS         Valparaiso University (Chemistry), with High Distinction
Valparaiso, IN
1987-1989 MD         Washington University School of Medicine
1998-2000            Saint Louis, MO
1989-2000 PhD        The University of Chicago Divinity School (Religious Ethics)
Chicago, IL
2000-2003 Resident   University of Utah (Pediatrics)
Salt Lake City, UT
2005-2006 Certificate Conflict Resolution Certificate Program, University of Utah
Salt Lake City, UT

## BOARD CERTIFICATION
2019   Pediatric Hospital Medicine, American Board of Pediatrics
2019   Healthcare Ethics Consultant-Certified, Healthcare Ethics Consultation Certification
Commission
2004   General Pediatrics, American Board of Pediatrics

## PROFESSIONAL LICENSES
2012-Present  Doctor of Medicine, Ohio
2006-2010     Alternative Dispute Resolution Provider—Mediator, Utah
2001-2014     Physician and Surgeon, Utah
2001-2014     Physician and Surgeon Controlled Substance, Utah

## PROFESSIONAL EXPERIENCE
**Full Time Positions**
2019-Present  *Professor*
Cincinnati Children's Hospital Medical Center, Cincinnati, OH
Department of Surgery
2019-Present  *Professor of Clinical-Affiliated*
University of Cincinnati, Cincinnati, OH
Department of Surgery
2017-Present  *Professor*

A-1

Cincinnati Children's Hospital Medical Center, Cincinnati, OH
Division of Pediatric Hospital Medicine
2017-Present   *Professor of Clinical-Affiliated*
University of Cincinnati, Cincinnati, OH
Department of Pediatrics
2016-2017       *Associate Professor of Clinical-Affiliated*
University of Cincinnati, Cincinnati, OH
Department of Pediatrics
2012-2017       *Associate Professor*
Cincinnati Children's Hospital Medical Center, Cincinnati, OH
Division of Pediatric Hospital Medicine
2012-Present   *Lee Ault Carter Chair in Pediatric Ethics*
Cincinnati Children's Hospital Medical Center
2012-2016       *Associate Professor-Affiliated*
University of Cincinnati, Cincinnati, OH
Department of Pediatrics
2010-2012       *Associate Professor of Pediatrics* (with Tenure)
University of Utah School of Medicine, Salt Lake City, UT
Divisions of Inpatient Medicine and Medical Ethics
2010-2012       *Adjunct Associate Professor of Medicine*
University of Utah School of Medicine, Salt Lake City, UT
Division of Medical Ethics and Humanities
2004-2010       *Assistant Professor of Pediatrics* (Tenure Track)
University of Utah School of Medicine, Salt Lake City, UT
Divisions of Inpatient Medicine and Medical Ethics
2004-2010       *Adjunct Assistant Professor of Medicine*
University of Utah School of Medicine, Salt Lake City, UT
Division of Medical Ethics and Humanities
2003-2004       *Instructor of Pediatrics* (Clinical Track)
University of Utah School of Medicine, Salt Lake City, UT
Divisions of Inpatient Medicine and Medical Ethics
2003-2004       *Adjunct Instructor of Medicine*
University of Utah School of Medicine, Salt Lake City, UT
Division of Medical Ethics

**Part Time Positions**
2024-Present   *Expert Witness*, Report and Deposition
                Misanin, et al., v. Wilson, et al., United States District Court for the Middle
                District of South Carolina. Case No. 2:24-CV-5734-RMG
2024-Present   *Expert Witness,* Report
                Van Garderen, et al., v. Montana, et al., Montana Fourth Judicial District Court,
                Missoula County. Cause No. DV 2023-541.
2024            *Expert Witness*, Report, Deposition, and Testimony
                Moe, et al., v. Yost, et al., Court of Common Pleas, Franklin County, Ohio. Case
                No. 24-CV-002481.
2024            *Expert Witness,* Report and Deposition
                Noe, et al., v. Parson, et al., Circuit Court of Cole County State of Missouri. Case
                No. 23AC-CC04530.
2023-Present   *Expert Witness,* Report
Voe, et al., v. Mansfiled, et al., United States District Court, Middle District of North Carolina.
                Case No. 1:23-CV-864-LCB-LPA
2023-Present   *Expert Witness,* Report and Deposition

Zayre-Brown v. The North Carolina Department of Public Safety, et al., United States District
        Court, Western District of North Carolina, Case No. 3:22-CV-01910-MOC-DCK
2023-Present   *Expert Witness,* Report
Poe, et al., v. Drummond, et al., United States District Court, Northern District of
        Oklahoma, Case No. 23-cv-00177-JFH-SH
2023-Present   *Expert Witness*, Report
L.W., et al., v. Skrmetti, et al., United States District Court, Middle District of
        Tennessee, Case No. 3:23-cv-00376.
2022-2023     *Expert Witness,* Report, Deposition, and Testimony
        Dekker, et al., v. Marstiller, et al., United States District Court, Northern District
        of Florida, Case No. 4:22-cv-oo325-RH-MAF
2022- 2025    *Expert Witness,* Report, Deposition, and Testimony
        Boe, et al., and United States, v. Marshall, et al., United States District Court,
        Middle District of Alabama Northern Division, Case No. 2:22-cv0-184-LCB.
2022           *Expert Witness,* Report
        Jeffrey Walker, et al., v. Steven Marshall, et al., United States District Court,
        Middle District of Alabama Northern Division
2022-Present   *Expert Witness,* Report and Testimony
        Jane Doe, et al., v. Greg Abbott, et al., District Court of Travis County, Texas
        353rd Judicial District, Case No. D-1-GN-22-000977
2021-2022     *Expert Witness*, Reports, Deposition, and Testimony
        Dylan Brandt, et al., v. Leslie Rutledge, et al., United States District Court,
        Eastern District of Arkansas, Case No.: 5:21-CV-00450-JM-1
2021           *Consultant*
Proctor & Gamble, Cincinnati, OH
2019           *Consultant*
Sanofi Genzyme, Cambridge, MA
2018-2023     *Consultant*
Center for Conflict Resolution in Healthcare, Memphis, TN
2017-2020     *Consultant*
Amicus Therapeutics, Cranbury, NJ
2017           *Expert Witness,* Report
Robert J. Klickovich, MD, PLLC v. Tristate Arthritis & Rheumatology, PSC, *et al.,*
        Commonwealth of Kentucky, Boone Circuit Court, Division III, Civil Action No.
        16-CI-01690
2017           *Consultant*
Sarepta Therapeutics, Cambridge, MA
2014           *Consultant*
Genzyme, A Sanofi Company, Cambridge, MA

**Editorial Experience**
Editorial Board
2020-Present *Pediatrics,* Associate Editor for Ethics Rounds and Member of the Executive
        Editorial Board
2015-2020     *Journal of Clinical Ethics*
2009-2020     *Journal of Medical Humanities*

Guest Academic Editor
2017           *PLOS|ONE*

Ad Hoc Reviewer:  *Academic Medicine, Academic Pediatrics, AJOB Primary Research,
American Journal of Bioethics, American Journal of Law & Medicine, American Journal of
Medical Genetics, American Journal of Transplantation, Archives of Disease in Childhood,*

*BMC Medical Ethics, BMJ Open, Canadian Journal of Bioethics, CHEST, Clinical Transplantation, European Journal of Human Genetics, European Journal of Pediatrics, Frontiers in Genetics, Hospital Medicine, International Journal of Health Policy and Management, International Journal of Nursing Studies, Journal of Adolescent and Young Adult Oncology, Journal of Clinical Ethics, Journal of Empirical Research on Human Research Ethics, Journal of General Internal Medicine, Journal of Healthcare Leadership, Journal of Hospital Medicine, Journal of the Kennedy Institute of Ethics, Journal of Law, Medicine & Ethics, Journal of Medical Ethics, Journal of Medical Humanities, Journal of Medicine and Life, Journal of Palliative Care, Journal of Pediatrics, Journal of Pediatric Surgery, Mayo Clinic Proceedings, Medicine, Healthcare and Philosophy, Molecular Diagnosis & Therapy, New England Journal of Medicine, Patient Preference and Adherence, Pediatrics, Pediatrics in Review, Personalized Medicine, PLOS|ONE, Risk Management and Healthcare Policy, Saudi Medical Journal, SSM - Qualitative Research in Health,* and *Theoretical Medicine and Bioethics*

## SCHOLASTIC AND PROFESSIONAL HONORS

| | |
|---|---|
| 2024 | *Member*, Sigma Xi: The Scientific Research Honor Society, Research Triangle Park, NC |
| 2023 | *Digital Health Award,* Bronze Medal in the Digital Health Media/Publications category for *Pediatric Collections: Ethics Rounds: A Casebook in Pediatric Bioethics Part II,* Health Information Resource Center, Libertyville, IL |
| 2021 | *Hidden Gem Award,* Cincinnati Children's Hospital Medical Center, Cincinnati, OH |
| 2019-2023 | *Presidential Citation,* American Society for Bioethics and Humanities, Chicago, IL |
| 2016 | *Laura Mirkinson, MD, FAAP Lecturer,* Section on Hospital Medicine, American Academy of Pediatrics, Elk Grove Village, IL |
| 2016, 2018 | *Certificate of Excellence*, American Society for Bioethics and Humanities, Glenview, IL |
| 2013, 2016 | *Senior Resident Division Teaching Award,* Cincinnati Children's Hospital Medical Center, Cincinnati, OH |
| 2012 | *Role Model*, Quality Review Committee, Primary Children's Medical Center, Salt Lake City, UT |
| 2011 | *Member*, Society for Pediatric Research, The Woodlands, TX |
| 2011 | *Presidential Citation*, American Society for Bioethics and Humanities, Glenview, IL |
| 2009 | *Role Model*, Quality Review Committee, Primary Children's Medical Center, Salt Lake City, UT |
| 2008 | *Nominee,* Physician of the Year, Primary Children's Medical Center, Salt Lake City, UT |
| 2005-2006 | *Fellow,* Medical Scholars Program, University of Utah School of Medicine, Salt Lake City, UT |
| 1995-1997 | *Doctoral Scholar*, Crossroads, A Program of Evangelicals for Social Action, Philadelphia PA |
| 1989-1992 | *Fellow*, The Pew Program in Medicine, Arts, and the Social Sciences, University of Chicago, Chicago, IL |

## ADMINISTRATIVE EXPERIENCE
### Administrative Duties

| | |
|---|---|
| 2023-2024 | *Chair,* Literature Selection Technical Review Committee, National Library of Medicine, Bethesda, MD |
| 2019-Present | *Chair,* Oversight Committee, Cincinnati Fetal Center, Cincinnati, OH |
| 2014-Present | *Chair*, Ethics Committee, Cincinnati Children's Hospital Medical Center, Cincinnati, OH |
| 2012-Present | *Director*, Ethics Center, Cincinnati Children's Hospital Medical Center, Cincinnati, OH |
| 2012-Present | *Chair,* Ethics Consultation Subcommittee, Cincinnati Children's Hospital Medical Center, Cincinnati, OH |
| 2010 | *Co-Chair,* Ethics Subcommittee, Work Group for Emergency Mass Critical Care in Pediatrics, Centers for Disease Control and Prevention, Atlanta, GA |
| 2009 | *Chair*, Ethics Working Group, H1N1 and Winter Surge, Primary Children's Medical Center, Salt Lake City, UT |
| 2005-2012 | *Chair*, Ethics Committee, Primary Children's Medical Center, Salt Lake City, UT |
| 2005-2012 | *Chair*, Ethics Consultation Subcommittee, Primary Children's Medical Center, Salt Lake City, UT |
| 2003-4 | *Chair*, Clinical Pertinence Committee, Primary Children's Medical Center, Salt Lake City, UT |

### Professional & Scientific Committees
Committees

| | |
|---|---|
| 2024-Present | *Member,* Program Committee, American Society for Bioethics and Humanities, Schaumburg, IL |
| 2023-Present | *Member,* Expert Committee, Humanitarian Access Program, Alnylam Pharmaceuticals, Cambridge, MA |
| 2021 | *Member*, EMCO Capacity Collaboration, Ohio Hospital Association, Columbus, OH |
| 2020-2021 | *Member*, Allocation of Scarce Resources Work Group, Ohio Hospital Association, Columbus, OH |
| 2020-2024 | *Member,* Literature Selection Technical Review Committee, National Library of Medicine, Bethesda, MD |
| 2020 | *Member*, Crisis Standards of Care Workgroup, The Health Collaborative, Cincinnati, OH |
| 2019-2023 | *Member,* Healthcare Ethics Consultant Certification Commission, Oak Park, IL |
| 2019 | *Member,* Expert Panel, Pediatric Oncology End-of-Life Care Quality Markers, Institute for Cancer Outcomes & Survivorship, University of Alabama at Birmingham, Birmingham, AL |
| 2018 | *Member,* Resource Planning and Allocation Team Implementation Task Force, Ohio Department of Health, Columbus, OH |
| 2012-2022 | *Member*, Gaucher Initiative Medical Expert Committee, Project HOPE, Millwood, VA |
| 2009-2014 | *Member,* Clinical Ethics Consultation Affairs Committee, American Society for Bioethics and Humanities, Glenview, IL |
| 2005-2011 | *Member,* Committee on Bioethics, American Academy of Pediatrics, Oak Park, IL |

