IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PFLAG, INC., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>*Defendants*. | Civil Action No. BAH-25-337 |

**AMICUS BRIEF OF MASSACHUSETTS, CALIFORNIA, MARYLAND, COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, MAINE, MINNESOTA, NEVADA, NEW JERSEY, NEW YORK, OREGON, RHODE ISLAND, VERMONT, WASHINGTON, AND THE DISTRICT OF COLUMBIA AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

_____

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*
ALLYSON SLATER
  *Deputy Director, Reproductive Justice Unit*
KIMBERLY PARR
ADAM M. CAMBIER
  *Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
Tel.: (617) 727-2200
Fax: (617) 727-3251
allyson.slater@mass.gov
*Attorneys for the Commonwealth of Massachusetts*

ANTHONY BROWN
*Attorney General of Maryland*
JAMES D. HANDLEY
  *Assistant Attorney General (counsel of record), Federal Bar No. 20299*
200 St. Paul Place, 20th Floor
Baltimore, MD 21202
Tel.: (410) 576-6993
Fax: (410) 576-6955
jhandley@oag.state.md.us
*Attorney for the State of Maryland*

ROB BONTA
  *Attorney General of California*
NELI N. PALMA
  *Senior Assistant Attorney General*
KATHLEEN BOERGERS
  *Supervising Deputy Attorney General*
KETAKEE KANE
HILARY BURKE CHAN
  *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Tel.: (510) 879-0011
Fax: (510) 622-2270
Kathleen.Boergers@doj.ca.gov
*Attorneys for the State of California*

**TABLE OF CONTENTS**

INTRODUCTION AND STATEMENT OF INTERESTS ............................................................. 1

ARGUMENT .................................................................................................................................. 3

    I.    Amici States Prohibit Discrimination Based on Gender Identity and Protect Access to Gender-Affirming Care for Transgender Youth. ......................... 4

    II.    The Executive Orders Are Harming Amici States and Our Residents. ................... 6

        A.    Restricting Access to Gender-Affirming Care Harms Transgender Youth. ............................................................................................................. 6

        B.    The Executive Orders Caused Chaos in the Healthcare Field, to the Detriment of Young People Who Require Gender-Affirming Care. .......... 11

        C.    The Interference with Healthcare Facilities in the Amici States Will Have Adverse Downstream Effects on Amici States. ....................... 14

CONCLUSION ............................................................................................................................. 15

## INTRODUCTION AND STATEMENT OF INTERESTS

In the two executive orders that Plaintiffs challenge here, President Donald Trump has targeted transgender people in an unlawful and discriminatory manner that, if given full effect, would functionally exclude them from public life.  One of these executive orders rejects the well-established medical condition of gender dysphoria, declares that it is now "the policy of the United States to recognize two sexes, male and female," denounces the existence of gender identity as distinct from biological sex, and seeks to prohibit the use of federal funds to promote "gender ideology" (the "Gender Identity Order").[1]  The second executive order disparages gender-affirming medical care as "mutilation" and directs all federal agencies to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end" gender-affirming care for transgender people under age nineteen (the "Denial of Care Order"; together with the Gender Identity Order, the "Executive Orders").[2]  Notably, the Denial of Care Order directs termination of certain medical treatments *only* if provided to transgender individuals, but not if provided to cisgender individuals.

Among the many, grave harms these executive orders have caused, perhaps the most severe and immediate is in the field of healthcare.  These Executive Orders direct agencies to take steps to unilaterally cut off access to life-saving gender-affirming care for young people and adults, overriding the thoughtful, informed, individual decision-making that medical providers, parents, guardians, and transgender youth, as well as transgender adults, make together about what medical care is clinically appropriate.  They unlawfully discriminate against transgender

---

[1] Exec. Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615 (Jan. 20, 2025) [hereinafter Gender Identity Order].
[2] Exec. Order No. 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg.8,771 (Jan. 28, 2025) [hereinafter Denial of Care Order].

1

youth and adults based on their gender identity, and have caused chaos and harm to families across America and interrupted delivery of crucial medical care across the healthcare system.

Amici the Commonwealth of Massachusetts, the States of California and Maryland, together with Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Minnesota, Nevada, New Jersey, New York, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia ("Amici" or "Amici States") have strong interests in protecting and defending the constitutional and statutory rights of all of their residents—including those who are transgender. Amici States deeply support the rights of transgender people—those whose gender identity is different from their sex assigned at birth—to live with dignity, to be free from discrimination, and to participate fully and equally in all aspects of civic life. Many Amici States accordingly have enacted laws, policies, and protections for transgender residents, including transgender youth under nineteen years of age. Among other things, these laws prohibit discrimination in public schools, employment, real estate, and other services on the basis of gender identity and some allow residents to request a change in the sex designation on their birth certificate.

Amici also regulate the practice of medicine in their jurisdictions, including by licensing doctors and other medical professionals; implementing standards of care for a wide variety of medical procedures and treatments; and enforcing those standards and other related regulations. In this realm, many Amici States have enacted laws safeguarding access to gender-affirming healthcare services and protecting people who lawfully provide or help others access such care. In the Amici States' experience, all of these laws are necessary to uphold the rights and dignity of our transgender residents and the well-being of our communities as a whole. For the reasons advanced below and by Plaintiffs, the Court should grant Plaintiffs' motion for a preliminary

injunction (ECF 69) and enjoin Defendants from implementing or enforcing section 3(g) of the Gender Ideology Order and section 4 of the Denial of Care Order.

