# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

---

PFLAG, INC., *et al.*,                              )
                                                    )
                        Plaintiffs,                 )
                                                    )
            v.                                      )       Civil Action No. 8:25-cv-337
                                                    )
DONALD J. TRUMP, in his official capacity as        )
President of the United States, *et al.*,           )
                                                    )
                        Defendants.                 )

---

## <u>DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>

## CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................3

   I.  The Executive Orders ........................................................................................3

   II.  This Lawsuit....................................................................................................5

STANDARD OF REVIEW ...................................................................................................6

ARGUMENT .......................................................................................................................7

   I.  Plaintiffs' claims fail at the threshold. ...............................................................7

     A. Any claims against the agency defendants are premature because they have not revoked or denied any funding on the basis of the EOs. ...............................................7

     B. Article II precludes this Court from considering Plaintiffs' claims..............................11

     C. Plaintiffs lack an equitable cause of action. ...................................................11

   II.  Plaintiffs have not established a likelihood of success on the merits. ..............................12

     A. The EOs cannot be ultra vires when they merely direct agencies to act in accordance with applicable law. ......................................................................................13

     B. Plaintiffs are unlikely to succeed on the merits of their Equal Protection claim. .........17

     C. Plaintiffs are unlikely to succeed on the merits of their statutory sex discrimination claim...........................................................................................25

   III. The remaining factors counsel against granting the requested relief.............................26

   IV. Any injunctive relief should be limited to Plaintiffs.............................................27

   V.  Any injunctive relief should be accompanied by a bond. ....................................30

   VI. Any injunctive relief should be stayed.........................................................30

CONCLUSION....................................................................................................................30

## INTRODUCTION

President Trump issued two Executive Orders (EOs) directing agencies to take steps, as permitted by law, to place conditions on certain federal grant funding in accordance with the Administration's policy goals. Executive Order 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025), entitled *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Defending Women EO), sets forth a policy "to recognize two sexes, male and female." *Id.* § 2. It states in relevant part that "each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* § 3(g). Meanwhile, Executive Order 14,187, 90 Fed. Reg. 8771, *Protecting Children from Chemical and Surgical Mutilation* (Protecting Children EO), sets forth a policy that the federal government will not "fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another." *Id.* § 1. It directs the heads of agencies that provide research or educational grants to medical institutions to, "consistent with applicable law and in coordination with the Director of the Office of Management and Budget, immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children." *Id.* § 4. Both orders make clear that they "shall be implemented consistent with applicable law," EO 14,168 § 8(b); EO 14,187 § 11(b), and "shall not be construed to . . . affect . . . the authority granted by law to an executive department or agency, or the head thereof," EO 14,168 § 8(a)(i); EO 14,187 § 11(a)(1).

Plaintiffs, two membership organizations and several individuals, claim the EOs were issued without authority, conflict with two laws prohibiting sex discrimination, and violate the Fifth Amendment's equal protection guarantee. Plaintiffs seek the extraordinary relief of a nationwide preliminary injunction (PI) enjoining the agency defendants from "conditioning or withholding federal funding based on" the provision of "gender affirming medical care." Proposed

Order on Pls.' Mot. for PI at 2, ECF No. 69-2 (Pls.' Proposed Order). But Plaintiffs fail to satisfy any of the requirements for the relief they seek.

Plaintiffs' claims fail at the threshold for multiple reasons. They identify no cause of action against the defendant agencies and cannot sue the President to challenge the EOs. Further, their claims are unripe. The defendant agencies have not denied or revoked any particular grants relied upon by the individual Plaintiffs' providers or association GLMA's members as a result of the EOs. Which grants the agencies can condition consistent with applicable law as directed by the EOs is currently uncertain, and there is no final agency action for the Court to evaluate.

On the merits, Plaintiffs are unlikely to succeed on any of their claims. First, the EOs are not *ultra vires.* The President's authority to direct subordinate agencies to implement his agenda, subject to those agencies' own statutory authorities, is well-established. *See Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[T]he President's power necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926))). By their terms, the EOs require any funding conditions to be implemented consistent with applicable law. Those laws include the executive's delegated authority to administer grants, including the procedural and substantive requirements applicable to individual grants that are set forth by statute and regulation. They also include antidiscrimination statutes like Section 1557 of the Affordable Care Act (ACA), and Section 1908 of the Public Health Services Act (PHSA), and the Constitution, which Plaintiffs paradoxically claim *conflict* with the EOs instead of cabining their scope.

Second, the EOs do not violate the Fifth Amendment's guarantee of equal protection. The framework for scrutinizing governmental action under equal protection doctrine has little

application here, where there is no agency action to scrutinize. The government recognizes that the Fourth Circuit in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024), held that certain funding restrictions on the provision of similar kinds of treatments implicated suspect classifications, although the government's position is that *Kadel* was wrongly decided and should be overruled. But Plaintiffs' equal protection claim nevertheless fails because the EOs substantially relate to the important governmental interest of safeguarding children from potentially dangerous, ineffective, and unproven treatments. As a result, the EOs satisfy both rational basis and heightened scrutiny.

As to Plaintiffs' statutory sex discrimination claims under Section 1557 of the ACA, 42 U.S.C. § 18116, and Section 1908 of the PHSA, 42 U.S.C. § 300w-7, the EOs expressly require any implementing agency action to be consistent with applicable law, including those statutes, and Plaintiffs have identified no action violating them. Plaintiffs also fail to satisfy the remaining elements for a preliminary injunction.

For these reasons, as explained more fully below, Plaintiffs' PI motion should be denied. If the court nonetheless enters a PI, it should be limited to Plaintiffs, accompanied by a bond, and stayed pending any further review.

## BACKGROUND

### I.     The Executive Orders

On January 20, 2025, President Trump signed the Defending Women EO. It states that "the Executive Branch will enforce all sex-protective laws to promote" the policy "to recognize two sexes, male and female," which "are not changeable." EO 14,168 § 2. In relevant part, the EO directs agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology," *id.* § 3(e), including by "assess[ing] grant conditions and grantee preferences and ensur[ing] grant funds do not promote gender ideology," *id.* § 3(g). The EO makes clear that "[n]othing in this order shall be construed to impair or otherwise affect . . . the authority granted

by law to an executive department or agency," *id.* § 8(a), and that the "order shall be implemented consistent with applicable law," *id.* § 8(b).

