IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PFLAG, INC., et al.,

   *Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

   *Defendants*.

Civil Action No. 8:25-cv-00337-BAH

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR A PRELIMINARY INJUNCTION**

# INTRODUCTION

Defendants' Opposition ("Opp.") recycles arguments already rejected by this Court and fails to provide any new record evidence to support their assertions that gender affirming medical care is either unsafe or ineffective. The Executive Orders have already imposed irreparable harm, and only a nationwide preliminary injunction can forestall additional harm once the Court's temporary restraining order expires.

# ARGUMENT

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS.

### A. Plaintiffs' Claims Are Ripe.

Plaintiffs' claims are ripe. *See* TRO 10-13. In arguing to the contrary, Defendants erroneously conflate "ripeness" with "final agency action." *See* Opp. 7-10. The "final agency action" requirement applies only to APA claims, not to *ultra vires* claims for equitable relief. *See* TRO 16 n.19; *Texas v. United States DHS*, 123 F.4th 186, 199 n.9 (5th Cir. 2024); *Hawaii v. Trump*, 878 F.3d 662, 682-83 (9th Cir. 2017), *rev'd and remanded*, 585 U.S. 667 (2018); *Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 672 (6th Cir. 2013); *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006); *R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002).

Defendants attempt to forestall ripeness by repeating their false assertion that "no agency defendant has revoked . . . any particular grants as a result of the EOs." Opp. 9. That assertion "is contradicted by" the documentary evidence showing that HRSA and CDC issued notices to grantees that immediately terminated all grants to the extent those grants were being used in a manner that did not align with the Gender Identity or Denial of Care Orders. TRO 11-12. Defendants assert that both of those termination notices have been "rescinded." Opp. 9. But the CDC notice has not been rescinded, and the "rescission" of the HRSA notice is insufficient to moot the need for injunctive relief. TRO 13-15.

Despite sending those blanket termination notices, Defendants now argue that "[t]he Court cannot determine in the abstract whether the statutory and regulatory requirements for any particular grant program provide the agency with discretion to condition funding on these terms." Opp. 9. But Defendants have only themselves to blame. The text of the Orders applies to all grants regardless of their terms, and HRSA and CDC chose to issue blanket termination notices without identifying specific grants at issue. Defendants cannot delay review of their actions by pointing to their own failure to ground those terminations in a particular statutory or regulatory context. The Constitution does not allow Defendants to terminate first and ask questions later.

Defendants also unsuccessfully attempt to illustrate the alleged lack of ripeness by pointing to the funding Dr. Birnbaum receives under Part D of the Ryan White Program. *See* Opp. 9-10. Defendants state that Section 4 of the Denial of Care Order would not strip Dr. Birnbaum of his Part D funding because Section 4 applies only to "research or education" grants, not to outpatient and ambulatory care grants such as Part D of the Ryan White Program. *Id*. Although Plaintiffs welcome Defendants' concession on this point, Defendants fail to mention that (1) Section 3(g) of the Gender Ideology Order applies to all grants, not just research or education grants; (2) Dr. Birnbaum also receives research grants from NIH in addition to his Ryan White funding, *see* Birnbaum Decl. ¶ 7; and (3) Dr. Birnbaum's clinic is part of University Hospital at SUNY Downstate, which receives "millions of dollars in federal grants, including from the NIH and HRSA," *see* Birnbaum Decl. ¶ 8. Under the Executive Orders, all those grants are immediately at risk if Dr. Birnbaum provides gender affirming medical care to his patients under nineteen.

Defendants also ignore a critical element of the test for ripeness: "the hardship to the parties of withholding court consideration." TRO 10 (citation omitted). There is a mountain of evidence documenting the hardships Plaintiffs experienced from the immediate cessation of medical care.

*See* TRO 12-13. Hospitals across the country ceased providing gender affirming medical care for people under nineteen in response to the Orders, inhibited GLMA's members' ability to provide care in accordance with their ethical responsibilities as physicians, and left the Transgender Plaintiffs stranded without the medical care that they need. These shutdowns were "exactly the intended effect of the Executive Orders." *Id.* at 24. As this Court previously recognized, the Executive Orders' immediate consequences require an immediate remedy. *See id.* at 16 n.19.

