# **<u>Exhibit A</u>**

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

15

| | |
|---|---|
| STATE OF WASHINGTON et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP et al.,<br><br>Defendants. | CASE NO. 2:25-cv-00244-LK<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION |

16      The United States Constitution creates three branches of government and vests each branch

17   with a different type of power. Congress has the "duty of making laws"; the President has "the

18   duty of executing them"; and the judiciary has "the duty of interpreting and applying them[.]"

19   *Massachusetts v. Mellon,* 262 U.S. 447, 488 (1923). This separation of powers "prevents the

20   accumulation of all powers, legislative, executive, and judiciary, in the same hands—an

21   accumulation that would pose an inherent threat to liberty." *Patchak v. Zinke*, 583 U.S. 244, 249–

22   50 (2018) (cleaned up).

23      As part of its duty to make laws, Congress holds the power of the purse, meaning that it

24   can appropriate federal funds and set conditions on their use. In this case, Congress exercised that

power by appropriating money for research and education grants to medical institutions across the country. These appropriations fund, among other things, research relating to cancer, diabetes, cardiovascular disease, pediatric oncology and blood disorders, and kidney disease.

Instead of "tak[ing] Care that [such] Laws be faithfully executed," as is his duty under the Constitution, U.S. Const. art. II, § 3, President Trump issued two Executive Orders directing revocation of the funding for any grant recipients that "promote gender ideology," including by providing medical care for gender dysphoria. But the President "does not have unilateral authority to refuse to spend the funds" Congress appropriates, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231–32 (9th Cir. 2018) (cleaned up), nor can he "switch the Constitution on or off at will" to advance his policy preferences, *Boumediene v. Bush*, 553 U.S. 723, 765 (2008). "Our basic charter cannot be contracted away like this." *Id.*

This violation of the separation of powers is not the only way the Executive Orders violate the Constitution. The Fifth Amendment's equal protection guarantee prohibits the federal government from treating people differently based on sex or transgender status unless the government can establish an "exceedingly persuasive justification" for doing so and a "close means-end fit." *Sessions v. Morales-Santana*, 582 U.S. 47, 58, 68 (2017); *see also Hecox v. Little*, 104 F.4th 1061, 1074 (9th Cir. 2024). The government cannot do so here.

The first Executive Order purports to protect "children" from regret associated with adults "chang[ing] a child's sex through a series of irreversible medical interventions." Dkt. No. 17-1 at 2. However, the Order is not limited to children, or to irreversible treatments, nor does it target any similar medical interventions performed on cisgender youth. In fact, its inadequate "means-end fit" would prevent federally funded medical providers from providing necessary medical treatments to transgender youth that are completely unrelated to gender identity. For example, a cisgender teen could obtain puberty blockers from such a provider as a component of cancer

1    treatment, but a transgender teen with the same cancer care plan could not. The Order would also

2    prevent federally funded providers from providing a vasectomy to a married cisgender 18-year-

3    old man who desires the surgery because he has Huntington's disease and does not want to pass it

4    to his children. Finally, while Plaintiffs submitted voluminous evidence, including expert

5    testimony, demonstrating the deficiencies in the Executive Orders, Defendants failed to rebut it

6    with any expert testimony of their own, and affirmatively chose not to put Plaintiffs' evidence to

7    the test at an evidentiary hearing.

8          The second Executive Order declares that "women are biologically female, and men are

9    biologically male." Dkt. No. 17-2 at 2. It directs federal agencies to "ensure grant funds do not

10   promote gender ideology"—i.e., the "false" notion that "males can identify as . . . women and vice

11   versa." *Id.* at 2–3. This Order denies the very existence of transgender people and instead seeks to

12   erase them from the federal vocabulary altogether and eliminate medical care for gender dysphoria

13   at federally funded medical institutions. Such "[a] bare desire to harm a politically unpopular group

14   cannot constitute a legitimate governmental interest." *Romer v. Evans*, 517 U.S. 620, 634 (1996)

15   (cleaned up).

16         Plaintiffs—Colorado, Minnesota, Oregon, Washington, and three physicians—seek to halt

17   enforcement of Sections 4 and 8(a) of the first Executive Order and Sections 3(e) and (g) of the

18   second Executive Order as unconstitutional. The Court grants their motion for a preliminary

19   injunction with respect to all sections except Section 8(a).[1]

20

21

22

---

23   [1] Section 8(a) directs the Attorney General to prioritize "enforcement of protections against female genital mutilation" under 18 U.S.C. § 116. Plaintiffs contend that any prosecution under Section 116 for the provision of the gender-affirming care referenced in the first Executive Order would be "baseless," and Defendants affirm that the Executive Order does not expand the criminalized conduct under that statute. Because no credible threat of prosecution exists, Plaintiffs lack standing to challenge Section 8(a).

24

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION - 3

## I.  BACKGROUND

On January 20, 2025, President Trump issued Executive Order 14,168 (the "Gender Ideology EO"), announcing that "[i]t is the policy of the United States to recognize two sexes, male and female." Dkt. No. 17-2 at 2. The Gender Ideology EO provides several definitions that "shall govern all Executive interpretation of and application of Federal law and administration policy":

- "'Sex' shall refer to an individual's immutable biological classification as either male or female. 'Sex' is not a synonym for and does not include the concept of 'gender identity'";

- "'Female' means a person belonging, at conception, to the sex that produces the large reproductive cell";

- "'Male' means a person belonging, at conception, to the sex that produces the small reproductive cell";

- "'Gender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true";

- "'Gender identity' reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." *Id.* at 2–3.

Section 3(b) of the Gender Ideology EO directs all federal agencies to "give the terms 'sex', 'male', [and] 'female'" the above meanings "when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications." *Id.* at 3. Section 3(e), in turn, mandates federal agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id.* In a similar vein, Section 3(g) states that "[f]ederal funds shall not be used to promote gender ideology," and directs each agency to "ensure grant funds do not promote gender ideology." *Id.*

On January 28, 2025, President Trump issued Executive Order 14,187 (the "Medical Services EO"), announcing that "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures." Dkt. No. 17-1 at 2. The Medical Services EO defines "children" as those under 19 years of age, and defines "chemical and surgical mutilation" to include four categories of medical treatment (the "Listed Services"):

- "[T]he use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex";

- "[T]he use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex";

- "[S]urgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex"; and

- "[S]urgical procedures . . . that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions." *Id.* at 2.

Section 4 of the Medical Services EO directs "[t]he head of each executive department or executive agency" that "provides research or education grants to medical institutions" to "immediately . . . ensure that [such grant recipients] end the chemical and surgical mutilation of children." *Id.* at 3. Section 8(a) of the Medical Services EO directs the Attorney General to "prioritize enforcement of protections against female genital mutilation" under 18 U.S.C. § 116. *Id.* at 3.

On February 7, 2025, Physicians 1, 2, and 3 (together, "Physician Plaintiffs") and the States of Washington, Oregon, and Minnesota filed a lawsuit on their own behalf and/or on behalf of the patients whom they treat. Dkt. No. 1. They alleged that Section 4 of the Medical Services EO violates the Constitution's separation of powers and Fifth Amendment equal protection guarantees, and that Section 8(a) of that Order violates the Tenth Amendment. *Id.* at 32–34. On the same day

they filed their Complaint, these plaintiffs filed a motion for a temporary restraining order seeking to enjoin all Defendants except President Trump from implementing or enforcing Sections 4 and 8(a) of the Medical Services EO. Dkt. No. 11; Dkt. No. 148 at 14 n.11. Defendants filed a brief opposing the motion on February 11, 2025. Dkt. No. 136.[2] On February 14, 2025, after hearing oral argument from the parties, the Court granted the motion and issued a temporary restraining order effective until February 28, 2024. Dkt. Nos. 158, 160; *see also* Dkt. No. 161.

On February 19, 2025, Plaintiffs filed an amended complaint, adding the State of Colorado as a plaintiff, re-alleging their original claims, and advancing the following new claims:

- Sections 3(e) and (g) of the Gender Ideology EO violate the Fifth Amendment equal protection guarantee and the separation of powers, Dkt. No. 164 at 42–44;

- Section 8(a) of the Medical Services EO violates not only the Tenth Amendment, but also the separation of powers, *id.* at 44–45; and

- Section 4 of the Medical Services EO and Sections 3(e) and (g) of the Gender Ideology EO violate the Fifth Amendment Due Process Clause because they are unconstitutionally vague, *id.* at 45–46.

Also on February 19, 2025, Plaintiffs filed a motion for a preliminary injunction seeking to enjoin all Defendants except President Trump from implementing and/or enforcing Sections 4 and 8(a) of the Medical Services EO and Sections 3(e) and (g) of the Gender Ideology EO. Dkt. No. 169 at 3; Dkt. No. 229 at 14 n.6. Defendants filed a brief opposing the motion on February 25, 2025. Dkt. No. 223.[3] On February 28, 2025, the Court heard oral argument from the parties.[4]

---

[2] Amicus briefs were submitted by the State of Alabama and the Service Employees International Union. Dkt. No. 133; Dkt. No. 140 at 6–17.

[3] Amicus briefs were submitted by Do No Harm and Amici Medical Organizations (defined below). Dkt. Nos. 219-1, 227-1.

[4] Prior to the hearing, the parties submitted a Joint Status Report agreeing that "no evidentiary hearing is necessary." Dkt. No. 228 at 1.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION - 6

## II.    DISCUSSION

**A.    Standing**

Article III's "case or controversy" requirement obligates federal courts to determine, as a preliminary matter, whether plaintiffs have standing to bring suit. *Lance v. Coffman*, 549 U.S. 437, 439 (2007). A plaintiff establishes standing by showing: (1) that it suffered an injury in fact, meaning a concrete and particularized harm that is actual or imminent, rather than hypothetical; (2) a causal connection between the injury and the challenged conduct that is fairly traceable to the defendant's actions; and (3) a non-speculative likelihood that the injury will be redressed by a decision in the plaintiff's favor. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024) (quoting *Sprint Communications Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 381. When a claimed injury has not yet occurred, a plaintiff must show that the potential harm is sufficiently imminent to qualify as an injury in fact. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

1.    Section 4 of the Medical Services EO and Sections 3(e) and (g) of the Gender Ideology EO

Plaintiff States argue that they have standing to challenge Section 4 of Medical Services EO and Sections 3(e) and (g) of the Gender Ideology EO because (1) these Sections immediately condition federal research and education grants on denying the existence of transgender people and denying transgender patients gender-affirming care, risking the loss of hundreds of millions of dollars awarded to Plaintiff States' medical institutions if they refuse to comply; and (2) the Defendants have caused these injuries such that an injunction and declaratory relief will prevent

1    Defendants from enforcing the Orders. Dkt. No. 169 at 10; Dkt. No. 11 at 8–11. Physician Plaintiffs

2    assert that they have standing to challenge these Sections because (1) the Executive Orders prevent

3    them from delivering medically appropriate care to patients, forcing them to violate their ethical

4    obligations to their patients; (2) their patients are injured by the Orders' discriminatory treatment

5    and coercion designed to stop gender-affirming care; and (3) the Defendants have caused these

6    injuries such that an injunction and declaratory relief will redress the harm. Dkt. No. 169 at 3, 10,

7    24–25; Dkt. No. 11 at 9–11. Defendants do not meaningfully address the Physician Plaintiffs'

8    standing here, noting instead that Plaintiffs' claim is unripe because relevant agencies have not

9    "revoked or withheld any particular grants as a result of the EOs." Dkt. 223 at 10.

10          The Court finds that all Plaintiffs have established standing to challenge Sections 3(e) and

11   (g) of the Gender Ideology EO because they have alleged an imminent, concrete, and particularized

12   harm if those sections are implemented and enforced. *See Spokeo, Inc. v. Robins*, 578 U.S. 330,

13   339 (2016). The same is true as to Section 4 of the Medical Services EO for all Plaintiffs except

14   Minnesota.[5] That Section directs "[t]he head of each executive department or agency . . . that

15   provides research or education grants to medical institutions, including medical schools and

16   hospitals," to "immediately take appropriate steps to ensure that institutions receiving Federal

17   research or education grants end" the Listed Services. Dkt. No. 17-1 at 3. Section 3(e) of the

18   Gender Ideology EO mandates that federal agencies "take all necessary steps, as permitted by law,

19

20   _____

    [5] Specifically, Minnesota does not aver that its medical institutions receive any research or education grants such that
21   it would be harmed by Section 4 of the Medical Services EO. However, it does establish that it could lose federal
    funding as a result of implementation of Sections 3(e) and (g) of the Gender Ideology EO. In particular, the Assistant
    Commissioner for the Minnesota Department of Human Services avers that the state's Medical Assistance and
22   MinnesotaCare programs—which are funded with federal dollars—"generally provide[] coverage for gender
    affirming care," and in fact the Department of Human Services "is required under Minnesota state law to provide
    [such] coverage." Dkt. No. 94 at 3–4. If it were no longer permitted to provide coverage for gender-affirming care,
23   "medically-necessary health care for Minnesotans" would be threatened, portending increased risks from "untreated
    gender dysphoria and associated health complications." *Id.* at 5. Defendants do not contest Minnesota's standing to
    challenge these sections of the Gender Ideology EO, and because the prohibitions under those sections are broader
24   than Section 4 of the Medical Services EO, Minnesota's lack of standing with respect to the latter is inconsequential
    with respect to the injunctive relief to which it is entitled.

1   to end the Federal funding of gender ideology," while Section 3(g) similarly directs each agency

2   to "ensure grant funds do not promote gender ideology." Dkt. No. 17-2 at 3.[6]

3           Plaintiff States (via their medical institutions) and Physician Plaintiffs provide the Listed

4   Services when they believe such Services are medically appropriate, including to certain patients

5   ages 18 and under.[7] Therefore, Plaintiffs have shown that they intend to engage in a course of

6   conduct in conflict with the Executive Orders. *See City & Cnty. of San Francisco*, 897 F.3d at

7   1237.

