# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

PFLAG, INC., ET AL.,

     Plaintiffs,

v.

DONALD J. TRUMP ET AL.,

     Defendants.

Civil No. 25-337-BAH

## MEMORANDUM OPINION

This matter is currently before the Court on Plaintiffs' motion for a preliminary injunction, ECF 69. To obtain a preliminary injunction, a movant must demonstrate: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Court considered these same factors when it evaluated Plaintiffs' request for entry of a temporary restraining order ("TRO").[1] *See* ECF 60; ECF 62.[2] Upon a renewed review of the whole record, including all filings

---

[1] On February 13, 2025, upon consideration of the parties' filings, and after oral argument on the motion, the Court granted Plaintiffs' motion for a TRO and, for the reasons stated on the record, entered a TRO against the agency Defendants enjoining the enforcement of particular sections of two Executive Orders as they relate to a prohibition on federal funding for institutions that provide gender-affirming medical care for transgender patients under the age of nineteen. ECF 61. In addition to that oral ruling, the Court issued a memorandum opinion on February 14, 2025. ECF 62.

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

in this case subsequent to February 14, 2025, the Court finds no reason to disturb the findings of fact and conclusions of law set forth in its February 14, 2025 memorandum opinion. ECF 62.

As the Court previously explained, "this case presents a straightforward question regarding the separation of powers," and "clearly established precedent of the United States Supreme Court and the United States Court of Appeals for the Fourth Circuit compels findings on Plaintiffs' discrimination-related claims." *Id.* at 1. Nothing presented to the Court since that finding disrupts this analysis. If anything, more recent filings by Plaintiffs only strengthen the case for the issuance of a preliminary injunction.[3]

The Court finds that Plaintiffs continue to meet their burden of showing that there is a strong likelihood that they will succeed on the merits of all three claims that are the subject of their motion for a preliminary injunction.[4] The challenged provisions of the Executive Orders place significant conditions on federal funding that Congress did not prescribe. This, the Constitution simply does not allow, as "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Further, given that the Court is bound by the holdings in *Bostock v. Clayton County*, 590 U.S. 644, 662 (2020), *Grimm v. Gloucester County School Board*, 972 F.3d 586, 611 (4th Cir. 2020)*, as amended* (Aug. 28, 2020), and *Kadel v. Folwell*, 100 F.4th 122, 163–64 (4th Cir. 2024), Plaintiffs are likely to succeed on their claims related to discrimination.

---

[3] To the extent the parties make new arguments in support of or in opposition to the motion for a preliminary injunction, the Court discusses those arguments below.

[4] The Court notes that the parties stipulated that no hearing was necessary on the preliminary injunction. *See* ECF 77. A robust and lengthy hearing was held on the TRO, which afforded Defendants the requisite opportunity to be heard. *See* ECF 60.

Plaintiffs have also shown they will face irreparable harm if the challenged portions of the Executive Orders are not enjoined because they have shown a strong likelihood of success on their constitutional claims, *see Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009), and also because they have provided unassailable documentation that they are suffering from "diminished access to high-quality health care suited to [their] needs," *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019).

Finally, the balance of equities and the public interest weigh in favor of a preliminary injunction as Defendants are not harmed by a prohibition that maintains the status quo and enjoins the enforcement of restrictions likely to be found unconstitutional. *See Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). Moreover, it is "well-established that the public interest favors protecting constitutional rights." *Id.* (citations omitted).

For these reasons, expanded on below, the Court **GRANTS** Plaintiffs' motion for a preliminary injunction. ECF 69.

## I.    BACKGROUND

### A.    Executive Orders

#### 1.    Executive Order 14,168

On January 20, 2025, President Trump issued Executive Order 14,168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Gender Identity Order"). *See* 90 Fed. Reg. 8615 (Jan. 20, 2025). To achieve the stated objective of eradicating gender ideology,[5] Section 3(g) of the Gender Identity Order

---

[5] Section 2(f) of the Gender Identity Order claims that "'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *See* Gender Identity Order § 3(g). It further asserts that "[g]ender ideology is internally inconsistent, in that it diminishes sex as an

declares: "[f]ederal funds shall not be used to promote gender ideology." *Id.* The Gender Identity Order directs that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* The Gender Identity Order cites "the Constitution and the laws of the United States of America, including section 7301 of title 5, United States Code," as the authority by which the President promulgated the executive order. *Id.* at Preamble. 5 U.S.C. § 7301 permits the President to "prescribe regulations for the conduct of employees in the executive branch."

2.    Executive Order 14,187

On January 28, 2025, President Trump issued Executive Order 14,187, titled "Protecting Children from Chemical and Surgical Mutilation" (the "Healthcare Order"). *See* 90 Fed. Reg. 8771 (Jan. 28, 2025). The Healthcare Order[6] directs all federal agencies[7] to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children."[8] *Id.* § 4. The Healthcare Order cites "the authority vested in [the] President by the Constitution and the laws of the United States of America" as the authority by which the President promulgated the executive order. *Id.* at Preamble.

---

identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id.* § 2(f).

[6] The Court will collectively refer to the Gender Identity Order and the Healthcare Order as the "Executive Orders" or "EOs." To be clear, when the Court refers to the Executive Orders, the Court is referring only to the challenged portions (Section 3(g) of the Gender Identity Order and Section 4 of the Healthcare Order).

[7] The Healthcare Order is specifically directed to "[t]he head of each executive department or agency [] that provides research or education grants to medical institutions." *See* Healthcare Order § 4.

[8] In Section 2(c) of the Healthcare Order, the President acknowledges that "th[e] phrase [chemical and surgical mutilation] sometimes is referred to as 'gender affirming care.'" The Court will refer to the treatment at issue as "gender-affirming medical care."

4

According to Plaintiffs, "President Trump unilaterally directs that all federal medical and research grants be stripped from medical institutions, medical schools and hospitals, that provide medically necessary gender-affirming medical care to patients under nineteen[9] for the purpose of gender transition, regardless of whether the funds are used for or related to such care." ECF 53 (amended complaint), at 16–17 ¶ 69 (emphasis in original). Defendants contend that "[t]he EOs do not purport to withhold all federal funding if an institution promotes gender ideology or provides the [referenced] treatments []," but instead, "instruct agencies to implement the President's policy to the extent permitted by applicable law." ECF 90, at 15.

### 3.    Impact of the Executive Orders

On January 31, 2025, Defendant Health Resources and Services Administration ("HRSA") issued a notice to HRSA grant recipients indicating that "HRSA grant funds may not be used for activities that do not align with" the Executive Orders and commanding that any "vestige, remnant, or re-named piece of any programs in conflict with these E.O.s are terminated in whole or in part."[10] ECF 69-5, at 2. The Center for Disease Control and Prevention ("CDC") also issued a notice to grant recipients stating: "[t]o implement the [Gender Identity Order] and in accordance with Office of Personnel Management's Initial Guidance [], you must immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating

---

[9] Section 2(a) of the Healthcare Order defines "child" or "children" to mean "an individual or individuals under [nineteen] years of age."

[10] The email was rescinded without explanation roughly a week later. ECF 90, at 11. Plaintiffs argued at the hearing that the recission was likely to ensure compliance with a temporary restraining order in an unrelated case challenging a blanket freeze in federal funding, *see Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-239 (LLA), --- F. Supp. 3d ---, 2025 WL 368852 (D.D.C. Feb. 3, 2025), and thus not indicative of an effort to repeal the funding contingencies in the Executive Orders.

gender ideology at every level and activity . . . that are supported with funds from this award."[11] ECF 69-6, at 2. Like the HRSA notice, the CDC notice indicated that "[a]ny vestige, remnant, or re-named piece of any gender ideology programs funded by the U.S. government under this award are immediately, completely, and permanently terminated." *Id.* Additionally, medical institutions across the United States that receive federal funding have stopped providing gender-affirming medical care for patients younger than nineteen as a result of the challenged portions of the Executive Orders. *See* ECF 69-7, at 2; ECF 69-8, at 2; ECF 69-9, at 2; ECF 69-11, at 2; ECF 69-13, at 2; ECF 69-14, at 3; 69-17, at 2; ECF 69-18, at 2–3.

Plaintiffs allege that federal funding makes up a significant portion of certain medical institutions' budgets where the patient Plaintiffs receive care. *See* ECF 53, at 20 ¶ 83 (explaining that Children's National in Washington, D.C. receives 70% of its research funding from federal agencies, including 60% from Defendant National Institute of Health[12] ("NIH")); *id.* ¶ 85 (explaining that Virginia Commonwealth University ("VCU") Health and Children's Hospital of Richmond received nearly $7.3 million in grants from Defendant HRSA and nearly $107 million in grants from Defendant NIH in fiscal year 2023); *id.* at 21 ¶ 86 (explaining that UVA Health in Charlottesville, Virginia received more than $200 million in grants from Defendant NIH in fiscal year 2023); *id.* at 22 ¶ 90 (explaining that NYU Langone Health in New York City received federal funding, including $5.6 million in grants from Defendants HRSA and NIH in the last twelve months); *id.* ¶ 93 (explaining that Boston Children's Hospital received more than $27.5 million in grants from Defendant HRSA and more than $245 million in grants from Defendant NIH in fiscal

---

[11] Defendants also characterize the CDC notice as "now rescinded," but provide no further information on this alleged recission. ECF 90, at 11.

[12] In fiscal year 2023, Children's National received $69.6 million in funding from Defendant NIH and $8.7 million from Defendant HRSA. ECF 53, at 20 ¶ 83.

year 2023); *id.* at 23 ¶ 95 (explaining that Denver Health in Denver, Colorado received more than $25 million in grants from Defendant HRSA and more than $700,000 in grants from Defendant NIH in fiscal year 2023); *id.* ¶ 97 (explaining that Children's Hospital Colorado received $9.75 million from Defendant HRSA and $50,000 from Defendant NIH during fiscal year 2023); *id.* at 24 ¶ 99 (explaining that Children's Hospital of Los Angeles received $33.5 million from Defendant NIH and $21 million from Defendant HRSA in fiscal year 2023); *id.* (explaining that Corewell Health in Michigan received $2.1 million from Defendant NIH and $1.2 million from Defendant HRSA in fiscal year 2023).

Members of Plaintiff American Association of Physicians for Human Rights, Inc. d/b/a GLMA Health Professionals Advancing LGBTQ+ Equality ("GLMA") also work at medical institutions that receive significant federal funding from the agency Defendants. *See, e.g.,* ECF 69-43, at 2–3 ¶¶ 3–6 (explaining that GLMA member Kyle Koe is a clinician-researcher at Boston Medical Center, which receives millions of dollars in federal grants from NIH, HRSA, the CDC, and Agency for Healthcare Research and Quality, among others); ECF 69-42, at 2–3 ¶¶ 3, 7 (explaining that GLMA member Peyton Poe is a board-certified pediatrician at Children's National, which receives extensive federal funding, including from Defendant NIH).

After the issuance of the Healthcare Order, medical institutions across the country announced that they were either pausing or cancelling gender-affirming medical care for transgender youth. *See* ECF 69-7, at 2 (pausing provision of puberty blockers and hormone therapy prescriptions for transgender youth at Children's National); ECF 69-8, at 2 (suspending gender-affirming medical care for patients under nineteen at VCU Health and Children's Hospital

of Richmond[13]); ECF 69-9, at 2 (suspending all gender-affirming medical care for patients under

nineteen at UVA Health[14]); ECF 69-23, at 8–9 ¶¶ 25, 28 (cancelling appointments for medical care

for transgender patients under nineteen at NYU Langone); ECF 69-27, at 8 ¶ 22 (cancelling

immediate appointments with transgender patients under nineteen at Boston Children's Hospital);

ECF 69-11, at 2 (indicating Denver Health is "working to understand and comply with the full

implications of the broadly worded and order," and acknowledging that "loss of funding would

critically impair our ability to provide care for the Denver community"[15]); ECF 69-13, at 2

(continuing to offer appointments for behavior health care services and visits with medical

providers to discuss specific care options at Children's Hospital Colorado, but indicating that

patients "will not be able to start any new medication treatments"); ECF 69-14, at 2 (pausing

initiation of hormonal therapy for gender-affirming care patients under nineteen at Children's

Hospital Los Angeles); ECF 69-17, at 2 (indefinitely pausing gender-affirming medical care for

---

[13] On January 30, 2025, the Attorney General of Virginia, Jason Miyares, sent a letter to the University of Virginia and VCU advising that the Healthcare Order "directs federal agencies to immediately ensure that medical institutions that receive federal research or education grants end chemical and surgical mutilation of children." ECF 69-12, at 2–4. He warned that "[a]ny hospital or other institution, including agencies of the Commonwealth, that continues to perform chemical and surgical mutilation of children is at risk of losing such grants," *id.* at 3, and noted that "the grants are not just limited to those related to this subject matter, but could apply to all medical and research grants from federal agencies." *Id.* (emphasis in original).

[14] UVA Health resumed gender-affirming care for patients under nineteen after "multiple federal courts . . . temporarily blocked President [] Trump's executive order[.]" ECF 69-10, at 2.

[15] In a statement, Denver Health acknowledged that the Healthcare Order would lead to "increased risk of depression, anxiety, and suicidality" among transgender adolescents. ECF 69-11, at 2. However, Denver Health indicated that it is concerned about the "criminal and financial consequences for those who do not comply [with the Healthcare Order]," including the loss of participation in federal programs administered by HHS that "represent a significant portion of Denver Health's funding." *Id.*

patients under nineteen at Phoenix Children's Hospital Gender Clinic); ECF 69-18, at 2 (ceasing gender-affirming care to minors at Prisma Community Care, an LGBTQ+ clinic in Arizona[16]).

On February 3, 2025, the White House issued a press release about the Healthcare Order, stating: "[i]t's already having its intended effect—preventing children from being maimed and sterilized by adults perpetuating a radical, false claim that they can somehow change a child's sex. Hospitals around the country are taking action to downsize or eliminate their so-called 'gender-affirming care' programs." ECF 69-20, at 2–3 (citing the cessation of gender-affirming care at NYU Langone Health, Denver Health, University of Colorado Health, VCU Health and Children's Hospital of Richmond, and Children's National, and the review of transgender-related services at Lurie Children's Hospital of Chicago and Children's Hospital of Philadelphia).

