IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PFLAG, INC., et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>*Defendants*. | Civil Action No. BAH-25-337 |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
EMERGENCY MOTION TO ENFORCE PRELIMINARY INJUNCTION**

## INTRODUCTION

Plaintiffs bring this emergency motion to enforce the Court's preliminary injunction issued on March 4, 2025. The injunction prohibits Defendants "from conditioning, withholding, or terminating federal funding under Section 3(g) of Executive Order 14,168 and Section 4 of Executive Order 14,187, based on the fact that a healthcare entity or health professional provides gender-affirming medical care to a patient under the age of nineteen" and from "tak[ing] any steps to implement, give effect to, or reinstate [those provisions of the Executive Orders] under a different name." Dkt. 116 at 1-2 (emphasis added).

Defendants violated the preliminary injunction the day after the Court signed it. On March 5, 2025, the Centers for Medicare and Medicaid Services ("CMS"), a subagency of HHS covered by this Court's preliminary injunction, issued a so-called Quality and Safety Special Alert Memo ("QSSAM") with the subject "Protecting Children from Chemical and Surgical Mutilation"—the exact same title as the Denial of Care Order. Block Decl. Ex. A. The QSSAM purports to warn covered entities of the alleged dangers of gender affirming medical care for minors and threatens that "CMS may begin taking steps to appropriately update its policies to protect children from chemical and surgical mutilation." *Id*. The next day, two other subagencies of HHS covered by the preliminary injunction, the Health Resources and Services Administration ("HRSA") and the Substance Abuse and Mental Health Services Administration ("SAMHSA"), issued notices to all their federal funding recipients—using identical language—that each agency will also "review its policies, grants, and programs in light of the concerns discussed in the QSSAM and may begin taking steps in the future to appropriately update its policies to protect children from chemical and surgical mutilation." They further state they "may also consider re-scoping, delaying, or potentially cancelling new grants in the future depending on the nature of the work and any future

policy change(s)." Block Decl. Exs. B and C. The HRSA notice also specifically identifies HRSA's Children's Hospitals Graduate Medical Education ("CHGME") Payment Program as a source of grant funding that HRSA might withhold from children's hospitals providing gender affirming medical care. *See id.* Ex. B.[1]

Each of these notices violates the preliminary injunction. By threatening to withhold federal funding, the Executive Orders coerced hospitals into immediately shutting down gender affirming medical care for people under nineteen to avoid potential loss of funds. The only purpose of sending these new notices is to create the same *in terrorem* effect by scaring hospitals into once again stopping care (or declining to restart care) by repeating the same threats in the unlawful Executive Orders. Defendants presumably will respond that their notices do not violate the injunction because they say only that the agencies "may consider" termination of funding. That conditional phrasing changes nothing. The notices are designed to inflict on Plaintiffs precisely the same immediate harm as the Executive Orders in precisely the same way: through the (renewed) threat of revocation of funding.[2]

Plaintiffs respectfully request that the Court enforce its preliminary injunction and (1) direct Defendants and any subagencies, including CMS, HRSA, and SAMHSA, to immediately rescind the notices at issue and any other similar notices, post notice of the rescission on their websites, and provide all recipients of the rescission notice with a copy of the Court's enforcement order, the Court's preliminary injunction, and the Court's March 4, 2025 memorandum opinion; (2) direct Defendants to file with the Court signed confirmation from the leader of each Defendant

---

[1] Plaintiffs refer to the March 6 HRSA and SAMHSA notices and CMS's March 5 QSSAM collectively as "the notices."

[2] These notices, along with other conduct, are the subject of a Motion for Contempt, Shortened Time, and Attorneys' Fees filed in *State of Washington v. Trump*, Case No. 2:25-cv-00244-LK (W.D. Wash. Mar. 6, 2025) (Dkt. 243).

agency (including all subagencies of HHS) that they have personally received a copy of the enforcement order and have read it; and (3) grant any such further relief the Court deems necessary and proper to fully effectuate the preliminary injunction in this matter.

