**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

---

|  |  |  |
|---|---|---|
| PFLAG, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 8:25-cv-337 |
| | ) | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | ) ) | |
| | ) | |
| Defendants. | ) | |

---

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**EMERGENCY MOTION TO ENFORCE THE PRELIMINARY INJUNCTION**

## INTRODUCTION

The agency documents challenged in Plaintiffs' motion to enforce do not violate this Court's preliminary injunction. The documents merely inform interested parties of HHS's concerns about the proliferation in use of puberty blockers, cross-sex hormones, and surgery to treat children with gender dysphoria and certain research and data on the potentially harmful effects of such interventions. And they explain that, moving forward, the agencies may take action, consistent with applicable law, to protect children from these interventions. The documents do not "condition[], withhold[], or terminat[e]" any federal funding. Prelim. Inj. Order (PI) at 1, ECF No. 116. They are not a harbinger of future agency action that will condition, withhold, or terminate funding "based on the fact that a healthcare entity or health professional provides gender-affirming medical care to a patient under nineteen." *Id*. at 2. And they were not issued under the enjoined provisions of the executive orders.

Plaintiffs, in effect, seek an expansion of the preliminary injunction to prohibit agencies from even considering any policies or actions pursuant to their existing authorities that might be related to the issues addressed in the executive orders. There is no basis for such relief. The Court made clear that the preliminary injunction does not prohibit the sort of "information-gathering" activities contemplated by the agency documents and does not "prevent the Executive from considering any particular policy." Prelim. Inj. Mem. Op. (PI Op.) at 50, 60, ECF No. 115. Moreover, the agency documents themselves provide assurances that the agencies will follow any applicable substantive and procedural requirements, including this Court's preliminary injunction, in taking any future action. Plaintiffs' motion should be denied.

## BACKGROUND

The Court is familiar with the background of this case, so Defendants will focus here on the facts relevant to the instant motion.

Plaintiffs challenge Section 3(g) of Executive Order 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025), entitled *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Defending Women EO), and Section 4 of Executive Order 14,187, 90 Fed. Reg. 8771, entitled *Protecting Children from Chemical and Surgical Mutilation* (Protecting Children EO).  Section 3(g) of the Defending Women EO states in relevant part that "each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." EO 14,168 § 3(g). Section 4 of the Protecting Children EO directs the heads of agencies that provide research or educational grants to medical institutions to, "consistent with applicable law and in coordination with the Director of the Office of Management and Budget, immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children." EO 14,187 § 4.

This Court entered a preliminary injunction on March 4, 2025. The order enjoined Defendants (except President Trump), their "officers, agents, successors, servants, employees, and attorneys, and any other persons who are in active concert or participation with them," from "conditioning, withholding, or terminating federal funding under Section 3(g) of Executive Order 14,168 and Section 4 of Executive Order 14,187, based on the fact that a healthcare entity or health professional provides gender-affirming medical care to a patient under the age of nineteen." PI at 1–2. The order further instructed Defendants to "provide written notice of the Court's preliminary injunction to all Defendants and their employees, contractors, and grantees by March 10, 2025." *Id*. at 2. The order stated, "[t]he written notice shall instruct the aforementioned groups that Defendants may not take any steps to implement, give effect to, or reinstate under a different name the directives in Section 3(g) of Executive Order 14,168 and Section 4 of Executive Order 14,187, based on the fact that a healthcare entity or health professional provides gender-affirming medical

care to a patient under the age of nineteen." *Id*.

In its opinion, the Court gave more context to the scope of its order. It stated, "nothing in this injunction implicates the 'information-gathering process'" for Defendants. PI Op. at 50. Further, the Court explained that its "ruling here is not intended to prevent the Executive from considering any particular policy." *Id*. at 60.

On March 7, 2025, Plaintiffs filed an Emergency Motion to Enforce Preliminary Injunction, ECF No. 118. Plaintiffs claim three documents issued by different components of Defendant U.S. Department of Health and Human Services (HHS) (collectively, "the agency documents") violate this Court's preliminary injunction. The agency documents are attached as exhibits to Plaintiffs' motion and described below.

