**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| PFLAG, INC., et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 8:25-cv-00337-BAH |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| *Defendants*. | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO
<u>STAY PRELIMINARY INJUNCTION PENDING APPEAL</u>**

**TABLE OF CONTENTS**

INTRODUCTION................................................................................................................. 1

ARGUMENT..................................................................................................................... 4

I.    DEFENDANTS' DELAY IS A SUFFICIENT BASIS FOR DENYING THE MOTION. ... 4

II.   DEFENDANTS ARE NOT LIKELY TO PREVAIL ON THE MERITS OF THEIR
      APPEAL................................................................................................................... 6

   A.    The Government Is Not Likely to Show that the President Had Constitutional or
         Statutory Authority to Issue the Challenged Provisions of the Gender Identity or
         Denial-of-Care Orders... ......................................................................................... 6

   B.    The Executive Orders Remain Subject to Heightened Scrutiny After *Skrmetti*. ......... 11

   C.    The Challenged Provisions of the Executive Orders Continue to Contravene Statutory
         Prohibitions on Sex Discrimination After *Skrmetti*................................................. 16

III.  DEFENDANTS ARE NOT ENTITLED TO A STAY REGARDING THE SCOPE OF THE
      PRELIMINARY INJUNCTION..................................................................................... 20

CONCLUSION ................................................................................................................. 25

## INTRODUCTION

Five months ago, this Court entered a preliminary injunction prohibiting the agency Defendants from conditioning, withholding, or terminating federal funding because a healthcare entity or professional provides gender-affirming medical care to people under nineteen pursuant to Section 3(g) of Executive Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Gender Identity Order"), and Section 4 of Executive Order No. 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025) (the "Denial-of-Care Order"), (collectively, the "Challenged Provisions"). Dkt. 116 at 1-2. When it issued the preliminary injunction, this Court also denied Defendants' motion for a stay pending appeal. Dkt. 115 at 65-66.[1] Defendants did not renew their request for a stay pending appeal with the Fourth Circuit, choosing instead to negotiate a lengthy extension of time for the briefing schedule. Gonzalez-Pagan Decl. Exs A-1, A-2. In addition, on April 9, 2025, this Court entered a limited partial stay of the district court proceedings in this case—a stay the parties jointly proposed based on Defendants' representation that they would not be seeking a stay of the preliminary injunction pending appeal. *Id.* Ex A-1; Dkt. 137. Now, after filing their opening brief with the Fourth Circuit and after several months of the preliminary injunction being in place, Defendants have suddenly decided to return to this Court with another purportedly urgent request to stay the injunction pending appeal. Dkt. 151.

Defendants once again fail to carry their heavy burden for obtaining a stay of the March preliminary injunction. Indeed, Defendants' lengthy delay in pursuing a stay pending appeal is

---

[1] Although Defendants' initial request for a stay was procedurally improper, the Court made clear it would have denied their request even if it had been filed correctly. Dkt. 115 at 65-66.

itself a sufficient basis for denying the request. Defendants claim that a stay pending appeal is suddenly appropriate because recent Supreme Court decisions "undermine" the Court's basis for the preliminary injunction. But none of the new decisions that Defendants rely upon justifies the extraordinary relief of a stay pending appeal.

*First*, the Supreme Court's order in early July staying a district court injunction against Executive Order No. 14210 in *Trump v. American Federation of Government Employees*, 145 S. Ct. 2635 (2025) ("*AFGE*"), does not cast any doubt on the Court's injunction in this case. In *AFGE*, the Court in a brief order concluded that the plaintiffs were unlikely to succeed in challenging that particular executive order, which instructed agencies to conduct reductions in force ("RIFs") in accordance with applicable law. There is no inherent contradiction between conducting RIFs and conducting RIFs lawfully. Here, by contrast, the Challenged Provisions of the Executive Orders mandate the immediate and unlawful termination of federal funding in excess of the President's Article II authority, in usurpation of Congress's Article I authority, and in defiance of congressional statutes prohibiting funding recipients from discriminating based on sex. There is no way to lawfully implement those unlawful directives. And as this Court previously concluded, a boilerplate statement that these facially illegal Challenged Provisions of the Executive Orders should be implemented consistent with law does not immunize the President's illegal orders from review. *See* Dkt. 115 at 37-38.

*Second*, the Supreme Court's mid-June decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), likewise does not alter Plaintiffs' likelihood of success on their equal protection claims. *Skrmetti* held that a Tennessee state law prohibiting the provision of gender-affirming medical care to minors did not *facially* classify based on sex or transgender status. But *Skrmetti* also made clear that such prohibitions—like any classification deemed to be facially neutral—can

still be challenged as discriminatory if they are "pretexts designed to effect an invidious discrimination against transgender individuals." 145 S. Ct. at 1833. Because the Challenged Provisions of the Executive Orders are rife with evidence of purposeful discrimination, they remain subject to heightened scrutiny.

*Third*, *Skrmetti* did not alter Plaintiffs' likelihood of success on their statutory sex discrimination claims. In holding that Tennessee's prohibition on gender affirming medical care for minors did not facially classify on the basis of sex or transgender status under the Equal Protection Clause, *Skrmetti* relied on *Geduldig v. Aeillo*, 417 U.S. 484 (1974), which held that classifications based on the medical condition of pregnancy are not facial sex classifications for purpose of equal protection. But Congress expressly rejected the application of *Geduldig*'s holding and reasoning to statutory prohibitions on sex discrimination. Unlike protections from sex discrimination under the Equal Protection Clause, statutory prohibitions on sex discrimination treat discrimination based on pregnancy as discrimination based on sex. *See* 42 U.S.C. § 2000e(k). Thus, after *Skrmetti*, prohibitions on gender affirming medical care for minors continue to violate Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116, and Section 1908 of the Public Health Service Act ("PHSA"), 42 U.S.C. § 300w-7.

*Finally*, this Court's nationwide injunction does not contravene the Supreme Court's decision in *Trump v. CASA, Inc.* 145 S. Ct. 2540 (2025). This Court correctly concluded that a nationwide injunction in this case is the only way to provide Plaintiffs with complete relief. Only a nationwide injunction can provide sufficient clarity and certainty to counteract the *in terrorem* effect caused by the Challenged Provisions of the Executive Orders and reassure medical providers that it is safe to continue providing care without the risk of suddenly losing all their federal funding. In any event, if Defendants want this Court to reevaluate its injunction while an appeal is pending,

they can seek an indicative ruling under Federal Rule of Civil Procedure 62.1. Seeking a belated

stay pending appeal while the appeal is already well into briefing is not the right avenue.

