**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| PFLAG, INC., *et al.*, <br><br>                   *Plaintiffs*, <br><br>     v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br>                 *Defendants*. | Civil Action No. 8:25-cv-337-BAH |

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL

## INTRODUCTION

Three Supreme Court decisions issued since this Court entered a nationwide preliminary injunction demonstrate that Defendants are likely to prevail on the merits of their appeal. Plaintiffs' opposition does not show otherwise. The Court, therefore, should stay its injunction pending appeal.

## ARGUMENT

### I.    Defendants Are Likely To Prevail On The Merits Of Their Appeal.

#### A.    *The Executive Orders comport with separation of powers principles.*

In *Trump v. American Federation of Government Employees*, 145 S. Ct. 2635 (2025) ("*AFGE*"), the Supreme Court stayed a preliminary injunction against enforcement of an executive order directing agencies to undertake actions "consistent with applicable law," where the district court's decision was not based on "any assessment" of specific agency action taken in response to the executive order. This Court made the same error in adjudicating Plaintiffs' separation of powers claim. Plaintiffs contend *AFGE* is distinguishable, but their arguments lack merit.

Plaintiffs accuse Defendants of "attempt[ing] to shift focus away from the President's authority" and instead focusing on "agency authority." Pls.' Mem. in Opp'n to Defs.' Mot. ("Opp."), at 8, ECF No. 155. But that follows from the Supreme Court's decision in *AFGE*, which stayed an injunction that was similarly premised on the district court's "view about the illegality of the Executive Order and Memorandum, not on any assessment of the [agency] plans themselves," *AFGE*, 145 S. Ct. at 2635; *see id.* (Sotomayor, J., concurring in the grant of stay). Moreover, Plaintiffs themselves hinge their argument on agency authority, arguing that the Executive Orders ("EOs") are unlawful because they purportedly "command agencies to take actions that simply cannot be accomplished 'consistent with applicable law[.]'" Opp. at 9; *see also id.* at 2 ("There is no way to lawfully implement those unlawful directives."). In any event, no

1

matter the focus, Defendants are likely to prevail on the merits of their appeal of the separation of powers claim.

Start with the President's authority. The President issued the EOs as an exercise of his authority to supervise and direct the actions of his subordinates in the Executive Branch. *See* U.S. Const. Art. II, § 1, Cl. 1., and §. 3. The Constitution provides that the "executive [p]ower shall be vested in a President of the United States of America," U.S. Const. art. II, § 1, cl. 1, who "shall take [c]are that the [l]aws be faithfully executed," *id*. § 3. The President's constitutional authority under these provisions necessarily encompasses "general administrative control of those executing the laws," *Myers v. United States*, 272 U.S. 52, 164 (1926), throughout the Executive Branch. As the Supreme Court explained long ago:

> The ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act ….

*Id*. at 135; *see also Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1339 (4th Cir. 1995) (recognizing "the President's general constitutional powers to direct the exercise of powers statutorily delegated to executive branch officials"); *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[The President's] faithful execution of the laws enacted by the Congress … ordinarily allows and frequently requires the President to provide guidance and supervision to his subordinates.").

That is precisely what the Defending Women EO and the Protecting Children EO do. Invoking the authority vested in the President "by the Constitution and the laws of the United States of America," the Executive Orders direct federal agencies to exercise what discretion they have under existing law to avoid funding "gender ideology" or "gender affirming care." *See* Exec. Order 14,168, *Defending Women From Gender Ideology Extremism and Restoring Biological*

2

*Truth to the Federal Government* § 3(e), (g), 90 Fed. Reg. 8615 (Jan. 20, 2025) ("Defending Women EO"); Exec. Order 14,187, *Protecting Children From Chemical and Surgical Mutilation,* § 4, 90 Fed. Reg. 8771 (Jan. 28, 2025) ("Protecting Children EO").

Switching tack, Plaintiffs assert that "no provision in any" statute authorizes agencies to impose grant conditions requiring medical institutions to refrain from providing "gender-affirming care" to minors. Opp. at 9. But that argument rests on mistakes regarding both the scope of agencies' statutory authority and Plaintiffs' burden on a facial, *ultra vires* challenge. Plaintiffs must show that *no* agency could take *any* hypothetical action to carry out the policies of the challenged EOs that is even plausibly within its statutory and constitutional authority. *See Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1775–76 (2025); *Reno v. Flores*, 507 U.S. 292, 301 (1993). The mere absence of a statute that *affirmatively* requires medical institutions to refrain from providing sex transition interventions for children under age 19 does not speak to the relevant question, which is whether agencies have discretion to implement the EOs within the limits Congress *has* established. They do.