Data Safety and Monitoring Boards

| | |
|---|---|
| 2019-Present | *Member,* Data and Safety Monitoring Board, Sickle Cell Domestic Trials, National Heart, Lung, and Blood Institute, Bethesda, MD |
| 2018-2019 | *Member,* Standing Safety Committee for P-188-NF (Carmeseal-MD$^{TM}$) in Duchenne Muscular Dystrophy, Phrixus Pharmaceuticals, Inc., Ann Arbor, MI |

A-5

2017-Present    *Member*, Observational Study Monitoring Board, Sickle Cell Disease Observational Monitoring Board, National Heart, Lung, and Blood Institute, Bethesda, MD

2016-2018    *Member*, Observational Study Monitoring Board, Long Term Effects of Hydroxyurea in Children with Sickle Cell Anemia, National Heart, Lung, and Blood Institute, Bethesda, MD

Reviewer

2020-2024    *Abstract Reviewer*, American Society for Bioethics and Humanities Annual Meeting

2020    *Grant Reviewer,* The Croatian Science Foundation, Hvatska zaklada za znanost (HRZZ)

2018    *Book Proposal Reviewer*, Elsevier

2018-2019    *Category Leader,* Religion, Culture, and Social Sciences, American Society for Bioethics and Humanities Annual Meeting

2017    *Timekeeper,* American Society for Bioethics and Humanities Annual Meeting

2017-Present    *Abstract Reviewer,* Pediatric Academic Societies Annual Meeting

2016-2021    *Workshop Reviewer*, Pediatric Academic Societies Annual Meeting

2016    *Grant Reviewer*, Innovation Research Incentives Scheme, The Netherlands Organisation for Health Research and Development

2016-2017    *Abstract Reviewer*, American Society for Bioethics and Humanities Annual Meeting

2014, 2016    *External Peer Reviewer*, PSI Foundation, Toronto, Ontario, Canada

2014    *Member,* Scientific Committee, International Conference on Clinical Ethics and Consultation

2013    *Abstract Reviewer*, American Society for Bioethics and Humanities Annual Meeting

2013    *Reviewer*, Open Research Area Plus, Agence Nationale de la Research, Deutsche Forschungsgemeinschaft, Economic and Social Research Council, National Science Foundation, and Organization for Scientific Research

2011-2012    *Abstract Reviewer,* Pediatric Academic Societies Annual Meeting

2011-2013    *Workshop Reviewer*, Pediatric Academic Societies Annual Meeting

2011-2014    *Abstract Reviewer*, Pediatric Hospital Medicine Annual Meeting

2011-2012    *Religious Studies Subcommittee Leader,* Program Committee, American Society for Bioethics and Humanities Annual Meeting

2010    *Abstract Reviewer*, American Society for Bioethics and Humanities Annual Meeting

Other

2023    *Member,* Student Paper Committee, American Society for Bioethics and Humanities

2021    *Timekeeper,* American Society for Bioethics and Humanities Annual Meeting

2021    *Mentor,* Early Career Advisor Professional Development Track, American Society for Bioethics and Humanities.

2021    *Mentor,* Early Career Advisor Paper or Project Track, American Society for Bioethics and Humanities.

2109    *Mentor*, Early Career Advising Program, American Society for Bioethics and Humanities

2018    *Passing Point Determination*, Healthcare Ethics Consultant-Certified Examination, Healthcare Ethics Consultant Certification Commission

2018    *Member*, Examination Committee, Healthcare Ethics Consultant-Certified Examination, Healthcare Ethics Consultant Certification Commission

A-6

2018            *Item Writer*, Healthcare Ethics Consultant-Certified Examination, Healthcare
                Ethics Consultant Certification Commission

## UNIVERSITY COMMUNITY ACTIVITIES
### Cincinnati Children's Hospital Medical Center
2025-Present  *Member*, Data Strategy Leadership Committee
2023-Present  *Member*, Artificial Intelligence Governance Council
2023-Present  *Member,* Executive Committee, Discover Together Biobank
2020-Present  *Member*, Faculty Diversity and Inclusion Steering Committee
2020-2022    *Member*, Medical Management of COVID-19 Committee
2020-2021    *Member,* Caregiver Refusal Team
2020-2021    *Member,* COVID-19 Vaccine Allocation Committee
2020        *Member*, Personal Protective Equipment Subcommittee of the COVID-19
                Steering. Committee
2018-2019    *Member,* Planning Committee, Center for Clinical & Translational Science &
                Training Research Ethics Conference
2017-Present  *Member*, Donor Selection Committee
2017-2020    *Member,* Employee Emergency Fund Review Committee
2017        *Member,* Root Cause Analysis Team
2016-2017    *Member,* Planning Committee, Center for Clinical & Translational Science &
                Training Research Ethics Conference
2015-2019    *Member,* Destination Excellence Medical Advisory Committee
2015-Present  *Member,* Disorders of Sexual Development Case Review Committee
2015-2019    *Member,* Destination Excellence Case Review Committee
2014-2018    *Member,* Genomics Review Group, Institutional Review Board
2014-2017    *Member,* Center for Pediatric Genomics Leadership Committee
2013-2017    *Member,* Genetic Testing Subcommittee, Health Network
2013-2016    *Member,* Schwartz Center Rounds Planning Committee
2013-2014    *Member*, Genomics Ad Hoc Subcommittee, Board of Directors
2012-Present  *Member,* Cincinnati Fetal Center Oversight Committee
2012-Present  *Member,* Ethics Committee
2012-Present  *Member,* G-23
2012-2016    *Member,* Integrated Solid Organ Transplant Steering Committee

### University of Utah
2009-2012    *Member,* Consolidated Hearing Committee

### University of Utah School of Medicine
2010-2012    *Member,* Medical Ethics, Humanities, and Cultural Competence Thread
                Committee
2008-2010    *Member,* Fourth Year Curriculum Committee

### University of Utah Department of Pediatrics
2010-2011    *Member,* Planning Committee, 25th Annual Biological Basis of Children's Health
                Conference, "Sex, Gender, and Sexuality"
2009-2012    *Member,* Medical Executive Committee
2005-2012    *Member,* Retention, Promotion, and Tenure Committee
2004-2012    *Interviewer,* Residency Program
2003-2012    *Member,* Education Committee

### Intermountain Healthcare
2009-2012    *Member,* System-Wide Bioethics Resource Service
2009-2012    *Member,* Pediatric Guidance Council

**Primary Children's Medical Center**

2012-2012    *Member,* Shared Accountability Organization Steering Committee
2009          *Member,* H1N1 and Winter Surge Executive Planning Team
2005-2010    *Member,* Continuing Medical Education Committee
2005-2010    *Member*, Grand Rounds Planning Committee
2003-2012    *Member*, Ethics Committee

## ACTIVE MEMBERSHIPS IN PROFESSIONAL SOCIETIES

2012-Present   Association of Bioethics Program Directors
2011-Present   Society for Pediatric Research
2000-Present   American Academy of Pediatrics
1999-Present   American Society of Bioethics and Humanities

## FUNDING
**Past Grants**

2015-2019    "Better Outcomes for Children: Promoting Excellence in Healthcare Genomics to
              Inform Policy."
              Percent Effort: 9%
              National Human Genome Research Institute
              Grant Number: 1U01 HG008666-01
              Role: Investigator

2015-2016    "Ethics of Informed Consent for Youth in Foster Care"
Direct Costs: $10,000
Ethics Grant, Center for Clinical and Translational Science and Training
University of Cincinnati Academic Health Center
Role:  Co-Investigator

2014-2015    "Extreme Personal Exposure Biomarker Levels: Engaging Community Physicians
              and Ethicists for Guidance"
              Direct Costs:  $11,640
              Center for Environmental Genetics
              University of Cincinnati College of Medicine
              Role: Investigator

2014-2015    "Child, Adolescent, and Parent Opinions on Disclosure Policies for Incidental
              Findings in Clinical Whole Exome Sequencing"
              Direct Costs:  $4,434
              Ethics Grant, Center for Clinical and Translational Science and Training,
              University of Cincinnati Academic Health Center
              Role:  Principal Investigator

2013-2014    "Better Outcomes for Children: GWAS & PheWAS in eMERGEII
Percent Effort:  5%
              National Human Genome Research Institute
              Grant Number: 3U01HG006828-0251
              Role: Investigator

| 2004-2005 | "Potential Patients' Knowledge, Attitudes, and Beliefs Regarding Participating in Medical Education: Can They be Interpreted in Terms of Presumed Consent?" Direct Costs: $8,000 Interdisciplinary Research in Applied Ethics and Human Values, University Research Committee, University of Utah Role: Principal Investigator |

## TEACHING RESPONSIBILITIES/ASSIGNMENTS
### Course and Curriculum Development

| 2003-2012 | Medical Ethics, Internal Medicine 7560, University of Utah School of Medicine, Taught 1 time per year, Taken by medical students, Enrollment 100 |

### Course Lectures

| 2018, 2021-Present | Introduction to Biotechnology, "Ethics and Biotechnology" and "Clinical Ethics," BIOL 3027, University of Cincinnati, Taught 1 time per year, Taken by undergraduate students, Enrollment 25. |
| 2018-Present | Biomedical Ethics, "Conscientious Objection in Healthcare" and "Ethical Issues in the Care of Transgender Adolescents," MEDS 4035 & MEDS 4036, University of Cincinnati College of Medicine, Taught 1 time per year, Taken by senior undergraduate students, Enrollment 52. |
| 2016 | Foundations of Healthcare Ethics and Law, "Clinical Ethics," HESA 390, Xavier University. |
| 2014-2020 | Physicians and Society, "Transfusion and the Jehovah's Witness Faith," "Obesity Management: Ethics, Policy, and Physician Implicit Bias," "Embryos and Ethics: The Ethics of Designer Babies," "Ethics and Genetic Testing," and "Ethics and Direct to Consumer Genetic Testing," 26950112 and 26950116, University of Cincinnati School of Medicine, Taken by first and second year medical students, Enrollment 100. |
| 2014-Present | Ethical Issues in Health Care, "Ethical Issues in Managing Drug Shortages: The Macro, Meso, and Micro Levels," HESA 583, College of Social Sciences, Health, and Education Health Services Administration, Xavier University, Taken by health services administration students, Enrollment 25. |
| 2009 | Physical Diagnosis II, Internal Medicine 7160, University of Utah School of Medicine, Taught 1 time per year, Taken by medical students, Enrollment 100 |
| 2003-2012 | Medical Ethics, Internal Medicine 7560, University of Utah School of Medicine, Taught 1 time per year, Taken by fourth year medical students, Enrollment 100 |

### Small Group Teaching

| 2024 | Clinical Ethics Consortium Tutorial B, BETH 731B, Harvard Medical School, Taught 1 time, Taken by Master of Science in Bioethics students. |
| 2018-Present | Ethics in Research, GNTD 7003-001, University of Cincinnati School of Medicine, Taught 1 time per year, Taken by fellows, MS, and PhD students, Enrollment 110. |
| 2007 | Physical Diagnosis I, Internal Medicine 7150, University of Utah School of Medicine, Taught 1 time per year, Taken by medical students, Enrollment 100 |
| 2003-2012 | Medical Ethics, Internal Medicine 7560, University of Utah School of Medicine, Taught 1 time per year, Taken by fourth medical students, Enrollment 100 |
| 2003 | Pediatric Organ System, Pediatrics 7020, University of Utah School of Medicine, Taught 1 time per year, Taken by medical students, Enrollment 100 |

A-9

**Graduate Student Committees**

2018-2022    *Chair,* Scholarship Oversight Committee, William Sveen, Pediatric Critical Care Fellowship, Cincinnati Children's Hospital Medical Center, Cincinnati, OH

2018-2020    *Member*, Scholarship Oversight Committee, Anne Heuerman, Genetic Counseling, University of Cincinnati, Cincinnati, OH

2017-2019    *Chair*, Scholarship Oversight Committee, Bryana Rivers, Genetic Counseling, University of Cincinnati, Cincinnati, OH

2013-2015    *Mentor*, Sophia Hufnagel, Combined Pediatrics/Genetics Residency, Cincinnati Children's Hospital Medical Center, Cincinnati, OH

2013-2015    *Co-Chair,* Scholarship Oversight Committee, Andrea Murad, Genetic Counseling, University of Cincinnati, Cincinnati, OH

2013-2014    *Member*, Scholarship Oversight Committee, Grace Tran, Genetic Counseling, University of Cincinnati, Cincinnati, OH

2011-2012    *Chair,* Scholarship Oversight Committee, Kevin E. Nelson, MD, PhD, Pediatric Inpatient Medicine Fellowship, University of Utah, Salt Lake City, UT

**Continuing Education Lectures**

2008    Choosing Healthplans All Together (CHAT) Exercise Facilitator, 18th Annual Intermountain Medical Ethics Conference, "Setting Priorities for Healthcare in Utah: What Choices are We Ready to Make?," Salt Lake City, Utah, October 3.