## ARGUMENT

The Executive Orders' attempt to terminate gender-affirming care for transgender youth is not only a patent violation of non-discrimination laws and equal protection rights, but it also imposes tremendous physical, emotional, and psychological harms.  It is contrary to medical standards of care, unjustified, and cruel.  Transgender youth are terrified and expressing feelings like, "'I don't even know why I should exist—my government hates me.'"[3]  Further, by threatening to strip federal funding from all institutions that provide gender-affirming care— even if the educational and research funds are unrelated to such care—Defendants have sown chaos and confusion among transgender youth, their parents, families, and caregivers, as well as healthcare providers in Amici States.  Already, providers across the country, including in Amici States, are halting gender-affirming care for youth who are mid-treatment, cancelling existing appointments, and turning away transgender youth who await treatment for fear of federal repercussions, including loss of critical funding.  This upheaval and the resulting harms are needless and unjustified.

Amici States have many laws and policies that, unlike the Executive Orders, adhere to medical standards of care and recognize the importance of the doctor-patient relationship in deciding on individualized care.  The Executive Orders improperly seek to override the Amici States' judgment in that respect and infringe on their historic power to protect the health and safety of their residents.  Far from causing the harms the Executive Orders presume, Amici

---

[3] Andrew Dyer, *San Diego Military Family Reacts To Loss of Gender-Affirming Medical Coverage*, KPBS (Jan. 7, 2025), https://www.kpbs.org/news/military/2025/01/07/san-diego-military-family-reacts-to-loss-of-gender-affirming-medical-coverage.

States' experience demonstrates that these laws result in better health outcomes for transgender youth; safeguard their physical, emotional, and financial well-being; and preserve the integrity and ethics of the medical profession. The Executive Orders run afoul of these laws and policies, are unconstitutional and discriminatory, and should be enjoined.

I. **AMICI STATES PROHIBIT DISCRIMINATION BASED ON GENDER IDENTITY AND PROTECT ACCESS TO GENDER-AFFIRMING CARE FOR TRANSGENDER YOUTH.**

Reinforcing applicable federal laws prohibiting discrimination on the basis of sex, Amici States have enacted civil rights protections for transgender people in education, employment, healthcare, housing, public accommodations, and other parts of public life.[4] They also have taken additional steps to safeguard access to gender-affirming care for transgender people, exercising their sovereign policymaking authority that such safeguards promote public health and well-being.

For instance, California, Maryland, Massachusetts and many other Amici States expressly uphold gender-affirming care as a legally protected right or health activity, and shield people in their States who access, provide, and/or assist with the provision of that care from civil or criminal penalties by out-of-state jurisdictions that outlaw it.[5] Amici States cover gender-

---

[4] *See, e.g.*, Cal. Civil Code §§ 51(b), 51(e)(5); Cal. Gov't Code § 12940(a); Cal. Gov't Code § 12955; Md. Code, Educ. § 26-704; Md. Code, State Gov't § 20-606; Md. Code Ann., State Gov't § 20-705; Mass. Gen. Laws ch. 151B, § 4; Mass. Gen. Laws ch. 272, §§ 92A, 98; Conn. Gen. Stat. §§ 10-15c, 46a-58 *et seq.*; Del. Code tit. 6, ch. 45 & 46; Del. Code tit. 19, ch. 7; D.C. Code § 2-1401.01 *et seq.*; Haw. Rev. Stat. §§ 368-1, 378-2, 489-3, 515-3; 775 Ill. Comp. Stat. 5/1-102(A), 5/1-103(O-1), 5/1-103(Q); Me. Rev. Stat. tit. 5, § 4551 *et seq.*; Minn. Stat. §§ 363A.03, subd. 50; 363A.01 *et seq.*; Nev. Rev. Stat. § § 118.100, 284.150(3), 439.994, 449.101(1), 613.330; N.J. Stat. Ann. §§ 10:5-1 *et seq.*; N.J. Stat. Ann. § 17:48-6oo; N.J. Stat. Ann. § 18A:36-41; N.Y. Exec. Law §§ 296, 296-a, 296-b; N.Y. Civil Rights Law § 40-c; N.Y. Comp. Codes R. & Regs. tit. 9, § 466.13; Or. Rev. Stat. §§ 659A.006, 659A.030, 659A.403, 659A.421; 11 R.I. Gen. Laws § 11-24-2; 23 R.I. Gen. Laws § 23-17-19; 28 R.I. Gen. Laws §§ 28-5-5, 28-5.1-12, 28-6-18, 23-17-19; 34 R.I. Gen. Laws §§ 34-37-2, 34-37-4, 34-37-4.3, 34-37-5.2, 34-37-5.3, 34-37-5.4; Vt. Stat. Ann. tit. 9, §§ 4502, 4503; Vt. Stat. Ann. tit. 21, § 495; Wash. Rev. Code §§ 49.60.030(1), 49.60.040(2), 49.60.040(29), 49.60.215.