On January 28, 2025, President Trump signed the Protecting Children EO. In relevant part, it directs the heads of departments and agencies "that provide[] research or educational grants to medical institutions" to, "consistent with applicable law and in coordination with the Director of the Office of Management and Budget, immediately take appropriate steps to ensure that institutions receiving Federal research or educations grants end the chemical and surgical mutilation of children."[1] EO 14,187 § 4.

The Protecting Children EO does not restrict care but rather announces a policy on what sorts of education and research the Executive Branch has chosen to subsidize, consistent with applicable law. The EO also does not address medical institutions or practices that do not receive federal research or educational grants, like many private, physician-owned practices, even if they receive other federal funding. Like the Defending Women EO, the Protecting Children EO makes clear that "[n]othing in this order shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency," *id.* § 11(a)(i), and that the "order shall be implemented consistent with applicable law," *id.* § 11(b). Further, the Protecting Children EO

---

[1] The EO defines "chemical and surgical mutilation" to mean

the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions.

EO 14,187 § 2(c).

contemplates that implementation of its directives will take time: in Section 9, it instructs agencies to submit a progress report within 60 days of the order, "detailing progress in implementing this order and a timeline for future action." EO 14,187 § 9.

A majority of states have gone further and enacted laws and policies to restrict gender-affirming care for minors. *See* KFF, *Policy Tracker: Youth Access to Gender Affirming Care and State Policy Restrictions*, https://perma.cc/M9Y3-D4M2 (last accessed Feb. 24, 2025). Other countries have also recently adopted similar restrictions. Joshua P. Cohen, *Increasing Number Of European Nations Adopt A More Cautious Approach To Gender-Affirming Care Among Minors*, FORBES, June 14, 2023, https://perma.cc/9VM9-W4S4 (last accessed Feb. 24, 2025).

## II.    This Lawsuit

On February 4, 2025, Plaintiffs filed this lawsuit. Compl., ECF No. 1. One week later, Plaintiffs amended their complaint. Am. Compl., ECF No 53. Plaintiffs consist of two membership organizations and several individuals. Am. Compl. ¶¶ 13–26. They sued President Trump, the U.S. Department of Health and Human Services (HHS), two HHS components, the National Science Foundation (NSF), and the heads of those agencies and components. Am. Compl. ¶¶ 27–36.

On February 5, 2025, Plaintiffs filed a motion for a temporary restraining order (TRO). On February 13, this Court granted the motion and restrained Defendants from "conditioning or withholding federal funding based on the fact that a healthcare entity or health professional provides gender affirming medical care to a patient under the age of nineteen under Section 3(g) of Executive Order 14168 and Section 4 of Executive Order 14187." TRO, ECF No. 61; *see also* Memorandum Opinion (TRO Op.), ECF No. 62.

Thereafter, Plaintiffs filed a motion for a PI. Pls.' Mot. for Prelim. Inj., ECF No. 69. Plaintiffs seek to preliminarily enjoin the agency defendants from

conditioning, withholding, or terminating federal funding under Section 3(g) of the Gender Identity Order and Section 4 of the Denial of Care Order based on the fact that a healthcare entity or health professional provides gender affirming medical care to a patient under nineteen, including any healthcare institution from which the Individual Plaintiffs, members of Plaintiff PFLAG, and patients of health professional members of Plaintiff GLMA receive gender affirming medical care, or at which health professional members of Plaintiff GLMA conduct federally-funded work.

Pls.' Proposed Order at 2, ECF No. 69-2.

Plaintiffs raise three claims in their motion: (1) the EOs are *ultra vires* because they purportedly attempt to amend, repeal, rescind, or circumvent duly enacted federal statutes or appropriations; (2) the EOs are *ultra vires* because they allegedly conflict with Section 1557 of the ACA, 42 U.S.C. § 18116, and Section 1908 of the PHSA, 42 U.S.C. § 300w-7; and (3) the EOs violate the equal protection component of the Fifth Amendment. *See* Mem. in Supp. of Pls.' Mot. for Prelim. Inj., ECF No. 69-1 (Pls.' Mem.).

## STANDARD OF REVIEW

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *see also MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power" and is "to be granted only sparingly and in limited circumstances" (citation omitted)). Such an injunction "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 690 (2008). A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

# ARGUMENT

## I.    Plaintiffs' claims fail at the threshold.

Multiple threshold defects plague Plaintiffs' claims. They identify no cause of action or final agency action that allows them to proceed against the agency defendants. Their claims are unripe because the agency defendants have not revoked or withheld funding based on the challenged portions of the EOs, leaving material questions unanswered about the statutory and regulatory requirements for any grant funding at issue and the scope of funding potentially at stake. Their attempt to prevent the Executive Branch from even considering a Presidential directive runs afoul of Article II. And Plaintiffs fail to demonstrate they are entitled to seek *ultra vires* relief.

> *A. Any claims against the agency defendants are premature because they have not revoked or denied any funding on the basis of the EOs.*

*No statutory cause of action.* Plaintiffs cannot bring claims against the agency defendants.[2] As an initial matter, Plaintiffs do not invoke the Administrative Procedure Act (APA) or any other statute providing for a cause of action against an agency. *See, e.g.*, 5 U.S.C. § 706(2)(A)–(C) (permitting courts to "set aside agency action . . . otherwise not in accordance with law; contrary to constitutional right. . . [or] in excess of statutory jurisdiction"). In any event, invoking the APA would be futile. The APA authorizes challenges to only final agency action. *Id.* § 704. A final

---

[2] Plaintiffs also cannot obtain relief against the President for issuing the EOs. Courts have no authority to second-guess "discretion[ary]" acts taken by the President "in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. 475, 499, 501 (1866); *see also Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part); *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *13 (D.C. Cir. Feb. 15, 2025) ("[T]he President enjoys absolute immunity from injunctive actions."). The courts' refusal to police the President's discretionary acts is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief." (citation omitted)).

agency action is one that "marks the consummation of the agency's decisionmaking process" and from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 156 (1997); *Genesis Healthcare, Inc. v. Becerra*, 39 F.4th 253, 262 (4th Cir. 2022). Plaintiffs have not shown any action taken by the agency defendants that determined any rights or obligations or otherwise caused legal consequences. Indeed, Plaintiffs' claimed harm is not based on any action taken by the agency defendants, but on the decisions of medical institutions to stop providing certain treatments based on their prediction that the agency defendants might take some action in the future to revoke their funding. *See* Pls.' Mem. at 12–15, 16–17. Furthermore, this Court's determination that the APA supplies the waiver of sovereign immunity for Plaintiffs' lawsuit,[3] TRO Op. at 18, does not provide Plaintiffs with a cause of action, which is a separate inquiry.[4] *See Z St., Inc. v. Koskinen*, 44 F. Supp. 3d 48, 65 (D.D.C. 2014), *aff'd sub nom. Z St. v. Koskinen*, 791 F.3d 24 (D.C. Cir. 2015).