### B.    Plaintiffs' *Ultra Vires* Claims Are Reviewable.

Plaintiffs have brought valid *ultra vires* claims. Defendants once again assert that Plaintiffs cannot invoke the Court's equitable jurisdiction for *ultra vires* review because hospitals and other healthcare entities are the "direct objects" of the Executive Order while Plaintiffs are merely "incidentally harmed" by those institutions' response to the Executive Orders' threats. Opp. 12. But Defendants concede that Plaintiffs have Article III standing, and Defendants fail to offer any support for their assertion that *ultra vires* claims impose a more stringent causation requirement.

Defendants cite a Tenth Circuit decision holding that a plaintiff cannot assert claims in equity against a state for statutory violations unless the plaintiff has a substantive right under the statute that has been violated. *Id.* (citing *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 902 (10th Cir. 2017)). But as the Tenth Circuit noted, "[t]he question of who may enforce a statutory right is fundamentally different from the question of who may enforce a right that is protected by the Constitution." *Id.* at 902 n.14 (citation omitted). And the Supreme Court has already recognized a right to equitable relief "under the Constitution to challenge governmental action under . . . separation-of-powers principles." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). Moreover, through their claim that the Orders conflict with Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116, and Section 1908 of the Public Health Service Act ("PHSA"), 42 U.S.C. § 300w-7, Plaintiffs are asserting their own substantive rights to be free

3

from sex discrimination by healthcare entities receiving grants and other federal funding. Plaintiffs may seek equitable relief to vindicate those rights.

### C. The Orders Violate the Separation of Powers.

The Court already has held Plaintiffs are likely to succeed on their claim that the Executive Orders are *ultra vires* actions violating the separation of powers. *See* TRO 26-37. Defendants' preliminary injunction brief contributes only two new paragraphs and otherwise recycles the same arguments they made in opposing the TRO—arguments that this Court already rejected.

Those new paragraphs do not call into question this Court's previous analysis. Defendants do not assert that the Executive has any inherent Article II power to unilaterally impose conditions on federal grants. Rather, Defendants appear to concede any authority the Executive has for imposing such conditions must be delegated by statute and exercised consistently with the "expressed or implied will of Congress." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015). Yet—as Plaintiffs and the Court have already explained—the Gender Identity and Denial of Care Order cite no statutory authority for unilaterally imposing new conditions on federally appropriated grant funds based on whether a grant recipient provides gender affirming medical care for people under nineteen. The notices issued by HRSA and CDC likewise cite no statutory authority.

Defendants now belatedly attempt to find some statutory delegation that could possibly justify imposing at least *some* conditions on *some* types of grants. But the proper time for identifying the source of statutory authority was *before* Defendants started sending out termination notices, not weeks later as a *post hoc* rationalization. To the extent "it is not clear what law the Court would need to apply or what funding would be at stake," Opp. 10, that is because *Defendants* chose to issue a blanket termination *without* explaining their legal authority for doing so. Defendants must defend the Orders that President Trump actually issued, not some hypothetical

4

narrower Executive Order that is tailored to statutory schemes on which the Orders did not purport to rely. *Cf. Nat'l Council of Nonprofits v. OMB*, 25 Civ. 239-LLA, Dkt. 51 at 27 (D.D.C. Feb. 25, 2025) ("Defendants cannot take a memorandum that was drafted broadly, interpreted expansively, and implemented categorically and fault Plaintiffs for 'overreading' that directive.").

In any event, none of the statutes dredged up by Defendants with respect to NIH grants actually authorize the President to "condition[] or distribut[e] funds according to Presidential policies." Opp. 16. The statutes vest NIH with discretion regarding grants, but that discretion must be exercised to "carry[] out the purposes of" the *statute*, not the President's own purposes. *See* 42 U.S.C. §§ 282(b), 284(b)(1). And NIH's discretion is further circumscribed by highly detailed provisions mandating the considerations that must inform NIH's decisions. *See, e.g.*, 42 U.S.C. §§ 241, 282(b), 284(b), 289(a). Tellingly, despite gesturing to these statutory provisions, Defendants never argue that prohibiting institutions from providing gender affirming medical care for minors would be a permissible condition for NIH to impose under the Public Health Services Act or any other federal grant statute. *Cf. Biden v. Nebraska*, 143 S. Ct. 2355, 2368 (2023) (delegated authority to modify loan requirements did not include authority for loan forgiveness); *NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (delegated authority to adopt workplace safety conditions did not include authority to mandate COVID vaccination).