8           The fact that the loss of funds has not yet materialized or that enforcement of the Orders

9   has not yet occurred does not mean that no injury is imminent or that Plaintiffs lack standing on

10  this ground. *Id.* The Medical Services EO contemplates immediate compliance by agencies,

11  mandating that the "head of each executive department or agency . . . that provides research or

12  education grants to medical institutions" shall "*immediately* take appropriate steps to ensure that

13  institutions receiving Federal research or education grants end the chemical and surgical mutilation

14

15  [6] Because the Listed Services help transgender patients align their physical appearance with their gender identity, it
    is beyond dispute that they "promote gender ideology."

16  [7] *See, e.g.*, Dkt. No. 13 at 5 (Physician 1, a physician at the Department of Pediatrics at the University of Washington,
    averring that, "[i]f both the patient and the parent or caregiver with medical decision-making authority express a desire

17  to proceed with gender-affirming medical care, and it is medically indicated and consistent with the standards of care,
    then we proceed with treatment," which can include puberty-delaying medications and gender-affirming hormones);

18  Dkt. No. 14 at 3 (Physician 2, a physician at a Seattle hospital, stating that, "where medically indicated . . . I prescribe
    medications to treat gender dysphoria," including "puberty-delaying medications and hormone replacement therapy");
    Dkt. No. 15 at 4 (Physician 3, a pediatric endocrinologist at a Seattle hospital, stating that "I prescribe medications to

19  treat gender dysphoria, which may include puberty-blocking medications and hormone replacement therapy," after
    obtaining consent from patients' guardians); Dkt. No. 16 at 5 (UW Medicine "provides gender-affirming medical care

20  coordinated across a range of clinicians in the UW Medicine system to its adult patients," including but not limited to
    surgical care, "[w]hen medically indicated and consistent with practice guidelines and standards of care," and the UW

21  School of Medicine Department of Pediatrics faculty physicians also "provide primary and specialty pediatric care,
    including gender-affirming medical care, to minor patients when medically indicated and necessary to serve the

22  patients' health needs"); Dkt. No. 79 at 3 (University of Minnesota medical institutions provide gender-affirming care,
    including puberty-suppressing medications, when medically appropriate); Dkt. No. 97 at 2 (Oregon State University

23  provides gender-affirming care to students through its Student Health Services, including hormone therapy, mental
    health support, and surgical referrals); Dkt. No. 107 at 8 (Oregon Health and Science University provides gender-
    affirming care, including hormone therapy and puberty suppression medications, "when appropriate, after additional

24  comprehensive mental health involvement[.]"); Dkt. No. 207 at 2, 5 (the University of Colorado School of Medicine
    provides gender affirming care, including puberty blockers and hormone therapy, to patients under the age of 19).

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION - 9

of children." Dkt. No. 17-1 at 3 (emphasis added). Underscoring the directive that agency heads

act "immediately," the Medical Services EO requires that they submit a report within 60 days of

the date of the Order "detailing progress in implementing this order[.]" *Id.* at 4. Similarly, the

Gender Ideology EO mandates that "[a]gencies shall take all necessary steps . . . to end the Federal

funding of gender ideology," and requires that "[w]ithin 120 days" "each agency head" send an

"update on implementation of this order to the President" addressing "agency-imposed

requirements on federally funded entities, including contractors, to achieve the policy of this

order." Dkt. No. 17-2 at 3–4.

Contrary to Defendants' claims that no threats of grant revocation have been made, Dkt.

No. 223 at 4, on January 31, 2025, the Health Resources & Services Administration ("HRSA")

sent an email to "HRSA Award Recipients" (including personnel at public medical institutions in

Plaintiff States) advising that, "[e]ffective *immediately*, HRSA grant funds may not be used for

activities that do not align with Executive Orders (E.O.) entitled . . . Protecting Children from

Chemical and Surgical Mutilation[] and Defending Women from Gender Ideology Extremism

[(i.e., the Medical Services EO)] and Restoring Biological Truth to the Federal Government

(Defending Women) [(i.e., the Gender Ideology EO)]," and that "[a]ny vestige, remnant, or re-

named piece of any programs in conflict with these E.O.s are terminated in whole or in part." Dkt.

No. 16 at 7 (emphasis added); Dkt. No. 16-1 at 2; *see also* Dkt. No. 13 at 10; Dkt. No. 107 at 13.

The email further warned that "[y]ou may not incur any additional costs that support any programs,

personnel, or activities in conflict with these E.O.s." Dkt. No. 16 at 7; Dkt. No. 16-1 at 2. Although

the email was rescinded without explanation roughly a week later, Dkt. No. 16-2 at 2, this concrete

step taken by a federal agency in response to the Executive Orders demonstrates the imminency

of their enforcement. *See PFLAG, Inc. v. Trump*, No. CV 25-337-BAH, 2025 WL 510050, at *7

1   (D. Md. Feb. 14, 2025) ("[I]t is clear that the rescission of the HRSA notice does not render the

2   issue moot.").

3          HRSA was not the only agency to interpret these Executive Orders to require immediate

4   action. On January 31, 2025, the Centers for Disease Control and Prevention ("CDC") sent a notice

5   to CDC grant recipients (including researchers at state medical institutions in the Plaintiff States)

6   informing them that in order to "implement the [Gender Ideology EO]," they must "*immediately*

7   terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or

8   inculcating gender ideology at every level and activity . . . that are supported with funds from this

9   award." Dkt. No. 174-1 at 2 (emphasis added); *see also* Dkt. No. 174 at 2; Dkt. No. 176 at 3. Like

10  the HRSA notice, the CDC notice indicated that "[a]ny vestige, remnant, or re-named piece of any

11  gender ideology programs funded by the U.S. government under this award are *immediately*,

12  completely, and permanently terminated." Dkt. No. 174-1 at 2 (emphasis added). The CDC's

13  notice was rescinded on February 11, 2025 pursuant to a temporary restraining order issued by a

14  federal court in Rhode Island. Dkt. No. 174-2 at 2; *see also* Dkt. No. 174 at 2; Dkt. No. 176 at 3.

15         Beyond this agency action, the White House issued a press release on February 3, 2025

16  declaring that the Medical Services EO was "having its intended effect" and offering specific

17  examples of "[h]ospitals around the country . . . [already] taking action to downsize or eliminate

18  their so-called 'gender-affirming care' programs[.]" Dkt. No. 17-9 at 2; *see also City & Cnty. of*

19  *San Francisco*, 897 F.3d at 1236 (finding that injury was sufficiently imminent where the Trump

20  Administration "consistently evinced its intent to enforce the Executive Order, and . . . made clear

21  that the [plaintiffs] are likely targets"); *PFLAG*, 2025 WL 510050, at *6 (finding that the February

22  3 press release illustrates that "the executive is committed to restricting federal funding based on

23  the denial of gender affirming care").

24

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION - 11

1    The record shows that enforcement of Sections 4 of the Medical Services EO and Sections

2    3(e) and (g) of the Gender Ideology EO will cause one of two concrete harms to Plaintiffs: they

3    will either (1) be forced to halt any treatment or funding for gender dysphoria or (2) lose federal

4    funding. As Physician 1 puts it, "Forcing me to stop providing care that my training, experience,

5    and medical judgment tell me is in the best interest of my patient would force me to violate the

6    oath I pledged to uphold," while upholding that oath would threaten Physician 1's livelihood

7    because the "grant funding that supports a significant portion of [my] work . . . will be stripped

8    away[.]" Dkt. No. 13 at 10.

9    Much the same is true for Plaintiff States on an institutional level. According to the Chief

10   Executive Officer of UW Medicine, who is also the Dean of the UW School of Medicine, ceasing

11   to provide gender-affirming care—including the Listed Services—"would undermine the UW

12   School of Medicine's mission and its ethical duties to its patients and to the community that it

13   serves." Dkt. No. 15 at 6–7. At the same time, the UW School of Medicine currently has direct

14   research grants from numerous federal agencies, including the Department of Agriculture,

15   Department of Commerce, Department of Defense, Department of Education, Department of

16   Energy, Department of Health and Human Services, Department of Veterans Affairs, National

17   Aeronautics & Space Administration, National Science Foundation, and Office of the Director of

18   National Intelligence. Dkt. No. 16 at 3. Because "[t]hese medical research grants support

19   operational and capital expenses including researchers, labs, and equipment," the school's ability

20   "to achieve its educational, research, and health care mission would be significantly impaired if it

21   were suddenly stripped of federal research or education grants under [the Medical Services EO]."

22   *Id.* at 6. Moreover, key research endeavors—including on Alzheimer's disease, cancer, diabetes,

23   liver disease, cardiovascular disease, autism and other neurodevelopmental disorders, asthma,

24   opioid use disorder, kidney disease, sleep apnea, Down syndrome, and organ transplantation—

"would be left unfinished, putting future medical treatments and breakthroughs at risk of not being developed or discovered." *Id.*

Oregon State University faces a similar Sophie's choice. According to its Executive Director, if the school were prevented from providing "medically necessary health care" to transgender students, the students would suffer "increased anxiety, depression, and likelihood of suicide or self-harm, and . . . severe illness or life-threatening conditions," and the University's "ability to fulfill its educational mission" would be impeded. Dkt. No. 97 at 3–4. But at the same time, and just like the UW School of Medicine, Oregon State University relies on substantial federal grants to support its work. Dkt. No. 92 at 3–4; Dkt. No. 97 at 3. The Vice President for Research and Innovation at Oregon State avers that "[i]f the federal government were to stop providing research and education grants to Oregon State University, the impacts would be devastating to its operations and disrupt critical research in areas such as integrated health and biotechnology, robotics, agriculture, food and beverages, semiconductors and artificial intelligence." Dkt. No. 92 at 4; *see also* Dkt. No. 97 at 3 (Executive Director of Student Health Services attesting to same).

Oregon Health and Science University, which "ranks as the top Oregon institution to receive National Institutes of Health (NIH) funding," would experience similarly dire consequences from an immediate federal funding cut: "4,221 grants that are currently underway" would be impacted, disrupting "critical research in areas such as rural health, fetal maternal medicine, cancer, cardiovascular health, Alzheimer's disease, neurology, behavioral health, and many other areas critical to human health," and resulting in the "immediate closure of at least 500 research programs" as well as "the loss of approximately 2000 research staff positions." Dkt. No. 107 at 3, 5 (declaration of Executive Vice President and Interim Chief Executive Officer of Oregon Health and Science University Health). Yet while grants are critical to Oregon Health and Science

University, the school also highly values its transgender health programs. It offers curricula in behavioral health, hormone therapy, and surgical care for gender diverse individuals, and is one of only a few international institutions to offer a medical student elective in transgender health and a surgical fellowship exclusively focused on gender-affirming surgeries. *Id.* at 10. "Should gender-affirming care be disallowed at OHSU, all forward workforce training in the various contributing professions and subspecialties related to this care would also cease," and patients unable to access that medically appropriate care would likely suffer "increase[d] mental health distress" and negative impacts to their "social functioning, emotional wellness, and psychological stability." *Id.* at 9–10.[8]

For the foregoing reasons, Plaintiffs have demonstrated that enforcement of Section 4 of the Medical Services EO and/or Sections 3(e) and (g) of the Gender Ideology EO will either (1) result in "a likely 'loss of funds promised under federal law,'" *City & Cnty. of San Francisco*, 897 F.3d at 1236 (quoting *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015)), or (2) force Plaintiffs to cease "providing medical services they would otherwise provide," *Isaacson v. Mayes*, 84 F.4th 1089, 1096–97 (9th Cir. 2023) ("an Article III injury in fact can arise when plaintiffs are simply prevented from conducting normal business activities" such

---

[8] Minnesota and Colorado face similar harm. *See* Dkt. No. 79 at 3 (University of Minnesota co-medical director of comprehensive gender care stating that "[i]t is very important that we offer gender affirming medical care when it is determined the patient is eligible and it is medically necessary, in order to prevent permanent physical changes that would be damaging to their health and to support positive physical and mental health outcomes"); Dkt. No. 94 at 3–5 (Assistant Commissioner for the Minnesota Department of Human Services averring that if the state's Medical Assistance and MinnesotaCare programs—which are funded with federal dollars—could no longer cover gender affirming care," "medically-necessary health care for Minnesotans" would be threatened, resulting in increased risks from "untreated gender dysphoria and associated health complications"); Dkt. No. 98 at 6 (assistant professor at the University of Minnesota attesting that "[n]ot providing gender-affirming health care is not a valid medical practice" and that, "as a medical provider, I know denying a person this care will cause serious harm to my patients. This order asks me to violate my oath as a physician"); Dkt. No. 207 at 5–6 (medical doctor affiliated with the University of Colorado School of Medicine stating that "[t]he Executive Order threatens our ability to serve patients funded by Medicaid, and my institution's ability to receive federal research funds (not just related to gender affirming care, but for medical research spanning the pediatric and adult populations)," and that "[i]n response to those threats, we had to alter our model of care to only provide patients with behavioral and supportive care, without the possibility of receiving puberty delaying medications or gender affirming hormone therapies going forward").