### B.    The Individual Plaintiffs

There are six individually named[17] transgender Plaintiffs in the instant suit.[18]  The six Plaintiffs are all under nineteen years old. ECF 53, at 25 ¶ 103; *id.* at 26 ¶ 109; *id.* at 27 ¶ 117; *id.* at 28 ¶ 126; *id.* at 30 ¶ 135; *id.* at 31 ¶ 143.  All six Plaintiffs have received gender dysphoria diagnoses. ECF 69-25, at 4 ¶ 11 (Gabe Goe); ECF 69-23, at 6 ¶ 16 (Bella Boe) ECF 69-29, at 8 ¶ 24 (Cameron Coe); ECF 69-27, at 4 ¶ 9 (Robert Roe); ECF 69-31, at 4–5 ¶ 12 (Lawrence Loe); ECF 69-32, at 4 ¶ 11 (Dylan Doe).  All of the Plaintiffs are members of PFLAG, Inc. ("PFLAG"). ECF 53, at 6–7 ¶ 13.

---

[16] Prisma Community Care resumed providing gender-affirming care after this Court issued the TRO. ECF 69-19, at 2.

[17] The individual plaintiffs are proceeding under pseudonyms. *See* ECF 62, at 7 n.14.

[18] There are also four parents named as Plaintiffs. ECF 53, at 7 ¶ 15; *id.* at 8 ¶ 17; *id.* ¶ 19; *id.* ¶ 21.

Plaintiffs were at various stages of obtaining care for gender dysphoria at the time the Executive Orders were issued. Each Plaintiff reported the discontinuation of gender-affirming medical care after the Healthcare Order was issued. *See* ECF 69-25, at 7 ¶ 22 (Gabe Goe); ECF 69-23, at 8 ¶¶ 22–25 (Bella Boe); ECF 69-29, at 9 ¶¶ 28–29 (Cameron Coe); ECF 69-27, at 8 ¶¶ 21–22 (Robert Roe); ECF 69-31, at 8 ¶ 26 (Lawrence Loe); ECF 69-32, at 8–9 ¶ 31 (Dylan Doe).

## C.    The Associational Plaintiffs

PFLAG is a 501(c)(3) national membership nonprofit organization. ECF 53, at 6 ¶ 13. PFLAG is an organization dedicated to supporting, educating, and advocating for lesbian, gay, bisexual, transgender, and queer ("LGBTQ+") people, their parents and families, and allies. *Id.* PFLAG has "more than 550,000 members[19] and supporters nationwide, including many families of transgender youth who currently receive or will soon need to access the medical treatment for gender dysphoria that the Executive Orders seek to prohibit." *Id.*

GLMA is a 501(c)(3) national nonprofit membership organization. *Id.* at 7 ¶ 14. GLMA's mission is to ensure health equity for LGBTQ+ people and equality for LGBTQ+ health professionals in their work and learning environments. *Id.* GLMA's membership includes approximately 1,000 physicians, nurses, advanced practice nurses, physician assistants, researchers and academics, behavioral health specialists, health-profession students, and other health professionals throughout the country.[20] *Id.*

---

[19] People become PFLAG members by joining the national organization directly or through one of its nearly 350 local chapters throughout the United States. ECF 53, at 6 ¶ 13.

[20] Their practices represent the major healthcare disciplines and a wide range of health specialties, including primary care, internal medicine, family practice, psychiatry, pediatrics, obstetrics/gynecology, emergency medicine, neurology, and infectious diseases. ECF 53, at 7 ¶ 14.

### D.    Procedural History

Plaintiffs brought this suit on February 4, 2025. ECF 1. The next day, Plaintiffs filed an emergency motion for a TRO. ECF 35. Plaintiffs also filed an amended complaint. ECF 53. The Court received additional briefing from the parties on the TRO. *See* ECF 55 (Defendants' response); ECF 57 (Plaintiffs' reply). On February 13, 2025, the Court held a lengthy hearing on the TRO. ECF 60. After the hearing, the Court issued a TRO, ECF 61, and one day later, issued a written memorandum opinion, ECF 62. On February 26, the Court granted Plaintiffs' motion to extend the TRO. ECF 109. The TRO is in effect until March 5, 2025. *Id.*

On February 18, 2025, Plaintiffs filed a motion for a preliminary injunction.[21] ECF 69. Defendants filed a response in opposition.[22] ECF 90. Plaintiffs filed a reply. ECF 108. As noted, all parties agree no additional hearing on the motion is needed. *See supra* note 4.

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citations omitted). To obtain a preliminary injunction, the Plaintiffs must establish four factors: (1) that they are likely to succeed on the merits; (2) that they are likely to

---

[21] The State of Maryland, joined by California, Massachusetts, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Minnesota, Nevada, New Jersey, New York, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia, filed an amicus brief in support of Plaintiffs' motion for a preliminary injunction. ECF 74. The American Academy of Pediatrics and the Communications Workers of America also filed motions for leave to file amicus briefs in support of Plaintiffs' motion for a preliminary injunction. ECF 79; ECF 103. These motions for leave will be granted.

[22] Do No Harm, Inc. filed a motion for leave to file an amicus brief in opposition to Plaintiffs' motion for a preliminary injunction. ECF 88. This motion will be granted. The States of Alabama, Alaska, Arizona, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Dakota, South Carolina, Tennessee, Texas, Virginia, and West Virginia also filed an amicus brief in opposition to Plaintiffs' motion for a preliminary injunction. ECF 92.

suffer irreparable harm if preliminary relief is not granted; (3) that the balance of equities favors

them; and (4) that an injunction is in the public interest. *See Frazier v. Prince George's Cnty.*, 86

F.4th 537, 543 (4th Cir. 2023) (citing *Winter*, 555 U.S. at 20). When a government entity is a party

to the case, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Pursuing

Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). The movant "must

establish all four elements in order to prevail." *Profiles, Inc. v. Bank of America Corp.*, 453 F.

Supp. 3d 742, 746 (D. Md. 2020) (citing *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013)).

"The substantive requirements for a TRO and a preliminary injunction are identical." *J.O.P. v.

U.S. Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 376 (D. Md. 2019) (citing *U.S. Dep't of Lab.

v. Wolf Run Mining Co., Inc.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006)).

## III.    ANALYSIS

Plaintiffs seek to convert the TRO into a preliminary injunction and enjoin all Defendants

except President Trump from implementing Section 4 of the Healthcare Order or Section 3(g) of

the Gender Identity Order. ECF 69. To obtain a preliminary injunction, Plaintiffs must satisfy the

same elements as required for a TRO. *See Winter*, 555 U.S. at 20. Generally, the Court's findings

on these elements for purposes of the TRO continue to apply and the Court incorporates those

findings here. *See* ECF 62. More specifically, and upon consideration of additional evidence

presented in the parties' filings and the amicus briefs, the Court makes the following additional

findings in relation to a preliminary injunction.

### A.    Ripeness

Defendants assert that the Court is being asked to prematurely judge the constitutionality

of a future government policy. ECF 90, at 11. Plaintiffs contend that the issues are fit for judicial

review because Plaintiffs "bring a facial challenge to the Orders' constitutionality, and this issue

does not depend on future uncertainties." ECF 69-1, at 22–23 (citation omitted). Plaintiffs further

argue that "[t]he Orders have also had an 'immediate and substantial impact upon' Plaintiffs, many of whom have suffered substantial disruptions and delays in their treatment." *Id.* at 23 (citing *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 171 (1967)).

When evaluating whether a claim is ripe for review, the Court "balance[s] the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (quotation marks and citations omitted). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Id.* (citing *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992)). "The hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiffs] . . . ." *Id.* (quotation marks and citation omitted) (brackets in original). "When considering hardship, [the court] may consider the cost to the parties of delaying judicial review." *Id.* (citation omitted).

Plaintiffs have brought a facial challenge, alleging that the challenged portions of the Executive Orders violate separation of powers, directly conflict with existing statutes, and violate the equal protection component of the Fifth Amendment's Due Process Clause. This legal question is squarely presented for the Court's review and does not depend on future uncertainties. The plain text of the Executive Orders conditions federally funded hospital grants on the denial of gender-affirming medical care to transgender youth. *See* Gender Identity Order § 3(g) ("[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology"); Healthcare Order § 4 (directing all federal agencies to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children"). Where the "only uncertainties are how, not if, the polic[ies]

will be implemented," the validity of the President's directive is fit for review. *Stone v. Trump*, 280 F. Supp. 3d 747, 767 (D. Md. 2017).

Defendants contend that the matter is not ripe because the particular funding at stake is unknown. *See* ECF 90, at 11 ("[I]t is not clear which funds would be implicated or if the plaintiffs here would be affected."); *see also id.* at 12 ("Absent essential context of which, if any, grants held by specific medical institutions are actually at risk, it would be premature to decide the issue now."). But Defendants cannot avoid judicial review through a vagueness problem of their own making. As Plaintiffs point out, "[t]he text of the Orders applies to all grants regardless of their terms, and HRSA and CDC chose to issue blanket termination notices without identifying specific grants at issue," thus it follows that, "Defendants cannot delay review of their actions by pointing to their own failure to ground those terminations in a particular statutory or regulatory context." ECF 108, at 3.

Simply put, Defendants cannot use the broad nature of the Executive Orders as both a sword and a shield. *See Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-239 (LLA), --- F. Supp. 3d ---, 2025 WL 597959, at *13 (D.D.C. Feb. 25, 2025) ("Defendants cannot take a memorandum that was drafted broadly, interpreted expansively, and implemented categorically and fault Plaintiffs for 'overreading' that directive."). It is clear from the evidence attached to Plaintiffs' motion that hospitals across the country immediately paused or cancelled gender-affirming care for youth in direct response to the Executive Orders. *See* ECF 69-7, at 2; ECF 69-8, at 2; ECF 69-9, at 2; ECF 69-23, at 8–9 ¶¶ 25, 28; ECF 69-27, at 8 ¶ 22; ECF 69-11, at 2; ECF 69-13, at 2; ECF 69-14, at 2; ECF 69-17, at 2; ECF 69-18, at 2. And the White House itself quickly acknowledged that the cessation of care was the "intended effect." ECF 69-20, at 2–

3. Accordingly, the Court need not wait for the agencies to identify specific funding programs affected by the Executive Orders to ripen the case for judicial review.

Additionally, as the Court noted at the TRO hearing, Defendants' theory of ripeness would likely mean that the case never becomes ripe for judicial review, as the *threat* of withholding federal funding, regardless of *which* funding or *how much* funding, was enough to compel the medical institutions to take immediate action. In other words, ripeness cannot hinge on the actual revocation of funding because the *threat* of revocation of funding was enough to compel the medical institutions to pause or cease the challenged care, if fact it was, by the executive's own admission, the "intended effect."[23] ECF 69-20, at 2–3.

Moreover, HRSA and CDC did not wait for further clarification or implementation guidance before sending out emails to all grant recipients requiring the immediate cessation of gender-affirming care.[24] The HRSA issued a notice to all grant recipients stating that: "grant funds may not be used for activities that do not align with" the Executive Orders. ECF 69-5, at 2. The CDC issued a similar notice to grant recipients requiring that all grant recipients: "must

---

[23] Moreover, if medical institutions fully comply with the Executive Orders, there would presumably never be a revocation of federal funding, and thus, under Defendants' theory of ripeness, the case would be permanently insulated from judicial review because no funding would be revoked, despite the Executive Orders illegally conditioning funding on the provision of gender-affirming medical care.

[24] Defendants refer to the notices as "now-rescinded emails." ECF 90, at 11. To the extent Defendants claim that they have ended (or reversed) any alleged unlawful activity by rescinding the HRSA email, the Court is not persuaded that the Government will refrain from "resum[ing]" the challenged activity" in the future. *Pub. Citizen, Inc. v. Fed. Energy Reg. Comm'n*, 92 F.4th 1124, 1128 (D.C. Cir. 2024). As evidenced by the White House press release noting the intended effects of the executive action at issue, there is ample proof that the Executive is committed to restricting federal funding based on the denial of gender-affirming care. ECF 69-20, at 2–3. Importantly, there is "nothing stopping [the agency] from rewording, repackaging, or reissuing the substance of [the HRSA email] if the court were to dismiss this lawsuit." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *7 (finding that "[i]f [d]efendants retracted the memorandum in name only while continuing to execute its directives, it is far from 'absolutely clear' that the conduct is gone for good"). Thus, the recission of the notices does not render the issue moot.

immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting or inculcating gender ideology at every level and activity . . . that are supported with funds from this award." ECF 69-6, at 2. Both notices indicated that "[a]ny vestige, remnant, or re-named piece of any gender ideology programs funded by the U.S. government under this award are immediately, completely, and permanently terminated." *Id.*; ECF 69-5, at 2.    Thus, Defendants' argument that "[t]he Court cannot determine in the abstract whether the statutory and regulatory requirements for any particular grant program provide the agency with discretion to condition funding on these terms," ECF 90, at 11, is plainly at odds with record evidence demonstrating that the agencies did not wait for specific grant programs to be identified before ordering grant recipients to cease all gender-affirming care.[25]

Considering the ample evidence in the record, the Court finds Defendants' argument that "no agency defendant has revoked or denied any particular grants as a result of the [Executive Orders]," ECF 90, at 11, to be "little more than a formalistic contrivance." *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Landsowne, LLC*, 713 F.3d 187, 198–99 (4th Cir. 2013)

---

[25] Defendants contend that "Plaintiffs [] have not established that [the Ryan White HIV/AIDS grant]"—which is the only specific example they provide in their briefing—"would even be subject to the Protecting Children EO" because it is not a federal research or education grant. ECF 90, at 12. However, as an initial matter, the Gender Identity Order plainly applies to all grants, not just research or education grants, and as Plaintiffs point out, "Dr. Birnbaum [a recipient of federal grant funding] also receives research grants from NIH in addition to his Ryan White funding, and [] Dr. Birnbaum's clinic is part of University Hospital at SUNY Downstate, which receives 'millions of dollars in federal grants, including from the NIH and HRSA.'" ECF 108, at 3 (citing ECF 69-46, at 3 ¶¶ 7, 8). The Executive Orders put all of those grants at risk, and in any event, even if Defendants could establish that the Ryan White HIV/AIDS grants were not affected by the Executive Orders, the Court, as previously established, need not wait for specific grants to be identified to review the executive action. Indeed, the HRSA and CDC notices to grant recipients implied a blanket termination. ECF 69-5, at 2; ECF 69-6, at 2. Thus, the Court is unpersuaded by Defendants' attempt to roll back the scope of the Executive Orders. *See Nat'l Council of Nonprofits*, 2025 WL 597959, at *13 ("[R]egardless of how Defendants would have *liked* their guidance to apply, that is a far cry from how it was administered in practice.") (emphasis in original). In short, the Court must presume that the Executive Orders mean what they say.