Plaintiffs further request that this Court expedite consideration of this motion by ordering Defendants to file a response by Monday, March 10, 2025, and by ordering the heads of the issuing agencies, or their designated representatives, to appear at a hearing on the motion next week. The Court should also direct Defendants' counsel to provide the Court in their response to this motion a complete list of (a) all agencies or subagencies that have issued similar notices and (b) all recipients of the notices, along with copies of those notices, so that the Court may direct any additional remedial action that is necessary.

## BACKGROUND

On January 20, 2025, President Trump issued Executive Order 14,168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Gender Identity Order"). Dkt. 115 at 3 (citing 90 Fed. Reg. 8615 (Jan. 20, 2025)). "To achieve the stated objective of eradicating gender ideology, Section 3(g) of the Gender Identity Order declares: '[f]ederal funds shall not be used to promote gender ideology,'" and "directs that '[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.'" *Id.* at 3-4 (quoting Gender Identity Order § 3(g)) (citations and footnotes omitted).

On January 28, 2025, President Trump issued Executive Order 14,187, titled "Protecting Children from Chemical and Surgical Mutilation" (the "Denial of Care Order"). *See id.* at 4 (citing 90 Fed. Reg. 8771 (Jan. 28, 2025)). The Denial of Care Order "directs all federal agencies to 'immediately take appropriate steps to ensure that institutions receiving Federal research or

3

education grants end'" gender affirming medical care for people under nineteen. *Id.* at 4 (quoting Denial of Care § 4) (footnotes omitted). HRSA and the CDC also sent termination notices informing grant recipients that their federal grants had been immediately terminated to the extent that the grants were inconsistent with the Executive Orders. *See id.* at 5-6.

The Executive Orders had an immediate *in terrorem* effect, prompting hospitals across the country to abruptly cease providing gender affirming medical care for people under nineteen to protect their federal funding. *See id.* at 7-9. President Trump issued a press release celebrating hospitals' decisions to deny care to transgender individuals under the age of nineteen as proof that his Executive Orders were already having their "intended effect." *See* Dkt. 115 at 9.

After Plaintiffs sued, this Court issued a temporary restraining order on February 13, 2025, followed by a preliminary injunction on March 4, 2025. In a memorandum opinion accompanying the preliminary injunction, this Court held that Plaintiffs were likely to succeed on their claims that enforcement of the Executive Orders (a) were *ultra vires* because they imposed conditions on federal grants that were not authorized by Congress, *see id.* at 29-42; (b) were *ultra vires* because they required grant recipients to discriminate based on sex in violation of *see id.* at 45-49, and (c) violated the equal protection rights of the Transgender Plaintiffs, *see id.* at 49-57.

To prevent enforcement of the Orders from continuing to inflict irreparable harm, this Court issued a nationwide preliminary injunction prohibiting Defendants "***from conditioning, withholding, or terminating federal funding*** under Section 3(g) of Executive Order 14,168 or Section 4 of Executive Order 14,187, ***based on the fact that a healthcare entity or health professional provides gender-affirming medical care to a patient under the age of nineteen***." Dkt. 116 at 1-2 (emphasis added). The preliminary injunction further ordered that written notice be provided to all Defendants instructing that "Defendants may not take any ***steps to implement,***

4

*give effect to, or reinstate under a different name* the directives in Section 3(g) of Executive Order 14,168 or Section 4 of Executive Order 14,187 that condition or withhold federal funding based on the fact that a healthcare entity or health professional provides gender-affirming medical care to a patient under the age of nineteen." Dkt. 116 at 2 (emphasis added).