On March 5, 2025, the Center for Clinical Standards and Quality within HHS's Centers for Medicare & Medicaid Services (CMS) posted on its website a Quality and Safety Special Alert Memo (QSSAM) to hospitals and other covered entities, describing certain research and data on the potentially harmful effects of treating gender dysphoria in children with puberty blockers, cross-sex hormones, and surgery.[1] *See* Decl. of Joshua Block, ECF No. 118-2, Exh. A (CMS Memo). The CMS Memo explained that these "medical interventions for gender dysphoria in children have proliferated" in recent years, with "more than 17,000" children with gender dysphoria starting treatment with puberty blockers or cross-sex hormones between 2017 and 2021, and, in a similar timeframe, "over 3,200 children who had breast or chest surgery and over 400

---

[1] QSSAMs are issued as part of CMS's quality, safety, and oversight functions. CMS, Quality, Safety, & Oversight – General Information, https://www.cms.gov/medicare/health-safety-standards/quality-safety-oversight-general-information (last accessed Mar. 9, 2025); *see also* CMS, Quality and Safety Special Alerts, https://www.cms.gov/medicare/health-safety-standards/quality-safety-oversight-general-information/quality-and-safety-special-alerts (last accessed Mar. 9, 2025) (explaining that QSSAMs "are geared towards specific provider types and will often serve as reminders of existing obligations or requirements").

children who had genital surgery resulting in permanent alternations to reproductive organs and impaired sexual function." CMS Memo at 1–2. The Memo cited materials showing that the body of evidence supporting these interventions is "underdeveloped" and that the interventions have potentially harmful long-term effects. *Id*. Given this evidence, the Memo noted that other developed nations "have recently issued restrictions on the medical interventions for children, including the use of puberty blockers and hormone treatments, and now recommend exploratory psychotherapy as a first line of treatment and reserve hormonal interventions only for exceptional cases." *Id*. at 2–3.

The Memo reminded providers to "adhere[] to the highest standard of care that is informed by robust evidence and the utmost scientific integrity" when serving patients, especially children. *Id*. at 1. It did not condition, withhold, or terminate any federal funding based on the provision of these medical interventions. Instead, it merely notified hospital providers and the public that "CMS may begin taking steps to appropriately update its policies to protect children from" these interventions. *Id*. at 3. The Memo also made clear that CMS would "follow any applicable substantive and procedural requirements in taking any future action." *Id*.

The next day, two other agencies within HHS—the Health Resources and Services Administration (HRSA) and the Substance Abuse and Mental Health Services Administration (SAMHSA)—sent letters explaining that, "in light of the concerns discussed in the [CMS Memo]," including the proliferation of these medical interventions for children and certain research and data showing their potentially harmful effects, they too would "review [their] policies, grants, and programs" and  "may begin taking steps in the future to appropriately update [their] policies to protect children from" these medical interventions. *See* Decl. of Joshua Block, ECF No. 118-2, Exh. B (HRSA Letter); *id*., Exh. C (SAMHSA Letter) at 1. The letters noted that the agencies "may

also consider re-scoping, delaying, or potentially cancelling new grants in the future depending on the nature of the work and any future policy change(s) [the agencies] may make." HRSA Letter; SAMHSA Letter at 1. And, like the CMS Memo, the letters provided assurances that the agencies would "following any applicable substantive and procedural requirements in taking any future action."[2] HRSA Letter; SAMHSA Letter at 1.

## ARGUMENT

To prevail on their motion to enforce the preliminary injunction, Plaintiffs must demonstrate, by clear and convincing evidence, that the agencies violated "an unequivocal command" "set forth in specific detail" in the Court's order. *In re Gen. Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995). They have failed to do so. The agency documents do not violate this Court's preliminary injunction because they do not "condition[], withhold[], or terminat[e] federal funding under Section 3(g) of Executive Order 14,168 and Section 4 of Executive Order 14,187, based on the fact that a healthcare entity or health professional provides gender-affirming medical care to a patient under the age of nineteen." PI at 1–2. That is so for three reasons.