Because Defendants have not met the stringent requirements to warrant a stay pending

appeal, this Court should deny Defendants' belated request for extraordinary relief.

## ARGUMENT

### I.    DEFENDANTS' DELAY IS A SUFFICIENT BASIS FOR DENYING THE MOTION.

This Court issued its preliminary injunction over five months ago, on March 4, 2025. Dkt.

115, 116. Defendants promptly appealed but declined to seek a stay from the Fourth Circuit at that

time. Dkt. 132. Based on Defendants' representation that they would not seek to stay the

preliminary injunction,[2] Plaintiffs agreed to Defendants' proposal to partially stay proceedings

before this Court, *see* Dkt. 136, and to extend the Fourth Circuit briefing schedule, *see* Gonzalez-

Pagan Decl. Ex. A-2. Pursuant to that briefing schedule, Defendants' opening brief was filed on

July 25 (as of today, Plaintiffs' response is due on September 19 and Defendants' reply is due 21

days thereafter). *Id*. In their opening brief, Defendants argued, among other things, that this Court's

decision should be reversed in light of *AFGE*, *Skrmetti*, and *CASA. See* Appellants' Br. 2-3, 14-15,

19-20, 39-54, 58-64, *PFLAG, Inc. v. Trump*, No. 25-1279 (4th Cir. filed July 25, 2025). The Fourth

Circuit will take up those arguments once briefing is completed.

But just one business day after filing their opening brief before the Fourth Circuit,

Defendants suddenly filed a motion for a stay pending appeal in *this* Court—raising precisely the

same arguments currently pending on appeal. Dkt. 151.

---

[2] *See* Gonzalez-Pagan Decl. Ex. A-1 (expressly noting that "DOJ is not planning to seek a stay of the PI as things currently stand, but we'd reserve the right to seek a stay depending on any subsequent orders"). No subsequent order from this Court has altered this calculus.

Defendants' lengthy delay in seeking a stay is sufficient reason for denying it. "[I]t is a wise rule in general that a litigant whose claim of urgency is belied by its own conduct should not expect discretionary emergency relief from a court." *West Virginia v. B.P.J., by Jackson*, 143 S. Ct. 889 (2023) (Alito, J., dissenting); *see also Infotek Corp. v. Preston*, No. CV CCB-18-1386, 2021 WL 4521330, at *3 (D. Md. Oct. 4, 2021). That is especially true in this case, where Plaintiffs agreed to Defendants' proposals to partially stay proceedings in this Court and extend briefing on appeal in reliance on Defendants' representations that they would not seek a stay. *See* Gonzalez-Pagan Decl. Ex. A-1, A-2.

Defendants assert that a stay is warranted now because of intervening Supreme Court decisions. But *Skrmetti* was decided on June 18; *CASA* on June 27; and even the Supreme Court's short order in *AFGE* issued in early July. Defendants sat on their hands for weeks before seeking "emergency" relief.

Moreover, to warrant a stay, the government must show a likelihood that it will suffer irreparable harm absent a stay. *See Nken v. Holder*, 556 U.S. 418, 433–435 (2019). This "threshold showing"—that the applicant will otherwise suffer irreparable harm—is necessary "regardless of the petitioner's proof regarding the other stay factors." *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020). "[S]imply showing some possibility of irreparable injury is insufficient." *Id.* at 1058-59. Instead, Defendants must "show[] that irreparable injury is likely to occur during the period before the appeal is decided." *Id.* at 1059. Here, Defendants can make no showing—let alone a strong showing—that they will suffer irreparable injury while the preliminary injunction remains in place during the appeal. The injunction has now been in place for nearly five months and Defendants cannot point to any harm they have suffered as a result. This, too, is independently fatal to Defendants' untimely motion for a stay pending appeal.

Indeed, even without considering Defendants' inordinate delay, the equities weigh just as heavily in Plaintiffs' favor as they did during the preliminary injunction briefing, if not more so. Plaintiffs continue to face the irreparable injury of losing essential medical care if the Court stays its injunction. As hospitals across the country continue to assess whether they should cease providing gender-affirming medical care for patients under nineteen based on concerns about federal funding, Plaintiffs risk losing access to crucial health care—making this Court's injunction all the more important in preventing irreparable injury. Defendants, moreover, have not shown—and cannot show—any harm from an injunction that restrains them from enforcing unconstitutional restrictions. As ever, "the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021).

## II.    DEFENDANTS ARE NOT LIKELY TO PREVAIL ON THE MERITS OF THEIR APPEAL.

In issuing its preliminary injunction, this Court detailed across 66 pages why Plaintiffs "meet their burden of showing that there is a strong likelihood that they will succeed on the merits." Dkt. 115 at 2. None of the decisions the government now cites undermines this Court's reasoning, and none of the government's arguments makes the requisite "strong showing" that would justify a stay. *Nken*, 556 U.S. at 426.

### A.    The Government Is Not Likely to Show that the President Had Constitutional or Statutory Authority to Issue the Challenged Provisions of the Gender Identity or Denial-of-Care Orders.

Plaintiffs remain likely to succeed on the merits of their claim that the President lacked constitutional or statutory authority to issue the Challenged Provisions of the Gender Identity and Denial-of-Care Orders. As this Court observed, President Trump issued both Orders without referencing his constitutional or statutory power to do so—because such power does not exist. Dkt. 115 at 29-49. The Orders condition federal funding on the recipients' agreement to cease providing

gender-affirming medical care for people under nineteen. But Article II does not authorize the President to impose conditions on federal funds, to amend or repeal the congressionally enacted federal laws providing those funds, or to impound congressionally appropriated monies. *Id.*; *Clinton v. City of N.Y.*, 524 U.S. 417, 438 (1998) (the Constitution does not "authorize[] the President to enact, to amend, or to repeal statutes"). By usurping Congress's power of the purse and bypassing the constitutionally mandated framework for enacting or repealing legislation, President Trump overstepped Article II's limits. And because "Congress has not authorized the President to withhold federal grant monies from medical institutions that provide gender-affirming care for those under nineteen years of age," that lack of constitutional authority is fatal. Dkt. 115 at 34.