One example is illustrative: the Public Health Service Act, 42 U.S.C. § 241 *et seq.*, confers broad authority on the Secretary of Health and Human Services to fund research and to award research grants for various purposes. *See, e.g.*, 42 U.S.C. § 241(a), (a)(3), (b)(1), (b)(3), (c); *id.* § 247b; *id.* § 284(b)(2); *id.* §§ 300u-1, 300u-2, 300u-3. These include grants to universities, hospitals, laboratories, and other public or private institutions for research projects relating to human physical and mental diseases. *Id.* §§ 241(a), (a)(3), 284(b)(2). The Secretary may also make grants to States and other public entities to assist them with the costs of establishing and maintaining preventive health service programs, *id.* § 247b(a), and to States and other public and

nonprofit private entities for research, public education, and training of healthcare professionals in the prevention and control of diseases, *id.* § 247b(k).

While these programs are subject to some restrictions from Congress—such as that projects funded under § 241(a)(3) must be "recommended by the advisory council"—none of these statutory authorities contains any affirmative requirement that grants be used to fund sex transition interventions for children under age 19. Consequently, an agency's implementation of the EOs' directives to avoid funding these particular research activities would not conflict with these statutory grant authorizations.

And more generally, HHS regulations have long recognized that grant terms may "include statutory, *executive order*, other Presidential directive, or regulatory requirements that apply by specific reference and are not program-specific." 45 C.F.R. § 75.210(b)(1)(ii) (emphasis added); *see also id.* § 75.300(a); *Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) (upholding agency's funding policies based on executive order and within congressional limits). *see also Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("The allocation of funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as committed to agency discretion" by law as "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."); *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (noting while Congress may directly "attach conditions on the receipt of federal funds," it may equally delegate that power to the Executive Branch, conditioning receipt of funds "upon compliance by the recipient with federal . . . administrative directives.") (citation omitted).

As these points illustrate, federal agencies have broad discretion, within the limits Congress has established, to determine priorities for federal funds or to take other discretionary steps with

respect to funding, and the President may direct them to exercise that discretion in a particular way.  None of this offends the separation of powers.

Plaintiffs also attempt to distinguish *AFGE* on the ground that the EOs here "had an immediate effect, separate and apart from any subsequent agency action."  Opp. at 9.  But that ignores what the EOs say.  They do not immediately cut off funds.  Rather, like the executive order in *AFGE*, they direct agencies to "immediately take *appropriate steps* to ensure" that funds do not go to certain activities, Protecting Children EO § 4 (emphasis added)—with "appropriate" defined in reference to the "applicable law" emphasized earlier in the same sentence, *id. Accord* Defending Women EO § 3(e).  The EOs are not self-executing and do not themselves terminate or condition any grant, but rather task agencies with determining in the first instance the extent to which their statutory grant authorities allow the imposition of conditions or prioritization of funded activities consistent with the policies in the EOs.

Thus, contrary to Plaintiffs' claim, agencies can "simultaneously comply with federal law and implement the [challenged EOs]."  Opp. at 10.  *AFGE* makes clear that the EOs' direction that agencies follow the law cannot be treated as merely theoretical.  Rather, "if an executive agency … may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law."  *See also Allbaugh,* 295 F.3d at 33.  Agencies should be afforded the presumption that they will act consistent with applicable law.  And, of course, nothing precludes Plaintiffs from suing over concrete, allegedly illegal actions.

### B.    *Plaintiffs' discrimination claims fail under* Skrmetti*.*

The Supreme Court's decision in *United States v. Skrmetti*, 605 U.S. ----, 145 S. Ct. 1816 (2025), forecloses Plaintiffs' constitutional and statutory discrimination claims.  In *Skrmetti*, the

Supreme Court held that a Tennessee law addressing the same sex transition interventions on minors as the challenged EOs did not classify based on sex or transgender status and satisfied rational basis review. With respect to their constitutional claim, Plaintiffs do not dispute that the EOs do not classify based on sex and would satisfy rational basis review under *Skrmetti*. They instead claim the EOs are subject to heightened scrutiny because, notwithstanding their similarity to the Tennessee law, they classify based on transgender status and are a pretext for discrimination against transgender-identifying individuals. As to their statutory claims, Plaintiffs assert that sex discrimination means something different under the relevant statutes than under the Constitution. These arguments fail.