2007    *Speaker*, Infant Medical Surgical Unit, Primary Children's Medical Center, "Withholding and Withdrawing Artificial Nutrition and Hydration: Can It Be Consistent With Care?," Salt Lake City, Utah, September 6.

2007    *Faculty Scholar-in Residence,* Summer Seminar, "The Role of Religion in Bioethics," Utah Valley State College, Orem, Utah, May 1.

2006    *Workshop Leader,* Faculty Education Retreat, "Publications and Publishing in Medical Education," University of Utah School of Medicine, Salt Lake City, Utah, September 15.

2006    *Breakout Session,* 16th Annual Intermountain Medical Ethics Conference, "Donation after Cardiac Death:  Evolution of a Policy," Salt Lake City, Utah, March 28.

**Other Educational Activities**

2008    *Instructor*, Contemporary Ethical Issues in Medicine and Medical Research, Osher Lifelong Learning Institute, University of Utah, "Religion and Bioethics: Religiously Based Demands for and Refusals of Treatment," Salt Lake City, Utah, February 7.

2007    *Speaker*, Biology Seminar, Utah Valley State College, "Is He Dead?: Criteria of the Determination of Death and Their Implications for Withdrawing Treatment and Recovering Organs for Transplant," Orem, Utah, September 21.

## PEER-REVIEWED JOURNAL ARTICLES

1.  <u>Armand H. Matheny Antommaria</u>, Matthew Kelleher, and Rachel J. Peterson. (In Press) "Quality of Evidence and Strength of Recommendations in American Academy of Pediatrics' Guidelines." *Pediatrics.*

2.  <u>Armand H. Matheny Antommaria</u>. (2024) "Decision Making for Adolescents with Gender Dysphoria." *Perspectives in Biology and Medicine*. 67: 244-60. PMID: 38828602.

3.  Erica K. Salter, D. Micah Hester, Lou Vinarcsik, <u>Armand H. Matheny Antommaria</u>, Johan Bester, Jeffrey Blustein, Ellen Wright Clayton, Douglas S. Diekema, Ana S. Iltis, Loretta M. Kopelman, Jay R. Malone, Mark R. Mercurio, Mark C. Navin, Erin Talati Paquette, Thaddeus Mason Pope, Rosamond Rhodes, and Lainie F. Ross, (2023) "Pediatric Decision Making: Consensus Recommendations," *Pediatrics.* 152: e2023061832. PMID: 37555276.

4.  William N. Sveen, <u>Armand H. Matheny Antommaria,</u> Stephen Gilene, and Erika L. Stalets. (2023) "Adverse Events During Apnea Testing for the Determination of Death by Neurologic Criteria:  A Single Center, Retrospective Pediatric Cohort." *Pediatric Critical Care Medicine.* 24: 399-405. PMID: 36815829.

5. Erica K. Salter, Jay R. Malone, Amanda Berg, Annie B. Friedrich, Alexandra Hucker, Hillary King, and Armand H. Matheny Antommaria. (2023) "Triage Policies at U.S. Hospitals with Pediatric Intensive Care Units." *AJOB Empirical Bioethics*. 14: 84-90. PMID: 36576201.

6. Armand H. Matheny Antommaria, Elizabeth Lanphier, Anne Housholder, and Michelle McGowan. (2023). "A Mixed Methods Analysis of Requests for Religious Exemptions to a COVID-19 Vaccine Requirement." *AJOB Empirical Bioethics*. 14: 15-22. PMID: 36161802.

7. Anne C Heuerman, Danielle Bessett, Armand H. Matheny Antommaria, Leandra. K. Tolusso, Nicki Smith, Alison H. Norris and Michelle L. McGowan (2022). "Experiences of Reproductive Genetic Counselors with Abortion Regulations in Ohio." *Journal of Genetic Counseling*. 31: 641-652.  PMID: 34755409.

8. Armand H. Matheny Antommaria and Ndidi I. Unaka. (2021) "Counterpoint: Prioritizing Health Care Workers for Scarce Critical Care Resources is Impractical and Unjust. *Journal of Hospital Medicine*. 16: 182-3. PMID 33617445.

9. Gregory A. Grabowski, Armand H. Matheny Antommaria, Edwin H. Kolodny, and Pramod K. Mistry. (2021) "Gaucher Disease: Basic and Translational Science Needs for More Complete Therapy and Management." *Molecular Genetics and Metabolism*. 132: 59-75. PMID: 33419694.

10. Armand H. Matheny Antommaria, Laura Monhollen, and Joshua K. Schaffzin. (2021) "An Ethical Analysis of Hospital Visitor Restrictions and Masking Requirements During the COVID-19." *Journal of Clinical Ethics*. 32(1): 35-44. PMID 33416516.

11. Armand H. Matheny Antommaria (2020) "The Pediatric Hospital Medicine Core Competencies: 4.05 Ethics." *Journal of Hospital Medicine*. 15(S1): 120-121.

12. Armand H. Matheny Antommaria, Tyler S. Gibb, Amy L. McGuire, Paul Root Wolpe, Matthew K. Wynia, Megan K. Applewhite, Arthur Caplan, Douglas S. Diekema, D. Micah Hester, Lisa Soleymani Lehmann, Renee McLeod-Sordjan, Tamar Schiff, Holly K. Tabor, Sarah E. Wieten, and Jason T. Eberl for a Task Force of the Association of Bioethics Program Directors (2020) "Ventilator Triage Policies During the COVID-19 Pandemic at U.S. Hospitals Associated With Members of the Association of Bioethics Program Directors." *Annals of Internal Medicine*. 173(3): 188-194. PMID: 32330224.

13. Armand H. Matheny Antommaria (2020) "Conflicting Duties and Reciprocal Obligations During a Pandemic." *Journal of Hospital Medicine*. 5:284-286. PMID: 32379030.

14. Mary V. Greiner, Sarah J. Beal, and Armand H. Matheny Antommaria (2020) "Perspectives on Informed Consent Practices for Minimal-Risk Research Involving Foster Youth." *Pediatrics*. 45:e20192845. PMID: 32156772.

15. Jennifer deSante-Bertkau, Michelle McGowan, and Armand H. Matheny Antommaria (2018) "Systematic Review of Typologies Used to Characterize Clinical Ethics Consultations." *Journal of Clinical Ethics*. 29:291-304. PMID: 30605439.

16. Andrew J. Redmann, Melissa Schopper, Armand H. Matheny Antommaria, Judith Ragsdale, Alessandro de Alarcon, Michael J. Jutter, Catherine K. Hart, and Charles M. Myer. (2018) "To Transfuse or Not to Transfuse? Jehovah's Witnesses and PostOperative Hemorrhage in Pediatric Otolaryngology." *International Journal of Pediatric Otorhinolaryngology*. 115:188-192. PMID: 30368384.

17. Armand H. Matheny Antommaria, Kyle B. Brothers, John A. Myers, Yana B Feygin, Sharon A. Aufox, Murray H. Brilliant, Pat Conway, Stephanie M. Fullerton, Nanibaa' A. Garrison, Carol R. Horowitz, Gail P. Jarvik, Rongling Li, Evette J. Ludman, Catherine A. McCarty, Jennifer B. McCormick, Nathaniel D. Mercaldo, Melanie F. Myers, Saskia C. Sanderson, Martha J. Shrubsole, Jonathan S. Schildcrout, Janet L. Williams, Maureen E. Smith, Ellen Wright Clayton, Ingrid A. Holm. (2018) "Parents' Attitudes toward Consent and Data Sharing in Biobanks: A Multi-Site Experimental Survey." *AJOB Empirical Research*. 21:1-15. PMID:  30240342.

18. <u>Armand H. Matheny Antommaria</u> and Cynthia A. Prows. (2018) "Content Analysis of Requests for Religious Exemptions from a Mandatory Influenza Vaccination Program for Healthcare Personnel" *Journal of Medical Ethics.* 44: 389-391. PMID: 29463693.

19. <u>Armand H. Matheny Antommaria</u> (2017) "May Medical Centers Give Nonresident Patients Priority in Scheduling Outpatient Follow-Up Appointments?" *Journal of Clinical Ethics.* 28: 217-221. PMID: 28930708.

20. Andrea M. Murad, Melanie F. Myers, Susan D. Thompson, Rachel Fisher, and <u>Armand H. Matheny Antommaria</u> (2017) "A Qualitative Study of Adolescents' Understanding of Biobanks and Their Attitudes Toward Participation, Re-contact, and Data Sharing." *American Journal of Medical Genetics: Part A.* 173: 930-937. PMID: 28328120.

21. Saskia Sanderson, Kyle Borthers, Nathaniel Mercaldo, Ellen Wright Clayton, <u>Armand Antommaria</u>, Sharon Aufox, Murray Brillant, Diego Campos, David Carrell, John Connolly, Pat Conway, Stephanie Fullerton, Nanibaa Garrison, Carol Horowitz, Gail Jarvik, David Kaufman, Terrie Kitchner, Rongling Li, Evette Ludman, Cahterine McCarty, Jennifer McCormick, Valerie McManus, Melanie Myers, Aaron Scrol, Janet Williams, Martha Shrubsole, Jonathan Schildcrout, Maureen Smith, and Ingrid Holm (2017) "Public Attitudes Towards Consent and Data Sharing in Biobank Research: A Large Multisite Experimental Survey in the US." *The American Journal of Human Genetics*. 100: 414-427. PMID: 28190457.

22. Maureen E. Smith, Saskia C Sanderson, Kyle B Brothers, Melanie F Myers, Jennifer McCormick, Sharon A Aufox, Martha J Shrubsole, Nanibaa' A Garrison, Nathaniel D Mercaldo, Jonathan S Schildcrout, Ellen Wright Clayton, <u>Armand H. Matheny Antommaria</u>, Melissa Basford, Murray Brilliant, John J Connolly, Stephanie M Fullerton, Carol R Horowitz, Gail P Jarvik, Dave Kaufman, Terrie Kitchner, Rongling Li, Evette J Ludman, Catherine McCarty, Valerie McManus, Sarah C Stallings, Janet L Williams, and Ingrid A Holm (2016) "Conducting a Large, Multi-Site Survey about Patients' Views on Broad Consent: Challenges and Solutions." *BMC Medical Research Methodology.* 16: 162. PMID: 27881091.

23. Angela Lorts, Thomas D. Ryan, <u>Armand H. Matheny Antommaria</u>, Michael Lake, and John Bucuvalas (2016) "Obtaining Consensus Regarding International Transplantation Continues to be Difficult for Pediatric Centers in the United States." *Pediatric Transplant.* 20: 774-777. PMID: 27477950.

24. Sophia B. Hufnagel, Lisa J. Martin, Amy Cassedy, Robert J. Hopkin, and <u>Armand H. Matheny Antommaria</u> (2016) "Adolescents' Preferences Regarding Disclosure of Incidental Findings in Genomic Sequencing That Are Not Medically Actionable in Childhood." *American Journal of Medical Genetics Part A.* 170: 2083-2088. PMID: 27149544.

25. Nanibaa' A. Garrison, Nila A. Sathe, <u>Armand H. Matheny Antommaria</u>, Ingrid A. Holm, Saskia Sanderson, Maureen E. Smith, Melissa McPheeters, and Ellen Wright Clayton (2016) "A Systematic Literature Review of Individuals' Perspectives on Broad Consent and Data Sharing in the United States." *Genetics in Medicine.* 18: 663-71. PMID: 26583683.

26. Kyle B. Brothers, Ingrid A. Holm Janet E. Childerhose, <u>Armand H. Matheny Antommaria</u>, Barbara A. Bernhardt, Ellen Wright Clayton, Bruce D. Gelb, Steven Joffe, John A. Lynch, Jennifer B. McCormick, Laurence B. McCullough, D. William Parsons, Agnes S. Sundaresan, Wendy A. Wolf, Joon-Ho Yu, and Benjamin S. Wilfond (2016) "When Genomic Research Participants Grow Up: Contact and Consent at the Age of Majority." *The Journal of Pediatrics* 168: 226-31. PMID: 26477867.

27. Erin E. Bennett, Jill Sweney, Cecile Aguayo, Criag Myrick, <u>Armand H. Matheny Antommaria</u>, and Susan L. Bratton (2015) "Pediatric Organ Donation Potential at a Children's Hospital." *Pediatric Critical Care Medicine.* 16: 814-820. PMID: 26237656.

28. Anita J. Tarzian, Lucia D. Wocial, and the ASBH Clinical Ethics Consultation Affairs Committee (2015) "A Code of Ethics for Health Care Ethics Consultants: Journey to the Present and Implications for the Field." *American Journal of Bioethics*. 15: 38-51. PMID: 25970392.

29. Armand H. Matheny Antommaria, Christopher A. Collura, Ryan M. Antiel, and John D. Lantos (2015) "Two Infants, Same Prognosis, Different Parental Preferences." *Pediatrics*, 135: 918-923. PMID: 25847802.

30. Stefanie Benoit, Armand H. Matheny Antommaria, Norbert Weidner, and Angela Lorts (2015) "Difficult Decision: What should we do when a VAD supported child experiences a severe stroke?" *Pediatric Transplantation* 19: 139-43. PMID: 25557132.