[5] *See, e.g.,* Cal. Civ. Code § 56.109; Md. Code Ann., State Pers. & Pens. § 2-312; Mass Gen. Laws c. 12, § 11 I ½(b), (c), & (d); Mass. Gen. Laws ch. 147, § 63; Mass. Gen. Laws ch. 276, § 13; Colo. Rev. Stat. §§ 10-16-121(1)(f), 12-30-121, 13-21-133, 16-3-102, 16-3-301; Conn. Gen. Stat. §§19a-17e, 52-146w, 52-146x, 52-571m,

(continued…)

4

affirming care through their State Medicaid programs,[6] and they prohibit State-regulated health insurance plans from refusing enrollment, unenrolling, or withholding coverage from individuals based on their gender identity or gender dysphoria, thereby ensuring that transgender residents enjoy the same access to health insurance coverage for medically necessary treatment as the cisgender population.[7] Many Amici States further prohibit State boards overseeing the healthcare professions from taking adverse action against their licensees based solely on an out-of-state conviction or adverse license action resulting from the provision of gender-affirming care, or directly exclude the performance, recommendation, or provision of gender-affirming care by itself from "professional misconduct."[8] Some of those State licensing boards—like the Boards of Registration in Medicine and in Nursing in Massachusetts—also instruct licensees that

---

52-571n, 54-155b; 735 Ill. Comp. Stat. 40/28-10, 40/28-11; Me. Rev. Stat. tit. 14, § 9001, *et seq.*; Me. Rev. Stat. tit. 22, §§ 1508; 2023 Minn. Laws, ch. 29; N.Y. Exec. Law § 837-x; N.Y. Comp. Codes R. & Regs. tit. 10, § 405.7(c)(2); Or. Rev. Stat. §§ 15.430, 24.500, 414.769, 435.210, 435.240; Vt. Stat. Ann. tit. 12, § 7301 *et seq.*; Wash. Rev. Code § 7.115 *et seq.*; N.J.A.C. Executive Order No. 326 (2023); *see also* Shield Laws for Reproductive and Gender-Affirming Health Care: A State Law Guide, https://williamsinstitute.law.ucla.edu/publications/shield-laws-fact-sheets/.

[6] *See, e.g.,* Gender-Affirming Care Covered by MassHealth, https://www.mass.gov/info-details/gender-affirming-care-covered-by-masshealth; Md. Code Ann., Health-Gen. § 15-151; 89 Ill. Adm. Code 140.440(h); Minn. Stat. § 256B.0625, subd. 3a; Nevada Medicaid Services Manual, Section 608, https://dhcfp.nv.gov/Resources/AdminSupport/Manuals/MSM/C600/Chapter600/; R.I. Gender Dysphoria/Gender Nonconformity Coverage Guidelines (Oct. 28, 2015), https://eohhs.ri.gov/sites/g/files/xkgbur226/files/Portals/0/Uploads/Documents/MA-Providers/MA-Reference-Guides/Physician/gender_dysphoria.pdf.

[7] *See, e.g.,* Mass. Gen. Laws c. 272, §§ 92A, 98; Cal. Code Regs. tit. 10 § 2561.2, subd. (a) (2012); Md. Code Ann., Ins. § 15-1A-22; 215 ILCS 5/356z.60(b); 3 Code Colo. Regs. § 702-4, Regulation 4-2-42, § 5(A)(1)(o); Del. Code tit. 18, § 2304; 50 Ill. Adm. Code § 2603.35; 215 Ill. Comp. Stat. 5/356z.60(b); Me. Rev. Stat. tit. 22, § 3174-MMM; Minn. Stat. § 62Q.585; N.J. Stat. Ann. § 17:48-6oo; N.Y. Comp. Codes R. & Regs. tit. 11, § 52.75; Or. Admin. R. 836-053-0441; Vt. Stat. Ann. tit. 8, § 4724; Vt. Stat. Ann. tit. 8, § 4088m; Mass. Division of Insurance Bulletins 2021-11 and 2014-03, available online at https://www.mass.gov/lists/doi-bulletins; R.I. Health Insur. Bull. 2015-03, available online at https://ohic.ri.gov/sites/g/files/xkgbur736/files/bulletins/Bulletin-2015-3-Guidance-Regarding-Prohibited-Discrimination.pdf.

[8] *See, e.g.,* Cal. Bus. & Prof. Code § 850.1, 852, 2253, 2761.1); Mass. Gen. Laws ch. 112, §§ 5F1/2, 77, 128; Md. Code Health Occ. § 1-227; Conn. Gen. Stat. §§ 19a-17e, 20-579a, 52-571m; Colo. Rev. Stat. 12-30-121; N.Y. Educ. Law § 6531-b; Or. Rev. Stat. §§ 675.070, 675.540, 675.745, 677.190, 678.138, 685.110, 689.405. Along these lines, some Amici States bar medical malpractice insurers from discriminating against an applicant or insured solely because the applicant or insured provides or assists with the provision of gender-affirming care. *See, e.g.,* Colo. Rev. Stat. §§ 10-4-109.6(1); Or. Rev. Stat. §§ 676.313.

they shall not withhold or deny care based on a patient's gender identity.[9] And California implemented the Transgender, Gender Diverse, and Intersex Inclusive Care Act in 2023 which, among other things, mandates training for healthcare professionals to ensure that patients who identify as transgender, gender diverse, and intersex receive trans-inclusive care.[10] In the experience of the Amici States, federal and state laws and policies requiring equal treatment of people—regardless of their gender identity—are essential to address long-standing inequities in the healthcare system.