*Ripeness.* For similar reasons, any claims against the agency defendants are not ripe. The ripeness doctrine "require[s] courts to avoid taking premature judicial action, thereby preventing them from becoming entangled in 'abstract disagreements.'" *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)). "A case is fit for adjudication when the action in controversy is final and not dependent on future uncertainties." *Id.* (quotation omitted). In other words, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).

---

[3] Plaintiffs did not plead a waiver of sovereign immunity under the APA in their Amended Complaint. *See generally* Am. Compl.; *see also Lancaster v. Sec'y of Navy*, 109 F.4th 283, 293 (4th Cir. 2024) ("[I]t is the plaintiff's burden to show that an unequivocal waiver of sovereign immunity exists and that none of the statute's waiver exceptions apply to his particular claim." (internal citation and quotation marks omitted)).

[4] And as discussed *supra*, Plaintiffs cannot assert an *ultra vires* claim, either.

Here, no agency defendant has revoked or denied any particular grants as a result of the EOs. Plaintiffs and the Court note that HRSA and the CDC issued now-rescinded emails to grant recipients that purportedly ripen this dispute. TRO Op. at 11–12; Pls.' Mem. at 23. But those generic emails do not constitute final agency action: neither agency component terminated any funding, let alone identified any specific grants at imminent risk. *See* ECF No. 35-5; ECF No. 57-2; *Nev. v. Dep't of Energy*, 457 F.3d 78, 85 (D.C. Cir. 2006) ("Final agency action pursuant to the Administrative Procedure Act is a crucial prerequisite to ripeness." (cleaned up)). Nor can these emails be considered the final agency response contemplated by the Protecting Children EO. By asking agencies for a progress report and a timeline for future action within 60 days, the EO anticipates final implementation to require more time. EO 14,187 § 9.

This Court also relied on *Stone v. Trump*, 280 F. Supp. 3d 747, 767 (D. Md. 2017), for the proposition that a matter is ripe when "[t]he only uncertainties are how, not if, the policy will be implemented." *Id.*; TRO Op. at 13. But that unsupported statement is doctrinally unsound and especially inapplicable here, where the "how" is crucial to determining whether any ultimate restrictions on funding are lawful. And even if the policy is eventually implemented as to some funding, it is not clear which funds would be implicated or if the plaintiffs here would be affected.

After all, when an agency puts into place any of the EOs' contemplated grant conditions, it must take only appropriate actions "as permitted by law." EO 14168 § 3(e); *see also* EO 14,187 § 4. Because the agency defendants have not withheld or denied specific grants on the basis of the EOs, it is not clear what law the Court would need to apply or what funding would be at stake. The Court cannot determine in the abstract whether the statutory and regulatory requirements for any particular grant program provide the agency with discretion to condition funding on these terms.

For instance, consider the Ryan White HIV/AIDS grant that Plaintiffs highlight. *See* Pls.'

Mem. at 20. Plaintiffs argue that the Protecting Children EO "strips grantees, including [declarant] Dr. Birnbaum, of their Ryan White Program funding if they also provide . . . gender-affirming care." *Id.* But Dr. Birnbaum receives funding under Part D of the program. Decl. of Dr. Jeffrey Birnbaum ¶ 7, ECF No. 69-46. That program funds only outpatient and ambulatory care grants for individuals with HIV/AIDS, not education or research grants. *See* Ex. A. at 18–19 (program notice of funding opportunity, which states that grant funds cannot be used for clinical research or research). Plaintiffs therefore have not established that this grant—which is the only specific example they provide in their briefing—would even be subject to the Protecting Children EO.

Moreover, as discussed in greater detail below, Congress in some circumstances provides the Executive Branch with significant discretion to determine and amend grant conditions. *See* Part II.A, *infra*. This Court thus cannot evaluate whether, in imposing a new or amended condition, an agency has lawfully exercised the discretion afforded to it without knowing the specific condition that has been imposed and the source of agency's authority to impose it. And given the latitude that Congress affords agencies in setting grant conditions in many circumstances, this Court is not free to assume that there are no situations in which an agency could amend a grant in the manner contemplated by the EOs.

Absent the essential context of which, if any, grants held by specific medical institutions are actually at risk, it would be premature to decide the issues now. *See Scoggins*, 718 F.3d at 271 (homeowners' claim based on request for HOA's permission to engage in construction not ripe for review because "final action on the request is still forthcoming and is dependent on future uncertainties"); *Donovan v. Vance*, 576 F. Supp. 3d 816, 824 (E.D. Wash. 2021), *aff'd in part, appeal dismissed in part and remanded,* 70 F.4th 1167 (9th Cir. 2023) ("It is simply too early to know with any degree of certainty whether Plaintiffs' fears of termination will come into

fruition."). If and when an agency takes final agency action against a medical institution under the EO, an injured party may bring suit then, and the Court can decide the matter on the facts presented.

*B. Article II precludes this Court from considering Plaintiffs' claims.*

As explained, the EO charges certain components of the Executive Branch with taking appropriate steps to implement a policy directive by the President, in a manner consistent with all applicable law. The President plainly has the constitutional authority to do just that. *See* Art. II § 1 ("The executive Power shall be vested in a President of the United States of America."); *id.* § 2 ("[h]e may require the Opinion . . . of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices."). Of course, if an agency decides to act in a specific manner contrary to law, the federal courts may review (and prevent) that action; but federal courts cannot superintend that policymaking—let alone proscribe it from even taking place. *See Trump v. United States*, 603 U.S. 593, 608–09 (2024).

*C. Plaintiffs lack an equitable cause of action.*

All of Plaintiffs' claims—statutory and constitutional—depend on this Court's inherent equitable powers to provide a cause of action, remedying what they see as *ultra vires* executive conduct in violation of some binding source of law. But that narrow form of relief, whatever its precise bounds, is not available to the Plaintiffs here.