Defendants' only specific examples of the President allegedly imposing new conditions on NIH grants are the restrictions different presidents have imposed on using federal funds for research involving embryonic stem cells. Opp. 16. But that is a perplexing example for Defendants to use. Since 1996, Congress has included the Dickey-Wicker Amendment in annual appropriation bills, which prohibits NIH from funding "research in which a human embryo or embryos are destroyed." Pub. L. No. 111–117, § 509(a)(2), 123 Stat. 3034, 3280–81. NIH's corresponding

5

conditions were therefore adopted pursuant to *Congressional* directive, not by Executive fiat. *See Sherley v. Sebelius*, 644 F.3d 388, 390 (D.C. Cir. 2011). Far from supporting Defendants' argument, this example only highlights that Congress knows how to condition grants—and did not do so regarding gender affirming medical care.

### D.     The Orders Conflict with Statutory Nondiscrimination Requirements.

The Orders are also *ultra vires* because they conflict with statutes prohibiting healthcare entities receiving federal funding from discriminating based on sex. Defendants acknowledge that the Orders would be unlawful if they directed grantees to engage in conduct that violated Section 1557 of the ACA or Section 1908 of the PHSA. Opp. 26 n.9. And Defendants concede that under *Kadel v. Folwell*, 100 F.4th 122, 153 (4th Cir. 2024) (*en banc*), denying gender affirming medical care to people under nineteen is sex discrimination under those statutes. Opp. 26 n.9. When added together, those concessions definitively establish Plaintiffs' likelihood of success on the merits.

Defendants' only response to the inherent conflict between the Executive Orders and the statutory nondiscrimination requirements set by Congress is to refer back to language stating that agencies should implement the Orders consistent with "applicable law."[1] This argument fails both because "[t]here are no magic words that can override an executive order's plain meaning," TRO 30, and, more fundamentally, because there is simply no action an agency could take to implement the Orders' restrictions on federal funding for healthcare providers that provide gender affirming medical care that would not conflict with these statutory requirements. Section 1557 "imposes an affirmative obligation not to discriminate" on health programs that are recipients of federal funding. *Schmitt v. Kaiser Found. Health Plan of Washington*, 965 F.3d 945, 955 (9th Cir. 2020). Thus, under Section 1557, it does not matter what specific grants are at issue or what funding

---

[1] Unlike *other* sections of the Gender Identity Order, Section 3(g) contains no such limitation.

6

stream is used. There is simply no scenario in which the new discriminatory condition imposed by the President does not conflict with the nondiscrimination mandate set by Congress.[2]

### E. The Orders Violate Equal Protection.

#### 1) The Orders Trigger Heightened Equal Protection Scrutiny.

Under *Kadel*, the Orders trigger heightened scrutiny because they "discriminate on the basis of transgender identity, and therefore on the basis of sex." TRO 44. Defendants' arguments for applying rational basis review cannot be squared with *Kadel*'s controlling precedent. First, *Kadel* squarely rejected Defendants' arguments that heightened scrutiny is not warranted because the Executive Orders apply evenhandedly to males and females. 100 F.4th at 147. Explicit facial classifications do not become neutral "on the assumption that all persons suffer them in equal degree." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). Second, *Kadel* confirmed that restrictions designed to tether a person to their sex assigned at birth enforce sex stereotypes and trigger heightened scrutiny on that basis. 100 F.4th at 154. Stereotypes related to biological differences are not immune from heightened scrutiny. *See id.* Third, *Kadel* also rejected Defendants' argument that the Orders classify based on medical purpose, not transgender status. *See id.* at 146 ("[T]he excluded treatments aim at addressing incongruity between sex assigned at birth and gender identity, the very heart of transgender status."). Finally, *Kadel* reaffirmed that classifications based on transgender status require heightened scrutiny, *see id.* at 143, which forecloses Defendants' attempt to argue otherwise.[3]

---

[2] Congress also has prohibited HHS from taking action that, among other things, "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care" or "impedes timely access to health care services." 42 U.S.C. § 18114(1)–(5). *See Mayor of Baltimore v. Azar*, 973 F.3d 258, 288 (4th Cir. 2020).