1    as provision of medical services). *See also City & Cnty. of San Francisco*, 897 F.3d at 1236

2    (Plaintiffs established standing by "demonstrat[ing] that, if their interpretation of the Executive

3    Order is correct, they will be forced to either change their policies or suffer serious

4    consequences.").[9] Enjoining the enforcement of Sections 4 of the Medical Services EO and

5    Sections 3(e) and (g) of the Gender Ideology EO would remedy this harm. *Food & Drug Admin.*,

6    602 U.S. at 380–81.[10]

7    Physician Plaintiffs also have standing to assert their patients' rights with respect to

8    Sections 3(e) and (g) of the Gender Ideology EO and Section 4 of the Medical Services EO.

9    Plaintiffs are permitted to "assert third-party rights in cases where the enforcement of the

10    challenged restriction against the litigant would result indirectly in the violation of third parties'

11    rights." *June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299, 318 (2020) (cleaned up), *abrogated on*

12    *other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). Here, as in *June*

13    *Medical*, Physician Plaintiffs are providers challenging government action that purports to regulate

14    their conduct where the "threatened imposition of governmental sanctions for noncompliance"

15    (1) "eliminates any risk that their claims are abstract or hypothetical," (2) assures the Court "that

16    the plaintiffs have every incentive to resist efforts at restricting their operations by acting as

17    advocates of the rights of third parties who seek access to their market or function," and (3) makes

18    Physician Plaintiffs "far better positioned than their patients to address the burdens of compliance."

19    *Id.* at 319 (internal quotation marks omitted). "They are, in other words, 'the least awkward' and

20

21    [9] Defendants also argue that Plaintiffs may not claim parens patriae standing to challenge the Executive Orders. Dkt. No. 223 at 29. However, Plaintiffs do not assert such standing. Dkt. No. 148 at 13 n.10.

22    [10] Because the Executive Orders direct immediate action and threaten Plaintiffs with serious penalties for noncompliance, and because Plaintiffs' claims primarily advance legal questions that require little factual development, this case is prudentially ripe. *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v.*

23    *Labrador*, 122 F.4th 825, 840 (9th Cir. 2024); *see also PFLAG*, 2025 WL 510050, at *6 (finding that a nearly identical challenge "d[id] not depend on future uncertainties" because "the plain text of the Executive Orders conditions

24    federally funded hospital grants on the denial of gender affirming medical care to transgender youth.").

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION - 15

1    most 'obvious' claimants here." *Id.* at 320 (quoting *Craig v. Boren*, 429 U.S. 190, 197 (1976)).

2    Physician Plaintiffs have suffered an injury in fact themselves—as discussed above—and maintain

3    close relationships with their patients. *Powers v. Ohio*, 499 U.S. 400, 411 (1991). Specifically,

4    over months and years of treatment, Physician Plaintiffs develop a close and personal relationship

5    with their patients experiencing gender dysphoria. *See, e.g.*, Dkt. No. 13 at 7; Dkt. No. 14 at 7;

6    Dkt. No. 15 at 5. Furthermore, due to the sensitive nature of the subject matter, fear of retaliation

7    from the federal government, and lack of capacity and/or financial resources, Physician Plaintiffs'

8    patients are hindered from protecting their own interests. *Powers*, 499 U.S. at 411; *see, e.g.*, Dkt.

9    No. 21 at 4; Dkt. No. 22 at 4; Dkt. No. 29 at 2, 5–7; Dkt. No. 36 at 2; Dkt. No. 37 at 8; Dkt. No.

10    45 at 2, 5; Dkt. No. 49 at 2; Dkt. No. 52 at 2, 4; Dkt. No. 54 at 2, 5; Dkt. No. 60 at 5; Dkt. No. 65

11    at 2, 5; Dkt. No. 67 at 4; Dkt. No. 68 at 5; Dkt. No. 69 at 2; Dkt. No. 70 at 5; Dkt. No. 72 at 2. As

12    such, Physician Plaintiffs may plead their patients' injuries as well as their own.

13        2.    Section 8(a) of the Medical Services EO

14        With respect to Section 8(a) of the Medical Services EO, the Court has benefited from

15    additional briefing and oral argument on the question of whether Physician Plaintiffs have

16    satisfactorily alleged standing, and now determines that they have failed to do so.

17        Section 8(a) directs the Attorney General to "review Department of Justice enforcement of

18    section 116 of title 18, United States Code, and prioritize enforcement of protections against

19    female genital mutilation." Dkt. No. 17-1 at 3. Plaintiffs argue that Section 8(a) violates the

20    separation of powers and the Tenth Amendment by criminalizing the Listed Treatments. Dkt. No.

21    169 at 19.

22        To establish pre-enforcement standing, Plaintiffs must show that (1) they have "an

23    intention to engage in a course of conduct arguably affected with a constitutional interest"; (2) the

24    conduct in question is "proscribed by [the law at issue]"; and (3) "there exists a credible threat of

1    prosecution[.]" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (internal citation

2    omitted). Importantly, "a generalized threat of prosecution" is not sufficient to establish standing.

3    *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000).

4        Here, all parties emphasize that "female genital mutilation" as defined in 18 U.S.C. § 116

5    differs markedly from the Listed Services. Dkt. No. 223 at 24 (Defendants: "[B]y its terms, th[e]

6    direction [in the Medical Services EO to prioritize enforcement] addresses 'female genital

7    mutilation,' which is defined in 18 U.S.C. § 116, and not 'chemical and surgical mutilation,' which

8    is defined separately and differently in the Executive Order."); Dkt. No. 164 at 35 (Plaintiffs:

9    "Lawful, state-regulated, medically appropriate and necessary gender-affirming care is not female

10   genital mutilation under 18 U.S.C. § 116."). Section 116 makes it a crime to "perform[], attempt[]

11   to perform, or conspire[] to perform female genital mutilation on another person who has not

12   attained the age of 18 years"; to consent, as the "parent, guardian, or caretaker of a person who has

13   not attained the age of 18 years" to female genital mutilation; or to "transport[] a person who has

14   not attained the age of 18 years for the purpose of the performance of female genital mutilation on

15   such person." 18 U.S.C. § 116. As Defendants point out, it is difficult to identify any overlap

16   between the Listed Services and Section 116:

17       • Section 116 "defines 'female genital mutilation' as 'any procedure performed for non-

18           medical reasons that involves partial or total removal of, or other injury to, the external

19           female genitalia' and provides examples, such as 'a clitoridectomy," and "the partial or

20           total removal . . . of the labia minora or the labia majora.'" Dkt. No. 223 at 7 (quoting

21           18 U.S.C. § 116(e)).

22       • Section 116 applies only to "female genital mutilation" of individuals under 18 years

23           old, and "Plaintiffs acknowledge that non-surgical options 'are generally the only

24           treatments minors can receive' and they are the only treatments the physician Plaintiffs

provide." *Id.* at 25 (citing Dkt. No. 11 at 21; Dkt. No. 13 at 5; Dkt. No. 14 at 3; Dkt. No. 15 at 4).

- Section 116 "excludes liability for '[a] surgical operation' that is 'necessary to the health of the person on whom it is performed, and is performed by a person licensed in the place of its performance as a medical practitioner.'" *Id.* at 7–8 (quoting 18 U.S.C. § 116(b)(1)); *see also* Dkt. No. 136 at 26.

- To obtain a conviction under Section 116, the government must prove that the charged conduct has a sufficient nexus to interstate or foreign commerce. Dkt. No. 223 at 5; *see also* 18 U.S.C. § 116(d).

Given the notable differences between the Listed Services and Section 116, it is true—as Plaintiffs argue—that the presence of a directive regarding Section 116 within the Medical Services EO seems misplaced, and could be construed as a bad-faith attempt to make parents and providers fear prosecution for providing the Listed Services. Dkt. No. 169 at 20–21. But such attempt does not amount to more than "a generalized threat of prosecution." *Thomas*, 220 F.3d at 1139.

The record before the Court does not suggest that there is any overt threat that the Department of Justice intends to prosecute the Listed Services as a violation of Section 116. Indeed, federal prosecutors and law enforcement are legally and ethically obligated to follow the law, and serious consequences could result from advancing a groundless criminal prosecution.[11] Furthermore, the only potential overlap between the Listed Services and female genital mutilation as defined in Section 116 concerns medically unnecessary bottom surgeries performed on

---

[11] For instance, the Federal Tort Claims Act expressly authorizes abuse of process and malicious prosecution claims against the United States based on federal investigative or law enforcement officers' actions. *See* 28 U.S.C. § 2680(h). Prosecutorial misconduct could also result in disciplinary proceedings or revocation of an attorney's license to practice law. *See, e.g.*, *N.C. State Bar v. Nifong*, 06 D.H.C. 35 (July 24, 2007), *available at* https://www.ncbar.gov/orders/06dhc35.pdf.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION - 18

biological females under the age of 18 that have some tie to interstate commerce. 18 U.S.C. §

116(a), (b)(1), (d), (e). The record is bereft of any evidence that Plaintiffs intend to engage in this

type of conduct. *See, e.g.*, Dkt. No. 169 at 21 (non-surgical treatments "are generally the only

treatment minors can receive"); Dkt. No. 13 at 5; Dkt. No. 14 at 3, 9; Dkt. No. 15 at 4; *see also*

Dkt. No. 112 at 4. And as Defendants point out, providers in all four Plaintiff States are already

subject to laws similarly criminalizing female genital mutilation. Dkt. No. 223 at 23 n.6; Wash.

Rev. Code Ann. § 9A.36.170; Minn. Stat. Ann. § 609.2245; Or. Rev. Stat. Ann. § 163.207; Colo.

Rev. Stat. Ann. § 18-6-401.

For these reasons, Physician Plaintiffs do not have standing to challenge Section 8(a).

3.  Defendants' Other Threshold Arguments

Defendants argue that Plaintiffs cannot bring claims against the agency defendants. Dkt.

No. 223 at 9–10. They also argue that Plaintiffs lack an equitable cause of action. *Id.* at 12. These

arguments are unavailing.

The Supreme Court in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*

found no support for the argument that a challenge to governmental action under separation of

powers principles should be "treated differently than every other constitutional claim" for which

"equitable relief 'has long been recognized as the proper means for preventing entities from acting

unconstitutionally.'" 561 U.S. 477, 491 n.2 (2010) (quoting *Correctional Services Corp. v.*

*Malesko,* 534 U.S. 61, 74 (2001)). It is well established that plaintiffs may seek equitable relief

against federal officials who exceed the scope of their authority or act unconstitutionally. *See West*

*v. Standard Oil Co.*, 278 U.S. 200, 210 (1929); *Noble v. Union River Logging R.R.*, 147 U.S. 165,

171–72 (1893); *see also, e.g.*, *City & Cnty. of San Francisco*, 897 F.3d at 1233–35 (affirming

judgment where executive order unconstitutionally violated the separation of powers); *Washington*

*v. Trump*, 847 F.3d 1151, 1164–65 (9th Cir. 2017) (denying motion to stay injunction against

1    executive order). Indeed, "[t]he ability to sue to enjoin unconstitutional actions by . . . federal

2    officers is the creation of courts of equity, and reflects a long history of judicial review of illegal

3    executive action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

4    **B.    Preliminary Injunction**

5        Federal Rule of Civil Procedure 65 empowers the court to issue a preliminary injunction.

6    Fed. R. Civ. P. 65(a). A preliminary injunction is "an extraordinary remedy never awarded as of

7    right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The Court will not

8    "mechanically" grant an injunction for every violation of law. *Weinberger v. Romero-Barcelo*, 456

9    U.S. 305, 313 (1982). Plaintiffs seeking a preliminary injunction must establish that (1) they are

10   "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of

11   preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in

12   the public interest." *Winter*, 555 U.S. at 20. The mere "possibility" of irreparable harm is

13   insufficient; instead, the moving party must "demonstrate that irreparable injury is likely in the

14   absence of an injunction." *Id.* at 22.[12]

15       For the reasons provided below, the Court finds that Plaintiffs have carried their burden.

16       1.   <u>Plaintiffs Have Demonstrated That They Are Likely to Succeed on the Merits</u>

17            *(a) Plaintiffs' Separation of Powers Claim*

18       As discussed above, Section 4 of the Medical Services EO imposes a condition on the

19   receipt of federal funds by the Plaintiff States' medical institutions, effective immediately:

20   "[I]nstitutions receiving Federal research or education grants [must] end the" Listed Services. Dkt.

21   No. 17-1 at 3. Sections 3(e) and (g) of the Gender Ideology EO do the same, mandating an "end"

22   to federal funding connected to "gender ideology." Dkt. No. 17-2 at 3. Plaintiffs argue that "[b]y

---

[12] Because Plaintiffs seek injunctive relief to prevent future constitutional violations, the requested injunction is prohibitory, not mandatory. *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017).

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION - 20

attaching conditions to federal funding that were . . . unauthorized by Congress," these sections of the Executive Orders "usurp Congress's spending, appropriation, and legislative powers." Dkt. No. 169 at 19. This argument is likely to succeed on the merits.

"Even before the birth of this country, separation of powers was known to be a defense against tyranny." *Loving v. United States*, 517 U.S. 748, 756 (1996). Although separation of powers does not mean that the three branches of government "ought to have no partial agency in, or no contro[]l over the acts of each other, it remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another." *Id.* (cleaned up). As relevant here, "[t]he United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco*, 897 F.3d at 1231 (citing U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause)).

Under this constitutional structure, the President's opportunity to weigh in on congressional legislation comes in the form of his veto power: "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections[.]" U.S. Const. art. I, § 7, cl. 2. Once a bill becomes a law, however, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal" it. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). The President must instead "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Importantly, this duty to faithfully enforce the law "refutes the idea that [the President] is to be a lawmaker[.]" *Youngstown*, 343 U.S. at 587 ("The Constitution limits [the President's] functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad."). And "[b]ecause Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations." *City & Cnty. of San Francisco*, 897 F.3d

at 1234. Failure to execute that duty "may be an abdication of the President's constitutional role." *Id.* (citing 2 U.S.C. §§ 681–688 for the proposition that "Congress has affirmatively and authoritatively spoken" with respect to the President's duty to execute appropriations laws).[13]

Although Congress's spending power includes the power to attach conditions on the receipt of federal funds, *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987), Plaintiffs have submitted evidence that none of the funds received by medical institutions in the Plaintiff States have a congressionally authorized condition requiring them to refrain from the provision of gender-affirming care. Dkt. No. 11 at 18–19; Dkt. No. 169 at 18 n.3 (listing 10 years of appropriations bills); Dkt. No. 16 at 8; Dkt. No. 92 at 4; Dkt. No. 94 at 4–5; Dkt. No. 97 at 4; Dkt. No. 116 at 6. Defendants have not refuted this evidence. And despite speculating that Congress might have provided certain relevant agencies "with discretion to condition funding on the[] terms" laid out in the two Executive Orders, Dkt. No. 223 at 11, Defendants have not pointed to a single piece of legislation that does so. Nor do the Executive Orders themselves "identif[y] a statute authorizing the executive branch to amend or terminate federal grants" in this way. *PFLAG*, No. 1:25-cv-00337-BAH, Dkt. No. 62 at 126. The President's power is thus "at its lowest ebb." *City & Cnty. of San Francisco*, 897 F.3d at 1234 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)); *see also Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015).