(finding that where defendants' position is unsupported by the record and plaintiffs have produced evidence that defendants have no intention of abandoning the matter at issue, defendants' "claim of factual uncertainty" does not defeat ripeness). Considering the tangible steps taken by at least two agencies to comply with the Executive Orders, along with the White House's press release, the legal claims are sufficiently viable and do not depend on future uncertainties.[26]

Additionally, withholding review would certainly impose hardship on Plaintiffs. As noted, Plaintiffs provide ample evidence of disrupted or delayed treatment and its effect. *See* ECF 69-25, at 7–8 ¶¶ 22–24 (Gabe Goe); ECF 69-23, at 8 ¶¶ 22–27 (Bella Boe); ECF 69-29, at 9 ¶¶ 28–30 (Cameron Coe); ECF 69-27, at 8 ¶¶ 21–23 (Robert Roe); ECF 69-31, at 8 ¶¶ 26–27 (Lawrence Loe); ECF 69-32, at 8–9 ¶¶ 31–32 (Dylan Doe).

Plaintiffs have established that the hardship they are suffering, as well as the hardship PFLAG's members are experiencing, are caused by the discontinuation of what has been deemed by medical professionals to be essential care. This hardship comes as a result of the conditioning on federal funding outlined in the Executive Orders and is non-speculative, concrete, and potentially catastrophic. Specifically, the sudden denial or interruption of Plaintiffs' medical care has caused or is expected to soon cause unwanted physical changes, depression, increased anxiety, heightened gender dysphoria, severe distress, risk of suicide, uncertainty about how to obtain medical care, impediments to maintaining a social life, and fear of discrimination, including hate crimes. *See* ECF 69-26, at 5–6 ¶ 18; ECF 69-23, at 8–9 ¶ 27; ECF 69-24, at 5 ¶ 16; ECF 69-27, at

---

[26] Defendants also argue that the HRSA and CDC emails "do not constitute final agency action [because] neither agency component terminated any funding, let alone identified any specific grants at imminent risk." ECF 90, at 11. But Plaintiffs have not brought an action under the Administrative Procedures Act ("APA"), as Defendants acknowledge. *Id.* at 9. And final agency action is only required for a claim under the APA, not for *ultra vires* claims for equitable relief. *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006).

8 ¶ 23; ECF 69-28, at 6–7 ¶ 19; ECF 69-29, at 9–10 ¶¶ 30–31; ECF 69-31, at 8 ¶¶ 27–28; ECF 69-32, at 9 ¶ 32. Defendants' assertion that these injuries are nothing more than "hypothetical" and "incidental," ECF 90, at 14, is blatantly contradicted by the record. Plaintiffs have demonstrated that hardship would result in the absence of judicial review. *See Stone*, 280 F. Supp. 3d at 767 (finding that plaintiffs had already suffered harmful consequences, including the cancellation and postponement of surgeries, and thus "[w]aiting until after the Directives have been implemented to challenge the[] alleged violation of constitutional rights only subjects [plaintiffs] to substantial risk of even greater harms"). Plaintiffs' claims are ripe for adjudication.

### B. Reviewability

Plaintiffs assert *ultra vires* causes of action against the Executive Branch officials and agencies. ECF 53, at 34; ECF 53, at 36. Defendants argue that Plaintiffs' claims fail at the threshold because "Plaintiffs do not invoke the Administrative Procedure Act (APA) or any other statute providing for a cause of action against an agency." ECF 90, at 9 (citing 5 U.S.C. § 706(2)(A)–(C)). However, courts have "never held that a lack of a statutory cause of action is *per se* a bar to judicial review." *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (collecting cases). And critically, "[e]ven if a statute does not provide for judicial review, 'when an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority.'" *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 406 (D. Md. 2011) (first citing *Reich*, 74 F.3d at 1328, then citing *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)).

Whether Plaintiffs can assert an equitable *ultra vires* cause of action turns on "whether the relief [they] request[] . . . was traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). "The substantive prerequisites

for obtaining an equitable remedy . . . depend on traditional principles of equity jurisdiction." *Id.* at 318–19 (quotations and citation omitted). The relief Plaintiffs request here has traditionally been available. "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320, 327 (2015); *see also Harmon v. Brucker,* 355 U.S. 579, 581–82 (1958) ("Generally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers."). And it is "well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Reich,* 74 F.3d at 1328 (quoting *Franklin v. Massachusetts,* 505 U.S. 788, 815 (1992) (Scalia, J., concurring)). Indeed, the Fourth Circuit has explicitly recognized that "a plaintiff [may] file[] suit seeking equitable relief against federal officials in their official capacities and alleging that those officials exceeded the scope of their authority *and/or acted unconstitutionally." Strickland v. United States,* 32 F.4th 311, 363 (4th Cir. 2022) (emphasis added) (first citing *Leedom v. Kyne,* 358 U.S. 184, 188–89 (1958), then citing *Noble v. Union River Logging R.R. Co.,* 147 U.S. 165, 171–72 (1893)). And the Supreme Court has affirmed that "the President's actions may . . . be reviewed for constitutionality." *See Franklin,* 505 U.S. at 801.

Additionally, the Supreme Court has rejected the argument that there is no right to equitable relief under the Constitution to challenge governmental action under separation-of-powers principles. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,* 561 U.S. 477, 491 n.2 (2010); *see also Washington v. Trump,* No. 25-cv-244, --- F. Supp. 3d ----, 2025 WL 659057, at *10 (W.D. Wash. Feb. 28, 2025) (finding an equitable cause of action against agency defendants in a nearly identical case). In fact, the Supreme Court has long reviewed constitutional challenges to

19

executive orders pursuant to this authority. *See, e.g., Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952). And the Supreme Court has consistently "sustain[ed] the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution." *See Bell v. Hood*, 327 U.S. 678, 684 (1946); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally.").

The availability of non-statutory judicial review of executive action is not new. In *American School of Magnetic Healing v. McAnnulty*, private plaintiffs brought suit to enjoin a subordinate "postmaster from carrying out the order of the Postmaster General." 187 U.S. 94, 101 (1902). The Supreme Court explicitly rejected the idea that it could not review the legality of the order:

> The acts of all [a government department's] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief. . . . Otherwise the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual.

*Id.* at 108–10. "The reasoning of *McAnnulty* has been employed repeatedly." *Reich*, 74 F.3d at 1327–28 (collecting cases).

*Reich* is instructive. In that case, the United States Court of Appeals for the District of Columbia Circuit considered "whether appellants are entitled to bring a non-statutory cause of action questioning the legality of [an] Executive Order." *Id.* at 1327. In holding that they could, the court reasoned that "courts will 'ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.'" *Id.* at 1328 (citing *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 681 (1986)). After reviewing the relevant case law, the *Reich*

20

court held that "courts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Id.* (citing *Soucie v. David*, 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971)).

Moreover, *Reich* helpfully clarified that there is a distinction in reviewability between cases in which "a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority," and cases in which "the presidential action—not one, it should be added, even contemplated by Congress—independently violates [] a statute that delegates no authority to the President to interfere . . . ." 74 F.3d at 1332 (distinguishing *Dalton v. Specter*, 511 U.S. 462 (1994) from the circumstances in *Reich*). The former is not judicially reviewable; the latter is. *Id.* Because Plaintiffs seek injunctive relief enjoining federal agencies from enforcing, implementing, or applying Section 3(g) of the Gender Identity Order and Section 4 of the Healthcare Order on the basis that the Executive Orders are unconstitutional and independently violate statutes that provided no delegation of authority, Plaintiffs have sufficiently alleged equitable *ultra vires* causes of action.

Defendants cite to *Griffith v. Federal Labor Relations Authority* for the proposition that "[t]he *ultra vires* doctrine is 'extremely limited' in 'scope.'" *See* ECF 90, at 13 (citing 842 F.2d 487, 493 (D.C. Cir. 1988)). The Court generally agrees. *See Ancient Coin Collectors Guild*, 801 F. Supp. 2d at 406 ("[W]here *ultra vires* judicial review is available[,] the scope of that review is limited."). However, despite generally (and correctly) pointing out that the *ultra vires* doctrine is narrow, Defendants have not demonstrated that this case falls outside of its constrained bounds. "*[U]ltra vires* review is limited to whether the President has violated the Constitution, the statute under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action." *Id.* Plaintiffs have brought a facial challenge, alleging that the Executive Orders violate separation of powers, directly conflict with existing statutes, and violate

the equal protection component of the Fifth Amendment's Due Process Clause, thus bringing this

case directly within the purview of the *ultra vires* doctrine. This is not a case where the Court is

tasked with determining whether the Executive has acted in excess of a specifically delegated

*statutory* authority as the Executive Orders, at least as they pertain to the freeze in federal funding

for institutions that provide gender-affirming medical care for those under nineteen, are not issued

pursuant to any relevant statutory delegation.[27] Accordingly, based on the reasoning in *McAnnulty*

and its progeny, the Court determines that the Executive Orders are judicially reviewable to

determine whether they were issued within the President's constitutional powers or any powers

delegated to him by Congress. *See Zivotofsky ex rel. Zivotofsky v. Kerry,* 576 U.S. 1, 10 (2015);

*Youngstown,* 343 U.S. at 635–38 (Jackson, J., concurring).

Defendants also maintain that "the Court's inherent equitable powers do not provide a

cause of action to redress [] removed harm." ECF 90, at 14. Specifically, Defendants argue that

"[a]ll of the hypothetical future actions that Plaintiffs complain about are funding decisions affecting

separate medical institutions," and thus the medical institutions are the "direct objects of any unlawful

action," and Plaintiffs are only "incidentally harmed depending on how these institutions react." *Id.*

Plaintiffs respond that "Defendants concede that Plaintiffs have Article III standing, and Defendants

---

[27] The Gender Identity Order does claim to derive authority from "section 7301 of title 5." Gender
Identity Order, Preamble. However, this statute simply provides that "[t]he President may
prescribe regulations for the conduct of employees in the executive branch," 5 U.S.C. § 7301, and
generally bestows on the President the "discretion-laden power" to regulate the federal workplace,
*see Crandon v. United States,* 494 U.S. 152, 180 (1990) (Scalia, J., concurring). This statute
essentially codifies "the President's responsibility for the efficient operation of the Executive
Branch." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin,* 418
U.S. 264, 273 n.5 (1974). While other sections of the Gender Identity Order, which are not at issue
in this case, may be aimed at regulating the federal workforce, 5 U.S.C. § 7301 cannot provide the
basis for the sweeping directive to withhold Congressionally allocated funds. Defendants do not
appear to argue otherwise. *See* ECF 90, at 13 (citing to Article II as the source of the authority to
implement the challenged portions of the Executive Orders).

fail to offer any support for their assertion that *ultra vires* claims impose a more stringent causation requirement." ECF 108, at 4.

The Court agrees with Plaintiffs that Defendants have failed to cite any cases to show that *ultra vires* claims require a more stringent causation standard than that demanded by Article III standing jurisprudence. Defendants appear to implicitly invoke Article III standing by arguing that *ultra vires* relief "is not a tool for those incidentally affected later" and does not "empower[]" plaintiffs to "reach upstream and proactively combat an alleged wrong happening to another." ECF 90, at 14. The Court acknowledges Defendants' concession that they "have not challenged Plaintiffs' standing," *id.*, but the Court nonetheless incorporates its previous Article III standing analysis in the TRO memorandum opinion because Defendants have provided no support that a more stringent standard is demanded. Additionally, courts have "an obligation to assure ourselves of jurisdiction under Article III." *Trump v. Hawaii*, 585 U.S. 667, 697 (2018).

For the purposes of Article III standing, "[w]hen the plaintiff is an unregulated party, causation 'ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). "The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *Id.* (citing *Allen v. Wright*, 468 U.S. 737, 757–59 (1984)). In short, to establish causation, a plaintiff must show "a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff." *Id.* at 385. Here, Plaintiffs have clearly articulated this "predictable chain of events," *id.*, as the issuance of the Executive Orders led almost

immediately to government agencies directing medical institutions to cease providing gender-affirming care for those nineteen years of age and younger or risk the loss of federal funds. Indeed, this case is not one where the Court must speculate on how third parties will respond to the Executive Orders as medical institutions across the country almost immediately ceased gender-affirming care explicitly because of the Executive Orders. *See* ECF 69-7, at 2; ECF 69-8, at 2; ECF 69-9, at 2; ECF 69-23, at 8–9 ¶¶ 25, 28; ECF 69-27, at 8 ¶ 22; ECF 69-11, at 2; ECF 69-13, at 2; ECF 69-14, at 2; ECF 69-17, at 2; ECF 69-18, at 2.

Further, a plaintiff seeking to hold government officials liable for a decision made by a private actor may succeed "when [the government] has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government]." *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *see also Robinson v. State of Fla.*, 378 U.S. 153, 156–57 (1964) (finding state action within the purview of the Fourteenth Amendment where Florida regulations "[did] not directly and expressly forbid restaurants" from serving all races but "certainly embod[ied] a state policy putting burdens upon any restaurant that did and therefore "involv[ing the state] to such a significant extent in bringing about restaurant segregation"); *Peterson v. City of Greenville, S.C.*, 373 U.S. 244, 248 (1963) (finding ordinance requiring restaurant owners to seat customers of different races separately "compell[ed] persons to discriminate against other persons because of race" and thus violated the Fourteenth Amendment).

The Ninth Circuit's decision in *United States v. King County*, 122 F.4th 740 (9th Cir. 2024) is instructive on this point. There, King County, Washington, "promulgated [an] Executive Order . . . direct[ing] county officials to ensure that future leases" at Boeing Field, a local airport, prohibited airport lessees "from servicing ICE [Immigration and Customs Enforcement] charter

flights." *Id.* at 747. "The record demonstrate[d] that the Executive Order had its intended effect almost immediately" as lessees quickly stopped providing services to ICE soon after it was issued. *Id.* at 749. The United States sued the county, alleging that the order violated the Supremacy Clause. *Id.* King County argued that the United States lacked standing and that suit was not yet ripe because the order was "a general policy statement with no legal force or effect." *Id.* at 750. Calling King County's "apparent theory that the Executive Order does nothing and means nothing" a "mischaracterization of the Executive Order and the plain impact it [] had on ICE's operations at Boeing Field," the Ninth Circuit found that the United States had "Article III standing and that its claims are ripe for resolution." *Id.* Relevant to the instant matter, the court rejected the claim that the matter was not justiciable because the decision to stop providing services to ICE "resulted not from the Executive Order but from the [lessees] own 'business' concerns." *Id.* at 751. "[T]hese business concerns," the court observed, "arise most readily from [lessees'] fears that County officials would put [them] out of business at Boeing Field if [they] continued servicing ICE." *Id.* "An asserted business concern that is itself rooted in the Executive Order does not demonstrate a lack of traceability between the Order and the injuries at hand" because the "Executive Order was still—at minimum—a substantial factor motivating the [lessees] to stop servicing ICE;" in fact, the court observed, "it was the overriding factor." *Id.* The same logic applies here.