The next day, CMS issued a QSSAM[3] with the same title as the enjoined Denial of Care Order—"Protecting Children from Chemical and Surgical Mutilation"—purporting to "alert[ ]" hospitals and covered entities of the alleged dangers of providing gender affirming medical care to minors. Block Decl. Ex. A. Echoing the same terminology as the Executive Orders, the QSSAM states that "CMS is alerting providers to the dangerous chemical and surgical mutilation of children." *Id.* The QSSAM recites the same debunked criticisms of the scientific support for gender affirming medical care that Defendants had raised in opposition to the motion for a preliminary injunction in this case and that the Court already held were unlikely to satisfy heightened scrutiny. *See* Dkt. 115 at 53-56. Referring to these criticisms, the QSSAM reminds hospitals that providers must "follow the highest standards of care." Block Decl., Ex. A. The QSSAM concludes by stating, "CMS may begin taking steps to appropriately update its policies to protect children from chemical and surgical mutilation." *Id.*

The following day—March 6, 2025—two additional HHS subagencies, HRSA and SAMHSA, issued notices to hospitals and grant recipients threatening to withhold federal grants "in light of the concerns discussed in the QSSAM" (*i.e.*, those raised on the Executive Orders) and stating that each subagency "may begin taking steps in the future to appropriately update its policies to protect children from chemical and surgical mutilation." Block Decl. Exs. B and C.

---

[3] QSSAMs are a type of memo designed to "serve as reminders of existing obligations or requirements." *Quality, Safety & Oversight - General Information*, CMS, https://www.cms.gov/medicare/health-safety-standards/quality-safety-oversight-general-information/quality-and-safety-special-alerts.

5

The HRSA notice states that "HRSA's review will include its Children's Hospitals Graduate Medical Education (CHGME) Payment Program. In particular, HRSA will examine the $367.2 million that was awarded in fiscal year 2024 to 59 free-standing children's hospitals nationwide in light of the concerns discussed in the QSSAM." Block Decl. Ex. B. The notice further states that "HRSA may also consider re-scoping, delaying, or potentially cancelling new grants in the future depending on the nature of the work and any future policy change(s) HRSA may make." *Id.* With almost identical wording, the SAMHSA notice states that "SAMHSA may also consider re-scoping, delaying, or potentially cancelling new grants in the future depending on the nature of the work and any future policy change(s) SAMHSA may make." Block Decl. Ex. C.

## DISCUSSION

The notices CMS, HRSA, and SAMHSA sent defy both the letter and spirit of this Court's preliminary injunction. They make clear that Defendants intend to violate this Court's preliminary injunction by "implement[ing], giv[ing] effect to, or reinstat[ing] under a different name the directives in Section 3(g) of Executive Order 14,168 or Section 4 of Executive Order 14,187 that condition or withhold federal funding based on the fact that a healthcare entity or health professional provides gender-affirming medical care to a patient under the age of nineteen." Dkt. 116 at 2. The notices reveal a plan across HHS and its subagencies, and perhaps other agencies as well, to condition and use federal funding to accomplish the Executive Orders' stated goal of ensuring that institutions receiving federal funding, including research and education grants, end what the Denial of Care Order and recent notices refer to as "the chemical and surgical mutilation of children," and what the Gender Identity Order deems to be "gender ideology." Denial of Care Order § 4; Gender Identity Order §§ 2(f), 3(g). And the notices perpetuate the same unlawful coercive conduct the Court has already enjoined.

6

If Defendants follow through on their stated intention of "re-scoping, delaying, or potentially cancelling new grants" because an entity provides gender affirming medical care to people under nineteen, those actions not only will violate the preliminary injunction, but will also be unlawful for all the same reasons as the Executive Orders. Neither the CHGME Payment Program nor any other federal funding that HHS and its subagencies administer provide the Executive with the authority to condition that funding on whether an entity provides gender affirming medical care. Imposing such restrictions would violate the separation of powers, force recipients to engage in sex discrimination in violation of Section 1557 of the Affordable Care Act and Section 1908 of the Public Health Service Act, and violate the equal protection rights of the Transgender Plaintiffs.