First, the agency documents do not condition, withhold, or terminate any federal funding. They merely inform interested parties of HHS's concerns about the proliferation of specified medical interventions to treat gender dysphoria in children and certain research and data on the potentially harmful effects of such interventions, and explain that, "moving forward," various agencies within HHS plan to "review [their] policies, grants, and programs" in light of these concerns. HRSA Letter; SAMHSA Letter at 1; *see* CMS Alert at 3. The documents do not specify any concrete or definitive actions the agencies intend to take. They instead advise that the agencies

---

[2] HHS's Office of Population Affairs sent a similar letter to grantees in the Title X family planning program. *See* Exhibit A, attached hereto. No other similar letters were sent by the Defendants or any of their components.

"may begin taking steps in the future to appropriately update [their] policies to protect children from" these medical interventions. CMS Alert at 3; HRSA Letter; SAMHSA Letter at 1. Although two of the documents mention grants, they state only that HRSA and SAMHSA "may consider re-scoping, delaying, or potentially cancelling new grants in the future depending on the nature of the work and any future policy change(s) [the agencies] may make." HRSA Letter; SAMHSA Letter at 1. The agencies do not commit to any action (much less any concrete action involving grants) or explain any potential future policy change(s) that may impact any new grants. And the documents make clear that, before taking any future action, the agencies will "follow[] any applicable substantive and procedural requirements," which would include any court injunctions. CMS Alert at 3; HRSA Letter; SAMHSA Letter at 1. Because the documents do not condition, withhold, or terminate any federal funding, they do not run afoul of the terms of the preliminary injunction, which prohibits only "conditioning, withholding, or terminating federal funding" in the specified circumstances. PI at 1–2.

Second, although Plaintiffs assume any funding actions the agencies may take in the future would be "based on the fact that a healthcare entity or health professional provides gender-affirming medical care to a patient under the age of nineteen," PI at 1–2, nothing in the agency documents supports that speculation. The documents speak in general terms about "policies, grants, and programs," and each agency has myriad policies, grants, and programs. HRSA Letter; SAMHSA Letter at 1; *see* CMS Alert at 3. Moreover, although the documents express concerns about specified medical interventions for treating gender dysphoria in children, there is no indication that the "update[s]" to "polic[y]" the agencies may consider would necessarily be funding-related or operate in a way that conditions, withholds, or terminates federal funding based on the fact that a healthcare entity provides this particular medical care. HRSA Letter; SAMHSA

Letter at 1; *see* CMS Alert at 3; *see* PI Op. at 49–50 (explaining that Plaintiffs "only" sought to enjoin the challenged EO provisions "to the extent [they] condition[] funding on whether a medical institution provides gender-affirming medical care for those under nineteen" and the Court's order was so limited).

Third, the agency documents do not violate the preliminary injunction because they were not issued "under Section 3(g) of Executive Order 14,168 [or] Section 4 of Executive Order 14,187." PI at 1–2. The documents do not mention those EO provisions and are rather, at most, issued consistent with other, unchallenged portions of the Protecting Children EO. Plaintiffs did not challenge—and the Court left intact—provisions of the Protecting Children EO that direct the Secretary to, "consistent with applicable law, take all appropriate actions to end the chemical and surgical mutilation of children, including regulatory and sub-regulatory actions, which may involve . . . quality, safety, and oversight memoranda" like the CMS Memo, EO 14,187, § 5(a)(v), and to, "as appropriate and consistent with applicable law" "use all available methods to increase the quality of data to guide practices for improving the health of minors with gender dysphoria, rapid-onset gender dysphoria, or other identity-based confusion, or who otherwise seek chemical or surgical mutilation," *id*. § 3(b).