In its stay motion, Defendants do not contend that the President actually has the power to do any of those things. Instead, they rehash their old arguments that Plaintiffs cannot directly challenge provisions of the Executive Orders but must instead wait to challenge final agency action taken pursuant to those Orders. Dkt. 151-1 at 2-4. This Court already rejected those arguments twice, first when it issued a temporary restraining order, and again when it issued a preliminary injunction. Dkt. 62 at 10-16; Dkt.115 at 15-18. As this Court explained, Plaintiffs' challenge to Challenged Provisions of the Executive Orders was ripe because the Orders immediately caused hospitals across the country to shut down care without the need for further agency implementation. Thus, "ripeness cannot hinge on the actual revocation of funding because the threat of revocation of funding was enough to compel the medical institutions to pause or cease the challenged care," and in "fact it was, by the executive's own admission, the 'intended effect.'" Dkt. 115 at 15. This Court also explained that the Executive Orders' boilerplate clauses stating that they should be implemented "consistent with applicable law" could not save the facially unconstitutional orders.

"Where, as here, the plain text and stated purpose of the Executive Orders evince a clear intent to unlawfully restrict federal funding without congressional authorization, the mere inclusion of the phrase 'consistent with applicable law' cannot insulate these Executive Orders from review." Dkt. 115 at 37.

Defendants' attempt to shift focus away from the President's authority to agency authority misses the mark. Plaintiffs challenge the President's authority to issue the Orders in the first instance, not merely their implementation. The Supreme Court has recognized such challenges for decades. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). This limit on Presidential power applies "[n]o matter the context," including when "the President claims authority to act but in fact exercises mere 'individual will' and 'authority without law.'" *Trump v. United States*, 603 U.S. 593, 607-608 (2024).

Defendants argue that this Court must revisit its analysis in light of the two recent stay decisions in *AFGE* and *National Ass'n of Diversity Officers in Higher Education v. Trump,* No. 25-1189, Dkt. 29 (4th Cir. Mar. 14, 2025) ("*NADOHE*"). But neither decision undermines this Court's previous conclusions.

Start with *AFGE.* In that case, a district court granted a preliminary injunction against enforcement of Executive Order No. 14210, 90 Fed. Reg. 9669 (2025), and a corresponding Office of Management and Budget (OMB) memo, which directed all federal agencies to "promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law" and to submit "Agency Reorganization Plans" to OMB. *AFGE*, 145 S. Ct. at 2635. The government sought a stay of the injunction. The Supreme Court granted the stay. *Id.* Its rationale was set forth in a single sentence: "Because the Government is likely to succeed on its argument

that the Executive Order and [OMB] Memorandum are lawful—and because the other factors bearing on whether to grant a stay are satisfied—we grant the application." *Id.*

The government touts the Supreme Court's stay order as standing for the proposition that Plaintiffs cannot bring facial challenges to Executive Orders that "merely tell agencies how to exercise their discretion … consistent with applicable law." Dkt. 151 at 2, 4. Notably absent from the government's brief is any citation to or reasoning from *AFGE* that mandates this result in *all* cases challenging executive orders and their implementation. After all, there is no inherent contradiction between an order for agencies to initiate RIFs and requiring that those RIFs be executed "consistent with applicable law." Even the dissent in *AFGE* recognized that the President has some authority to effectuate "minor workforce reductions consistent with existing law." *AFGE*, 145 S. Ct. at 2636 (Jackson, J., dissenting).

This case is plainly distinguishable from *AFGE*. The Executive Orders in this case command agencies to take actions that simply cannot be accomplished "consistent with applicable law;" the Challenged Provisions of the Orders are unlawful on their face. As this Court already found, the Challenged Provisions' of the Executive Orders directive for agencies to defund entities that provide gender-affirming medical care to minors is facially unconstitutional because "no provision in any of the statutes" regarding the issuance of grants "authorizes agencies to condition the *entirety* of their [] funding" in this fashion. Dkt. 115 at 33 (emphasis in original). Moreover, unlike the Executive Order and OMB memo in *AFGE*, the Orders in this case had an immediate effect, separate and apart from any subsequent agency action. *Id.* at 23-28, 26 (hospitals' "decisions to pause or cancel care came as 'a clear (and fairly predictable) response to' the Executive Orders. And this was exactly the intended effect.") (citations omitted). Because the President lacks

authority to condition funding in this manner, *supra* at 6-8, there is no way the Orders could be lawfully implemented.

The government's reliance on the Fourth Circuit's stay in *NADOHE* fails for the same reason.[3] The court there stayed an injunction prohibiting the government from enforcing two executive orders that "instruct[ed] executive agencies to end 'diversity, equity, and inclusion' … programs within federal grant and contract processes." *See* Order at 2, ECF No. 29, No. 25-1189 (4th Cir. Mar. 14, 2025) (citing Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025); Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025)). Judge Harris's concurrence explained that those orders applied "only to conduct that violates existing federal anti-discrimination law" and directed the termination of grants "based only on the nature of the grant-funded activity itself." *Id.* at 7 (Harris, J., concurring).[4] Thus, although the court expressed concern about whether "[a]gency enforcement actions that go beyond the Orders' narrow scope" might violate the Constitution, the Fourth Circuit concluded the case did not present that question because the plaintiffs had not "directly challenge[d] any such action." *Id.* at 7-8; *see id.* at 4 (Diaz, C.J., concurring); *id.* at 9-10 (Rushing, J., concurring). In other words, there was at least a plausible argument that the Orders operated within the bounds of federal law—and the court was not evaluating whether the Orders themselves usurped Congress's power.

Here, again, the opposite is true. As this Court has already found, there is no way for agencies to simultaneously comply with federal law and implement the Challenged Provisions'

---

[3] Defendants also do not explain how the March 2025 stay in *NADOHE* warrants a stay in this case now, when it did not prompt Defendants to seek a stay when they filed their notice of interlocutory appeal a week after that stay was issued.

[4] For example, Executive Order No. 14173 contained a provision requiring federal agencies to include a term in every federal contract or grant stating that the grantee or contractor certified "that it does not operate any programs promoting DEI *that violate any applicable Federal antidiscrimination laws.*" *See* 90 Fed. Reg. at 8634 (emphasis added).

command to withhold all federal funds for entities that provide gender-affirming medical care for minors. Dkt. 115 at 29-38. Because "the plain text and stated purpose of the Executive Orders evince[d] a clear intent" for agencies "to unlawfully restrict federal funding without congressional authorization," there was no plausible way for the agencies to lawfully exercise their discretion. Dkt. 115 at 37. The government thus cannot not "insulate these Executive Orders from review." *Id.* (citing *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018)).