First, Plaintiffs half-heartedly claim the EOs classify based on transgender status notwithstanding *Skrmetti*. Opp. at 11-12. According to Plaintiffs, the EOs "do not merely regulate a medical procedure; they also seek to 'regulate[] a class of *persons* identified on the basis of a specified characteristic," "namely, that transgender people have a gender identity that differs from their sex at birth." *Id*. at 11-12 (quoting *Skrmetti*, 145 S. Ct. at 1834 n.3). But the Supreme Court rejected this same reasoning in *Skrmetti* because it "contort[s] the meaning of the term 'medical treatment'" by ignoring "the underlying medical concern the treatment is intended to address." 145 S. Ct. at 1830. The use of hormones to align a person's physical appearance with an identity that differs from his or her sex—i.e., a "sex transition" intervention—is not the same medical treatment as the use of hormones to treat, for example, a congenital defect or other disease. *Id*. at 1830–31. The Protecting Children EO's coverage of the former but not the latter does not turn on transgender status (or sex); rather, it is based on medical use. *Id*. at 1831.

Section 3(g) of the Defending Women EO likewise does not draw lines based on anyone's status. The Court regarded the Defending Women EO as "slightly vaguer" than the Protecting

Children EO, but even so it interpreted the Defending Women EO "as doing exactly what Section 4 of the [Protecting Children EO] does—cease funding institutions, including medical institutions, that provide gender-affirming medical care to patients under the age of nineteen," emphasizing "that Plaintiffs only seek a preliminary injunction enjoining … Section 3(g) of the [Defending Women EO] to the extent it conditions funding on whether a medical institution provides gender-affirming medical care for those under nineteen." Mem. Op. at 49-50, ECF No. 115. Insofar as this Court understood the two EOs to be identical in this respect, there is no basis for subjecting the Defending Women EO to a different level of scrutiny or reaching any different result.

Nor do the EOs classify based on transgender status by "targeting those who 'transition,'" where "only transgender people undergo 'transition.'" Opp. at 12 n.5 (citation omitted). The Supreme Court rejected this argument in *Skrmetti* too. 145 S. Ct. at 1832–33. Specifically, the Court concluded that the Tennessee law's prohibition on medical interventions for gender dysphoria, gender identity disorder, and gender incongruence did not discriminate against trans-identifying individuals because "there is a 'lack of identity' between transgender status and the excluded medical diagnoses," given that some but not all trans-identifying individuals might seek the excluded interventions. *Id*. at 1833. The same reasoning applies here.

Second, Plaintiffs contend that even if the EOs are facially neutral, they are still subject to heightened scrutiny because they are animated by discriminatory animus against transgender-identifying individuals. Opp. at 12-15. But Plaintiffs cannot make the required showing that the EOs are "inexplicable by anything but animus," particularly after *Skrmetti*. *Trump v. Hawaii*, 585 U.S. 667, 706 (2018) (citation omitted); *see also Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253 (2022) ("This Court has long disfavored arguments based on alleged legislative motives."). *Skrmetti* recognized the substantial "medical and scientific uncertainty" surrounding

7

these interventions and acknowledged that "open questions regarding basic factual issues" remain. *Skrmetti*, 145 S. Ct. at 1836-37. The EOs are motivated by the same concerns with sex transition interventions for children that supported the Tennessee law banning them outright, including protecting vulnerable children from interventions that "are experimental, can lead to later regret, and are associated with harmful and sometimes irreversible risks." *Id*. at 1832. *Compare id*., *with* Protecting Children EO § 1 ("Policy and Purpose"). Their purpose is to protect the health and welfare of all children, regardless of sex or transgender status, which the Court in *Skrmetti* held does not evince sex stereotyping and was a legitimate government interest. *Skrmetti,* 145 S. Ct. at 1832.

Instead of focusing on the executive order provisions challenged here, Plaintiffs attempt to show animus by pointing to unchallenged provisions of the Defending Women EO and other unchallenged executive orders. Opp. at 14-15. But Plaintiffs cite no authority for the proposition that other provisions or orders issued by the President—not before the Court in this case—can or should shed meaningful light on the purposes of the provisions challenged here, and such speculative theories conflict with the Supreme Court's reluctance to engage in wide-ranging motive-based inquiries. *See Dobbs*, 597 U.S. at 253.