31. Kyle B. Brothers, John A. Lynch, Sharon A. Aufox, John J. Connolly, Bruce D. Gelb, Ingrid A. Holm, Saskia C. Sanderson, Jennifer B. McCormick, Janet L. Williams, Wendy A. Wolf, Armand H. Matheny Antommaria, and Ellen W. Clayton (2014) "Practical Guidance on Informed Consent for Pediatric Participants in a Biorepository." *Mayo Clinic Proceedings,* 89: 1471-80. PMID: 25264176.

32. Sophia M. Bous Hufnagel and Armand H. Matheny Antommaria (2014) "Laboratory Policies on Reporting Secondary Findings in Clinical Whole Exome Sequencing: Initial Uptake of the ACMG's Recommendations." *American Journal of Medical Genetics Part A*, 164: 1328-31. PMID: 24458369.

33. Wylie Burke, Armand H. Matheny Antommaria, Robin Bennett, Jeffrey Botkin, Ellen Wright Clayton, Gail E. Henderson, Ingrid A. Holm, Gail P. Jarvik, Muin J. Khoury, Bartha Maria Knoppers, Nancy A. Press, Lainie Friedman Ross, Mark A. Rothstein, Howard Saal, Wendy R. Uhlmann, Benjamin Wilfond, Susan M. Wold, and Ron Zimmern (2013) "Recommendations for Returning Genomic Incidental Findings? We Need to Talk!" *Genetics in Medicine*, 15: 854-859. PMID: 23907645.

34. Armand H. Matheny Antommaria (2013) "An Ethical Analysis of Mandatory Influenza Vaccination of Health Care Personnel: Implementing Fairly and Balancing Benefits and Burdens," *American Journal of Bioethics*, 13: 30-37. PMID: 23952830.

35. Joseph A. Carrese and the Members of the American Society for Bioethics and Humanities Clinical Ethics Consultation Affairs Standing Committee (2012) "HCEC Pearls and Pitfalls: Suggested Do's and Don't's for Healthcare Ethics Consultants," *Journal of Clinical Ethics*, 23: 234-240. PMID: 23256404.

36. Christopher G Maloney, Armand H Matheny Antommaria, James F Bale Jr., Jian Ying, Tom Greene and Rajendu Srivastiva (2012) "Factors Associated with Intern Noncompliance with the 2003 Accreditation Council for Graduate Medical Education's 30-hour Duty Period Requirement," *BMC Medical Education* 12: 33. PMID: 22621439.

37. Armand H. Matheny Antommaria, Jill Sweney, and W. Bradley Poss (2010) "Critical Appraisal of: Triaging Pediatric Critical Care Resources During a Pandemic: Ethical and Medical Considerations," *Pediatric Critical Care Medicine,* 11:396-400. PMID: 20453611.

38. Armand H. Matheny Antommaria, Karen Trotochaud, Kathy Kinlaw, Paul N. Hopkins, and Joel Frader (2009) "Policies on Donation After Cardiac Death at Children's Hospitals: A Mixed-Methods Analysis of Variation," *Journal of the American Medical Association,* 301: 1902-8. PMID: 19436017.

39. Kristine M. Pleacher, Elizabeth S. Roach, Willem Van der Werf, Armand H. Matheny Antommaria, and Susan L. Bratton (2009) "Impact of a Pediatric Donation after Cardiac Death Program," *Pediatric Critical Care Medicine,* 10: 166-70. PMID: 19188881.

40. Flory L. Nkoy, Sarah Petersen, Armand H Matheny Antommaria, and Christopher G. Maloney (2008) "Validation of an Electronic System for Recording Medical Student Patient Encounters," *AMIA [American Medical Informatics Association] Annual Symposium Proceedings*, 6: 510-14. PMID: 18999155. Nominated for the Distinguished Paper Award

41. Armand H. Matheny Antommaria, Sean D. Firth, and Christopher G. Maloney (2007) "The Evaluation of an Innovative Pediatric Clerkship Structure Using Multiple Outcome Variables including Career Choice" *Journal of Hospital Medicine*, 2: 401-408. PMID: 18081170.

42. Armand H. Matheny Antommaria (2006) "'Who Should Survive?: One of the Choices on Our Conscience.' Mental Retardation and the History of Contemporary Bioethics." *Kennedy Institute of Ethics Journal*, 16: 205-224. PMID: 17091558.

43. <u>Armand H. Matheny Antommaria</u> (2004) "Do as I Say Not as I Do: Why Bioethicists Should Seek Informed Consent for Some Case Studies." *Hastings Center Report,* 34 (3): 28-34. PMID: 15281724.
44. <u>Armand H. Matheny Antommaria</u> (2004) "A Gower Maneuver:  The American Society for Bioethics and Humanities' Resolution of the 'Taking Stands' Debate." *American Journal of Bioethics,* 4 (Winter): W24-27. PMID: 15035934.

## NON PEER-REVIEWED JOURNAL ARTICLES

1. Katherine Wade and <u>Armand H. Matheny Antommaria</u> (2016) "Inducing HIV Remission in Neonates: Children's Rights and Research Ethics." *Journal of Medicine and Biology*, 58(3): 348-54.  PMID 27157354.
2. <u>Armand H. Matheny Antommaria</u> (2014) "Response to Open Peer Commentaries on 'An Ethical Analysis of Mandatory Influenza." *American Journal of Bioethics,* 14(7): W1-4. PMID: 24978422.
3. <u>Armand H. Matheny Antommaria</u> and Brent D. Kaziny (2012) "Ethical Issues in Pediatric Emergency Medicine's Preparation for and Response to Disasters." *Virtual* Mentor, 14: 801-4. PMID: 23351860.
4.  <u>Armand H. Matheny Antommaria,</u> Tia Powell, Jennifer E. Miller, and Michael D. Christian (2011) "Ethical Issues in Pediatric Emergency Mass Critical Care," *Pediatric Critical Care Medicine*, 12(6 Suppl): S163-8. PMID: 22067926.
5. <u>Armand H. Matheny Antommaria</u> and Emily A. Thorell (2011) "Non-Pharmaceutical Interventions to Limit Transmission of a Pandemic Virus: The Need for Complementary Programs to Address Children's Diverse Needs." *Journal of Clinical Ethics,* 22: 25-32. PMID: 21595352.
6. <u>Armand H. Matheny Antommaria</u> (2010) "Conscientious Objection in Clinical Practice: Notice, Informed Consent, Referral, and Emergency Treatment." *Ave Maria Law Review*, 9: 81-99.
7. <u>Armand H. Matheny Antommaria</u> (2008) "Defending Positions or Identifying Interests: The Uses of Ethical Argumentation in the Debate over Conscience in Clinical Practice," *Theoretical Medicine and Bioethics,* 29: 201-12. PMID: 18821078.
8. <u>Armand H. Matheny Antommaria</u> (2008) "How can I give her IV antibiotics at home when I have three other children to care for?: Using Dispute System Design to Address Patient-Provider Conflicts in Health Care." *Hamline Journal of Public Law & Policy*, 29: 273-86.
9. <u>Armand H. Matheny Antommaria</u> (2007) "Alternative Dispute Resolution and Pediatric Clinical Ethics Consultation: Why the Limits of Ethical Expertise and the Indeterminacy of the Best Interests Standard Favor Mediation." *Ohio State Journal on Dispute Resolution,* 23: 17-59.
10. <u>Armand H. Matheny Antommaria</u> (2006) "Jehovah's Witnesses, Roman Catholicism, and Calvinism: Religion and State Intervention in Parental, Medical Decision-Making," *Journal of Law and Family Studies,* 8: 293-316.
11. <u>Armand H. Matheny Antommaria</u> and James F. Bale, Jr. (2002) "Ethical Issues in Clinical Practice: Cases and Analyses," *Seminars in Pediatric Neurology* 9: 67-76. PMID: 11931129.

## REVIEW ARTICLES

<u>Armand H. Matheny Antommaria</u> (2010) "Conceptual and Ethical Issues in the Declaration of Death: Current Consensus and Controversies." *Pediatrics in Review* 31: 427-430. PMID: 20889737.

## BOOKS

1. <u>Armand  H.  Matheny  Antommaria, ed. (2022) *Ethics  Rounds:  A  Casebook  in  Pediatric Bioethics Part II*. Itasca, IL: American Academy of Pediatrics.</u>

2. Armand H. Matheny Antommaria (1998) *A Retrospective, Political and Ethical Analysis of State Intervention into Parental Healthcare Decisions for Infants with Disabilities*. Wynnewood, Pennsylvania: Evangelicals for Social Action.

**BOOK CHAPTERS**
1. Armand H. Matheny Antommaria (2018) "Against Medical Advice Discharges: Pediatric Considerations." In *Against-Medical-Advice Discharges from the Hospital: Optimizing Prevention and Management to Promote High-Quality, Patient-Centered Care*. David Alfandre. New York, Springer: 143-157.
2. Armand H. Matheny Antommaria (2016) "Conscientious Objection in Reproductive Medicine." In *The Oxford Handbook of Reproductive Ethics*. Leslie Francis. Oxford, Oxford University Press: 209-225.
3. Armand H. Matheny Antommaria (2011) "Patient Participation in Medical Education." In *Clinical Ethics in Pediatrics: A Case-based Approach*. Douglas Diekema, Mark Mercurio, and Mary Beth Adam. Cambridge, Cambridge University Press: 221-225.
4. Armand H. Matheny Antommaria (2011) "State Intervention in Parental Decision Making: *Gone Baby Gone*." In *The Picture of Health: Medical Ethics and the Movies*. Henri Colt, Silvia Quadrelli, and Lester Friedman. Oxford, Oxford University Press: 308-12.
5. Armand H. Matheny Antommaria (2009) "Managing Conflicts of Interest: A Perspective from a Pediatrician." In *Professionalism in Medicine: The Case-Based Guide for Medical Students*. John Spandorfer, Charles Pohl, Thomas Nasca and Susan Lee Rattner. Cambridge, Cambridge University Press: 376-7.
6. Armand H. Matheny Antommaria (2007) "Do-Not-Resuscitate Orders." In *Comprehensive Pediatric Hospital Medicine*. L. B. Zaoutis and V. W. Chiang. Philadelphia, Mosby Elsevier**:** 1200-4.

**OTHER**
**Policy Statements and Technical Reports**
1. American Academy of Pediatrics Committee on Bioethics. Armand H. Matheny Antommaria Lead Author. (2013)  "Conflicts between Religious or Spiritual Beliefs and Pediatric Care: Informed Refusal, Exemptions, and Public Funding." *Pediatrics*. 132: 962-965. PMID: 24167167.
2. American Academy of Pediatrics Committee on Bioethics. Armand H. Matheny Antommaria Lead Author. (2013) "Ethical Controversies in Organ Donation After Circulatory Death." *Pediatrics*. 131: 1021-1026. PMID: 23629612.
3. American Academy of Pediatrics Committee on Bioethics and Committee on Genetics and the American College of Medical Genetics and Genomics Social, Ethical, and Legal Issues Committee (2013) "Policy Statement: Ethical and Policy Issues in Genetic Testing and Screening of Children." *Pediatrics*. 131: 620-622. PMID: 23428972.
4. Lainie Friedman Ross, Howard M. Saal, Karen L. David, Rebecca R. Anderson and the American Academy of Pediatrics Committee on Bioethics and Committee on Genetics and the American College of Medical Genetics and Genomics Social, Ethical, and Legal Issues Committee (2013) "Technical Report: Ethical and Policy Issues in Genetic Testing and Screening of Children." *Genetics in Medicine*. 15: 234-245. PMID: 23429433.
5. American Academy of Pediatrics Committee for Pediatric Research and Committee on Bioethics (2012) "Human Embryonic Stem Cell (hESC) and Human Embryo Research." *Pediatrics* 130: 972-977. PMID: 23109685.
6. American College of Obstetricians and Gynecologists, Committee on Ethics and American Academy of Pediatrics, Committee on Bioethics (2011) "Maternal-Fetal Intervention and Fetal Care Centers," *Pediatrics* 128;  e473-e478. PMID: 21788223.
7. American Academy of Pediatrics Committee on Pediatric Emergency Medicine and Committee on Bioethics (2011) "Consent for Emergency Medical Services for Children and Adolescents." *Pediatrics* 128: 427-433. PMID: 21788221.

8. Council on School Health and Committee on Bioethics. Robert Murray and <u>Armand H. Matheny Antommaria</u> Lead Authors. (2010) "Honoring –Do-Not-Attempt Resuscitation Requests in Schools." *Pediatrics* 125; 1073-1077. PMID: 20421255.

9. Committee on Bioethics (2010) "Ritual Genital Cutting of Female Minors." *Pediatrics* 125; 1088-1093. PMID: 20421257.

10. Committee on Bioethics.  (2010) "Children as Hematopoietic Stem Cell Donors," *Pediatrics* 125; 392-40. PMID: 20100753.