Taken together, the above laws and policies reflect Amici States' core commitment to preserving the integrity of the medical profession, protecting the equality of all people, and ensuring that people with gender dysphoria are not denied medically necessary healthcare. In contrast to the Executive Orders, these laws and policies adhere to medical standards of care; recognize the importance of the doctor-patient relationship; result in better health outcomes for transgender youth; safeguard their physical, emotional, and financial well-being; and preserve the integrity and ethics of the medical profession. The Executive Orders therefore undermine the Amici States' sovereign authority in protecting the health and well-being of our residents.

## II.   THE EXECUTIVE ORDERS ARE HARMING AMICI STATES AND OUR RESIDENTS.

### A.   Restricting Access to Gender-Affirming Care Harms Transgender Youth.

Many transgender individuals suffer from gender dysphoria, a medical condition characterized by the lack of congruence between a person's gender identity and the sex they were designated at birth, which results in clinically significant distress.[11] Left untreated, gender

---

[9] *See* 244 Code Mass. Reg. § 9.03; Massachusetts Board of Registration in Medicine Policy 16-01: Policy on Gender Identity and the Physician Profile Program, available online at https://www.mass.gov/lists/physician-regulations-policies-and-guidelines.

[10] Cal. Ins. Code § 10133.13.

[11] Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 513–14 (5th ed., text rev. 2022).

dysphoria can substantially affect quality of life, including causing "symptoms of depression and anxiety, substance use disorders, a negative sense of well-being and poor self-esteem, and an increased risk of self-harm and suicidality."[12]

Courts across the country have acknowledged there is considerable medical evidence that gender-affirming care improves the symptoms of gender dysphoria, and that denying gender-affirming care to transgender youth with gender dysphoria can have tragic consequences for their physical and mental well-being.[13] For example, an analysis conducted in 2021 found that, for teenagers under the age of eighteen, use of gender-affirming hormone therapy was associated with lower odds of recent depression and lower odds of attempting suicide compared to adolescents who wanted, but did not receive, such therapy.[14] Another study concluded that, for teenagers and young adults ages thirteen to twenty, receiving gender-affirming care, including puberty blockers and gender-affirming hormones, was associated with 60% lower odds of moderate or severe depression and 73% lower odds of having suicidal thoughts over a twelve-

---

[12] Garima Garg et al., *Gender Dysphoria*, StatPearls (July 11, 2023), https://www.ncbi.nlm.nih.gov/books/NBK532313/.

[13] *See, e.g., Brandt v. Rutledge*, 551 F. Supp. 3d 882, 891 (E.D. Ark. 2021), *aff'd sub nom. Brandt by & through Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) ("Every major expert medical association recognizes that gender-affirming care for transgender minors may be medically appropriate and necessary to improve the physical and mental health of transgender people."); *Doe v. Ladapo*, 676 F. Supp. 3d 1205, 1214 (N.D. Fla. 2023) (crediting expert testimony that "denial of [gender-affirming treatment] will cause needless suffering for a substantial number of patients and will increase anxiety, depression, and the risk of suicide."); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1150 (M.D. Ala. 2022), *vacated sub nom. Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023) ("The record shows that, without transitioning medications, Minor Plaintiffs will suffer severe medical harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicidality."); *Fain v. Crouch*, 618 F. Supp. 3d 313, 330 (S.D.W. Va. 2022), *aff'd sub nom. Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (finding that "medical treatments for gender dysphoria have been studied extensively, and have been shown to improve 'quality of life and measures of mental health' for patients . . ."); *Poe by and through Poe v. Labrador*, 709 F. Supp. 3d 1169, 1193 (D. Idaho 2023) ("[E]vidence shows not only that gender-affirming medical care delivered in accordance with [clinical] guidelines is helpful and necessary for some adolescents, but also that withholding such care is harmful."), *appeal filed*, No. 24-142 (9th Cir. 2024), *stayed in part*, 144 S. Ct. 921 (2024).

[14] Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. Adolescent Health 643, 647–48 (2022), https://doi.org/10.1016/j.jadohealth.2021.10.036.

month follow-up.[15] A longitudinal study that followed transgender adolescents from their intake at a gender clinic into young adulthood reported that gender-affirming treatment resulted in significant improvement in global functioning and psychological well-being and that the participants' life satisfaction, quality of life, and subjective happiness were comparable to their cisgender peers.[16] Another study found significant improvement in teenagers' sense of self-worth after starting hormone therapy.[17] In light of the clinical and research-based evidence on the significant benefits and limited risks, major medical organizations—"includ[ing] the American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, American College of Obstetricians and Gynecologists, American College of Physicians, American Medical Association, American Psychiatric Association, and at least a dozen more"—"have formally recognized" the benefits of gender-affirming care. *Ladapo*, 676 F. Supp. 3d at 1213.[18]

Forcing transgender young people with gender dysphoria to wait until they are nineteen years old to access gender-affirming care causes significant harm. Not only are they denied

---

[15] Diana M. Tordoff, et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5 J. Am. Med. Ass'n Network Open 1, 6 (2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789423.