The *ultra vires* doctrine is "extremely limited" in "scope." *Griffith v. Fed. Labor Rel. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988). Of these limits, one is that it is only available to parties who are the *direct objects* of the allegedly unlawful governmental action. *See Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 153–54 (1951) (Frankfurter, J., concurring) ("[T]he injury must be 'a wrong which directly results in the violation of a legal right.'"). *Ultra vires* relief developed as an equitable remedy to prevent the government from unlawfully acting upon a person—*i.e.*, to prevent a certain restriction or enforcement action from taking place. *See, e.g.*,

*American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110–11 (1902). It is not a tool for those incidentally affected later, empowering them to reach upstream and proactively combat an alleged wrong happening to another. *See Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 902–04 (10th Cir. 2017). And that is this case. All of the hypothetical future actions that Plaintiffs complain about are funding decisions affecting separate medical institutions. But *those* institutions would be the direct objects of any unlawful action. Plaintiffs here may be incidentally harmed depending on how those institutions react (*i.e.*, whether they choose to forgo federal funding or continue certain procedures). But this Court's inherent equitable powers do not provide a cause of action to redress that sort of removed harm. The Court previously analyzed this issue under Article III standing case law to conclude that Plaintiffs have established "causation" between the EO and their claimed injuries. TRO Op. at 23; *see also id.* at 21–24. But Defendants have not challenged Plaintiffs' standing. And, as explained above, more is required to proceed on the limited, equitable claim for *ultra vires* relief. Plaintiffs fail to meet that burden.

Another limit is that *ultra vires* relief must run against a particular government action that "violates some specific command of a statute" or other binding law. *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 764 (D.C. Cir. 2022). But again, Plaintiffs have not identified any specific source of authority that prevents a presidential order directing subordinates to consider and pursue as appropriate (and as consistent with law) a given policy. All of Plaintiffs' arguments concern hypothetical downstream actions that may or may not result from the EO; but *ultra vires* relief is about stopping actual concrete action, not pretermitting hypothetical future harm.

## II.    Plaintiffs have not established a likelihood of success on the merits.

The President plainly has authority to direct agencies to fully implement his agenda, consistent with each agency's underlying statutory authorities. This well-established authority dooms Plaintiffs' likelihood of succeeding on their claim that the President exceeded his authority

in issuing the EOs. Plaintiffs also are unlikely to succeed on their constitutional and statutory discrimination claims: the EOs do not discriminate based on sex or any other protected class, and they bear a substantial relationship to important governmental objectives regarding the protection of children and adolescents from potentially dangerous and ineffective treatments such that they satisfy any possible standard of constitutional scrutiny anyway.

### A. The EOs cannot be ultra vires when they merely direct agencies to act in accordance with applicable law.

Plaintiffs' facial, *ultra vires* claims fail because they rely on characterizations of the EOs that are simply inconsistent with their terms. The EOs do not purport to withhold all federal funding if an institution promotes gender ideology or provides the treatments referenced in the Protecting Children EO. Instead, the EOs instruct agencies to implement the President's policy to the extent permitted by applicable law. The Executive often has discretion to impose other conditions or allocate fixed grants based on priorities. As discussed above, courts have long upheld these types of Presidential directives to agencies.

The Defending Women EO explicitly states that any withholding of federal funds must only be implemented "as permitted by law." EO 14168 § 3(e). The Protecting Children EO likewise requires agencies to act "consistent with applicable law and in coordination with the Director of the Office of Management and Budget" in ending federal research and educational grants to institutions providing the treatments referenced in the EO. EO 14,187 § 4. Further, both EOs include a "General Provision[]," stating that "[n]othing in this order shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency" and that "[t]his order shall be implemented consistent with applicable law." EO 14,168 § 8(a), (b); EO 14,187 § 11(a), (b).

Definitionally, directing executive agencies to take action *to the extent consistent with applicable law* cannot be interpreted as an order to violate the law. It is plainly lawful for the President to instruct agencies to act within their own statutory authorities to implement the President's priorities consistent with applicable law. *See, e.g.*, *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."); *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981). Indeed, on his first day in office, President Biden issued an analogous executive order, requiring agencies to take action, consistent with applicable law, "to fully enforce . . . laws that prohibit discrimination on the basis of gender identity or sexual orientation. Exec. Order No. 13,988, §§ 1–2, 86 Fed. Reg. 7023, 7023 (Jan. 20, 2021). Those kinds of orders are fairly frequent across presidential administrations.[5]

The D.C. Circuit's decision in *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002) is instructive. There, Plaintiffs challenged an executive order that provided that "to the extent permitted by law," no federal agency and no entity that receives federal assistance for a construction product could require or prohibit bidders or contractors from entering into a project labor agreement. *Id.* at 29. Plaintiffs sued, claiming that

---

[5] Presidents regularly exercise their supervisory authority over how executive officers carry out their statutory responsibilities. *See, e.g.*, Exec. Order No. 12,866, 58 Fed. Reg. 51,735, § 1(b), (Sept. 30, 1993) (directing agencies on how to exercise regulatory authority, "to the extent permitted by law and where applicable"); Exec. Order No. 13,563, 76 Fed. Reg. 3821, § 1(b) (Jan. 18, 2011) (similar); Exec. Order No. 13,279, 67 Fed. Reg. 77,141, § 2 (Dec. 12, 2002) (directing agencies, "to the extent permitted by law," to be guided by certain principles when "formulating and implementing policies that have implications for faith-based and community organizations"); Exec. Order No. 13,765, 82 Fed. Reg. 8351, § 2 (Jan. 20, 2017) (directing agencies to "exercise all authority and discretion available to them" to waive certain requirements "[t]o the maximum extent permitted by law"); Exec. Order. No. 14,004, 86 Fed. Reg. 7475 § 1 (Jan. 25, 2021) (directing the Executive Branch to "consistent with applicable law, use terms and conditions of Federal financial assistance awards and Federal procurements to maximize the use of goods, products, and materials produced in, and services offered in, the United States").

the executive order exceeded the President's constitutional authority. *See id.* at 31–32. The D.C. Circuit rejected this argument, pointing out that the executive order "directs [agencies] how to proceed in administering federally funded projects, but only '[t]o the extent permitted by law.'" *Id.* at 33. "Thus, if an executive agency, such as the FEMA, may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Id.* The court concluded that "[t]he mere possibility that some agency might make a legally suspect decision" in the future is not a ground for an injunction. *Id.* (citing *Reno v. Flores*, 507 U.S. 292, 301 (1993)); *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) (Katsas, J.) ("We cannot ignore these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing the memorandum.").

The Fourth Circuit's decision in *HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021), is not to the contrary. There, the court held that an EO and an implementing agency notice imposed a requirement that was contrary to statute, even though they allowed a "theoretical opportunity for the Secretary to *override*" the unlawful requirement. *Id.* at 325. Imposing a requirement that is contrary to law, but allowing agencies the "discretion" to override it in "limited circumstances," *id.* at 319, is not the same as directing agencies to take actions only to the extent they are consistent with applicable law. The former may be contrary to law, but the latter cannot.[6]

Nor do the EOs challenged here "preclude[] a court from examining whether [they are] consistent with law," rendering "judicial review . . . a meaningless exercise." *HIAS*, 985 F.3d at 325 (quoting *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018)). As the D.C.