[3] Defendants intimate that the Denial of Care Order merely discriminates based on age. Opp. 24. But including an age classification alongside a sex classification does not insulate the Denial of Care Order from heightened scrutiny. *See Craig v. Boren*, 429 U.S. 190, 197 (1976).

7

Defendants also have no answer to the fact that the Orders independently trigger heightened scrutiny because they were passed at least in part because of their adverse effects on transgender people. *See Pers. Admin. of Mass. v. Feeney*, 442 U.S. 256 (1979). Defendants' reliance on *Trump v. Hawaii*, 585 U.S. 667 (2018), confuses the test for determining whether a measure can only be explained by "animus" under rational basis review with the test for determining whether a discriminatory purpose exists such that a policy is subject to heightened scrutiny. The dispositive question for assessing whether heightened scrutiny is triggered is whether "a gender-based discriminatory purpose has, *at least in some measure*, shaped" the Orders. *Feeney*, 442 U.S. at 276 (emphasis added). That is the case here. PI at 24-25.

### 2) The Orders Fail Heightened Scrutiny.

Defendants have failed to meet their burden of showing that the Orders "are substantially related to the achievement of [important governmental] objectives." *Kadel*, 100 F.4th at 156 (cleaned up). When this Court granted the TRO, it noted that Defendants had failed to introduce any evidence into the otherwise "bare[] record." TRO 45. Despite having an opportunity to do so, Defendants have not provided any actual evidence to support their criticisms of gender affirming care or respond to the extensive expert testimony produced by Plaintiffs. And, although Defendants' *amici* attempt to pick up the slack, the *amicus* briefs by these non-parties supporting Defendants are filled with highly misleading distortions and mischaracterizations of the record in other cases. *See* Antommaria Reply Decl. ¶¶ 5-17; Karasic Reply Decl. ¶¶ 8-44; Shumer Reply Decl. ¶¶ 8-31; Turban Reply Decl. ¶¶ 4-16.

In the end, Defendants' unsupported criticisms of gender affirming medical care are overstated, untrue, or ultimately applicable to many other forms of medical treatment. PI at 26-28. Far from showing a substantial relationship between their asserted interests and the Orders'

8

sweeping attack on medical treatment related to gender transition, Defendants have shown no fit at all.

**Effectiveness**. Though Defendants (Opp. 23-24) and their *amici* claim that gender affirming medical care is "dangerous and ineffective," they neither cite nor offer any record evidence to support such claims. The record here demonstrates the opposite: a substantial body of evidence and clinical experience shows that gender affirming medical treatment is safe and effective for treating gender dysphoria, including in patients under 19. *See* Dkts. 69-50 (¶¶ 78-101); 69-49 (¶¶ 86-87). On top of the decades of research and clinical experience showing the benefits of gender affirming medical care, Plaintiffs' experiences further confirm its efficacy. *See* Dkts. 69-27 (¶¶ 14, 18-19); 69-28 (¶¶ 10-12, 19); 69-29 (¶¶ 26, 33); 69-30 (¶¶ 14, 16); 69-31 (¶¶ 18-20); 69-32 (¶¶ 16-18, 32-33). They also show the harm of delaying or denying this care when medically indicated. *See* Dkts. 69-23 (¶¶ 26-30); 69-24 (¶¶ 13-17); 69-25 (¶¶ 23-27); 69-26 (¶¶ 17-18); 69-29 (¶¶ 30-31); 69-30 (¶ 15); 69-31 (¶¶ 9-12, 24, 28).[4]

**Capacity to consent**. Defendants claim that the Orders' disparate treatment is warranted because minors lack the capacity to consent to the medical care at issue. This is not supported by the record. First, and most critically, as with nearly all pediatric medical care, it is a minor's parent or guardian who consents to the treatment, not the minor. *See* Dkts. 69-48 (¶¶ 48-52); 69-49 (¶¶ 68, 88); 69-50 (¶ 44). Second, gender affirming medical care is comparable in potential risk and benefit to many other forms of medical treatment that parents routinely consent to on behalf of their minor children. *See* Dkts. 69-48 (¶¶ 61-63); 69-50 (¶¶ 70-71, 85-86); Antommaria Reply Decl.