In spite of this, President Trump's Executive Orders purport to do something not even Congress may do: "surprise[] states with post acceptance . . . conditions" on federal funds and "impose conditions on federal grants that are unrelated to the federal interest in particular national projects or programs." *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019) (cleaned

---

[13] *See also Memorandum Opinion on Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, Op. O.L.C. 1, 309 (Dec. 1, 1969) ("With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.").

up). As in *City and County of San Francisco*, "[n]ot only has the Administration claimed for itself Congress's exclusive spending power, it has also attempted to coopt Congress's power to legislate." *City & Cnty. of San Francisco*, 897 F.3d at 1234. But President Trump "is without authority to thwart congressional will by canceling appropriations passed by Congress" or to "decline to follow a statutory mandate or prohibition simply because of policy objections." *Id.* at 1232 (quoting *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013)); *see also Clinton*, 524 U.S. at 445–46 (holding that a congressional act "authoriz[ing] the President himself to effect the repeal of laws, for his own policy reasons, without observing the procedures set out in Article I, § 7" violated the separation of powers).

The Court's holding here is not about the policy goals that President Trump seeks to advance; rather, it is about reaffirming the structural integrity of the Constitution by ensuring that executive action respects congressional authority. This outcome preserves an enduring system of checks and balances that the Founders considered to be "essential to the preservation of liberty." *Mistretta v. United States*, 488 U.S. 361, 380 (1989). Because Section 4 of the Medical Services EO and Sections 3(e) and (g) of the Gender Ideology EO purport to condition congressionally appropriated funds in a manner that effectively rewrites the law, they usurp Congress's legislative role and thus amount to an end run around the separation of powers. Plaintiffs' separation of powers argument is likely to succeed on the merits.

*(b) Plaintiffs' Fifth Amendment Equal Protection Claim*

Even if Section 4 of Medical Services EO and Sections 3(e) and (g) of the Gender Ideology EO did not violate the separation of powers (they do), Plaintiffs have shown a likelihood of success on the merits regarding their claim that these Sections of the Executive Orders violate the Equal Protection Clause of the Fifth Amendment.

1    The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or

2    property, without due process of law[.]" U.S. Const. amend. V. The Supreme Court has determined

3    that "the Due Process Clause of the Fifth Amendment contains an equal protection component

4    prohibiting the United States from invidiously discriminating between individuals or groups."

5    *Washington v. Davis*, 426 U.S. 229, 239 (1976).[14] "The Constitution's guarantee of equality 'must

6    at the very least mean that a bare [governmental] desire to harm a politically unpopular group

7    cannot' justify disparate treatment of that group." *United States v. Windsor*, 570 U.S. 744, 770

8    (2013) (quoting *Dep't of Agric. v. Moreno,* 413 U.S. 528, 534–35 (1973)).

9    When considering an equal protection claim, the Court first "determine[s] what level of

10    scrutiny applies to a classification under a law or policy, and then decide[s] whether the policy at

11    issue survives that level of scrutiny." *Hecox*, 104 F.4th at 1073.

12            *(i)*  Heightened Scrutiny Applies

13    Laws that "differentiate on the basis of gender" are subject to "heightened review under

14    the Constitution's equal protection guarantee." *Sessions*, 582 U.S. at 58. In the Ninth Circuit,

15    "discrimination on the basis of transgender status is a form of sex-based discrimination," and such

16    "sex-based classifications are subject to heightened scrutiny." *Hecox*, 104 F.4th at 1079; *see also*

17    *Doe v. Horne*, 115 F.4th 1083, 1102 (9th Cir. 2024); *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th

18    Cir. 2019). Specifically, a law that employs such classifications withstands constitutional scrutiny

19    only where the classifications (1) serve important governmental objectives and (2) are substantially

20    related to the achievement of those objectives. *Craig*, 429 U.S. at 197. "Successful defense of [a

---

[14] The "Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975). Therefore, cases analyzing claims of state discrimination in violation of the Equal Protection Clause are equally applicable to claims of federal discrimination under the equal protection guarantee of the Fifth Amendment. *See Buckley v. Valeo*, 424 U.S. 1, 93 (1976), *abrogated on other grounds*.

law] that differentiates on the basis of gender . . . requires an 'exceedingly persuasive justification.'" *Sessions*, 582 U.S. at 58 (quoting *United States v. Virginia*, 518 U.S. 515, 531 (1996); *Kirchberg v. Feenstra,* 450 U.S. 455, 461 (1981)).

Plaintiffs argue that heightened scrutiny applies because the two Executive Orders at issue classify based on transgender status, gender-diverse status, and sex. Dkt. No. 169 at 11. Defendants contend that the Court should instead apply rational basis review because the Medical Services EO "targets specified treatments for young people based on their medical purpose, not the trans-identifying status of the patient," and because the Gender Ideology EO's "recognition that the 'sexes are not changeable[]' . . . does not deny the existence of" transgender people. Dkt. No. 223 at 17–18.

### (a) Background

Before the Court addresses the nature of the classifications in the Executive Orders, it first reviews key concepts. "'Gender identity' is 'the term used to describe a person's sense of being male, female, neither, or some combination of both.'" *Hecox*, 104 F.4th at 1068 (quoting Joshua D. Safer & Vin Tangpricha, *Care of Transgender Persons*, 381 N. Eng. J. Med. 2451, 2451 (2019)). "A person's 'sex' is typically assigned at birth based on an infant's external genitalia, though external genitalia do not always align with other sex-related characteristics, which include internal reproductive organs, gender identity, chromosomes, and secondary sex characteristics." *Id.* (cleaned up).[15] "A 'transgender' individual's gender identity does not correspond to their sex assigned at birth, while a 'cisgender' individual's gender identity corresponds with the sex assigned to them at birth." *Id.* at 1068–69. "Some individuals are nonbinary, meaning they identify with or express a gender identity that is neither entirely male nor entirely female." *Horne*, 115

---

[15] As discussed above, the Gender Ideology EO defines "sex" differently.

1    F.4th at 1092. In addition, around two percent of people are born "intersex," which is "an umbrella

2    term for people born with unique variations in certain physiological characteristics associated with

3    sex, such as chromosomes, genitals, internal organs like testes or ovaries, secondary sex

4    characteristics, or hormone production or response." *Hecox*, 104 F.4th at 1069 (cleaned up).

5         Transgender individuals often experience "gender dysphoria," a medical diagnosis

6    contained in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental

7    Disorders as a condition in which individuals experience "a marked incongruence between one's

8    experienced/expressed gender and assigned gender, lasting at least 6 months," that is "associated

9    with clinically significant distress or impairment in social, occupational, or other important areas

10   of functioning." Dkt. No. 18 at 14 (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical

11   Manual of Mental Disorders 512–13 (5th ed., text rev. 2022)); *see also* Dkt. No. 82 at 4 ("When a

12   patient presents with gender dysphoria, it means they experience distress related to their gender

13   that limits their ability to function.").  "The diagnosis of gender-dysphoria is based on the child or

14   adolescent's own gender identity, not a gender identity imposed by the adolescent's parent(s)."

15   Dkt. No. 18 at 22–23 (Antommaria).

16        The World Professional Association of Transgender Health ("WPATH"), an association of

17   medical professionals treating transgender individuals, and the Endocrine Society, an organization

18   of more than 18,000 endocrinologists, have published evidence-based guidelines for the treatment

19   of gender dysphoria. *See Standards of Care for the Health of Transgender and Gender Diverse*

20   *People, Version 8*, 23 Int'l J. of Transgender Health S1 (2022), *available at*

21   https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644; Wylie C. Hembree et al.,

22   *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society*

23   *Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869, 3874 (2017)

24   (together, the "Standards of Care"). Under the Standards of Care, when a person is diagnosed with

1  gender dysphoria, the recommended care depends on their age as well as their physical and mental

2  development. For pre-pubertal children, gender dysphoria treatment plans include therapy,

3  support, and assistance with elements of a social transition. Dkt. No. 19 at 11; Dkt. No. 227-1 at

4  13. A person's social transition may include adopting a new name and pronouns and dressing in

5  clothing that comports with their gender identity. Dkt. No. 19 at 11. Recommended treatment plans

6  for children younger than pubertal age do not involve medications or surgical treatments. Dkt. No.

7  19 at 11, 14; Dkt. No. 227-1 at 13.

8          After the onset of puberty, an adolescent's recommended treatment plan may include

9  medical intervention. Dkt. No. 19 at 11, 14. Puberty-suppressing medications may be prescribed

10 to prevent pubertal development that is inconsistent with the patient's gender identity. *Id*. But

11 before such medications are prescribed, the Standards of Care require (among other things) that a

12 qualified health care professional confirm that (1) the adolescent has demonstrated a sustained and

13 persistent pattern of gender nonconformity or gender dysphoria; (2) the adolescent has

14 demonstrated the emotional and cognitive maturity required to provide informed consent for

15 treatment; (3) any coexisting psychological, medical, or social problems that could interfere with

16 diagnosis, treatment, or the adolescent's ability to consent have been addressed; (4) the adolescent

17 has been informed of the reproductive effects of treatment in the context of their stage in pubertal

18 development and discussed fertility preservation options; and (5) the adolescent has reached

19 "Tanner stage 2" of puberty to initiate pubertal suppression. Dkt. No. 227-1 at 14. Puberty

20 blocking-medications may not be given without the informed assent of the adolescent and the

21 informed consent of their parents or guardians. *Id.*

22         Puberty-blocking medications serve only a temporary purpose. *Id.* at 15. "The purpose of

23 puberty blockers is to delay the development of permanent secondary sex characteristics—which

24 may result in significant distress for transgender youth—until adolescents are old enough and have

1    had sufficient time to make more informed decisions about whether to pursue further treatments."

2    *Id.* If the adolescent's gender dysphoria persists, the recommended treatment plan may include

3    hormone therapy, which facilitates the development of sex-specific physical changes that are in

4    line with a transgender adolescent's gender identity. *Id.* "Although some of the changes caused by

5    hormone therapy become irreversible after those secondary sex characteristics are fully developed,

6    others are partially reversible if the patient discontinues use of the hormones." *Id.* at 16. Hormone

7    therapy is appropriate only "when the experience of dysphoria is marked and sustained over time,

8    the adolescent demonstrates emotional and cognitive maturity required to provide an informed

9    consent/assent for treatment, other mental health concerns (if any) that may interfere with

10    diagnostic clarity and capacity to consent have been addressed, and the adolescent has discussed

11    reproductive options with their provider." Dkt. No. 19 at 18 (Shumer).

12    Finally, "[i]n the adolescent patient population, gender-affirming chest surgery

13    (specifically removal of breast tissue in transgender young men) may be recommended as part of

14    an individualized gender-affirming treatment plan for adolescents, although with less regularity

15    than hormonal interventions." *Id.* at 20 (internal citation omitted). "Genital surgeries, however, are

16    typically reserved for adults (age 18 and older, inclusive of patients who are 18 years old)." *Id.*

17    The Standards of Care recommend that healthcare providers "offer individuals considering

18    gender-affirming medical care methods to potentially preserve their fertility." Dkt. No. 18 at 24

19    (Antommaria); *see also, e.g.*, Dkt. No. 98 at 4–5 ("Part of the reason I wait until patients reach a

20    certain stage of puberty prior to prescribing puberty blockers is because waiting minimizes the

21    impact on fertility and side effects. All patients and their guardians receive counseling on potential

22    for fertility impacts and options for fertility preservation.").

23

24

(b) <u>Analysis</u>

Here, the Court finds that the Executive Orders facially discriminate on the basis of transgender status and sex.

Defendants argue that the Medical Services EO does not discriminate on the basis of transgender status because it "targets specified treatments for young people based on their medical purpose, not the trans-identifying status of the patient." Dkt. No. 223 at 17. While it is true that the Medical Services EO is *aimed* at gender-affirming care that only transgender individuals receive, its text is not so limited in scope. For example, the first Listed Service does not allow federally funded institutions to offer "puberty blockers . . . to delay the onset or progression of normally timed puberty *in an individual who does not identify as his or her sex*." Dkt. No. 17-1 at 2 (emphasis added). In other words, federally funded institutions can offer puberty blockers to delay the onset of normally timed puberty to *anyone except* "an individual who does not identify as his or her sex." This is true regardless of whether the puberty blockers are provided in connection with gender-affirming care. For example, a *cisgender* teen who needs puberty blockers in the course of cancer treatment[16] could receive them from federally funded institutions, but a *transgender* teen who needs puberty blockers *due to the same diagnosis*—and not to align with the teen's gender identity—could not.[17] The same would be true for transgender youth with other medical conditions

---

[16] The Court notes that Gonadotrophin-releasing hormone ("GnRH") agonists, which are included as "puberty blockers" in the Medical Services EO, Dkt. No. 17-1 at 2, are sometimes used to treat prostate cancer. Specifically, because "[p]rostate cancer is hormone-sensitive and testosterone promotes growth of the cancer," one method of treating it "uses a . . . GnRH[] agonist, which binds to receptors in the pituitary gland," eventually "reduc[ing] testosterone to the medical castration level." *Ferring Pharms. Inc. v. Fresenius Kabi USA, LLC*, 645 F. Supp. 3d 335, 344 (D. Del. 2022); *see also Doe v. Ladapo*, 737 F. Supp. 3d 1240, 1258 (N.D. Fla. 2024) ("GnRH agonists are routinely used to treat patients with central precocious puberty . . . as well as, in some circumstances, endometriosis and prostate cancer."), *appeal dismissed sub nom. Doe v. Surgeon Gen., Fla.*, No. 23-12159-JJ, 2024 WL 5274658 (11th Cir. July 8, 2024); *Dekker v. Weida*, 679 F. Supp. 3d 1271, 1285 (N.D. Fla. 2023) (same).