Though it was no doubt true that the lessees in *King County*—much like the federally-funded care providers here—made the decision to stop providing the forbidden services, it was only because they saw "the writing on the wall," felt the government's "pressure," and "immediately fell in line." *Id.* at 752. This is enough to establish causation. *Id.* To find otherwise would be to deny reality as Plaintiffs have amply supported their claim that medical institutions

immediately halted gender-affirming care for those under the age of nineteen soon after the issuance of the Executive Orders. *See* ECF 69-7, at 2; ECF 69-8, at 2; ECF 69-9, at 2; ECF 69-23, at 8–9 ¶¶ 25, 28; ECF 69-27, at 8 ¶ 22; ECF 69-11, at 2; ECF 69-13, at 2; ECF 69-14, at 2; ECF 69-17, at 2; ECF 69-18, at 2. More importantly, these decisions to pause or cancel care came as "a clear (and fairly predictable) response to" the Executive Orders. *King Cnty.,* 122 F.4th at 752. And this was exactly the intended effect. *See* Healthcare Order § 1 (explaining that the purpose of the EO is to "prohibit or limit these destructive and life-altering procedures"); ECF 69-20, at 2–3 (February 3, 2025 White House press release noting the Healthcare Order "[is] already having its intended effect . . . [as] [h]ospitals around the country are taking action to downsize or eliminate their so-called 'gender-affirming care' programs"). This is enough to show that the medical institutions' purported choice to cease providing the challenged care can be imputed to Defendants. *See Blum,* 457 U.S. at 1004.

Having established that the hospitals' recission of medical care was directly caused by the Executive Orders, this Court is satisfied that the causal connection is imputed to the individually named Plaintiffs as well. In other words, if the hospitals' decision to withhold the relevant gender-affirming medical care was caused by the Executive Orders, then it follows that the denial of care experienced by the named Plaintiffs was also causally related to the Executive Orders. Defendants' statement that the claims "concern hypothetical downstream actions that may or may not result from the EO[s]" is unpersuasive. ECF 90, at 14. The denial of Plaintiffs' medical care is causally connected to the Executive Orders, regardless of the fact that the medical institutions

are the regulated party, because the medical institutions, as established above, acted in direct response to the Executive Orders.[28]

Finally, Defendants contend that "Plaintiffs have not identified any specific source of authority that prevents a presidential order directing subordinates to consider and pursue as appropriate (and as consistent with law) a given policy." ECF 90, at 14.  Defendants mischaracterize the effect of the plain text and directives in the Executive Orders.  The Executive Orders do not direct subordinates to simply consider a policy; the challenged portions of the Executive Orders direct subordinates to "immediately take appropriate steps to ensure that

---

[28] Plaintiffs attach numerous exhibits to the preliminary injunction motion that articulate the hospitals' official statements on gender-affirming medical care, which unambiguously cite the Executive Orders as the reason for ceasing care. *See, e.g.,* ECF 69-7, at 2 ("[Children's National is] currently pausing all puberty blockers and hormone therapy prescriptions for transgender youth patients, *per the guidelines in the Executive Order* issued by the White House this week."); ECF 69-8, at 2 ("VCU Health and Children's Hospital of Richmond at VCU have suspended gender-affirming medications and gender-affirming surgical procedures for patients under 19 years old *in response to an Executive Order* issued by the White House [] on January 28, 2025, and related state guidance received by VCU on January 30, 2025."); ECF 69-9, at 2 ("*In response to the recent federal executive order* and related Commonwealth of Virginia, Office of Attorney General guidance, UVA Health has suspended all gender-affirming care for patients under 19 years of age."); ECF 69-11, at 2 ("The executive order . . . includes criminal and financial consequences for those who do not comply, including placing participation in federal programs including Medicare, Medicaid and other programs administered by HHS at risk.  These programs represent a significant portion of Denver Health's funding, and *the executive order explicitly states that should we not comply, our participation in these programs is at risk*.") (emphasis added to all).  It is difficult to conceive of clearer causal language than that used by the hospitals here.  Thus, the Court is satisfied that the hospitals acted "in response to" the Executive Orders, which, in turn, led to the denial of medical care at issue in this case.  The injury, that is, the consequences of being denied gender-affirming medical care, is therefore clearly traceable to the challenged conduct: conditioning funding on refusing to provide such care.  Defendants have provided no support in the case law for their conclusory assertion that "this Court's inherent equitable powers do not provide a cause of action to redress that sort of removed harm." ECF 90, at 14.  As this Court has already established, Plaintiffs have sufficiently established equitable *ultra vires* causes of action, and Defendants concede that Plaintiffs have Article III standing. *Id.*  Thus, simply stating that "more is required to proceed on the limited, equitable claim for *ultra vires* relief," *id.*, is inadequate to compel this Court to alter its previous findings that Plaintiffs have suffered concrete harms as a direct result of the Executive Orders and subsequent agency action and that an equitable suit seeking to enjoin the *ultra vires* actions of the Executive would remedy the alleged harms.

institutions receiving Federal research or education grants end the chemical and surgical mutilation

of children," and mandate that "[e]ach agency shall assess grant conditions and grantee preferences

and ensure grant funds do not promote gender ideology." *See* Healthcare Order § 4; Gender

Identity Order § 3(g). Accordingly, Plaintiffs have identified a source of authority—Articles I and

II of the Constitution—that prevent a president from directing subordinates to condition grant

funding on conditions not prescribed by Congress. Additionally, through their claim that the

Orders conflict with Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116, and

Section 1908 of the Public Health Service Act ("PHSA"), 42 U.S.C. § 300w-7, Plaintiffs are

seeking equitable relief to vindicate their own substantive rights to be free from discrimination by

healthcare entities receiving grants and other federal funding. As such, Plaintiffs have identified

specific sources of authority that prevent the challenged action and the action is properly

reviewable before this Court.

### C.    **Preliminary Injunction**

Plaintiffs claim that the Executive Orders violate the separation of powers, conflict with

statutory law, and violate the equal protection component of the Fifth Amendment's Due Process

Clause. ECF 69-1, at 8. While the parties discuss all three claims in their briefs, it bears noting

that the Court "only needs to find that Plaintiffs are likely to succeed on one in order for this factor

to weigh in favor of a[n] [injunction]." *See Nat'l Council of Nonprofits*, 2025 WL 368852, at *9

(citation omitted); *see also Profiles, Inc.*, 453 F. Supp. 3d at 747 ("Plaintiffs bear the burden to

show that they are likely to succeed on one of their claims." (citation omitted)). Regardless, the

Court will analyze all three claims. The Court will first take up Plaintiffs' argument that the

Executive Orders are *ultra vires* because they exceed the President's Article II powers and

unconstitutionally infringe upon the power of Congress by attempting to amend federal legislation while bypassing Article I's Bicameralism and Presentment Clauses. ECF 69-1, at 24.

    1.    <u>Likelihood of Success on the Merits</u>

           *i.*    *Ultra Vires – Presidential Action in Excess of Constitutional Authority*

                (1)    Article II does not authorize the President to terminate federal grants authorized by Congress.

The President's authority to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. And it is clear that "when it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1233–34 (9th Cir. 2018) (citing *Youngstown*, 343 U.S. at 637). Neither the Healthcare Order nor the Gender Identity Order identifies a statute authorizing the Executive Branch to amend or terminate federal grants; therefore, in order for the action to be lawful, Article II must provide this authority.[29] Against this backdrop, Plaintiffs first argue that "[f]ederal grants are federal law enacted by Congress," and "conditioning or cancelling federal grants amounts to amending or repealing federal law." ECF 69-1, at 24 (citing *Clinton*, 524 U.S. at 444). According to Plaintiffs, "[n]either federal statute nor Article II authorize the President to amend or repeal federal statutes." *Id.*

Under Article II, the President has an obligation to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. "Where Congress has failed to give the President discretion in allocating funds, the President has no constitutional authority to withhold such funds and violates his obligation to faithfully execute the laws duly enacted by Congress if he does so." *Cnty. of*

---

[29] As noted, the only statutory authority the Gender Identity Order identifies pertains to "regulations for the conduct of employees in the executive branch." Gender Identity Order, Preamble (citing 5 U.S.C. § 7301).

*Santa Clara v. Trump*, 250 F. Supp. 3d 497, 531 (N.D. Cal. 2017) (citing *Clinton*, 524 U.S. at 439);

*see also City & Cnty. of San Francisco*, 897 F.3d at 1234 ("Because Congress's legislative power

is inextricable from its spending power, the President's duty to enforce the laws necessarily

extends to appropriations."). Moreover, the President's obligation to execute the laws is "an

affirmative one, meaning that failure to act may be an abdication of the President's constitutional

role." *City & Cnty. of San Francisco*, 897 F.3d at 1234. As then-Judge Kavanaugh explained, "a

President sometimes has policy reasons (as distinct from constitutional reasons []) for wanting to

spend less than the full amount appropriated by Congress for a particular project or

program . . . [b]ut in those circumstances, even the President does not have unilateral authority to

refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

Defendants acknowledge that the President "issued two Executive Orders [] directing

agencies to take steps, as permitted by law, to place conditions on certain federal grant funding in

accordance with the Administration's policy goals."[30] ECF 90, at 3. This is a clear violation of

the Constitution as "attempt[s] [by the Executive Branch] to place new conditions on federal funds

[are] [] improper attempt[s] to wield Congress's exclusive spending power and is a violation of

the Constitution's separation of powers principles." *Cnty. of Santa Clara*, 250 F. Supp. 3d at 531.

*County of Santa Clara* is instructive on how to interpret a challenge to this delicate balance

of power between the President and Congress. There, the court analyzed an executive order that

---

[30] The Court notes that Defendants cite Article II and *Trump v. United States*, 603 U.S. 593, 608–09 (2024), for the proposition that "if an agency decides to act in a specific manner contrary to law, the federal courts may review (and prevent) that action; but federal courts cannot superintend—let alone proscribe—that policymaking from even taking place." ECF 90, at 13. HRSA and CDC acted contrary to law in sending notices to grant recipients requiring compliance with the Executive Orders or lose allocated funding. Thus, even assuming that Article II allows for this type of general policymaking, the action at issue goes well beyond the President's "constitutional authority" to direct his subordinates to "take appropriate steps to implement a policy directive." ECF 90, at 13 (citing U.S. Const. art. II, §§ 1, 2).

directed relevant officials to ensure that jurisdictions that willfully refused to comply with a statute were not eligible to receive federal grants, with limited exceptions for law enforcement purposes. *Id.* The court explained that the executive order at issue there "purport[ed] to give the Attorney General and the Secretary [of Homeland Security] the power to place a new condition on federal funds (compliance with [a statute]) not provided for by Congress." *Id.* In issuing injunctive relief, the court reasoned that "the President does not have the power to place conditions on federal funds and so cannot delegate this power." *Id.*

These fundamental principles compel the same result here. Section 4 of the Healthcare Order directs "[t]he head of each executive department or agency [] that provides research or education grants to medical institutions . . . [t]o immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children." Similarly, Section 3(g) of the Gender Identity Order instructs that "[f]ederal funds shall not be used to promote gender ideology," and "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology."[31] As in *County of Santa Clara*, Sections 4 and 3(g) of the respective Executive Orders purport to give executive agencies the power to place a new condition on federal funds not provided for by Congress.

Defendants argue that "[c]ontrary to Plaintiffs' argument, the Executive Branch does not uniformly 'lack[] the power to condition federal funds.'" ECF 90, at 18 (citation omitted). Defendants then cite several provisions of the Public Health Services Act to support the argument that "NIH possesses general authority to fund research and to exercise discretion to allocate funds and determine research priorities." *Id.* (citing 42 U.S.C. §§ 241(a), 284(b), 282(b)(3), (5), (6), (21)).

---

[31] Gender ideology is defined in Section 2(f) of the Gender Identity Order as "permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true."

Plaintiffs respond that this is a "belated[] attempt to find some statutory delegation that could possibly justify imposing at least *some* conditions on *some* types of grants," however, according to Plaintiffs, "the proper time for identifying the source of statutory authority was before Defendants started sending out termination notices, not weeks later as a *post hoc* rationalization." ECF 108, at 5 (emphasis in original).

The Court agrees with Plaintiffs' observation that "Defendants must defend the Orders that President Trump actually issued, not some hypothetical narrower Executive Order that is tailored to statutory schemes on which the Orders did not purport to rely." ECF 108, at 5–6 (citation omitted). But even ignoring that neither the Executive Orders nor the HRSA and CDC notices purport to derive authority from any specific statutory provision, Defendants' *post-hoc* invocation of provisions of the Public Health Services Act are nonetheless unpersuasive. Fundamentally, "[a]dministrative agencies are creatures of statute," and "accordingly possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022); *see also City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (finding that when an executive agency administers a federal statute, the agency's power to act is "authoritatively prescribed by Congress"). "It is no exaggeration to say that 'an agency literally has no power to act . . . unless and until Congress confers power upon it.'" *New York v. Trump,* No. 25-cv-39, 2025 WL 357368, at *2 (D.R.I. Jan. 31, 2025) (citing *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). Moreover, "[a]ny action that an agency takes outside the bounds of its statutory authority is *ultra vires*." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (citing *City of Arlington*, 569 U.S. at 297).

Recognizing the lack of specific authorization by Congress, Defendants do not explicitly argue that conditioning federal funding on medical institutions' denial of gender-affirming care would be a permissible condition for NIH to impose under the Public Health Services Act or any

32

other federal grant statute.  Rather, Defendants generally argue, as mentioned above, that the

Executive Branch "does not uniformly lack the power to condition federal funds," ECF 90, at 18

(alteration and citation omitted), and that NIH, for example, "possesses general authority to fund

research, and to exercise discretion to allocate funds and determine research priorities." *Id.* (citing

42 U.S.C. §§ 241(a), 284(b), 282(b)(3), (5), (6), (21)).  However, no provision in any of the statutes

Defendants cite authorizes agencies to condition the *entirety* of their federal funding on the denial

of gender-affirming care for those under the age of nineteen, as the Healthcare Order does in

instructing department and agency leadership to "immediately take appropriate steps to ensure that

institutions receiving Federal research or education grants end [the challenged care]."[32]  *See*

Healthcare Order § 4.  Moreover, as Plaintiffs point out, "[t]he statutes vest NIH with discretion

regarding grants, but that discretion must be exercised to 'carry[] out the purposes of' the statute,

not the President's own purposes," ECF 108, at 6 (citing 42 U.S.C. §§ 282(b), 284(b)(1)), and

critically, "NIH's discretion is further circumscribed by highly detailed provisions mandating the

considerations that must inform NIH's decision." *Id.* (citing 42 U.S.C. §§ 241, 282(b), 284(b),

---

[32] In fact, a brief review of recent legislative history reflects that while bills banning federal funding for this type of care have been proposed at the federal level, none have passed.  The Court takes judicial notice of H.R. 10075, a bill introduced in the House in the 2023-2024 Legislative Session, which attempted the same action that the Executive Orders direct here.  *See* H.R. 10075 (prohibiting an entity from receiving Federal funds if such entity provides to any person any medical or surgical intervention for the purpose of assisting an individual's disassociation from his or her sex).  This bill failed in Congress.  The Court is mindful of the fact that "speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt." *Bostock*, 590 U.S. at 670.  However, that the challenged portions of the Executive Orders bear a strong resemblance to failed legislation supports Plaintiffs' overarching premise that the Executive Orders sought to do what Congress expressly had not—namely, banned funding for institutions that provide gender-affirming care for minors and young adults. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) ("The Secretary's assertion of administrative authority has 'conveniently enabled [him] to enact a program' that Congress has chosen not to enact itself." (citing *West Virginia v. EPA*, 597 U.S. 697, 731 (2022))).