Moreover, by sending out the notices to federal funding recipients, Defendants have gone well beyond "general policymaking." *See* Dkt. 115 at 60. They have instead taken concrete action to influence hospitals' *current* behavior. The only conceivable purpose of "alerting" hospitals to future unlawful withholdings of federal funding is to recreate precisely the same *in terrorem* effect as the enjoined Executive Orders: scaring hospitals into shutting down or declining to resume gender affirming medical care for people under nineteen. As the preliminary injunction record establishes, even after this Court issued its TRO, several hospitals were reluctant to restart care until they could be reassured that there would be an injunction in effect for a long enough period of time so that they could safely do so without being forced to precipitously stop care again. *See*, *e.g.*, Dkt. 69-47, ¶ 11. Thus, as this Court recognized when it issued its preliminary injunction, a nationwide injunction was necessary because of "the continued coercive effect of the unlawful portions of the Executive Orders under anything less than a nationwide injunction." Dkt. 115 at 64. "[A] more limited injunction would allow the coercive impact of the challenged portions of

7

the Executive Orders to persist and would effectively deny the named Plaintiffs the relief they seek." *Id.*

Moreover, the agencies' statements that they "will follow any applicable substantive and procedural requirements in taking any future action" provide little assurance to federal funding recipients for at least two reasons. First, any action to restrict funding based on a recipient's provision of gender affirming medical care inherently violates applicable substantive requirements. *Id.* at 47-49. Second, HHS took action earlier this week to alter procedural requirements that have been in place for over 50 years. Although the Administrative Procedure Act exempts "matter(s) relating to . . . grants" from the requirements of notice-and-comment rulemaking, 5 U.S.C. 553(a)(2), since 1971, HHS has waived that exemption to foster public participation. *See Public Participation in Rule Making*, 36 Fed. Reg. 2532 (Feb. 5, 1971) (the "Richardson Waiver"). The waiver explained that "[t]he public benefit from such participation should outweigh any administrative inconvenience or delay which may result from use of the APA procedures in the . . . exempt categories." *Id.* But last Monday—just a couple of days before rolling out the notices to hospitals about possible changes to their federal funding, including grants—HHS withdrew that waiver. *See Policy on Adhering to the Text of the Administrative Procedure Act*, 90 Fed. Reg. 11029 (Mar. 3, 2025). According to the rescission by Defendant Kennedy, "the extra-statutory obligations of the Richardson Waiver impose costs on the Department and the public, are contrary to the efficient operation of the Department, and impede the Department's flexibility to adapt quickly to legal and policy mandates." *Id.*

Therefore, although HHS's subagencies now say they will follow all "procedural requirements in taking any future action," the most important procedural protections no longer exist. Defendants could follow through on their plan to withhold federal funding, in violation of

8

the preliminary injunction, at any time without the traditional safeguards of notice and comment rulemaking that have protected HHS federal funding recipients since the Nixon administration.[4]

The Court may in its discretion grant further injunctive relief where necessary and appropriate to ensure a party's compliance with a court order, in addition to other sanctions. *Schwartz v. Rent-A-Wreck of Am.*, 261 F. Supp. 3d 607, 617 (D. Md. 2017). To counteract the harm caused by these unlawful notices and to prevent future violations from occurring, Plaintiffs respectfully request that the Court enforce its preliminary injunction and:

(1) direct Defendants and any subagencies, including CMS, HRSA, and SAMHSA to (a) immediately rescind the March 5 and 6, 2025 notices and any other similar notice, (b) post notice of these rescissions on their websites, and (c) provide all recipients of the rescission notices with a copy of the Court's enforcement order, the Court's preliminary injunction, and the Court's March 4, 2025 memorandum opinion;

(2) direct Defendants to file with the Court signed confirmation from the leader of each Defendant agency (including all subagencies of HHS) that they have personally received a copy of the enforcement order and have read it; and

---

[4] Indeed, HHS has already shown how quickly it is willing to terminate funding. On Monday, March 3, 2025, HHS and other agencies "announced a comprehensive review of Columbia University's federal contracts and grants in light of ongoing investigations for potential violations of Title VI of the Civil Rights Act." *See* Press Release, *HHS, ED, and GSA Announce Additional Measures to End Anti-Semitic Harassment on College Campuses*, GSA (Mar. 3, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/hhs-ed-and-gsa-announce-additional-measures-to-end-antisemitic-harassment-03032025. Today, just a few days later, HHS and the other agencies announced they were immediately terminating $400 million in federal funding. *See* Press Release, *DOJ, HHS, ED, and GSA Announce Initial Cancellation of Grants and Contracts to Columbia University Worth $400 Million*, GSA (Mar. 7, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/doj-hhs-ed-and-gsa-announce-initial-cancellation-of-grants-and-contracts-03072025.