For similar reasons, the agencies' statements that they will review their policies and may begin taking steps in the future, consistent with any applicable substantive and procedural requirements, to update those policies in light of the concerns expressed in the CMS Memo are not a "repeat[ of] the same threats in the unlawful Executive Orders." Pls.' Mem. at 2. Even Plaintiffs acknowledged at the TRO hearing that they were not seeking to prevent agencies from relying on their own existing authorities to take actions relating to these medical interventions. *See* Mots. Hearing Tr. 16:10–14, Feb. 13, 2025 ("If an agency wants to initiate rulemaking or go through the

regular procedures for saying that statute X authorizes us to withhold funds based on Y conditions, or even that statute X delegates to us discretion to consider this issue, then that would be another matter."); *id.* at 20:2–5 (distinguishing Plaintiffs' challenge to the EOs from a circumstance where "the agencies were going to implement the order with the normal administrative processes" and people "affected by the agency action . . . would have an opportunity to bring a lawsuit to challenge it"). Furthermore, in entering the preliminary injunction, the Court made clear that its order does not prohibit the sort of "information-gathering" activities contemplated by the agency documents. PI Op. at 50. And the Court explained that its decision "is not intended to prevent the Executive from considering any particular policy." *Id.* at 60. Yet that is exactly what Plaintiffs' motion to enforce seeks to do. By Plaintiffs' expansive logic, the preliminary injunction would prohibit the agencies from even considering any policies or actions pursuant to their existing authorities that might be related to the issues addressed in the EOs. That goes well beyond the terms of the preliminary injunction and would be improper in any event.

Plaintiffs' reliance on another provision of the preliminary injunction fares no better. *See* Pls.' Mem. at 6. Plaintiffs point to the portion of the Court's order that requires Defendants to provide a "written notice" to their employees, contractors, and grantees that "instruct[s] [them] that Defendants may not take any steps to implement, give effect to, or reinstate under a different name the directives in Section 3(g) of Executive Order 14,168 or Section 4 of Executive Order 14,187 that condition or withhold federal funding based on the fact that a healthcare entity or health professional provides gender-affirming medical care to a patient under the age of nineteen." Like the provision discussed above, this provision similarly enjoins (1) the conditioning or withholding of federal funds, (2) based on the fact that a healthcare entity provides the specified medical interventions, and (3) that such funding action be akin to the enjoined directives in the EOs. For

the reasons explained above, the agency documents do not satisfy any of these criteria.

Given the disconnect between the terms of the preliminary injunction and the agency documents at issue here, Plaintiffs forthrightly acknowledge at times in their brief that the agency documents do not violate the preliminary injunction. *See* Pls.' Mem. at 6–7. Rather, Plaintiffs contend that the documents show the agencies "intend to violate" the preliminary injunction in the future. *Id*. at 6. Likewise, Plaintiffs argue that, "[i]f Defendants follow through on their stated intention," their future "actions . . . will violate the preliminary injunction." *Id*. at 7. That is not how injunctions work. A court cannot penalize a party based on speculation that it may violate an injunction through future action, especially where (as discussed above) there are policies the agencies could potentially adopt as a result of their review that would not run afoul of the preliminary injunction. Moreover, the agencies have committed to "follow[ing] any applicable substantive and procedural requirements," which would include this Court's preliminary injunction. CMS Alert at 3; HRSA Letter; SAMHSA Letter at 1. To the extent Plaintiffs' argument boils down to a concern that the agencies may take actions in the future that violate the Court's preliminary injunction, the Court's injunction already prohibits such actions and the Court should not assume the agencies will violate it.[3]

Equally uncompelling is Plaintiffs' claim that the agency documents violate the "spirit" of the Court's preliminary injunction. Pls' Mem. at 6. They do not for the reasons discussed above. In any event, "[p]rinciples of 'basic fairness require that those enjoined receive explicit notice' of

---

[3] At times, Plaintiffs' brief reads like a legal challenge to the agency documents themselves, rather than a motion to enforce the preliminary injunction. *See* Pls.' Mem. at 7 (claiming any actions the agencies take in the future "will . . . be unlawful for all the same reasons as the Executive Orders"); *id*. at 8–9. These arguments put the cart before the horse. The Court cannot adjudicate the lawfulness of unspecified actions the agencies have not taken in the normal course of litigation, much less in the context of a motion to enforce a preliminary injunction.