**B.     The Executive Orders Remain Subject to Heightened Scrutiny After *Skrmetti*.**

In its decision granting Plaintiffs' motion for a preliminary injunction, this Court properly held that the Executive Orders are subject to heightened scrutiny for purposes of Plaintiffs' equal protection claim because, under *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (en banc), the Orders' prohibitions on federal funding for entities that provide gender-affirming medical care for minors facially classify based on sex and transgender status. Defendants now argue that Plaintiffs are no longer likely to succeed on their equal protection claims because *Skrmetti* purportedly abrogated *Kadel* to the extent that it held the coverage exclusions on gender-affirming medical care in the state health plans in those cases classify based on sex and transgender status on their face. Defendants also argue that *Skrmetti* abrogated *Kadel* because it held that Tennessee's ban on gender-affirming medical care for minors survived rational basis review.

To the contrary, while *Skrmetti* may alter some of the analysis in a case involving a law that regulates the provision of medical care as Tennessee did, it does not change the ultimate result in this case. As an initial matter, the Executive Orders at issue in this case still constitute facial classifications based on transgender status even under *Srkmetti*. The Gender Identity Order and the Denial-of-Care Order operate in tandem. Together, they do not merely regulate a medical procedure; they also seek to "regulate[] a class of *persons* identified on the basis of a specified characteristic," *Skrmetti*, 145 S. Ct. at 1834 n.3—namely, that transgender people have a gender

identity that differs from their sex at birth, which the Gender Identity Order deems to be a "false claim." Gender Identity Order § 2(f). The Orders thus target those who express a gender identity inconsistent with their birth-assigned sex, regardless of what medical procedures they have. *See*, *e.g.*, *id.* §§ 1, 2(f), 2(g). The Denial of Care Order similarly declares that it is "the policy of the United States" to "not fund, sponsor, promote, assist, or support the so-called 'transition'" of a transgender minor, well beyond transition-related medical care. Denial-of-Care Order § 1.[5]

Moreover, because *Skrmetti* did not decide what standard of scrutiny applies to discrimination against transgender people, it did not disturb Fourth Circuit precedent holding that heightened scrutiny applies. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611 (4th Cir. 2020). And, because *Skrmetti* never analyzed Tennessee's bans under heightened scrutiny, *Skrmetti* does not alter this Court's previous conclusion that the Challenged Provisions of the Executive Orders fail that demanding standard.

In any event, even if the Executive Orders in this case were deemed *facially* neutral, *Skrmetti* also made clear that facially neutral prohibitions on gender-affirming medical care—like any other classification deemed to be facially neutral—can still be challenged as discriminatory if they are "pretexts designed to effect an invidious discrimination against transgender individuals." *Skrmetti*, 145 S. Ct. at 1833; *accord Kadel*, 100 F. 4th. at 168 (Richardson, J., dissenting) ("Even a facially neutral classification may warrant heightened scrutiny if it uses a proxy to camouflage intentional discrimination based on a protected trait"). Here, the plain text of the Executive Orders

---

[5] By targeting those who "transition," the Orders necessarily classify based on transgender status; only transgender people undergo "transition." *See Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 577 (6th Cir. 2018) ("Title VII protects transgender persons because of their transgender or *transitioning status*, because transgender or *transitioning status* constitutes an inherently gender non-conforming trait.") (emphasis added), *aff'd sub nom. Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020).

proclaims their discriminatory purpose. The Gender Identity Order declares that it is the official "policy of the United States" to recognize only "two sexes" based on people's "immutable biological classification as either male or female." Gender Identity Order §§ 2, 2(a). According to the Order, simply recognizing that transgender people have a gender identity that differs from their sex designated at birth has "a corrosive impact . . . on the validity of the entire American system," and undermines "public safety, morale, and trust in government itself," along with our country's "cherished legal rights and values." *Id.* § 1.

Thus, "the Gender [Identity] Order's stated purpose is to deny the existence of transgender persons entirely." *S.F. A.I.D.S. Found. v. Trump*, No. 25-CV-01824-JST, 2025 WL 1621636, at *15 (N.D. Cal. June 9, 2025). "Viewed as a whole, the language of the Executive Order is candid in its rejection of the identity of an entire group—transgender Americans—who have always existed and have long been recognized in, among other fields, law and the medical profession." *Orr v. Trump*, 778 F.Supp.3d 394, 415 (D. Mass. 2025). As this Court previously recognized, it is difficult to "fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." Dkt. 115 at 48.

The Denial-of-Care Order reflects and implements the Gender Identity Order's ideological opposition to the existence of transgender people by seeking to end access to medically necessary care for transgender adolescents and young adults. The Denial-of-Care Order is filled with pejorative and inflammatory language. It refers to gender-affirming medical care as "chemical and surgical mutilation," accusing doctors and parents of "maiming and sterilizing" children, and describing transgender people as waging a "losing war with their own bodies." Denial-of-Care Order § 1. The Order also draws crass comparisons between gender-affirming medical care and female genital mutilation and states that medical care to treat gender dysphoria is "child abus[e]."

13

*Id.* §§ 8(a)-(b), (e). The plain text of the Orders thus makes clear that their purpose is to effectuate and widely cultivate the Trump administration's disapproval of transgender people.

The Executive Orders on their face thus demonstrate that their animating purpose is to deny the existing of transgender people in general, not merely to regulate a discrete medical procedure. In sweeping terms, the Gender Identity Order "imposes a 'broad and undifferentiated disability' on a discrete group of people," *Orr*, 778 F.Supp.3d at 415 (quoting *Romer v. Evans*, 517 U.S. 620, 632 (1996)), across virtually all aspects of life, including with respect to the workplace (Gender Identity Order § 5), schools (*id.* § 7(c)(2)), restrooms (*id.* § 4(d)), prisons health care and housing (*id.* §§ 4(a), 4(c)), passports (*id.* § 3(d)), and grants for scientific research and the arts (*id.* § 3(d)).