Finally, as to their statutory discrimination claims, Plaintiffs argue that the Pregnancy Discrimination Act forecloses application of the Supreme Court's reasoning in *Skrmetti* to claims of sex discrimination under Section 1557 of the Affordable Care Act ("ACA") and Section 1908 of the Public Health Service Act ("PHSA"). Opp. at 16-20. Congress enacted the Pregnancy Discrimination Act in 1978 to amend the definition of sex discrimination under Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e(k). The Pregnancy Discrimination Act provides that the definition of sex discrimination in Title VII includes discrimination "because of or on the

basis of pregnancy, childbirth, or related medical conditions[.]" *Id*.  According to Plaintiffs, the Supreme Court relied on *Geduldig v. Aiello*, 417 U.S. 484 (1974) to conclude that the Tennessee law in *Skrmetti* classified based on medical use and age, not sex, but Congress's enactment of the Pregnancy Discrimination Act after *Geduldig* purportedly establishes that "statutory prohibitions on sex discrimination [like those in Sections 1557 and 1908] include medical conditions that classify based on sex."  Opp. at 17.  Plaintiffs' leap of logic is doubly flawed.

As an initial matter, the Supreme Court did not rely on *Geduldig* in concluding that the Tennessee law at issue in *Skrmetti* did not classify based on sex.  It discussed *Geduldig* only in the context of considering whether the law discriminated based on transgender status.  *See Skrmetti*, 145 S. Ct. at 1832-33.  As to purported classification based on sex, the Court rejected the argument that the Tennessee law's application turns on sex by "prohibit[ing] certain treatments for minors of one sex while allowing those same treatments for minors of the opposite sex."  *Id*. at 1830.  The Court explained that such an argument "contort[s] the meaning of the term 'medical treatment'" by omitting "the underlying medical concern the treatment is intended to address"—under the Tennessee law, "*no* minor may be administered puberty blockers or hormones to treat gender dysphoria, gender identity disorder, or gender incongruence[,]" and "minors of *any* sex may be administered puberty blockers or hormones for other purposes."  *Id*. at 1830–31.  The same is true of the EOs challenged here.  They single out the use of puberty blockers, cross-sex hormones, and surgeries for certain *medical uses* or purposes, regardless of an individual's sex.  Thus, even if *Geduldig*'s reasoning were not applicable to statutory sex discrimination claims, this Court need not rely on it to reach the straightforward conclusion that the EOs do not classify based on sex.

Furthermore, this case has nothing to do with pregnancy or the Pregnancy Discrimination Act.  Even assuming the prohibitions on sex discrimination in Sections 1557 and 1908 are read to

cover pregnancy discrimination (despite their failure to incorporate or reference the definition of sex discrimination in Title VII as amended by the Pregnancy Discrimination Act), sex transition interventions for children under age 19 are distinct from medical care related to pregnancy. While only females can become pregnant, both males and females may be administered puberty blockers or hormones to treat gender dysphoria, gender identity disorder, or gender incongruence. Thus, unlike laws that classify based on pregnancy, which impact only (some) females, the EOs (and the Tennessee law in *Skrmetti*) treat minors of both sexes the same—they cannot receive the specified interventions for some medical uses but can receive them for other medical purposes. Under *Skrmetti*, that is not sex discrimination, period—regardless of whether discrimination is alleged under the Equal Protection Clause or Sections 1557 and 1908.[1]

### C.    *CASA forecloses sweeping universal relief.*

The Court's nationwide injunction cannot stand under *CASA*, which confirmed that equitable relief is limited to providing at most complete "relief *between the parties*." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2557 (2025) ("*CASA*") (citation omitted). In attempting to defend the nationwide injunction, Plaintiffs concede that it provides relief beyond the parties and that such relief is not merely "incidental[]." Opp. at 21. Rather, that is its purpose, *i.e.*, "to counteract the *in terrorem* effect of the Executive Orders and reassure medical providers [not before the Court] that it is safe to continue providing care without the risk of suddenly losing all their federal funding." *Id.* at 22. This admission is fatal to Plaintiffs' defense of the injunction's scope, because

---

[1] *L.B. v. Premera Blue Cross*, No. 2:23-cv-00953-TSZ, 2025 WL 2326966 (W.D. Wash. Aug. 12, 2025), on which Plaintiffs rely, is distinguishable for the same reasons. There, the court determined "Premera's medical policies" discriminated based on sex in violation of Section 1557 because they "offer[ed] insurance coverage for one sex and not the other." *Id.* at *2-3. In contrast, the court noted, the Tennessee law in *Skrmetti* (like the EOs challenged here) "applies to all minors regardless of sex." *Id.* at *2.

that's exactly what *CASA* prohibits: "the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." 145 S. Ct. at 2557.