11. Committee on Bioethics.  <u>Armand H. Matheny Antommaria</u> Lead Author. (2009) "Physician Refusal to Provide Information or Treatment Based on Claims of Conscience." *Pediatrics.* 124;  1689-93. PMID: 19948636.

12. Committee on Bioethics (2009) "Pediatrician-Family-Patient Relationships: Managing the Boundaries." *Pediatrics* 124; 1685-8. PMID: 19948635.

13. Douglas S. Diekema, Jeffrey R. Botkin, and Committee on Bioethics (2009) "Forgoing Medically Provided Nutrition and Hydration in Children." *Pediatrics* 124; 813-22. PMID: 19651596.

14. Lainie Friedman Ross, J. Richard Thistlethwaite, Jr., and the Committee on Bioethics (2008) "Minors as Living Solid-Organ Donors." *Pediatrics* 122: 454-61. PMID: 18676567.

15. Mary E. Fallat, John Hutter, and Section on Hematology Oncology and Section on Surgery the Committee on Bioethics (2008) "Preservation of Fertility in Pediatric and Adolescent Patients with Cancer." *Pediatrics* 121: 1461-9. PMID: 18450888.

16. Marcia Levetown and Bioethics and the Committee on Bioethics (2008) "Communicating With Children and Families: From Everyday Interactions to Skill in Conveying Distressing Information." *Pediatrics* 121: 1441-60. PMID: 18450887.

17. American Academy of Pediatrics. Committee on Bioethics (2007) "Professionalism in Pediatrics: Statement of Principles." *Pediatrics* 120:895-7. PMID: 17908776.

**Ethics Rounds**

1. Agustín Silberberg, Thomas Iolster, Christian Pizarro, Adrienne Borschuk, Josefina Castro Méndez, Christian Kreutzer, and <u>Armand H. Matheny Antommaria</u>. (2025) "A Controversial Clinical Case of a Child With Hypoplastic Left Heart Syndrome." *Pediatrics*. Jan 15: e2024065655. Online ahead of print. PMID: 39813140.

2. Imogen Clover-Brown, Bryanna More, Christina G. Andrews, and <u>Armand H. Matheny Antommaria.</u> (2023) "Ethical Issues With Patient-Provider Interactions in an Evolving Social Media Landscape." *Pediatrics.* 151: e2022060066. PMIC 3765789.

3. Maeghann S. Weaver, Marianne E. M. Yee, Courtney E. Lawrence, <u>Armand H. Matheny Antommaria,</u> and Ross M. Fasano. (2023) "Requests for Directed Blood Donations." *Pediatrics*. 151: e2022058183. PMID: 36897227.

4. Erwin Jiayuan Khoo, Devan M. Duenas, Benjamin S. Wilfond, Luke Gelinas, <u>Armand H. Matheny Antommaria</u>. (2023) "Incentives in Pediatric Research in Developing Countries: When Are They Too Much?" *Pediatrics*.  141: e2021055702. PMID: 36660851.

5. Kim Mooney-Doyle, Kimberly A. Pyke-Grimm, Ashley Foster Lanzel, Kathleen E. Montgomery, Jamila Hassan, Anisha Thompson, Rebecca Rouselle, and <u>Armand H. Matheny Antommaria.</u> (2022) "Balancing Protection and Progress in Pediatric Palliative Care Research: Stakeholder Perspectives." *Pediatrics*. 150: e2022057502.  PMID: 36069137.

6. Megan H. Pesch, Phoebe Dazinger, Lainie Friedman Ross, and <u>Armand H. Matheny Antommaria.</u> (2022) "An Ethical Analysis of Newborn Congenital Cytomegalovirus Screening." *Pediatrics*. 149: e2021055368.  PMID: 35641472.

7. Ian D. Wolfe, Don Brunnquell, Rena Sorensen, and <u>Armand H. Matheny Antommaria</u>. (2022) "Should Tactile Defensiveness Exclude a Life-Sustaining Intervention in an Adolescent With Autism?" *Pediatrics*. 149: e2021054469. PMID: 35229117.

8. Jennifer E. deSante-Bertkau, Timothy K. Knilans, Govind Persad, Patricia J. Zettler, Holly Fernandez Lynch, and <u>Armand H. Matheny Antommaria</u>. (2021) "Off-Label Prescription of COVID-19 Vaccines in Children: Clinical, Ethical, and Legal Issues." *Pediatrics*. 149: e2021054578. PMID: 34615694.

9. Jamilah M. Hackworth, Meera Kotagal, O. N. Ray Bignal, 2nd, Ndidi Unaka, and <u>Armand H. Matheny Antommaria.</u> (2021) "Microaggressions: Privileged Observers' Duty to Act and What They Can Do." *Pediatrics*. 148: e2021052758. PMID: 34417286.

10. Elizabeth Lanphier, Luke Mosley, and <u>Armand H. Matheny Antommaria.</u> (2021) "Assessing Visitor Policy Exemption Requests During the COVID-19 Pandemic." *Pediatrics*. 148: e2021051254. PMID: 33990461.

11. Natalie Lanocha, Tyler Tate, Erica Salter, Nanette Elster, and <u>Armand H. Matheny Antommaria.</u> (2021) "Can Parents Restrict Access to Their Adolescent's Voice?: Deciding About a Tracheostomy." *Pediatrics*. 147: e2021050358. PMID 33785636.

12. Timothy Crisci, Zeynep N. Inanc Salih, Ndidi Unaka, Jehanna Peerzada, and <u>Armand H. Matheny Antommaria.</u> (2021) "What Should an Intern Do When She Disagrees With the Attending?" *Pediatrics*. 147: e2020049646. PMID 33627371.

13. Liza-Marie Johnson, Erica C. Kaye, Kimberly Sawyer, Alex M. Brenner, Stefan J. Friedrichsdorf, Abby R. Rosenberg, <u>Armand H. Mathey Antommaria</u>. (2021) "Opioid Management in the Dying Child With Addiction." *Pediatrics* 147: e2020046219. PMID 33446508.

**Continuing Medical Education**

1. Armand H. Matheny Antommaria (2014) Authored 4 questions. NEJM Knowledge+ Family Medicine Board Review. NEJM Group.

2. Armand H. Matheny Antommaria (2009) "Hot Topics: Ethics and Donation After Cardiac Death [online course]. PediaLink. American Academy of Pediatrics. October 24. http://ethics.ht.courses.aap.org/.  Accessed December 14. 2009.

**Editorials**

1. <u>Armand H. Matheny Antommaria</u>, Chris Feudtner, Mary Beth Benner, and Felicia Cohn on Behalf of the Healthcare Ethics Consultant-Certified Certification Commission (2020) "The Healthcare Ethics Consultant-Certified Program: Fair, Feasible, and Defensible, But Neither Definite Nor Finished," *American Journal of Bioethics* 20:1-5. PMID: 32105202.

2. <u>Armand H. Matheny Antommaria</u> and Pamela W. Popp (2020) "The Potential Roles of Surrogacy Ladders, Standby Guardians, and Medicolegal Partnerships, in Surrogate Decision Making for Parents of Minor Children," *Journal of Pediatrics* 220:11-13. PMID 31952849.

**Commentaries**

1. <u>Armand H. Matheny Antommaria</u>. (In Press) "Inaccurate Criteria for Conscientious Objection and Invidious Discrimination Threaten Patients' Access." *American Journal of Bioethics*.

2. Jerry Schwartz, Dawn Nebrig, Laura Monhollen, and <u>Armand H. Matheny Antommaria.</u> (2023) "Transforming Behavior Contracts into Collaborative Commitments with Families." *American Journal of Bioethics*. 23(1): 73-75.  PMID: 36594997.

3. <u>Armand H. Matheny Antommaria</u> and Elizabeth Lanphier. (2022) "Supporting Marginalized Decision-Marker's Autonom(ies)." *American Journal of Bioethics*. 22(6):22-24. PMID: 35616965.

4. Mary V. Greiner and <u>Armand H. Matheny Antommaria.</u> (2022) "Enrolling Foster Youth in Clinical Trials: Avoiding the Harm of Exclusion." *American Journal of Bioethics*. 22(4):85-86. PMID: 35420526.  Reprinted in (2024) *Challenging Cases in Clinical Research Ethics*. Benjamin S. Wilfond, Liza-Marie Johnson, Devan M. Duenas, and Holly A. Taylor. Boca Raton, FL, CRC Press: 166-167.

5. William Sveen and <u>Armand H. Matheny Antommaria. (2020)</u> "Why Healthcare Workers Should Not Be Prioritized in Ventilator Triage." *American Journal of Bioethics*. 20(7): 133-135. PMID: 32716811.

6.  Armand H. Matheny Antommaria, William Sveen, and Erika L. Stalets (2020) "Informed Consent Should Not Be Required for Apnea Testing and Arguing It Should Misses the Point," *American Journal of Bioethics.* 20: 25-27. PMID: 32441602.

7.  Armand H. Matheny Antommaria (2019) "Relational Potential versus the Parent-Child Relationship," *Hastings Center Report.* 49(3): 26-27. PMID: 31269255.

8.  Armand H. Matheny Antommaria, Robert A. Shapiro, and Lee Ann E. Conard (2019) "Psychological Maltreatment and Medical Neglect of Transgender Adolescents: The Need for Recognition and Individualized Assessment." *American Journal of Bioethics.* 19: 72-74. PMID: 31543011.

9.  Armand H. Matheny Antommaria (2018) "Accepting Things at Face Value: Insurance Coverage for Transgender Healthcare." *American Journal of Bioethics.* 18: 21-23. PMID: 31159689.

10. Armand H. Matheny Antommaria and Judith R. Ragsdale (2018) "Shaken, not Stirred: What are Ethicists Licensed to Do?" *American Journal of Bioethics* 18: 56-58. PMID: 29697345.

11. Armand H. Matheny Antommaria (2017) "Issues of Fidelity and Trust Are Intrinsic to Uncontrolled Donation after Circulatory Determination of Death and Arise Again with Each New Resuscitation Method," *American Journal of Bioethics* 17: 20-22. PMID: 28430053.

12. Armand H. Matheny Antommaria (2016) "Conscientious Objection: Widening the Temporal and Organizational Horizons," *The Journal of Clinical Ethics* 27: 248-250. PMID: 27658282.

13. Armand H. Matheny Antommaria and Ron King. (2016) "Moral Hazard and Transparency in Pediatrics: A Different Problem Requiring a Different Solution." *American Journal of Bioethics* 16: 39-40. PMID: 27292846.

14. Armand H. Matheny Antommaria and Richard F. Ittenbach (2016) "Quality Attestation's Portfolio Evaluation Is Feasible, But Is It Reliable and Valid?" *American Journal of Bioethics* 16: 35-38. PMID: 26913658.

15. Armand H. Matheny Antommaria and Kristin Stanley Bramlage (2015) "Enrolling Research Participants in Private Practice: Conflicts of Interest, Consistency, Therapeutic Misconception, and Informed Consent." *AMA Journal of Ethics.* 17:1122-1126. PMID: 26698585.

16. Armand H. Matheny Antommaria (2015) "Characterizing Clinical Ethics Consultations: The Need for a Standardized Typology of Cases." *American Journal of Bioethics* 15: 18-20. PMID: 25970383.

17. Armand H. Matheny Antommaria (2015) "Intensified Conflict Instead of Closure: Clinical Ethics Consultants' Recommendations' Potential to Exacerbate Ethical Conflicts." *American Journal of Bioethics* 15: 52-4. PMID: 25562231.

18. Lainie Friedman Ross and Armand H. Matheny Antommaria (2014) "The need to promote all pediatric stem cell donors' understanding and interests." *Pediatrics* 133: e1356-e1357. PMID: 24777208.

19. Armand H. Matheny Antommaria (2014) "Pubertal Suppression and Professional Obligations: May a Pediatric Endocrinologist Refuse to Treat an Adolescent with Gender Dysphoria." *American Journal of Bioethics* 13: 43-46. PMID: 24422933.

20. Armand H. Matheny Antommaria (2012) "Empowering, Teaching, and Occasionally Advocating: Clinical Ethics Consultants' Duties to All of the Participants in the Process." *American Journal of Bioethics* 12 11-3. PMID: 22852533.

21. Armand H. Matheny Antommaria (2010) "Dying but not Killing: Donation after Cardiac Death Donors and the Recovery of Organs." *Journal of Clinical Ethics* 21: 229-31. PMID: 21089993.

22. Armand H. Matheny Antommaria and Julie Melini (2010) "Is it Reasonable to Refuse to be Seen by a Nurse Practitioner in the Emergency Department?" *American Journal of Bioethics* 10: 15-17. PMID: 20694899.

23. William Meadow, Chris Feudtner, <u>Armand H. Matheny Antommaria</u>, Dane Sommer, John Lantos (2010) "A Premature Baby with Necrotizing Enterocolitis Whose Parents Are Jehovah's Witnesses." *Pediatrics.* 216: 151-155. PMID: 20566607.