[16] Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696, 702 (2014), https://doi.org/10.1542/peds.2013-2958; *see also* Oscar Taube, *The Science Doesn't Support Trump's Order on Transition Care*, Baltimore Sun (Feb. 9, 2025), https://www.baltimoresun.com/2025/02/09/the-science-doesnt-support-trumps-order-on-transition-care-guest-commentary.

[17] Marijn Arnoldussen et al., *Self-Perception of Transgender Adolescents After Gender-Affirming Treatment: A Follow-Up Study Into Young Adulthood*, 9 LGBT Health 238, 242-244 (2022), https://www.liebertpub.com/doi/epdf/10.1089/lgbt.2020.0494.

[18] Notably, the Denial of Care Order rescinds funding only where the gender-affirming care is offered to an individual whose "identity . . . differs from his or her sex." Denial of Care Order, *supra* note 2, § 2(c). People who are cisgender remain free to receive the exact same treatments, including to better "align [their] physical appearance" with their gender identity. *Id.*; *see K.C. v. Individual Members of* Med. Licensing *Bd.* of *Indiana*, 677 F. Supp. 3d 802, 814 (S.D. Ind. 2023), appeal filed, No. 23-2366 (7th Cir. July 12, 2023), stayed, No. 23-2366, 2024 WL 811523, at *1 (7th Cir. Feb. 27, 2024), *rev'd and rem'd*, 121 F.4th 604 (7th Cir. Nov. 13, 2024); *Ladapo*, 676 F. Supp. 3d at 1217.

8

medical treatment that could alleviate their anxiety, depression, and other symptoms, but those symptoms are likely to worsen while they wait because, without treatment, they will undergo the puberty and associated physiological changes typical of those with their sex assigned at birth—which does not conform to the gender with which they identify.  For instance, a study conducted in 2020 showed that adolescents who begin gender-affirming treatment at later stages of puberty are five times more likely to be diagnosed with depression and four times more likely to have anxiety disorders than adolescents who seek treatment in early puberty.[19]  The authors concluded that "[gender incongruent] youth who present to [gender-affirming medical care] later in life are a particularly high-risk subset of a vulnerable population."[20]

The Executive Orders also threaten to interfere with the doctor-patient relationship by trying to prevent doctors from advising patients of the most appropriate type of care to treat their gender dysphoria and, after discussion of the risks and benefits of the different care options with the patient, and together with their parents or caregivers, allowing the patient to make a personal decision regarding the care they wish to receive.[21]  Indeed, even those studies that purport to question the appropriate types of gender-affirming care that should be provided to minors still affirm the need for an individualized determination of necessary care.[22]  Such interference by the

---

[19] *See* Julia C. Sorbara et al., *Mental Health and Timing of Gender-Affirming Care*, 146 Pediatrics 1, 5–6 (2020), https://publications.aap.org/pediatrics/article/146/4/e20193600/79683/Mental-Health-and-Timing-of-Gender-Affirming-Care (reporting odds ratios).

[20] *Id.*

[21] Ian Wolfe, *Bioethics & Gender Affirming Care*, Univ. of Minn. Ctr. for Bioethics, https://bioethics.umn.edu/news/bioethics-gender-affirming-care (last visited Feb. 19, 2025) ("Any conversation around ethics and gender affirming care must balance the benefits and burdens for the individual child.  It is important to focus on *improving the child's health*." (emphasis in original)).

[22] Meredithe McNamara, et al., *An Evidence Based Critique of "The Cass Review" on Gender-affirming Care for Adolescent Gender Dysphoria*, at 7 (2024) https://law.yale.edu/sites/default/files/documents/integrity-project_cass-response.pdf  (comparing statements in The Cass Review- the 2024 UK inquiry into gender-affirming care for adolescents- with Endocrine Society and WPATH recommendations); *see also* Swedish Nat'l Brd. of Health and Welfare, *Care of Children and Adolescents With Gender Dysphoria: Summary of National Guidelines* (Dec. 2022), https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2023-1-

(continued…)

9

federal government with the doctor-patient relationship will cause lasting harm to doctors and transgender patients in Amici States.[23]

While the harms inflicted on transgender young people who wish to obtain gender-affirming care and those who are preparing for such care would be enough to forestall the Executive Orders, the presidential actions go even further and purport to withdraw this medically necessary care to youth who are already receiving it.  There are *no* exceptions in the plain language of the Executive Orders, despite the fact that gender-affirming care only proceeds after doctors, parents, other legal guardians/caregivers, and patients carefully weigh the risks and benefits and agree that treatment is in the patient's best interest.  Sudden discontinuation of vital treatment from the Denial of Care Order will cause youth who have been thriving upon receiving gender-affirming care to suffer from the loss of such treatment, possibly resurrecting or even amplifying former mental health struggles that the treatment had helped mitigate.[24]  One father stated that his daughter being denied her medications would be "catastrophic" and would put him

---

8330.pdf (limiting access to certain gender-affirming care for minors, but allowing that puberty blockers and hormone therapy may be appropriate for some adolescents and is not entirely prohibited).