---

[6] The EOs' applicability only to the extent consistent with existing law also forecloses Plaintiffs' argument that they conflict with Section 1557 of the ACA, 42 U.S.C. § 18,116, Section 1908 of the PHSA, 42 U.S.C. § 300w-7, or the Fifth Amendment. *See* Pls.' Mem. at 19–27.

Circuit noted, "[i]n the event that an agency does contravene the law in a particular instance, an aggrieved party may seek redress through any of the procedures ordinarily available to it: a bid protest, a motion for administrative reconsideration, or an action in the district court challenging that specific decision." *Allbaugh*, 295 F.3d at 33; *see also* 5 U.S.C § 702.

Plaintiffs and this Court appear to misapprehend the nature of the EOs and of executive authority to administer grants. Contrary to Plaintiffs' argument, the Executive Branch does not uniformly "lack[] the power to condition federal funds." Pls.' Mem. at 18. For example, NIH possesses general authority to fund research, *see* 42 USC §§ 241(a), 284(b), and to exercise discretion to allocate funds and determine research priorities, *id.* § 282(b)(3), (5), (6), (21); *cf. Apter v. Richardson*, 510 F.2d 351, 355 (7th Cir. 1975) ("[T]he Public Health Service Act does confer broad discretion in the funding of training programs."). NIH has exercised this authority, delegated by Congress, to add terms and conditions to grants in accordance with Executive Orders, including Executive Order 13,505, which directed NIH to "support and conduct responsible, scientifically worthy human stem cell research, including human embryonic stem cell research, to the extent permitted by law." Exec. Order 13,505, 74 FR 10,667, 10,667 (2009); *see* NIH Guidelines, 74 FR 32,170–32,175 (July 7, 2009); 45 C.F.R. § 75.210 (authorizing NIH to place terms and conditions on awards); *Sherley v. Sebelius*, 644 F.3d 388, 397 (D.C. Cir. 2011).

This is but one example where the Executive Branch possesses discretion, delegated by Congress, to administer federal grants, including by conditioning or distributing funds according to Presidential policies. Therefore, contrary to the Court's TRO opinion, the President's directive to agencies to take appropriate steps to condition certain grants consistent with applicable law does not facially exceed the President's Article II authority, does not infringe on Congress's spending power, and does not usurp Congress's Article I lawmaking authority. *See* TRO Op. at 31–37.

TROs granted against a separate executive order placing a broad and immediate pause on federal funding, meanwhile, do not counsel in favor of a PI here. *See* TRO, *New York v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I. Jan. 31, 2025), ECF No. 50; *see also* TRO, *Nat'l Council of Nonprofits v. OMB*, 25-cv-239-LLA (D.D.C. Feb. 3, 2025), ECF No. 30. In those cases, the plaintiffs challenged a now-rescinded OMB memorandum "requir[ing] Federal agencies to identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements." OMB Mem. at 1, M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025). The OMB Memo further directed that "[i]n the interim, to the extent permissible under applicable law, Federal agencies must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders." *Id.* at 2. The EOs at issue here are fundamentally different from the funding pause at issue in those cases. By their own terms, the EOs challenged here direct agencies to impose a new *condition* on grant funding (to the extent consistent with applicable law)—not immediately pause existing grant funding. Thus, the two actions implicate different agency statutory authorities and aspects of the underlying grant agreements. Moreover, no agency defendant has terminated or withheld funding for any grant on the basis of the Defending Women or Protecting Children EOs.

### B. Plaintiffs are unlikely to succeed on the merits of their Equal Protection claim.

"[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). This guarantee "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). To analyze governmental action under the equal protection guarantee, courts "apply different levels of scrutiny to different types of classifications." *Clark v.*

*Jeter*, 486 U.S. 456, 461 (1988). Typically, governmental classifications must be merely "rationally related to a legitimate governmental purpose." *Id.* "Classifications based on race or national origin," on the other hand, are suspect and receive "the most exacting scrutiny." *Id.* "Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy." *Id.*

As an initial matter, application of any of these tiers of scrutiny is inappropriate here, where there is no agency action to scrutinize. The EOs further do not implicate a suspect or quasi-suspect classification. Although the Fourth Circuit in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) held that certain funding restrictions on the provision of similar kinds of treatments implicated quasi-suspect classifications, the government's position is that *Kadel* was wrongly decided and should be overruled.[7] In any event, the EOs satisfy both rational and intermediate scrutiny, and Plaintiffs' motion should therefore be denied.

   i.   *EOs directing agencies to explore future options are not amenable to constitutional scrutiny.*

At the threshold, there is a doctrinal mismatch between the EOs—which direct agencies to explore a policy option—and any form of heightened scrutiny. As discussed in Parts I.A and II.A, *supra*, the EOs only direct agencies to gather information and take "appropriate steps," based on what the facts and law allow. EO 14,187 § 4. The EOs do not, as Plaintiffs posit, "prohibit recipients of federal funds" from doing anything. Pls.' Mem. at 22. Plaintiffs seek to pretermit the agencies' information-gathering process, forcing the government to justify policies that it has not

---

[7] Petitions for certiorari in *Kadel* are currently pending before the Supreme Court. The Supreme Court's disposition of those petitions may be affected by its forthcoming decision in *United States v. Skrmetti*, No. 23-477 (U.S.), concerning whether other state laws regarding similar treatments violate the Equal Protection Clause.

even adopted. Defendants are aware of no case requiring that the government must carry a particular evidentiary burden before it can even *contemplate* future action, and Plaintiffs cite none. Plaintiffs therefore have not met their heavy burden to show entitlement to the extraordinary relief of a preliminary injunction.

> ii.    The EOs do not warrant intermediate scrutiny based on sex classification.

In *Kadel*, the closely-split *en banc* Fourth Circuit held that funding restrictions on coverage for treatments whose purpose was "to align a patient's gender presentation with a gender identity that does not match their sex assigned at birth" amounted to a sex classification, where coverage was not restricted "when the purpose of the surgery is to align a patient's gender presentation with their sex assigned at birth." *Id.* at 153. *Kadel* did not consider conditions tethered solely on provision of certain treatments to adolescents. But in any event, the government respectfully preserves the argument that *Kadel* was wrongly decided.