---

[4] Defendants wrongly argue the holding from *Kadel* regarding efficacy is not controlling because "the laws at issue in *Kadel* were not limited to treatments for adolescents, nor based on concerns especially applicable to young people." Opp. 23. But Defendants ignore both that the Orders are not limited to treatments for adolescents either, barring care for legal adults, and that two of the plaintiffs in *Kadel* were suing over gender affirming medical care denied to them *as minors*. *See Kadel v. Folwell*, 620 F. Supp. 3d 339, 355, 364 (M.D.N.C. 2022), *aff'd*, 100 F.4th 122; Am. Compl., *Kadel v. Folwell*, 19 Civ. 272 (M.D.N.C.) (ECF No. 75), ¶¶ 76-89, 99-118.

9

¶ 12; Shumer Reply Decl. ¶ 18. Third, despite Defendants' singular assertion about protecting "children", the Denial of Care Order restricts care for eighteen-year-old *adults*.

**Fertility**. Though Defendants repeatedly reference the potential effects of gender affirming medical care on fertility, they offer no evidence that the banned treatments impact fertility or that gender affirming medical care uniquely compromises a patient's fertility. As explained in Plaintiffs' opening brief, the Executive Orders single out several treatments which have no impact on fertility and for those that can impact fertility, the medical guidelines provide an extensive process for patients and parents to weigh those potential risks against the potential benefits of treatment and the risk of not providing treatment. Dkts. 69-48 (¶ 52); 69-49 (¶¶ 73, 83); 69-50 (¶¶ 83, 121); Shumer Reply Decl. ¶ 25.[5]

**Regret**. Defendants assert that the potential for regret justifies the Executive Orders. Not so. The record shows that regret is rare and is not unique to the targeted medical treatments. *See* Dkts. 69-48 (¶¶ 66-67); 69-49 (¶¶ 97-101); 69-50 (¶¶ 77, 100, 120); 69-51 (¶¶ 31-34); Dkt. 69-51 ¶¶ 29-30. Transition regret is uncommon, and those who discontinue treatment often do so because of external factors (such as pressure from family, societal rejection, or harassment by peers) rather than because they "regret" initiating treatment. Turban Decl. ¶¶ 29, 30. What is more, longitudinal studies looking at adolescent patients treated with gender affirming medical interventions have shown very low rates of detransition. Shumer Reply Decl. ¶ 28.

**Quality of Evidence**. Defendants (Opp. 30) and their *amici* argue that the efficacy of gender affirming medical care to treat adolescent gender dysphoria is not supported by high-quality evidence. Citing to legislative "findings" in a Tennessee bill, Defendants argue (Opp. 23) that

---

[5] Do No Harm's amicus brief focuses on a potential risk to fertility, but its selective deposition cites from another case are misleading. As Dr. Shumer explains, the potential for fertility preservation remains in place for patients treated with gender affirming medical care, and patients and their parents are extensively counseled about fertility preservation options. Shumer Reply Decl. ¶¶ 19-25; *see also* Dkt. 69-48 (¶ 56).

10

gender affirming medical care is "experimental." This is false. The record evidence shows the opposite: the quality of evidence demonstrating the efficacy of gender affirming medical treatment is comparable to quality of evidence supporting many other forms of medical treatment routinely prescribed by clinicians and undisturbed by the Orders. PI at 28; *see also* Dkts. 69-48 (¶¶ 6, 29, 32, 39); Dkt. 69-49 (¶¶ 60, 102); Antommaria Reply Decl. ¶¶ 8, 9, 13; Karasic Reply Decl. ¶¶ 33-35, 37; Shumer Reply Decl. ¶¶ 13-14, 16; Gonzalez-Pagan Decl., Ex. EE-1, at 27-33.