[17] Defendants could not offer an alternative interpretation of the Medical Services EO's text when asked about it at the TRO hearing. Dkt. No. 160 at 24–25. As discussed below, the newly minted interpretations they offer in their preliminary injunction briefing contravene the plain text of Section 2(c) of that Executive Order.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION - 29

1   requiring that puberty be delayed for a period of time—e.g., "patients with disabilities who are

2   unable to tolerate puberty at the typical age due to hygienic or behavioral concerns; adolescents

3   with short stature who despite growth hormone treatment will have a very short adult height; and

4   young women with endometriosis." Dkt. No. 19 at 17 (Shumer citing Yaylaci, 2020; Pasquino,

5   2000; Shim, 2023).

6          Federally funded institutions likewise are barred from providing the second and third

7   Listed Services—sex hormones and surgical procedures—*only if* those Services are provided to

8   "align" the appearance of an individual 18 or younger "with an identity that differs from his or her

9   sex[.]" Dkt. No. 17-1 at 2. Thus, cisgender youth could receive (cis)gender-affirming care from

10  federally funded medical providers (e.g., a mastectomy for a cisgender boy with gynecomastia,

11  testosterone therapy for a cisgender male who wants to "jumpstart" puberty, breast augmentation

12  surgery for a cisgender female, Dkt. No. 14 at 7–8; Dkt. No. 112 at 9–10), but transgender youth

13  could not.

14         The Medical Services EO therefore conditions grant funding *based on* whether grant

15  recipients provide medical services (1) to transgender individuals or (2) for the purpose of treating

16  gender dysphoria. *See M.H. v. Hamso*, No. 23-35485, 2024 WL 4100235, at *2 (9th Cir. Sept. 6,

17  2024) ("[B]y singling out gender dysphoria as the only non-covered condition, the policy

18  exclusively burdens transgender beneficiaries relative to cisgender beneficiaries, regardless of

19  individual circumstances or medical necessity.").

20         Similarly, Sections 3(e) and (g) of the Gender Ideology EO revoke federal funding for grant

21  recipients who "promote gender ideology," i.e., "the false claim that males can identify as . . .

22  women and vice versa." Dkt. No. 17-2 at 2–3. The Order thus conditions grant funding *based on*

23  whether grant recipients offer—among other things—gender-affirming services for individuals

24  with gender dysphoria.

For these reasons, Section 4 of the Medical Services EO and Sections 3(e) and (g) of the Gender Ideology EO discriminate based on transgender status. *See Kadel v. Folwell*, 100 F.4th 122, 146 (4th Cir. 2024) ("The excluded treatments aim at addressing incongruity between sex assigned at birth and gender identity, the very heart of transgender status.").

The Medical Services EO also discriminates on the basis of sex. "[A] central tenet of equal protection in sex discrimination cases" is that the government "'must not rely on overbroad generalizations' regarding the sexes." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 609 (4th Cir. 2020) (quoting *Virginia*, 518 U.S. at 533). Such generalizations "have a constraining impact," *Sessions*, 582 U.S. at 63—an impact that can be particularly harmful to individuals who fall "outside the average description," *Virginia*, 518 U.S. at 550. Again, here the second and third Listed Services are only prohibited if they "align an individual's physical appearance with an identity that differs from his or her sex"—i.e., if they make an individual look more stereotypically male or stereotypically female. Put simply, a biological male can have hormone therapy and surgery to look more stereotypically male, but a biological female cannot. As the Fourth Circuit framed it in a recent case,

> [Under the law at issue], while mastectomies are available for both people assigned male at birth and those assigned female at birth, when they are conducted for gender-affirming purposes, they are only available to those assigned male at birth. This difference in coverage is rooted in a gender stereotype: the assumption that people who have been assigned female at birth are supposed to have breasts, and that people assigned male at birth are not. No doubt, the majority of those assigned female at birth have breasts, and the majority of those assigned male at birth do not. But we cannot mistake what is for what must be. And because gender stereotypes can be so ingrained, we must be particularly careful in order to keep them out of our Equal Protection jurisprudence.

*Kadel*, 100 F.4th at 154. Here, as in *Kadel*, patients are subjected to sex discrimination based on whether they "conform to the sex stereotype[s] propagated by the [Executive Order]." *Grimm*, 972 F.3d at 608 (finding that a policy requiring transgender individuals to use a bathroom

1   corresponding to their biological sex discriminated on the basis of sex).[18] Where, as here, a law or

2   policy "penalizes a person identified as male at birth for traits or actions that it tolerates in [a

3   person] identified as female at birth," the person's "sex plays an unmistakable . . . role." *Bostock*

4   *v. Clayton Cnty.*, 590 U.S. 644, 660 (2020).

5       Furthermore, these prohibitions on federally funded treatments "cannot function without

6   relying on direct . . . discrimination." *Kadel*, 100 F.4th at 146. Specifically, determining whether

7   a particular treatment involves "an individual who does not identify as his or her sex" or would

8   "align an individual's physical appearance with an identity that differs from his or her sex," Dkt.

9   No. 17-1 at 2, "is impossible—literally cannot be done—without inquiring into a patient's sex

10  assigned at birth and comparing it to their gender identity," *Kadel*, 100 F.4th at 147.

11      For all these reasons, heightened scrutiny applies.

12          *(ii)* The Executive Orders Do Not Survive Heightened Scrutiny

13      Heightened scrutiny is an "extremely fact-bound test," *Hecox*, 104 F.4th at 1081, requiring

14  courts to examine the "actual purposes" of the governmental action and "carefully consider the

15  resulting inequality to ensure that our most fundamental institutions neither send nor reinforce

16  messages of stigma or second-class status," *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d

17  471, 483 (9th Cir. 2014). Again, to survive this level of scrutiny, the government must demonstrate

18

19  [18] *See also Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724–25 (1982) ("Although the test for determining the
    validity of a gender-based classification is straightforward, it must be applied free of fixed notions concerning the

20  roles and abilities of males and females."); *Virginia*, 518 U.S. at 550 (rejecting "generalizations about 'the way women
    are'" and "estimates of what is appropriate for *most women*" as an adequate justification for sex discrimination);

21  *Kadel*, 100 F.4th at 153 ("textbook sex discrimination" occurs when "conditioning access to [certain medical
    treatments] based on a patient's sex assigned at birth stems from gender stereotypes about how men or women should

22  present"); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir.
    2017) (holding that a school district's bathroom policy "treat[ed] transgender students . . . who fail to conform to the
    sex-based stereotypes associated with their assigned sex at birth[] differently", *abrogated on other grounds as*

23  *recognized by Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020); *Glenn v. Brumby*, 663 F.3d 1312,
    1316 (11th Cir. 2011) ("A person is defined as transgender precisely because of the perception that his or her behavior

24  transgresses gender stereotypes. . . . There is thus a congruence between discriminating against transgender and
    transsexual individuals and discrimination on the basis of gender-based behavioral norms.").

1    "that the [challenged] classification serves important governmental objectives and that the

2    discriminatory means employed are substantially related to the achievement of those objectives."

3    *Virginia*, 518 U.S. at 524 (internal quotation marks and citations omitted). This "burden of

4    justification is demanding"—not "deferential"—and "rests entirely on the [federal government]."

5    *Id.* at 533, 555.

6                                    (a)  The Medical Services EO

7           With respect to the Medical Services EO, the question before the Court is not what the

8    correct course of treatment is for an adolescent with gender dysphoria. The question is whether

9    Defendants have shown sufficient justification for Section 4's facial classifications and a "close

10   means-ends fit." *Sessions*, 582 U.S. at 68.

11          The Medical Services EO's stated purpose is to protect "children" from regret associated

12   with adults "chang[ing] a child's sex through a series of irreversible medical interventions." Dkt.

13   No. 17-1 at 2. But even assuming that this is an important governmental interest, the Order's

14   means—which seek to categorically ban transgender youth and 18-year-old adults from receiving

15   the Listed Services from federally funded providers—are not substantially related to, and in fact

16   undermine, that objective.

17          First, as explained in the Court's prior order, the Medical Services EO is not limited to

18   children, or to irreversible treatments, nor does it target any similarly risky or irreversible medical

19   interventions performed on cisgender youth. Dkt. No. 161 at 3.

20          Despite professing to protect "impressionable children" from the decisions of "adults," the

21   Medical Services EO bans federally funded institutions from providing the Listed Services to 18-

22   year-old adults. Dkt. No. 17-1 at 2. Defendants argue that the Order is not rendered overbroad by

23   its inclusion of 18 year olds because "the relevant risks apply to adolescents." Dkt. No. 223 at 21.

24   Tellingly, the only authority they could locate for this proposition is from Canada, where the age

of majority is 19 in four provinces and three territories. *Id.* (citing Age Limits and Adolescents, Canadian Paediatric Society (Nov. 2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC2794325/); *see also* Government of Canada, Department of Justice, *Putting Children's Interest First - Federal-Provincial-Territorial Consultations on Custody and Access and Child Support: Child support for children at or over the age of majority*, Dec. 28, 2022, https://www.justice.gc.ca/eng/rp-pr/fl-lf/famil/cons/consdoc/cscam-paem.html. But Defendants do not dispute that in all Plaintiff States as well as the vast majority of other U.S. states, 18-year-olds are legally recognized as adults who are generally entitled to make their own medical decisions.[19] The Medical Services EO is wholly devoid of any explanation as to why, in spite of relevant state laws, 18 year olds should nonetheless be considered "impressionable children" at risk of irreversible harm due to decisions made by "adults."

In another mismatch between the Order's purpose and method, some of the Listed Services are neither permanent nor irreversible. Dr. Armand Antommaria, a pediatrician and bioethicist with extensive clinical and research experience, attests in his expert declaration that "GnRH analogs, do not, by themselves, permanently impair fertility." Dkt. No. 18 at 24. Dr. Daniel Shumer, a pediatric endocrinologist, associate professor of pediatrics, and the Clinical Director of the Child and Adolescent Gender Clinic at Mott Children's Hospital at Michigan Medicine, likewise attests in his expert declaration that "GnRHa do not have long-term implications on fertility." Dkt. No. 19 at 21. The Amici Medical Organizations similarly aver that puberty blockers

---

[19] *See, e.g.*, Or. Rev. Stat. § 109.510 (Generally, "in this state any person shall be deemed to have arrived at majority at the age of 18 years, and thereafter shall: (1) Have control of the person's own actions and business; and (2) Have all the rights and be subject to all the liabilities of a citizen of full age."); Wash. Rev. Code § 26.28.015(5) (Generally, "all persons shall be deemed and taken to be of full age . . . at the age of eighteen years" to "make decisions in regard to their own body . . . to the full extent allowed to any other adult person including but not limited to consent to surgical operations[.]"); Minn. Stat. § 645.451 Subds. 3, 6; Colo. Rev. Stat. § 13-22-101(d) (at 18, a Colorado citizen may "make decisions in regard to his own body and the body of his issue . . . to the full extent allowed to any other adult person"); *see also* Dkt. No. 18 at 9 (Antommaria); Dkt. No. 19 at 30 (Shumer).

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION - 34

1    "are generally reversible, and when a patient discontinues their use, the patient resumes

2    endogenous puberty." Dkt. No. 227-1 at 15 (citing Simona Martin et al., *Criminalization of*

3    *Gender-Affirming Care—Interfering with Essential Treatment for Transgender Children and*

4    *Adolescents*, 385 New Eng. J. Med. 579, at 2 (2021), https://perma.cc/BR4F-YLZS). For example,

5    "[c]hildren with central precocious puberty are routinely treated with GnRH analogs and have

6    typical fertility in adulthood." Dkt. No. 18 at 24 (Antommaria). Furthermore, "[p]atients who

7    initiate hormones after completing puberty are offered gamete preservation prior to hormonal

8    initiation, but even when not undertaken, withdrawal of hormones in adulthood often is successful

9    in achieving fertility when it is desired." Dkt. No. 19 at 21 (Shumer citing Coleman, et al., 2022;

10   Light, et al., 2014; Knudson, et al., 2017). "There are transgender men who became pregnant while

11   on or after discontinuing testosterone therapy," and "[t]ransgender men and women are also

12   capable of producing eggs and sperm respectively both during and after the discontinuation of

13   gender-affirming hormone treatment." Dkt. No. 18 at 24 (Antommaria). The Medical Services EO

14   provides no explanation for why federally funded institutions should be prohibited from offering

15   certain gender-affirming medical services *even if* those services are not in conflict with the Order's

16   stated goal of preventing "regret" associated with irreversible medical treatments. Dkt. No. 17-1

17   at 2.

18        The incongruities don't end there. Despite purporting to protect "children" generally, the

19   Executive Order targets only gender-affirming care for *transgender* youth, and does not encompass

20   any similar (cis)gender-affirming care for *cisgender* youth (e.g., a mastectomy for a cisgender boy

21   with gynecomastia, testosterone for a cisgender boy to "jumpstart" puberty, breast augmentation

22   surgery for a cisgender girl), even where those medical treatments pose the same or similar risks.

23   *See* Dkt. No. 112 at 9–10 (breast augmentation surgery for adolescent cisgender females "has

24   significant risks involved, including elevated risk of breast implant-associated breast cancer, and

1  guarantees additional surgeries during the patient's lifetime"); *id.* at 9 (the technique for a

2  mastectomy for gynecomastia "mirrors gender-affirming mastectomy/chest reduction"); Dkt. No.