289(a)). Thus, Defendants' attempt to transform statutory language providing agencies some limited discretion in determining research priorities into specific authorization for the action at issue here, which goes well beyond determining research priorities, "stretch[es] the statutory language beyond hope of recognition." *Barr*, 954 F.3d at 32. Notably, the Supreme Court has struck down agencies' attempts to extrapolate broad authority under narrow delegations of power. *See NFIB*, 595 U.S. at 117 (upholding injunction where the act at issue "empower[ed] the Secretary to set workplace safety standards, not broad public health measures"); *see also Biden*, 143 S. Ct. at 2368 (finding that delegated authority to modify loan requirements did not include authority for loan forgiveness). And again, it bears reiterating that the President has not purported to implement these Executive Orders under a delegation of authority from Congress beyond citing his workplace authority over the Executive Branch under 5 U.S.C. § 7301. Under these circumstances, the Court finds that Congress has not authorized the President to withhold federal grant monies from medical institutions that provide gender-affirming care for those under nineteen years of age, thus the Executive Branch exceeded its power under Article II by refusing to spend the funds. *See* U.S. Const. art. I, § 8, cl. 1.

Defendants argue that Plaintiffs "misapprehend the nature of the EOs and of executive authority to administer grants." ECF 90, at 18. For example, Defendants claim that the Executive Branch has authority to condition the receipt of federal research funds without express congressional authorization, noting, for example, that NIH has exercised this authority "to add terms and conditions to grants in accordance with Executive Orders, including Executive Order 13,505, which directed NIH to 'support and conduct responsible, scientifically worthy human stem cell research, including human embryonic stem cell research, to the extent permitted by law.'" *Id.* (citing Exec. Order 13,505, 74 Fed. Reg. 10,667, 10,667 (2009); NIH Guidelines, 74 Fed. Reg.

32,170–32,175 (July 7, 2009); 45 C.F.R. § 75.210 (authorizing NIH to place terms and conditions on awards)). According to Defendants, the exercise of NIH's authority, as detailed in *Sherley v. Sebelius*, "is but one example where the Executive Branch possesses discretion, delegated by Congress, to administer federal grants, including by conditioning or distributing funds according to Presidential policies." ECF 90, at 18 (citing 644 F.3d 388, 397 (D.C. Cir. 2011)). Plaintiffs respond that *Sherley* is a "perplexing example for Defendants to use" because the NIH conditions at issue in that case were "adopted pursuant to Congressional directive, not by Executive fiat." ECF 108, at 6–7 (citing *Sherley*, 644 F.3d at 390).

Putting aside that Defendants offer no examples of any court upholding sweeping limitations on *all* federal funding to recipients of the scope at issue here, Plaintiffs appear to have the better argument as to the applicability of *Sherley v. Sebelius*. *Sherley* involved a challenge to NIH guidelines for research involving embryonic stem cells ("ESCs"). 644 F. 3d at 390 (citing Pub. L. No. 111–117, § 509(a)(2), 123 Stat. 3034, 3280–81). Since 1996, Congress, through the Dickey-Wicker amendment to various appropriations bills, expressly prohibited NIH from funding particular types of research that created or destroyed human embryos. *Id.* After several administrations modified NIH guidelines for implementing this legislative directive, a group of doctors filed suit challenging the implementation of new guidelines issued in 2009 that permitted funding for research conducted on ESCs "derived from embryos" so long as certain conditions were satisfied. *Id.* at 391. After applying the deference afforded to agency actions at the time, *see Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984), the United States Court of Appeals for the District of Columbia Circuit held that the Dickey-Wicker amendment did not bar funding for the research endorsed by the 2009 NIH guidelines and further determined that NIH's guidance on the subject was reasonable. *Sherley*, 644 F.3d. at 393–95.

35

Here, Defendants point to no statutory authority reflecting the supposed will of Congress as it relates to gender-affirming care for individuals under the age of nineteen. Thus, unlike the narrow *Chevron* inquiry into guidelines interpreting a congressionally authorized funding limitation in *Sherley*, the Court here is tasked with analyzing executive action that comes with no congressional or constitutional authorization at all. Moreover, the challenged guidelines at issue in *Sherley* addressed government funding of a specific subset of research projects, namely those involving ESCs. *Id.* at 391 ("These guidelines therefore recognize the distinction, accepted by Congress, between the derivation of stem cells from an embryo that results in the embryo's destruction, for which Federal funding is prohibited, and research involving [ESCs] that does not involve an embryo nor result in an embryo's destruction, for which Federal funding is permitted.") (citing NIH Guidelines, 74 Fed. Reg. 32,173 (July 7, 2009)). Here, in contrast, the challenged portions of the Executive Orders threaten to revoke *all* government funding to institutions if they continue to provide a specific type of care even if that care is not itself funded by federal dollars. *See* Healthcare Order § 4; Gender Identity Order § 3(g); *see also* ECF 69-11, at 2; ECF 69-12, at 3 (interpreting the EOs to mean all federal funding could be lost, not simply funds being used to provide gender-affirming care for patients under the age of nineteen). To be sure, *Sherley* may provide guidance on the manner in which an administration may advance its policy goals within the balanced framework of checks and balances that the Constitution provides. As the decision makes clear, several administrations had apparently interpreted the Dickey-Wicker amendment differently and instructed NIH to carefully develop guidelines in accordance with their interpretation of that specific limit on funding appropriations. *Sherley,* 644 F. 3d at 391–92. *Sherley* does not, however, go so far as to endorse the withholding of *all* congressionally allocated funds simply because the recipients of those funds are providing a service—here, health care

deemed medically necessary and agreed to by doctors, patients, and, when applicable, a patient's parent or guardian—that the executive thinks the recipients should not provide.

Defendants argue that the Executive Orders "instruct agencies to implement the President's policy to the extent permitted by applicable law," ECF 90, at 15, and therefore "[d]efinitionally, directing executive agencies to take action *to the extent consistent with applicable law* cannot be interpreted as an order to violate the law." *Id.* at 16 (emphasis in original). While this admonition to be lawful is unquestionably present in the Executive Orders, courts have repeatedly rejected the argument that simply including "consistent with applicable law" or a similar boilerplate phrase inoculates an otherwise unconstitutional executive order from judicial review. *See, e.g., HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021) (rejecting government's attempt to "immunize the Order from review through a savings clause which, if operational, would nullify the 'clear and specific' substantive provisions of the Order" (citation omitted)). There are no magic words that can override an executive order's plain meaning. Rather, any savings clause (or similar directive to follow the law), if it is to be afforded weight, must not be "purely theoretical," and cannot "override the Order's meaning" as derived from the Order's "stated goal." *Id.* Where, as here, the plain text and stated purpose of the Executive Orders evince a clear intent to unlawfully restrict federal funding without congressional authorization, the mere inclusion of the phrase "consistent with applicable law" cannot insulate these Executive Orders from review. As the Ninth Circuit has pointed out, "[i]f 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues." *City & Cnty. of San Francisco*, 897 F.3d at 1240.

Contrary to Defendants' argument, *see* ECF 90, at 18, *Building & Construction Trades Department v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), does not counsel a different result. In

*Allbaugh*, the D.C. Circuit considered an executive order with a savings clause, ultimately holding that "[t]he mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that, so far as the present record reveals, is above suspicion in the ordinary course of administration." *Id.* at 33. Unlike *Allbaugh*, and more like the executive order at issue in *City and County of San Francisco*, the Executive Orders here "unambiguously command[] action" such that there is much "more than a 'mere possibility that some agency might make a legally suspect decision.'" *City & Cnty. of San Francisco*, 897 F.3d at 1240 (citing *Allbaugh*, 295 F. 3d at 33). In fact, as established above, a legally suspect decision has already been made by the CDC and HRSA by virtue of the agencies sending out grant termination and compliance notices. Given that the Executive Orders explicitly instruct the executive to develop policies that run afoul of the separation of powers, the apparent simultaneous command to "follow the law" bears a striking resemblance to the "purely theoretical savings clause," in *HIAS*, which the Fourth Circuit held "cannot immunize [the] Order from scrutiny." *HIAS, Inc.*, 985 F.3d at 325.

                    (2)      The Executive Orders run afoul of Article I's grant of spending powers to Congress.

Plaintiffs further argue that "[t]he Executive's unilateral attempt to terminate federal grants also infringes on Congress's power of the purse." ECF 69-1, at 25. The Court agrees. Article I of the United States Constitution specifically grants the spending powers to Congress. "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. The Constitution's allocation of authority with respect to appropriations could not be clearer: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ." U.S. Const. art. I, § 9, cl. 7. "Incident to [the spending] power, Congress may attach

conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal [monies] upon compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)). "Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress." *City & Cnty. of San Francisco*, 897 F.3d at 1232.

"The Appropriations Clause of the Constitution gives Congress exclusive power over federal spending." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *12 (citation omitted). Without it, "the [E]xecutive would possess an unbounded power over the public purse of the nation[] and might apply all its monied resources at his pleasure." *U.S. Dep't of the Navy v. Fed. Lab. Rel. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (quoting 3 Joseph Story, Commentaries on the Constitution of the United States § 1342, at 213–14 (1833)). Indeed, the Clause "was intended as a restriction upon the disbursing authority of the Executive [Branch]." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937); *see also U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 76 (D.D.C. 2015) ("Congress's power of the purse is the ultimate check on the otherwise unbounded power of the Executive.").

In keeping with this fundamental principle of our constitutional order, the District Court of the District of Columbia recently enjoined federal agencies from pausing agency grant, loan, and other assistance programs on the basis of other executive actions. *Nat'l Council of Nonprofits*, 2025 WL 368852, at *1. In *National Council of Nonprofits*, a memorandum issued by the Office of Management and Budget ("OMB") directed federal agencies to temporarily pause "all activities related to [the] obligation or disbursement of all Federal financial assistance, and other relevant agency acti[vities] that may be implicated by the executive orders, including, but not limited to,

financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." *Id.* In finding that plaintiffs there had demonstrated a likelihood of success on the merits, the court held that "Defendants' actions appear to suffer from infirmities of a constitutional magnitude." *Id.* at 12. In reaching this holding, the court explained the following:

> In 1982, Congress enacted the "Purpose Statute," which requires the appropriation of federal funds in accordance with "the objects for which . . . [they] were made." Any "reappropriation and diversion of the unexpended balance of an appropriation for a purpose other than that for which [it] originally was made" is treated "as a new appropriation." Related laws expressly prohibit the Executive Branch from encroaching on Congress's appropriations power. Most notably, the Impoundment Act of 1974, 2 U.S.C. § 681 *et seq.*, lays out specific procedures whenever the President wishes to suspend appropriations that have already been enacted.

*Id.* (citing 31 U.S.C. § 1301(a), (b), 31 U.S.C. §§ 1341, 1350). Ultimately, the court held that "a wealth of legal authority supports this fundamental separation of powers," and thus "[t]he appropriation of the government's resources is reserved for Congress, not the Executive Branch."[33] *Id.*

The same logic applies here where Defendants have likewise "attempted to wrest the power of the purse away from the only branch of government entitled to wield it." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *12. The challenged portions of the Executive Orders direct the agencies of the Executive Branch to withhold funds appropriated by Congress in order to further an administrative policy on gender ideology. *See* Healthcare Order § 4; Gender Identity Order § 3(g). Regardless of the validity of this policy, it is a plain and simple fact that Congress has not imposed conditions on federal grants regarding gender-affirming care. "[I]n those instances where

---

[33] Judge AliKhan analyzed the separation of powers issue to determine whether the plaintiffs were likely to succeed on the merits of their claim that the agency action was arbitrary and capricious under the APA. The court concluded that "[i]f Defendants' actions violated the separation of powers, that would certainly be arbitrary and capricious under the APA." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *12. While Plaintiffs do not raise an APA claim here, the separation of powers analysis nevertheless applies.

Congress has intended the States to fund certain entitlements as a condition of receiving federal funds, it has proved capable of saying so explicitly."[34]  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–18 (1981) (citing *King v. Smith*, 392 U.S. 309, 333 (1968)).

Plaintiffs also point out that the Executive Orders "appl[y] even to grantees who comply with the [legitimate] conditions attached to their funding [by Congress] and utilize their funds to effectuate the program's purposes."  ECF 69-1, at 26.  Thus, the Executive Orders are "incompatible with the expressed or implied will of Congress." *Zivotofsky*, 576 U.S. at 10.  "The Executive Branch has a duty to align federal spending and action with the will of the people as expressed through congressional appropriations, not through 'Presidential priorities.'" *New York*, 2025 WL 357368, at *2 (emphasis omitted).  As Chief Judge McConnell of the District of Rhode Island recently reiterated, "[f]ederal law specifies how the Executive should act if it believes that appropriations are inconsistent with the President's priorities—it must ask Congress, not act unilaterally." *Id.*  Because there is no evidence that the President asked Congress to rescind appropriated funds, the Court finds that the challenged portions of the Executive Orders unconstitutionally intrude upon the congressional prerogative to control the public fisc. *See City & Cnty. of San Francisco*, 897 F.3d at 1235 ("Absent congressional authorization, the

---

[34] Defendants attempt to distinguish *National Council of Nonprofits v. Office of Management and Budget* and *New York v. Trump* by claiming that "[b]y their own terms, the [Executive Orders] challenged here direct agencies to impose a new *condition* on grant funding[]—not immediately pause existing grant funding." ECF 90, at 19 (emphasis in original). This argument fails to remedy the inherent separation of powers issue that prohibits the President from "possess[ing] an unbounded power over the public purse of the nation." *U.S. Dep't of the Navy*, 665 F.3d at 1347. Regardless of whether the executive action is characterized as a "new condition" on grant funding or a "pause" on grant funding, the case law is clear: if Congress wishes to condition federal research and education grants on the denial of gender-affirming care, it has "proved capable of saying so explicitly." *Pennhurst State Sch. & Hosp.*, 451 U.S. at 17–18. In the absence of congressional action, no amount of re-packaging and re-naming the executive action will cure the unconstitutionality.

Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").

(3)    The Executive Orders impermissibly infringe on Article I's framework for passing legislation.

Lastly, Plaintiffs argue that "the Orders not only usurp Congressional powers, but unconstitutionally bypass the Legislative branch altogether." ECF 69-1, at 26. Defendants argue the Executive Orders "instruct agencies to implement the President's policy to the extent permitted by applicable law." ECF 90, at 15. Again, the Court finds that Plaintiffs have the stronger argument and have shown a likelihood of success on the merits.

As the Supreme Court put it, albeit in a different context, "the question here is not whether something should be done; it is who has the authority to do it." *Biden*, 143 S. Ct. at 2372; *see also Washington*, 2025 WL 2025 WL 659057, at *12 ("The Court's holding here is not about the policy goals that President Trump seeks to advance; rather, it is about reaffirming the structural integrity of the Constitution by ensuring that executive action respects congressional authority."). The Constitution and its history evidence the "unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process." *INS v. Chadha*, 462 U.S. 919, 959 (1983). "The power to enact statutes may only 'be exercised in accord with a single, finely wrought and exhaustively considered, procedure.'" *Clinton*, 524 U.S. at 439–40 (quoting *Chadha*, 462 U.S. at 951). As Justice Kennedy observed, if "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened." *Id.* at 451 (Kennedy, J., concurring). "The bicameral requirement, the Presentment Clauses, the President's veto, and Congress's power to override a veto were intended to erect enduring checks on each Branch and to protect the people from the improvident exercise of power by mandating certain prescribed steps." *Chadha*, 462 U.S.

at 957. "To preserve those checks, and maintain the separation of powers, the carefully defined limits on the power of each Branch must not be eroded." *Id.* at 957–58.

"In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343 U.S. at 587. Rather, as the Supreme Court has unequivocally stated: "[t]he Constitution limits [the President's] functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Id.* The Executive Orders cannot, therefore, be properly sustained as an exercise of the President's power. The Constitution is "neither silent nor equivocal about who shall make laws which the President is to execute." *Id.* To accomplish what has been attempted by the Executive Orders in this case requires "action in conformity with the express procedures of the Constitution's prescription for legislative action," not unilateral action on the part of the President. *Chadha*, 462 U.S. at 958.

The Court is unpersuaded by Defendants' argument that the challenged portions of the Executive Orders are merely a reflection of the President's "plain[] authority to direct agencies to fully implement [the President's] agenda, consistent with each agency's underlying statutory authorities." ECF 90, at 14. In essence, "the Administration argues that the Executive Order is all bluster and no bite, representing a perfectly legitimate use of the presidential 'bully pulpit,' without any real meaning—'gesture without motion,' as T.S. Eliot put it." *City & Cnty. of San Francisco*, 897 F.3d at 1238. However, the Executive Orders do far more than simply effectuate the President's unquestionably lawful authority to amplify his position on an issue of national importance. Much like the pronouncements at issue in *City and County of San Francisco v. Trump*, the plain language of the Executive Orders here reflects that "the Administration's current litigation position is grounded not in the text of the Executive Order[s] but in a desire to avoid

legal consequences." *Id.*  As discussed above, the Executive Orders direct agencies to act "immediately" and the funding restrictions are mandatory, thus demonstrating that Defendants' current position that the directives are mere toothless advisements to explore possible routes to effectuating policy appears to be a direct response to litigation, rather than a reasonable interpretation of the plain text of the challenged portions of the Executive Orders. *See HIAS, Inc.,* 985 F.3d at 325 (interpreting an executive order by analyzing its "stated goal," and the "clear and specific substantive provisions").

It is, moreover, well established that the President may not usurp Congress's power just because the administration of healthcare at issue is antithetical to the President's policies. Here, the President has "[n]ot only . . . claimed for [himself] Congress's exclusive spending power, [but] also attempted to coopt Congress's power to legislate." *City & Cnty. of San Francisco,* 897 F.3d at 1234. However, "[t]he Constitution [does] not subject this law-making power of Congress to presidential [] control." *Youngstown,* 343 U.S. at 588 (finding a separation of powers violation where "[t]he President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President"). If the President does not wish to disburse funds in the manner appropriated by Congress, "the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *In re Aiken Cnty.,* 725 F.3d at 261 n.1; *see also* U.S. Const. art. I, § 7, cl. 2. Article I does not allow the President to circumvent bicameralism and presentment by unilaterally amending or cancelling federal appropriations through an executive order. *See Clinton,* 524 U.S. at 448. This is especially true where, as here, Congress has "considered and thus far rejected legislation accomplishing the goals of the Executive Order." *City & Cnty. of San*

*Francisco*, 897 F.3d at 1234; *see supra* note 32 (noting failed congressional efforts to ban funding for gender-affirming care for minors).

Because the Executive Orders direct agencies to withhold funding on a condition that Congress has not authorized, the President has exceeded his authority. The Plaintiffs have thus sufficiently shown likelihood of success on the merits of their *ultra vires* claim that the Executive Orders violate the separation of powers.

ii.     *Ultra Vires - Contrary to Existing Statutes*

Plaintiffs argue that they are likely to succeed on the merits of their second claim for relief—that the Executive Orders are *ultra vires* in that they conflict with statutory law (namely, Section 1557 of the ACA, 42 U.S.C § 18116, and Section 1908 of the PHSA, 42 U.S.C. § 300w-7) which prohibits discrimination on the basis of sex. *See* ECF 69-1, at 27–28. Defendants argue that the Executive Orders "do not classify based on trans-identifying status in the first place," ECF 90, at 33, because the Healthcare Order "targets only specified treatments for minors based on their medical purpose," and the Gender Identity Order merely "recogni[zes] that the 'sexes are not changeable,'" *id.* at 23. Defendants' argument cannot withstand *Kadel*'s rationale, which, as Defendants recognize, is binding on this Court. Defendants do not advance any argument that would disturb the Court's analysis as laid out in the TRO memorandum opinion.

As noted, "when 'the President takes measures incompatible with the expressed or implied will of Congress . . . he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.'" *Zivotofsky*, 576 U.S. at 10 (quoting *Youngstown*, 343 U.S. at 635–38 (Jackson, J., concurring)). The Court has the authority to determine whether the Executive Orders are incompatible with the will of Congress. *See, e.g., Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (summarizing the function of the Judiciary to interpret

45

statutes dating back to the earliest decisions of the Supreme Court and citing *Marbury v. Madison*, 1 Cranch 137, 177 (1803); *United States v. Dickson*, 15 Pet. 141, 162 (1841); *Decatur v. Paulding*, 14 Pet. 497, 515 (1840)). Bound by precedent from both the Supreme Court and the United States Court of Appeals for the Fourth Circuit, the Court is constrained to conclude that the Executive Orders are indeed incompatible with the will of Congress.

Section 1557 of the ACA "provides that, '[e]xcept as otherwise provided . . . an individual shall not, on the ground prohibited under Title VI of the Civil Rights Act . . . [and] Title IX . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance.'" *Kadel*, 100 F.4th at 163–64 (alteration in original) (quoting 42 U.S.C. § 18116(a)). Section 1908 of the PHSA mandates that "[n]o person shall on the ground of sex . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity funded in whole or in part with funds made available under this part." 42 U.S.C. § 300w-7(a)(2).

In *Bostock*, the Supreme Court held that Title VII's prohibition on discrimination on the basis of sex in employment, 42 U.S.C. § 2000e–2(a)(1), encompassed discrimination on the basis of transgender status. 590 U.S. at 662. Justice Gorsuch, writing for the Court, explained: "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* at 660. "The plain language of Title VII, the Court observed [in *Bostock*], establishes a but-for causation standard." *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 590 (D. Md. 2021). In *Kadel*, the Fourth Circuit, sitting en banc, affirmed a district court's application of *Bostock* to Section 1557 of the ACA, explicitly rejecting the idea that *Bostock*'s analysis applied only to Title VII claims. 100 F.4th at 164 (citing *Bostock*, 590 U.S. at 658). Defendants did not at the TRO stage, and have not now, presented any argument

that the *Kadel* court's application of *Bostock*'s reasoning should not also extend to Section 1908

of the PHSA, which is nearly identical in wording to Section 1557 of the ACA. Indeed, Defendants

appear to concede that *Kadel* compels the outcome the Court reaches here. *See* ECF 90, at 28

("And in *Kadel*, the Fourth Circuit held that *Bostock*'s reasoning applies to Title IX's sex-

discrimination prohibition, as incorporated into Section 1557." (citing *Kadel*, 100 F.4th at 164));

*see also* ECF 55, at 28 n.9 ("The government acknowledges that the Fourth Circuit in *Kadel* held

that Section 1557 prohibits discrimination based on transgender status.").[35]

The sections challenged here facially differentiate on the basis of transgender identity.

Section 4 of the Healthcare Order directs agency heads to "immediately take appropriate steps to

ensure that institutions receiving Federal research or education grants end the chemical and

surgical mutilation of children." "Chemical and surgical mutilation of children" is defined as

> the use of puberty blockers, including GnRH agonists and other interventions, to
> delay the onset or progression of normally timed puberty *in an individual who does
> not identify as his or her sex*; the use of sex hormones, such as androgen blockers,
> estrogen, progesterone, or testosterone, *to align an individual's physical
> appearance with an identity that differs from his or her sex*; and surgical procedures
> that attempt to transform an individual's physical appearance *to align with an
> identity that differs from his or her sex* or that attempt to alter or remove an
> individual's sexual organs to minimize or destroy their natural biological functions.
> This phrase sometimes is referred to as "gender affirming care."

Healthcare Order § 2(c) (emphasis added). The same course of treatment, such as prescribing

puberty blockers or hormones, therefore, is available to a patient who is not "an individual who

does not identify as his or her sex" and not undergoing the course of treatment "to align an

---

[35] Defendants maintain the position that "*Kadel* was wrongly decided and should be overruled."
ECF 90, at 28. Given *Kadel*'s binding holding that compels this Court to find that discrimination
on the basis of transgender status violates Section 1557 of the ACA, Defendants are left only to
argue that the Executive Orders "do not classify based on trans-identifying status in the first place,"
"do not themselves impose any conditions on funding," and "must be imposed consistent with
'applicable law,'" including the ACA and PHSA. *Id.* (quoting Healthcare Order § 4). The Court
has already considered and rejected the latter two arguments and will not repeat its reasoning here.

individual's physical appearance with an identity that differs from his or her sex." *Id.* "This is

textbook sex discrimination" under *Kadel* because

> [f]or one, [the Court] can determine whether some patients will be eliminated from
> candidacy for these surgeries [or other courses of treatment] solely from knowing
> their sex assigned at birth. And two, conditioning access to these surgeries based
> on a patient's sex assigned at birth stems from gender stereotypes about how men
> or women should present.

100 F.4th at 153 (citing *Bostock*, 590 U.S. at 660–74). Indeed, the effect of the Healthcare Order—

the cessation of all gender-affirming medical care for those under the age of nineteen—tracks

precisely with the Executive Order's stated purpose, which is to "prohibit or limit these . . .

procedures." Healthcare Order § 1.

Section 3(g) of the Gender Identity Order is admittedly slightly vaguer than Section 4 of

the Healthcare Order in that it only proscribes the use of "[f]ederal [grant] funds [to] promote

gender ideology." The Gender Identity Order, appears, however, to deny the existence of

transgender persons altogether. *See* Gender Identity Order § 1 (describing the purpose of the order

as "defend[ing] women's rights and protect[ing] freedom of conscience by using clear and accurate

language and policies that recognize women are biologically female, and men are biologically

male"); *id.* § 2 ("It is the policy of the United States to recognize two sexes, male and female.

These sexes are not changeable and are grounded in fundamental and incontrovertible reality.").

The Court cannot fathom discrimination more direct than the plain pronouncement of a policy

resting on the premise that the group to which the policy is directed does not exist.[36] Thus, Section

---

[36] To the extent the Court needs to state the obvious, the Fourth Circuit has recognized that there
are "approximately 1.4 million people in the United States who identify as transgender," *Kadel*,
100 F.4th at 135, and it, and the Supreme Court, have repeatedly acknowledged transgender
people's existence. *See, e.g.*, *Grimm*, 972 F.3d at 610 (finding that "transgender people constitute
at least a quasi-suspect class"); *Williams v. Kincaid*, 45 F.4th 759, 773 (4th Cir. 2022) ("In part
because of the long history of discrimination against transgender people, we have held that

3(g) of the Gender Identity Order can only be read as doing exactly what Section 4 of the Healthcare Order does—cease funding institutions, including medical institutions, that provide gender-affirming medical care to patients under the age of nineteen. Thus, as with Section 4 of Healthcare Order, *Kadel* mandates a similar finding of discrimination as to Section 3(g) of the Gender Identity Order.

Plaintiffs accurately note that the Executive Orders foist upon hospitals receiving federal funds an impossible choice: (1) keep providing medical care to transgender patients under the age of nineteen in compliance with the antidiscrimination statutes and risk losing federal funding under the Executive Orders, or (2) stop providing care on the basis of transgender identity in violation of the statutes, but in compliance with the EOs.[37]  Because the challenged portions of the Executive Orders are facially discriminatory on the basis of transgender identity, and therefore sex under *Kadel* and *Bostock*, in violation of Section 1557 of the ACA and Section 1908 of the PHSA, the Court finds that Plaintiffs are likely to succeed on the merits of their *ultra vires* statutory claim.

### iii.    *Equal Protection*

To the extent Defendants argue that Plaintiffs cannot succeed on their equal protection claim because they "seek to pretermit the agencies' information-gathering process, forcing the government to justify policies that it has not even adopted," ECF 90, at 20–21, the Court has already addressed this ripeness challenge above.  Further, it bears repeating that Plaintiffs only

---

intermediate scrutiny applies to laws that discriminate against them."); *Bostock*, 590 U.S. at 683 ("An employer who fires an individual merely for being . . . transgender defies the law.").

[37] While Defendants attempted to counter this in the TRO briefing, *see* ECF 55, at 28 ("If grantees believe that providing, for example, a given hormone to a cisgender patient for one purpose but not to a transgender patient for a different purpose is discrimination under Sections 1557 or 1908, the grantees may choose not to provide that hormone to anyone."), they do not raise it in opposition to the motion for a preliminary injunction. *See* ECF 90, at 27–28.

seek a preliminary injunction enjoining Section 4 of the Healthcare Order and Section 3(g) of the Gender Identity Order to the extent it conditions funding on whether a medical institution provides gender-affirming medical care for those under nineteen. Nothing in this injunction implicates the "information-gathering process."