9

(3) grant any such further relief this Court deems necessary and proper to fully effectuate the preliminary injunction in this matter.

Plaintiffs further request that this Court expedite consideration of the motion by ordering Defendants to file a response by Monday, March 10, 2025 and ordering the heads of the issuing agencies, or their designated representatives, to appear at a hearing on the motion next week. The Court should also direct Defendants' counsel to provide the Court in their response to this motion a complete list of (a) all agencies or subagencies that have issued similar notices and (b) all recipients of the notices, along with copies of those notices, so that the Court may direct any additional remedial action that is necessary.

## CONCLUSION

For all these reasons, Plaintiffs' motion to enforce the preliminary injunction should be granted.

Dated: March 7, 2025

Respectfully submitted,

*/s/ Omar Gonzalez-Pagan*

Joshua Block*
Harper Seldin*
Chase Strangio*
Alexandra R. Johnson*
**American Civil Liberties Union
  Foundation**
125 Broad Street, Floor 18
New York, NY 10004
Telephone: (212) 549-2500
Facsimile: (212) 549-2650
jblock@aclu.org
hseldin@aclu.org
cstrangio@aclu.org
a.johnson@aclu.org

Deborah A. Jeon (Fed. Bar No. 06905)
Zoe M. Ginsberg (Fed. Bar No. 30727)

Omar Gonzalez-Pagan*
Jennifer C. Pizer*
**Lambda Legal Defense
  and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
Facsimile: (855) 535-2236
ogonzalez-pagan@lambdalegal.org
jpizer@lambdalegal.org


Karen L. Loewy*
**Lambda Legal Defense
  and Education Fund, Inc.**
815 16th Street NW, Suite 4140
Washington, DC 20006
Telephone: (202) 804-6245

**American Civil Liberties Union
  Foundation of Maryland**
3600 Clipper Mill Road, Suite 200
Baltimore, MD 21211
Telephone: (410) 889-8555
Facsimile:  (410) 366-7838
jeon@aclu-md.org
zginsberg@aclu-md.org

Catherine E. Stetson**
Danielle Desaulniers Stempel (Fed. Bar No. 20501, Renewed 1/31/25)
Sam H. Zwingli*
**Hogan Lovells US LLP**
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5491
Facsimile:  (202) 637-5910
cate.stetson@hoganlovells.com
danielle.stempel@hoganlovells.com
sam.zwingli@hoganlovells.com

Facsimile:  (855) 535-2236
kloewy@lambdalegal.org

Nora Huppert*
**Lambda Legal Defense
  and Education Fund, Inc.**
3656 N. Halsted Street
Chicago, IL 60613
Telephone: (312) 605-3233
Facsimile:  (855) 535-2236
nhuppert@lambdalegal.org

Jackson Skeen***
**Hogan Lovells US LLP**
125 High Street
Suite 2010
Boston, MA 02110
Telephone: (617) 702-7747
Facsimile:  (617) 371-1037
jackson.skeen@hoganlovells.com

*Attorneys for Plaintiffs*

*\*Application for admission pro hac vice granted.*

*\*\*Application for admission forthcoming.*

*\*\*\*Application for admission pro hac vice granted and admitted only in D.C. Supervised by principals of the firm admitted in Massachusetts.*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed using the Court's CM/ECF system.  Service was effected by and through the Court's CM/ECF system.


Dated: March 7, 2025                                       */s/ Omar Gonzalez-Pagan*
                                                                              Omar Gonzalez-Pagan