'what conduct is outlawed,'" and relief should not be granted "where there is *a fair ground of doubt* as to the wrongfulness of the defendant's conduct.'" *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019). Relatedly, Plaintiffs claim that "[t]he only purpose of sending" the agency documents was to "scar[e] hospitals into shutting down or declining to resume gender affirming medical care for people under nineteen." Pls.' Mem. at 2, 7. But the agency documents themselves explain their alternative purpose: to express the agencies' concerns about the proliferation in the use of puberty blockers, cross-sex hormones, and surgery to treat children with gender dysphoria; to provide interested parties with research and data on the potentially harmful effects of such interventions; to explain that the agencies intend to undertake a review of their policies, grants, and programs in light of these concerns; and to notify interested parties that the agencies may take action in the future, consistent with applicable law, to protect children from these interventions. CMS Alert; HRSA Letter; SAMHSA Letter. There is nothing improper about agencies alerting interested parties to potential health and safety concerns, or transparently explaining that they may take action in the future to address those concerns. Agencies do so regularly.[4]

Plaintiffs tack on to their motion a request that the Court order "the heads of the issuing agencies [i.e., CMS, HRSA, and SAMHRA], or their designated representatives, to appear at a hearing on the motion [to enforce] next week" and require Defendants' counsel to file "a complete

---

[4] *See, e.g.*, CMS, Policy & Memos, https://www.cms.gov/medicare/health-safety-standards/quality-safety-oversight-general-information/policy-memos (last accessed Mar. 9, 2025) (collecting CMS Quality Safety & Oversight Memoranda (QSOs)); CMS, Quality & Safety Special Alerts, https://www.cms.gov/medicare/health-safety-standards/quality-safety-oversight-general-information/quality-and-safety-special-alerts (last assessed Mar. 9, 2025) (collecting CMS Quality & Safety Special Alerts, a communication format started in April 2024); CMS, QSO-22-05-Hospitals, Dec. 7, 2021, https://www.cms.gov/files/document/qso-22-05-hospitals.pdf (explaining "CMS is considering additional quality measures for future years to further advance maternity care") (last assessed Mar. 9, 2025); CMS, QSO-20-29-NH, May 2, 2020, https://www.cms.gov/files/document/qso-20-29-nh.pdf (announcing agency's future intent to issue interim final rule) (last assessed Mar. 9, 2025).

list of . . . all recipients of the [agency documents]." Pls.' Mem. at 10. The Court should deny these requests without further consideration, as Plaintiffs provide no justification whatsoever for them. *Grayson O Co. v. Agadir Int'l, LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument . . . by failing to develop [it]—even if its brief takes a passing shot at the issue." (cleaned up)). In any event, it is well established that high-ranking government officials may not be called to testify absent extraordinary circumstances. *See, e.g.*, *Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209, 211 (4th Cir. 1991); *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985). Such officials "have greater duties and time constraints than other witnesses," *In re FDIC*, 58 F.3d 1055, 1060 (5th Cir.1995), and their "compelled appearance . . . in a judicial proceeding implicates the separation of powers," *In re United States (Jackson)*, 624 F.3d 1368, 1372 (11th Cir. 2010). Because Plaintiffs do not provide any reason for their request, much less establish extraordinary circumstances, it fails on the merits as well.[5]

## CONCLUSION

Plaintiffs' motion to enforce the preliminary injunction should be denied.

Dated: March 10, 2025                    Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

MICHELLE BENNETT
Assistant Director
Federal Programs Branch

*/s/ Vinita B. Andrapalliyal*
VINITA B. ANDRAPALLIYAL
Senior Counsel
CHRISTIAN S. DANIEL
Trial Attorney
United States Department of Justice

---

[5] Plaintiffs also seek a list of any agencies that have issued similar documents, along with copies of those documents. Pls.' Mem. at 10. This information is provided in n.2.

Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel.:    (202) 514-0265
vinita.b.andrapalliyal@usdoj.gov
christian.s.daniel@usdoj.gov
*Counsel for Defendants*