The scope of the prohibitions stands in stark contrast to the law in *Skrmetti*. According to Justice Alito, "the limited scope" of Tennessee's law supported "the conclusion that the legislature's true purpose" was to regulate a medical treatment. *Skrmetti*, 145 S. Ct. at 1859 (Alito, J., concurring). The Tennessee law "d[id] not regulate any other behavior in which minors might engage for the purpose of expressing their gender identity" and "sa[id] nothing at all about names, pronouns, hair styles, attire, recreational activities or hobbies, or career interests," and "impose[d] no restrictions on medical care for adults." *Id.* By contrast, the extraordinarily broad sweep of the Gender Identity Order, in tandem with the Denial-of-Care Order, compels the opposite conclusion: the Orders' true purpose is to regulate transgender people out of existence.

The context surrounding these Orders further demonstrates their intent, at least in part, to impose adverse effects on transgender people. *See Pers. Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279 (1979). The Orders "were part of a constellation of close-in-time executive actions directed at transgender Americans that contained powerfully demeaning language." *Orr*, 778 F.Supp.3d at 417. One executive order excluding transgender people from continuing to serve in the military

14

declared that a soldier's transgender status "conflicts" with their "commitment to an honorable, truthful, and disciplined lifestyle," and that "[a] man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member." Exec. Order No. 14183 § 1, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025). Another executive order targets schools that support the ability of transgender youth to socially transition which—according to the executive order— "sow[s] division, confusion, and distrust" and "undermine[s] the very foundations of personal identity and family unity." Exec. Order No. 14190 § 1, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025). "Although aimed at different policy goals, each of these related orders, in tone and language, conveys a fundamental moral disapproval of transgender Americans." *Orr*, 778 F.Supp.3d at 417.

In short, the Executive Orders do not merely regulate a medical procedure based on alleged concerns about safety and efficacy. They target transgender people for discrimination across the board as part of a comprehensive policy of denying the validity of transgender people's existence. Under Fourth Circuit precedent, intentional discrimination mandates heightened scrutiny. Every court to uphold a ban on gender-affirming medical care for minors, including the Supreme Court in *Skrmetti*, has done so by applying rational basis review. No court has ever held that a law targeting transgender people for discrimination by limiting or restricting coverage or the provision of gender-affirming medical care survives the more demanding heightened-scrutiny standard. [6]

---

[6] Many courts have evaluated governmental laws or policies that targeted transgender people for discrimination by limiting or restricting access to gender-affirming medical care and have found such laws and policies to be unconstitutional when heightened scrutiny is applied. *See*, *e.g.*, Dkt. 115 at 49-57; *Washington v. Trump*, 768 F. Supp. 3d 1239, 1277 (W.D. Wash. 2025); *Doe v. Ladapo*, 737 F. Supp. 3d 1240, 1284 (N.D. Fla. 2024) (holding that restrictions on transgender-related health care for adults and ban on gender-affirming medical care for minors did not survive heightened scrutiny), *appeal docketed*, No. 24-11996 (11th Cir., argued Jan 15, 2025); *Dekker v.*

### C.    The Challenged Provisions of the Executive Orders Continue to Contravene Statutory Prohibitions on Sex Discrimination After *Skrmetti*.

Neither *Skrmetti* nor any of the recent decisions relied on by Defendants undermines this Court's conclusion that the challenged provisions of the Gender Identity and Denial-of-Care Orders are *ultra vires* because they conflict with Section 1557 of the ACA, 42 U.S.C. § 18116, and Section 1908 of the PHSA, 42 U.S.C. § 300w-7, both of which prohibit discrimination on the basis of sex. The claims at issue in this aspect involve statutory discrimination claims, not constitutional claims. As another district court recently explained, "*Skrmetti* involve[d] a fundamentally different type of claim than the ACA § 1557 claim [and PHSA § 1908 claim] raised

---

*Weida*, 679 F. Supp. 3d 1271, 1293 (N.D. Fla. 2023) (finding ban on Medicaid coverage failed heightened scrutiny as applied to both minors and adults), *appeal docketed,* No. 23-12155 (11th Cir., argued Nov. 22, 2024); *Kadel*, 100 F.4th at 156-57 (holding exclusions targeting transgender health care in North Carolina State Health Plan West Virginia Medicaid plan failed heightened scrutiny); *Flack v. Wisconsin Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1022 (W.D. Wis. 2019) (holding exclusion in Wisconsin Medicaid plan failed heightened scrutiny); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 1003 (W.D. Wis. 2018) (holding exclusion in health plan for state employees failed heightened scrutiny). Even the courts that have considered state bans on gender-affirming care for minors have found that such laws cannot survive heightened scrutiny. *See, e.g.*, *L.W. ex rel. Williams v. Skrmetti*, 679 F. Supp. 3d 668, 712 (M.D. Tenn. 2023) (applying heightened scrutiny), and *Doe 1 v. Thornbury*, 679 F. Supp. 3d 576, 584 (W.D. Ky. 2023) (applying heightened scrutiny), *rev'd and remanded*, 83 F.4th 460 (6th Cir. 2023) (applying rational basis), *and aff'd sub nom. United States v. Skrmetti*, 145 S. Ct. at 1816 (applying rational basis); *Poe ex rel. Poe v. Labrador*, 709 F. Supp. 3d 1169, 1191-93 (D. Idaho 2023) (applying heightened scrutiny), *appeal dismissed*, No. 24-142, 2025 WL 1872749 (9th Cir. June 18, 2025); *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, 677 F. Supp. 3d 802, 818 (S.D. Ind. 2023) (applying heightened scrutiny), *rev'd and remanded*, 121 F.4th 604 (7th Cir. 2024) (applying rational basis); *Koe v. Noggle*, 688 F. Supp. 3d 1321, 1348 (N.D. Ga. 2023) (applying heightened scrutiny); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1147-48 (M.D. Ala. 2022) (applying heightened scrutiny), *rev'd*, 80 F.4th 1205 (11th Cir. 2023) (applying rational basis); Order Re: Cross-Mots. Summ. J., *Cross v. Montana*, No. DV-23-541 (Missoula Cnty. Dist. Ct., Mont. May 13, 2025), at 44 (finding Montana's ban did not survive equal protection scrutiny applied under the Montana Constitution). Of course, whether heightened scrutiny is appropriate depends on the wording and context of the particular law or policy, as *Skrmetti* recognized. And for the reasons already articulated above, this is a case where heightened scrutiny applies, not rational basis.