Plaintiffs' administrability concerns do not expand Article III jurisdiction. In any event, Plaintiffs do not explain why an injunction that extends to only grant recipients that provide services to the named Plaintiffs and association members who have demonstrated standing is not workable.[2] Plaintiffs may want to absolve themselves and the Court of the obligation to establish standing before members obtain relief, Opp. at 23, but that is their burden—and the Court's role. Basic principles of equity require that an enjoined defendant must know against whom it must refrain from acting. *See* Fed. R. Civ. P. 65(d). The associations here cannot forgo pleading or joining specific claims or available class-action procedures for litigating those claims; assert that they have large, dispersed, and anonymous memberships; claim only an unidentified fraction have standing; and still demand injunctive relief for all members (and everyone else). That exceeds the traditional bounds of equity and, hence, the Court's authority to provide equitable relief.

Finally, although Defendants could have moved for an indicative ruling under Federal Rule of Civil Procedure 62, they were not required to do so to obtain the relief they seek here—a stay of the injunction pending appeal. Indeed, *CASA* itself involved the exact procedure Defendants invoke here. 145 S. Ct. at 2549; *see, e.g.* Defs.' Mot. to Stay Inj. Pending Appeal, *CASA, Inc., et al., v. Trump, et al.*, No. 8:25-cv-201-DLB (D. Md. Feb. 11, 2025), ECF No. 70; *see also* Fed. R. App. P. 8(a)(1)(A).[3]

---

[2] Contrary to Plaintiffs' assertion (Opp. at 24), Defendants have never suggested that grant recipients protected by any injunction would "retain federal funding as to the named Plaintiffs and [members]" but lose it as to other patients.

[3] Plaintiffs request that the Court delay any stay of the injunction for a period of 21-days should be denied, as Plaintiffs cite no rule authorizing that relief.

## II.    THE REMAINING STAY FACTORS FAVOR DEFENDANTS.

Plaintiffs overstate their alleged harms while ignoring the substantial and irreparable harms imposed on Defendants.  Blocking the Executive Branch from pursuing policy objectives, consistent with applicable law, especially in areas implicating child welfare, intrudes on the President's constitutional authority and inflicts institutional harm. *INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers). Moreover, the Court's overbroad injunction imposes an additional, distinct harm.  As the Supreme Court explained in *CASA*, "the Government is likely to suffer irreparable harm from the District Courts' entry of injunctions that likely exceed the authority conferred by the Judiciary Act."  145 S. Ct. at 2562.  In other words, the sheer "improper[] intru[sion]" on the Executive's power to "enforc[e] its policies against nonparties" amounts to irreparable harm.  *Id*. at 2561 (quotation marks and citation omitted).

Plaintiffs' concerns over Defendants' purported delay in filing this stay motion (Opp. at 1, 4-6) do not undermine this showing of irreparable harm.  Defendants timely filed their stay motion several weeks after three intervening Supreme Court decisions clearly established that this Court's injunction was entered in error.  Defendants were not required to sit idly by, continuing to suffer irreparable harm under the injunction, when subsequent binding precedent from the Supreme Court established their right to relief from the Court's order.  Nor have Defendants waived their right to seek such relief.  The parties' joint motion for a limited stay of district court proceedings was not conditioned on any such waiver.  *See* ECF No. 136.  In March 2025, counsel for Defendants represented to Plaintiffs that, "we understand that DOJ is not planning to seek a stay of the [preliminary injunction] *as things currently stand*."  *See* Exhibit A-1 at 2, ECF No. 155-2 (emphasis added).  In light of the recent Supreme Court decisions relied on in this motion, things have undoubtedly changed.

## CONCLUSION

The Court should grant Defendants' Motion to Stay the Preliminary Injunction Pending Appeal.

Dated: August 28, 2025                    Respectfully submitted,

                                          BRETT A. SHUMATE
                                          Assistant Attorney General

                                          MICHELLE BENNETT
                                          Assistant Branch Director

                                          */s/ Robert C. Bombard*
                                          ROBERT C. BOMBARD
                                          Trial Attorney
                                          United States Department of Justice
                                          Civil Division, Federal Programs Branch
                                          1100 L Street NW
                                          Washington, DC 20530
                                          Tel.: (202) 616-0773
                                          robert.bombard2@usdoj.gov
                                          *Counsel for Defendants*