24. C. C. Weitzman, S. Schlegel, Nancy Murphy, <u>Armand H. Matheny Antommaria</u>, J. P. Brosco, Martin T. Stein (2009) "When Clinicians and a Parent Disagree on the Extent of Medical Care." *Journal of Developmental and Behavioral Pediatrics.* 30: 242-3. PMID: 19525718. Reprinted as (2010) *Journal of Developmental and Behavioral Pediatrics.* 31: S92-5. PMID: 20414087

25. <u>Armand H. Matheny Antommaria</u> and Susan Bratton (2008) "Nurses' Attitudes toward Donation after Cardiac Death: Implications for Nurses' Roles and Moral Distress." *Pediatric Critical Care Medicine,* 9: 339-40. PMID: 18446100.

26. <u>Armand H. Matheny Antommaria</u> and Nannette C. Dudley (2007) "Should Families Be Present During CPR?" *AAP Grand Rounds,* 17: 4-5.

27. <u>Armand H. Matheny Antommaria</u> (2006) "The Proper Scope of Analysis of Conscientious Objection in Healthcare: Individual Rights or Professional Obligations" *Teaching Ethics*, 7: 127-31.

28. <u>Armand H. Matheny Antommaria</u> and Rajendu Srivastava (2006) "If Cardiologists Take Care of Patients with Heart Disease, What do Hospitalists Treat?: Hospitalists and the Doctor-Patient Relationship." *American Journal of Bioethics*, 6: 47-9. PMID: 16423793.

29. <u>Armand H. Matheny Antommaria</u> (2003) "I Paid Out-of-Pocket for My Son's Circumcision at Happy Valley Tattoo and Piercing: Alternative Framings of the Debate over Routine Neonatal Male Circumcision," *American Journal of Bioethics* 3: 51-3. PMID: 12859817.

**Letters**

1. Benjamin S. Wilfond, David Magnus, <u>Armand H Matheny Antommaria</u>, Paul Appelbaum, Judy Aschner, Keith J. Barrington, Tom Beauchamp, Renee D. Boss, Wylie Burke, Arthur L. Caplan, Alexander M. Capron, Mildred Cho, Ellen Wright Clayton, F. Sessions Cole, Brian A. Darlow, Douglas Diekema, Ruth R. Faden, Chris Feudtner, Joseph J. Fins, Norman C. Fost, Joel Frader, D. Micah Hester, Annie Janvier, Steven Joffe, Jeffrey Kahn, Nancy E. Kass, Eric Kodish, John D. Lantos, Laurence McCullough, Ross McKinney, Jr., William Deadow, P. Pearl O'Rourke, Kathleen E. Powderly, DeWayne M. Pursley, Lainie Friedman Ross, Sadath Sayeed, Richard R. Sharp, Jeremy Sugarman, William O. Tarnow-Mordi, Holly Taylor, Tom Tomlison, Robert D. Truog, Yoram T. Unguru, Kathryn L. Weise, David Woodrum, Stuart Youngner (2013) "The OHRP and SUPPORT," *New England Journal of Medicine,* 368: e36. PMID: 23738513.

2. Lainie Friedman Ross and <u>Armand H. Matheny Antommaria</u> (2011) "In Further Defense of the American Academy of Pediatrics Committee on Bioethics 'Children as Hematopoietic Stem Cell Donors' Statement." *Pediatric Blood & Cancer*. 57: 1088-9.

3. <u>Armand H. Matheny Antommaria</u> (2011) "Growth Attenuation: Health Outcomes and Social Services." *Hastings Center Report*, 41(5): 4. PMID: 21980886.

4. Susan Bratton and <u>Armand H. Matheny Antommaria</u> (2010) "Dead Donor Rule and Organ Procurement: The Authors Reply." *Pediatric Critical Care Medicine*, 11: 314-5.

5. <u>Armand H. Matheny Antommaria</u> and Joel Frader (2009) "Policies of Children's Hospitals on Donation After Cardiac Death—Reply." *Journal of the American Medical Association*, 302: 845.

**Case Reports**

<u>Armand H. Matheny Antommaria</u> (2002) "Case 4.9: Inappropriate Access to a Celebrity's Medical Records." In *Ethics and Information Technology: A Case-Based Approach to a Health Care System in Transition*, James G. Anderson and Kenneth W. Goodman, 79-80. New York: Springer-Verlag.

**Book Reviews**

1. <u>Armand H. Matheny Antommaria</u> (2024) Review of *Mormonism, Medicine, and Bioethics,* by Courtney S. Campbell. *Mormon Studies Review* 11: 182-8.
2. <u>Armand H. Matheny Antommaria</u> (2023) "An Ambitious Goal: A Grounded, Informed, and Compelling Theological Bioethics." Review of *Disability's Challenge to Theology: Genes, Eugenics, and the Metaphysics of Modern Medicine* by Devan Stahl. *Hastings Center Report* 53(2): 44-45.
3. <u>Armand H. Matheny Antommaria</u> (2021) Review of *When Harry Became Sally: Responding to the Transgender Moment,* by Ryan T. Anderson. *Journal of Medical Humanities* 42: 195-9. PMID 31808021.
4. <u>Armand H. Matheny Antommaria</u> (2012) Review of *The Ethics of Organ Transplantation*, by Steven J. Jensen, ed., *Journal of the American Medical Association* 308: 1482-3.
5. <u>Armand H Matheny Antommaria</u> (2012) Review of *The Soul of Medicine: Spiritual Perspectives and Clinical Practice*, by John R. Peteet and Michael N. D'Ambra, ed., *Journal of the American Medical Association* 308: 87.
6. <u>Armand H. Matheny Antommaria</u> (2009) Review of *Conflicts of Conscience in Health Care: An Institutional Compromise,* by Holly Fernandez Lynch. *American Journal of Bioethics* 9: 63-4.
7. <u>Armand H. Matheny Antommaria</u> (2008) Review of *A Practical Guide to Clinical Ethics Consulting: Expertise, Ethos, and Power*, by Christopher Meyers. *American Journal of Bioethics* 8: 72-3.
8. <u>Armand H. Matheny Antommaria</u> (2004) Review of *Children, Ethics, and Modern Medicine*, by Richard B. Miller. *American Journal of Bioethics* 4: 127-8.
9. <u>Armand H. Matheny Antommaria</u> (2002) Review of *Ward Ethics: Dilemmas for Medical Students and Doctors in Training*, by Thomasine Kushner and David Thomasma, ed. *American Journal of Bioethics* 2: 70-1. PMID: 22494193.
10. <u>Armand H. Matheny Antommaria</u> (1999) Review of *Human Cloning: Religious Responses*, by Ronald Cole-Turner, ed. *Prism* 6 (March/April): 21.
11. <u>Armand H. Matheny Antommaria</u> (1999) Review of *Christian Theology and Medical Ethics: Four Contemporary Approaches*, by James B. Tubbs, Jr. *Journal of Religion* 79 (April): 333-5.
12. <u>Armand H. Matheny Antommaria</u> (1997) Review of *Body, Soul, and Bioethics*, by Gilbert C. Meilaender. *Prism* 4 (May/June): 28.

**Newspaper Articles**

1. W. Bradley Poss and <u>Armand H. Matheny Antommaria</u> (2010) "Mass casualty planning must incorporate needs of children." *AAP News* 31 (July): 38.
2. Robert Murray and <u>Armand H. Matheny Antommaria</u> (2010) "Pediatricians should work with school nurses to develop action plans for children with DNAR orders." *AAP News* 31 (May): 30..
3. <u>Armand H. Matheny Antommaria</u> (2009) "Addressing physicians' conscientious objections in health care." *AAP News* 30 (December): 32.

**<u>UNPUBLISHED POSTER PRESENTATIONS</u>**

1. <u>Armand H. Matheny Antommaria.</u> (2018) "Ethical Issues in the Care of International Patients: A Case Study." International Conference on Clinical Ethics and Consultation, Oxford, United Kingdom.
2. Jill S Sweney, Brad Poss, Colin Grissom, Brent Wallace, and <u>Armand H Matheny Antommaria,</u> (2010) "Development of a Statewide Pediatric Pandemic Triage Plan in Utah." Pediatric Academic Societies Annual Meeting, Vancouver, Canada. E-PAS20103713.147.

3. Christopher G. Maloney, <u>Armand H. Matheny Antommaria</u>, James F. Bale, Thomas Greene, Jian Ying, Gena Fletcher, and Rajendu Srivastava (2010) "Why Do Pediatric Interns Violate the 30 Hour Work Rule?" Pediatric Academic Societies Annual Meeting, Vancouver, Canada. E-PAS20101500.596

4. <u>Armand H. Matheny Antommaria</u> and Edward B. Clark (2007) "Resolving Conflict through Bioethics Mediation." 3rd International Conference on Ethics Consultation and Clinical Ethics, Toronto, Canada.

5. Elizabeth Tyson, Tracy Hill, <u>Armand Antommaria</u>, Gena Fletcher, and Flory Nkoy (2007) "Physician Practice Patterns Regarding Nasogastric Feeding Supplementation and Intravenous Fluids in Bronchiolitis Patients." Pediatrics Academic Societies Annual Meeting, Toronto, Canada. E-PAS2007:61300.

## ORAL PRESENTATIONS
### Keynote/Plenary Lectures
<u>International</u>

1. 2021, *Panelist*, Partnership for Quality Medical Donations, Charitable Access Programming for Rare Diseases, "Ethical Issues," Webinar, April 6.

2. 2017, *Invited Speaker*, Spina Bifida Fetoscopic Repair Study Group and Consortium, "Ethics of Innovation and Research in Fetal Surgery," Cincinnati, Ohio, October 26.

3. 2014, *Invited Speaker,* CIC 2013 CCI: Canadian Immunization Conference, "Condition-of-Service Influenza Prevention in Health Care Settings," Ottawa, Canada, December 2.

4. 2014, *Invited Speaker*, National Conference of the Chinese Pediatric Society, "A Brief Introduction to Pediatric Research and Clinical Ethics," Chongqing, China, September 12.

<u>National</u>

1. 2020, *Panelist*, Children's Mercy Bioethics Center, "Ethical Issues in the COVID Pandemic at Children's Hospitals," Webinar, March 2.

2. 2019, *Invited Speaker*, North American Fetal Therapy Network (NAFTnet), "Ethics of Innovation," Chicago, Illinois, October 12.

3. 2019, *Panelist,* National Society of Genetic Counselors Prenatal Special Interest Group, "Fetal Intervention Ethics," Webinar, September 12.

4. 2017, *Invited Participant,* American College of Epidemiology Annual Meeting, Preconference Workshop, "Extreme Personal Exposure Biomarker Levels: Guidance for Study Investigators," New Orleans, Louisiana, September 24.

5. 2016, *Invited Speaker,* American Academy of Pediatrics National Conference & Exhibition, Joint Program: Section on Hospital Medicine and Section on Bioethics, "Resource Allocation: Do We Spend Money to Save One Patient with Ebola or Over a 1,000?" San Francisco, California, October 23.

6. 2016, *Invited Speaker*, 26th Annual Specialist Education in Extracorporeal Membrane Oxygenation (SEECHMO) Conference, "Ethical Issues in ECMO: The Bridge to Nowhere," Cincinnati, Ohio, June 5.

7. 2015, *Invited Speaker,* Extracorporeal Life Support Organization (ELSO) 26th Annual Conference, "ECMO-Supported Donation after Circulatory Death: An Ethical Analysis," Atlanta, Georgia, September 20.

8. 2014, *Invited Speaker*, Pediatric Evidence-Based Practice 2014 Conference: Evidence Implementation for Changing Models of Pediatric Health Care, "Ethical Issues in Evidence-Based Practice," Cincinnati, Ohio, September 19.

9. 2014, *Invited Speaker,* 6th Annual David Kline Symposium on Public Philosophy: Exploring the Synergy Between Pediatric Bioethics and Child Rights, "Does Predictive Genetic Testing for Adult Onset Conditions that Are Not Medically Actionable in Childhood Violate Children's Rights?" Jacksonville, Florida, March 6.

10. 2010, *Invited Speaker,* Quest for Research Excellence: The Intersection of Standards, Culture and Ethics in Childhood Obesity, "Research Integrity and Religious Issues in Childhood Obesity Research," Denver, Colorado, April 21.

11. 2010, *Invited Speaker*, Symposium on the Future of Rights of Conscience in Health Care: Legal and Ethical Perspectives, J. Reuben Clark Law School at Brigham Young University and the Ave Maria School of Law, "Conscientious Objection in Clinical Practice: Disclosure, Consent, Referral, and Emergency Treatment," Provo, Utah, February 26.
12. 2009, *Invited Speaker*, Pediatric Organ Donation Summit, "Research Findings Regarding Variations in Pediatric Hospital Donation after Cardiac Death Policies," Chicago, Illinois, August 18.
13. 2008, *Meet-the-Experts*, American Academy of Pediatrics National Conference & Exhibition, "Physician Refusal to Provide Treatment: What are the ethical issues?" Boston, Massachusetts, October 11.
14. 2008, *Invited Conference Faulty*, Conscience and Clinical Practice: Medical Ethics in the Face of Moral Controversy, The MacLean Center for Clinical Medical Ethics at the University of Chicago, "Defending Positions or Identifying Interests: The Uses of Ethical Argumentation in the Debate over Conscience in Clinical Practice," Chicago, IL, March 18.
15. 2007, *Symposium Speaker*, Alternative Dispute Resolution Strategies in End-of-Life Decisions, The Ohio State University Mortiz College of Law, "The Representation of Children in Disputes at the End-of-Life," Columbus, Ohio, January 18.
16. 2005, *Keynote Speaker*, Decisions and Families, *Journal of Law and Family Studies* and The University of Utah S.J. Quinney College of Law, "Jehovah's Witnesses, Roman Catholicism, and Calvinism: Religion and State Intervention in Parental, Medical Decision-Making," Salt Lake City, Utah, September 23.