[23] Scott J. Schweikart, *What's Wrong with Criminalizing Gender-Affirming Care of Transgender Adolescents?*, 25 AMA J. Ethics 414, 417 (June 2023), https://journalofethics.ama-assn.org/article/whats-wrong-criminalizing-gender-affirming-care-transgender-adolescents/2023-06. (bans on gender-affirming healthcare for adolescents lead to "undermining of trust in patient-physician relationships, which promotes a chilling effect that harms the practice of medicine more broadly.").

[24] Stacy Weiner, *States are banning gender-affirming care for minors. What does that mean for patients and providers?*, AAMC News (Feb. 20, 2024), https://www.aamc.org/news/states-are-banning-gender-affirming-care-minors-what-does-mean-patients-and-providers ("For patients who start hormone treatment but then must stop after legislation passes, it can be highly distressing to see desired changes begin slipping away and unwanted, permanent ones develop"); *Get the Facts on Gender-Affirming Care*, Hum. Rts. Campaign, https://www.hrc.org/resources/get-the-facts-on-gender-affirming-care (last visited Feb. 13, 2025) (describing puberty blockers as reversible, hormone replacement therapy as fully or partially reversible, and how going through puberty may cause transgender and non-binary youth "intense distress and dysphoria, as it leads their body to develop into a gender that is not theirs — including in ways that are irreversible, or only reversible later with surgery"); *Outlawing Trans Youth: State Legislatures and the Battle over Gender-Affirming Healthcare for Minors*, 134 Harv. L. Rev. 2163 (2021) (surveying extensive research demonstrating that transgender youth who want and receive gender-affirming care, which can include medical transitioning, experience far better psychological outcomes than those who do not receive such care).

in a position where he feared for her health and safety.[25]  Echoing this statement, a Massachusetts mother said that her child is "thriving while in treatment after years of struggling in school and at home."[26]  A Washington D.C. parent said gender-affirming care saved her son's life after he was suicidal.[27]  The Denial of Care Order purports to know better than these parents—but it is wrong.  The disruption and denial of gender-affirming care will cause, and is already causing, real, lasting consequences for transgender youth in Amici States.

> B.  **The Executive Orders Caused Chaos in the Healthcare Field, to the Detriment of Young People Who Require Gender-Affirming Care.**

The Executive Orders also have sown chaos and confusion among gender-affirming care providers and caused anxiety and fear among transgender youth and their families, guardians, and caregivers.  The Trevor Project, which provides confidential counseling to LGBTQ+ youth suffering from various issues, including depression and suicidal thoughts, reported a 700% increase in access to its crisis services since the election, with a 46% increase in volume following inauguration.[28]  And in the immediate aftermath of the Executive Orders, some institutions that have been key providers of gender-affirming care cancelled longstanding appointments or halted care altogether, including in Amici States.[29]  As a result, transgender youth, as well as their families and caregivers, are suffering.

---

[25] Anya Kamnetz, *'It Shouldn't Be Happening Here' Parents of trans children in NYC are outraged as hospitals quietly shift their approach to gender-affirming care,* The Cut (Feb. 4, 2025), *https*://www.thecut.com/article/parents-react-nyc-hospitals-denying-gender-affirming-care.html.

[26] Martha Bebinger, *Mass. Clinics Still Provide Trans Care for Kids. The Future Is Uncertain*, WBUR (Jan. 31, 2025), https://www.wbur.org/news/2025/01/31/trans-health-care-massachusetts-trump-funding.

[27] Jenna Portnoy, *After Trump Order, Hospitals Suspend Some Trans Health Care for Youth*, Washington Post (Jan. 31, 2025), https://www.washingtonpost.com/dc-md-va/2025/01/31/trans-children-trump-hormones-healthcare/.

[28] *The Trevor Project's Crisis Line Volume Continues To Increase Following Inauguration Day*, Trevor News (Jan. 22, 2025), https://www.thetrevorproject.org/blog/the-trevor-projects-crisis-line-volume-continues-to-increase-following-inauguration-day/.

[29] *See* Carla Johnson et al., *Some Hospitals Pause Gender-Affirming Care to Evaluate Trump's Executive Orders*, AP News (Jan. 30, 2025), https://apnews.com/article/transgender-trump-executive-order-hormones-hospitals-8d9e6b94b34d2e6f890c06ebeba0fe1d.

11

Several institutions have preemptively halted gender-affirming care for youth, an act hailed as a victory by the Administration.[30] These institutions fear that if they continue to provide gender-affirming medical care to transgender youth, they will lose federal funding for healthcare unrelated to the provision of such gender-affirming care. Indeed, notices went out to grant recipients of Health Services Resource Administration ("HRSA") funds stating "[e]ffective immediately, HRSA grant funds may not be used for activities that do not align with" the Denial of Care Order. For example, as a result of the Executive Orders:

- In California, a Los Angeles health clinic reported losing federal funding as a result of the Denial of Care Order, and the Centers for Disease Control and Prevention (CDC) terminated a $1.6 million grant intended to support the Los Angeles health clinic's transgender health and social services program.[31] Children's Hospital of Los Angeles disclosed that it would stop initiating hormonal therapy for transgender patients under nineteen.[32] One child impacted was currently receiving puberty blocking treatment that the hospital purportedly discontinued.[33]