The EOs do not treat anyone differently on the basis of sex, applying evenhandedly to males and females. The Protecting Children EO directs agencies to take appropriate steps, consistent with applicable law, to ensure that grant recipients do not provide the referenced treatments to members of either sex who are less than 19 years of age. EO 14,187 §§ 2, 4. *See L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 480 (6th Cir. 2023), *cert. granted*, 144 S. Ct. 2679 (U.S.) (that a "key distinction in the laws turns on age" is "eminently reasonable and does not trigger heightened review."). The Defending Women EO similarly rejects the proposition that "there is a vast spectrum of genders that are disconnected from one's sex," EO 14,168 § 2(f)—a position that applies equally to both sexes. Such policies do not privilege or burden one sex over the other, nor apply one regime to men and another to women, making it wholly unlike the classifications the Supreme Court has found to be sex-based. *See, e.g.*, *Miss. Univ. for Women v. Hogan*, 458 U.S.

718 (1982) (university's policy of admitting women, but not men, was sex classification).

Plaintiffs wrongly contend that the Protecting Children EO classifies based on sex because it does not implicate "a given type of care" (e.g., "testosterone") to a boy who seeks to align his appearance with a male identity, but does implicate that type of care for a girl who seeks to align her appearance with a male identity. Pls.' Mem. at 23. This reasoning wrongly "assumes that any administration of these hormones is one treatment," whereas in fact "[u]sing testosterone or estrogen to treat gender dysphoria . . . is a different procedure from using testosterone or estrogen to treat, say, Kleinfelter Syndrome or Turner Syndrome." *Skrmetti*, 83 F.4th at 481; *see also Eknes-Tucker v. Governor of Ala.*, 114 F.4th 1241, 1262 (11th Cir. 2024) (Lagoa, J., concurring in denial of reh'g en banc) (state restriction on similar treatments "discriminates based on purpose, not sex"). That the Protecting Children EO addresses different treatments differently does not implicate the Fifth Amendment's requirement that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

Plaintiffs also wrongly argue the EOs classify based on sex because they "enforc[e] sex stereotypes and gender conformity." Pls.' Mem. at 22. But the Orders do not prescribe how men and women should behave or present themselves, nor do they rely on generalizations relating to "the proper roles of men and women," *Hogan*, 458 U.S. at 726. The EOs instead recognize inherent biological differences between men and women—differences that the Supreme Court and others have long recognized. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533 (1996) (stating that "[p]hysical differences between men and women . . . are enduring"). Governmental recognition of the "biological" and "undeniable difference[s]" between the sexes "is not a stereotype." *Nguyen v. INS*, 533 U.S. 53, 68, 73 (2001); *see also Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974).

       *iii.*   *The EOs do not warrant intermediate scrutiny based on trans-identifying classification.*

Plaintiffs next argue that the EOs trigger intermediate scrutiny because they "classify based on transgender status." Pls.' Mem. at 23. The Protecting Children EO targets only specified treatments for minors based on their medical purpose, EO 14,187 § 2, and does not constitute a classification based on "transgender status." Nor does the Defending Women EO's recognition that the "sexes are not changeable," EO 14,168 § 2, "deny the existence," TRO Op. at 40, of persons whose "subjective sense of self" is "disconnected" from that "biological reality," EO 14,168 § 2.

Even if the Court finds that the EOs classify based on trans-identifying status, as it did in its TRO opinion, the government respectfully preserves the argument that the Fourth Circuit's cases treating trans-identifying individuals as a "quasi-suspect class" were wrongly decided. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020). Trans-identifying persons do not "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group." *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987). "The Supreme Court has not recognized any new constitutionally protected classes in over four decades," and lower courts should follow the Supreme Court's lead. *Ondo*, 795 F.3d at 609.

       *iv.*   *The EOs do not warrant intermediate scrutiny based on discriminatory intent.*

Plaintiffs argue that even if the EOs do not facially classify based on sex, they still warrant intermediate scrutiny because they are animated by discriminatory intent. Pls.' Mem. at 24–25. But Plaintiffs do not come close to the required showing that the Orders are "inexplicable by anything but animus." *Trump v. Hawaii*, 585 U.S. 667, 706 (2018); *see also Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253 (2022) ("This Court has long disfavored arguments based on alleged legislative motives.").

As set out in the EOs' text and further discussed at Part II.B.v., *infra*, the purpose of the Protecting Children EO is to combat oft-irreversible "medical interventions" that some "children soon regret," leaving them with rising "medical bills," "lifelong medical complications," and other issues. EO 14,187 § 1; *see also* EO 14,168 § 1 (discussing purpose of protecting women's "dignity, safety, and well-being"); *Eknes-Tucker*, 114 F.4th at 1271–75 (declarations discussing physical and mental health issues stemming from similar medical interventions). As the Sixth Circuit explained in *Skrmetti*, "a law premised only on animus toward the transgender community would not be limited" by age, and age limits on serious medical interventions in fact show that the government "plainly had other legitimate concerns in mind." 83 F.4th at 487; *see also id.* at 488 (noting that the "novelty" of similar treatments "also undercuts any claim of animus").

Plaintiffs' contention that the "context surrounding" the EOs shows animus should not be credited. Pls.' Mem. at 25. Plaintiffs cite no authority for the proposition that other orders issued by the President—not before the Court in this case—can or should shed meaningful light on the purposes of the EOs challenged here, and such speculative theories conflict with the Supreme Court's reluctance to engage in wide-ranging motive-based inquiries. *See Dobbs*, 597 U.S. at 253.

> v.   *Important governmental interests animate the President's directive that agencies explore policy options.*

Rational basis review requires only that "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Under intermediate scrutiny, the government must show that the classification "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533 (quotations omitted). Because the EOs do not classify based on any protected characteristic, rational basis review should apply. But the EOs also satisfy intermediate scrutiny, and should therefore be

upheld. The Court should not read *Kadel* to bar this conclusion, as the laws at issue in *Kadel* were not limited to treatments for adolescents, nor based on concerns especially applicable to young people. *See* EO 14,187 § 1. To the extent the Court concludes otherwise, Defendants respectfully preserve the argument that *Kadel* was wrongly decided.

The EOs here serve important governmental interests. "A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens," and the Supreme Court has accordingly "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *New York v. Ferber*, 458 U.S. 747, 757 (1982) (quotation omitted). The EOs are based on this governmental interest: as the Protecting Children EO explains,

> Countless children soon regret that they have been mutilated [through the covered treatments] and begin to grasp the horrifying tragedy that they will never be able to conceive children of their own or nurture their children through breastfeeding. Moreover, these vulnerable youths' medical bills may rise throughout their lifetimes, as they are often trapped with lifelong medical complications, a losing war with their own bodies, and, tragically, sterilization.