*Amicus* Do No Harm's singular focus on select systematic reviews commissioned by entities in Europe and Florida to justify the Orders is misguided. None of the cited reviews justify stripping needed medical treatment from patients who have been informed of the treatments' risks and benefits and who are currently benefiting from that treatment. *See* Turban Reply Decl. ¶¶ 6-17; Antommaria Reply Decl. ¶¶ 5-10; Shumer Reply Decl. ¶¶ 11-17; Karasic Reply Decl. ¶¶ 32-37. As noted above, the systematic reviews for gender affirming medical care find the same level of evidence that most systematic reviews across all areas of medicine find. And notwithstanding the quality of the evidence based on study design, all of these reviews consistently find the same: gender affirming medical interventions are associated with reductions in gender dysphoria, reductions in depression, anxiety, and suicidality, and improvements in quality of life. Turban Reply Decl. ¶ 18; Shumer Reply Decl. ¶ 17; Karasic Reply Decl. ¶ 29.

Finally, Defendants and their *amici* claim that the risks of gender affirming medical care mean that it may be held to a higher standard of evidence than all other forms of medical care (though, as discussed above, these risks are comparable to other forms of medical treatment). But they ignore that "evidence quality is not synonymous with clinical recommendations." Karasic Reply Decl. ¶ 38 (quotation omitted). In addition to the quality of evidence, clinical recommendations must *also* consider the benefits and harms of both treatment and no treatment,

11

as well as patients' values and preferences. *Id.*; Antommaria Reply Decl. ¶11. Here, Defendants ignore the harms associated with withholding medical treatment for gender dysphoria for those who need it, and that there are no evidence-based alternative treatments to effectively treat gender dysphoria. Antommaria Reply Decl. ¶ 12; Shumer Reply Decl. ¶ 17; Turban Reply Decl. ¶ 4.[6]

**Overinclusive and Underinclusive**. For all these reasons, Defendants have not met their burden of showing that the Orders substantially advance their asserted interest in protecting children. Their proffered critiques of these treatments are not only exaggerated but also true of many other forms of medical treatment untouched by the Orders. Defendants respond "by asserting that all that is demanded under heightened scrutiny is a "reasonable" fit. Opp. 25. But they draw that quote from a Second Amendment case that applied the "intermediate scrutiny" test used for evaluating content neutral speech restrictions. *See United States v. Chapman*, 666 F.3d 220, 231 (4th Cir. 2012). Intermediate scrutiny under the Equal Protection Clause is a different standard and requires a much closer "means-ends" fit. *Sessions v. Morales-Santana*, 582 U.S. 47, 68 (2017).

Here, "the Order[s] [are] underinclusive in that [they] do[] not encompass any similar medical treatments for cisgender youth …, even where those medical treatments pose the same or similar risks." *Washington v. Trump*, No. 2:25-CV-00244-LK, 2025 WL 509617, at *10 (W.D. Wash. Feb. 16, 2025). They are "overinclusive as well," because they are "not limited to minors and instead include[] 18 year olds." *Id.* Defendants' misguided concerns about evidence quality,

---

[6] Alabama et al.'s critique of the WPATH guidelines with extra-record evidence likewise does not justify the Orders' sweeping attempts to end the provision of gender affirming medical care to individuals under 19. Alabama et al.'s brief paints a false narrative belied by the actual record. Karasic Reply Decl. ¶¶ 8-25. Relying on cherry-picked references to evidence in another case, Alabama et al. criticize the WPATH's guidelines but ignore the Endocrine Society's similar guideline, which provides similar robust clinical recommendations for treating gender dysphoria. Turban Reply Decl. ¶ 5. In addition to the Endocrine Society Guideline, every major medical association in the United States recognizes the safety and efficacy of gender affirming medical interventions. *Id.*; Dkts. 69-49 (¶¶ 61-63); 69-50 (¶¶ 50-51, 125). *See also* Gonzalez-Pagan Decl., Ex. EE-1.

efficacy, regret, or fertility do not justify singling out these medical treatments for transgender adolescents and young adults for sweeping attacks by the federal government.