3  18 at 30 (Antommaria: the Medical Services EO "does not exclude coverage for the use of GnRH

4  analogs to treat central precocious puberty but prohibits coverage for its use to treat gender

5  dysphoria, even though its use to treat both conditions is supported by comparable levels of

6  evidence."); Dkt. No. 14 at 7–8 (hormone replacement therapy to "jumpstart" puberty in a

7  cisgender male with a constitutional delay in puberty poses similar risks as hormone replacement

8  therapy for a transgender male).[20] Considering this, Defendants' rationale that the Medical

9  Services EO "protects children from . . . the long-term, irreversible effects of the treatment, is

10  counterintuitive to the fact that it allows the same treatment for cisgender minors as long as the

11  desired results conform with the stereotype of their biological sex." *Brandt v. Rutledge*, 551 F.

12  Supp. 3d 882, 891 (E.D. Ark. 2021), *aff'd sub nom. Brandt by & through Brandt v. Rutledge*, 47

13  F.4th 661 (8th Cir. 2022); *see also Poe by & through Poe v. Labrador*, 709 F. Supp. 3d 1169, 1193

14  (D. Idaho 2023) (finding the government's asserted objective "pretextual" because it "allows the

15  same treatments for cisgender minors that are deemed unsafe and thus banned for transgender

16  minors"; "rather than targeting the treatments themselves, [the law] allows children to have these

17  treatments—but only so long as they are used for any reason other than as gender-affirming

18  medical care").

19       Furthermore, and concerningly, the collateral consequences of the Medical Services EO's

20  mistailored means include harm to children and adults, even outside the realm of gender care. As

---

[20] Risks of comparable treatments for cisgender youth include the risk of infertility. For example, treatment of some nonmalignant rheumatologic disorders and hematologic conditions may impair fertility in minors. Dkt. No. 18 at 25 (Antommaria). In addition, "[i]ndividuals with some types of DSDs [(disorders of sex development)], such as complete androgen insensitivity syndrome, are treated with sex hormones, which have comparable risks to the use of these treatments in persons with gender dysphoria. Parents of children with some types of DSDs may even choose to have their children's gonads removed due to the possible elevated risk of malignancy, which causes infertility." *Id.* at 26.

1    discussed above, a cisgender teen who needs puberty blockers in the course of treatment for cancer

2    or endometriosis, or as a result of disabilities rendering puberty intolerable, could receive them

3    from federally funded institutions, but a transgender teen who needs puberty blockers *for the same*

4    *diagnosis*—and not to align with the teen's gender identity—could not. The Medical Services EO

5    also prohibits federal funding to providers that offer surgeries "to alter or remove an individual's

6    sexual organs to minimize or destroy their natural biological functions," regardless of the

7    individual's gender identity. Dkt. No. 17-1 at 2. This would prevent a federally funded provider

8    from, for instance, providing a vasectomy to a married cisgender 18-year-old man who desires this

9    surgery because he has Huntington's disease and does not want to pass it to his children.

10         Although Defendants could not offer alternative interpretations of the Medical Services

11    EO when asked at the TRO hearing, Dkt. No. 160 at 25–26, they now do so in their preliminary

12    injunction briefing. First, they argue that "because section 2(c) of [the Medical Services] EO

13    describes the relevant treatments as 'gender affirming care,' it is implausible to read that section

14    to apply to a transgender teen who needs puberty blockers for cancer treatment." Dkt. No. 223 at

15    17 (cleaned up). But as discussed above, the first Listed Service makes no mention of "gender

16    affirming care"; instead, it prohibits *any* "*individual who does not identify as his or her sex*" from

17    obtaining "puberty blockers . . . to delay the onset or progression of normally timed puberty." Dkt.

18    No. 17-1 at 2 (emphasis added). That the Executive Order mentions that what it defines as

19    "chemical and surgical mutilation" is "sometimes referred to as 'gender affirming care'" does not

20    change its definitional sweep, just as the Order's definition of "child" to include 18-year-olds is

21    not altered by the fact that 18 year olds are not children.

22         The plain text of Section 2(c) likewise undermines Defendants' argument that the Medical

23    Services EO would "not apply to a patient seeking a vasectomy for purposes of not passing on

24    Huntington's disease . . . to his children, because that would not be a 'gender affirming' surgery."

Dkt. No. 223 at 21–22 (cleaned up). The text of the fourth Listed Service contains no such limitation. Instead, it differs from the second and third Listed Services by *omitting* any language relating to aligning an individual's physical appearance "with an identity that differs from his or her sex":

- Second Listed Service: "[T]he use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, *to align an individual's physical appearance with an identity that differs from his or her sex*[.]" Dkt. No. 17-1 at 2.

- Third Listed Service: "[S]urgical procedures that attempt to transform an individual's physical appearance *to align with an identity that differs from his or her sex*[.]" *Id.*

- Fourth Listed Service: "[Surgical procedures] that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions[.]" *Id.*

An 18-year-old man who seeks a vasectomy (whether to avoid passing on Huntington's disease to his children or not) is manifestly seeking a surgical procedure "that attempt[s] to alter or remove [his] sexual organs to minimize or destroy their natural biological functions." *See* Dkt. No. 19 at 30 (Shumer: "[P]rohibiting medical care to individuals under 19 that 'attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions' is written in a way that unintentionally includes care unrelated to gender affirmation."). As such, Defendants' efforts to evade the plain meaning of Section 2(c)'s text are unavailing.

The Medical Services EO's one-sided approach to the important interests at stake further underscores its inadequate tailoring. The Executive Order implicitly recognizes that not all youth who receive gender-affirming care regret it, Dkt. No. 17-1 at 2 § 1, and it is undisputed that there are serious and sometimes irreversible risks to transgender youth *either way*. Specifically, "[p]uberty is when most trans children reach a crisis point[.]" Dkt. No. 105 at 5. Left untreated,

1  gender dysphoria can result in severe physical and psychological harms, including "debilitating

2  distress," "depression," "substance use," "self-injurious behaviors," and "even suicide." *Edmo* v.

3  *Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019) (per curiam).[21] On the other hand, if a patient

4  receives gender-affirming care that they later regret, depending on the nature of the treatment, the

5  patient may not be able to undo physiological changes resulting from the care. Dkt. No. 19 at 21

6  (Shumer). As Dr. Shumer cautions, the "[r]isk for fertility changes must be balanced with the risk

7  of withholding treatment." *Id.*

8          However, the Medical Services EO takes into account only the risks associated with regret,

9  making no attempt to balance them against the very real risks (supported by ample medical data)

10  facing transgender youth who desire gender-affirming care but do not receive it.[22] Nor does the

11  Order weigh the risks of gender-affirming care against the potential benefits. Instead, it simply

12  dismisses the Standards of Care as "junk science" and conclusorily pronounces that they "lack[]

---

[21] *See also* Dkt. No. 19 at 11 (Shumer: "If left untreated, [gender dysphoria] can result in severe anxiety and depression, eating disorders, substance abuse, self-harm, and suicidality[.]").

[22] Plaintiffs have submitted voluminous evidence on this point. *See, e.g.*, Dkt. No. 18 at 11 (Antommaria: One cross-sectional study found "that those who received pubertal suppression had lower odds of lifetime suicidal ideation compared to those who wanted treatment with pubertal suppression but did not receive it."); Dkt. No. 79 at 2 (physician and assistant professor of Family Medicine in Minnesota: "When a patient does not have access to care for any reason, . . . we often see worse outcomes, in particular related to mental health and suicide attempts."); Dkt. No. 96 at 3 (board-certified pediatrician and board-certified adolescent medicine specialist: "In my professional experience, I have seen that patients who do not have access to gender affirming care have worse physical and mental health outcomes."); Dkt. No. 98 at 6 (family medicine physician: "If minors lose access to gender-affirming medication and healthcare, they will experience irreversible physical changes that could cause the[m] a lifetime of distress. Not providing gender-affirming health care is not a valid medical practice—as a medical provider, I know denying a person this care will cause serious harm to my patients."); Dkt. No. 36 at 4 (parents: "We know that hormone therapy can result in permanent changes that could become an issue if Child A were to later revert to identifying as female. But, that risk is very small compared to the risks that come with the alternative of Child A continuing to develop and live with female physical features. Those changes are permanent, too."); Dkt. No. 44 at 4 (parents of a child who had engaged in self-harm before receiving gender-affirming care: "The possibility of regret was absolutely one of the closed-door conversations I had with my spouse as we weighed the possibility of a medical transition for our child. Granting that regret was a possibility, we still decided that it was more important to be affirming and supportive of the choices our daughter made today. We knew that having our love and support would help keep her alive."); *see also* Dkt. No. 227-1 at 11 (Amici Medical Organizations brief stating that "[i]f untreated or inadequately treated, gender dysphoria may lead to depression, anxiety, self harm, and suicidality." (citing Brayden N. Kameg & Donna G. Nativio, *Gender Dysphoria In Youth: An Overview For Primary Care Providers*, 30(9) J. Am. Ass'n Nurse Prac. 493 (2018), https://pubmed.ncbi.nlm.nih.gov/30095668)).

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION - 39

scientific integrity." Dkt. No. 17-1 at 2. But almost every court and medical organization to address the issue has disagreed with that view. *See Edmo*, 935 F.3d at 769 ("Most courts agree" that the Standards of Care "are the internationally recognized guidelines for the treatment of individuals with gender dysphoria." (collecting cases)); *Kadel*, 100 F.4th at 136 ("[T]he medical community uses generally accepted protocols from the *Standards of Care for the Health of Transgender and Gender Diverse People* . . . developed by the World Professional Association for Transgender Health."); *Grimm*, 972 F.3d at 595 (the Standards of Care "represent the consensus approach of the medical and mental health community, and have been recognized by various courts, including this one, as the authoritative standards of care" (citation omitted)); *Brandt*, 47 F.4th at 671 (noting that "the recognized standard of care" allows gender-affirming care, including puberty blockers, for minors under appropriate circumstances); *Poe*, 709 F. Supp. 3d at 1181–82 (finding that treatment for gender dysphoria that is compliant with the Standards of Care is "safe, effective, and medically necessary for some adolescents," and noting that the Standards of Care "are accepted by every major medical organization in the United States"); *Ladapo*, 676 F. Supp. 3d at 1212 ("I credit the abundant testimony in this record that these standards are widely followed by well-trained clinicians."); *Brandt v. Rutledge*, 677 F. Supp. 3d 877, 890–91 (E.D. Ark. 2023); *Koe v. Noggle*, 688 F. Supp. 3d 1321, 1353 (N.D. Ga. 2023); Dkt. No. 227-1 at 11–12 (amicus brief of the American Academy of Pediatrics, the Academic Pediatric Association, the American Academy of Child & Adolescent Psychiatry, the American Academy of Nursing, the American College of Obstetricians and Gynecologists, the American College of Osteopathic Pediatricians, the American College of Physicians, the American Pediatric Society, the Association of American Medical Colleges, Association of Medical School Pediatric Department Chairs, Inc., the Minnesota Chapter, American Academy of Pediatrics, the Oregon Chapter of the American Academy of Pediatrics, the Washington Chapter of the American Academy of Pediatrics, the

Endocrine Society, the National Association of Pediatric Nurse Practitioners, the Pediatric Endocrine Society, the Society for Adolescent Health and Medicine, the Society of Pediatric Nurses, and WPATH) (collectively, the "Amici Medical Organizations") stating that the Standards of Care are "established, evidence-based clinical guidelines" developed "by expert clinicians and researchers who have worked with patients with gender dysphoria for many years"); *see also* Dkt. No. 18 at 15–16 (Antommaria); Dkt. No. 19 at 12 (Shumer); Dkt. No. 98 at 6; Dkt. No. 106 at 3; Dkt. No. 114 at 4.[23]

Defendants seek to prop up the bare conclusions made in the Medical Services EO with post hoc rationalizations and justifications that are nowhere to be found in the Order's text. *See, e.g.*, Dkt. No. 223 at 20–21 (arguing that there is evidence that the Listed Services are "dangerous and ineffective," that "there is a lack of clear data on how frequently regret occurs," and that there is evidence supporting concerns about "a lack of sufficient evidence of the efficacy of such treatments for gender dysphoria in minors"). But as Plaintiffs point out, Defendants "submit no evidence" of their own and instead rely on "non-binding legal opinions" and a study known as the Cass Review (referenced via hyperlink in their brief). Dkt. No. 229 at 3, 7–8; *see also* Dkt. No. 223 at 20–21. The legal opinions (one a single-judge concurrence) are not evidence, apply rational basis review (not heightened scrutiny) to the laws at issue, and do not address the facts specific to this case (i.e., the particular means and ends of the Executive Orders). As for the Cass Review, medical associations and subject matter experts have criticized it for its author's lack of clinical

---

[23] *But see L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 488 (6th Cir. 2023) (describing the "nature of treatments in this area" as "unsettled, developing, in truth still experimental"), *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (2024); *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, 121 F.4th 604, 611 (7th Cir. 2024) ("these organizations have not evaded criticism," with some courts "express[ing] doubt about whether WPATH's guidelines actually reflect medical consensus as to treatments for gender dysphoria."); *Gibson v. Collier*, 920 F.3d 212, 223 (5th Cir. 2019) ("[T]he WPATH Standards of Care do not reflect medical consensus," and "[t]here is no medical consensus that sex reassignment surgery is a necessary or even effective treatment for gender dysphoria.").

experience or research qualifications; its "selective and inconsistent use of evidence," and "its

unfounded medical opinion[s]" that "ignor[e] more than three decades of clinical experience in

this area as well as existing evidence showing the benefits of hormonal interventions on the mental

health and quality of life of gender diverse young people." WPATH, *WPATH and USPATH*

*Comment on the Cass Review* 1–2 (May 17, 2024), https://wpath.org/wp-

content/uploads/2024/11/17.05.24-Response-Cass-Review-FINAL-with-ed-note.pdf; *see also*

Dkt. No. 229 at 8. And significantly, the Cass Review does not recommend banning the Listed

Services altogether, as the Executive Orders do with respect to federally funded providers.