"The Fifth Amendment to the United States Constitution provides, in pertinent part, that '[n]o person shall ... be deprived of life, liberty, or property, without due process of law.'" *Strickland*, 32 F.4th at 356 (alterations in original) (quoting U.S. Const. amend. V). While the Equal Protection Clause of the Fourteenth Amendment applies only to the states, "'[i]n numerous decisions,' the Supreme 'Court has held that the Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws.'" *Id.* (quoting *Davis v. Passman*, 442 U.S. 228, 234 (1979)). The equal protection analyses and the "obligations imposed by the Fifth and the Fourteenth Amendments" are "indistinguishable." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995). "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.* For the challenged government action to withstand judicial review under intermediate scrutiny, "the government bears the burden of establishing a reasonable fit between the challenged statute and a substantial governmental objective." *Kadel*, 100 F.4th at 156 (quoting *United States v. Chapman*, 666 F.3d 220, 226 (4th Cir. 2012)). "The classification must be based on 'reasoned analysis rather than [on] the mechanical application of traditional, often inaccurate, assumptions.'" *Id.* (alteration in *Kadel*) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718,

50

726 (1982)). "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

In *Kadel*, the Fourth Circuit confronted equal protection challenges to North Carolina's and West Virginia's state-funded health plans and their lack of coverage for gender-affirming care. 100 F.4th at 133. North Carolina's plan "exclu[ded] . . . '[t]reatment or studies leading to or in connection with sex changes or modifications and related care," and West Virginia's "cover[ed] some gender-affirming care, but not gender-affirming surgery," and did "cover the same surgical procedures when conducted to treat non-gender dysphoria diagnoses." *Id.* at 133–34. Preliminarily, an en banc Fourth Circuit reiterated its holding in *Grimm*, 972 F.3d at 611, that "transgender people constitute a quasi-suspect class." *Kadel*, 100 F.4th at 143. The Court then held that "gender dysphoria [is] a proxy for transgender identity," that "proxy discrimination [can be] facial discrimination," and that, in that case, "discrimination on the basis of gender dysphoria [was] discrimination on the basis of gender identity." *Id.* Thus, "[b]ecause the [health plan] exclusions discriminate[d] on the basis of transgender identity and sex, they [were] subject to intermediate [or heightened] scrutiny." *Id.* at 155–56.

The *Kadel* court then found that the healthcare insurance exclusions did not satisfy intermediate scrutiny. *Id.* at 156 ("[T]he district court properly rejected the contention that the coverage exclusion is substantially related to [protecting public health from ineffective medicine]."); *id.* at 156–57 ("Without evidence to show that gender-dysphoria treatments are ineffective, the North Carolina Appellants cannot show that the coverage exclusion is narrowly tailored to serve the state's substantial interest in not covering medically ineffective treatment."); *id.* at 157 ("What's more, West Virginia Department of Health and Human Resources Secretary Bill Crouch said he did not know if Medicaid had conducted any research or analysis about the

cost of providing access to gender-affirming care[, so] Appellants' proffered rationales were created for the purposes of litigation" and "therefore cannot justify the policy under a heightened-scrutiny analysis." (citing *Virginia*, 518 U.S. at 533)).

As noted above, the Court finds that the Executive Orders facially classify on the basis of transgender status. Defendants assert that the Healthcare Order "targets only specified treatments for minors based on their medical purpose," which "does not constitute a classification based on 'transgender status.'" ECF 90, at 23. In making this argument, Defendants ignore that to determine the "medical purpose" of each treatment and to determine whether it is permitted or restricted under the Order necessarily requires the evaluation of a patient's sex assigned at birth and then a determination of whether the treatment is sought to align the patient's physical characteristics with that birth sex or with a different sex—one that aligns with the person's identity.[38] This is precisely what the en banc *Kadel* court described as "textbook sex discrimination." *See Kadel*, 100 F.4th at 153; *see also Bostock*, 590 U.S. at 660–74. Thus, the government bears the burden of establishing that the orders are substantially related to an important government interest.[39] *Kadel*, 100 F.4th at 156.

---

[38] In preliminarily enjoining enforcement of Section 4 of the Healthcare Order and Sections 3(e) and 3(g) of the Gender Identity Order based on Equal Protection grounds, Judge King pointed out that the scope of the Healthcare Order's definition of "chemical and surgical mutilation" extends to transgender individuals seeking hormone treatment for a purpose other than to transition. *See Washington*, 2025 WL 659057, at *15. "[A] *cisgender* teen who needs puberty blockers in the course of cancer treatment could receive them from federally funded institutions, but a *transgender* teen who needs puberty blockers *due to the same diagnosis*—and not to align with the teen's gender identity—could not." *Id.* (emphasis in original) (footnote omitted). This is because, under the Order, "chemical and surgical mutilation" encompasses prescribing puberty blockers to "an individual who does not identify as his or her sex." Healthcare Order § 2(c). While this section describes the use of hormones and surgery as impermissible if prescribed "to align an individual's physical appearance with an identity that differs from his or her sex" and "to align with an identity that differs from his or her sex," it does not qualify the use of puberty blockers in the same way.

In seeking to meet their burden, Defendants argue that the challenged portions of the Executive Orders survive heightened scrutiny because they relate to the important government interest of "safeguarding children from potentially dangerous, ineffective, and unproven treatments." ECF 90, at 5; *see also id.* at 25–27. Setting aside the fact that the Healthcare Order specifically targets gender-affirming medical care for those under *nineteen*, not simply children, the government "cannot immunize itself from violating [constitutional equal protection guarantees] by discriminating against only a subset of a protected group." *Kadel*, 100 F.4th at 146.

Defendants assert that the Orders are substantially related to this important government interest because "[e]vidence abounds that treatments covered by the Protecting Children EO 'are dangerous and ineffective.'" ECF 90, at 25 (quoting *Eknes-Tucker v. Governor of Ala.*, 114 F.4th 1241, 1266 (11th Cir. 2024) (Lagoa, J., concurring); *Williams v. Skrmetti*, 83 F.4th 460, 480 (6th Cir. 2023), *cert. granted*, 144 S. Ct. 2679)). Though Defendants might well have support for their argument, an en banc Fourth Circuit in *Kadel* rejected a similar claim by noting that "those criticisms do not support the notion that gender-dysphoria treatments are ineffective so much as still developing." 100 F.4th at 156; *see also id.* at 156–57 ("Without evidence to show that gender-dysphoria treatments are ineffective, the North Carolina Appellants cannot show that the coverage exclusion is narrowly tailored to serve the state's substantial interest in not covering medically ineffective treatment."). And while *Kadel* did not explicitly address gender-affirming care for

---

[39] While Defendants argue that the Court should evaluate the Executive Orders under rational basis review, rather than heightened scrutiny, ECF 90, at 21–24, the Court need not address this argument because it finds that the facts of this case fit squarely within *Kadel*'s purview. To the extent Defendants argue that "*Kadel* was wrongly decided," *id.* at 21, this Court does not have the authority to overturn an en banc circuit court decision.

minors, as Plaintiffs point out, two plaintiffs in *Kadel* were the parents of transgender adolescents,[40] so *Kadel*'s holding necessarily encompassed gender-affirming care for minors.

In support of the contention that the Executive Order pass constitutional muster, Defendants offer brief citations to the Sixth Circuit's decision in *Skrmetti*, the Tennessee law at issue there (Tenn. Code Ann. § 68-33-101), Judge Lagoa's concurrence in *Eknes-Tucker*, and a United Kingdom National Health Service website that outlines courses of treatment for gender dysphoria in the United Kingdom (*Treatment: Gender Dysphoria*, National Health Service (May 28, 2023), https://www.nhs.uk/conditions/gender-dysphoria/treatment/). *See* ECF 90, at 25–26. Defendants also offer two reports: (1) *The Cass Review: Independent Review of Gender Identity Services for Children and Young People* (Apr. 2024) (hereinafter "Cass Review"), https://perma.cc/3QVZ-9Y52, a report from the United Kingdom, and (2) Annette L. Cantu et al., *Changes in Anxiety & Depression from Intake to First Follow-Up Among Transgender Youth in a Pediatric Endocrinology Clinic*, 5:3 Transgender Health 196 (2020) (hereinafter "Cantu Study"), https://pmc.ncbi.nlm.nih.gov/articles/PMC7906229/. ECF 90, at 26–27. It bears noting, however, that because the Executive Orders themselves do not cite to any of these materials, Defendants merely attempt "to prop up the bare conclusions made in the [Healthcare] EO [and Gender Identity EO] with *post hoc* rationalizations and justifications that are nowhere to be found in the Order[s'] text." *Washington*, 2025 WL 659057, at *22.

Regardless, even if the Executive Orders had explicitly rested on these opinions and reports, the Court is doubtful they would be sufficient to survive the requisite means/ends test.

---

[40] *See* ECF 108, at 10 n.4 (citing *Kadel v. Folwell*, Civ. No. 1:19-cv-00272-LCB-LPA, ECF 75, at 4 ¶¶ 8, 10 (noting that one plaintiff "is the father of . . . an 18-year-old transgender young man" and noting that another "is the father of C.B., a 15-year-old transgender boy"); *see also id.* at 21–24 ¶¶ 76–89 (describing the 18-year-old's experience of obtaining gender-affirming medical care as a minor)).

First, "[t]he legal opinions (one a single-judge concurrence) are not evidence, apply rational basis review (not heightened scrutiny) to the laws at issue, and do not address the facts specific to this case (i.e., the particular means and ends of the Executive Orders)." *Id.* Second, the cited reports fail to establish a reasonable fit between the immediate cessation of gender-affirming care for those under nineteen and the purported goal of protecting children. For example, while Defendants cite the Cantu Study for the proposition that it found "'no change in acute distress' in 'transgender youth initiating gender-affirming care,'" ECF 90, at 27 (citing Cantu Study), a more thorough review of the Cantu Study reveals that its conclusions are not as sweeping as Defendants would have the Court believe. The study, as the title suggests, measured only changes in anxiety and depression of transgender youth from their initial intake appointment to their first follow-up appointment, an average period of only about four months. *See* Cantu Study, at 196. The study's other limitations include the fact that "[d]ata collected were limited to one clinic, with a relatively small sample size and only two time points examined." *Id.* at 199. Thus, "[d]ue to sample size," the study's authors acknowledge they "could not examine how age, affirmed gender, or initiation of hormone blockers were associated with changes in symptoms of distress." *Id.* The authors also admit that "patients may not experience the physical effects of [hormone therapy] until 3–6 months following initiation," so "depression and anxiety may not be impacted until visible effects begin to occur," after the first follow-up appointment, *id.,* and thus outside the limited parameters of the study.

Reliance on the Cass Review similarly fails to justify the disparate treatment of transgender youth as a means of protecting them, especially in the face of Plaintiffs' record evidence contesting the veracity of this report, including the declarations of four experts. *See* ECF 69-48 (declaration of Armand H. Matheny Antommaria M.D., Ph.D.); ECF 69-49 (declaration of Dan H. Karasic,

M.D.); ECF 69-50 (declaration of Daniel Shumer, M.D.); ECF 69-51 (declaration of Jack Turban,

M.D. M.H.S.); ECF 108-4 (reply declaration of Dr. Antommaria); ECF 108-5 (reply declaration

of Dr. Karasic); ECF 108-6 (reply declaration of Dr. Shumer); ECF 108-7 (reply declaration of

Dr. Turban).  As Judge King noted:

> [M]edical associations and subject matter experts have criticized [the Cass Review]
> for its author's lack of clinical experience or research qualifications; its "selective
> and inconsistent use of evidence," and "its unfounded medical opinion[s]" that
> "ignor[e] more than three decades of clinical experience in this area as well as
> existing evidence showing the benefits of hormonal interventions on the mental
> health and quality of life of gender diverse young people."

*Washington*, 2025 WL 659057, at *22 (quoting WPATH, *WPATH and USPATH Comment on the

Cass Review* 1–2 (May 17, 2024), https://wpath.org/wp-content/uploads/2024/11/17.05.24-

Response-Cass-Review-FINAL-with-ed-note.pdf) (additional citation omitted).    Further, Dr.

Turban points out that the Cass Review's conclusions do not even support a complete ban on

gender-affirming care for minors.  *See* ECF 69-51, at 21 ¶ 36 ("While the Cass Report has been

heavily critiqued for methodological failings, it also does not recommend banning gender-

affirming medical treatments for adolescents." (footnote omitted)); ECF 108-7, at 8 ¶ 11 ("[T]he

Cass Report itself recognized that a ban on gender-affirming medical interventions for adolescent

gender dysphoria would not be appropriate and highlighted that treatment should still be available

to pediatric patients in certain circumstances[.]").[41]

---

[41] To the extent Defendants argue the Executive Orders are aimed at protecting children from later
regretting gender-affirming medical treatment, *see* ECF 90, at 24 (citing Healthcare Order § 1),
Defendants have not demonstrated a reasonable fit because "the [Healthcare] EO takes into
account only the risks associated with regret, making no attempt to balance them against the very
real risks (supported by ample medical data) facing transgender youth who desire gender-affirming
care but do not receive it." *Washington*, 2025 WL 659057, at *21; *see also* ECF 69-48, at 27–28
¶¶ 65–67 (opining that the available literature suggests that regret rates for gender-affirming
medical care are low); ECF 69-49, at 26–28 ¶¶ 96–101 (same); ECF 69-50, at 21–22 ¶ 77 (same);
ECF 69-51, at 16–20 ¶¶ 28–35 (same).

Guided and bound by Fourth Circuit's analysis in *Kadel*, and with a barer record than the one before the Fourth Circuit there, the Court is compelled to find that the Executive Orders' effective ban on all gender-affirming care for those under nineteen by federally funded institutions is not substantially related to the important government interest of protecting children.[42] As such, Plaintiffs are likely to succeed on the merits of their Equal Protection claim.

2.    Irreparable Harm

To establish irreparable harm, a plaintiff "must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (citation omitted). Additionally, the harm "must be irreparable, meaning that it cannot be fully rectified by the final judgment after trial." *Id.* (quotations and citations omitted).

The Court notes at the outset that "the prospect of an unconstitutional enforcement 'supplies the necessary irreparable injury.'"[43] *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381–82 (1992)). Additionally, because Plaintiffs have shown a strong likelihood of success on their constitutional claims, the irreparable harm factor is satisfied. *See Mills*, 571 F.3d at 1312 ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time,

---

[42] Further, Section 4 of the Healthcare Order directs "immediate[]" action. In doing so, it makes no effort to ensure that a patient is weaned off any medical care they are currently undergoing in conjunction with their medical provider. Such an abrupt halt in medical care, even if, as Defendants contend, that care is dangerous or ineffective, cuts against Defendants' argument that the policy is substantially related to protecting children.