16

in this case." Order, *L.B. v. Premera*, No. 2:23-cv-00953-TSZ, Slip Op., at 4 (W.D. Wash. Aug. 12, 2025) (attached hereto as Gonzalez-Pagan Decl., Ex. A-3).[7]

Because statutory prohibitions on sex discrimination include medical conditions that classify based on sex, *Skrmetti* does not change the fact that the Gender Identity Order and the Denial-of-Care Order facially classify based on sex and transgender status for purposes of Section 1557 of the ACA, 42 U.S.C. § 18116, and Section 1908 of the PHSA, 42 U.S.C. § 300w-7. In holding that prohibitions on gender-affirming medical care for minors do not facially classify on the basis of sex or transgender status under the Equal Protection Clause, the Supreme Court relied on *Geduldig*, 417 U.S., which held that classifications based on the medical condition of pregnancy were not facial sex classifications for purpose of equal protection. *See Skrmetti*¸ 145 S. Ct. at 1833. But *Geduldig*'s reasoning does not apply to statutory prohibitions against sex discrimination. Indeed, when the Supreme Court attempted to import *Geduldig*'s reasoning into Title VII in *General Elec. Co. v. Gilbert*, 429 U.S. 125 (1976), Congress swiftly amended Title VII to "unambiguously" reject "the holding and the reasoning" of *Gilbert* and *Geduldig*. *See Newport*

---

[7] In *Kadel*, the Fourth Circuit held that the exclusion of gender-affirming surgery from West Virginia's Medicaid program discriminated on the basis of sex in violation of Section 1557. The Supreme Court granted, vacated, and remanded *Kadel* for further consideration in light of *Srkmetti*, *see Folwell v. Kadel*, 2025 WL 1787687 (U.S. Jun. 30, 2025), but it is "well-settled" that a GVR "has no precedential weight." *Texas v. United States*, 798 F.3d 1108, 1116 (D.C. Cir. 2015); *accord Tyler v. Cain*, 533 U.S. 656, 666 n.6 (2001) ("Our [GVR] order … was not a final determination on the merits.") (citation modified). The Fourth Circuit will eventually determine whether to reinstate the portion of its decision addressing Section 1557. In the meantime, at least one other court has already concluded that "nothing in *Skrmetti* undermines the validity of *Bostock* or the extension of *Bostock* from Title VII to Title IX and/or ACA § 1557 claims." Order, *L.B. v. Premera*, No. 2:23-cv-00953-TSZ, Slip Op., at 8 n.4 (W.D. Wash. Aug. 12, 2025) (citation omitted). *See also* Mem. Op., *Am. Ass'n of Physicians for Human Rts., Inc. v. Nat'l Inst. of Health*, No. 8:25-cv-01620-LKG, Slip Op. at 13-14, 20-21 (D. Md. Aug. 14, 2025) (holding that directives prohibiting funding for research related to gender identity or LGBTQI+ health violate Section 1557 of the ACA and that *Bostock*'s reasoning applies to Section 1557) (attached hereto as Gonzalez-Pagan Decl., Ex. A-4).

*News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 678 (1983); *accord id.* at 679, n.17 (collecting statements by legislators).[8] Congress instead took the position that the dissenting Justices in *Gilbert* "correctly interpreted" federal civil rights law, rejecting *Geduldig. See Newport News,* 462 U.S. at 678-79 ("Proponents of the bill repeatedly emphasized that the Supreme Court had erroneously interpreted congressional intent and that amending legislation was necessary to re-establish the principles of Title VII law[.]").

The Pregnancy Discrimination Act's reaffirmation that discrimination based on pregnancy is sex discrimination under Title VII also guides the proper interpretation of Title IX. *See Emeldi v. Univ. of Oregon*, 698 F.3d 715, 724 (9th Cir. 2012) ("[T]he legislative history of Title IX 'strongly suggests that Congress meant for similar substantive standards to apply under Title IX as had been developed under Title VII.'") (quoting *Lipsett v. Univ. of P.R.,* 864 F.2d 881, 897 (1st Cir. 1988)). Indeed, "[t]he Fourth Circuit looks to Title VII . . . to guide the 'evaluation of claims under Title IX.'" *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 590 (D. Md. 2021) (quoting *Grimm*, 972 F.3d at 616).[9]

Consistent with Congress's reaffirmation that Title VII prohibits discrimination based on pregnancy, Title IX's regulations relating to sex discrimination have expressly prohibited discrimination based on pregnancy since their first formulation 50 years ago. *See* Nondiscrimination on the Basis of Sex, 40 Fed. Reg. 24128 (Jun. 4, 1975); *see also* 45 Fed. Reg.

---

[8] *See* 123 CONG. REC. 10581, 10582 (1977) (statement by Rep. Hawkins); 123 CONG. REC. 29385 (1977) (statement by Sen. Williams); *id.* at 29387 (statement by Sen. Javits); 123 CONG. REC. 29641 (1977) (statement by Sen. Bayh); *id.* at 29647 (statement by Sen. Williams); 124 CONG. REC. 21435 (1978) (statement by Rep. Hawkins); *id.* at 21439 (statement by Rep. Corrada); *id.* at 21440 (statements of Reps. Thompson and LaFalce); *id.* at 21441 (statement by Rep. Whalen); *id.* at 21442 (statement by Rep. Myers).

[9] The test announced in *Bostock* therefore is the appropriate test to determine whether a policy discriminates in violation of the ACA. *See Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022).

at 35,959, 35,962-63 (May 9, 1980). And the courts have consistently upheld those regulations, concluding that "discrimination on the basis of pregnancy, childbirth, or related medical conditions is a form of sex discrimination prohibited by Title IX." *Muro v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, No. 19-10812, 2019 WL 5810308, at *3 (E.D. La. Nov. 7, 2019); *accord Stanford v. Fox Coll.,* No. 18 C 3703, 2020 WL 814865, at *6 (N.D. Ill. Feb. 19, 2020) ("Discrimination 'on the basis of sex' [under Title IX] includes pregnancy discrimination."); *Workman v. Univ. of Akron*, No. 5:16-cv-156, 2017 WL 6326898, at *3 (N.D. Ohio Dec. 11, 2017) ("The discrimination prohibited by Title IX includes discrimination related to pregnancy."). "Although it is true that Congress has never amended Title IX's definition of sex to explicitly include pregnancy," that is simply a reflection of the fact that "[i]n the case of Title IX there has been no faulty precedent to overturn." *Conley v. Nw. Fla. State Coll.*, 145 F. Supp. 3d 1073, 1083–85 (N.D. Fla. 2015).