Regional/Local
1. 2024, *Speaker,* Current Trends 2024: Discover Big Ideas for the Smallest Lungs, "Ethics for RTs: ECMO and Trachs," Cincinnati, Ohio, November 14.
2. 2024, *Case Expert Commentator*, Center for Bioethics Clinical Ethics Consortium, Harvard Medical School, "Can he be his mother's keeper?", Boston, Massachusetts, February 2.
3. 2023, *Speaker*, Yale Ethics Program, Yale School of Medicine, "Gender-Affirming Care," New Haven, Connecticut, March 8.
4. 2021, *Panelist*, Pediatric Residency Noon Conference, University of Tennessee Health Science Center, "Bioethics Rounds—Ethical Issues in the Care of Transgender Adolescents," Memphis, Tennessee, September 21.
5. 2020, *Keynote Speaker*, 53rd Annual Clinical Advances in Pediatrics, "Referral to a Fetal Care Center: How You Can Help Patients' Mothers Address the Ethical Issues," Kansas City, Kansas, September 16.
6. 2019, *Speaker,* Patient and Family Support Services, Primary Children's Hospital, "Ethical Issues in the Care of Trans Adolescents," Salt Lake City, Utah, December 5.
7. 2019, *Speaker,* Evening Ethics, Program in Medical Ethics and Humanities, University of Utah School of Medicine, "Patients, Parents, and Professionals: Ethical Issues in the Treatment of Trans Adolescents," Salt Lake City, Utah, December 4.
8. 2019, *Speaker,* Pediatric Hospital Medicine Board Review Course, "Ethics, Legal Issues, and Human Rights including Ethics in Research," Cincinnati, Ohio, September 8.
9. 2019, *Speaker,* Advances in Fetology, "Evolving Attitudes Toward the Treatment of Children with Trisomies," Cincinnati, Ohio, September 6.
10. 2019, *Speaker,* Half-Day Ethics Training: Ethics Consultation & Ethics Committees, "Navigating the Rapids of Clinical Ethics Consultation: Intake, Recommendations, and Documentation," Salt Lake City, Utah, June 1.
11. 2019, *Speaker*, Scientific and Ethical Underpinnings of Gene Transfer/Therapy in Vulnerable Populations: Considerations Supporting Novel Treatments, BioNJ, "What Next? An Ethical analysis of Prioritizing Conditions and Populations for Developing Novel Therapies," Cranbury, New Jersey, March 7.
12. 2018, *Panelist*, Periviability, 17th Annual Regional Perinatal Summit, Cincinnati, Ohio, October 12.

13. 2018, *Speaker,* Regional Advance Practice Registered Nurse (APRN) Conference, "Adults are Not Large Children: Ethical Issues in Caring for Adults in Children's Hospitals," Cincinnati, Ohio, April 26.
14. 2018, *Speaker*, Southern Ohio/Northern Kentucky Sigma Theta Tau International Annual Conference, "Between Hope and Hype: Ethical Issues in Precision Medicine," Sharonville, Ohio, March 2.
15. 2017, *Speaker*, Advances in Fetology 2017, "Ethics of Innovation and Research: Special Considerations in Fetal Therapy Centers," Cincinnati, Ohio, October 27.
16. 2016, *Speaker*, End-of-Life Pediatric Palliative Care Regional Conference, "Ethical/Legal Issues in Pediatric Palliative Care," Cincinnati, Ohio, September 15.
17. 2016, *Speaker*, 26th Annual Bioethics Network of Ohio (BENO) Conference, "When Does Parental Refusal of Medical Treatment for Religious Reasons Constitute Neglect?" Dublin, Ohio, May 29.
18. 2014, *Speaker,* Cincinnati Comprehensive Sickle Cell Center Symposium: Research Ethics of Hydroxyurea Therapy for Sickle Cell Disease During Pregnancy and Lactation, "Ethical Issues in Research with Pregnant and Lactating Women," Cincinnati, Ohio, October 30.
19. 2014, *Speaker,* Advances in Fetology 2014, "The 'Miracle Baby' and Other Cases for Discussion," Cincinnati, Ohio, September 26.
20. 2014, *Speaker,* Advances in Fetology 2014, "'Can you tell me …?': Achieving Informed Consent Given the Prevalence of Low Health Literacy," Cincinnati, Ohio, September 26.
21. 2014, *Panelist*, Center for Clinical & Translational Science & Training, Secrets of the Dead: The Ethics of Sharing their Data, Cincinnati, Ohio, August 28.
22. 2014, *Speaker,* Office for Human Research Protections Research Community Forum: Clinical Research … and All That Regulatory Jazz, "Research Results and Incidental Findings: Do Investigators Have a Duty to Return Results to Participants," Cincinnati, Ohio, May 21.
23. 2013, *Opening Presentation*, Empirical Bioethics: Emerging Trends for the 21st Century, University of Cincinnati Center for Clinical & Translational Science & Training, "Empirical vs. Normative Ethics: A Comparison of Methods," Cincinnati, Ohio, February 21.
24. 2012, *Videoconference,* New York State Task Force on Life and the Law, "Pediatric Critical Care Triage," New York, New York, March 1.
25. 2011, *Presenter,* Fall Faculty Development Workshop, College of Social Work, University of Utah, "Teaching Ethics to Students in the Professions, " Salt Lake City, Utah, November 14.
26. 2011, *Speaker,* 15th Annual Conference, Utah Chapter of the National Association of Pediatric Nurse Practitioners, "Ethical Issues in Pediatric Practice," Salt Lake City, Utah, September 22.
27. 2011, *Speaker*, Code Silver! Active Shooter in the Hospital, Utah Hospitals & Health Systems Association, Salt Lake City, Utah, March 21.
28. 2009, *Speaker,* Medical Staff Leadership Conference, Intermountain Healthcare, "The Ethics of Leadership," Park City, Utah, October 30.
29. 2008, *Speaker*, The Art and Medicine of Caring: Supporting Hope for Children and Families, Primary Children's Medical Center, "Medically Provided Hydration and Nutrition: Ethical Considerations," Salt Lake City, Utah, February 25.
30. 2005, *Speaker*, Utah NAPNAP (National Association of Pediatric Nurse Practitioners) Chapter Pharmacology and Pediatric Conference, "Immunization Update," Salt Lake City, Utah, August 18.
31. 2005, *Keynote Speaker,* 17th Annual Conference, Utah Society for Social Work Leadership in Health Care, "Brain Death:  Accommodation and Consultation," Salt Lake City, Utah, March 18.
32. 2004, *Continuing Education Presentation*, Utah NAPNAP (National Association of Pediatric Nurse Practitioners), "Febrile Seizures," Salt Lake City, Utah, April 22.
33. 2004, *Speaker,* Advocacy Workshop for Primary Care Providers, "Ethics of Advocacy," Park City, Utah, April 3.

A-23

34. 2002, *Speaker,* 16th Annual Biologic Basis of Pediatric Practice Symposium, "Stem Cells: Religious Perspectives," Deer Valley, Utah, September 14.

**Meeting Presentations**

International

1. 2024, *Panelist,* International Conference on Clinical Ethics and Consultation, "Clinical Ethicists as Expert Witnesses: A Workshop Based on the Experiences of Clinical Ethicists and Lawyers in Pediatrics," Montreal, Canada, May 31.
2. 2023, *Speaker,* International Conference on Clinical Ethics and Consultation, "Addressing Ethical and Conceptual Issues in Gender-Affirming Medical Care Outside of the Hospital," Rome, Italy, June 8.
3. 2018, *Speaker,* International Conference on Clinical Ethics and Consultation, "A Systematic Review of Typologies Used to Characterize Clinical Ethics Consultations," Oxford, United Kingdom, June 21.

National

1. 2024, Srinivasan Suresh, Sriram Ramgopal, Judith Dexheimer, and Armand H. Matheny Antommaria. *Workshop Presenter*, Pediatric Academic Societies Annual Meeting, "ChatGPT for Pediatricians: You've Heard About It. Noe Learn how to Use It!" Toronto, May 6.
2. 2023, *Speaker,* American Society for Bioethics and Humanities Annual Meeting, "Addressing Restrictions on Gender-Affirming Medical Care in New Spaces: State Houses and Courtrooms," Baltimore, Maryland, October 13.
3. 2023, Kelsey S. Ryan, Rakhi Gupta Bassuray, Leela Sarathy, Sharon Ostfeld, Armand H. Matheny Antommaria, Erin Rholl, Steven R. Leuthner, and Christy L. Cummings. *Workshop Presenter,* Pediatric Academic Societies Annual Meeting, "How Can Newborn Toxicology Testing be Equitable?" Washington, DC, April 30.
4. 2022, *Speaker,* American Society for Bioethics and Humanities Annual Meeting, "A Mixed Methods Analysis of Requests for Religious Exemptions to a COVID-19 Vaccine Requirement." Portland, Oregon, October 27.
5. 2022, *Panelist,* American Society for Bioethics and Humanities Annual Meeting, Pediatric Ethics Affinity Group, "When Ethical Healthcare Is Prohibited By Law, How Do We Respond?" Portland, Oregon, October 27.
6. 2022, *Speaker,* APPD/PAS Fellow Core Curriculum Workshop, Pediatric Academic Societies Annual Meeting, "From Idea to Implementation: Navigating the Ethical Landscape of Pediatric Clinical Research," Denver, Colorado, April 22.
7. 2021, *Panelist,* Pediatric Endocrine Society Annual Meeting, Difference of Sex Development Special Interest Group, Virtual Conference, April 29.
8. 2020, *Speaker,* American Society for Bioethics and Humanities Annual Meeting, "Is This Child Dead? Controversies Regarding the Neurological Criteria for Death," Virtual Conference, October 17.
9. 2020, *Speaker,* American Society for Bioethics and Humanities Annual Meeting, "Contemporary Ethical Controversy in Fetal Therapy: Innovation, Research, Access, and Justice," Virtual Conference, October 15.
10. 2020, *Speaker,* American Society for Bioethics and Humanities Annual Meeting, "K-12 Schools and Mandatory Public Health Programs During the COVID-19 Pandemic," Virtual Conference, October 15.
11. 2019, *Speaker,* American Society for Bioethics and Humanities Annual Meeting, "Ethical Issues in Translating Gene Transfer Studies Involving Children with Neurodegenerative Disorders," Pittsburgh, Pennsylvania, October 26.
12. 2019, *Moderator,* Pediatric Academic Societies Annual Meeting, Clinical Bioethics, Baltimore, Maryland, April 28.
13. 2018, *Presenter,* American Society for Bioethics and Humanities Annual Meeting, "Looking to the Past, Understanding the Present, and Imaging the Future of Bioethics and Medical Humanities' Engagement with Transgender Health," Anaheim, California, October 19.