- In Massachusetts, community groups reported that Boston Children's Hospital cancelled appointments with transgender patients in response to the Executive Orders.[34]

---

[30] *See* Fact Sheets, *President Trump is Delivering on His Commitment to Protect Our Kids*, The White House (Feb. 3, 2025), https://www.whitehouse.gov/fact-sheets/2025/02/president-trump-is-delivering-on-his-commitment-to-protect-our-kids/. Some institutions have been taking such steps, notwithstanding the temporary restraining order in *Trump v. New York*, which bars a blanket funding freeze. *See* Press Release, AG Campbell Leads 14 AGs in Issuing Statement on Protecting Access to Gender-Affirming Care, Office of Mass. Att'y Gen. (Feb. 5, 2025), https://www.mass.gov/news/ag-campbell-leads-14-ags-in-issuing-statement-on-protecting-access-to-gender-affirming-care (explaining the temporary restraining order "means that federal funding to institutions that provide gender-affirming care continues to be available, irrespective of President Trump's recent Executive Order").

[31] Kristen Hwang, *LA Clinics Lose Funding for Transgender Health Care as Trump Executive Orders Take Hold*, Cal Matters (Feb. 4, 2025), https://calmatters.org/health/2025/02/trump-executive-order-transgender-health/.

[32] Emily Reyes, *Children's Hospital L.A. Stops Initiating Hormonal Therapy for Transgender Patients Under 19*, Los Angeles Times (Feb. 4, 2025), https://www.latimes.com/california/story/2025-02-04/childrens-hospital-to-stop-initiating-hormonal-therapy-for-trans-patients-under-19.

[33] *Id.* The California Attorney General issued a reminder to the hospital that discontinuation of transgender care would violate California's anti-discrimination laws. Press Release, Attorney General Bonta Reminds Hospitals and Clinics of Anti-Discrimination Laws Amid Executive Order on Gender Affirming Care, Office of Cal. Att'y Gen. (Feb. 5, 2025), https://oag.ca.gov/news/press-releases/attorney-general-bonta-reminds-hospitals-and-clinics-anti-discrimination-laws. New York issued a similar reminder on February 3, 2025. Letter from New York Attorney General Letitia James (Feb. 3, 2025),https://ag.ny.gov/sites/default/files/letters/ag-james-to-hc-providers-re-tro-letter-2025.pdf.

[34] Mike Damiano, *Legal Groups Sue Trump Over Transgender Medicine Order*, Boston Globe (Feb. 4,

(continued…)

- In Colorado, Denver Health stopped providing gender-affirming surgeries to patients under 19 and Children's Hospital Colorado stopped offering puberty blockers and hormonal treatment to patients because of the Executive Orders.[33]

- Hospitals in Washington D.C. and Virginia paused prescriptions of puberty blockers and hormone therapy as providers assess the Executive Orders, reporting that patients who were mid-treatment experienced cancellation of medication appointments.[35] Children's National Medical Center cancelled appointments.[36]

- In the week following the Executive Orders, hospital-based providers across New York, including New York University and Mount Sinai Hospitals, reportedly cancelled medical appointments for transgender youth and their families.[37] New York Presbyterian Hospital has reportedly removed all references to gender-affirming care from its website, and NYU Hospital, one of the leading providers of gender-affirming care in New York City, has reportedly "paused" accepting all new patients, and several existing patients were unable to obtain care they had been scheduled to receive.[38]

- In Illinois, a Chicago-based hospital paused gender-affirming surgeries for patients under nineteen.[39]

As articulated in Plaintiffs' brief, ECF 69-1 at 7-12, the resulting confusion and disruption has had a profound impact on transgender youth, including residents of the Amici States. The harm caused by the Executive Orders is not abstract or hypothetical. Some transgender youth are not receiving the healthcare they need *right now*, regardless of what medical providers, parents, caregivers, and guardians believe is best for their medical needs. As discussed *supra*, this

---

2025), https://www.bostonglobe.com/2025/02/04/metro/aclu-challenge-transgender-medicine-trump-executive-order/.

[35] Jenna Portnoy, *supra* note 27.

[36] Press Release, Children's National Hospital Statement on Executive Order Children's Nat'l Med. Ctr. (Jan. 30, 2025), https://www.childrensnational.org/about-us/newsroom/2025/statement-on-executive-order.

[37] Joseph Goldstein, *N.Y. Hospital Stops Treating 2 Children After Trump's Trans Care Order*, N.Y. Times (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/nyregion/nyu-langone-hospital-trans-care-youth.html; Anna Betts, *U.S. Hospitals Suspend Healthcare for Transgender Youth After Trump Order*, Guardian (Feb. 3, 2025), https://www.theguardian.com/us-news/2025/feb/03/trans-youth-healthcare-hospitals-trump.

[38] Anya Kamenetz, *'It Shouldn't Be Happening Here': Parents of Trans Children in NYC Are Outraged as Hospitals Quietly Shift Their Approach to Gender-Affirming Care*, The Cut (Feb. 4, 2025), https://www.thecut.com/article/parents-react-nyc-hospitals-denying-gender-affirming-care.html.