EO 14,187 § 1.[8] Far from evincing a "bare desire to harm" trans-identifying people, Pls.' Mem. at 28–29, the Protecting Children EO evinces a presidential directive that agencies consider appropriate ways to prevent serious harms to young people under applicable law.

Evidence abounds that treatments covered by the Protecting Children EO "are dangerous and ineffective." *Eknes-Tucker*, 114 F.4th at 1266 (Lagoa, J., concurring); *Skrmetti*, 83 F.4th at 489 (discussing evidence); Tenn. Code Ann. § 68-33-101 (legislative findings that similar treatments "can lead to the minor becoming irreversibly sterile, having increased risk of disease and illness,

---

[8] Although Plaintiffs challenge both EOs, they discuss only the government's interest in protecting the health of adolescents, as particularly addressed in the Protecting Children EO. And they only seek an injunction against the Defending Women EO to the extent it relates to provision of "gender affirming medical care to a patient under nineteen." Pls.' Proposed Order at 2.

or suffering from adverse and sometimes fatal psychological consequences"). Moreover, as the Protecting Children EO references, adolescents cannot necessarily "appreciate the life-altering nature of the[se] medical treatments" such that they are "incapable of knowingly consenting" to their use. *Eknes-Tucker*, 114 F.4th at 1267 (Lagoa, J., concurring). Combined with the fact that "studies show that most children with gender dysphoria grow out of it," *id.*, this results in adolescents later experiencing "regret" about the treatments they were subjected to, EO 14,187 § 1. At minimum, there is a "lack of clear data on how frequently . . . regret occurs," supporting the government's interest in limiting funding for such treatments at this time. *The Cass Review: Independent Review of Gender Identity Services for Children and Young People* ("*Cass Review*") at 22, 179 (Apr. 2024), https://perma.cc/3QVZ-9Y52.

Plaintiffs argue that these treatments are "safe and effective." Pls.' Mem. at 26. But there is ample cause for the EOs' concern about a lack of sufficient medical or scientific evidence of the safety and efficacy of such treatments for gender dysphoria in minors. *See, e.g.*, *Skrmetti*, 83 F.4th at 488–89 (discussing the "unsettled, developing, in truth still experimental[] nature of treatments in this area"); Tenn. Code Ann. § 68-33-101 (similar treatments "are experimental in nature and not supported by high-quality, long-term medical studies"); *Treatment: Gender Dysphoria*, National Health Service (May 28, 2023), https://www.nhs.uk/conditions/gender-dysphoria/treatment/ (explaining that "[p]uberty suppressing hormones are not available to children and young people" for treating gender dysphoria in England "because there is not enough evidence on their clinical safety and effectiveness"); *Cass Review* at 22, 179 (finding "no evidence that puberty blockers improve body image or dysphoria," and stating that "[o]ur current understanding of the long-term health impacts of hormone interventions is limited" and that there is "insufficient/inconsistent evidence about the effects of puberty suppression on . . . fertility");

Annette L. Cantu et al., *Changes in Anxiety & Depression from Intake to First Follow-Up Among Transgender Youth in a Pediatric Endocrinology Clinic*, 5:3 Transgender Health 196 (2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7906229/ (finding "no change in acute distress" in "transgender youth initiating gender-affirming care").[9]

Plaintiffs repeatedly criticize the EOs as underinclusive because they do not address unrelated medical procedures that could create a "risk of regret," could "also impact fertility," or might not be "supported by a particular level of evidence." Pls.' Mem. at 27–28. That the EOs do not address the entire universe of medical treatments does "not undermine the constitutionality of" the EOs, because at most Plaintiffs suggest that the fit between the government's means and its ends "is not a perfect one," whereas "a reasonable fit is all that is required under intermediate scrutiny." *United States v. Chapman*, 666 F.3d 220, 231 (4th Cir. 2012). Neither law nor reason demands that the government address all conceivable medical harms in a single executive order seeking to address the risk of specific harms. Plaintiffs have not shown that the EOs are so "*grossly over* [or] *under*-inclusive," *Harrison v. Kernan*, 971 F.3d 1069, 1075 (9th Cir. 2020) (emphasis added), that there can be no substantial relationship between the government's means and its ends. The EOs satisfy intermediate and rational basis scrutiny, and should not be enjoined.

> *C. Plaintiffs are unlikely to succeed on the merits of their statutory sex discrimination claim.*

Title IX of the Education Amendments of 1972 prohibits certain education entities from subjecting individuals to discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Section 1557 of the ACA, 42 U.S.C. § 18116, and Section 1908 of the PHSA, 42 U.S.C. § 300w-7, in turn, incorporate Title IX's prohibition against health care entities receiving certain federal funding.

---

[9] To the extent Plaintiffs argue that not every covered treatment may present the same risks to fertility, that contention does not gainsay the Protecting Children EO's recognition of fertility risks alongside many other potential risks applicable to one or more of the covered treatments.

In *Bostock v. Clayton County*, 590 U.S. 644 (2020), the Supreme Court held that discrimination "because of [an] individual's . . . sex" under Title VII of the Civil Rights Act of 1964 includes discrimination based on "transgender status." And in *Kadel*, the Fourth Circuit held that *Bostock*'s reasoning applies to Title IX's sex-discrimination prohibition, as incorporated into Section 1557. *See* 100 F.4th at 164. Plaintiffs argue, as this Court found for purposes of its TRO opinion, that the EOs discriminate on the basis of trans-identifying status and that they therefore violate the sex-discrimination prohibitions in Section 1557 and Section 1908 under *Kadel*.

As set out in Part II.B.iii, *supra*, the EOs do not classify based on trans-identifying status in the first place, and Plaintiffs' statutory sex discrimination claim therefore fails. Plaintiffs' claim further lacks merit because the EOs do not themselves impose any conditions on funding: any funding conditions would only be imposed after agencies take further steps to "assess grant conditions," EO 14,168 § 3(g), and must be imposed consistent with "applicable law," EO 14,187 § 4. Thus, the EOs require that funding conditions be imposed in a manner consistent with Section 1557 and Section 1908, as applicable, and the EOs are not *ultra vires*. Plaintiffs' speculation that agencies will nevertheless impose conditions violating those statutes—contrary to the EOs' instructions—is premature. Finally, Defendants respectfully preserve the position that *Kadel* was wrongly decided.