### 3) The Orders Fail Rational Basis Review.

The Orders ultimately fail any standard of review because they are so disconnected from any legitimate government justification and on their face result from "negative attitudes" and "irrational prejudice." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985). Indeed, the Orders fail any level of scrutiny because they are transparently motivated by a "bare desire to harm" transgender people. *Romer v. Evans*, 517 U.S. 620, 645 (1996) (quotation omitted). The Orders are directly and exclusively aimed at preventing any medical care "to align an individual's physical appearance with an identity that differs from his or her sex" because, according to the President, it is a "false claim" that a person's sex can change. Denial of Care Order 1, 2(c). These goals and assertions are not grounded in concerns about science or medicine but in casting as "false" the idea that "males can identify as and thus become women and vice versa." Gender Identity Order 2(f). As this Court has already recognized, it is difficult to "fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." TRO 41. The Orders are "inexplicable by anything but animus toward the class it affects." *Romer*, 517 U.S. at 632.

## II. THE COURT SHOULD ENTER A NATIONWIDE INJUNCTION.

Plaintiffs explained why all the remaining equitable factors favor injunctive relief. PI 29-30. The Court agrees. TRO 45-49. And Defendants barely argue otherwise. Opp. 26.

Instead, Defendants focus on arguing that the Court should not grant nationwide injunctive relief. Opp. 26-30. But, once again, Defendants merely recycle their previous arguments instead of offering new ones. Under Fourth Circuit precedent, "[a] district court may issue a nationwide injunction so long as the court molds its decree to meet the exigencies of the particular case."

13

*HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (cleaned up). And, as this Court explained in its TRO opinion, "the 'equities of the case' call for" a nationwide injunction and "a narrower injunction cannot provide complete relief." TRO 52.[7]

Even critics of nationwide injunctions agree that injunctions may incidentally benefit third parties when "that benefit [is] merely a consequence of providing relief to the plaintiff." *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring); *accord United States v. Texas,* 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring). Here, as this Court has explained, "because members of PFLAG and GLMA are located throughout the country … an injunction of nationwide scope is necessary to provide complete relief." TRO 51. The evidence demonstrates that by threatening hospitals across the country with the immediate loss of all federal grant funds, the Executive Orders have created an *in terrorem* effect that has coerced hospitals to immediately stop providing gender affirming medical care. And to dispel that *in terrorem* effect, "a court order must be clear and definite." *Id.* at 50 (quotation omitted).

At a minimum, Plaintiffs are entitled to an injunction extending to all members of PFLAG and GLMA, not merely the specific members who filed declarations in this case. *See Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 932 (2024) (Kavanaugh, J., concurring) (explaining that even an

---

[7] *HIAS* remains good law. *Labrador v. Poe by & through Poe*, 144 S. Ct. 921 (2024) (partially staying state-wide injunction). The Fourth Circuit "do[es] not lightly presume that the law of the circuit has been overturned," and "a Supreme Court decision overrules or abrogates [] prior [circuit] precedent only if [circuit precedent] is *impossible* to reconcile with [the Supreme Court's] decision." *United States v. Hunt*, 123 F.4th 697, 702 (4th Cir. 2024) (cleaned up). In *Poe*, "the Court [did] not decide[] the propriety of 'universal injunctions.'" 144 S. Ct. at 937 (Jackson, J., dissenting); *see also id.* at 933 n.4 (Kavanaugh, J., concurring) (joined by Justice Barrett, noting the order addressed the government's likelihood of success on the issue, and thus did not make a definitive decision). Indeed, the Supreme Court recently passed up an opportunity "to resolve definitively the question whether a district court may issue universal injunctive relief." *McHenry v. Texas Top Cop Shop, Inc.*, 145 S. Ct. 1 (2025) (Gorsuch, J., concurring). Absent a definitive holding to the contrary by the Supreme Court, *HIAS* remains controlling precedent in this Circuit. *See Hecox v. Little*, 104 F.4th 1061, 1089 (9th Cir. 2024), *as amended* (June 14, 2024) (rejecting argument that *Poe* abrogates prior circuit precedent and establishes that a "preliminary injunction would necessarily be overbroad as a matter of law if it extends to nonparties").