In any event, the criticisms of gender-affirming care cited by Defendants "do not support

the notion that gender-dysphoria treatments are ineffective so much as still developing." *Kadel*,

100 F.4th 156. Moreover, Defendants have presented no evidence to the Court of desistance or

regret in those who would qualify for the Listed Services pursuant to the applicable standard of

care. Indeed, the record evidence is to the contrary, showing that when gender-affirming care is

provided in accordance with the Standards of Care, rates of regret are low.[24]

---

[24] *See, e.g.*, Dkt. No. 19 at 19 (Shumer: "Findings from studies in which participants have undergone comprehensive evaluation prior to gender care show low levels of regret (de Vries, et al., 2011; van der Loos, et al., 2022; Wiepjes, et al., 2018). These extremely low rates of regret are in contrast to the high rates of poor psychological functioning in untreated adolescents (van der Miesen, et al., 2020). The findings of these studies match my own clinical experience."); Dkt. No. 18 at 27 (Antommaria recounting that studies show that rates of regret for gender-affirming care are "very low," between about 0.3 and 1.1 percent); Dkt. No. 15 at 9 (Physician 3: "Out of the approximately 200 transgender and gender-diverse patients I have treated, I have never had a patient who regretted pursuing puberty-blocking medications or hormone replacement therapy. Instead, my patients express an overwhelming sense of relief and happiness."); Dkt. No. 112 at 7 & n.3 (University of Washington surgeons: "Out of the approximately 1000 gender-affirming care surgeries we have collectively provided, we have only had three patients ever express a desire to reverse the effects of their gender affirming care through surgery, and two did not have initial care or surgery with us. Notably, none of these patients expressed decisional regret for their gender affirming surgery. Each of the patients had their own reasons for desire for reversal including evolving gender identity, usually to non-binary, or complications with initial surgery. . . . Medical literature reflects that the regret rate for gender-affirming surgery is less than one percent." (citing Thornton SM, Edalatpour A, Gast KM. *A systematic review of patient regret after surgery- A common phenomenon in many specialties but rare within gender-affirmation surgery*. Am J Surg. 2024;234:68-73; Jedrzejewski BY, Marsiglio MC, Guerriero J, et al. *Regret after Gender-Affirming Surgery: A Multidisciplinary Approach to a Multifaceted Patient Experience*. Plast Reconstr Surg. 2023;152(1):206-214; Bruce L, Khouri AN, Bolze A, Ibarra M, Richards B, Khalatbari S, Blasdel G, Hamill JB, Hsu JJ, Wilkins EG, Morrison SD, Lane M. *Long-Term Regret and Satisfaction With Decision Following Gender-Affirming Mastectomy*. JAMA Surg.

---

Plaintiffs have also submitted abundant evidence—including expert witness declarations, medical studies, and declarations attesting to personal and professional experience with gender affirming care—supporting the efficacy and safety of the Listed Services.[25] And Plaintiffs further submitted expert testimony that the evidence supporting gender-affirming care for adolescents is

---

2023 Oct 1;158(10):1070-1077. doi: 10.1001/jamasurg.2023.3352. PMID: 37556147; PMCID: PMC10413215)): Dkt. No. 77 at 5 (psychologist: "In 15 years of helping hundreds of transgender youth, I have encountered only one client who medically transitioned and then sought to de-transition. Clients who medically transition almost never report regretting their decision. And when de-transitioning occurs, research has shown that the primary cause is social pressure external to the individual, not personal conflict over the individual's gender identity or their decision to transition." (citing Turban, Loo, et al., *Factors Leading to "De transition" Among Transgender and Gender Diverse People in the United States: A Mixed-Methods Analysis*, LGBT Health, 2021; Pazos, Gomez, et al, *Transsexuality: Transitions, detransitions, and regrets in Spain*, Endocrinol Diabetes Nutr. (Engl. Ed.); 2020; James, Herman, et al, *The Report of the 2015 US. Transgender Survey*. Washington, DC: National Center for Transgender Equality 2016)); Dkt. No. 82 at 6 (family medicine physician and instructor with the University of Washington School of Medicine and School of Public Health: "regret rates . . . are 2% or less in the field of transgender medicine (whereas they can exceed 30% in the field of orthopedics"); Dkt. No. 99 at 6 (licensed independent clinical social worker: "The worry over fear of regret is something I talk a lot about with families. The reality is that the percentage of detransition is very low. The literature and research show that the regret is significantly lower than it is for people who receive breast augmentation surgery for non-gender-affirming care and significantly lower for surgeries such as hip replacement."); Dkt. No. 100 at 4 (medical doctor in Minnesota: "I have *never* worked with a transgender or non-binary patient under 19 years old—or any patient otherwise—who has elected to stop receiving gender-affirming medical care or who has regretted undergoing such care. I have cared for at least 100 such patients.").

[25] *See, e.g.*, Dkt. No. 19 at 27–28 (Shumer: "The sum of the data supports the conclusion that treatment of gender dysphoria with these interventions promotes wellness and helps to prevent negative mental health outcomes, including suicidality. The data to support these interventions are so strong that withholding such interventions would be negligent and unethical."); Dkt. No. 18 at 17–18 (Antommaria); Dkt. No. 82 at 2–3 (board-certified family medicine physician: "Over 2000 peer-reviewed publications since 1975 have established the safety and efficacy of gender-affirming care. Every major medical association in the United States supports medical care for transgender people."); Dkt. No. 107 at 11 (Executive Vice President and Interim Chief Executive Officer of OHSU Health: "Medical providers have decades of experience providing care and a growing body of research supporting the efficacy and safety of this care, in addition to substantial evidence about the use of these medications in other areas of medicine."); Dkt. No. 72 at 5 (parents: "My wife and I have dedicated so much to understand our child in order to overcome our own misconceptions. Our one regret is that we let our own fears and misunderstandings get in the way of getting our child treatment sooner. . . . Following the start of gender-affirming medical treatment, the difference in S.O. was incredible."); Dkt. No. 82 at 6 (family medicine physician: "I routinely watch my adolescent patients become more comfortable, confident, and joyful as they begin to receive gender-affirming care. . . . I have had patients tell me they are alive because of the gender-affirming care provided. I have watched dozens of adolescents grow into the adults they want and need to be, able to attend college and get jobs because their dysphoria is well-managed."); Dkt. No. 68 at 2–3 (parent: before receiving gender affirming care, Child A "suffered from immense depression and anxiety" and "could barely function," but "things took a drastic turn for the better" when he received that care; "[h]e blossomed in every way you can imagine. He was happier, more confident, and started excelling in school again. His teachers loved his class engagement and enthusiasm to learn. Child A has been receiving hormone therapy for three years now and is doing better than ever. . . . All these positive changes in my son are a direct result of, and could not have been achieved without, gender-affirming care.") *see also* Dkt. No. 227 at 11 (Amici Medical Organizations: "The widely accepted view of the professional medical community is that gender-affirming care is the appropriate treatment for gender dysphoria and that, for some adolescents, puberty blockers and hormone therapy are necessary. Gender-affirming care greatly reduces the negative physical and mental health consequences that result when gender dysphoria is untreated." (citing Endocrine Soc'y, *Transgender Health: An Endocrine Society Position Statement* (2020), https://www.endocrine.org/advocacy/positionstatements/transgender-health).

---

1    as robust as the evidence supporting other pediatric treatments. Dkt. No. 18 at 16–18

2    (Antommaria); Dkt. No. 19 at 20–28 (Shumer). Not only have Defendants failed to rebut this

3    evidence with any of their own; they also elected not to have an evidentiary hearing to cross-

4    examine Plaintiffs' expert witnesses or otherwise test Plaintiffs' evidence. Dkt. No. 228 at 1.

5          In sum, although the Medical Services EO purports to be premised on protecting "children"

6    from regret associated with adults "chang[ing] a child's sex through a series of irreversible medical

7    interventions," Dkt. No. 17-1 at 2, it is not limited to children, or to irreversible treatments, nor

8    does it target any similar medical interventions performed on cisgender youth. It rejects the

9    prevailing medical consensus without engaging with the basis for that consensus or weighing the

10   relevant risks against the countervailing benefits established in the record. It insinuates without

11   any evidentiary basis that gender-affirming care results in high rates of regret. And it prevents both

12   transgender and cisgender youth and adults from obtaining necessary medical care completely

13   unrelated to gender-affirming care.

14         For all of the above reasons, the Executive Order's means are not substantially related to,

15   and in fact undermine, its stated objective. The Court finds it likely that Plaintiffs will succeed on

16   the merits in showing that Section 4 of the Medical Services EO violates the Fifth Amendment's

17   Equal Protection Clause.

18                        (b) <u>The Gender Ideology EO</u>

19         The Gender Ideology EO purports to "defend[] women" from "ideologues" who permit

20   transgender women to "gain access to intimate single-sex spaces and activities designed for

21   women" Dkt. No. 17-2 at 2. It seeks to do so by "[b]asing Federal policy on truth" "using clear

22   and accurate language and policies that recognize women are biologically female, and men are

23   biologically male." *Id.* To advance this purpose, Sections 3(e) and (g) direct agencies to "end the

24   Federal funding of gender ideology" and "ensure grant funds do not promote gender ideology,"

respectively. *Id.* at 3. "Gender ideology," in turn, is described as "replac[ing] the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa[.]" *Id.* at 2.

This Executive Order—far more than the Medical Services EO—reflects a "bare desire to harm a politically unpopular group," *Romer*, 517 U.S. at 634 (cleaned up), as its underlying "actual purpose[]," *SmithKline Beecham Corp.*, 740 F.3d at 483. Its language, which declares that it is "false" that "males can identify as . . . women and vice versa" and that the only identity that is "true" in "reality" is one's biological sex, Dkt. No. 17-2 at 2, denies and denigrates the very existence of transgender people—despite the evidence that they do exist and have "as long as human history has been recorded." Dkt. No. 107 at 11 ("[S]imply stating gender is sex and that transgender people do not, or should not, exist does not make it so."). More than that, the Order aims to erase them, precluding them from accessing care for gender dysphoria from federally funded providers and eviscerating from the federal vocabulary any recognition of gender identity. *Id.* §§ 3(b)–(e), (g). Defendants were hard-pressed to justify such baldfaced stigmatization. And they failed to do so, instead focusing their briefing on this point entirely on the "serious harms to young people" that purportedly animate the Medical Services EO. Their sole attempt to explicate the Gender Ideology EO's government interest—that it is "based on concerns about the harms stemming from '[e]fforts to eradicate the biological reality of sex,'" Dkt. No. 223 at 20 (citing Dkt. No. 17-2 at 2)—is conclusory and unsupported. Where, as here, government action is motivated by purposeful discrimination, it violates the Fifth Amendment's equal protection guarantee. *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 274 (1979); *see also, e.g.*, *Ladapo*, 676 F. Supp. 3d at 1220 (finding that state law violated the Equal Protection Clause where it was "motivated in substantial part by the plainly illegitimate purposes of disapproving transgender status and discouraging individuals from pursuing their honest gender identities"). Even if Defendants could

1    establish a legitimate government purpose here (they cannot), the means-end fit between the

2    Gender Ideology EO's stated purpose and the compromises it makes to achieve that is unhinged

3    from the demanding standards set by equal protection jurisprudence.

4         Plaintiffs' claim that Sections 3(e) and (g) of the Gender Ideology EO violate the equal

5    protection guarantee is likely to succeed on the merits.

6              (c)  *Plaintiffs' Fifth Amendment Due Process Clause Claim*

7         Having found that Section 4 of the Medical Services EO and Sections 3(e) and (g) of the

8    Gender Ideology EO are unconstitutional because they violate the separation of powers and the

9    equal protection guarantee of the Fifth Amendment, the Court need not address Plaintiffs'

10   argument that these Sections are also unconstitutionally vague under the Due Process Clause of

11   the Fifth Amendment. Dkt. No. 169 at 22.

12        2.   The Savings Clauses Do Not Save the Executive Orders

13        Defendants effectively argue that the Executive Orders are at worst sheep in wolves'

14   clothing because any illegal directives therein are neutralized by their savings clauses. Dkt. No.

15   223 at 13–15. In each Executive Order, the savings clause states that "[n]othing in this order shall

16   be construed to impair or otherwise affect . . . the authority granted by law to an executive

17   department or agency" and that "[t]his order shall be implemented consistent with applicable law."

18   Dkt. No. 17-1 at 4; Dkt. No. 17-2 at 5. As Plaintiffs point out, the Ninth Circuit rejected nearly

19   identical arguments in *City & County of San Francisco v. Trump*.

20        There, the court addressed constitutional challenges to an executive order directing agency

21   heads, "in their discretion and to the extent consistent with law," to ensure that "sanctuary

22   jurisdictions" that did not comply with 8 U.S.C. § 1373 were "not eligible to receive Federal

23   grants." 897 F.3d at 1232–33. As in this case, defendants there argued that the executive order was

24   "all bluster and no bite" because the savings clause served to ensure that the government's actions

1   would be "consistent with law." *Id.* at 1238–39. But the Ninth Circuit held that because savings

2   clauses are to be read in their context, they "cannot be given effect when the Court . . . would [need

3   to] override clear and specific language" to rescue the constitutionality of a measure, and "[t]he

4   Executive Order's savings clause does not and cannot override its meaning." *Id.* at 1238–40.

5           So too here. The Medical Services EO commands "immediate[]" action from agency heads

6   to be detailed in a 60-day progress report, Dkt. No. 17-1 at 3–4, while the Gender Ideology EO

7   mandates that agencies "take all necessary steps . . . to end the Federal funding of gender ideology"

8   and provide an "update on implementation of this order to the President" within 120 days, Dkt.