[43] Defendants merely recycle their ripeness arguments in arguing that Plaintiffs have not shown irreparable harm. *See* ECF 90, at 28 (asserting that the prospect of unconstitutional enforcement "is speculative at this point given that the [Executive Orders] have not been applied to any specific funding or grants"). The Court has already rejected these arguments above and found that the Executive Orders threaten immediate and irreparable injuries, as evidenced by the HRSA and CDC notices and cessation of gender-affirming care at medical institutions throughout the country.

unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))).

The Fourth Circuit has also previously held that the irreparable harm prong is satisfied where the plaintiff suffers from "diminished access to high-quality health care suited to the individual plaintiff's needs." *Baker*, 941 F.3d at 707. As Plaintiffs point out, "[t]ransgender adolescents and young adults across the country already have lost care because their providers have cancelled appointments, refused to fill prescriptions, or even shut down their gender affirming medical care programs altogether." ECF 69-1, at 35. Further, "[f]amilies have been forced to watch their children suffer, and medical providers have been compelled to abandon their patients." *Id.* The circumstances in this case yield no justification to depart from the Fourth Circuit's reasoning in *Baker*, as the sudden denial of medical care "visits a tangible harm" on the health and well-being of Plaintiffs.[44] *Baker*, 941 F.3d at 707.

The medical institutions have made clear that the decision to pause or cancel gender-affirming care was undertaken as a direct response to the Executive Orders and the threat to withhold federal funding. Thus, enjoining Defendants from withholding funding for institutions that provide prohibited gender-affirming medical care would remedy Plaintiffs' harms. Based on the record evidence at this early stage of litigation, the Court has no reason to conclude that the sudden and complete cancellation of gender-affirming care at the medical institutions was related to anything other than the fear of losing federal funding pursuant to the challenged portions of the

---

[44] Defendants argue that lack of access to high-quality health care does not constitute irreparable harm in this case because "the relevant treatments are not supported by high quality evidence and present serious risks to young people." ECF 90, at 29. The Court has already found, however, that the en banc Fourth Circuit in *Kadel* rejected a similar claim on the merits by noting that "those criticisms do not support the notion that gender-dysphoria treatments are ineffective so much as still developing." 100 F.4th at 156; *see also id.* at 156–57.

Executive Orders. *See, e.g.,* ECF 69-11, at 2 (explaining that "[t]he loss of this funding would critically impair [Denver Health's] ability to provide care for the Denver Community"). As such, enjoining agencies from attaching specific conditions to the hospitals' federal grants would, as far as this Court can tell at this stage, remedy the harm suffered by Plaintiffs.

Lastly, a final judgment after trial cannot rectify the harm caused by Section 4 of the Healthcare Order and Section 3(g) of the Gender Identity Order given that Plaintiffs have shown that the care has already ceased and that each day that passes exacerbates Plaintiffs' injuries, which, as described above, include depression, increased anxiety, heightened gender dysphoria, severe distress, risk of suicide, uncertainty about how to obtain medical care, impediments to maintaining a social life, and fear of discrimination, including hate crimes. *See Koe v. Noggle,* 688 F. Supp. 3d 1321, 1357 (N.D. Ga. 2023) (finding irreparable harm in the absence of a preliminary injunction where "middle-school-age plaintiffs will be unable to obtain [] a course of treatment that has been recommended by their health care providers in light of their individual diagnoses and mental health needs"). The Court concludes that the Plaintiffs have demonstrated they are likely to suffer irreparable harm absent injunctive relief.

### 3.    Prejudice and Public Interest

The Court must balance the significant irreparable harms identified above against the harms that the Government asserts will arise from temporarily enjoining enforcement of the challenged provisions of the Executive Orders. Here, the balance of equities and the public interest weigh in favor of issuing a preliminary injunction. *See Ass'n of Cmty. Cancer Ctrs. v. Azar,* 509 F. Supp. 3d 482, 501 (D. Md. 2020).

As an initial matter, the Court finds that the Government is not harmed by the issuance of a preliminary injunction which prevents it from enforcing restrictions likely to be found unconstitutional. *See Leaders of a Beautiful Struggle,* 2 F.4th at 346. And it is "well-established

that the public interest favors protecting constitutional rights." *Id.* (citations omitted). Further, the Executive Orders threaten to harm transgender youth, as well as access to medical care for entire communities if hospitals decide to continue to provide gender-affirming medical care and then lose significant federal funding.

Plaintiffs point to affidavits by doctors and researchers that detail the far-reaching effects of these Executive Orders. And importantly, the Executive Orders have been interpreted to mean that *all* of medical institutions' federal funding is in jeopardy if they do not comply, regardless of whether the funding is tied to gender-affirming care. *See* ECF 69-11, at 2; ECF 69-12, at 3. As Denver Health acknowledged in their statement regarding the Healthcare Order, federally funded programs represent "a significant portion of Denver Health's funding," and the "loss of this funding would critically impair our ability to provide care for the Denver community." ECF 69-11, at 2. The Government, on the other hand, has adduced no evidence that any harm will result if the grant funding is restored to the status quo. Instead, Defendants simply argue that the "public interest is not advanced when the Executive is disabled from even *considering* a policy, especially one that has been the subject of legislation across the country." ECF 90, at 29 (emphasis in original) (citation omitted). This Court's ruling here is not intended to prevent the Executive from considering any particular policy. However, as described above, the Executive Orders went well-beyond general policymaking; the Executive Orders condition funding in a manner not prescribed by Congress. Though the Executive is no doubt free to pursue at the federal level the very type of legislation that Defendants note has been enacted in many states, this process must proceed within the boundaries set by the Constitution. Seeking to effectively enact legislation by executive order clearly exceeds the bounds of Article II and thus does not serve the public interest.

60

In sum, the Executive Orders threaten to disrupt treatment of patients, stall critical research, and gut numerous programs in medical institutions that rely on federal funding. Accordingly, the Plaintiffs have shown that they are likely to succeed on the merits, that they would suffer irreparable harms absent an injunction, and that the balance of equities and the public interest tip in their favor. The Court will therefore grant a preliminary injunction.

### D.    Scope of Injunction

Having determined that Plaintiffs are entitled to a preliminary injunction, the Court must determine its proper scope. Plaintiffs contend that "PFLAG and GLMA have members 'throughout the country' who have been harmed by the Executive Orders." *See* ECF 69-1, at 36 (citations omitted). Additionally, Plaintiffs maintain that "by threatening hospitals across the country with the immediate loss of all federal grant funds, the Executive Orders have created an *in terrorem* effect that has coerced hospitals to immediately stop providing gender affirming medical care." ECF 108, at 15.

"Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Hills v. Gautreaux*, 425 U.S. 284, 293–94 (1976) (citations and internal quotation marks omitted). It is well established that "district courts have broad discretion when fashioning injunctive relief." *Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010). Nevertheless, the "power[] [is] not boundless." *Id.* "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Consistent with these principles, courts may issue nationwide injunctions. *See Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308–09 (4th Cir. 1992); *see also Azar*, 509 F. Supp. 3d at 503 ("[F]ederal courts over the years

have issued 'hundreds' of nationwide injunctions 'reaching beyond the parties in the lawsuit[,]' especially when such a scope is considered 'necessary to afford complete relief.'" (citing *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 46 (D.D.C. 2020))). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 583 (2017) (per curiam) (denying in part a request to stay a nationwide injunction in a challenge to an executive order suspending entry of foreign nationals from seven countries). Here, Plaintiffs have demonstrated that they are likely to succeed on their claims that the challenged portions of the Executive Orders purport to wield powers exclusive to Congress, directly conflict with existing statutes, and, pursuant to *Kadel*, violate the equal protection component of the Fifth Amendment's Due Process Clause, which supports nationwide relief.

This Court has reasonably cautioned that "a court order should not cause confusion about which companies or providers are subject to a rule and which are not; instead, a court order must be clear and definite." *Azar*, 509 F. Supp. 3d at 504. With this principle in mind, the Court finds that a piecemeal approach is not appropriate in this case. Significant confusion would result from preventing agencies from conditioning funding on certain medical institutions, while allowing conditional funding to persist as to other medical institutions. And while the preliminary injunction is nationwide in scope, it is "limited in that it simply preserves the status quo without requiring the agency to take any affirmative action." *Id.*

Moreover, PFLAG and GLMA are organizational plaintiffs suing on behalf of their members. When associations prevail in obtaining injunctive relief, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). Here, PFLAG has members who "currently

receive or will soon need to access the medical treatment for gender dysphoria that the Executive Orders seek to prohibit." ECF 53, at 6–7 ¶ 13. Additionally, GLMA includes many "health professional members who work at medical institutions receiving grant funding from Defendants HRSA and NIH as well as other subagencies of Defendant [HHS]." *Id.* at 7 ¶ 14. The members of PFLAG and GLMA are located throughout the country. *See id.* at 6–7 ¶¶ 13, 14. Thus, it follows that an injunction of nationwide scope is necessary to provide complete relief.

Further, the reason the challenged portions of the Executive Orders are unconstitutional— namely that, at minimum, they violate the separation of powers—are applicable to jurisdictions throughout the country.[45] The necessity of a nationwide injunction is underscored by the fact that hospitals all over the county could lose access to all federal funding if they continue to provide gender-affirming medical care.[46] And if medical institutions stop providing gender-affirming medical care, as many have already done, the irreparable harm to Plaintiffs, who live in many different states, would continue. *See Richmond Tenants Org.*, 956 F.2d at 1308–09 (upholding nationwide injunction where challenged conduct caused irreparable harm in myriad jurisdictions across the country). The constitutional and statutory violations apply equally to all medical institutions that receive federal grants. Accordingly, the equities of the case call for, and the Court

---

[45] *Kadel* is obviously not binding beyond this Circuit, thus the Court's holding with respect to Equal Protection may clash with the findings of other courts. If this were Plaintiffs' lone claim, the Court might be persuaded that a more limited injunction is appropriate. However, even Defendants appear to concede that the separation of powers issue, if decided in Plaintiffs' favor, would apply equally in all jurisdictions. *See* ECF 90, at 31 (arguing only that the statutory and equal protection arguments diverge from authority in other circuits).

[46] The harm of losing this funding extends well beyond the named Plaintiffs or even the transgender community writ large. Some hospitals, like Denver Health, have already stated that losing this funding would "critically impair" hospital functioning and deprive all persons in the Denver area of critical access to healthcare. ECF 69-11, at 2. The Government has not presented factual differences that would compel a different conclusion in any other jurisdictions.

will issue, an order enjoining Defendants from enforcing the contested provisions of the Executive Orders. Given the circumstances, a narrower injunction cannot provide complete relief.

Defendants contend that it would be inappropriate for the Court to issue a nationwide injunction based on concerns over "mere" lack of uniformity and the geographic variance of PFLAG and GLMA members. ECF 90, at 31. Contrary to Defendants' argument, the Court is not persuaded that a narrower injunction would, in fact, be "well-tailored" to the circumstances of this case. *Id.* (citing *Georgia v. President of the U.S.*, 46 F.4th 1283, 1307 (11th Cir. 2022)). It is not simply lack of uniformity or geographic scope that concern the Court but also the continued coercive effect of the unlawful portions of the Executive Orders under anything less than a nationwide injunction. If the Court were to limit the injunction to the named Plaintiffs alone, as Defendants suggest, that would seemingly give rise to a convoluted scenario where healthcare providers could simultaneously retain federal funding as to the named Plaintiffs and the organizations' members but still lose it as to similarly situated third parties if the medical institutions continue to provide gender-affirming care to those third parties. Defendants appear to entirely ignore the realities regarding how difficult it would be for medical institutions to navigate that situation. In any event, the Fourth Circuit has recently reaffirmed the principle that district courts have the "equitable power[] . . . to issue nationwide injunctions extending relief to those who are similarly situated to the litigants." *CASA, Inc. v. Trump*, Civ. No. 25-1153, at *3 (4th Cir. Feb. 28, 2025) (quoting *Roe v. Dep't of Def.*, 947 F.3d 207, 232 (4th Cir. 2020)).

In short, a more limited injunction would allow the coercive impact of the challenged portions of the Executive Orders to persist and would effectively deny the named Plaintiffs the relief they seek. *See id.* at *4 (upholding nationwide injunction where district court "carefully explained why an injunction limited to the parties—including organizations with hundreds of

64

thousands of members nationwide—would be unworkable in practice and thus fail to provide complete reliefs to the plaintiffs"). Accordingly, the Court determines that a nationwide injunction is required in order to "provide complete relief to the [P]laintiffs" and is, as such, "no more burdensome to the [D]efendant[s] than necessary." *Roe*, 947 F.3d at 231 (quoting *Madsen*, 512 U.S. at 765).

Finally, "where a law is unconstitutional on its face, and not simply in its application to certain plaintiffs, a nationwide injunction is appropriate." *Cnty. of Santa Clara*, 250 F. Supp. 3d at 539 (citing *Califano*, 442 U.S. at 702); *see also Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 508 (N.D. Tex. 2024), *appeal dismissed*, Civ. No. 24-10603, 2024 WL 5279784 (5th Cir. July 22, 2024). The Court declines to issue an injunction out of proportion with "the extent of the violation established," *Califano*, 442 U.S. at 702, and thus determines that nationwide injunctive relief is warranted under the circumstances.

## E.    Stay Pending Appeal

Defendants request that the Court stay injunctive relief pending the disposition of appeal. ECF 90, at 32. This request is procedurally improper under Federal Rule of Civil Procedure 7. *See* Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion.").

Even if the request were procedurally proper, the Court denies it. Although the Court has discretion to grant a stay pending appeal, "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken*, 556 U.S. at 433–34 (citations omitted). Four factors are relevant: (1) "whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits" of the appeal; (2) "whether the applicant will be irreparably injured absent a stay"; (3) "whether issuance of the stay will substantially injure the other parties interested in the proceeding"; and (4) "where the public interest lies." *Id.* at 434. For

all the reasons discussed above, Defendants satisfy none of these factors. Thus, the Court declines to issue a stay pending appeal.

**F.    Security**

The Court previously declined to require the posting of security under Rule 65(c). Defendants have now affirmatively requested a bond because "any preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed." ECF 90, at 32. Because the Court has found that Plaintiffs are likely to succeed on their claim that the withholding of the funds at issue in this case is unconstitutional, the Court again declines to require a bond. *See Md. Dep't of Human Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1483 n.23 (4th Cir. 1992) (stating that district court has "discretion to set a bond amount of zero where the enjoined or restrained party faces no likelihood of material harm"); *see also Washington*, 2025 WL 659057, at *28 n.29 ("Defendants' assertion that 'any preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed,' is unsupported and speculative." (internal citation omitted)).

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction, ECF 69, is **GRANTED**. A separate implementing Order will issue.

Dated: <u>March 4, 2025</u>

Brendan A. Hurson
United States District Judge

66