When Congress prohibited sex discrimination under the ACA in 2010 and under Section 1908 of the PHSA in 1981, it did so under the backdrop of how discrimination based on sex had been interpreted in Title VII and Title IX to include discrimination based on pregnancy. *See* 42 U.S.C. § 18116(a); 42 U.S.C. § 300w–7. And "where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Lorillard v. Pons*, 434 U.S. 575, 581 (1978). Indeed, although the regulations for Section 1557 have oscillated depending on which administration is in power, the regulations of Section 1557 have consistently prohibited discrimination based on pregnancy across administrations. [10]

---

[10] The 2024 regulations promulgated by the Biden administration included a provision stating that "[d]iscrimination on the basis of sex includes, but is not limited to, discrimination on the basis of," inter alia, "[p]regnancy or related conditions." Nondiscrimination in Health Programs and

These statutory protections for discrimination based on pregnancy cut the legs out from any attempt to analogize to *Skrmetti*'s rationale. *Skrmetti* held that because classifications based on pregnancy are facially sex-neutral under the Equal Protection Clause, restrictions on gender-affirming medical care are also facially sex-neutral. But for statutory protections, the converse is true. Since discrimination based on pregnancy *is* discrimination based on sex under Section 1557 of the ACA, 42 U.S.C. § 18116, and Section 1908 of the PHSA, 42 U.S.C. § 300w-7, restrictions on gender-affirming medical care are similarly explicit sex classifications under those statutes. By commanding funding recipients to engage in discrimination that Congress has prohibited, the Challenged Provisions of the Executive Orders are and remain *ultra vires*.

## III. DEFENDANTS ARE NOT ENTITLED TO A STAY REGARDING THE SCOPE OF THE PRELIMINARY INJUNCTION.

Finally, Defendants argue that this Court's nationwide injunction should be narrowed in light of *CASA*, 45 S. Ct. 2540. But *CASA* does not support Defendants' motion for a stay of the injunction. In fact, if anything, *CASA* confirms that this Court's injunction was properly designed and issued.

In *CASA*, the Supreme Court reaffirmed that courts may issue a nationwide injunction where, as here, it is necessary to provide complete relief to the parties. Thus, following *CASA*,

---

Activities, 89 Fed. Reg. 37,522, 37,699 (May 6, 2024). The 2020 regulations issued by the Trump administration declined to define "on the basis of sex" but reaffirmed that the term included pregnancy. "Many comments on the 2019 NPRM assume that Section 1557's protection against discrimination 'on the basis of sex' covers women's health issues including pregnancy, uterine cancer, and prenatal and postpartum services. That assumption is correct: These issues are protected under Section 1557 because of the ordinary and biological meaning of 'sex.'" Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160, 37,179–80 (June 19, 2020). The 2016 regulations issued by the Obama administration stated that "[o]n the basis of sex includes, but is not limited to, discrimination on the basis of pregnancy[.]" Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,467 (May 18, 2016).

several courts have recognized the continued need for such nationwide injunctions, upholding injunctions in situations that require them for complete relief. *See Washington v Trump*. 25-807, 2025 WL 2061447, at *17 (9th Cir. July 23, 2025); Order, *State of New Jersey v. Trump*, No. 1:25-cv-10139-LTS (D.N.J. July 25, 2025).

*CASA* distinguished between "universal" injunctions, which are designed primarily to protect non-parties, and "traditional, parties-only injunction[s]," which may be more limited but "can apply beyond the jurisdiction of the issuing court." 45 S. Ct. at 2549 n.1 (citing *Steele v. Bulova Watch Co*., 344 U.S. 280, 289 (1952)). Although the Supreme Court held that courts likely do not have the authority to issue "universal" injunctions designed to protect "*anyone*, anywhere," *id.*, it reaffirmed the complete-relief principle, which allows a court to use its equitable powers to "'administer complete relief *between the parties*.'" *Id*. at 2556-57 (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)) (emphasis in *CASA*). Complete relief is "not a guarantee." *Id*. at 2558. It is, however, the traditional equitable remedy, and the "great principles of equity" endeavor to "secur[e] complete justice," not partial relief. *Brown v. Swann*, 35 U.S. 497, 503 (1836). Exercising equitable authority to award complete relief is particularly justified where, as here, a party's likelihood of success is strong. *See CASA*, 145 S. Ct. at 2558. Such an injunction may advantage nonparties, but because it does so "only incidentally," it is permissible. *Id*. at 2557 (quoting *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring)). Indeed, the Supreme Court acknowledged in *CASA* that there may be injuries "for which it is all but impossible for courts to craft relief that is complete and benefits only the named plaintiffs." *Id*. at 2557 n.12 (citing *Shaw v. Hunt*, 517 U.S. 899 (1996)).

Whether to issue a nationwide injunction to provide complete relief requires an "equitable weighing process," where a court considers "what is necessary, what is fair, and what is workable,"

*North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (citations and quotations omitted). Of course, any injunction must "comport with both the complete-relief principle and other 'principles of equity.'" *CASA*, 145 S. Ct. at 2564 (Thomas, J., concurring). To make this determination, courts must take "care to 'mold [their] decree to meet the exigencies of the particular case'" and "carefully consider the equities, 'focusing specifically on the concrete burdens that would fall' on the parties and the public consequences of an injunction." *Roe v. Dep't of Def.*, 947 F.3d 207, 232 (4th Cir. 2020) (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017).

That is exactly what this Court did when it found that a nationwide injunction was warranted in this case. The Court did not reflexively award a universal injunction. Instead, it emphasized that injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." Dkt. 115 at 61 (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)). The Court then weighed the equities and applied the complete-relief principle in determining that a national injunction is necessary because "a narrower injunction cannot provide complete relief." *Id*. at 64.

A nationwide injunction is particularly necessary in this case because of the manner in which the Executive Orders harm the Plaintiffs. Because the Executive Orders were designed to—and did—exert an immediate and extreme coercive effect on third parties who receive federal grant funding, to provide complete relief to the Plaintiffs, an injunction must provide sufficient clarity and certainty to counteract the *in terrorem* effect of the Executive Orders and reassure medical providers that it is safe to continue providing care without the risk of suddenly losing all their federal funding. Under these circumstances, a "piecemeal approach" would cause "significant confusion" for medical institutions, whose access to federal funding would become dependent on

whether their patients and employees were or were not plaintiffs in some particular case, and for patients, whose ability to access care would vary unpredictably. Dkt. 115 at 61.