14. 2018, *Speaker,* American Society for Bioethics and Humanities Annual Meeting, "Should Vaccination Be a Prerequisite for Sold Organ Transplantation?" Anaheim, California, October 18.
15. 2018, Lindsey Douglas, <u>Armand H. Matheny Antommaria,</u> Derek Williams. *Workshop Presenter*, Pediatric Hospital Medicine Annual Meeting, "IRB Approved! Tips and Tricks to Smooth Sailing through the Institutional Review Board (IRB)." Atlanta, Georgia, July 20.
16. 2018, Alan Schroeder, <u>Armand H. Matheny Antommaria,</u> Hannah Bassett, Kevin Chi, Shawn Ralston, Rebecca Blankenburg<u>.</u> *Workshop Speaker,* Pediatric Hospital Medicine Annual Meeting, "When You Don't Agree with the Plan: Balancing Diplomacy, Value, and Moral Distress," Atlanta, Georgia, July 20.
17. 2018, Alan Schroeder, Hannah Bassett, Rebecca Blankenburg, Kevin Chi, Shawn Ralston, <u>Armand H. Matheny Antommaria.</u> *Workshop Speaker,* Pediatric Academic Societies Annual Meeting, "When You Don't Agree with the Plan: Balancing Diplomacy, Value, and Moral Distress," Toronto, Ontario, Canada, May 7.
18. 2017, *Speaker,* American Society for Bioethics and Humanities Annual Meeting, "Tensions in Informed Consent for Gender Affirming Hormone Therapy and Fertility Preservation in Transgender Adolescents," Kansas City, Missouri, October 19.
19. Lindsey Douglas, <u>Armand H. Matheny Antommaria,</u> and Derek Williams. 2017, *Workshop Leader,* PHM[Pediatric Hospital Medicine]2017, "IRB Approved! Tips and Tricks to Smooth Sailing through the Institutional Review Board (IRB) Process," Nashville, Tennessee, July 21.
20. 2016, *Speaker*, American Society for Bioethics and Humanities Annual Meeting, "Ethical Challenges in the Care of International Patients: Organization, Justice, and Cultural Considerations," Washington, DC, October 9.
21. 2015, *Coauthor,* The American Society of Human Genetics Annual Meeting, "Adolescents' Opinions on Disclosure of Non-Actionable Secondary Findings in Whole Exome Sequencing," Baltimore, Maryland, October 9.
22. 2012, *Speaker*, American Society for Bioethics and Humanities Annual Meeting, "A Public Health Ethics Analysis of the Mandatory Immunization of Healthcare Personnel: Minimizing  Burdens and Increasing Fairness," Washington, DC, October 21.
23. <u>Armand H. Matheny Antommaria</u>, Valerie Gutmann Koch, Susie A. Han, Carrie S. Zoubul. 2012, *Moderator*, American Society for Bioethics and Humanities Annual Meeting, "Representing the Underrepresented in Allocating Scarce Resources in a Public Health Emergency:  Ethical and Legal Considerations," Washington, DC, October 21.
24. 2012, *Platform Presentation,* Pediatric Academic Societies Annual Meeting, "Qualitative Analysis of International Variation in Donation after Circulatory Death Policies and Rates," Boston, Massachusetts, April 30.  Publication 3150.4.
25. 2011, *Speaker*, American Society for Bioethics and Humanities Annual Meeting, "The Intersection of Policy, Medicine, and Ethics during a Public Health Disaster: Special Considerations for Children and Families," Minneapolis, Minnesota, October 13.
26. <u>Armand H. Matheny Antommaria</u> and Joel Frader. 2010, *Workshop Leader,* Pediatric Academic Societies Annual Meeting, "Conscientious Objection in Health Care: Respecting Conscience and Providing Access," Vancouver, British Columbia, Canada. May 1. Session 1710.
27. 2009, *Workshop Leader,* American Society for Bioethics and Humanities Annual Meeting, "Advanced Clinical Ethics Consultation Skills Workshop: Process and Interpersonal Skills," Washington, DC, October 15.
28. 2009, *Platform Presentation*, Pediatric Academic Societies Annual Meeting, "Qualitative Analysis of Donation after Cardiac Death Policies at Children's Hospitals," Baltimore, Maryland, May 2.  Publication 2120.6.
29. 2008, *Speaker*, American Society for Bioethics and Humanities Annual Meeting, "Qualitative Analysis of Donation After Cardiac Death (DCD) Policies at Children's Hospitals," Cleveland, Ohio, October 26.

30. 2007, *Participant,* Hamline University School of Law Biennial Symposium on Advanced Issues in Dispute Resolution, "An Intentional Conversation About Conflict Resolution in Health Care," Saint Paul, Minnesota, November 8-10.
31. *2007, Speaker,* American Society of Bioethics and Humanities Annual Meeting, "Bioethics Consultation and Alternative Dispute Resolution: Opportunities for Collaboration," Washington, DC, October 21.
32. 2007, *Speaker,* American Society of Bioethics and Humanities Annual Meeting, "DNAR Orders in Schools: Collaborations Beyond the Hospital," Washington, DC, October 18.
33. <u>Armand H. Matheny Antommaria</u> and Jeannie DePaulis. 2007, *Speaker,* National Association of Children's Hospitals and Related Institutions Annual Meeting, "Using Mediation to Address Conflict and Form Stronger Therapeutic Alliances," San Antonio, Texas, October 9.
34. 2006, *Speaker,* American Society of Bioethics and Humanities Annual Meeting, "Bioethics Mediation: A Critique," Denver, Colorado, October 28.
35. 2005, *Panelist,* American Society of Bioethics and Humanities Annual Meeting, "How I See This Case: 'He Is Not His Brain,'" Washington, DC, October 20.
36. 2005, *Paper Presentation,* Pediatric Ethics: Setting an Agenda for the Future, The Cleveland Clinic, "'He Is Not His Brain:' Accommodating Objections to 'Brain Death,'" Cleveland, Ohio, September 9.
37. 2004, *Speaker,* American Society for Bioethics and Humanities Spring Meeting, "Verification and Balance: Reporting Within the Constraints of Patient Confidentiality," San Antonio, Texas, March 13.
38. 2002, *Panelist*, American Society for Bioethics and Humanities Annual Meeting, "'Who Should Survive?:' Mental Retardation and the History of Bioethics," Baltimore, Maryland, October 24.

**Invited/Visiting Professor Presentations**
1. 2013, Visiting Professor, "How to Listen, Speak and Think Ethically: A Multidisciplinary Approach," Norton Suburban Hospital and Kosair Children's Hospital, Louisville, Kentucky, May 22.
2. 2010, Visiting Professor, Program in Bioethics and Humanities and Department of Pediatrics, "What to Do When Parents Want Everything Done: 'Futility' and Ethics Facilitation," University of Iowa Carver College of Medicine, Iowa City, Iowa, September 10.

**Grand Round Presentations**
1. 2023, Harvey and Bernice Jones Lecture in Pediatric Ethics, "Too Far or Not Far Enough? Assessing Possible Changes in Determining Death and Procuring Organs," Arkansas Children's Hospital, Little Rock, November 16.
2. 2019, David Green Lectureship, "Establishing Goals of Care and Ethically Limiting Treatment," Primary Children's Hospital, Salt Lake City, Utah, December 5.
3. 2018, "The Ethics of Medical Intervention for Transgender Youth," El Rio Health, Tucson, Arizona, September 29.
4. 2018, Pediatrics, "Patient Selection, Justice, and Cultural Difference: Ethical Issues in the Care of International Patients," Cleveland Clinic, Cleveland, Ohio, April 10.
5. 2018, Bioethics, "Reversibility, Fertility, and Conflict: Ethical Issues in the Care of Transgender and Gender Nonconforming Children and Adolescents," Cleveland Clinic, Cleveland, Ohio, April 9.
6. 2017, Heart Institute, "'Have you ever thought about what you would want—if god forbid— you became sicker?': Talking with adult patients about advance directives," Cincinnati Children's Hospital Medical Center, Cincinnati, Ohio, October 16.

7. 2017, Pediatrics, "Respectful, Effective Treatment of Jehovah's Witnesses," with Judith R. Ragsdale, PhD, MDiv and David Morales, MD, Cincinnati Children's Hospital Medical Center, Cincinnati, Ohio, March 14.
8. 2017, Pediatrics, "Ethical Dilemmas about Discharging Patients When There Are Disagreements Concerning Safety," Seattle Children's Hospital, Seattle, Washington, January 19.
9. 2015, Pediatrics, "'Nonbeneficial' Treatment: What must providers offer and what can they withhold?," Greenville Health System, Greenville, South Carolina, May 10.
10. 2014, Advance Practice Providers, "Common Ethical Issues," Cincinnati Children's Hospital Medical Center, Cincinnati, Ohio, August 13.
11. 2014, Respiratory Therapy, "Do-Not-Resuscitate (DNR) Orders," Cincinnati Children's Hospital Medical Center, Cincinnati, Ohio, July 15.
12. 2013, Heart Institute, "No Not Months. Twenty-Two *Years*-Old: Transiting Patients to an Adult Model of Care." Cincinnati Children's Hospital Medical Center, Cincinnati, Ohio, October 21.
13. 2013, Division of Neonatology, "This Premature Infant Has a *BRCA1* Mutation!?: Ethical Issues in Clinical Whole Exome Sequencing for Neonatologists." Cincinnati Children's Hospital Medical Center, Cincinnati, Ohio, October 11.
14. 2013, Department of Pediatrics, "Adults are Not Large Children: Ethical Issues in Caring for Adults in Children's Hospitals," Cincinnati Children's Hospital Medical Center, Cincinnati, Ohio, February 26.
15. 2012, "Mandate or Moratorium?: Persisting Ethical Controversies in Donation after Circulatory Death," Cedars-Sinai Medical Center, Los Angeles, California, May 16.
16. 2011, Division of Pediatric Neurology Friday Lecture Series, "Inducing or Treating 'Seizures' with Placebos: Is It Ever Ethical?," University of Utah, Salt Lake City, Utah, October 7.
17. 2011, Department of Surgery, "DNR Orders in the OR and other Ethical Issues in Pediatric Surgery: Case Discussions," Primary Children's Medical Center, Salt Lake City, Utah, October 3.
18. 2009, Department of Pediatrics, "What to Do When Parents Want Everything Done: 'Futility' and Bioethical Mediation," Primary Children's Medical Center, Salt Lake City, Utah, September 17.
19. 2008, Division of Pulmonology and Critical Care, "Futility: May Clinicians Ever Unilaterally Withhold or Withdraw Medical Treatment?" Utah Valley Regional Medical Center, Provo, Utah, April 17.
20. 2007, Division of Otolaryngology-Head and Neck Surgery, "Advance Directives, Durable Powers of Attorney for Healthcare, and Do Not Attempt Resuscitation Orders: Oh My!," University of Utah School of Medicine, Salt Lake City, Utah, June 20.

**Outreach Presentations**
1. 2019, *Panelist*, Cincinnati Edition, WVXU, "The Ethics of Human Gene Editing," Cincinnati, Ohio, June 13.
2. 2019, *Speaker*, Adult Forum, Indian Hill Church, "Medical Ethics," Indian Hill, Ohio, March 24.
3. 2016, *Speaker*, Conversations in Bioethics: The Intersection of Biology, Technology, and Faith, Mt. Washington Presbyterian Church, "Genetic Testing," Cincinnati, Ohio, October 12.
4. 2008, *Speaker*, Science in Society, Co-sponsored by KCPW and the City Library, "Death—Choices," Salt Lake City, Utah, November 20.
5. 2003, *Panelist*, Utah Symposium in Science and Literature, "The Goodness Switch: What Happens to Ethics if Behavior is All in Our Brains?" Salt Lake City, Utah, October 10.
6. 2002, *Respondent*, H. Tristram Englehardt, Jr. "The Culture Wars in Bioethics," Salt Lake Community College, Salt Lake City, Utah, March 29.

**Podcasts**
1. 2025, "Ethics, Wellness, and Compassion," Love Rounds, January 15.
2. 2021, "Ethics of COVID Vaccines in Kids," PHM from Pittsburgh, August 12.
3. 2020, COVID Quandaries: Episode 1, "Is Getting Sick Just Part of the Job?" Hard Call, October 6.

# **<u>Exhibit B</u>**

**EXHIBIT B**

TABLE 1: Strength of Recommendation and Quality of Evidence in Recommendations Made by the Endocrine Society

| Strength of the Recommendation/ Quality of the Evidence[1] | Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons | Pediatric Obesity-Assessment, Treatment, and Prevention | Congenital Adrenal Hyperplasia Due to Steroid 21-Hydroxylase Deficiency |
|---|---|---|---|
| Strong\|High | 0 (0)[2] | 0 (0) | 0 (0) |
| Strong\|Moderate | 3 (11) | 4 (13) | 18 (33) |
| Strong\|Low | 5 (18) | 6 (20) | 13 (25) |
| Strong\|Very Low | 2 (7) | 1 (3) | 1 (2) |
| Weak\|High | 0 (0) | 0 (0) | 0 (0) |
| Weak\|Moderate | 0 (0) | 0 (0) | 2 (4) |
| Weak\|Low | 9 (32) | 5 (17) | 4 (7) |
| Weak\|Very Low | 3 (11) | 12 (40) | 7 (13) |
| Ungraded Good Practice Statement[3] | 6 (21) | 2 (7) | 9 (17) |
| Either Low or Very Low | 19 (68) | 24 (80) | 25 (46) |
| Total | 28 | 30 | 54 |

[1] Quality of the Evidence
High: "Consistent evidence from well-performed RCTs [Randomized Controlled Trials] or exceptionally strong evidence from unbiased observational studies"
Moderate: "Evidence from RCTs with important limitations (inconsistent results, methodological flaws, indirect or imprecise evidence), or unusually strong evidence from unbiased observational studies"
Low: "Evidence for at least one critical outcomes from observational studies, from RCTs with serious flaws, or indirect evidence"
Very Low: "Evidence for at least one of the critical outcomes from unsystematic clinical observations or very indirect evidence"
See Swiglo BA, Murad MH, Schünemann HJ, et al. A case for clarity, consistency, and helpfulness: State-of-the-art clinical practice guidelines in endocrinology using the grading of recommendations, assessment, development, and evaluation system. *J Clin Endocrinol Metab.* 2008;93(3):666-73.

[2] n (%)

[3]Ungraded Good Practice Statement: "Direct evidence for these statements was either unavailable or not systematically appraised and considered out of the scope of this guideline. The intention of these statements is to draw attention to these principles." See Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3869-3903.

Guidelines:
Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3869-3903.
Styne DM, Arslanian SA, Connor EL, et al. Pediatric obesity-assessment, treatment, and prevention: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(3):709-757.
Speiser PW, Arlt W, Auchus RJ, et al. Congenital adrenal hyperplasia due to steroid 21-hydroxylase deficiency: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2018;103(11):4043-4088.