[39] Eunice Alpasan, *Lurie Children's Hospital Pauses Gender-Affirming Surgeries for Patients Under 19 Following Trump's Executive Order*, WTTW News (Feb. 10, 2025), https://news.wttw.com/2025/02/10/lurie-children-s-hospital-pauses-gender-affirming-surgeries-patients-under-19-following.

13

increases the risk of anxiety, depression, and suicidality for the youth denied care. The Administration has announced—and celebrated—hospitals and clinics that have ceased gender-affirming care as a result of the Executive Orders, demonstrating that the health and well-being of transgender youth was never the goal.[40]

### C. The Interference with Healthcare Facilities in the Amici States Will Have Adverse Downstream Effects on Amici States.

The Executive Orders have interfered with healthcare facilities in Amici States and have the potential to interfere with state agency operations, causing irreparable harm. *See, e.g., Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017), *reconsideration denied*, No. 17-CV-00485-WHO, 267 F. Supp. 3d 1201, 2017 WL 3086064 (N.D. Cal. July 20, 2017); *Mich. v. DeVos*, 481 F. Supp. 3d 984, 988–89 (N.D. Cal. 2020). The potential that state healthcare facilities may lose funding, and the budgetary uncertainty that results, requires Amici States to take steps to mitigate the risk of losing federal funds. This uncertainty interferes with Amici States' ability to budget, plan for the future, and properly serve their residents. *See Cnty. of Santa Clara*, 250 F. Supp. 3d at 537; *see also United States v. North Carolina*, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016) (finding irreparable harm where unavailability of funds was "likely to have an immediate impact on [the state's] ability to provide critical resources to the public, causing damage that would persist regardless of whether funding [was] subsequently reinstated").

Implementation of the Executive Orders will also result in States facing a population of transgender youth in crisis. Transgender youth who are denied gender-affirming care are likely

---

[40] The Administration gives the Executive Orders "credit" for decisions by New York, NYU Langone Health; Colorado, Denver Health; VCU Health and Children's Hospital in Richmond, Virginia; and Children's National Hospital in Washington, D.C. "pausing" or cancelling appointments for minors seeking gender-affirming care. Fact Sheets, *supra* note 30.

to require additional, more costly physical and mental healthcare, now and down the road.[41] The Executive Orders are already causing (and will continue to cause) serious harm to this population, affecting their ability to thrive at school and at home.

## CONCLUSION

This Court should grant Plaintiffs' motion for a preliminary injunction (ECF 69) and enjoin Defendants from implementing or enforcing sections 3(g) and 4 of the Executive Order.

Dated: February 21, 2025

Respectfully submitted,

/s/ *James D. Handley*

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*
ALLYSON SLATER
  *Deputy Director, Reproductive Justice Unit*
KIMBERLY PARR
ADAM M. CAMBIER
  *Assistant Attorneys General*
*Attorneys for the Commonwealth of Massachusetts*

ROB BONTA
  *Attorney General of California*
NELI N. PALMA
  *Senior Assistant Attorney General*
KATHLEEN BOERGERS
  *Supervising Deputy Attorney General*
KETAKEE KANE
HILARY BURKE CHAN
  *Deputy Attorneys General*
*Attorneys for the State of California*

ANTHONY G. BROWN
  *Attorney General of Maryland*
JAMES D. HANDLEY
  *Assistant Attorney General (counsel of record)*
  *Federal Bar No. 20299*
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
Tel.: (410) 576-6993
Fax: (410) 576-6955
jhandley@oag.state.md.us
*Attorneys for the State of Maryland*

[Additional counsel listed on subsequent page]

---

[41] Landon D. Hughes et al., *"These Laws Will Be Devastating": Provider Perspectives on Legislation Banning Gender-Affirming Care for Transgender Adolescents*, 69 J. Adolescent Health 976 (2021) ("[P]roviders described how denial of evidence-based, gender-affirming care for [transgender and gender-diverse youth] will necessitate more serious and costly interventions including avoidable surgeries later in life"); *Outlawing Trans Youth: State Legislatures and the Battle over Gender-Affirming Healthcare for Minors,* 134 Harv. L. Rev. 2163 (2021) (explaining how puberty blockers and hormone replacement therapies allow transgender youth to avoid intense psychological distresses, including anxiety, depression, and suicidal behavior).

Additional Counsel

PHILIP J. WEISER
*Attorney General, State of Colorado*
Office of the Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General of the State of Delaware*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
*Attorney General of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General of Illinois*
115 S. LaSalle St.
Chicago, IL 60603

AARON M. FREY
*Attorney General of Maine*
6 State House Station
Augusta, ME 04333-0006

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
*Attorney General of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

LETITIA A. JAMES
*Attorney General*
*State of New York*
28 Liberty St.
New York, NY 10005

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

DAN RAYFIELD
*Attorney General of Oregon*
1162 Court Street NE
Salem, OR 97301

CHARITY R. CLARK
*Attorney General of Vermont*
109 State Street
Montpelier, VT 05609

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

BRIAN L. SCHWALB
*Attorney General for the District of Columbia*
400 6th Street NW
Washington, DC 20001

## CERTIFICATE OF SERVICE

    I certify that, on this 21st day of February, 2025 the foregoing was served by CM/ECF on all counsel of record.

                                                  /s/ *James D. Handley*
                                                  JAMES D. HANDLEY