### III.    The remaining factors counsel against granting the requested relief.

Plaintiffs wrongly contend that they have shown irreparable injury because of the "prospect of an unconstitutional enforcement" against them. Pls.' Mem. at 29 (quoting *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022)). But that prospect is speculative at this point given that the EOs have not been applied to any specific funding or grants. Regardless, as set out herein, Plaintiffs "are unlikely to succeed on the merits of their constitutional claims; therefore, their alleged constitutional injuries do not constitute irreparable harm." *Talleywhacker, Inc. v.*

*Cooper*, 465 F. Supp. 3d 523, 542 (E.D.N.C. 2020). Nor is "access to high-quality health care" at issue, TRO Op. at 46—as discussed, the relevant treatments are not supported by high quality evidence and present serious risks to young people.

On the other side of the coin, the relief Plaintiffs request would effectively disable the President and federal agencies from effectuating the President's agenda consistent with their statutory authorities and constitutional duties. The public interest is not advanced when the Executive is disabled from even *considering* a policy, especially one that has been the subject of legislation across the country. *See* KFF, *Policy Tracker: Youth Access to Gender Affirming Care and State Policy Restrictions*. Thus, the balance of the equities weighs in favor of the Government and relief should be denied.

### IV.    Any injunctive relief should be limited to Plaintiffs.

As explained above, the Court should deny Plaintiffs' motion in its entirety. But even if the Court determines that preliminary injunctive relief is appropriate, it should be limited to the Plaintiffs before this Court. Nationwide injunctions are extraordinary remedies, and the burden is on the plaintiff to prove why one is necessary. Plaintiffs have not demonstrated why an injunction limited to themselves would not suffice. Rather, they relegate this heavy burden to a cursory paragraph at the end of their brief. *See* Pls.' Mem. at 30.

"Article III of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.'" *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 438 (2017) (citation omitted). A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Gill v. Whitford*, 585 U.S. 48, 50 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)); *see also Doe 2 v. Shanahan*, 917 F.3d 694, 739–40 (D.C. Cir. 2019) (Williams, J., concurring) ("'The Court's constitutionally prescribed role is to vindicate the individual rights of

the people appearing before it.' Nothing more." (quoting *Gill*, 585 U.S. at 72)). Thus, "a plaintiff's judicial 'remedy must be tailored to redress *the plaintiff's* particular injury.'" *Id.* at 740 (quoting *Gill*, 585 U.S. at 73).

Principles of equity reinforce those limitations. A court's equitable authority to award relief is generally confined to relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318, 319 (1999). And "[u]niversal injunctions have little basis in traditional equitable practice." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring); *see also Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021) (noting that the "appropriate circumstances" for issuing a nationwide injunction "are rare").

Nationwide injunctions also "take a toll on the federal court system." *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring). "The traditional system of lower courts issuing interlocutory relief limited to the parties at hand . . . encourages multiple judges and multiple circuits to weigh in." *New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring). In contrast, nationwide injunctions "prevent[] legal questions from percolating through the federal courts." *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring). Moreover, "[i]f a single successful challenge is enough to stay the challenged rule across the country, the government's hope of implementing any new policy could face the long odds of a straight sweep, parlaying a 94-to-0 win in the district courts into a 12-to-0 victory in the courts of appeal." *New York*, 140 S. Ct. at 601 (Gorsuch, J., concurring). "A single loss and the policy goes on ice—possibly for good, or just as possibly for some indeterminate period of time until another court jumps in to grant a stay." *Id.* These concerns are apt here. A group of plaintiffs have challenged the same EOs on similar grounds in the Western District of Washington, and have also moved for a preliminary injunction after entry of a TRO. *See* Pls.' Mot.

-28-

for Prelim. Inj., ECF No. 169, *Washington*, 2:25-cv-244 (W.D. Wash. Feb. 28, 2025). Here, Plaintiffs' statutory and Equal Protection arguments hinge on Fourth Circuit precedent that diverges from authority in other circuits, and Ninth Circuit law and the reviewing court's analysis may diverge in other relevant respects as well. As a result, this Court should allow "multiple circuits to weigh in," *New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring), and not block the administration's policies beyond what is necessary to provide relief to Plaintiffs.

Permitting nationwide injunctions also undercuts the primary mechanism Congress has authorized to permit broader relief: class actions. It enables all potential claimants to benefit from nationwide injunctive relief by prevailing in a single district court, without satisfying the prerequisites of Federal Rule of Civil Procedure 23, while failing to afford the Government the corresponding benefit of a definitive resolution of the underlying legal issues to all potential claimants if it prevails instead.

Plaintiffs nonetheless contend that a nationwide PI is necessary because the plaintiff associations have "members throughout the country" (though they do not say that they have members in every state, let alone every hospital that receives federal grant funding). Pls.' Mem. at 30. But "injunctive relief operates on specific parties, not geographic territories, and identifying the . . . association members is possible." *Georgia v. President of the U.S.*, 46 F.4th 1283, 1307 (11th Cir. 2022). Nor is nationwide relief appropriate to avoid "confusion" from "preventing agencies from conditioning funds on certain medical institutions, while allowing conditional funding to persist as to other medical institutions." TRO Op. at 50–51; *see also* Pls.' Mem. at 30. It is "inappropriate" to grant overbroad relief due to the mere "lack of uniformity that would result from a well-tailored injunction." *Georgia*, 46 F.4th at 1307. For all these reasons, any PI should be limited to the named Plaintiffs only. And as to the membership organizations, any relief should be

granted only to the members identified in the complaint, and plaintiffs have identified none beyond named Plaintiffs. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring).

**V.    Any injunctive relief should be accompanied by a bond.**

The Defendants also respectfully request that any injunctive relief be accompanied by a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A bond is appropriate here given that any preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed.

**VI.    Any injunctive relief should be stayed.**

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized. *See* Fed. R. App. P. 8(a)(1).

**CONCLUSION**

Plaintiffs' motion for a preliminary injunction should be denied.

Dated: February 25, 2025                    Respectfully submitted,

                                            ERIC J. HAMILTON
                                            Deputy Assistant Attorney General

                                            MICHELLE BENNETT
                                            Assistant Director
                                            Federal Programs Branch

                                            */s/ Vinita B. Andrapalliyal*

-30-

VINITA B. ANDRAPALLIYAL
Senior Counsel
CHRISTIAN S. DANIEL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel.:    (202) 514-0265
vinita.b.andrapalliyal@usdoj.gov
christian.s.daniel@usdoj.gov
*Counsel for Defendants*