14

injunction "as to particular plaintiffs . . . could still have widespread effect" as "the plaintiff [is] an association that has many members"). Under longstanding precedent, injunctive relief extends to *all* an organization's members. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986); *Warth v. Seldin*, 422 U.S. 490, 515 (1975). While one Justice has argued that those precedents should be overruled, *see FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring), only a majority of the Court has the power to do so.

### III. THIS COURT SHOULD REJECT THE REQUESTS FOR BOND AND A STAY.

The Court should either waive the bond requirement or impose a nominal bond of zero dollars. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-CV-00333-ABA, 2025 WL 573764, *30 (D. Md. Feb. 21, 2025) (collecting examples of courts waiving bond when bond would frustrate Plaintiffs' ability to vindicate constitutional rights).

The Court should also deny Defendants' request for a stay, which would alter the status quo that currently exists under the TRO and undercut this Court's finding that Plaintiffs "are likely to suffer irreparable harm absent injunctive relief." TRO 47. If the Court believes a stay may be warranted, then separate briefing on that question would be appropriate.

Dated: February 26, 2025                                      Respectfully submitted,

                                                              */s/ Omar Gonzalez-Pagan*

Joshua Block*
Harper Seldin*                                                Omar Gonzalez-Pagan*
Chase Strangio*                                               Jennifer C. Pizer*
Alexandra R. Johnson*                                         **Lambda Legal Defense**
**American Civil Liberties Union**                              **and Education Fund, Inc.**
  **Foundation**                                              120 Wall Street, 19th Floor
125 Broad Street, Floor 18                                    New York, NY 10005
New York, NY 10004                                            Telephone: (212) 809-8585
Telephone: (212) 549-2500                                     Facsimile: (855) 535-2236
Facsimile: (212) 549-2650                                     ogonzalez-pagan@lambdalegal.org

15

jblock@aclu.org
hseldin@aclu.org
cstrangio@aclu.org
a.johnson@aclu.org

Deborah A. Jeon (Fed. Bar No. 06905)
Zoe M. Ginsberg (Fed. Bar No. 30727)
**American Civil Liberties Union
   Foundation of Maryland**
3600 Clipper Mill Road, Suite 200
Baltimore, MD 21211
Telephone: (410) 889-8555
Facsimile: (410) 366-7838
jeon@aclu-md.org
zginsberg@aclu-md.org

Catherine E. Stetson**
Danielle Desaulniers Stempel (Fed. Bar No. 20501, Renewed 1/31/25)
Kristina Alekseyeva*
Sam H. Zwingli*
**Hogan Lovells US LLP**
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
Facsimile: (202) 637-5910
cate.stetson@hoganlovells.com
danielle.stempel@hoganlovells.com
kristina.alekseyeva@hoganlovells.com
sam.zwingli@hoganlovells.com

jpizer@lambdalegal.org

Karen L. Loewy*
**Lambda Legal Defense
   and Education Fund, Inc.**
815 16th Street NW, Suite 4140
Washington, DC 20006
Telephone: (202) 804-6245
Facsimile: (855) 535-2236
kloewy@lambdalegal.org

Nora Huppert*
**Lambda Legal Defense
   and Education Fund, Inc.**
3656 N. Halsted Street
Chicago, IL 60613
Telephone: (312) 605-3233
Facsimile: (855) 535-2236
nhuppert@lambdalegal.org

Jackson Skeen***
**Hogan Lovells US LLP**
125 High Street
Suite 2010
Boston, MA 02110
Telephone: (617) 702-7747
Facsimile: (617) 371-1037
jackson.skeen@hoganlovells.com

*Attorneys for Plaintiffs*

*\*Application for admission pro hac vice granted.*

*\*\*Application for admission forthcoming.*

*\*\*\*Application for admission pro hac vice granted and admitted only in D.C. Supervised by principals of the firm admitted in Massachusetts.*

16

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed using the Court's CM/ECF system. Service was effected by and through the Court's CM/ECF system.

Dated: February 26, 2025                                         */s/ Omar Gonzalez-Pagan*
                                                                            Omar Gonzalez-Pagan