9   No. 17-2 at 3–4. These directives have already resulted in two agencies sending notices to grant

10  recipients (1) commanding them to "immediately" stop using federal funding for any activities

11  that do not align with the Medical Services EO and the Gender Ideology EO, and (2) pronouncing

12  that "[a]ny vestige, remnant, or re-named piece" of any programs in conflict with the Executive

13  Orders is terminated. Dkt. No. 16-1 at 2 (HRSA); Dkt. No. 174-1 at 2 (CDC). Although the notices

14  were rescinded within two weeks, Dkt. No. 16-2 at 2; Dkt. No. 174-2 at 2, the agencies' immediate

15  implementation of the Executive Orders emphatically demonstrates that "this wolf comes as a

16  wolf." *Morrison v. Olson,* 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).

17          "Because the Executive Order[s] unambiguously command[] action, here there is more

18  than a mere possibility that some agency might make a legally suspect decision." *City & Cnty. of*

19  *San Francisco*, 897 F.3d at 1240 (internal quotation marks omitted). The savings clauses cannot

20  salvage the clear meaning of the Executive Orders. *See PFLAG*, No. 1:25-cv-00337-BAH, Dkt.

21  No. 62 at 30 ("Where, as here, the plain text and stated purpose of the Executive Orders evince a

22  clear intent to unlawfully restrict federal funding without Congressional authorization, the mere

23  inclusion of the phrase 'consistent with applicable law' cannot insulate these Executive Orders

24  from review.").

3.   <u>Plaintiffs Have Shown That They are Likely to be Irreparably Harmed</u>

Plaintiffs allege that they and Physician Plaintiffs' patients will face irreparable harm if Sections 4 of the Medical Services EO and Sections 3(e) and (g) of the Gender Ideology Order are implemented. Dkt. No. 169 at 22–26. In response, Defendants merely recycle the same ripeness argument the Court rejected above, averring that harm is "wholly speculative" because the Executive Orders "have not been applied to any specific funding or grants." Dkt. No. 223 at 26.

Defendants' argument is disingenuous at best. It ignores the Executive Orders' explicit directives for agencies to take action on the Orders and report back, Dkt. No. 17-1 at 3; Dkt. No. 17-2 at 3–4, the overt steps already taken by HRSA and the CDC to implement the Order, Dkt. No. 16-1 at 2; Dkt. No. 174-1 at 2, and the White House's press release boasting that the Medical Services EO was "already having its intended effect" by causing the discontinuation of care at medical institutions around the country, Dkt. No. 17-9 at 2.

As the Court discussed above, Plaintiffs have shown that the Executive Orders threaten immediate and irreparable injuries. These include, but are not limited to, the loss of hundreds of millions of dollars in federal funding (as well as its devastating consequences for all manner of medical research and treatment), *see supra* Section II.A.1; *see also, e.g.*, Dkt. No. 107 at 5 (describing "4,221 grants that are currently underway" which would be impacted, resulting in the "immediate closure of at least 500 research programs" as well as "the loss of approximately 2000 research staff positions"); and the dire harms to transgender youth deprived of gender-affirming care.[26] It is clear that in the absence of the injunctive relief Plaintiffs request, serious and irreparable harm will follow.

---

[26] With respect to the latter, as Physician 1 attests, discontinuing puberty-delaying medications or gender-affirming hormones can result in "permanent puberty changes that d[o] not align with [an individual's] gender identity" and "will likely require surgery in the future to reverse"—ultimately increasing the number of medical procedures an individual will have to undergo. Dkt. No. 14 at 8–9. Physician 2 adds that discontinuing such gender-affirming care

1      4.  The Balance of Equities and Public Interest Lie in Plaintiffs' Favor

2          Finally, the Court finds that both the balance of equities and the public interest strongly

3   favor the entry of a preliminary injunction. These two factors merge when the federal government

4   is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The rule of law is secured by a strong public

5   interest that the laws "enacted by their representatives are not imperiled by executive fiat." *E. Bay*

6   *Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (cleaned up). Indeed, "the public

7   interest cannot be disserved by an injunction that brings clarity to all parties and to citizens

8   dependent on public services." *City & Cnty. of San Francisco*, 897 F.3d at 1244. And constitutional

9   violations weigh heavily in favor of an injunction. *Betschart v. Oregon*, 103 F.4th 607, 625 (9th

10  Cir. 2024). Any hardship suffered by Defendants pales in comparison to the irreparable harms

11  likely to befall Plaintiffs. Indeed, if the Court were to adopt Defendants' argument that an

12  injunction should not issue because "the relief Plaintiffs request would effectively disable the

13  President and federal agencies from effectuating the President's agenda," Dkt. No. 223 at 27, then

14  "no act of the executive branch asserted to be inconsistent with a legislative enactment could be

15  the subject of a preliminary injunction. That cannot be so." *Doe #1 v. Trump*, 957 F.3d 1050, 1059

16  (9th Cir. 2020).

17     5.  Scope of the Injunction

18         The Government argues that any preliminary injunction "should be limited to the named

19  Plaintiffs only and should not include nonparty providers geographically situated in the state

20  Plaintiffs' boundaries." Dkt. No. 223 at 29. However, district courts have "considerable discretion

21  _____

22  can cause puberty changes within a month, resulting in "higher rates of anxiety, depression, and suicidal ideation."
    Dkt. No. 15 at 11–12 ("I would expect many of these youth would not want to leave their home as their body starts

23  changing in ways that they find distressing. I anticipate these youth would experience significant social withdrawal,
    difficulty attending school, and struggle to excel in school. I expect there to be overall mental health crises for the vast
    majority of transgender and gender-diverse youth."). In fact, the severity of the impact to transgender youth's mental

24  health from "suddenly hav[ing] their medications ripped away" leaves Physician 1 "certain" that "[t]here are going to
    be young people who are going to take their lives if they can no longer receive this care." Dkt. No. 13 at 9.

1    in ordering an appropriate equitable remedy." *City & Cnty. of San Francisco*, 897 F.3d at 1245.

2    While the general rule is that injunctions must "be limited . . . only to named plaintiffs where there

3    is no class certification," *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th

4    Cir. 1996), there is "no general requirement that an injunction affect only the parties in the suit,"

5    *Hecox*, 104 F.4th at 1090 (cleaned up). Rather, "[t]he equitable relief granted by the district court

6    is acceptable where it is necessary to give prevailing parties the relief to which they are entitled."

7    *Id.* (quoting *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 680 (9th Cir. 2021)). District

8    courts may accordingly exercise their discretion in "exceptional cases" to extend injunctive relief

9    "to persons other than prevailing parties in the lawsuit . . . if such breadth is necessary to give

10   prevailing parties the relief to which they are entitled," *City & Cnty. of San Francisco*, 897 F.3d

11   at 1245 (quoting *Bregsal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987)).

12        In light of the concern that overbroad injunctions "have detrimental consequences to the

13   development of law," "deprive appellate courts of a wider range of perspectives," "deprive[

14   nonparties] the right to litigate," and can encourage forum-shopping, *California v. Azar*, 911 F.3d

15   558, 583 (9th Cir. 2018), crafting an injunction is a balancing act necessitating the "exercise of

16   discretion and judgment, often dependent as much on the equities of a given case as the substance

17   of the legal issues it presents," *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571 (2017).

18   For example, the Ninth Circuit has frowned upon nationwide relief when the reasons justifying it

19   are offered "in conclusory fashion," *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th

20   Cir. 2019), or where there is not a "sufficiently developed [record] on the nationwide impact," *City

21   & Cnty. of San Francisco*, 897 F.3d at 1231, 1244–45. And in *East Bay Sanctuary Covenant v.

22   Barr*, the Ninth Circuit rejected the claim that a nationwide injunction "is appropriate simply

23   because this case presents a rule that applies nationwide." 934 F.3d at 1029.

24

1    Here, Plaintiffs do not seek a nationwide injunction and instead ask the Court to enjoin

2  enforcement of the challenged portions of the Executive Orders only within the Plaintiff States.

3  *See* Dkt. No. 169-1 at 5. And while reasonable debate persists regarding the propriety of

4  nationwide injunctions, it "does not foreclose the imposition of statewide injunctive relief." *Koe*

5  *v. Noggle*, 688 F. Supp. 3d 1321, 1361 (N.D. Ga. 2023); *see also id.* at 1361, 1361 n.39 (listing

6  cases permitting "statewide injunctions in cases not involving class actions"). Having closely

7  examined the record, the Court determines that statewide relief is not only appropriate, but

8  essential to provide complete relief to Plaintiffs. *See id.* at 1362. Plaintiffs have developed a

9  voluminous record containing testimony from dozens of providers attesting to the widespread

10  harms the Orders have inflicted on providers in the Plaintiff States, including state institutions,

11  nonprofit entities, and private practitioners. *See* Dkt. Nos. 73, 74, 75, 76, 77, 79, 80, 81, 83, 85,

12  88, 89, 90, 91, 93, 95, 96, 99, 100, 101, 102, 105, 106, 108, 109, 111, 116, 177, 202, 203, 204,

13  205. And where, as here, a multidisciplinary approach is frequently necessary to address patients'

14  medical needs,[27] anything less than a statewide injunction would risk impacting some members of

15  patients' care teams, but not others—leading to an overly complex enforcement landscape within

16  Plaintiff States and undermining the injunction's impact on transgender youth seeking care.

17  Because anything more limited would threaten to create an unduly burdensome "bifurcated"

18  enforcement landscape, a statewide injunction is "necessary to provide complete relief from the

19  diversion of resources harms" which would otherwise be created. *E. Bay Sanctuary Covenant v.*

20

21

22  [27] *See, e.g.*, Dkt. No. 14 at 9 (Physician 2: "Although I do not provide surgical care, I make referrals for gender-affirming surgery when it is medically indicated and consistent with the patient's goals of care."); Dkt. No. 99 at 3 (Licensed Independent Clinical Social Worker attesting that her private therapy practice "connect[s] [patients] with specialty care endocrinology medical providers" if a patient is ready for hormone therapy); Dkt. No. 100 at 2 (physician at Minnesota clinic stating that she "make[s] referrals to medical providers for surgery, and referrals that supported our patients in their transition and gender confirmation, such as for voice training, mental-health care, legal assistance, emotional support, and peer support").

23

24

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION - 51

1  *Barr*, 391 F. Supp. 3d 974 (N.D. Cal. 2019), *aff'd*, 964 F.3d 832 (9th Cir. 2020), *and aff'd sub*

2  *nom. E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2020).

3      Because many of the concerns with nationwide injunctions are muted in the context of

4  statewide injunctions, and are also outweighed by the need to provide complete and effective relief

5  here, anything less than a statewide injunction risks creating a confusing and fragmented

6  enforcement of the Court's order. Plaintiffs have more than adequately demonstrated that providers

7  throughout the Plaintiff States would be equitably served by an injunction barring enforcement of

8  the unconstitutional provisions of the Executive Orders. *See PFLAG*, 2025 WL 510050, at *23–

9  24 (finding nationwide injunction appropriate in nearly identical challenge).

10      6.  <u>Defendants' Request for a Stay Pending Appeal is Denied</u>

11      Defendants submit a one-sentence request for a stay pending appeal. Dkt. No. 223 at 29–

12  30. This request is procedurally improper under Federal Rule of Civil Procedure 7 and Local Civil

13  Rule 7. "[R]equests for affirmative relief must be made in a motion, not in the response[.]"

14  *Sergeant v. Bank of Am., N.A.*, No. C17-5232-BHS, 2018 WL 1427345, at *1 n.2 (W.D. Wash.

15  Mar. 22, 2018) (citing LCR 7(b)(1), 7(k)); *see also* Fed. R. Civ. P. 7(b)(1) ("A request for a court

16  order must be made by motion.").

17      Even if the request were procedurally proper, the Court denies it. Although the Court has

18  discretion to grant a stay pending appeal, "[t]he party requesting a stay bears the burden of showing

19  that the circumstances justify an exercise of that discretion." *Nken*, 556 U.S. at 433. Four factors

20  are relevant: (1) "whether the stay applicant has made a strong showing that [it] is likely to succeed

21  on the merits" of the appeal; (2) "whether the applicant will be irreparably injured absent a stay";

22  (3) "whether issuance of the stay will substantially injure the other parties interested in the

23  proceeding"; and (4) "where the public interest lies." *Id.* at 434. For all the reasons discussed

24  above, Defendants satisfy none of these factors.

### III.   CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Plaintiffs'

Motion for a Preliminary Injunction, Dkt. No. 169, and ORDERS as follows:

1. Defendants[28] and all their respective officers, agents, servants, employees, and
   attorneys, and any person in active concert or participation with them who receives
   actual notice of this Order (collectively, the "Enjoined Parties"), are hereby fully
   enjoined from enforcing or implementing Section 4 of Executive Order 14,187 within
   the Plaintiff States.

2. The Enjoined Parties are hereby fully enjoined from enforcing Sections 3(e) or 3(g) of
   Executive Order 14,168 to condition or withhold federal funding based on the fact that
   a health care entity or health professional provides gender-affirming care within the
   Plaintiff States.

3. Defendants' attorneys shall provide written notice of this Order to all Defendants and
   agencies and their employees, contractors, and grantees by March 6, 2025. Defendants
   shall file a copy of the notice on the docket at the same time.

4. This preliminary injunction remains in effect pending further orders from this Court.

No security bond is required under Federal Rule of Civil Procedure 65(c) because

Defendants will not suffer any costs as a result of the Temporary Restraining Order.[29]

Dated this 28th day of February, 2025.

Lauren King
United States District Judge

---

[28] For the purposes of this Temporary Restraining Order, "Defendants" herein refers to all Defendants listed in the Complaint except President Trump.

[29] Defendants' assertion that "any preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed," Dkt. No. 223 at 29, is unsupported and speculative.