Indeed, even *with* this Court's preliminary injunction in place, the administration has done everything it can to intimidate medical institutions into ending their provision of gender-affirming medical care. *See* Complaint, *Commonwealth of Massachusetts v. Trump*, Case No. 25-cv-12162 (D. Mass. filed Aug. 1, 2025) (lawsuit by several states documenting Trump administration's recent actions, including its explicit threats of civil and criminal prosecution of providers of gender-affirming medical care and criminal investigations into children's hospitals that provide this care) (Dkt. 1). And just after Defendants filed their stay motion in this case, the White House issued a press statement celebrating these hospital closures as evidence that President Trump has "delivered" on his promise "to end" gender-affirming medical care for minors.[11] In this climate of fear and official intimidation, an uncertain or confusing remedy is no remedy at all.

The risk of inadministrability also counsels in favor of a nationwide injunction. In the absence of a nationwide injunction, the Court would need to confirm the identity of each hospital that provides care to each member of each of the named Plaintiff associations. In addition to needlessly draining judicial resources, the Court likely would be unable to meaningfully carve out individual healthcare institutions to provide relief on the scale necessitated to provide these Plaintiffs complete relief. Defendants suggest (at 8-9) that the Court could bar application of the Executive Orders to the institutions identified in Plaintiffs' declarations, but they have not demonstrated how this supposed alternative would ensure complete relief on an administrable basis. As the Court has previously explained, "[i]f the Court were to limit the injunction to the

---

[11] The White House, *President Trump Promised to End Child Sexual Mutilation — and He Delivered* (July 25, 2025), https://www.whitehouse.gov/articles/2025/07/president-trump-promised-to-end-child-sexual-mutilation-and-he-delivered/.

named Plaintiffs alone, as Defendants suggest, that would seemingly give rise to a convoluted scenario where healthcare providers could simultaneously retain federal funding as to the named Plaintiffs and the organizations' members but still lose it as to similarly situated third parties if the medical institutions continue to provide gender-affirming care to those third parties." Dkt. 115 at 64. This is not workable. Not surprisingly, Defendants have provided no explanation as to how their approach would work in practice, suggesting that such inadministrability and uncertainty—far from being complete relief—is actually the result they seek.

In any event, a motion to stay the injunction pending appeal is not the proper procedural mechanism for seeking relief from the scope of an injunction. In the cases Defendants cite where district courts "narrowed the scope of their injunctions," Mot. 10, Defendants had not yet filed a notice of appeal and jurisdiction over the injunctions remained with the district court. Here, where a notice of appeal was filed months ago and briefing is well under way, the proper method for seeking to modify the preliminary injunction is for Defendants to file a motion pursuant to Federal Rule of Civil Procedure 62.1 seeking an indicative ruling from the Court. *See CASA, Inc. v. Trump*, No. CV DLB-25-201, 2025 WL 1952521, at *1 (D. Md. July 16, 2025) (issuing indicative ruling). Defendants would then file a motion with the Fourth Circuit pursuant to Federal Rule of Appellate Procedure 12.1(b) seeking a limited remand to this Court. *See CASA, Inc. v. Trump*, No. 25-1153, 2025 WL 2141296, at *1 (4th Cir. July 29, 2025) (remanding case to district court for modification of injunction).

A motion for an indicative ruling would provide the parties an opportunity to fully brief the issues and allow the Court to make any necessary supplemental findings of fact with respect to how broad an injunction is necessary to provide complete relief. If, however, the Court is inclined to grant a stay of the injunction, Plaintiffs request a 21-day period before the stay is

instituted to allow Plaintiffs to explore other avenues for seeking nationwide relief without a disruption in care. *Cf. CASA*, 2025 WL 1952521, at *1 (issuing indicative ruling that the court would issue a modified preliminary injunction on behalf of a putative nationwide class).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' belated motion to stay pending appeal.

Dated: August 15, 2025

Respectfully submitted,

Joshua Block*
Harper Seldin*
Chase Strangio*
Alexandra R. Johnson*
**American Civil Liberties Union**
  **Foundation**
125 Broad Street, Floor 18
New York, NY 10004
Telephone: (212) 549-2500
Facsimile: (212) 549-2650
jblock@aclu.org
hseldin@aclu.org
cstrangio@aclu.org
a.johnson@aclu.org

Deborah A. Jeon (Fed. Bar No. 06905)
Zoe M. Ginsberg (Fed. Bar No. 30727)
**American Civil Liberties Union**
  **Foundation of Maryland**
3600 Clipper Mill Road, Suite 200
Baltimore, MD 21211
Telephone: (410) 889-8555
Facsimile: (410) 366-7838
jeon@aclu-md.org
zginsberg@aclu-md.org

Catherine E. Stetson (Fed. Bar No. 31517)
Danielle Desaulniers Stempel (Fed. Bar No. 20501)
Sam H. Zwingli*
**Hogan Lovells US LLP**
555 13th Street, N.W.
Washington, D.C. 20004

*/s/ Omar Gonzalez-Pagan*

Omar Gonzalez-Pagan (Fed. Bar. No. 31739)
Jennifer C. Pizer*
**Lambda Legal Defense**
  **and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
Facsimile: (855) 535-2236
ogonzalez-pagan@lambdalegal.org
jpizer@lambdalegal.org

Karen L. Loewy*
**Lambda Legal Defense**
  **and Education Fund, Inc.**
815 16th Street NW, Suite 4140
Washington, DC 20006
Telephone: (202) 804-6245
Facsimile: (855) 535-2236
kloewy@lambdalegal.org

Nora Huppert*
**Lambda Legal Defense**
  **and Education Fund, Inc.**
3656 N. Halsted Street
Chicago, IL 60613
Telephone: (312) 605-3233
Facsimile: (855) 535-2236
nhuppert@lambdalegal.org

Jackson B. Skeen*

Telephone: (202) 637-5491
Facsimile: (202) 637-5910
cate.stetson@hoganlovells.com
danielle.stempel@hoganlovells.com
sam.zwingli@hoganlovells.com

**Hogan Lovells US LLP**
125 High Street
Suite 2010
Boston, MA 02110
Telephone: (617) 702-7747
Facsimile: (617) 371-1037
jackson.skeen@hoganlovells.com

*Attorneys for Plaintiffs*

*\*Admitted pro hac vice.*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed using the Court's

CM/ECF system. Service was effected by and through the Court's CM/ECF system.


Dated: August 15, 2025                                  */s/ Omar Gonzalez-Pagan*
                                                        Omar Gonzalez-Pagan